Charles S. Sims
Adam D. Siegartel
Proskauer Rose LLP
1585 Broadway
New York, New York 10036
Tel: 212.969.3000
Fax: 212.969.2900
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL G. PORTO (a.k.a. GUY MICHAELS)

                    Plaintiff,

                    v.

STEPHEN ADLY GUIRGIS, LABYRINTH
THEATER COMPANY, PHILIP SEYMOUR
HOFFMAN, FABER AND FABER, INC., AND
DRAMATISTS PLAY SERVICE, INC.,

                    Defendants.

---

Civil Action No. 08 Civ. 1228 (LTS)(GWG)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT,
AND FOR AN AWARD OF COSTS AND ATTORNEYS' FEES UNDER 17 U.S.C. § 505**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ...................................................................................3

    Plaintiff's Amended Complaint..................................................................3

    The Independent Creation of *The Last Days of Judas Iscariot* ............5

    The Parties' Works ....................................................................................5

ARGUMENT ........................................................................................................7

POINT I: SUMMARY JUDGMENT IS REQUIRED IN COPYRIGHT
INFRINGEMENT CASES WHEN THE PARTIES' WORKS ARE NOT
SUBSTANTIALLY SIMILAR IN PROTECTABLE EXPRESSION............................7

    A.  Where Appropriate, Dismissal As A Matter of Law Is Common And
        Favored ...........................................................................................7

    B.  Substantial Similarity Is Determined From The Ordinary Observer's
        Perspective......................................................................................8

    C.  Only Protectable Expression Is Relevant When Determining
        Substantial Similarity – Historical Facts, Ideas, *Scenes à Faire*, Stock
        Elements, And The Like Should Be Excluded ................................9

POINT II: THE LAST DAYS OF JUDAS ISCARIOT DOES NOT INFRINGE THE
COPYRIGHTABLE EXPRESSION WITHIN JUDAS ON APPEAL .........................12

    A.  Plaintiff's Alleged Similarities ...................................................13

    B.  Additional Fundamental Differences Between The Parties' Works...............18

        Narrative And Story Structure.........................................18

        Setting...............................................................................19

        Plot....................................................................................20

        Language ...........................................................................23

        Defendants' Play ..............................................................23

        Plaintiff's Novel...............................................................25

        Theme................................................................................27

i

Characters, Including Court Figures And Witnesses ............................29

Overall Thrust, Mood, And Feel ..........................................................31

POINT III: DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONTRIBUTORY AND VICARIOUS INFRINGEMENT CLAIMS ...............31

POINT IV: DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S COMMON LAW UNFAIR COMPETITION CLAIM.........................................32

POINT V: DEFENDANTS ARE ENTITLED TO REASONABLE ATTORNEYS' FEES   AND COSTS UNDER 17 U.S.C. § 505 ...........................................................33

CONCLUSION...................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adsani v. Miller,*
    No. 94 Civ. 9131, 1996 WL 194326 (S.D.N.Y. April 22, 1996)..............................12

*American Direct Marketing, Inc. v. Azad Intern., Inc.,*
    783 F. Supp. 84 (E.D.N.Y. 1992) ..........................................................................10

*Arden v. Columbia Pictures Indus., Inc.,*
    908 F. Supp. at 1258 (S.D.N.Y. 1995).............................................................8, 9, 12

*Ariel(UK) Ltd. v. Reuters Group PLC,*
    No. 05 Civ. 9646 (JFK), 2006 U.S. Dist. LEXIS 79319 (S.D.N.Y. Oct. 30, 2006) ...............31

*Bell v. Blaze Magazine,*
    No. 99 Civ. 12342 (RCC), 2001 U.S. Dist. LEXIS 2783 (S.D.N.Y. March 16, 2001) .......7, 12

*Boyle v. Stephens, Inc.,*
    No. 97 Civ. 1351, 1998 U.S. Dist. LEXIS 1968 (S.D.N.Y. Feb. 23, 1998) .............................8

*Brown v. Perdue,*
    No. 04 Civ. 7417 (GBD), 2005 U.S. Dist. LEXIS 15885 (S.D.N.Y. Aug. 4, 2005) ...........9, 10

*Brown v. Perdue,*
    177 Fed. Appx. 121 (2d Cir. 2006) .........................................................................9

*CBS Broadcasting Inc. v. ABC, Inc.,*
    No. 02 Civ. 8813 (LAP), 2003 U.S. Dist. LEXIS 20258 (S.D.N.Y. Jan. 14, 2003)...............11

*Chivalry Film Prods. v. NBC Universal,*
    No. 05 Civ. 5627 (GEL), 2007 U.S. Dist. LEXIS 86889 (S.D.N.Y. Nov. 27, 2007)........33, 34

*Davis v. United Artists, Inc.,*
    547 F. Supp. at 724 n.9 (S.D.N.Y. 1982)................................................................8

*DeBitetto v. Alpha Books,*
    7 F. Supp. 2d 330 (S.D.N.Y. 1998) .......................................................................8

*Dellar v. Samuel Goldwyn, Inc.,*
    150 F.2d 612 (2d Cir. 1945)..................................................................................2

*Denker v. Uhry,*
    820 F. Supp. 722 (S.D.N.Y. 1992) .......................................................................12

*Faulkner v. Nat'l Geographic Soc'y,*
    409 F.3d 26 (2d. Cir. 2005)..................................................................................31

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.,*
    25 F.3d 119 (2d Cir. 1994)......................................................................................9, 11

*Flaherty v. Filardi,*
    388 F. Supp. 2d 274 (S.D.N.Y. 2005).......................................................8, 9, 12, 32

*Flaherty v. Filardi,*
    No. 03 Civ. 2167 (LTS) (HBP), 2007 U.S. Dist. LEXIS 69202 (Sept. 19, 2007)..................32

*Green v. Lindsey,*
    885 F. Supp. 469 (S.D.N.Y. 1992) ......................................................................12

*Kregos v. Associated Press,*
    3 F.3d 656 (2d Cir. 1993)................................................................................32

*Kretschmer v. Warner Bros.,*
    No. 93 Civ. 1730, 1994 WL 259814 (S.D.N.Y. June 8, 1994)..............................12

*Laureyssens v. Idea Group, Inc.,*
    964 F.2d 131 (2d Cir. 1992).................................................................................9

*Littel v. Twentieth Century Fox,*
    No. 89 Civ. 8526, 1995 WL 404939 (S.D.N.Y. July 7, 1995), *aff'd., sub nom*
    *DeStefano v. Tweentieth Century Fox Film Corp.*
    100 F.3d 943 (2d Cir. 1996)................................................................................12

*Lynx Ventures, LLC v. Miller,*
    45 Fed. Appx. 68 (2d Cir. 2002) ...........................................................................8

*Mallery v. NBC Universal, Inc.,*
    No. 07 CV 2250 (DLC), 2007 U.S. Dist. LEXIS 88960 (S.D.N.Y. Dec. 3, 2007) .......8, 11, 12

*Mallery v. NBC Universal, Inc.,*
    No. 07 Civ. 2250 (DLC), 2008 U.S. Dist. LEXIS 20893 (S.D.N.Y. March 18, 2008) .....33, 34

*New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc.,*
    497 F.3d 109 (2d Cir. 2007).................................................................................10

*Oliveira v. Frito-Lay, Inc.,*
    No. 96 Civ. 9289, 1997 U.S. Dist. LEXIS 8299 (S.D.N.Y. June 13, 1997)..............................8

*Orange County Choppers, Inc. v. Olaes Enters., Inc.,*
    497 F. Supp. 2d 541 (S.D.N.Y. 2007)................................................................33

*Pavlica v. Behr,*
    397 F. Supp. 2d 519 (S.D.N.Y. 2005)................................................................31

*Polsby v. St. Martin's Press, Inc.*,
  8 Fed Appx. 90 (2d Cir. 2001) .................................................................8

*Reyher v. Children's Television Workshop*,
  533 F.2d 87 (2d Cir. 1976) ...................................................................11

*Rogers v. Koons*,
  960 F.2d 301 (2d Cir. 1992) ..................................................................11

*Screenlife Establishment v. Tower Video, Inc.*,
  868 F. Supp. 47 (S.D.N.Y. 1994) ...........................................................33

*Silverstein v. Penguin Putnam, Inc.*,
  522 F. Supp. 2d 579 (S.D.N.Y. 2007) ......................................................33

*Tabachnik v. Dorsey*,
  257 Fed. Appx. 409 (2d Cir. 2007) ..........................................................10

*Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*,
  996 F.2d 1366 (2d Cir. 1993) ...................................................................9

*Walker v. Time Life Films, Inc.*,
  784 F.2d 44 (2d Cir. 1986) .................................................................7, 8

*Warner Bros., Inc. v. American Broadcasting Companies*,
  654 F.2d 204 (2d Cir. 1981) ("Warner Bros. I") .......................................10

*Warner Bros., Inc. v. American Broadcasting Companies*,
  720 F.2d 241 (2d Cir. 1981) ("Warner Bros. II") ......................................11

*Williams v. Crichton*,
  860 F. Supp. 158 (S.D.N.Y. 1994) ........................................................7, 34

*Williams v. Crichton*,
  891 F. Supp. 120 (S.D.N.Y. 1994), *aff'd.* 84 F.3d 581 (2d Cir. 1996) ...............7, 9, 10, 11, 34


**STATUTES**

17 U.S.C. § 505 ...........................................................................1, 2, 33, 34


**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6) ...................................................................1, 7, 8

Fed. R. Civ. P. 56 ..........................................................................1, 7, 8

## PRELIMINARY STATEMENT

Defendants Stephen Adly Guirgis, Philip Seymour Hoffman, LAByrinth Theater Company, Faber and Faber, Inc., and Dramatists Play Service, Inc. (collectively, "defendants") respectfully submit this Memorandum of Law in support of their motion pursuant to Rules 12(b)(6) and 56, Fed. R. Civ. P., to dismiss or in the alternative for summary judgment. This brief is also submitted in support of defendants' motion for an award of costs and attorneys' fees under 17 U.S.C. § 505.

Plaintiff's complaint alleges that *The Last Days of Judas Iscariot*, written by the distinguished playwright Stephen Adly Guirgis (and produced, directed, and published by the remaining defendants), infringes the copyright in plaintiff's novel *Judas on Appeal*. The court, however, need only read plaintiff's novel and defendants' script in order to have all of the information it needs to conclude that no factfinder could find that the Guirgis play is substantially similar in copyrightable expression to plaintiff's novel. The fundamental differences and lack of any similarity in expression go to the very heart of each work, and encompass every meaningful variable that can be used to compare creative texts, including story structure, narrative structure, language, plot, setting, theme, tone, mood, and, consequently, overall thrust and feel.

To the extent that there are any similarities at all between the works, these concern only uncopyrightable elements that must be excluded from the substantial similarity inquiry, namely, ideas, well-established and commonly-accepted historical and Christian theological concepts, and plot elements and characters that are a direct result of both works incorporating a common unprotectable idea, namely, a trial of Judas Iscariot that concerns Judas' alleged betrayal and Jesus' final days. Accordingly, defendants move to dismiss upon the single ground that as a

matter of law, *The Last Days of Judas Iscariot* is not substantially similar in protectable expression to *Judas on Appeal*.

Plaintiff's claims for contributory copyright infringement and vicarious copyright infringement must be dismissed because in the absence of direct copyright infringement there can be no indirect infringement. Plaintiff's final claim for common law unfair competition is not only meritless but preempted by the Copyright Act.

Because plaintiff's claims are objectively unreasonable in light of the glaring differences between the parties' works, an award of defendants' attorneys' fees and costs is warranted under the Copyright Act's attorneys' fees provision, 17 U.S.C. § 505. Such an award is common in "substantial similarity" copyright cases, and the fundamental differences between the parties' works makes clear that this is *precisely* the kind of frivolous case in which such an award is warranted.

This case is one of many copyright suits in which isolated alleged similarities in a popular work and the hope of publicity or quick riches have led authors without public success to claim that actionable copying has occurred, "partly upon a wholly erroneous understanding of the extent of copyright protection; and partly upon that obsessive conviction, so frequent among authors and composers, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." *Dellar v. Samuel Goldwyn, Inc.*, 150 F.2d 612, 613 (2d Cir. 1945). Here, in his attempt to profit from the success of others, plaintiff has sued Stephen Adly Guirgis, a highly-regarded and well-known playwright, and also Philip Seymour Hoffman, an Academy Award-winning actor. For the reasons discussed herein, the court should dispose of this case quickly and efficiently, and grant defendants' motion in full.

2

**STATEMENT OF FACTS**

**Plaintiff's Amended Complaint (the "Complaint")**

Plaintiff Michael G. Porto (a/k/a Guy Michaels according to the Complaint) alleges that he resides in the Bronx and is the author of the novel *Judas on Appeal*. Compl. ¶1.[1] Plaintiff alleges that he wrote and self-published this novel in or about February 1999, and that he owns two United States copyright registrations covering the work. *Id.* ¶¶ 9, 11.

Plaintiff alleges that on approximately March 2, 2005 (approximately three years before plaintiff filed this complaint), defendants' play commenced live performances at The Public Theater in New York City. According to plaintiff, defendant Stephen Adly Guirgis wrote the play, defendant Philip Seymour Hoffman directed the play, and defendant LAByrinth Theater Company produced the play. Plaintiff alleges that the play was performed until approximately April 3, 2005 in New York City, and live performances occurred subsequently in other cities including Austin, Dallas, Boston, Chicago, Los Angeles, Philadelphia, Tucson, and Toronto (different producers). Plaintiff alleges that defendants Dramatists Play Service, Inc. and Faber and Faber, Inc. published defendants' script in book form beginning in approximately 2006.[2]

---

[1] Plaintiff's Amended Complaint (including exhibits) is attached to the Declaration of Adam Siegartel (the "Siegartel Decl.") as Exhibit 1.

[2] Throughout this Memorandum of Law, and because all defendants are covered by this dispositive motion, we refer to *The Last Days of Judas Iscariot* as "defendants' play." However, defendants reserve all rights with respect to the differing roles that each defendant played in connection with the writing, performing, and publishing of *The Last Days of Judas Iscariot*. The use of "defendants' play" is in no way meant to suggest that each defendant had an equal (or even actual) role in connection with the play, and this terminology is for the sake of convenience only in the context of this specific motion.

Plaintiff's allegations of substantial similarity – ¶¶21-26 of his Complaint – are based on the following:[3]

1. Each work is "a fictional account of a modern-day trial of Judas Iscariot to decide whether or not his soul should be allowed into heaven," and includes "a modern courtroom setting." *Id.* ¶¶21-22.

2. Among the many witnesses there are five witnesses who testify in both works, namely, Jesus, Peter, Caiaphas, Pontius Pilate, and Satan, and both works incorporate "a random combination of mythical and historical figures." *Id.* at ¶22.

3. Jesus forgives Judas at the end of both works. *Id.*

4. *Satan Similarities*: Satan wears a black tuxedo in plaintiff's book and a Gucci suit in defendants' play, and whereas in plaintiff's story Satan testifies that Judas was "easy" and that his soul was "handed to him on a silver platter," in defendants' play Satan testifies that he did not have to do anything to obtain Judas' soul and that "Judas was a gimme." *Id.* ¶23.

5. *Caiaphas Similarities*: Caiaphas testifies in both works that Jesus had blasphemed, that Caiaphas feared Roman reprisals, and that Caiaphas did not approach Judas about betraying Jesus. *Id.* ¶24.[4]

6. *Peter Similarity*: Peter testifies in plaintiff's novel that Jesus told Judas at the Last Supper, "what thou hast to do, do it quickly." Peter testifies in defendants' play that Jesus told Judas at the Last Supper, "do what you gotta do." *Id.* ¶25.

7. *Pontius Pilate Similarities*: Whereas in plaintiff's story Pilate refers to the killing of Jesus as "one less Jew," in defendants' play Pilate is asked if he considered Jesus to be "one more Jew." Plaintiff also alleges Pilate "disparages" Jews in both works. *Id.* ¶26.

Exhibit A to the Complaint is alleged to be a copy of *Judas on Appeal* as published, and

Exhibit E to the Complaint is alleged to be copies of *The Last Days of Judas Iscariot* as

published by defendants Faber and Faber and Dramatists Play Services.[5]

_____

[3] As discussed below, plaintiff mischaracterizes both parties' works in his attempt to allege similarities. Even if the complaint were accurate, however, these similarities are inadequate as a matter of law to support an allegation of substantial similarity.

[4] Plaintiff's Complaint alleges that Caiaphas testifies in both works that Judas (not Jesus) had blasphemed. We believe that this is an inadvertent mistake and accordingly the discussion below regarding this purported similarity proceeds under the assumption that plaintiff intended to write "Jesus blasphemed" and not "Judas blasphemed."

Plaintiff brings claims for (1) copyright infringement against Stephen Adly Guirgis (the playwright); (2) vicarious and contributory copyright infringement against LAByrinth Theater Company (the producer), Philip Seymour Hoffman (the director), and Dramatists Play Service, Inc. and Faber and Faber, Inc. (the publishers); and (3) common law unfair competition against all defendants.

**The Independent Creation of *The Last Days of Judas Iscariot***

While this motion is based entirely on a lack of any substantial similarity of copyrightable expression as a matter of law, we have submitted on the motion a declaration by the playwright Stephen Adly Guirgis attesting to his play's independent creation, lest the failure to do so be taken as a concession of copying. We do not further discuss that declaration's passages regarding independent creation, given the gravamen of the motion.

**The Parties' Works**

Point II in the Argument below features an in-depth discussion and comparison of the parties' works. This comparison includes detailed descriptions of each work's structure, setting, plot, language, theme, characters, tone, and overall mood and feel. It is thus unnecessary to include an extended discussion of the parties' works here, and just a brief description of the works is now presented.

Defendants' play, *The Last Days of Judas Iscariot*, is a two-act play with no narrator or central character who dominates the play's lines or stage time. Its action takes place in no

---

[5] The Faber and Faber publication includes introductory and afterword pages not included in the Dramatists Play Service publication, and the pagination of the two works is different. However, as explained in the Declaration of Stephen Adly Guirgis (the "Guirgis Decl."), the scripts included in both published versions appear to be either substantively or completely identical, and any differences between the published scripts are immaterial. Guirgis Decl. at ¶16. In this Memorandum of Law page cites to the published script are to the Faber and Faber version, which is also attached to the Guirgis Declaration as Exhibit 1. Plaintiff's novel *Judas on Appeal* that was attached as Exhibit A to plaintiff's Complaint is included within Exhibit 1 of the Siegartel Declaration, which includes plaintiff's Complaint in its entirety.

recognizable place.  In sharp contrast, plaintiff's 60-chapter novel *Judas on Appeal* features a

first-person narrator dictating the entire story, which takes place entirely in contemporary New

York City (the first-person protagonist is a news anchor named Michael Sarto who works at the

fictional New York City news station WCS).

Defendants' play goes back and forth in time via flashbacks; plaintiff's novel progresses

chronologically and linearly from start to finish without interruptions.  Plaintiff's novel also

employs a repetitive "everyday" structure, in which the narrator describes to the reader over and

over again his waking up in the morning, traveling to court, preparing his telecast, having lunch,

heading home at night, etc.  Such recurring elements are nowhere found in defendants' play, which

does not employ any repetitive structure, much less one tied to the progress of successive days.

Defendants' play is replete with crass, rough, urban, and profane language.  Plaintiff's

novel uses a completely different language – prosaic, pedestrian, and staid, fit for television.

Even those characters in defendants' play who do not employ crass, urban, or profane language

(for example, Mother Theresa), employ a unique, personalized, and distinctive dialect not at all

analogous to the pedestrian language employed in plaintiff's novel.

Finally, the plot and themes of the two works are fundamentally and starkly different, as

described below.[6]

---

[6] To assist the court in this matter, and keeping in mind that defendants here include the producer and director of the theatrical production of *The Last Days of Judas Iscariot*, defendants have submitted with this motion a DVD that includes large portions of a performance of defendants' play.  Siegartel Decl., Exh. 2 (this DVD has been filed under seal with plaintiff's counsel's consent).  Although defendants' play has been produced throughout the United States and in Canada and the United Kingdom as well, this DVD footage is from the production that was directed and produced by defendants in New York City.

**ARGUMENT**

**POINT I**

**SUMMARY JUDGMENT IS REQUIRED IN COPYRIGHT
INFRINGEMENT CASES WHEN THE PARTIES' WORKS ARE
NOT SUBSTANTIALLY SIMILAR IN PROTECTABLE EXPRESSION**

Defendants move to dismiss or in the alternative for summary judgment against the
copyright infringement claim on a single ground, namely, that *The Last Days of Judas Iscariot* is
not substantially similar in protectable expression to *Judas on Appeal*. This motion raises no
issues concerning access, actual copying, or the ownership or validity of plaintiff's purported
copyright registrations, as such issues are irrelevant to the substantial similarity determination.

**A.    Where Appropriate, Dismissal As A Matter of Law Is Common And Favored**

Lack of substantial similarity is a well-established ground for summary judgment, and
"[t]he determination of whether the parties' works are 'substantially similar' may be decided by
the court as a matter of law." *Bell v. Blaze Magazine,* No. 99 Civ. 12342 (RCC), 2001 U.S. Dist.
LEXIS 2783, at *8-9 (S.D.N.Y. Mar. 16, 2001). "If a court determines that no reasonable jury
could find that the works are substantially similar, or if it concludes that the similarities pertain
only to unprotected elements of the work, it is appropriate for the court to dismiss the action
because, as a matter of law, there is no copyright infringement." *Id.* (granting motion to dismiss
on substantial similarity grounds); *see also Williams v. Crichton,* 860 F. Supp. 158 (S.D.N.Y.
1994) (same), *aff'd,* 84 F.3d 581 (2d Cir. 1996); *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48
(2d Cir. 1986) (summary judgment appropriate when lack of substantial similarity between
protectable aspects is "so clear as to fall outside the range of disputed fact questions requiring
resolution").

Although early dismissal of copyright claims is often made under Rule 56, it may be
entered under Rule 12(b)(6) as well, when the relevant works are annexed to or referenced in the

7

complaint and the court can discern the absence of substantial similarity as a matter of law. *Mallery v. NBC Universal, Inc.*, No. 07 Civ. 2250 (DLC), 2007 U.S. Dist. LEXIS 88960, at \*23 (S.D.N.Y. Dec. 3, 2007) (granting defendants' pre-discovery motion based upon lack of substantial similarity; converting motion to dismiss to motion for summary judgment and holding that "[h]aving reviewed the works in question, no reasonable juror could find that they are substantially similar"); *Flaherty v. Filardi*, 388 F. Supp. 2d 274, 283, 291 (S.D.N.Y. 2005) (granting pre-discovery summary judgment motion on substantial similarity grounds; no discovery necessary because parties' completed works within evidence and substantial similarity may be resolved "solely by comparing" the parties' completed works) (Swain, J.); *DeBitetto v. Alpha Books,* 7 F. Supp. 2d 330 (S.D.N.Y. 1998) (granting motion to dismiss and for summary judgment).[7]

**B.     Substantial Similarity Is Determined From The Ordinary Observer's Perspective**

Courts customarily determine whether works are "substantially similar" by reading the works themselves.  *Walker*, 784 F.2d at 52; *Davis v. United Artists, Inc.*, 547 F. Supp. 722, 724 n.9 (S.D.N.Y. 1982); *Arden v. Columbia Pictures Indus.*, 908 F. Supp. 1248, 1258 (S.D.N.Y. 1995).  "In determining substantial similarity, the Court uses the 'ordinary observer' test.  The Court considers whether the average lay observer would recognize the challenged material as having been copied from the copyrighted work." *Flaherty*, 388 F. Supp. 2d at 286; *see also Lynx Ventures, LLC v. Miller*, 45 Fed. Appx. 68, 69 (2d Cir. 2002) ("The standard test in

---

[7] *See also Polsby v. St. Martin's Press, Inc.*, 8 Fed Appx. 90, 92 (2d Cir. 2001) (affirming pre-discovery grant of summary judgment on substantial similarity grounds; "discovery was not necessary for a comparison of the works in order to assess whether, as to the protectible elements, they were substantially similar"); *Boyle v. Stephens, Inc.*, No. 97 Civ. 1351, 1998 U.S. Dist. LEXIS 1968 (S.D.N.Y. Feb. 23, 1998); *Oliveira v. Frito-Lay, Inc.*, No. 96 Civ. 9289, 1997 U.S. Dist. LEXIS 8299, at \*5 (S.D.N.Y. June 13, 1997) ("a complaint is deemed to include any written instrument attached to it as an exhibit"). Nothing turns here on the distinction, except that making the motion under Rule 12(b)(6) as well as Rule 56 obviates the need to file an Answer.

determining substantial similarity is the ordinary observer test") (internal quotes omitted); *Mallery*, 2007 U.S. Dist. LEXIS 88960, at *24 (applying "ordinary observer" standard in granting summary judgment motion based upon lack of substantial similarity).

A judgment that two literary works are substantially similar may be based on either "global similarities in structure and sequence" or "localized similarity in language." *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993). With respect to global structure and sequence, the court should "examine the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting" of the works in question. *Williams*, 84 F.3d at 588.

## C. Only Protectable Expression Is Relevant When Determining Substantial Similarity – Historical Facts, Ideas, *Scenes à Faire*, Stock Elements, And The Like Should Be Excluded

To establish improper appropriation, plaintiff must show that defendants' work "is substantially similar *to the protectable expression*" in plaintiff's work. *Brown v. Perdue*, 177 Fed. Appx. 121, 123 (2d Cir. 2006) (quoting *Williams*, 84 F.3d at 587; emphasis added), *aff'g*, No. 04 Civ. 7417 (GBD), 2005 U.S. Dist. LEXIS 15995 (S.D.N.Y. Aug. 4, 2005); *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994) ("the court must find a substantial similarity between the protectable elements of the two works"); *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 139-140 (2d Cir. 1992).

Any similarity with respect to historical events, facts, stock elements, *scenes à faire*, ideas, and the like is irrelevant, because it is not actionable or evidence of any infringement of plaintiff's protectable expression. *Arden*, 908 F. Supp. at 1259; *see also Flaherty v. Filardi*, 388 F. Supp. 2d at 287 (S.D.N.Y. 2005) ("[t]he Court's examination of substantial similarities between the two works excludes, however, elements constituting 'scenes a faire,' that is, sequences of events that necessarily result from the choice of a setting or situation and do not

9

enjoy copyright protection" and typically-portrayed characters) (Swain, J.) (internal quotes omitted); *American Direct Marketing, Inc. v. Azad Int'l, Inc.*, 783 F. Supp. 84, 95 (E.D.N.Y. 1992) ("thematic concepts" and "themes commonly repeated" are unprotectable).

As discussed below, most of plaintiff's alleged similarities are well-established and commonly-accepted historical concepts, interpretations, and events, all of which are unprotectable elements not relevant to the substantial similarity analysis. *See, e.g., Brown*, 2005 U.S. Dist. LEXIS 15995, at *22-23 (in case involving *The Da Vinci Code*, rejecting alleged similarities because "[a]ll of these similarities, however, are unprotectible ideas, historical facts and general themes that do not represent any original elements . . . . [I]t is without question that references to historical figures and events constitute unprotectible elements under the copyright laws, as no claim of copyright protection can arise from the fact that plaintiff has written about such historical and factual items"); *see also New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 497 F.3d 109, 114 (2d Cir. 2007) ("facts do not owe their origin to an act of authorship. . . . All facts – scientific, *historical biographical,* and news of the day may not be copyrighted and are part of the public domain") (emphasis added; internal cites, quotes, and ellipsis omitted); *Tabachnik v. Dorsey*, 257 Fed. Appx. 409, 410 (2d Cir. 2007) ("historical facts . . . are not original and therefore may not be copyrighted").

Nor does any similarity as regards ideas defeat dismissal, since Section 102(b) of the Copyright Act expressly provides that "[i]n no case does copyright protection . . . extend to any idea, . . . [or] concept"; *see also Williams*, 84 F.3d at 587 ("[i]t is a principle fundamental to copyright law that a copyright does not protect an idea, but only the expression of an idea"); *Arden*, 908 F. Supp. at 1285. The court must decide "whether the similarities shared by the works are something more than mere generalized ideas or themes." *Warner Bros., Inc. v.*

10

*American Broadcasting Companies*, 654 F.2d 204, 208 (2d Cir. 1981) ("Warner Bros. I").  In

examining two works for substantial similarity, the "focus must be on the *similarity of the*

*expression* of an idea or fact, not on the similarity of the facts, ideas, or concepts themselves."

*Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992) (emphasis added).[8]

A court must also focus on *the differences between the works* that would lead an ordinary

observer to find that the works are not alike, because "numerous differences tend to undercut

substantial similarity."  *Warner Bros. II*, 720 F.2d at 241 (internal cites and quotes omitted);

*Mallery*, 2007 U.S. Dist. LEXIS 88960, at *22-23 (held that plaintiff's "scattershot listing" of

"several highly generalized similarities . . . fails to address the underlying issue: whether a lay

observer would consider the works as a whole substantially similar to one another, even without

scrutinizing the plaintiffs' works to isolate their protected elements.  Having reviewed the works

in question, no reasonable juror could find that they are substantially similar").[9]

The controlling principles just enunciated in this Part I, when applied in Part II below,

compel the conclusion that no reasonable juror could possibly conclude that *The Last Days of*

*Judas Iscariot* is "substantially similar" to *Judas on Appeal* in protectable expression within the

meaning of the law.  Not only are the two works fundamentally different with respect to every

meaningful analytic variable (plot, language, structure, etc.), but to the extent that any

"similarities" exist, these are trivial, scattershot, and most importantly, wholly unprotectable

(ideas, well-established historical concepts, *scenes à faire*, etc.).  The fact (if it can be called a

---

[8] *See also Fisher-Price*, 25 F.3d at 123 (court "must exclude comparison of the unprotectible elements from our application of the ordinary observer test"); *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976) ("[T]he essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization").

[9] *See also Williams v. Crichton*, 84 F.3d at 590 (affirming summary judgment where any similarities were "scattered throughout the works"); *CBS Broadcasting Inc. v. ABC, Inc.*, No. 02 Civ. 8813 (LAP), 2003 U.S. Dist. LEXIS 20258, at *18 (S.D.N.Y. Jan. 14, 2003) ("scatter-shot approach cannot support a finding of substantial similarity" because it does not consider "the works as a whole").

"fact") that both parties' works incorporate *the idea* of a Judas trial is irrelevant, and courts confronted with divergent works such as these have uniformly concluded that there is no substantial similarity, despite the existence of just such a common idea.[10]  Plaintiff's novel and defendants' script are before the Court and their contents are undisputed, and no other evidence is necessary to conclude that there is no substantial similarity between the parties' works as a matter of law.

## POINT II

### *THE LAST DAYS OF JUDAS ISCARIOT* DOES NOT INFRINGE THE COPYRIGHTABLE EXPRESSION WITHIN *JUDAS ON APPEAL*

Just a single reading of the parties' works will provide the court with all of the information it needs to conclude that the differences between the parties' works are so fundamental, and any similarities so rooted in commonly-accepted historical and theological concepts rather than the parties' creative expression, that no properly instructed factfinder could find infringing similarity – whether based upon global structure and sequence or localized

---

[10] *See, e.g., Williams*, 84 F.3d at 581 (no substantial similarity as matter of law between movie "Jurassic Park" and children's book dealing with dinosaur zoo); *Denker v. Uhry*, 820 F. Supp. 722 (S.D.N.Y. 1992) (Mukasey, J.), *aff'd*, 996 F.2d 301 (2d Cir. 1993) (no substantial similarity in two works dealing with relationship between older Jewish employer and black attendant); *Mallery v. NBC Universal, Inc.*, No. 07 Civ. 2250 (DLC), 2007 U.S. Dist. LEXIS 88960, at *23 (S.D.N.Y. Dec. 3, 2007); *Flaherty v. Filardi*, 388 F. Supp. 2d 274, 283, 291 (S.D.N.Y. 2005) (Swain, J.); *Bell v. Blaze Magazine*, No. 99 Civ. 12342 (RCC), 2001 U.S. Dist. LEXIS 2783 (S.D.N.Y. March 16, 2001); *Adsani v. Miller*, No. 94 Civ. 9131, 1996 WL 194326 (S.D.N.Y. April 22, 1996) (no substantial similarity between two works focused on rebelling Saudi princess); *Arden*, 908 F. Supp. at 1248 (no substantial similarity between two works dealing with man being forced to relive same day again and again); *Littel v. Twentieth Century Fox*, No. 89 Civ. 8526, 1995 WL 404939 (S.D.N.Y. July 7, 1995), *aff'd sub nom DeStefano v. Twentieth Century Fox Film, Corp.*, 100 F.3d 943 (2d Cir. 1996) (no substantial similarity as matter of law between book dealing with albino boy raised by baboons in Africa who comes to New York and kills unsuspecting victims and movie dealing with predator coming from future to kill military team in South American jungle); *Green v. Lindsey*, 885 F. Supp. 469 (S.D.N.Y. 1992), *aff'd*, 9 F.3d 1537 (2d Cir. 1993) (no substantial similarity as a matter of law in two science fiction works about conflict between brilliant woman Amazon and barbarian on distant planet who are also attracted to each other); *Kretschmer v. Warner Bros.*, No. 93 Civ. 1730, 1994 WL 259814 (S.D.N.Y. June 8, 1994) (no substantial similarity as matter of law between two works dealing with advertising executive dying and trying to defend his life before jury in heaven).

language. (As discussed in Point I.B, a substantial similarity determination may be based on either "global similarities in structure and sequence" or "localized similarity in language.") The differences between the two works are striking and marked, and such differences – which go to the very heart of each work – extend to every meaningful variable that can be used to compare creative works, including story structure and organization, narrative structure, language, plot, overarching themes, tone, mood, setting, and, consequently, overall thrust and feel. With respect to protectable expression, as opposed to general structural differences, fundamental disparities dominate such that no reasonable juror could find defendants' play substantially similar to plaintiff's novel. To the extent that there are any similarities at all between the works, these concern only indisputably unprotectable elements, namely, historical facts, well-engrained concepts regarding historical figures and Christian theology, and plot elements that are a direct result of both works incorporating a common unprotectable idea, namely, a Judas Iscariot trial that focuses upon Judas' alleged betrayal and Jesus' final days.

## A.    Plaintiff's Alleged Similarities

Plaintiff's complaint alleges various plot and character similarities. Each of these alleged similarities is non-existent and/or non-actionable and will be addressed individually.

(1) *Judas Standing Trial*: The idea of a Judas trial is just that – an idea not subject to copyright protection. *Plaintiff has conceded this proposition.* See Siegartel Decl., Exh. 14, which is a June 26, 2008 letter from plaintiff's counsel to defendants' counsel in which plaintiff's counsel concedes that it "is clear" that "a modern-day trial of Judas Iscariot to decide whether or not his soul should be allowed into Heaven" is "an idea, one that is not entitled to protection."

Without substantial similarity of protectable expression, it is irrelevant as a matter of law whether both works incorporate the idea of Judas standing trial for his alleged betrayal. The

expression of the idea is dissimilar in the two works; the parties' depicted trials are completely different (as discussed in greater detail in Part II.B below).

The unprotectability of the "Judas standing trial" idea is established without regard to whether third-parties have also utilized this idea. In fact, however, third-parties *have* incorporated this idea in their creative works, further undercutting plaintiff's position. *See* Siegartel Decl., Exhs. 3 and 4. Exhibit 3 is entitled "Judas Iscariot on Trial" and is a "Satirical Drama in Three Acts" in which Judas is the focus of a judicial proceeding (Exh. 3 at 1; like in plaintiff's novel – but not defendants' play – Judas testifies). Exhibit 4 includes an article that recounts a Colorado church group that staged a play entitled "The Trial of Judas Iscariot," in which just like in plaintiff's novel and defendants' play, Judas stands trial for his alleged betrayal, including opening statements, objections, and witness testimony. See Exh. 4 at 17.[11]

(2) *Purported Satan Similarities*: Plaintiff claims that Satan's outfits in the two works are evidence of infringement. Compl. ¶23 (Siegartel Decl., Exh. 1). However, the two Satan characters do not even wear the same clothing (a tuxedo in plaintiff's novel and a Gucci suit in defendants' play). Siegartel Decl., Exh. 1, Exh. A at 139 (plaintiff's novel); Guirgis Decl., Exh. 1 at 49 (defendants' play). More importantly, Satan dressing in formal or semi-formal attire is an extremely widespread and standard artistic device that is not even remotely original. *See* Siegartel Decl., Exh. 6, which includes *more than fifteen different examples* of films,

---

[11] These third-party Judas trials are just two examples of the broader creative phenomenon in which historical and/or celebrity figures stand trial fictionally. *See, e.g.,* the works catalogued in Siegartel Decl., Exh. 5, which include the following: (a) "After the Truth," a film in which "Dr. Josef Mengele, the notorious Angel of Death at Aushwitz, returns to modern-day Germany to stand trial" (at 1); (b) "Called to Account," a play "about a fictional trial of Tony Blair for illegally going to war in Iraq" (at 1); (c) "Is God a Criminal," an essay in which the author creates "a fictional trial of God on charges of crimes against peace, war crimes, and crimes against humanity" (at 2); (d) "Patriot Act: The Trial of George W. Bush," a play in which George Bush stands trial "to determine if the president has violated the constitution, committed treasonous acts, or is innocent of all charges" (at 1); and (e) "Judgment at Nuremberg," a film which "follows the fictional trial of several judges that served on the bench during the Nazi's reign of terror" (at 1).

television programs, theatrical works, literary works, lithographs, video games, and other creative works that feature Satan wearing formal or semi-formal attire. Accordingly, this stock artistic device should be excluded entirely from the substantial similarity analysis as a matter of law.

Furthermore, in plaintiff's novel Satan testifies wearing a second outfit that is completely different, namely, a bright red toga, a Julius Caesar-type crown, a solid gold chain and medallion, and sandals. Siegartel Decl., Exh. 1, Exh. A at 146. There is absolutely no analogue to this Caesar costume in defendants' play, which includes only Satan's Gucci suit. Thus, even if Satan's formal attire was protectable (and it is not), the parties' expression regarding Satan's overall attire is not substantially similar.

Independent of Satan's clothing, plaintiff also claims that the parties' works are similar because in plaintiff's novel Satan testifies that Judas' soul was "easy" to procure and was "handed to him on a silver platter," and in defendants' play Satan testifies that Judas "didn't require nudging, Judas was a gimme." Compl. ¶23 (these quotes found in the parties' works at Siegartel Decl., Exh. 1, Exh. A at 143, 151, and Guirgis Decl., Exh. 1 at 50). First, these passages are not even similar in expression, much less substantially similar – they use entirely different diction with no syntax crossover. Second, and just like Satan's attire, the idea that Judas' soul was easy for Satan to co-opt is well-established in the literature and is a widespread and unoriginal concept. *See* Siegartel Decl., Exh. 7, which includes several third-party references incorporating this idea. Consequently, as a matter of law this concept also should be excluded from the similarity analysis.

(3) *Purported Caiaphas Similarities*: Plaintiff alleges as evidence of infringement that Caiaphas testifies in both works that Jesus had blasphemed, that Caiaphas feared Roman

reprisals, and that Caiaphas did not approach Judas about betraying Jesus. Compl. ¶24. As with

the Satan "similarities" just discussed, these are all completely unoriginal concepts that are

well-engrained within the relevant historical texts, in this case the four Gospels of the New

Testament, *i.e.*, the Gospels of Matthew, Mark, Luke, and John. *See* Siegartel Decl., Exh. 8,

which includes the passages from *The New Oxford Annotated Bible* and the *King James Version*

*of the Bible* that include these same exact ideas.[12]  Thus, as a matter of law, these historical

concepts from Caiaphas' testimony should be excluded from the substantial similarity analysis.[13]

    (4) *Purported Pontius Pilate Similarities*: Plaintiff alleges that the parties' works are

similar in that (a) Pontius Pilate "disparages" Jews in both works, and (b) in plaintiff's novel

Pontius Pilate refers to Jesus' killing as "one less Jew," and in defendants' play Pontius Pilate is

asked if he considered Jesus to be merely "one more Jew." Compl. ¶26. These purported

similarities are irrelevant again for the same reason, namely, that these are well-established and

completely unoriginal historical concepts widespread in the relevant literature. Regarding

Pilate's disparagement of Jews and his lack of concern for a single Jewish life, *see* Siegartel

Decl., Exhs. 9 and 10, which include a multitude of secondary sources that detail the disparaging,

antagonistic, and brutal relationship that prevailed between Pontius Pilate and the Jews (Exh. 9),

---

[12] For example (these passages from *The New Oxford Annotated Bible*), (a) "Then the high priest [Caiaphas] tore his clothes and said '*He has blasphemed*' Why do we still need witnesses? You have now heard his blasphemy" (Matthew 26:65-66; emphasis added); (ii) "So the chief priests and the Pharisees called a meeting of the council, and said, 'What are we to do? This man is performing many signs. If we let him go on like this, everyone will believe in him, *and the Romans will come and destroy both our holy place and our nation*. . . . But one of them, Caiaphas, who was high priest that year, said to them '. . . it is better for you to have one man die for the people than for the whole nation destroyed'" (John 11:47-50; emphasis added); and (iii) "Then Judas Iscariot, who was one of the twelve, went to the chief priests in order to betray him to them. When they heard it, they were greatly pleased, and promised to give him money." (Mark 14:10-11)

[13] Not only are these Caiaphas-related concepts unprotectable and well-established ideas that should be excluded from the similarity inquiry, but the manner in which these concepts are expressed within the two parties' works is not substantially similar.

and the widely accepted belief that Pilate's attitude to killing Jesus would be simply "one less Jew" (Exh. 10).[14]  These well-established and unoriginal historical concepts should also be excluded from the substantial similarity inquiry.[15]

(5) *Purported Peter Similarity*: Plaintiff alleges only one similarity regarding Peter, namely, that in plaintiff's novel Peter testifies that Jesus said to Judas at the Last Supper, "[w]hat thou hast to do, do it quickly," and in defendants' play Jesus said to Judas, "do what you gotta do."  Compl. ¶25 (these quotes found at Siegartel Decl., Exh. 1, Exh. A at 44, and Guirgis Decl., Exh. 1 at 47, respectively).  First, these phrases are not remotely similar in expression, and instead are representative of the expressive dissimilarities that pervade both works.  Plaintiff's phrase is spoken in the language of Scripture ('thou"; "hast"), while defendants' script incorporates rough slang.  Second, and once again, the idea that Judas should "do it quickly" is nothing more than a well-established and utterly stock concept that is expressly included within the Gospels of the New Testament, in this case the Gospel of John (chapter 13, verse 27). *See* Siegartel Decl., Exh. 11, which includes the translations of this verse from *The New Oxford Annotated Bible* and the *King James Version of the Bible* that include this "do it quickly" concept.  Exhibit 11 also includes several other scholarly texts that incorporate this idea, as well

---

[14] For example, "Pilate's dislike and even hatred of the Jews was well-documented. . . . Pilate has a consistent record of taunting the Jewish leaders.  It would be fitting that his one philosophy would be 'one less Jew the better.'"  This passage, from an article on a website devoted to Ancient Rome (http://ancientsites.com), incorporates both alleged Pilate similarities (disparagement and "one less Jew") and is included in both Exhibits 9 and 10.

[15] Note also that as with the Caiaphas testimony, the parties express these unprotectable Pilate concepts in entirely different ways.  In plaintiff's novel, Pilate himself volunteers that "[o]ne less Jews did not mean the end of the world."  *See* Siegartel Decl., Exh. 1, Exh. A at 126.  But in defendants' play it is the defense attorney who argues during Pilate's cross-examination that Jesus "was just one more Jew, and you didn't hesitate" – and Pilate *emphatically rejects this argument* and tries to leave ("I think I've had enough here").  See Guirgis Decl., Exh. 1 at 87-88.  Plaintiff alleges no other similar Pilate-related expressive text besides "one less Jew/one more Jew."

as an internet search report that reveals that a recent search for "Jesus," "Judas," and "do it quickly" uncovered approximately 340 hits.

*       *       *

In sum, every one of plaintiff's alleged similarities is unprotectable and should be excluded from the substantial similarity analysis as a matter of law. Each of these "similarities" is an unprotectable idea and/or a well-established and commonly-accepted (and thus unoriginal) historical or Christian theological concept that pervades the relevant literature, and thus is available to anyone who writes about Judas' alleged betrayal of Jesus.[16]

**B.    Additional Fundamental Differences Between The Parties' Works**

As noted above, the differences between plaintiff's novel and defendants' play are striking and fundamental, and encompass every meaningful variable that can be used to compare creative works, including narrative and story structure, plot, setting, language, overarching theme, characters, and, consequently, overall thrust and feel.

**Narrative And Story Structure:** The narrative structures of the two works are entirely different. Defendants' work is a two-act play with no narrator or central character who dominates the play's lines or stage time. Plaintiff's work is a novel, with a first-person narrator dictating the entire story.

The story structures are also fundamentally dissimilar. Plaintiff's story proceeds chronologically with no flashbacks or other literary devices that interrupt the entirely linear

---

[16] Plaintiff also alleges as probative that both parties works' include several of the same characters, namely, Jesus, Judas, Saint Peter, Pontius Pilate, Caiaphas (leader of the Jewish ruling council at the time of Jesus' death), and Satan. As will be discussed below within the sub-section entitled "Characters, Including Court Figures And Witnesses" (see pages 29-31), (1) these characters are dictated entirely by the subject matter of Jesus' death and Judas' alleged betrayal, and thus the inclusion of these characters in both works is irrelevant for purposes of the substantial similarity analysis; (2) these "crossover characters" are depicted in very different ways in the two works; and (3) while there are six "crossover characters," there are a far greater number of characters who appear in only one of the two works.

structure. Defendants' play is the exact opposite – not at all linear but much more complex, with

flashbacks and other fantasy-type episodes that constantly break up the scenes of Judas' trial.

Furthermore, the sequence of plaintiff's novel is not only chronological and linear, but

also *starkly cyclical and repetitive*. Plaintiff's book includes sixty separate chapters spanning

approximately a 12-day period, often with periods of elapsed time between chapters that range

from multiple hours to 1-2 days and that are readily apparent. Over and over again as a

framework for the novel, plaintiff's narrator/protagonist describes *in detail* his "everyday"

activities, including waking up, traveling to court in the morning and arriving in the courtroom,

preparing for the telecast with his cameraman, discussions with his cameraman and security

entourage over lunch, and leaving court and his trip home. Such "everyday" details are

described repeatedly and account for a significant number of pages in plaintiff's novel, resulting

in a novel with a strikingly sequential and repetitive feel.

Defendants' play in contrast is not at all sequential or repetitive. Defendants' work is a

free-flowing two-act play with scenes moving quickly from one into the next, usually with no

apparent passage of time in between or a time passage that is impossible to discern. As is written

on the back of defendants' published script, defendants' play is "set in a time-bending world . . .

between heaven and hell." Guirgis Decl., Exh. 1 (back cover). Unlike plaintiff's novel, real-world

concepts of time are inapposite, with none of the "everyday" plot devices that characterize

plaintiff's novel. Defendants' play has no waking up in the morning and going to court,

discussions over lunch, going home at night, etc.

**Setting:** Every event in plaintiff's novel occurs in contemporary New York City, where

plaintiff's narrator/protagonist lives and where the Judas appeal takes place (at the Foley Square

federal courthouse). In contrast, defendants' play does not include a single scene in New York

City. Defendants' Judas trial is set in the fictional location of Hope, within Purgatory, with other scenes taking place in a variety of fictional and/or unspecified locations.

**Plot:** The plots of the two works are completely different, in part due to the structural and setting differences just discussed (first-person narrator only in plaintiff's novel; plaintiff's chronological structure versus defendants' flashbacks; repeated "everyday" occurrences in plaintiff's novel not in any way shared by defendants). Even independent of these critical differences, the plots are not at all alike, including for the following reasons:

(1) Plaintiff's book revolves around a prominent television news anchor who chronicles in first-person format the Judas appeal occurring in New York City. Defendants' play does not include any news or media personnel (much less a first-person newsman narrator), and as just mentioned does not include a single scene in New York City.

(2) The focal point of plaintiff's Complaint is that both plaintiff's novel and defendants' play incorporate fictional Judas trials that each include historical figures. This is an unprotectable idea. Furthermore, insofar as protectable expression is concerned, *it is difficult to comprehend how the parties' Judas trials could be any more different*. The only "similarities" are unprotectable: both trials feature lawyers, at least one judge, and witnesses. But plaintiff's Judas trial features (a) a six-judge panel comprised of Solomon, Buddha, Mohammed, Marx, Machiavelli, and the Mormon leader Joseph Smith; (b) an "analyst panel" comprised of Aristotle, Thomas More, and Martin Luther; and (c) lawyers Calvin and Dante. Siegartel Decl., Exh. 1, Exh. A at 8, 11-12, and 15-16. *Not a single one of these characters is included in defendants' play*, which instead features a single judge (a made-up character, Judge Littlefield), no analyst panel (or anything remotely like it), and two entirely fictional attorneys.

Although plaintiff alleges in his complaint that defendants' play features a "modern-day" Judas trial (¶21), the play itself refutes that allegation. As mentioned above, defendants' play is "set in a time-bending . . . world between heaven and hell," and the precise time period of the trial is unspecified and not "modern-day." Guirgis Decl., Exh. 1 (back cover).

Similarly contrary to the works is plaintiff's allegation that Jesus testifies in both trials (Complaint, ¶22). In defendants' play, Jesus clearly does not testify but instead goes to hell to speak to Judas at the conclusion of the play. Guirgis Decl., Exh. 1 at 101-07. In plaintiff's novel, Jesus does testify, another important plot difference. Siegartel Decl., Exh. 1, Exh. A at 284-99.

Another fundamental difference between the works is that whereas Judas attends and testifies at the hearing in plaintiff's novel, in defendants' play Judas remains in hell during the entire trial and never attends the trial. A further differentiation is that whereas the final chapter in plaintiff's novel depicts Judas' verdict (*id.* at 300-05), the verdict in defendants' play is not shown on-stage at all, but is instead only referenced after-the-fact when the jury foreman appears in hell and tells Judas that he was found guilty. Guirgis Decl., Exh. 1 at 107.

Consider these additional differences as well: (a) plaintiff's Judas trial is a bench trial, defendants' trial is a jury trial; and (b) in defendants' play the two lawyers alternate calling witnesses; in plaintiff's novel Calvin only begins calling witnesses after Dante.

(3) Plaintiff's novel includes repeated violence, including (a) multiple violent public demonstrations (for example, a violent demonstration in front of St. Patrick's Cathedral that causes the Cardinal's fatal heart attack; Siegartel Decl., Exh. 1, Exh. A at 86-95); (b) an audience member at the hearing stabbing and attempting to murder Judas (*id.* at 113-14); and (c) the

protagonist's police escort being fatally shot in the head by a sniper (*id.* at 157).  Defendants' play depicts no violence at all.

(4) Plaintiff alleges that both parties' works "ultimately end[] with Jesus forgiving Judas."  Complaint ¶22.  Any suggestion that in the play Jesus alters his outlook and forgives Judas at the end is misleading.  As Jesus says to Judas several times at the play's conclusion, Jesus has "never gone away" from Judas.  Guirgis Decl., Exh. 1 at 103, 106.

More importantly, *the suggestion that the works end similarly is absurd.*  Plaintiff's story concludes with Judas winning his appeal, being permitted to enter heaven, "leap[ing] into the air," and "kissing Jesus' robe," while "pandemonium" erupts in the courtroom.  Siegartel Decl., Exh. 1, Exh. A at 305.  Defendants' play ends with Judas losing his case, remaining in hell, "broke . . . unfixable," and in utter despair as he begs Jesus not to leave, followed by the jury foreman (Butch Honeywell) recounting his own adultery and betrayal of his wife to Judas.  Guirgis Decl., Exh. 1 at 106-11.  Plaintiff's novel also includes a "twist" at the end in which the reader learns that the entire trial was merely a dream.  Siegartel Decl., Exh. 1, Exh. A at 305.  The end of defendants' play is not remotely similar – simply the fading of lights as Butch concludes his monologue and Jesus tends to Judas.  Guirgis Decl., Exh. 1 at 111.

Furthermore, any contention that two works could be considered similar because Jesus "forgives" in both works is also baseless, as the concept of "Jesus as forgiver" is so deeply rooted in Christian theology that it could not possibly be plaintiff's protectable expression.  Even plaintiff's prior counsel in a December 21, 2007 demand letter sent to Mr. Guirgis' lawyer expressly conceded that "the concept of Judas receiving forgiveness by Jesus Christ as set forth in a modern day courtroom scene" is simply an "idea."  *See* Siegartel Decl., Exh. 13 (this letter is

also discussed in Part V below, in connection with defendants' motion for a fee- and cost-shifting award under the Copyright Act and the objective unreasonableness of this lawsuit).

**Language:** The language of the two works could not be more different – except for overall plot, this is perhaps the single most glaring difference between the two works. Defendants' play is replete with characters – including many rooted in Christian theology – who utilize crass, rough, urban, and profane language.  The prose in plaintiff's novel is completely different – prosaic, pedestrian, and staid.  As for defendants' characters who do not employ crass, urban, or profane language (for example, Mother Theresa), each of these characters, like all characters in defendants' play, employs a unique, personalized, and distinctive dialect not at all analogous to the language employed in plaintiff's novel.[17]  Confronted by such fundamentally different language, which goes to the very natures of the two works, no reasonable juror could find the works to be substantially similar in terms of protectable expression.  Consider the following representative passages from the works:

### Defendants' Play

- Towards the beginning of the play, Saint Monica explains that "I was axed to look into the case of Judas Iscariot by this Irish gypsy lawyer bitch in Purgatory named Cunningham," and after the Judge agrees to hear the appeal, Saint Monica exclaims, "Signed, sealed, delivered, mothafuckah!  Peace!" *Id.* at 17, 20.

- Representative of the language in Saint Peter's monologue, Peter states that, "I even had a standing rule on my fishing boat that was strictly enforced, 'Talk about Rome, and your ass can

---

[17] For example, Mother Theresa – who requires a hearing device – uses "jess" instead of "yes" and states "doan look good" instead of "don't look good."  *Id.* at 37-41.  And like defendants' other characters, Mother Theresa does occasionally utilize slang, for instance, "Everybody wanna say something . . . Nobody wanna listen nothing."  *Id.* at 41.  Mother Theresa's language pattern, like the language of the rest of defendants' characters, has no counterpart in plaintiff's novel.

swim home alone.'" *Id.* at 35.  Similarly, Saint Matthew labels himself a "scumbag" for being a Jewish tax collector for the Romans, to which Saint Peter responds "True dat." *Id.* at 36.

- Simon the Zealot testifies that it was "whacked out shit" when Jesus foretold his death to the apostles. *Id.* at 44.

- The prosecuting attorney El-Fayoumy describes Jesus' crucifixion as Jesus being "strung up and left to be baked by the hot Judean sun 'til [Jesus] resembled a shriveled-up, bearded frankfurter." *Id.* at 45.  El-Fayoumy is also an incessant and over-the-top flatterer, a trait repeatedly apparent in the play (and a trait not shared by any character in plaintiff's novel).  For example, when El-Fayoumy first meets the Judge he calls him "great handsome sir" and "eminently great sir," and then proceeds to tell the Judge that his bench "is a lovely bench! Splendid and sturdy like the great derriere that rests upon it!" *Id.* at 13-14.

- Satan testifies that he was up late and "could barely make it through my double session pilates this morning." *Id.* at 49.  Satan subsequently testifies that man's ability to "self-correct," which was supposed to balance out free will, is "not a particular favorite of the homo sapiens. I'd say self-correct falls somewhere between 'colonoscopy' and 'firing squad' on most people's holiday wish lists." *Id.* at 97.

- Act II of the play begins with Saint Monica and Mary Magdalene on stage.  Their dialogue is infused with rough, profane, and urban language, including the statements that "Bitch got clout!" and "Pimps up, hos down!" *Id.* at 59.

- Caiaphas testifies that when he tried to stop Pontius Pilate from placing Roman symbols in the Temple, "the gist" of Pilate's initial response was "Well, what are you gonna do about it, Curley?" *Id.* at 69.

- Saint Thomas states that, "I thought Judas was a bit of a jerk-off. Actually, fuckin' dick would be more accurate," but concludes that "Judas was a dick, but he deserved better. Just one saint's opinion." *Id.* at 78, 80.

- In a flashback, when Judas recants to Pilate and proclaims Jesus' innocence, Pilate tries to calm Judas, telling him that "we ain't tryin' to lay down no heavy charge on that Nazareth boy – we just gonna beat down his ass a little. . . . ain't like we lookin' to crucify the muthafuckah!" *Id.* at 81-82. When Pilate subsequently testifies, he calls Judas' attorney "baby" and "missy." *Id.* at 82, 84.

- Towards the end of the play, Jesus addresses the audience and states that he is everywhere, including Darfur, in "the Rose Garden with George Bush," and "on Lafayette and Astor waiting to hit you up for change so I can get high." *Id.* at 101.

- At the end of the play, Judas screams at Jesus, shouting "TAKE YOUR FUCKIN' HANDS OFF ME!" and "JUST BACK OFF MY GRILL, MAN!" *Id.* at 102 (capitalization in script).

### Plaintiff's Novel

- After plaintiff's narrator learns that that there will be a six-judge panel for Judas' appeal comprised of Solomon, Buddha, Mohammed, Marx, Machiavelli, and Joseph Smith, and a three-member "analyst panel" of Aristotle, Thomas More, and Martin Luther, the narrator merely exclaims, "I still couldn't believe this was really happening. Life was surely very strange sometimes." Siegartel Decl., Exh. 1, Exh. A at 12.

- Plaintiff describes Dante's demeanor during his direct examination of Peter as follows: "Dante had a smile on his face a mile long when he heard Peter's answer. He actually turned to the spectators and just nodded, as if to say 'You heard it. Right from the horse's mouth.'" *Id.*

25

at 40-41.  Plaintiff describes the audiences' reaction to Peter's direct as follows: "The spectators

gasped. . . . Judas looked straight ahead.  Advocate Calvin did not look too happy either."  *Id.*

at 43-44 (Calvin is Judas' lawyer).

- During Peter's cross examination, plaintiff employs the following representative prosaic

prose: "The spectators gasped.  Solomon banged the gavel for silence.  Richard [the cameraman]

was now switching back and forth with his camera.  The expressions on the spectators' faces

made the saying come completely true, 'A picture says a thousand words.'  In this case, the

picture on the screen spoke a million words."  *Id.* at 78.

- In his characteristic style, plaintiff writes of the devil that "[h]is eyes were deeply

penetrating.  I could honestly not say what color they were.  Truthfully, it was the weirdest set of

eyes I had ever seen.  Believe me, I have seen plenty of eyes in my lifetime."  *Id.* at 139-40.

- After the narrator's security officer is killed by a sniper, plaintiff describes the narrator's

reaction as follows: "My teeth chattered, as though Sammy Davis, Jr. was tap dancing in my

mouth."  *Id.* at 157.

- When the narrator delivers the eulogy at the officer's funeral, plaintiff writes that "[s]ome

officers turned their faces toward the wall to weep.  Yes, grown men and women actually

shedding tears."  *Id.* at 176.

- Plaintiff's novel incorporates repeated "analyst panel discussions" in which the narrator

asks a panel of Aristotle, Martin Luther, and Thomas More questions about the case.  Like the

rest of plaintiff's novel, these discussions employ plaintiff's characteristically stilted pedestrian

language, for example: "[Question] Did you find it very strange when Advocate Dante turned the

calling and questioning of the witnesses over to Advocate Calvin?  [Answer by Aristotle] Yes, I

found the position which Advocate Dante took to be extremely strange.  I honestly cannot

26

understand why he did what he did.  However, he probably had a good reason for doing it.
[Question] Were you surprised when the two prophets were called as witnesses?  [Answer by
Aristotle] No, I was not.  I feel Advocate Calvin will proceed in a very logical approach in order
to win the case."  *Id.* at 195.

• When Calvin asks the judges that "Jesus Christ Himself be summoned to testify,"
plaintiff describes the scene as follows: "The courtroom exploded.  It can't be, I said to myself.
Solomon was banging away with his gavel.  The spectators just kept on reacting.  Sounds of no!
no! were heard."  *Id.* at 243.

• As Judas' verdict is announced, plaintiff describes his narrator's reaction as follows: "My
mouth went completely dry.  It was as though I had walked miles in the Sahara Desert in the
middle of August."  *Id.* at 302.

• And finally, as Jesus rises and states that "My Father" has offered Judas forgiveness,
plaintiff writes that "[t]he courtroom went into complete hysterics, pandemonium, bananas or
whatever terminology one wishes.  Judas leaped into the air.  He first hugged John Calvin and
then dashed toward Jesus Christ. . . . He began kissing Jesus' robe, thanking Jesus for forgiving
him."  *Id.* at 305.

There is no substitute for reading the parties' works in order to fully appreciate the
massive language difference that separates plaintiff's novel and defendants' play.  However, as
these representative examples make clear, the languages of the novel and play are so starkly
different that no reasonable juror could find the works to be substantially similar in terms of
protectable expression.

**Theme:** The overarching theme of plaintiff's novel is "predestination," in other words,
whether Judas was predestined to commit a certain act (betraying Jesus), and therefore

responsible for that act and/or deserving of being relegated to hell. *See, e.g.*, *id.* at 10 ("the basis" of Judas' appeal is that "he was PREDESTINED. He was born to do a certain act and he did it"; emphasis in original). In this manner, hell within plaintiff's novel represents the traditional notion of a place where someone is sent as punishment for sins.

The overarching theme of defendants' play is different – not predestination, but "despair." Defendants' play incorporates the untraditional portrayal of hell as a despair so deep that a person is unable to accept love, and Judas' "hell" is portrayed as self-inflicted. *See, e.g.*, Guirgis Decl., Exh. 1 at 38 (Mother Theresa testifying that Judas "has succumb[ed] to despair," which she defines as "the ultimate development of a pride so great and stiff-necked that it selects the absolute misery of damnation rather than accept happiness from the hands of God"); *id.* at 99 (Satan testifying that "your client is free to leave [hell] whenever he wants to . . . your client succumbed to despair"). At the play's conclusion Judas is portrayed as unable to accept Jesus' love, following which a modern analogy is depicted in which the recently-deceased jury foreman recounts to Judas his infidelity to his wife and his consequent inability to accept her love, which led to more drinking and womanizing, and then his eventual death and joining Judas in hell. *Id.* at 107-11.

Not only do the parties' works have different overarching themes (predestination versus despair), but this difference manifests itself in the parties' trials that focus upon entirely different subjects. The lawyers and witnesses in plaintiff's novel repeatedly focus upon predestination, as does the judges' verdict at the conclusion of the novel. Defendants' trial, in contrast, emphasizes Judas' despair and the reasons why Judas – and other characters in the play – are unable to accept love.[18]

---

[18] And ultimately there is no verdict scene depicted in defendants' play, because if Judas may leave hell only if he accepts Jesus' love, a third-party verdict could not possibly result in Judas' departure from hell.

**Characters, Including Court Figures And Witnesses:** Despite some common uses of New Testament figures, the characters in plaintiff's novel and defendants' play are extremely different. Defendants' play includes no character remotely similar to Michael Sarto, the central character and *Judas on Appeal* narrator. Defendants' play also lacks any of the well-known historical figures who comprise the six judges, the three panelists, and the lawyers in plaintiff's novel. In turn, plaintiff includes no characters similar to the primary court figures in defendants' play, namely, Judge Littlefield, Fabiana Aziza Cunningham, and Yusef El-Fayoumy (Judas' counsel and opposing counsel, respectively).

Not only are the judicial figures in the two works entirely different, but *the level of detail* in each of the works regarding these characters is radically different. Judge Littlefield and the lawyers in defendants' play are central characters with well-developed personalities. Background details are provided, for instance, regarding their places of residence (Judge Littlefield and Cunningham in purgatory; El-Fayoumy in hell), reason for this residence (for example, because Judge Littlefield committed suicide), and various other biographical details (for example, that Judge Littlefield was a civil war soldier, and that Cunningham was the child of a Romanian gypsy and local parish priest). In contrast, the judges, lawyers, and analyst panelists in plaintiff's novel, although well-known historical figures, are virtually stick figures with practically no background information provided in the novel (for example, information regarding current residence). Also, many of these characters in plaintiff's novel in no way advance the plot, for example, the five non-Chief Justices who barely speak throughout the novel (only Solomon, the Chief Judge, has periodic dialogue, and even then just snippets).

It is not only the judicial figures and lawyers just discussed who fail to overlap; there are also a wealth of other characters who appear in just one of the two works. Defendants' play does

not include any of the following witnesses who testify in plaintiff's novel: former high priest Annas; the "Centurion" who crucified Jesus; Zacharias the prophet; David the Psalmist; John and Mark the Evangelists; "the portress who confronted Peter the Apostle"; and "the relative of Malchus." Defendants' play also lacks supporting characters analogous to those in plaintiff's novel, including Michael Sarto's multiple police escorts or his wife. Finally, while plaintiff's plot is repeatedly impacted by the "general public" (*e.g.*, repeated violent public demonstrations), the "general public" has no role in defendants' play.

Conversely, plaintiff's novel lacks each of the following characters from defendants' play: Mother Theresa (witness), Sigmund Freud (witness), Simon the Zealot (apostle and witness); Gloria (introduces audience to Hope at the beginning of the play); Henrietta Iscariot (Judas' mother, whose monologue begins the play); Mary Magdalene; Saint Monica; Saint Thomas; and Butch Honeywell (jury foreman whose monologue concludes the play).

The only characters included in both works are dictated entirely by the subject matter of Judas' alleged betrayal, namely, Jesus and Judas, Saint Peter, Pontius Pilate, Caiaphas, and Satan. Attached to the Siegartel Decl., Exh. 12 are materials demonstrating that many other creative works that also focus upon Jesus' life include these same characters (for example, Mel Gibson's "The Passion of the Christ," Martin Scorsese's "The Last Temptation of Christ," and "Jesus Christ Superstar"). As the relevant secondary sources in Siegartel Decl., Exh. 12 make clear, it is widely believed that each of these characters (even Satan) played an integral role in Jesus' death and/or Judas' betrayal. Plaintiff's "similar characters" allegation is akin to someone claiming copyright infringement because two books about Disneyland both mention Mickey Mouse, or two about Judaism mention Moses. As the relevant caselaw makes clear, the

30

inclusion of these characters is irrelevant for purposes of the substantial similarity analysis, and plaintiff cannot use these characters as evidence of infringement.

Note as well that these characters' portrayal in the parties' works are not at all similar. For instance, in defendants' play Pontius Pilate and Saint Peter use crass, profane, and rough language, which of course is entirely unexpected of such theological figures. Guirgis Decl., Exh. 1 at 35, 81-90. In contrast, plaintiff portrays these characters entirely traditionally. Peter, for instance, quotes Scriptures and speaks calmly and politely. Siegartel Decl., Exh. 1, Exh. A at 40-44.

**Overall Thrust, Mood, And Feel**: The vastly different overall thrust, mood, and feel of the parties' works is a direct by-product of the variables already discussed (structure; plot; language; etc.), and accordingly, the overall thrust, mood, and feel are fundamentally different.

*    *    *

In conclusion, plaintiff's claim for copyright infringement should be dismissed because defendants' play *The Last Days of Judas Iscariot* is so dissimilar to *Judas on Appeal* that no properly instructed, reasonable jury could find them similar, much less substantially similar with respect to protectable expression. The presence of scattered similarities in both plays arises from the fact that each play loosely incorporates a fictional trial concerning Judas' alleged betrayal, an entirely non-actionable idea. Reading the parties' works – indeed, even reading just a handful of pages from each work – makes plain that plaintiff's claims are baseless and should be dismissed.

**POINT III**

**DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONTRIBUTORY AND VICARIOUS INFRINGEMENT CLAIMS**

Where there is no direct copyright infringement there can be no indirect contributory or vicarious infringement. *Faulkner v. Nat'l Geographic Soc'y*, 409 F.3d 26, 40 (2d. Cir. 2005)

31

(affirming dismissal of contributory infringement claim "because there can be no contributory infringement absent actual infringement"); *Ariel(U.K.) Ltd. v. Reuters Group PLC*, No. 05 Civ. 9646 (JFK), 2006 U.S. Dist. LEXIS 79319, at *30 (S.D.N.Y. Oct. 31, 2006) ("[i]f the direct infringement claim is dismissed, the vicarious claim against [defendant] must also be dismissed, because a direct infringement must have occurred to hold a defendant vicariously liable"); *Pavlica v. Behr*, 397 F. Supp. 2d 519, 528 (S.D.N.Y. 2005) ("[t]o be found liable for contributory infringement, there must be a primary infringer"; dismissing contributory claim because no evidence of primary copying).

Here, because plaintiff's direct infringement claim fails, plaintiff's contributory and vicarious infringement claims must fail as well.

## POINT IV

### DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S COMMON LAW UNFAIR COMPETITION CLAIM

Plaintiff's common law unfair competition claim is not only meritless but also preempted by the Copyright Act, as it is based on precisely the same copying that underlies the copyright claim. Section 301 of the Copyright Act preempts a state law claim where "(1) the work to which the claim is applied falls within the scope of works protected by Sections 102 or 103 of the Copyright Act, and (2) the claim addresses legal or equitable rights already protected by copyright law." *Flaherty v. Filardi*, 388 F. Supp. 2d 274, 290 (S.D.N.Y. 2005) (Swain, J.). Here, *Judas on Appeal* falls within the scope of the Copyright Act and plaintiff's unfair competition claim seeks to vindicate the same rights already protected by the copyright law. Because this claim is not premised on violations of rights outside the ambit of copyright, there is no "extra element" that permits the claim to survive the preemption analysis.

Indeed, because in this context a common law unfair competition claim merely seeks to protect the expression of ideas (*i.e.*, a copyright-protected right), courts have repeatedly held such claims preempted. *See, e.g.*, *Kregos v. Associated Press*, 3 F.3d 656, 666 (2d Cir. 1993) (unfair competition claim based on copying of protected expression preempted because "[t]he common law of unfair competition in New York requires proof of no element that is in excess of those elements necessary to establish a copyright-infringement action"); *Flaherty*, 388 F. Supp. 2d at 290-91 (New York common law unfair competition claim preempted because it "address[es] precisely the same issues as [plaintiff's] copyright claims" and is "premised on rights protected by the Copyright Act"); *Flaherty v. Filardi*, No. 03 Civ. 2167 (LTS) (HBP), 2007 U.S. Dist. LEXIS 69202 (S.D.N.Y. Sept. 17, 2007), at *15-16 (holding that remaining common law unfair competition claim was also preempted by Copyright Act) (Swain, J.).[19]

### POINT V

### DEFENDANTS ARE ENTITLED TO REASONABLE ATTORNEYS' FEES AND COSTS UNDER 17 U.S.C. § 505

For the reasons discussed above, plaintiff's claims are objectively unreasonable. Accordingly, the Copyright Act's attorneys' fees provision (17 U.S.C. § 505) provides for an award of costs, including attorneys' fees, against the plaintiff.

Under 17 U.S.C. § 505, "objective unreasonableness" is sufficient for and warrants an award of costs and attorneys' fees. *Mallery v. NBC Universal, Inc.*, No. 07 Civ. 2250 (DLC), 2008 U.S. Dist. LEXIS 20893, at *2 (S.D.N.Y. March 18, 2008); *Chivalry Film Prods. v. NBC*

---

[19] *See also Orange County Choppers, Inc. v. Olaes Enters., Inc.,* 497 F. Supp. 2d 541, 556 (S.D.N.Y. 2007) ("[i]t is axiomatic that unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by the Copyright Act"; unfair competition claim preempted because it and the copyright claim "are duplicative in substance and objective and are thus governed exclusively by the Copyright Act"); *Silverstein v. Penguin Putnam, Inc.*, 522 F. Supp. 2d 579, 608 (S.D.N.Y. 2007) ("[i]t is well-settled that a claim for reverse passing off predicated on the theory that defendant's product replicates plaintiff's expressions contains no extra element and is therefore preempted").

*Universal*, No. 05 Civ. 5627 (GEL), 2007 U.S. Dist. LEXIS 86889, at *6 (S.D.N.Y. Nov. 27, 2007) (claim is objectively unreasonable if "clearly without merit or otherwise patently devoid of legal or factual basis"). Costs and fee awards under § 505 do not require a finding of bad faith or frivolousness. *Screenlife Establishment v. Tower Video, Inc.*, 868 F. Supp. 47, 52 (S.D.N.Y. 1994).

Courts in this Circuit routinely award costs and attorneys' fees under § 505 following a grant of summary judgment on substantial similarity grounds. The *Mallery* decision from earlier this year is directly on-point. In that case, after defendants' summary judgment motion was granted on substantial similarity grounds, the court held that plaintiff's claims were objectively unreasonable and "wholly without merit" because "nearly every instance of alleged similarity between [the works] relates to unprotectable ideas rather than protectable expression and, viewed more broadly, the total concept and feel of these works are profoundly different." 2008 U.S. Dist. LEXIS 20893, at *4 (also holding that § 505 award would "advance considerations of compensation and deterrence, as failing to award attorney's fees to defendants would invite others to bring similarly unreasonable actions without fear of consequences") (internal cites and quotes omitted); *see also Chivalry Film Prods.*, 2007 U.S. Dist. LEXIS 86889, at *3 (costs and attorneys' fees awarded under § 505; parties' works "strikingly different"); *Williams v. Crichton*, 891 F. Supp. 120, 121 (S.D.N.Y. 1994), *aff'd*, 84 F.3d 581 (2d Cir. 1996).

Because plaintiff's claims are objectively unreasonable, this is precisely the kind of case in which an award of costs and fees is warranted. Plaintiff's and defendants' works are fundamentally different in every meaningful way, and the alleged similarities are inherently unprotectable for a litany of reasons, including because they comprise ideas and/or well-established historical concepts. The Complaint is based not on any similarity in expression,

34

but only at the level of subject and idea, as if the idea of a trial of Judas could be plaintiff's property.  Given the rash of meritless cases attempting to obtain settlement value from, or free publicity at the expense of, famous defendants, this is the kind of case in which a fee-shifting award is particularly appropriate.

An award of costs and fees is also especially warranted because *before* the Complaint was filed, Mr. Guirgis' counsel had already explained to plaintiff's prior counsel multiple times – in writing and after being threatened with litigation – that there was no colorable claim of copyright infringement.  *See* Siegartel Decl., Exh. 13 (correspondence from counsel; these correspondence were referenced in the Complaint at ¶ 28 and attached to the Complaint as Exhibit G, except for the December 21, 2007 letter from Mr. Guirgis' counsel, despite this being the final letter between counsel before plaintiff's complaint was filed).

In plaintiff's counsel's final letter (also dated December 21), plaintiff's counsel conceded that "the concept of Judas receiving forgiveness by Jesus Christ as set forth in a modern day courtroom scene" is merely an "idea."  Mr. Guirgis' counsel's in his December 21 response expressly cautioned that only the expression of ideas is protectable and not the ideas themselves, and consequently plaintiff's counsel had not stated a copyright claim.  Mr. Guirgis' counsel also wrote that "[w]e urge you to consult with a copyright specialist; if your client has a legitimate copyright claim, we will address it once it is presented to us."

Nonetheless, plaintiff proceed to file this objectively unreasonable lawsuit.  Considering that plaintiff filed this lawsuit only *after* being put on notice regarding his lawsuit's lack of merit, and thus disregarded that prior notice, putting defendants to the entirely unwarranted expense of preparing this motion, the costs of this litigation and dismissing this action should be shifted to plaintiff.

## CONCLUSION

For all of the foregoing reasons, defendants' motion to dismiss or for summary judgment

should be granted.

Dated: June 27, 2008
      New York, New York

                                             PROSKAUER ROSE LLP


                                             Charles S. Sims
                                             Adam D. Siegartel
                                             1585 Broadway
                                             New York, New York 10036
                                             Tel: 212.969.3000
                                             Fax: 212.969.2900
                                             *Attorneys for Defendants*

**APPENDIX**
**Part 1**

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.))

▷Adsani v. Miller
S.D.N.Y.,1996.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Friederike Monika ADSANI, Plaintiff,
v.
Peter MILLER, PMA Literary and Film
Management, Inc., Jean P. Sasson, William Morrow
& Company, Inc., Avon Books, The Hearst
Corporation, Bantam, Doubleday, Dell Publishing
Group, Inc., Defendants.
No. 94 CIV. 9131.

April 22, 1996.

Stuart Fish, Cutler & Fish, New York City, Bruce K.
Lagerman, Lagerman & Associates, Reston, VA, for
Plaintiff.
Richard Dannay, Schwab Goldberg Price & Dannay
New York City, for Defendants Jean P. Sasson,
William Morrow & Company, Inc., Avon Books, The
Hearst Corporation, and Bantam Doubleday Dell
Publishing Group, Inc.
Carl E. Person, New York City, for Defendants Peter
Miller and PMA Literary and Film Management, Inc.

*OPINION & ORDER*

COTE, District Judge:
*1 Plaintiff Friederike Monika Adsani brings this
action alleging copyright infringement and related
state-law claims for breach of fiduciary duty,
misappropriation of ideas, and unjust enrichment.
Defendants Jean P. Sasson ("Sasson"), William
Morrow & Company, Inc. ("Morrow"), Avon Books
("Avon"), The Hearst Corporation ("Hearst"), and
Bantam Doubleday Dell Publishing Group, Inc.
("Bantam") move for summary judgment to dismiss
plaintiff's copyright infringement, misappropriation,
and unjust enrichment claims. Defendants Peter
Miller ("Miller") and PMA Literary and Film
Management, Inc. ("PMA") have joined in the
motion for summary judgment. For the reasons set
forth below, defendants' motion for summary
judgment is granted in part and denied in part.

BACKGROUND

The following facts are taken from the parties'
statements pursuant to Local Civil Rule 3(g). Plaintiff
is the author and owner of the copyrights in three
manuscript versions of her unpublished
autobiography titled "Cinderella in Arabia" or
"Cinderella in Kuwait" ("Cinderella"). Sasson is the
named author of two books: "Princess: A True Story
of Life Behind the Veil in Saudi Arabia"
("Princess"), published in hardcover in 1992 by
defendant Morrow and in paperback in 1993 by
defendant Avon, and "Princess: Sultana's Daughters"
("Daughters"), published in hardcover in 1994 by
Doubleday, a division of defendant Bantam and in
paperback in 1995 by another one of Bantam's
divisions, Dell Publishing.

The following facts are taken from the Complaint.
Plaintiff wrote "Cinderella" in 1986 and early 1987.
She first provided a complete version of "Cinderella"
to defendant Miller in January 1988. On August 31,
1988, plaintiff entered into an "Author's Agreement"
with PMA, pursuant to which PMA and Miller
agreed to be plaintiff's "sole and exclusive
representative and agent" of "Cinderella" for a period
of one year. On or about August 2, 1989, Miller
advised plaintiff that he was no longer interested in
marketing "Cinderella". Miller expressed renewed
interest in 1992, and plaintiff sent a new, updated
version of "Cinderella". Several weeks later, Miller
informed plaintiff that he had decided to market
another book: "Princess".

Plaintiff alleges that Sasson, with the help of Miller,
essentially stole the idea for "Princess" and
"Daughters" from plaintiff's "Cinderella". The sole
copyright issue raised by defendants' motion is
whether "Princess" and "Daughters" are substantially
similar to "Cinderella". With respect to the state-law
claims for misappropriation and unjust enrichment,
defendants argue that they are preempted by federal
copyright law.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the
submissions of the parties, taken together, "show that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 2
Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.))

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Rule 56(c), Fed. R. Civ. P. When deciding a motion for summary judgment, the Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor."*American Casualty Co. of Reading, Pennsylvania v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir. 1994).*

**\*2** In the context of an action for copyright infringement, the Court

may determine noninfringement as a matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff['s] work, or when no reasonable trier of fact could find the works substantially similar.

*Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir.), cert. denied, 476 U.S. 1159 (1986)* (citing *Warner Bros., Inc. v. American Broadcasting Co., 654 F.2d 204, 207 (2d Cir. 1981), aff'd, 720 F.2d 231 (2d Cir. 1983)* (hereinafter, *Warner II*))."Courts have an important responsibility in copyright cases to monitor the outer limits within which juries may determine reasonably disputed issues of fact."*Warner II, 720 F.2d at 245.* Summary judgment is appropriate when the lack of substantial similarity between the protectible aspects of the works is "'so clear as to fall outside the range of disputed fact questions' requiring resolution at trial."*Walker, 784 F.2d at 48* (quoting *Warner II, 720 F.2d at 239*).

## COPYRIGHT INFRINGEMENT

To succeed in its copyright infringement claim, plaintiff must demonstrate: (1) ownership of a valid copyright; (2) that the defendant has actually copied the plaintiff's work; and (3) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's. *Knitwaves, Inc. v. Lollytogs, Ltd., 71 F.3d 996, 1002 (2d Cir. 1995).See also Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 122-23 (2d Cir. 1994); Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139 (2d Cir. 1992).* For the purposes of this motion, defendants do not challenge the validity of plaintiff's copyright nor that they had access to "Cinderella".

It is axiomatic that copyright protection "does not extend to ideas; it protects only the means of expression employed by the author."*CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc., 44 F.3d 61, 68 (2d Cir. 1994), cert. denied, 116 S. Ct. 72 (1995).* As many courts have noted, this distinction is more easily stated than applied. *See, e.g., Walker, 784 F.2d at 48.* In tackling the problem, courts have often invoked the language of Judge Learned Hand, sometimes referred to as his "abstractions test":

Upon any work ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas', to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930), cert. denied, 282 U.S. 902 (1931).* In examining two works for substantial similarity, the "focus must be on the similarity of the expression of an idea or fact, not on the similarity of the facts, ideas, or concepts themselves."*Rogers v. Koons, 960 F.2d 301, 308 (2d Cir.), cert. denied, 506 U.S. 934 (1992)* (citing *Durham Industries, Inc. v. Tomy Corp., 630 F.2d 905, 912 (2d Cir. 1980)*). Because copyright does not protect "thematic concepts", there is no copyright protection for "scènes a faire", that is, "sequences of events which necessarily follow from a common theme."*Reyher v. Children's Television Workshop, 533 F.2d 87, 91 (2d Cir.), cert. denied, 429 U.S. 980 (1976).* Therefore, "'no one infringes, unless he descends so far into what is concrete (in a work) as to invade ... (its) "expression."'"*Id.* (parentheses in original) (quoting *National Comics Publications v. Fawcett Publications, 191 F.2d 594, 600 (2d Cir. 1951)*). Similarly, there is no copyright protection for familiar "stock figures" borrowed from the public domain. *See Nichols, 45 F.2d at 121-22* ("the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly").

**\*3** Although the legal question focusses on the existence of *similarities* between the works, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Second Circuit has observed that "'numerous differences tend to undercut substantial similarity.'"*Warner II*, 720 F.2d at 241 (quoting *Durham*, 630 F.2d at 913). A court should look both at the individual parts of the work and its whole, for:

just as similarity cannot be rejected by isolating as an idea each characteristic the characters have in common, it cannot be found when the total perception of all the ideas as expressed in each character is fundamentally different.

*Warner II*, 720 F.2d at 243 (television character "Great American Hero" found not to infringe upon the character "Superman" as a matter of law). The general test for evaluating "substantial" similarity is "'whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'"*Warner Bros., Inc. v. American Broadcasting Companies*, 654 F.2d 204, 208 (2d Cir. 1981)(*Warner I*) (quoting *Ideal Toy v. Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir. 1966)). Ultimately, a court must determine whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same."*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand, J.). Customarily, courts resolve the question "primarily through detailed viewing or reading of the works themselves,"*Walker*, 784 F.2d at 52, and by examining their "'total concept and feel.'" *Knitwaves*, 71 F.3d at 1003 (quoting *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 (2d Cir. 1982)).[FN1]

A. Summary of the Works Considered

1. "Princess"

Echoing the famous first line of Jean Jacques Rousseau's *The Social Contract*, Princess Sultana announces in the Introduction to "Princess" the book's general theme of female subjugation in the male-dominated Kingdom of Saudi Arabia with these words: "I was born free, yet today I am in chains.'"*Princess"* is principally a collection of anecdotes purportedly taken from the life of a real Saudi princess named Sultana, whose name has been changed for her protection. "Princess" is also interspersed with many comments about Saudi culture and Sultana's religion, Islam.

Born in 1956, Sultana is the tenth and youngest child in her family. She is "from an early age ... the family troublemaker."As a child, and unlike her sisters, Sultana was "loud and unruly," "[w]illful and reckless." She was her mother's favorite, but being a girl, her father's "last of many disappointments." Sultana describes her father as "an intense man filled with dark cruelties" and a "merciless man." He has four wives and a total of twenty-two daughters. Sultana's mother was his first wife. Sultana's mother "was a melancholy woman" who gave birth to sixteen children, only eleven of whom survived through adulthood.

*4 Sultana has a privileged upbringing in terms of material possessions. The family has many servants and four palaces in Riyadh, Jeddah, Taif and Spain, all of which are exactly the same in each city. The girls' privileged upbringing, however, was not unqualified. Since her father refused for quite some time to permit his daughters to receive any kind of an education (other than to memorize the Koran), the children "had little or nothing to do other than to play in our rooms or lounge in the women's gardens."Sultana's older sisters were uneducated as a result. With the assistance of King Faisal's wife, Sultana's mother convinced her husband to allow his other female children, including Sultana, to receive an education.

After her father, the other principal male in Sultana's family is her older (and only surviving) brother, Ali, who from the time that she was seven years old, "was [Sultana's] devoted enemy." He was a cruel child.

Sara is Sultana's favorite sister. According to Sultana, Sara is "exceptionally bright," and the most beautiful of her father's daughters, with "huge brown eyes" and "long black hair." As a child, Sara's dream was to study art in Italy and be the first to open an art gallery in Jeddah. Sara's dream ends, however, on her sixteenth birthday, when she learns that she is engaged to be married. Desirous of marrying Sara to a "man of great prominence and wealth," her father chose a sixty-two year-old man who was a member of a leading merchant family in Jeddah. Sara becomes that man's third wife. Like her other sisters, Sara has no choice in the matter, and is greatly upset by the news. It is a very unfortunate marriage: five weeks after her wedding, Sara attempts suicide.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 4
Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.))

She is brought to such a desperate act by her husband's "sadistic ... sickening sexual brutality." This is the first of many stories of sexual brutality and exploitation of women found in "Princess." Eventually, Sara is divorced from her husband and returns home. Sara's experience provides Sultana with "a new resolve ... to live, breathe, and plot for the rights of women in my country."

After Sara's return, Nura — the oldest daughter — convinces her father that Sara needs a vacation to cure her depression. Nura, her husband Ahmed and their three children, along with Sara, Sultana, Ali and his friend Hadi, leave for a trip to Italy and Egypt aboard Ahmed's private plane. Sultana is fourteen years-old at the time. It is in Cairo that Sultana begins to menstruate — a defining moment that means she has left the relative freedom of childhood and entered the constricted life of a woman. From now on, she is required to wear a veil and *abaaya*, the long, black cloak worn over a woman's clothing. Although unsettled by the "grinding poverty" she sees, Cairo becomes Sultana's favorite city. While in Cairo, the family stays in Ahmed's large apartment. Returning early one day to the apartment, Sultana and Sara discover Ali and Hadi raping an eight year-old girl who had been "sold" by the girl's mother. Sultana then learns through a shameless Ali that her father "always did the same sort of thing when he came to Cairo."

*5 Sultana's mother dies soon after her return from her trip; she is buried in the desert. Four months after her mother's death, her father marries her fifteen year-old cousin Randa. Hurt by her father's indifference to her mother's recent death, Sultana "vow[s] to awaken Father's new wife to a path of purpose: freedom for women in our land."Her plan is to introduce Randa to two friends of hers, Nadia and Wafa, who "might encourage Randa to become more assertive."The four of them create a private club called "Lively Lips." The club's life is short-lived, however, because Nadia and Wafa get into trouble by picking up men for sexual escapades. Both girls are punished: Wafa is hastily married to a fifty-three year-old bedouin religious man (*mutawa*), and Nadia is drowned by her father in her family's swimming pool. Sultana's father discovers the existence of "Lively Lips" and divorces Randa.

Sultana becomes depressed by the recent debacle of

"Lively Lips" and the fate of her friends. Marci, Sultana's Filipino maid, consoles her by telling stories. Through Marci's stories, Sultana learns of the physical abuse inflicted on foreign-born servants, and "that women from Third World countries were held as sex slaves in my own country, Saudi Arabia."Sultana also learned that her father intends to marry her three months after her sixteenth birthday.

Huda, Sultana's Sudanese servant, engages in the occult. Huda reads Sultana's palm and predicts Sultana's marriage. She prophesizes that Sultana will "find misery and happiness in one man," and her "future actions would bring good along with bad to the family I loved."Sultana learns later that evening that her father has found a husband for her; his name is Kareem and is a royal cousin. Huda also prophesizes that Sara will remarry and have six children.

Kareem is twenty-eight at the time of his engagement to Sultana; he is "exceptionally handsome," was educated in London as a lawyer, and recently has opened his own law firm in Riyadh. Sultana at first is not interested in Kareem, and she calls Kareem's sister to tell her, among other things, that her face was "hideously scarred." As a result, she is examined by two of Kareem's aunts. Sultana scares them off by threatening to bite them. To Sultana's surprise, her father is amused by Sultana's behavior and later agrees to let Sultana meet Kareem before the wedding. This is highly unusual and Sultana considers it a triumph to have achieved this much influence in her destiny. At this meeting, Sultana and Kareem fall in love. During a telephone conversation, Kareem asks Sultana if she had been circumcised; not knowing the answer, she asks her family at the dinner table and a scandalized Ali orders Nura to have a talk with Sultana. Through Nura, Sultana learns from someone with first-hand knowledge about female circumcision. Sultana learns that she was saved from this procedure by a "Western doctor" who discovered that four of her sisters had been circumcised; to Sultana's surprise, her mother was responsible for her sisters' circumcision. Sultana thus learns that a "major obstacle to change and relief from our antiquated customs were the women of Arabia themselves."Happy to learn that her future husband is concerned about her own sexuality, Sultana "looked to [her] wedding date with determined anticipation. [She] would be the first of the Saudi women to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 5
Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.))

reform her inner circle."

**\*6** After their wedding and ten weeks-long honeymoon, Sultana moves in with her in-laws. Sultana learns that her mother-in-law, Noorah, tried to kill her own husband's second wife by means of black magic. Noorah is unhappy about Kareem's choice of a wife, and she makes life difficult for Sultana. A fight breaks out between Noorah and Sultana; Kareem takes his mother's side and hits Sultana. When Kareem's younger brother Muneer gets into trouble with the *mutawas* for smuggling alcohol, Sultana takes advantage of her father's closer kinship to the King by threatening Noorah that she will seek a severe punishment for Muneer. In a flash of anger, Sultana suggests that she and Kareem should divorce; Kareem seems to agree. Soon afterwards, Sultana discovers that she is pregnant; she decides to get an abortion because Kareem will not divorce her if he discovers her pregnancy. There is no abortion, however, because Kareem discovers Sultana's plans and, at the abortion clinic, professes his love for Sultana and "vow[s] that he had never considered divorce."

Meanwhile, Sara and Kareem's brother Asad fall in love and get engaged. Sultana gives birth to a baby boy -- Abdullah. At the maternity ward, Sultana learns that a young woman (fourteen or fifteen years-old), who was brutally raped by several boys, is being falsely accused of fornication; her father's punishment for her is death by stoning, which takes place immediately after delivery of her baby. The rapists go unpunished.

A few years later, Sultana learns that Sameera, a friend of her sister Tahani, is being punished for having a non-Muslim lover. She is sentenced to the so-called "woman's room," which places her in solitary confinement for the rest of her life. Sultana gives birth to two daughters, Maha and Amani. By this time "the fiery Sultana ... ha[s] become an ordinary, dull, and listless Saudi woman," bored with her "lazy and luxurious life." Sultana is diagnosed with breast cancer; although she has lost one breast to the disease, her doctors are optimistic. Upon recommendation by her physicians not to become pregnant, Sultana decides to undergo sterilization. Under the pretense of wanting more children, Kareem tells Sultana that he plans to wed another woman. Rather than suffer the humiliation of no

longer being the sole wife, Sultana escapes Saudi Arabia with her three children. During her escape, Sultana hears the sad story of a fellow passenger, whose child was kidnapped by a rich Saudi and forced to donate one of her kidneys. Sultana returns to Saudi Arabia only after making Kareem sign a legal document in which he agrees to never take a second wife. Were he to break his promise, Sultana would be able to divorce him, take all his children and half his fortune. To insure their freedom and financial independence, Kareem also agrees to deposit one million dollars in each of his daughter's names in a Swiss bank account, and gives Sultana papers that enable her and her children to travel without restriction.

2. "Daughters"

**\*7** Only one month after its publication, "Princess" is discovered by Ali during a trip to Germany. A family meeting takes place, and Sultana admits that it is based on her life. Sultana threatens to go to the King himself. Her father, afraid of creating a scandal, decides not to punish Sultana but forces her to promise to keep quiet. Sultana privately disavows her promise, resulting in "Daughters", the sequel to "Princess".

In "Daughters", Sultana relates more stories about her life, primarily through her experience as a mother. Maha, Sultana's eldest daughter, is a "stunningly attractive girl, with a frighteningly seductive personality" and a "demonic energy." Hurt by her father's affections for her brother Abdullah, Maha grows up a belligerent child. She and her friend Aisha get into trouble when Kareem discovers that Maha has a gun. At a meeting between the two families, Maha becomes enraged when the parents decide that the two girls should no longer be friends. Preoccupied by their daughter's frenzied state, Sultana and Kareem decide to take Maha to London to consult a psychiatrist. Prior to their departure, Sultana discovers evidence that Maha has engaged in black magic. In London, the psychiatrist informs Sultana and Kareem that their daughter hates men and is in love with Aisha. Sultana speculates that it is her country's religious fanatics who have "driven my daughter into the arms of a woman."Maha recovers after several months of treatment and confides in her mother of the trauma which Sultana's escape from Kareem caused her when she was a little girl. Maha

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.))

tells her mother that her dislike of men also resulted from learning that Aisha's father had sex with many young girls, some of whom he had "married" solely for the purpose of having sex with them. This kind of arrangement, according to Sultana, is called *mut'a*, and it is only a temporary union. Upon their return to Saudi Arabia, Maha confesses that Sultana's mother-in-law (Noorah) introduced her to black magic.

Sultana convinces a reluctant Kareem that the family should make the pilgrimage to Mecca, or *Haj*, to give thanks to God for Maha's recovery. Sultana learns that Kareem's apparent lack of faith is due to a nightmare he once had that he would be trampled to death by pilgrims. During the pilgrimage, Sultana observes her daughter Amani's religious awakening with apprehension. The *Haj* brings Sultana and Kareem closer together.

After the *Haj*, the family travels to the family palace in Jeddah. Amani, who by now has become extremely religious, organizes a religious group of whom she is the leader. Sultana expresses her fear that Amani's repudiation of her family's wealth will one day result in the overthrow of the Saudi monarchy. Through Amani, Sultana learns that Majed, Ali's son, raped a woman who was unconscious at a hospital. A scandal is averted by paying off a hospital orderly who witnessed the crime.

Abdullah discovers that his best friend, Jafer, has escaped Saudi Arabia with Fayza, the daughter of Kareem's business partner, Fouad. Jafer is Palestinian and poor but very handsome. The two are later found in the United States, and Fouad, with his sons, forcibly take Fayza back to Saudi Arabia. Jafer is not allowed to return to Saudi Arabia. Abdullah vows to meet his friend in Lebanon. Sultana discovers Abdullah's plot to help Fayza escape Saudi Arabia, but she decides not to divulge his plan. Sultana finds hope in her country's future because Abdullah, although a man, has demonstrated his courage and understanding for the young lovers' plight. Although Sultana does not know where Abdullah plans to take Fayza, Kareem accuses Sultana of knowing Abdullah's travel plans. Fayza escapes and rejoins Jafer. Fayza's father finally agrees to the marriage. Sultana's family goes to Cairo to celebrate Fayza and Jafer's wedding. Kareem asks for Sultana's forgiveness, and Sultana finally feels that her

marriage is back to what it was before her escape.

*8 After the wedding, Sultana learns from Fatma, her Egyptian maid, that Fatma's granddaughter, Alhaan, is going to be circumcised that evening. Although reluctant to interfere in a family matter, Sultana agrees to try to dissuade Fatma's daughter, Elham, from going ahead with the ceremony. Sultana and Fatma are driven to Elham's home by Abdullah, who expresses regret that some women still have to suffer such an operation. Sultana is unsuccessful, and the family departs the next day for Monte Carlo.

The family's visit to Monte Carlo is abruptly cut short by the news that Reema, one of Sultana's sisters, has been brutally sodomized by her husband Saleem. Sultana returns to Saudi Arabia to see Reema. Back in Saudi Arabia, Sultana learns that Ali divorced his most favored wife, Nada, because she had refused to accommodate his desire to have sex with him late at night. Ali now regrets having divorced Nada and enlists his sisters' help to convince Nada to remarry him. Nada at first expresses her desire to leave Ali for good but later changes her mind, apparently lured by Ali's wealth.

Although Reema does not want to live with Saleem, she decides that it is better to stay married to Saleem rather than lose all of her children. Sultana is disappointed by Reema's choice, but she understands how important the children are to Reema and promises not to seek retribution against Saleem.

A week later Sultana and her sisters get together for their annual gathering in memory of their mother. Sultana is amused to learn that her mother made each one of her sisters promise to keep Sultana in their prayers. Sultana also learns that Sameera has died that day after having spent fifteen years confined in the "woman's room." Sultana "promised [herself] that somehow the moral order of our world would be changed, and right would triumph someday."

### 3. "Cinderella"[FN2]

Monika was raised in a convent school in Austria. As a student at Oxford University in the 1950s, Monika meets and falls in love with a foreign medical student from Kuwait, Abdullah Amahani ("Abdullah"). Monika is a "fashion and body conscious" pretty blonde who loves listening to Elvis Presley. Abdullah

Not Reported in F.Supp.                                                                                                    Page 7
Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.)
(Cite as: Not Reported In F.Supp., 1996 WL 194326 (S.D.N.Y.))

likes to drink, have fun, and does not take his studies seriously. Monika gets pregnant, and the two secretly marry in England after their baby boy, Saud, is born. Through Monika's hard work and the discipline she imposes on Abdullah, Abdullah finally passes his exams. Abdullah leaves for Kuwait to prepare the way for Monika.

Much of Monika's experience in Kuwait involves suffering the insults and crude behavior of her in-laws. Abdullah has three sisters: Diba, Sabiha and Tamader. Abdullah's family controls him, and Monika soon realizes that Abdullah will never take her side against his family. For example, although Abdullah promises her a new home within two weeks after her arrival, it takes seven years of living with her in-laws before that dream comes true. The reason for this delay is Abdullah's mother's insistence that he live at home. Monika is sure that much of her in-laws' hostility is due to their jealousy, because she is "pretty and witty ... was all day elegantly dressed in western clothes while they walked about like unmade beds in the house."She later discovers that her in-laws practice black magic and cast spells on Abdullah to control him and turn him against her.

*9 Monika has no privacy; she is not allowed her independence. For example, during her first three months in Kuwait, Monika is told what to wear by her mother-in-law, whose guests stop by the house to see her son's new, foreign wife. According to Monika, her mother-in-law is greedy, abusive, and suspicious of everything she does. Monika feels treated like another house servant.

Monika and Abdullah occupy the top floor of her in-laws' ill-kept, dirty, and vermin-infested house. According to Monika, however, her "European ways" teach her in-laws how to keep a clean, tidy house.

Abdullah soon obtains a high position in a Government hospital and works for only half of the day. He drinks often and, when drunk, he becomes abusive and insults Monika.

During her years in Kuwait, Monika learns many things about Kuwaiti culture. For example, she learns that being the wife of an *Aseel* Kuwaiti is a privilege; [FN3] that despite Islam's prohibition against drinking alcohol, "its [sic] an open secret that a lot of people

drink"; that many things get done in Kuwait by giving and getting "special favors" (*wasta*).

Monika's social life involves women-only parties, going to the sea, camping in the desert, seeing movies. Four years after her arrival, Abdullah goes to London for further medical training; Monika accompanies him. In London, Abdullah becomes "his old caring natural humourous [sic] self again."Monika gets pregnant with their second child. Unfortunately, Sabiha and Tamader pay them a visit and make life difficult for Monika. Naeel is later born. A fight breaks out between Monika and Abdullah, largely on account of Abdullah's sisters' rude behavior, and Abdullah moves out of the apartment — but only until his sisters go back to Kuwait. The two make up and Monika follows Abdullah back to Kuwait.

Back in Kuwait, Abdullah buys Monika a car; this creates more problems with the in-laws. Apparently as a result of her in-laws' witchcraft, Naeel suffers three accidents. Bored and depressed about her life, Monika convinces Abdullah — by giving him "sexual performances 'a la carte'" — to let her open up a restaurant. Monika gets pregnant with Latif. The restaurant becomes a very successful venture and gives Monika some independence from her in-laws. Still, there are many times when Abdullah makes Monika feel that she was less important than his mother and sisters. Abdullah also engages once again in a cycle of drunken and abusive behavior, followed by apologies and promises never to do so again. "Monikas [sic] Kuwaiti husband was now transformed into a completely different person."To Monika, "her hope of freedom" lies in the new house being built for her and Abdullah; it is the only thing that gives "her the power to carry on."

Monika's new house, to which she contributed much of the design and interior decoration, is admired by Abdullah's friends and even copied by one of his sisters. Unfortunately, even after moving into her new, palatial home, Monika does not find the peace and independence that she hoped for. Because her in-laws visit constantly and make themselves at home, even Monika's home is not her own home. "[N]ow there was no light left at the end of the tunnel."Her restaurant burns down. While at the hospital to have her tonsils removed, Monika learns of Abdullah's affair with a woman named Fawzia. For the first time

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.))

Monika contemplates escaping Kuwait. An angry Monika confronts Abdullah and calls Fawzia's husband to expose her infidelity. "The only reason she stayed ... were her kids."Monika puts on weight as a result of her depression; "she felt useless and wasted." She opens a boutique to take "her mind off things a bit," but still "her general outlook was very very bleak."By this time, Monika is more or less convinced that her mother-in-law's witchcraft is responsible for her misfortunes. The boutique is successful, but Monika often receives harassing telephone calls. Monika's health deteriorates; afraid that she has cancer, she goes to Austria to see a doctor. Her doctor advises her that her ailment is not cancer but depression, and he counsels her to be stronger and more assertive.

*10 Monika returns to Kuwait, a much happier person. Abdullah goes to California for a six-month medical course. A fight between Monika and the in-laws breaks out, and Abdullah, to Monika's surprise, takes her side. Although the in-laws stop bothering her, several bizarre things happen to Monika. She gets prank calls by people who apparently have been following her. She has two automobile accidents. Once again, Monika believes she is the victim of her in-laws' black magic. When Abdullah returns, he soon reverts "to his unnormal [sic] behaviour." A woman named Bettina writes Monika from the United States to warn Monika of Abdullah's unfaithfulness. Apparently, Abdullah seduced Bettina, promising her that he would soon divorce Monika.

Monika and Abdullah leave Kuwait after Abdullah is offered a job at the Kuwaiti embassy in London. Abdullah spends much of his time gambling, drinking, and cheating on his wife. Monika gets pregnant, but this time, and unbeknownst to Abdullah, she decides to have an abortion. Monika also works for the embassy, but Abdullah becomes jealous of his wife's excellent reputation and later forces her to resign. She builds a house in the country outside Vienna. She also tries to open up a Kuwaiti restaurant in London but cannot when Abdullah changes his mind at the last minute. Eventually, Monika convinces Abdullah to divorce her after twenty-three years of married life.

In May 1991,[FN4] after the end of the Gulf War, Monika flies to London from Vienna to see her son

Saud. Her high spirits end abruptly when Abdullah tells her that Saud, a first lieutenant in the Kuwaiti Air Force and a resistance fighter during the Iraqi occupation of Kuwait, is in the hospital. Monika learns that her son was tortured by a Kuwaiti sheik, after being wrongfully accused of copying and circulating a pornographic video tape involving the sheik and another woman.

B. Comparison of the Works

The Court has read "Cinderella" (the 1987 and 1992 manuscript versions), [FN5] "Princess", and "Daughters". Plaintiff claims that Sasson appropriated the character of Monika; that is, plaintiff claims that the personalities of Sultana and Monika,

their role in the plot, their development throughout the story, their interaction with the other characters, their reactions to certain triggering events, their patterns of behavior and their behavior at (the same or similar) critical junctures in their lives, are virtually identical.

Plaintiff also claims that Sasson "appropriated substantially the identical tone and mood," as well as "numerous novel and unusual events and occurrences" from plaintiff's "Cinderella", at least from that portion of "Cinderella" that follows Monika's arrival in Kuwait. In summary, plaintiff claims that there is substantial similarity with respect to "sequence of events, interplay of characters, treatment, details, scenes, characterization, selection or arrangement of facts, and some literal expression."

1. Characterization

*11 With respect to plaintiff's claim that Sultana is substantially similar to Monika, the Court must consider

the "totality of [their] attributes and traits" as well as the extent to which the defendants' characters capture the "total concept and feel" of figures in the book.

*Walker, 784 F.2d at 50* (quoting *Warner II, 720 F.2d at 241*). Sultana and Monika are starkly different women. To begin with, Sultana is born into a royal family in Saudi Arabia. She is surrounded by a large family. Sultana is a devout Muslim who is proud of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

her heritage; her only dislike about her culture is its treatment of women. Her own sex life is not discussed in any detail. In sum, Sultana is portrayed as a decidedly non-Western but progressive Saudi woman. Religion is a very important part of her life.

Monika, on the other hand, is a European, born to an Austrian mother who is a dentist and a Czech father, also a dentist. Since she was a child, Monika's parents were involved in a protracted divorce, which lasted twenty-five years and ended when her father died after an auto accident. She is educated in a convent school in Austria and lives a lonely, isolated life as a child. As she reaches adulthood, she becomes proud of her blonde and sexy looks; she considers herself to have excellent taste and to be a very good dresser. "Cinderella" is replete with instances in which Arab men whistle at her or make sexually suggestive comments directed at her. The fact that she is a *Hamra* — a white person — living in Kuwait, with all its advantages and disadvantages (*e.g.*, sexual harassment and being called or treated like a prostitute), is a constant theme of "Cinderella". Her sexual life is frequently and sometimes vividly discussed. She loves to listen to Elvis Presley. Monika has next to nothing positive to say about Kuwaiti culture or Islam; indeed, her commentary is often marked by statements of European culture's superiority over the "backwardness" of Kuwaiti culture. By contrast to Sultana, Monika is decidedly Western in mentality, and religion plays no part in her life.

Moreover, the relationships between Sultana and Kareem on the one hand, and Monika and Abdullah on the other hand, are very different. Kareem has his faults, but he is not the debauched and abusive womanizer that Abdullah is portrayed to be. He is not portrayed as always following his mother's wishes, like Abdullah. Indeed, Kareem and Sultana live most of their married life quite independently of the influence of their parents, in stark contrast from Monika and Abdullah, who never escape the presence and control of Abdullah's mother so long as they live in Kuwait. Finally, Kareem is truly fond of Sultana and his children; rather than divorcing her after her escape from Saudi Arabia, Kareem gives in to all of her demands and, in "Daughters", he is portrayed as a loving, liberal-minded husband. Abdullah, to say the least, is the opposite of Kareem. Abdullah is portrayed as an infantile, alcoholic, lazy,

unfaithful and abusive husband.

*12 Much of Sultana's character is developed by her relationships with her sisters and her much-despised brother Ali. Thus, Sultana is portrayed as a caring woman who loved her mother and sisters; she has, however, an explosive temper and, at times, a mischievous nature, as when she plays various pranks on Ali. Monika, on the other hand, admits that she was not close to her mother, to whom she refers as "Dentist Pacek". Her father and brother are hardly mentioned. Thus, besides Dentist Pacek, the reader knows very little about Monika's family.

Unlike Sultana, Monika has an entrepreneurial personality. She takes the initiative to clean up and decorate her living quarters. Rather than living a boring life, Monika opens up her own highly successful restaurant in Kuwait. After the restaurant burns down, Monika opens up a boutique, which is also quite successful. While living in London, Monika works at the Kuwaiti embassy and tries to open another restaurant. This aspect of Monika's character is completely absent in Sultana, and given Sultana's status as a wealthy and pampered member of the royal family, it would have been utterly shocking for her to engage in many of the dramatic events of Monika's life in Kuwait, from scrubbing the floors and walls of her living quarters, to opening businesses in order to gain some financial independence and ease her boredom.

## 2. Setting

Plaintiff's claim of substantial similarity with respect to the works' setting is similarly lacking in validity. For example, the plaintiff points out that both works take place in Middle Eastern cities (namely, Kuwait City and Riyadh); both Sultana and Monika marry men "from high social classes, with many financial comforts" and initially live with the in-laws and move into the upstairs floor; both travel to Cairo, stay in "apartments owned by relatives," visit a nightclub, and

do not focus on the positive sight-seeing aspects of Cairo, but instead make sad comments on the poverty in Cairo, witnessing Egyptians who engage in child prostitution or self-inflicted injuries all in an effort to obtain money.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 10
Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.))

In addition, plaintiff points out that the husbands travel with their wives to New York, California, Hawaii, London, Cairo, and Italy; that both Sultana and Monika "move into newly-built extravagant homes near a mosque, complete with gardens and a zoo."

Plaintiff's rendition of similarities is very misleading. Although Saudi Arabia and Kuwait are both in the Middle East, both works highlight the fact that Saudi Arabia is a more conservative Islamic country than Kuwait. In "Princess" the reader is told that Kuwaiti women are allowed to drive and go unveiled; this freedom is a source of great inspiration to Saudi women like Sultana. In "Cinderella," Monika emphasizes the difference between the two countries in no uncertain terms:

Saudia [sic] Arabia ... is much much [sic] stricter than Kuwait in [any] respect .... Kuwait is a paradise compared with Saudi Arabia, the true stories that come out of there would make interesting reading in the west, so dont [sic] ever put Saudia [sic] Arabia and Kuwait into the same pot, the difference is like young and old.

*13 (1987 Manuscript at 196.) Furthermore, the Saudi Arabia depicted by Sultana is one of great affluence and sophistication. In contrast, the Kuwait Monika depicts is replete with instances of vulgar behavior. At any rate, the fact that both works take place primarily in the Middle East is not itself protectible.

Although it is true that Sultana and Monika marry Arab men from "high social classes" — Kareem, like Sultana, is a member of the Saudi royal family, and Abdullah is an *Aseel* Kuwaiti — Abdullah, though well-to-do, is not nearly as wealthy or sophisticated as the members of Sultana's family. For example, Sultana has four homes; Kareem has to wait seven years to build one home for himself and Monika. Sultana and her family often travel in their private planes; this is never mentioned as one of the luxuries that Abdullah could afford. Monika describes Abdullah and the majority of Kuwaitis in derogatory terms (*i.e.*, as "nouveau riche"). In short, they are, in Monika's eyes, people who have great wealth but no culture or, for that matter, taste, unlike Monika. Thus, Monika and Sultana lived at very different strata of Middle Eastern life, in addition to living in countries

that are very different.

Plaintiff also overlooks the salient differences between the homes of Sultana and Monika. Monika's in-laws lived in a "filthy neglected flat" with rats that "even came out at night to watch TV standing up on their hind legs" and a kitchen "where cockroaches lived quite undisturbed on some cupboard shelves."In addition, nowhere is it even hinted that Sultana lived in the upper floor of her in-laws' home, as did Monika. The passage plaintiff cites for this proposition only describes Sultana walking down a staircase.

Although both Sultana and Monika travelled to Cairo and stayed at a relative's home, the settings are, again, very different. Monika's was "so cockroached [sic] infested that when the light was switched on late at night the whole room came alive."Sultana, on the other hand, stayed in a "luxurious apartment." Finally, Monika's experience in Cairo was very different from Sultana's. For example, Monika — but not Sultana — witnessed beggars who deliberately inflicted (or feigned) injuries to arouse pity. Sultana -- but not Monika -- witnessed her brother's participation in the rape of an Egyptian girl who had been sold by her mother.

The fact that the characters in both works travelled to such popular destinations as New York, California, Hawaii, Italy, and London does not rise to the level of protected expression. The motive for these trips is also very different. Sultana and Kareem went to Cairo, Paris, New York, Los Angeles, and Hawaii for their honeymoon. Monika went to New York, Washington, Los Angeles, Las Vegas, San Francisco, and Memphis (to visit Elvis Presley's home) for no reason other than to take a vacation. Sultana went to Italy with her sister Sara; the purpose of this trip was to help Sara recover from her depression. In contrast, there was no stated purpose for Monika's trip to Italy.

*14 Finally, Monika's "zoo" consisted of two parrots, a monkey, a donkey, a skylark, a siamese cat, and a dog. The context makes it clear that Monika's statement was hyperbolic, not descriptive, in nature. In contrast, Sultana and Kareem built a small zoo, equipped with "spacious caged areas" and "numerous breeds of exotic animals" for their daughter Amani.

3. Sequence of Events

The summaries above make clear that there is no similarity, much less substantial similarity, between the works in terms of sequence of events. The manner in which Sultana and Monika meet their husbands is very different. Sultana's marriage was prearranged by her father and, besides one brief, chaperoned encounter, she had no contact with Kareem before their wedding. Monika met Abdullah in England, and the two had an active sexual life before getting married. Indeed, the marriage was due to Monika's pregnancy. Sultana had a lavish wedding, attended by her family; Monika's wedding was in a registry office and without anyone's knowledge. Unlike Monika, Sultana does not live for any extended period of time in England. Although Sultana and Monika have three children, Sultana has two daughters and one son, whereas Monika has three sons. "Cinderella" consists of one humiliating or frustrating experience after another, usually as a result of Monika's in-laws; the only thing that keeps Monika going is the hope that her problems will go away once she moves into her new home. This, however, does not happen, because Abdullah practically converted his new home into his mother's second home. Thus, Monika never succeeds in keeping her detested in-laws away from her and Abdullah. None of this occurs in "Princess" or "Daughters". Sultana escapes with her children in "Princess", but she and Kareem reunite and eventually become a happy couple in "Daughters". In "Cinderella", Monika never escapes from Kuwait, and plaintiff's statement that "Adsani's 'escape' is in the form of a divorce from her husband," a divorce that takes place after they are living in England again, will not make it so.

Plaintiff also lists a litany of similar details which, in the main, are nothing more than trivial instances of similarity which, particularly in light of the vast differences in structure between the works, do not approach meaningful, much less substantial similarity.

4. Mood and Overall Tone

Plaintiff attempts to portray "Cinderella" as a work that, like "Princess" and "Daughters", expresses concern for women's rights in Kuwait. Indeed, plaintiff claims that the tone of the works is that of "strong, high-spirited women who portray their personal experiences and relate the dominance of men and the subservience of women in the Middle East."Although "Cinderella" does mention instances of women's secondary status in Kuwait, its tone or mood is rather one of anger, frustration and contempt for Monika's in-laws in particular and Kuwaiti society in general. Furthermore, "Cinderella" at times employs strong, foul language and portrays adult situations that underscore the theme of Kuwait's lack of refinement (e.g., Kuwaiti men masturbating at the sight of bikini-clad, white women). In plaintiff's own words, "Cinderella" "exposes affluent, yet uncouth everyday Kuwait."

*15 "Princess" and "Daughters", in contrast, convey a different tone, as would be expected of someone who is proud of her culture and religion, but saddened about the way women are treated in her country. There is no foul language in "Princess" or "Daughters", and the adult situations in these books underscore the books' stated purpose — "unveiling" the lack of women's rights in Saudi Arabia.[FN8]

In conclusion, the only similarities between these two books stem from the fact that each has a female protagonist living in a Middle Eastern country. Beyond that, they bear almost no relationship to each other. "Princess" and "Daughters" tell the story of a very privileged, wealthy woman from the highest social stratum married to a hard working, decent, enlightened husband. She is principally concerned about the lot of women in Saudi Arabia, a country she describes as having a deeply religious culture. Drawing on her life experiences, she relates anecdotes about the shocking treatment of other women in her country.

In contrast, "Cinderella" is the biography of a European woman who is financially dependent on her abusive, unfaithful, alcoholic husband. She relates her personal struggle to survive in an alien culture for which she has little respect. Her struggle centers on the grotesque treatment she receives from her husband and her in-laws, bringing to mind the image of the fairy tale Cinderella's treatment at the hands of her step-mother and step-sisters. To preserve her mental health, she engages in various entrepreneurial projects, including opening a restaurant and a boutique. The country she describes is preoccupied with consumerism and alcohol, rather than religion. Rather than being concerned with issues of feminism

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.))

Page 12

and human rights, she is concerned with fashion, table manners, social status, acquisition of wealth, and the way Kuwaitis treat foreigners. It is, in the final analysis, a deeply personal story of one woman's escape from a humiliating and degrading marriage, an escape made possible by her tremendous energy and indomitable spirit. The feminist issues that are at the core of "Princess" and "Daughters", such as female circumcision, are mentioned in passing simply as further examples of the backwardness of Arab culture.

As plaintiff concedes, there is no protection under the copyright laws for ideas, only for the expression of ideas. These two stories are not similar in mood, details, sequence, or characterization. Even when viewing the works in a light most favorable to the plaintiff, the conclusion is inescapable that there is no substantial similarity between "Princess" or "Daughters" on the one hand and "Cinderella" on the other.

### STATE-LAW CLAIMS

Plaintiff admits that her claim for unjust enrichment is preempted by the Copyright Act. Plaintiff, however, contends that her claim for misappropriation is not preempted for two reasons. First, plaintiff argues that, because her misappropriation claim includes an element of breach of fiduciary duty, it therefore has an "extra element" which precludes federal preemption. Second, plaintiff argues against preemption because the subject matter of copyright law does not extend to ideas, which are given protection through the law of misappropriation.

*16 Section 301(a) of the Copyright Act states in pertinent part, that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright ... are governed exclusively" by the Copyright Act. 17 U.S.C. § 301(a).Section 301(b), however, limits this broad displacement of state law. Section 301(b) states in pertinent part, that

[n]othing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to ... activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

17 U.S.C. § 301(b).Section 106 provides the copyright owner with the exclusive right to: (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies of the work by sale or otherwise; and, with respect to certain artistic works, (4) perform the work publicly; and (5) display the work publicly.

Computer Assocs. Int'l v. Altai, Inc., 982 F.2d 693, 716 (2d Cir. 1992) (citing 17 U.S.C. § 106(1)-(5)).Section 301"thus preempts only those state law rights that 'may be abridged by an act which, in and of itself, would infringe one of the exclusive rights' provided by federal copyright law."Id. (quoting Harper & Row, Publishers, Inc. v. Nation Enters., 723 F.2d 195, 200 (2d Cir. 1983), rev'd on other grounds,471 U.S. 539 (1985)). Thus, if an "extra element" is required in addition to or instead of the acts protected under Section 106 in order to constitute a state-law cause of action, then the right does not lie within the general scope of copyright and there is no preemption. See id.In addition, the "extra element" must "change[] the 'nature of the action so that it is qualitatively different from a copyright infringement claim."Id. (quoting Mayer v. Josiah Wedgwood & Sons, Ltd., 601 F. Supp. 1523, 1535 (S.D.N.Y. 1985)).

Claims for misappropriation "grounded solely in the copying of a plaintiff's protected expression" are preempted by the Copyright Act. Kregos v. Associated Press, 3 F.3d 656, 666 (2d Cir. 1993), cert. denied,114 S. Ct. 1056 (1994) (emphasis supplied)."[U]nfair competition claims based upon breaches of confidential relationships, breaches of fiduciary duties and trade secrets," however, "have been held to satisfy the extra-element test and avoid § 301 preclusion."Id.

In New York, a claim for misappropriation of an idea requires (1) the existence of a legal relationship between the parties in the form of a fiduciary relationship, an express or implied-in-fact contract, or quasi-contract; and (2) the idea must be novel and concrete. McGhan v. Ebersol, 608 F. Supp. 277, 284 (S.D.N.Y. 1985) (citing Vantage Point, Inc. v. Parker Bros., Inc., 529 F. Supp. 1204, 1216 (E.D.N.Y. 1981), aff'd without op. sub. nom.Vantage Point, Inc. v. Milton Bradley, 697 F.2d 301 (2d Cir. 1982))Accord Oasis Music, 614 N.Y.S.2d at 881.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.))

Page 13

Plaintiff's misappropriation claim asserts an "extra element" in addition to copying: breach of fiduciary duty. However, this element is part of plaintiff's misappropriation claim against Miller and PMA but not Sasson. The misappropriation claim is pleaded as follows:

**\*17** Defendants Miller and PMA, through their fiduciary relationship with Miller and PMA, and Sasson misappropriated Plaintiff's novel ideas for use in *Princess* and *Sultana's Daughters,* without Plaintiff's authorized consent.

Plaintiff thus alleges that Miller and PMA's breach of their fiduciary relationship to plaintiff resulted in Sasson's having access to and her alleged copying of "Cinderella". That plaintiff has not pleaded a breach of fiduciary duty on the part of Sasson is further evidenced by the fact that the Complaint's breach of fiduciary duty cause of action is pled solely against Miller and PMA. Finally, no factual basis has been presented to the Court in connection with this motion that would suggest either a fiduciary or contractual relationship between Sasson and plaintiff. Therefore, plaintiff's claim for misappropriation against Sasson must be dismissed for failure to state a claim against Sasson.[FN7]

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted with respect to plaintiff's claims for copyright infringement and unjust enrichment. Sasson's motion for summary judgment with respect to plaintiff's misappropriation claim is also granted. The motion by Miller and PMA with respect to plaintiff's misappropriation claim is denied.

Because the Court finds no just reason for delay of partial judgment in favor of defendants Sasson, Morrow, Avon, Hearst and Bantam, Rule 54(b), Fed. R. Civ. P., the Clerk of Court is hereby ordered to dismiss the Complaint against these defendants and enter judgment on their behalf. With respect to defendants Miller and PMA, the Clerk of Court is further ordered to dismiss Counts I and IV of the Complaint with prejudice.

Finally, if the defendants wish to move for an award of attorney's fees pursuant to 17 U.S.C. § 505,[FN8] they

must do so no later than May 10, 1996.

SO ORDERED:

FN1. The Court has reviewed the Declaration of Dr. R. Victoria Arana, submitted by the plaintiff to prove illegal copying. Such expert testimony on the issue of substantial similarity is generally irrelevant, however, because the test for infringement is based on the response of the ordinary lay observer. See *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 713 (2d Cir. 1992). In addition, although the Court has reviewed the Declaration and accompanying tables submitted by plaintiff's counsel, which lists various purported similarities between "Cinderella" and "Princess" or "Daughters", the Court has relied on its reading of the works at issue.

FN2. Except where otherwise indicated, the following summary applies to both manuscript versions of "Cinderella" reviewed by the Court. For the sake of consistency and simplicity, quoted material derives from the 1987 manuscript version. The names of important characters, which vary between the 1987 and the 1992 versions, also derive from the 1987 manuscript version.

FN3. According to "Cinderella", an *Aseel* Kuwaiti is someone "who lived in Kuwait before the British pumped oil out of her. *Aseels* are superior to all other Arabs in the country."(1992 manuscript version.)

FN4. The following summary is derived from the 1992 manuscript version of "Cinderella".

FN5. The Court has not read the 1988 version of "Cinderella", but has reviewed it sufficiently to determine that it is an edited version of the 1987 manuscript.

FN6. As the discussion makes clear, the Court has not relied on defendants' argument that there is no substantial similarity because

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.))

Page 14

the facts of plaintiff's life are not protectible under the Copyright Act. Similarly, given the conclusion that there is no substantial similarity between the works, the Court need not address plaintiff's argument that an issue of material fact exists as to whether or not Sasson's books are fictional.

FN7. Since no legal relationship exists between Sasson and plaintiff to support a misappropriation claim against Sasson, and since plaintiff has properly alleged an "extra element" with respect to her claims of misappropriation against Miller and PMA, the Court need not reach plaintiff's second argument against preemption — that ideas are not within the subject matter of federal copyright law.

FN8. The Court

in its discretion may allow the recovery of full costs by or against any party ... [and] may also award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505. See generally *Fogerty v. Fantasy, Inc.,* 114 S. Ct. 1023, 1033 & n.19 (1994); *Knitwaves,* 71 F.3d at 1011 (listing relevant factors).

S.D.N.Y.,1996.
Adsani v. Miller
Not Reported in F.Supp., 1996 WL 194326 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE



Positive
As of: Jun 25, 2008

ARIEL(UK) LIMITED, Plaintiff, v. REUTERS GROUP PLC, REUTERS C LLC,
REUTERS TRANSACTION SERVICES LIMITED, THE NASDAQ STOCK
MARKET INC., NORWAY ACQUISITION CORP., INET ATS INC., SILVER
LAKE PARTNERS II, L.P., INSTINET HOLDINGS INCORPORATED, f/k/a
ICELAND ACQUISITION CORP., INSTINET GROUP INCORPORATED,
INSTINET INCORPORATED, and INSTINET LLC, Defendants.

05 Civ. 9646 (JFK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2006 U.S. Dist. LEXIS 79319

October 31, 2006, Decided

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Motion denied by Ariel (UK) Ltd. v. Reuters Group PLC, 2007 U.S. Dist. LEXIS 7423 (S.D.N.Y., Jan. 24, 2007)
Affirmed by Ariel (UK) Ltd. v. Reuters Group, PLC, 2008 U.S. App. LEXIS 9866 (2d Cir., May 6, 2008)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff computer program developer filed suit alleging copyright infringement, vicarious copyright infringement, breach of contract, and declaratory relief against defendant successors to or acquirers of a company with which plaintiff entered into licensing agreements with. Defendants moved under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss plaintiff's claims for lack of subject matter jurisdiction and failure to state a claim for relief.

**OVERVIEW:** Plaintiff entered into a 1972 licensing agreement and a 1975 non-exclusive licensing agreement with the company for a computer-based securities trading system. The company was later acquired by various defendants. Plaintiff alleged that defendants were subject to the 1975 agreement and that as a result of the transactions among defendants, plaintiff's copyrights were exploited and infringed and the licensing agreement breached. The court held that defendants were valid

licensees; thus, defendants could not be sued for copyright infringement under the Copyright Act of 1909, as the 1975 agreement contained no provision qualifying the company's right to grant sub-licenses. The licenses were also not rescinded. Not only did plaintiff fail to plead rescission, but rescission was not justified where there was no rescission clause and no affirmative steps toward rescission by the parties. The court did not allow plaintiff to re-plead since the amended claims would be contradicted by an earlier pleading. Because the copyright claims were dismissed, the court lacked jurisdiction over the remaining claims, and it declined to exercise pendent jurisdiction under 28 U.S.C.S. § 1367(c).

**OUTCOME:** The court dismissed the copyright infringement claims with prejudice. The remaining claims were dismissed without prejudice.

**COUNSEL:** [*1] For Plaintiff Ariel (UK) Limited: BAINTON MCCARTHY LLC, New York, New York, Of Counsel: J. Joseph Bainton, Esq., Michael J. Cohen, Esq.

For Defendants Reuters Group PLC, Reuters C LLC, Reuters Transaction Services Limited: WEIL, GOTSCHAL & MANGES LLP, New York, New York, Of Counsel: David Yohai, Esq., Alan Feigenbaum, Esq.

For Defendants NASDAQ Stock Market, Inc., Norway Acquisition Corp., Instinet Group, Inc.: AKIN, GUMP, STRAUSS, HAUER & FLED LLP, New York, New York, Of Counsel: Doug Maynard, Esq.

For Defendants Silver Lake Partners II, L.P., Instinet Inc., Instinet Holdings, Inc., Instinet LLC: ROPES & GRAY LLP, New York, New York, Of Counsel: William Sussman, Esq.

JUDGES: JOHN F. KEENAN, United States District Judge.

OPINION BY: JOHN F. KEENAN

OPINION

OPINION and ORDER

JOHN F. KEENAN, United States District Judge:

Plaintiff Ariel (UK) Limited ("Ariel") has filed this action for copyright infringement, vicarious copyright infringement, breach of contract, and declaratory relief. The defendants are either successors to or acquirers of Institutional Networks Corporation ("Instinet"), a company with which Ariel entered into licensing agreements in 1972 and 1975. [*2] The defendants fall into three groups: Reuters Group PLC, Reuters C LLC, Reuters Transaction Services Limited ("Reuters"); NASDAQ Stock Market, Inc., Norway Acquisition Corp., Instinet Group, Inc. ("NASDAQ"); [1] and Silver Lake Partners II, L.P., Instinet Inc., Instinet Holdings, Inc., Instinet LLC ("Silver Lake"). The defendants now move pursuant to Fed. R. Civ. P. 12(b) (1) and 12(b) (6), [2] respectively, to dismiss Ariel's claims for lack of subject matter jurisdiction and failure to state a claim on which relief can be granted.

> 1　Defendant INET ATS, Inc., named in the caption, was a subsidiary of Defendant Norway Acquisition Group but has ceased to exist as a corporate entity. Norway Acquisition Group now operates what used to be INET.
>
> 2　Reuters, NASDAQ, and Silver Lake each has filed a separate motion to dismiss. Because the arguments contained in the motions are substantially similar, the Court discusses the motions collectively.

[*3] Because the defendants are valid licensees of the copyrights that Ariel claims to own and therefore cannot be sued for copyright infringement, the Court dismisses Ariel's copyright claims with prejudice. The remaining claims do not supply a basis for federal jurisdiction and, accordingly, are dismissed without prejudice.

BACKGROUND

The following facts are derived from Ariel's Amended Complaint ("Am. Compl.") and the exhibits attached thereto.

Ariel is a United Kingdom company that was founded, in 1971 to develop and sell computerized securities trading systems. (Am. Compl. PP 1, 21.) Instinet was a United States company that was established in 1970. Like Ariel, Instinet developed and sold computerized securities trading systems. (Am. Compl. PP 22-23.) In 1972, Instinet obtained both European and U.S. patents on its original computer-based securities trading system ("Instinet System") before Ariel was able to do so. (Am. Compl. PP 24-25.) Ariel could not exploit its own trading system ("Ariel System") without using Instinet's patented technology. In 1972, therefore, Ariel entered into a licensing agreement with Instinet ("1972 Agreement"). [3] (Am. Compl. P 26.)

> 3　The 1972 Agreement is attached to the Amended Complaint as Exhibit A.

[*4] The 1972 Agreement gave Ariel a license to exploit Instinet's patented technology in Western Europe, as well as the right to exploit any enhancements or re-issuances of those patents. Under the 1972 Agreement, Instinet promised to disclose to Ariel any developments undertaken by Instinet relating to the patented technology. In exchange for the license, Ariel agreed to pay Instinet licensing fees, royalties, and stock options. The license had an initial term of 14 years. (Am. Compl. P 27, 32-36.)

In 1973, Ariel obtained a United Kingdom patent on aspects of its own securities trading system (the Ariel System). (Am. Compl. P 41.) In the course of developing the Ariel System, Ariel authored "four separate copyrighted works," consisting of source code, object code, functional specification, and system documentation, that underlay the Ariel System ("Ariel Works"). (Am. Compl. P 42.)

After execution of the 1972 Agreement, at Instinet's behest, Instinet and Ariel worked together to develop a new, improved version of the Instinet System (the "Instinet II System"). (Am. Compl. PP 49-51.) Instinet agreed to pay Ariel for its programming help in developing the Instinet II System but never [*5] actually made payments. (Am. Compl. PP 53-54.) While developing the Instinet II System, Ariel authored computer code, functional specifications, and system documentation that pertained to the Instinet II System and that derived from the Ariel Works ("Ariel Derivative

2006 U.S. Dist. LEXIS 79319, *

Works"). (Am. Compl. P 53.) Ariel alleges that it holds U.K. copyrights in both the Ariel Works and the Ariel Derivative Works. (Am. Compl. P 57.)

Between 1972 and 1975, Instinet faced increasing financial difficulties, because its original system had performed poorly. (Am. Compl. PP 47-48.) Instinet was desperate for cash. (Am. Compl. P 55.) Ariel, on the other hand, was experiencing considerable success with its system and was eager to exploit its technology without the geographical restrictions that had been imposed by the 1972 Agreement. (Am. Compl. PP 59-60.) Instinet and Ariel therefore negotiated a new agreement, which first took the form of an offer-letter memorializing key terms ("Cable Agreement") and then took the form of a formal contract ("1975 Agreement") which set forth in greater detail the key terms of the Cable Agreement. [4] (Am. Compl. PP 64, 67.)

4    The Cable Agreement is attached to the Amended Complaint as Exhibit B. The 1975 Agreement is attached as Exhibit C.

[*6] Under the 1975 Agreement, Ariel and Instinet granted each other perpetual, royalty-free, world-wide, non-exclusive licenses to exploit the Ariel System, the Instinet System, and the Instinet II System. (Am. Compl. P 70, Ex. C § 6.) Specifically, the 1975 Agreement provided that "Ariel and Instinet agree that each of them is free to operate and to license others to operate computerized communications systems in any part of the world . . . ." (Am. Compl. Ex. C § 6.) To that end, the 1975 Agreement provided that Ariel and Instinet

grant each to the other royalty free worldwide non-exclusive licenses

. . .

(b) to use their respective Know-how together in each case with the right to grant sub-licenses from time to time under under any such licenses in any country or countries[;]

(Am. Compl. Ex. C P 5(1).) (emphasis added.) In addition to the license to exploit each other's "Know-how", the 1975 Agreement gave Ariel and Instinet royalty free, worldwide, non-exclusive licenses to exploit and sub-license "Patents" and "Future Patents" pertaining to the Insintet, Ariel, and Instinet II Systems. (Am. Compl. Ex. C P 5(1) - (2).)

"Know-how" is defined in the 1975 Agreement [*7] to include "all know-how[,] documentation[,] information[,] procedures[,] knowledge[,] experience[,] and data (a) developed up to 31st December 1975 by or

for Instinet or Ariel and which relates in any way to the Instinet System, the Ariel System and the Instinet Two System and (b) developed after 31st December but prior to 30th June 1976 by Instinet in conjunction with Ariel and Datasynteks and which relates in any way to the Instinet Two System . . ." (Am. Compl. Ex. C 1.) [5]

5    "Patents" are defined to include all patents that related to the Ariel System, the Instinet System, or the Instinet II System that were in existence at the time of the 1975 Agreement's execution. "Future Patents" are defined to include applications for patents that "covered[ed]" the Ariel System, the Instinet System, or the Instinet II System that were pending at the time of the contract's execution, as well as "all such applications" made in the future. (Am. Compl. Ex. C 1.) The viability of Ariel's breach of contract and related declaratory relief claims appears to depend, in large part, on whether the 1975 Agreement's definition of "Future Patents" includes patents issued after June 30, 1976. The Court takes no position on the meaning of the contractual language at issue, because Ariel's non-copyright claims are dismissed without prejudice for want of federal jurisdiction.

[*8] Under the 1975 Agreement, both parties were obligated to issue licensing agreements confirming each other's right to exploit, or grant sub-licenses in, the patented technology at issue. (Am. Compl. P 73, Ex. C § 5(5).) The agreement also obligated each party to provide the other party, upon request, with information about new developments relating to the patented technology that underlay the Ariel System, Instinet System, and Instinet II System. (Am. Compl. P 72, Ex. C, § 5(6).)

The 1975 Agreement further provided that Instinet absolved Ariel of all future royalty obligations. (Am. Compl. Ex. C § 4(1).) Ariel also was free to exploit the Instinet II technology worldwide, not just in Western Europe. (Am. Compl. Ex C(B).) In consideration for Instinet's broad grant of licensing rights and the removal of any temporal or geographical restrictions, Ariel paid Instinet a lump sum of cash less the amount Instinet owed Ariel for Ariel's programming work on the Instinet II System. (Am. Compl. Ex C § 3.)

In 1986, Reuters, a U.K. company with offices in New York, acquired Instinet. (Am. Compl. PP 9, 76.) Reuters formed Instinet Group, Inc., which continued to provide services identical [*9] to those that Instinet had provided. (Am. Compl. P 8.) Instinet Group, Inc. and Reuters remained distinct as corporate entities, although the companies shared a common CEO, and Instinet's financial statements were consolidated into those of Reuters. (Am. Compl. PP 77-78.) In 1987, Reuters

directed an Instinet programmer, who formerly worked for Ariel as a programmer, to prepare written specifications of the Instinet II System for Reuters' use in developing its own computerized trading technology. (Am. Compl. PP 84-87.) In developing its own similar computerized trading system, Reuters and "Instinet/Reuters" allegedly copied "aspects of the Instinet II System, the Ariel Works, and the Ariel Derivative Works." (Am. Compl. P 88.)

In 1995 and 1999, Reuters filed for United States patents relating to computerized securities trading systems ("1990s Patents"). Reuters eventually obtained those patents. Reuters' 1995 and 1999 patent applications cited both Ariel's 1973 U.K. patent and Instinet's 1972 U.S. patents as prior art. Ariel contends that Reuters' 1990s Patents "relate directly to and are enhancements of . . . the Instinet II System" and are therefore "Future Patents" within the meaning [*10] of the 1975 Agreement. (Am. Compl. PP 95-96.) Thus, Ariel claims that, under the terms of the 1975 Agreement, it owns licensing rights in the 1990s Patents.

In January 2004, Ariel and Bloomberg, L.P. were in negotiations regarding Ariel's sub-licensing of the 1990s Patents to Bloomberg. (Am. Compl. P 104, 122(a).) Ariel allegedly asked Defendants Reuters and Instinet Group Inc. to confirm Ariel's right to grant Bloomberg a license to use the 1990s Patents, but Reuters and Instinet Group, Inc. refused to do so. (Am. Compl. P 122(a).)

In December 2005, Reuters sold its interest in Instinet Group, Inc. to NASDAQ, through NASDAQ's subsidiary, Norway Acquisition Corp. Immediately thereafter, NASDAQ sold Instinet Group, Inc.'s institutional brokerage division to Defendant Silver Lake Partners II, through Silver Lake's wholly owned subsidiary, Defendant Instinet Holdings. NASDAQ retained INET, which provided computerized trading services to U.S. securities brokers, and Norway Acquisition Corp. continued to operate INET after that company was dissolved as a corporate entity. (Am. Compl. PP 4-16, 97-98.) Reuters, NASDAQ, and Silver Lake never entered into any licensing agreements with Ariel, [*11] nor did the defendant companies ever communicate with Ariel regarding the various corporate transactions that involved elements of Instinet (Am. Compl. PP 79-80, 99.)

Ariel broadly alleges that the defendants are "either successors to Instinet or companies with which successors to Instinet have been consolidated" and thus subject to the rights and obligations imposed by the 1975 Agreement. (Am. Compl. P 103.) As a result of the transactions among the defendants, Ariel contends, Ariel's copyrights were exploited "by Reuters until December 8, 2005 and ha[ve] been recently transferred

either in whole or in substantial part to NASDAQ and in turn in part to Silver Lake in derogation of Ariel's rights." (Am. Compl. P 18.) By refusing to confirm Ariel's right to grant Bloomberg licenses in the 1990s Patents, therefore, all of the defendants became liable for copyright infringement and breach of the licensing agreements that Ariel originally entered into with Instinet. (Am. Compl. P 122.)

In its unverified Amended Complaint, Ariel asserts five causes of action. [6] The first and second claims, respectively, are for direct copyright infringement, against all of the defendants except for [*12] Silver Lake, and vicarious copyright infringement, solely against Silver Lake. (Am. Compl. PP 105-111.) The third and fourth claims are state law claims for declaratory judgments regarding Ariel's licensing rights as against all defendants. (Am. Compl. PP 112-119.) The fifth claim is a state law claim for breach of contract and is asserted against all defendants. (Am. Compl. PP 120-123.)

[6]    Ariel's original Verified Complaint, filed November 16, 2005, included claims for alter-ego liability and tortious interference with contract. The parties acknowledge that the defendants drafted motions to dismiss in response to Ariel's original complaint and showed those drafts to Ariel. Ariel then amended its complaint to omit the claims for alter-ego liability and tortious interference and filed its Amended Complaint on February 28, 2006.

Subject matter jurisdiction is conferred by 28 U.S.C. § 1338(a), which gives federal courts original jurisdiction of claims arising under federal copyright law, [*13] and 28 U.S.C. § 1367, which allows federal courts to exercise jurisdiction over related state law claims.

Ariel contends that the defendants, except for Silver Lake, "have copied, have used knowing of Ariel's copyrights, and are presently knowing of" Ariel's copyrights in the Ariel Works and the Ariel Derivative Works without Ariel's consent. (Am. Compl. P 107.) In its claim for vicarious copyright infringement, Ariel claims that Silver Lake supervised the infringing activities of Instinet's institutional brokerage division, which Silver Lake had acquired from NASDAQ, and thereby assumed vicarious liability. (Am. Compl. PP 110-111.)

Defendants argue, inter alia, that according to Ariel's Amended Complaint and the attached 1975 Agreement, the defendants are valid licensees of the works that Ariel claims the defendants have infringed and therefore, as a matter of law, the defendants cannot be sued for copyright infringement. [7] The Court agrees.

7  The defendants assert the following additional arguments in favor of dismissal of the copyright claims:

(1) Ariel has not pled with sufficient specificity where or when the alleged infringements occurred; what works the defendants copied; or when the alleged copying occurred;

(2) Ariel has not alleged any acts of copyright infringement in the United States;

(3) The doctrine of laches bars the copyright claim;

(4) Ariel does not actually own copyright in the Ariel Derivative Works, because the works were produced as a work-for-hire for Instinet; and

(5) Forum non conveniens doctrine demands that the action be litigated in the UK, rather than in the United States.

Because the Court finds that the defendants' status as licensees mandates dismissal of the copyright claims, the Court need not discuss these additional arguments.

## [*14] DISCUSSION

### Legal Standard

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the complaint as true. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996). The issue is not whether the plaintiff will ultimately prevail, but whether it is entitled to offer evidence to support its claim. Id. Dismissal is not warranted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) (internal quotations omitted)). A court should "read the complaint generously and draw reasonable inferences in favor of the pleader." Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989). However, where allegations set out in the complaint are contradicted by other matters asserted or by materials attached to or incorporated by reference in the complaint, the court is not obliged [*15] to credit the allegations in the complaint. Brown v. New York City Hous. Auth., No. 05 Civ. 7332, 2006 U.S. Dist. LEXIS 30193, at *4-5 (S.D.N.Y. May 16, 2006). Where the plaintiff's allegations are contradicted by a document that the plaintiff has attached as an exhibit in support of its complaint, the document controls. See Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

The defendants argue that, as a matter of law, Ariel cannot sue the defendants for copyright infringement because the defendants possess licenses to use Ariel's copyrighted works. "A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998). This is because the "licensee of any of the rights comprised in the copyright, though it is capable of breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright rights conveyed to it." United States Naval Inst. v. Charter Communications, Inc., 936 F.2d 692, 695 (2d Cir. 1991). Dismissal of a claim [*16] for copyright infringement is proper where a contract underlying the suit clearly and unambiguously demonstrates the existence of the defendant's license to exploit the plaintiff's copyrights and where plaintiff has not shown any limitation on that license. See Jasper v. Sony Music Entm't, Inc., 378 F. Supp. 2d 334, 338 (S.D.N.Y. 2005); Chapman v. N.Y. State Div. for Youth, No. 04 Civ. 867, 2005 U.S. Dist. LEXIS 40916 (N.D.N.Y. Sept. 29, 2005). Even though a defendant's status as a valid licensee may be characterized as an affirmative defense, see, e.g., Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995), such defenses also "may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998) (emphasis added).

### Instinet's License

Under the 1975 Agreement, Ariel and Instinet granted each other the right to "be free to operate and to authorise others to operate computerized communications systems in any part of the world." (Am. [*17] Compl. Ex. C § 6.) Included in this very broad grant was the right to use or sub-license, without limitation, the "Know-how" of each party. "Know-how", as defined in the 1975 Agreement, included, as among other things, all documentation, information, and data that pertained to the computerized securities trading systems that the parties had developed at the time of the agreement's execution. It is undisputed, therefore, that "Know-how" encompassed the Ariel Works and the Ariel Derivative Works, which underlay, respectively, the Ariel System and the Instinet II System, and which Ariel had authored prior to 1975. (Am. Compl. PP 42, 53). Thus, under the 1975 Agreement, Instinet was free without temporal or geographical limitation to exploit or sub-license the Ariel Works and the Ariel Derivative Works. As Ariel states in its Amended Complaint, the

1975 Agreement "grant[ed] Instinet the rights in the Ariel Derivative Works that it required." (Am. Compl. P 60.) From the 1975 Agreement and Ariel's allegations in the complaint, it is clear, therefore, that Instinet held an express, non-exclusive license to exploit or sub-license the works in which Ariel claims to own copyright.

### [*18] *Defendants' Licenses*

Under the Copyright Act of 1909, [4] a licensee has no right to sell or sub-license the rights acquired unless expressly authorized so to do by the licensor or by the terms of the licensing agreement. See Ward v. Nat'l Geographic Soc'y, 208 F. Supp. 2d 429, 441 (S.D.N.Y. 2002); Gardner v. Nike, Inc., 279 F.3d 774, 778 (9th Cir. 2002); 3 Nimmer, Nimmer on Copyright § 10.01. Here, the 1975 Agreement expressly authorized Instinet to grant sub-licenses. The 1975 Agreement unequivocally states that Instinet received not only a perpetual, world-wide non-exclusive license to use Ariel's "Patents," "Future Patents," and "Know-how", but also the right to grant sub-licenses, without restriction. (Am. Compl. Ex. C § 5(1)-(2).)

> 8  The 1909 Act, rather than the Copyright Act of 1976, applies to copyrighted works created prior to January 1, 1978. See Playboy Enters. V. Dumas, 831 F. Supp. 295, 301 (S.D.N.Y. 1993). Thus, the 1909 Act applies to the works at issue in this case. Under the 1976 Act, however, the result is the same: a non-exclusive license holder cannot assign the license unless expressly authorized to do so. See, e.g., In re Patient Educ. Media, Inc., 210 B.R. 237 (Bankr. S.D.N.Y. 1997).

[*19]  According to Ariel's allegations, the defendants are either "successors to Instinet or companies with which successors to Instinet have been consolidated." (Am. Compl. P 103.) More specifically, the Amended Complaint characterizes each of the ten defendants as a successor to Instinet (Instinet Group, Inc.; Instinet Inc.; Reuters C LLC; and Instinet LLC); an acquirer of Instinet (Reuters Group PLC; Reuters Transaction Services Limited); or an acquirer of elements of Instinet (NASDAQ Stock Market; Norway Acquisition Corp; Silver Lake Partners II; and Instinet Holdings, Inc.). (Am. Compl. PP 2-17.) Under the explicit terms of the 1975 Agreement, Instinet was free to grant, and the defendants-as successors to or acquirers of Instinet-were equally free to receive, sub-licenses that encompassed Ariel's works. The 1975 Agreement contains no provision restricting or qualifying Instinet's right to grant sub-licenses in the intellectual property at issue.

Ariel does not attempt to argue that the defendants are not recipients of such sub-licensing rights. [9] In fact, Ariel concedes that the defendants are valid licensees. In its brief, Ariel speaks of the "license granted to Instinet and the [*20] Reuters Parties by the Agreements", "the license granted by the Agreements," and "the purported assignment of a license of the Works to the Nasdaq Parties and Silver Lake Parties." (Ariel's Mem. of Law, at 21.) Ariel also describes the "Reuters parties" as "licensees of the Works under the 1975 Agreement" (Ariel's Mem. of Law, at 26.) Similarly, at oral argument, Ariel's counsel flatly conceded that the defendants "used intellectual property licensed to them in the first instance in 1972." (Tr. Or. Arg. 31.) Ariel's counsel further admitted the point by stating, "In 1987, we were rooting for [the defendants]. We were hoping they were going to turn this perpetual license of ours into something of value." (Tr. Or. Arg. 32.) (emphasis added). The Court therefore concludes that, under the clear terms of the 1975 Agreement and according to Ariel's own allegations and arguments, the defendants are licensees of the works in which Ariel claims to hold U.K. copyrights.

> 9  In connection with its non-copyright claims, Ariel alleges that the defendants, as successors to Instinet or companies with which Instinet has been consolidated, are bound by the terms of the 1975 Agreement because an assignment clause in the 1972 Agreement was incorporated by reference into the 1975 Agreement via the Cable Agreement. The defendants counter that the express language of the 1975 Agreement terminated the 1972 Agreement and that the Cable Agreement was replaced by the 1975 Agreement and thus has no legal effect. The parties do not dispute, however, the continuing validity of the 1975 Agreement. Whether the 1972 Agreement's assignment clause has survived to bind the defendants to the contracts that Ariel entered into with Instinet is irrelevant for purposes of determining Defendants' status as licensees of Ariel's intellectual property. The defendants' status as licensees derives from Instinet's clear right, under the 1975 Agreement, to sub-license Ariel's works to whomever it wanted.

### [*21] *Ariel's Rescission Argument*

As discussed above, Ariel does not dispute the defendants' status as licensees of the works under the clear terms of the 1975 Agreement. Rather, Ariel responds to the defendants' licensing arguments by asserting that those licenses are no longer valid, because Reuters' and Instinet Group, Inc.'s refusal, in January 2004, to confirm Ariel's right to license the 1990s Patents

to Bloomberg was a material breach of the licensing agreements that automatically triggered a rescission of those contracts and resulted in revocation of the license. Therefore, the continued use of Ariel's intellectual property by Reuters, NASDAQ, and Silver Lake after the automatic revocation of the license in January 2004 constituted copyright infringement. (Ariel's Mem. of Law, at 20-21.)

Ariel's rescission argument fails for two reasons.

First, Ariel failed to plead the factual allegation of rescission in either its original complaint or in its Amended Complaint. "Factual allegations contained in legal briefs or memoranda are . . . treated as matters outside the pleading for purposes of Rule 12(b)." Fonte v. Board of Managers of Continental Towers Condominium, 848 F.2d 24, 25 (2d Cir. 1988). [*22] It is "axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." Stillman v. Townsend, No. 05 Civ. 6612, 2006 U.S. Dist. LEXIS 50770, at *9 (S.D.N.Y. July 26, 2006). In its Amended Complaint, Ariel insisted, in essence, that the 1975 Agreement was alive and well. In its memorandum of law, however, Ariel claims that Reuters repudiated the 1975 Agreement and Ariel "acceded" to Reuters' decision. (Ariel's Mem. of Law, at 21.) Ariel asserts that this repudiation and accession entitles it to a right of rescission. Ariel thus tries to smuggle in new facts through its legal argument. Under well-settled law, Ariel's rescission argument cannot be considered and is insufficient to defeat the defendants' motions to dismiss.

Second, even if this Court were to entertain the rescission argument, the remedy of rescission is not justified under the facts alleged by Ariel. Rescission of a contract is "an extraordinary remedy." Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 143 (2d Cir. 2000). "New York law does not presume the rescission or abandonment of a contract and the party asserting rescission or abandonment has the [*23] burden of proving it." Graham, 144 F.3d at 238. [10] To determine whether breach of a licensing agreement justifies rescission, "a district court must determine whether the complaint alleges a breach of a condition to, or a covenant of, the contract licensing or assigning the copyright." Schoenberg v. Shapolsky Publishers, 971 F.2d 926, 932 (2d Cir. 1992) (citing Costello Publishing Co. v. Rotelle, 216 U.S. App. D.C. 216, 670 F.2d 1035, 1045 (D.C. Cir. 1981)). If the court finds that plaintiff has alleged a breach of a condition precedent to the license, the plaintiff may sue for copyright infringement, rather than for breach of contract. Id. This is because, in the event of a breach of a condition to the license, "it follows that the rights dependant upon satisfaction of such condition have not been effectively licensed, and therefore, any use by the licensee is without authority

from the licensor and may therefore, constitute an infringement of copyright." Graham, 144 F.3d 238. "However, if the complaint merely alleges a breach of a covenant in the agreement licensing or assigning the copyright, then the court must next determine whether [*24] the breach is so material as to create a right of rescission in the grantor." Schoenberg, 971 F.2d at 932. To justify rescission, the breach must be "so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." Septemberide Pub., B.V. v. Stein & Day, Inc., 884 F.2d 675, 678 (2d Cir. 1989).

10    Although the licensing agreements do not contain choice-of-law clauses, and the Amended Complaint is silent as to where Ariel, a U.K. company, and Instinet, a U.S. company, substantially negotiated those contracts, both parties cite New York state law in their legal memoranda and do not dispute its application. (See, e.g., Reuters Mem. of Law, at 14; Ariel's Mem. of Law, at 36.) New York law therefore should be applied here because "in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." Robi, Ltd. v. Proksch, No. 99 Civ. 1924, 2000 U.S. Dist. LEXIS 3632, at *2 n.1 (S.D.N.Y. Feb. 10, 2000). Here, the parties have clearly consented to the application of New York's law.

[*25]    The 1975 Agreement does not state any conditions that either party needed to satisfy prior to obtaining its license. Similarly, the 1975 Agreement does not contain any clause that mentions conditions under which the license would automatically revert to either party or under which either party would obtain a right of rescission. Nor does Ariel even allege that the agreement imposed any conditions precedent to the grant of licensing rights or that the agreement contains any language that could be interpreted as a rescission clause. Ariel merely alleges that, 30 years after execution of the last contract, Instinet's successors breached various provisions of the 1975 Agreement that required the parties to confirm each other's licensing rights and keep each other informed as to developments relating to the Instinet II System's patents. These allegations constitute breaches of covenants rather than of conditions precedent.

Having found that there was no allegation of a breach of a condition precedent to the license, the Court next must determine whether the alleged breaches were so fundamental as to trigger a right of rescission in Ariel. Ariel argues that the defendants' breaches were [*26] so substantial as to destroy the "object of the Agreements"

and therefore "entitle[] Ariel to the remedy of rescission of the license granted to Instinet and the Reuters Parties by the Agreements," (Ariel's Mem. of Law at 20-21.) However, the breaches alleged simply do not "strongly tend to defeat the object of the parties in making the contract." Septembertide Pub., 884 F.2d at 678. Both Ariel and Instinet received the benefits of their bargain after the 1975 Agreement was executed: Instinet obtained much-needed cash; Ariel was absolved of all future royalty obligations, and all temporal and geographical restrictions on Ariel's right to exploit or sub-license the Instinet II technology were lifted. The parties coexisted peacefully under the terms of the 1975 Agreement for nearly three decades. As counsel for Ariel conceded at oral argument, Ariel "had the benefit of the bargain until 2004." (Tr. Or. Arg. 34.) Furthermore, as noted above, the 1975 Agreement does not contain any clause providing for reversion of the licensing rights or stating conditions under which rescission of the contract may occur. The absence of a rescission or reversion clause in a licensing [*27] agreement is a factor that weighs against rescission. See, e.g., Morris v. Castle Rock Entm't, 246 F. Supp. 2d 290, 294 (S.D.N.Y. 2003); USAR Sys. v. Brain Works, 897 F. Supp. 163, 167 (S.D.N.Y. 1995). Thus, Ariel has failed to allege facts that would justify rescission.

Moreover, even if the facts as alleged weighed in favor of granting Ariel a right of rescission, Ariel cannot point to any step it actually took to attempt to rescind the 1975 Agreement. Even when a breach is so material as to give rise to a right of rescission, rescission does "not occur automatically without some affirmative steps" by a party to the agreement. " Graham, 144 F.3d at 238. "New York law does not presume the rescission or abandonment of a contract and the party asserting rescission or abandonment has the burden of proving it." Id. See also TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 93 (2d Cir. 2005) (observing that a license must be rescinded formally before a plaintiff may sue for copyright infringement).

11  Ariel cites a Ninth Circuit case, Rano v. Sipa Press, Inc., 987 F.2d 580 (9th Cir. 1993), for the proposition that a "party's continued use of a protected work after the party's license has been rescinded is tantamount to infringement." (Ariel's Mem. of Law at 21.) But in Rano the Ninth Circuit found only that a breach that constituted "total failure in the performance of a contract" would give rise in the licensor "to a right of rescission which allows the nonbreaching party to terminate the agreement." Rano, 987 F.2d at 586 (emphasis added).

[*28]  In its memorandum in opposition, Ariel argues that Reuters and Instinet Group, Inc. "affirmatively stated their intention not to honor the terms and conditions of the license granted by the Agreements, a decision to which Instinet acceded." (Ariel's Mem. of Law, at 21.) Ariel cites to paragraph 122 of its Amended Complaint in support of this assertion. (Ariel's Mem. of Law, at 21.) Paragraph 122, however, contains only Ariel's various breach of contract claims, the most specific of which is the allegation that, in January 2004, Defendants Reuters and Instinet Group, Inc. breached the licensing agreements by refusing to confirm Ariel's right to grant a sub-license to Bloomberg. Ariel's contention that the defendants "affirmatively stated" an intention to breach the 1975 Agreement and that Ariel "acceded" to the defendants' refusal find absolutely no support in paragraph 122 or anywhere else in the Amended Complaint. Ariel itself appears to concede that, at most, it is entitled to a right of rescission, which it has not yet exercised. (see Ariel's Mem. of Law, at 21.) Ariel's counsel conceded that Ariel has yet to attempt rescission, stating, "We contend that [the breach of contract [*29] that occurred in 2004] entitles us, and the law does not require that we do it at this time, to a remedy for breach of a particular type of contract, which is a license agreement." (Tr. Or. Arg. 31.)

In sum, Ariel's rescission argument has no merit because Ariel has not alleged that the defendants breached a condition precedent to the licensing agreement or that defendants' breach was so material as to give rise to a right of rescission. In addition Ariel cannot claim rescission because it has not alleged that it took any steps to rescind the 1975 Agreement. Any claim of rescission by Ariel is without merit in this case.

Ariel makes one additional attempt to counter defendants' claim that they are valid licensees by asserting that the issue of whether a defendant is a valid licensee is "an issue of fact that cannot be resolved on a motion to dismiss." (Rep. Mem. of Law, at 22.) For authority, Ariel cites Roberts v. Keith, No. 04 Civ. 10079, 2006 U.S. Dist. LEXIS 8959 (S.D.N.Y. Mar. 3, 2006). Ariel misstates the law, however, and cites an inapposite case. In Roberts, the court stated only that the defendant's argument that it was a valid licensee failed because [*30] neither the complaint, nor attached documents, nor any documents incorporated by reference established that the defendant was a licensee. Id. at *14-15. Here, by contrast, the 1975 Agreement and the Amended Complaint expressly establish that Instinet and its successors are valid licensees of Ariel's copyrighted works. And, as discussed above, federal courts have dismissed claims for copyright infringement on the basis of complaints and attached documents that show a valid

licensing arrangement between plaintiff and defendant. See Jasper, 378 F. Supp. 2d at 338; Chapman, 2005 U.S. Dist. LEXIS 40916. Here, as discussed, the defendants' status as licensees or sub-licensees of Ariel's protected works is evident from Ariel's Amended Complaint and from the 1975 Agreement that Ariel has attached to the complaint.

Ariel therefore is precluded as a matter of law from suing valid licensees of the allegedly copyrighted works for copyright infringement.

If the direct infringement claim is dismissed, the vicarious claim (against Silver Lake) must also be dismissed, because "a direct infringement must have occurred" to hold a defendant vicariously liable. Matthew Bender & Co. v. West Publ. Co., 158 F.3d 693, 706 (2d Cir. 1998).

**[*31]** *Dismissal of the Copyright Claims with Prejudice*

The Court declines to allow Ariel to re-plead the copyright claims. Upon granting a motion to dismiss, it is the usual practice to allow the plaintiff leave to re-plead. See Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991). "When the plaintiff never requests leave to amend, however, there is no error in not granting such leave sua sponte if the complaint could not be amended in a manner that would survive dismissal." Schloss v. Danka Bus. Sys. PLC, No. 00-7403, 2000 U.S. App. LEXIS 29317, at *8 (2d Cir. Nov. 13, 2000) (citing Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 76 (2d Cir. 1998)). Courts of this Circuit have refused to grant leave to re-plead dismissed copyright claims, pursuant to Rule 12(b)(6), on the ground that defendants are licensees of the copyrights. See, e.g., Jasper, 378 F. Supp. 2d at 334; Chapman, 2005 U.S. Dist. LEXIS 40916.

The instant complaint is Ariel's second attempt at pleading its copyright claims. Ariel has not requested, either in its brief or at oral argument, **[*32]** leave to re-plead in the event that the Court dismisses its claims. In any event, the Court does not see how Ariel could satisfactorily plead its claims a third time without alleging that defendants are licensees. Any complaint alleging that defendants do not hold licenses in the intellectual property at issue would necessarily and impermissibly contradict the 1975 Agreement's plain language and the facts alleged in Ariel's earlier two pleadings. Where, as here, the claims contained in an amended complaint are contradicted by the plain language of a document attached to an earlier pleading, amendment "would be an exercise in futility as well as a waste of judicial resources to allow further amendment." Rapoport v. Asia Elecs. Holding Co., 2000 U.S. Dist.

LEXIS 3891, at *27-28 (S.D.N.Y. Mar. 30, 2000). Accordingly, Ariel's copyright claims are dismissed with prejudice.

*Dismissal of the Remaining Claims Without Prejudice*

The defendants argue, correctly, that if Ariel's copyright claims are dismissed, the remaining claims do not supply any basis for federal jurisdiction. Although Ariel's breach of contract claims stem from the defendants' alleged violation **[*33]** of agreements that involve patents, the mere fact that a disputed contract revolves around patent rights is insufficient to create federal jurisdiction. See, e.g., Design Science Toys v. McCann, 931 F. Supp. 282, 283 (S.D.N.Y. 1996) (stating that the "fact that a patent is the property that is the subject of a contractual or ownership claim does not make that claim any less a question of state law"); Kaufman Malchman & Kirby, P.C. v. Hasbro, Inc., 897 F. Supp. 719, 721 (S.D.N.Y. 1995) ("[W]hen patent issues are merely implicated incidentally in a cause of action . . . federal courts do not have jurisdiction of the case pursuant to [28 U.S.C.] § 1338."). Similarly, the declaratory relief claims, standing alone, do not create federal jurisdiction. The Declaratory Judgment Act, 28 U.S.C. § 2201, "does not independently create federal jurisdiction" because "an action for declaratory judgment may be brought in federal court ordinarily only if there would exist a basis for federal jurisdiction in a coercive action between the two parties." Tasini v. New York Times Co., 184 F. Supp. 2d 350, 358 (S.D.N.Y. 2002) **[*34]** (quoting Warner-Jenkinson Co. v. Allied Chem. Corp., 567 F.2d 184, 186 (2d Cir. 1977) (internal quotations and alterations omitted). In addition, there is no jurisdiction through diversity, because both plaintiffs (Ariel) and at least one of the defendants (Reuters Services) are citizens of the United Kingdom. The presence of an alien on both sides of the litigation destroys diversity. See Universal Licensing Corp. v. Paola del Lungo S.P.A., 293 F.3d 579, 581 (2d Cir. 2002).

Because Ariel's copyright claims must be dismissed and there is no basis for federal jurisdiction over the remaining claims, pursuant to 28 U.S.C. § 1367(c), the Court may decline to exercise pendent jurisdiction over those claims. "In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998). Where a federal district court declines to hear the pendent claims, those claims should be dismissed without prejudice and "left for resolution to state tribunals." Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001) **[*35]** (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726-27, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)). Thus, the Court declines to

exercise jurisdiction over Ariel's claims for breach of contract (Claim Four) and the related claims for declaratory relief (Claims Two and Three) and dismisses those claims without prejudice.

## CONCLUSION

The Court finds that the defendants are valid licensees of the works in which Ariel claims to own copyright. Therefore, as a matter of law, the defendants cannot be sued for infringing use of those works. Ariel will be unable to re-plead its claims for copyright infringement without either contradicting its earlier pleadings or again alleging that the defendants hold express, non-exclusive licenses in the copyrighted works at issue. Therefore, the Court dismisses Ariel's copyright claims with prejudice.

Because the remaining claims are state law claims and there is no remaining ground for federal jurisdiction, the Court declines to exercise pendent jurisdiction and dismisses Ariel's claims for breach of contract and declaratory relief without prejudice.

The Court orders this case closed and removed from the docket of this [*36] Court.

**SO ORDERED**

**DATED: New York, New York**

**October 31, 2006**

**JOHN F. KEENAN**

**United States District Judge**

LEXSEE



Cited
As of: Jun 25, 2008

**James Bell, Plaintiff, v. Blaze Magazine, Vibe Magazine, Keith Clinkscales, founder/President, John Rollins, Publisher, Darryl Dawsey, Features Editor, Corey Takahasi, Associate Editor, Tone Boots, Assistant Editor, Future Known and Unknown Infringers, Defendants.**

**99 CIV 12342 (RCC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2001 U.S. Dist. LEXIS 2783; 58 U.S.P.Q.2D (BNA) 1464; Copy. L. Rep. (CCH) P28,241**

**March 15, 2001, Decided**
**March 16, 2001, Filed**

**DISPOSITION:** [*1] Defendants' motion to dismiss Plaintiff's complaint GRANTED and Plaintiff's complaint DISMISSED WITH PREJUDICE.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sued defendants, alleging copyright infringement. Defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

**OVERVIEW:** Plaintiff argued that articles published by defendants infringed his copyright on a manuscript dealing with the matter of hip-hop music in prison. The court granted defendants' motion. Plaintiff validly registered his manuscript and owned a valid copyright. However, plaintiff was unable to prove that defendants copied his works. Although one article at issue had a similar title, there was no copyright protection for titles, words, or phrases. Moreover, the ways in which the ideas were expressed in the articles were different from the manner in which they were expressed in the manuscript.

**OUTCOME:** Defendants' motion to dismiss was granted. Plaintiff was unable to show that defendants copied his works.

**COUNSEL:** For JAMES BELL, plaintiff: James Bell, New York, NY.

For BLAZE MAGAZINE, KEITH CLINKSCALES, JOHN ROLLINS, DARREL DAWSEY, COREY TAKAHASHI, TONE BOOTS, defendants: Yuki A. Hirose, Maura J. Wogan, Frankfurt, Garbus, Klein & Selz, P.C., New York, NY.

For VIBE MAGAZINE, defendant: Maura J. Wogan, Frankfurt, Garbus, Klein & Selz, P.C., New York, NY.

**JUDGES:** Richard Conway Casey, U.S.D.J.

**OPINION BY:** Richard Conway Casey

**OPINION**

OPINION AND ORDER

**Richard Conway Casey, U.S.D.J.:**

Plaintiff *pro se* James Bell ("Plaintiff") brought this Copyright Infringement Lawsuit against Vibe/Spin Ventures LLC (incorrectly sued under the names Blaze Magazine and Vibe Magazine, however, referred to herein as "Blaze Magazine" and "Vibe Magazine," consistent with Plaintiff's complaint), Keith Clinkscales, John Rollins, Darryl Dawsey, Corey Takahasi, Tone Boots, and Future Known and Unknown Infringers

2001 U.S. Dist. LEXIS 2783, *; 58 U.S.P.Q.2D (BNA) 1464;
Copy. L. Rep. (CCH) P28,241

("Defendants"), alleging the Defendants infringed his copyright of a manuscript he created entitled "Hip Hop Behind the Walls." Plaintiff brought this action pursuant to Title 17 of the United [*2] States Code, Sections 106(4) and 601(a), and Title 28 of the United States Code, Section 1400(a). Defendants have brought a motion to dismiss Plaintiff's complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)"). For the reasons stated herein, Defendants' motion is GRANTED.

### Federal Jurisdiction

This case is properly before the Court pursuant to Title 28 of the United States Code, Section 1338(a).

### Factual Background

Plaintiff is an inmate at the Cape Vincent Correctional Facility, and alleges that defendants Blaze and Vibe Magazines infringed on his copyright by publishing infringing articles in its magazine. Plaintiff created a manuscript (the "Manuscript") in September of 1998, for a magazine proposal entitled "Hip Hop Behind The Walls." The magazine was intended to "touch down on real artist [sic] who are known and unknown who are or have been incarcerated. It was to also to touch down on news, weather, topics of everyday life, from those who are incarcerated. Talks with former drug dealers who are also incarcerated." (Compl. P12.) Plaintiff alleges that he submitted the Manuscript to three magazines in November [*3] of 1998, including The Source Magazine, XXL Magazine, and Blaze Magazine. Id. P13. Plaintiff sought support and financial backing from Blaze Magazine in order to help launch his publication. (Compl. Ex. 1B.) In February of 1999, Plaintiff called each publication and Blaze Magazine informed him that it could not locate the Manuscript. Id. In May of 1999, Blaze Magazine published works which Plaintiff allege infringed on his Manuscript, including a cover article entitled "Hip Hop B-hind Bars," an interview "that was spoke [sic] about in the letter that was sent with his Manuscript describing what would be added if the magazine wanted to use plaintiff's work." Id. P14. Plaintiff also alleges that there was an article under the same title, "Hip Hop Behind Bars," that involved an interview Plaintiff conducted with a convicted drug dealer, restructuring the interview and using the magazine's greater resources to get information on much larger drug dealers. Id. P15. Plaintiff further alleges that the June/July issues of Blaze Magazine featured another article, dealing with private prisons, hip hop and prisons in America, drugs' affect on ethnic groups, and lengthy sentences [*4] for drug crimes. Plaintiff alleges that this involves the same subject matter as does his Manuscript. Id. P15-16. Plaintiff alleges that he sent a cease and desist letter to Blaze Magazine in April of 1999, yet has never received a response.

Plaintiff alleges that defendants Keith Clinkscales and John Rollins of Blaze Magazine allowed such infringement to take place. Plaintiff alleges that defendants Darryl Dawsey and Corey Takahasi wrote infringing articles, which were published in Blaze Magazine, involving certain interviews and detailing the business of private prisons, ethnic targeting in drug cases and the resulting sentences. Plaintiff also alleges that Defendants' took this idea and restructured it in a paraphrasing manner. (Compl. P8.) Plaintiff alleges that defendant Tone Boots wrote an infringing article concerning drug dealers entitled "The Infamous," which was allegedly modeled after Plaintiff's article entitled "True Willies." Plaintiff alleges that this defendant took Plaintiff's work and restructured it in a paraphrasing manner, but ultimately, the idea was derived from Plaintiff's article. Id. P9. Plaintiff alleges that defendant Blaze Magazine infringed on [*5] his copyright by paraphrasing the title of Plaintiff's article "Hip Hop Behind the Walls" to read "Hip Hop Behind Bars." Id. P10. Plaintiff seeks damages in the amount of $ 2 million from each individual defendant.

### Standard of Review

In order for a party to succeed on a motion to dismiss under Rule 12(b)(6), it must be clear that the plaintiff can prove no set of facts that would establish his or her claim for relief. Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994). When making a determination of whether plaintiff can prove any set of facts which would entitle him or her to relief, a court must assume that the allegations in the complaint are true and draw all reasonable inferences in the plaintiff's favor. Cooper v. Pate, 378 U.S. 546, 546, 12 L. Ed. 2d 1030, 84 S. Ct. 1733 (1964); Kaluczky v. City of White Plains, 57 F.3d 202, 206 (2d Cir. 1995). Vague and conclusory allegations of official participation in civil rights violations, however, are not sufficient to withstand a motion to dismiss. A complaint must "contain [*6] allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory." American Council of Learned Societies v. MacMillan, Inc., 1996 U.S. Dist. LEXIS 18145, *9, 1996 WL 706911, at *3 (S.D.N.Y. Dec. 6, 1996).

### Discussion

In order to state a claim for copyright infringement, a plaintiff must show (1) ownership of a valid copyright; and (2) copying of the protected elements of the copyrighted work. Key Publications, Inc. v. Chinatown Today Publishing Enterprises, Inc., 945 F.2d 509, 514 (2d Cir. 1991) (citing Feist Publications, Inc. v. Rural

2001 U.S. Dist. LEXIS 2783, *; 58 U.S.P.Q.2D (BNA) 1464;
Copy. L. Rep. (CCH) P28,241

*Telephone Service Co., Inc.*, 499 U.S. 340, 361, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991). However, the fact that a work is copyrighted does not mean that every element of the work is protected, rather, a copyright protects only the original components of the author's work. *Feist*, 499 U.S. at 345, 348. Words and short phrases, such as titles or slogans, are insufficient to warrant copyright protection, as they do not exhibit the minimal creativity required for such protection. *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir 1992); [*7] 37 C.F.R. § 202.1(a)(2001). Similarly, copyright protection does not extend to a concept or idea, regardless of the form in which it is communicated, explained, illustrated, or embodied. *Mazer v. Stein*, 347 U.S. 201, 217-18, 98 L. Ed. 630, 74 S. Ct. 460 (1954) (stating that copyright protection extends only to the expression of the idea and never to the idea itself); *see* 17 U.S.C. § 102(b)(1988); *Williams v. Crichton*, 84 F.3d 581, 587-88 (2d Cir. 1996) (stating that this is a principle fundamental to copyright law). An idea, once born, may be exploited by others without violating the copyright laws, *see Arica*, 970 F.2d at 1071, however, the expression of an idea, other than a form of expression that is essential to conveying the idea, may be protected by copyrights. *See Kregos v. Associated Press*, 937 F.2d 700, 704-05 (2d Cir. 1991) (citations omitted); *Williams*, 84 F.3d at 587-88.

Here, Plaintiff registered for a copyright on the Manuscript on May 26, 1999, in accordance with Title 17 of the United States Code, Section 411(a). (Compl. P 27.) This [*8] was done prior to the filing of this complaint on December 27, 1999. Ex. H to the Complaint. It appears that Plaintiff has validly registered the Manuscript and owns a valid copyright, satisfying the first prong of the test to determine copyright infringement. Therefore, in order to prevail, Plaintiff must show that Defendants copied his works.

A plaintiff can prove the second prong of the standard either by direct evidence, or by demonstrating that the defendants had access to plaintiff's work and that the parties' works are "substantially similar." *Arica*, 970 F.2d at 1071. Works are "substantially similar" where defendants have "appropriated the fundamental essence or structure of [a] plaintiff's work." *Id.* at 1073 (citations omitted). The determination of whether the parties' works are "substantially similar" may be decided by a court as a matter of law. *Id.* at 1072; *Warner Brothers, Inc. v. American Broadcasting Companies, Inc.*, 720 F.2d 231, 240 (2d Cir. 1983). In the case where a work contains protectable and unprotectable elements, a court must determine whether the protectable elements, standing alone, are [*9] substantially similar. *Crichton*, 84 F.3d at 588 (citing *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)). If a court determines

that no reasonable jury could find that the works are substantially similar, or if it concludes that the similarities pertain only to unprotected elements of the work, it is appropriate for the court to dismiss the action because, as a matter of law, there is no copyright infringement. *Buckman v. Citicorp*, 1996 U.S. Dist. LEXIS 891, 1996 WL 34158, at *3 (S.D.N.Y. Jan. 30, 1996), *aff'd*, 101 F.3d 1393 (2d Cir. 1996).

Plaintiff described his Manuscript as a concept designed to center around hip hop in prisons and to focus on artists who are not recognized by the hip hop industry, while touching on issues and topics of everyday life, such as current events and the weather. He also planned to focus on what he termed the "inside" - on ways to restructure the lives of those who are incarcerated. (Compl. Ex. 1B.)

Blaze Magazine, launched in September, 1998, is a youth spin-off of Vibe, a major urban lifestyle and music magazine, focusing primarily on the "hip hop" style of music. The ideas embodied in [*10] both Plaintiff's Manuscript and Defendant's publication are not novel. They both focus on hip hop, and they both include articles covering many common subjects, such as the news and weather, and the allegedly infringing articles involve a similar subject to Plaintiff's Manuscript. Plaintiff claims that Defendants violated his copyright by capitalizing on his idea to publish a magazine which focuses on prison life and the black community, arguing that this concept, his specific ideas for stories and titles, were novel and protectable. This is simply not the case. It is clear that Plaintiff claims that Defendants copied his *ideas* - not the *expression* of his ideas. Indeed, the complaint makes that clear, in that Plaintiff alleges specifically that "defendant . . . fraudulently [took] plaintiff's work and restructured it in a [sic] infringing manner." (Compl. P 22.) The case law is clear that Defendant's use of a concept or idea - even when narrowed to specific story lines that have been "restructured" - cannot provide a basis for copyright infringement claims. *See Boyle v. Stephens, Inc., Wells Fargo Bank, N.A., and Wells Fargo Nikko Investment Advisors*, 1998 U.S. Dist. LEXIS 15215, 1998 WL 690816, [*11] at *5 (S.D.N.Y. Sept. 29, 1998) (citations omitted); *A.A. Hoehling v. Universal City Studios, Inc.*, 1979 U.S. Dist. LEXIS 10636, 1979 WL 1068, at *2 (S.D.N.Y. Aug. 2, 1979) (holding that a work that was the product of the plaintiff's lengthy research and marshaling, and the theory on which the plaintiff's work was based, were not copyrightable). In support of his claim that Defendants' copied his expression and not simply his ideas and concepts, Plaintiff attaches numerous exhibits to his complaint in an attempt to demonstrate similarities between his Manuscript and

2001 U.S. Dist. LEXIS 2783, *; 58 U.S.P.Q.2D (BNA) 1464;
Copy. L. Rep. (CCH) P28,241

Defendant's publication. (*See e.g.* Compl. Exs. A, B, D, E, F, G.)

Specifically, with respect to the cover and article entitled "Hip Hop Behind Bars," the Court finds that the mere fact that it involved similar subject matter to Plaintiff's article "Hip Hop Behind the Walls" does not give rise to a copyright violation. As a preliminary matter, there is no copyright protection for titles, words or phrases, therefore, any similarity in the two titles is not actionable. *Arica*, 970 F.2d at 1072. Furthermore, the manners in which the ideas were expressed were markedly different. The fact that Blaze Magazine used its [*12] greater resources to get information on much larger drug dealers than those to which Plaintiff had access is simply an example of Defendants capitalizing on Plaintiff's idea and tailoring it to the needs of Blaze Magazine. The law does not provide for relief under the copyright laws for the exploitation of others' ideas. *Id.* at 1074. Therefore, there was no copyright infringement. The Court further finds that the allegedly infringing article in the June/July issues of Blaze Magazine, dealing in part with private prisons, hip hop, drugs' affect on ethnic groups, and lengthy sentences for drug crimes, does not amount to a copyright violation of Plaintiff's work. Plaintiff alleges that this article involves the same subject matter as does his Manuscript, however, even assuming that the two articles involve the same subject matter, this is not enough to give rise to copyright infringement. Again, any similarity involved ideas or concepts, which are not protected by the copyright laws.

Plaintiff's allegations that defendants Darryl Dawsey and Corey Takahasi wrote infringing articles, and that defendant Tone Boots wrote an infringing article concerning drug dealers entitled [*13] "The Infamous," which was allegedly modeled after Plaintiff's article entitled "True Willies," also are insufficient to rise to the level of a copyright violation. Even assuming as true Plaintiff's allegation that Defendants' took his ideas for these articles and restructured them in a paraphrasing manner, again, this merely demonstrates that Defendant's used Plaintiff's ideas or concepts and therefore cannot give rise to a violation of the copyright laws.

The Court has examined all of these alleged similarities and concludes that they all relate to unprotectable concepts and ideas and not Plaintiff's expression of these ideas. At the most general level, portions of the cited articles involve similar subject matter to the Manuscript. However, the manner in which such subject matter is expressed is vastly different. The mere fact that some of the formats are similar (for example, the interview format) or the fact that the subject matter is similar (both works including articles on the weather, current events, hip hop music, prison life, ethnic targeting and drug crimes) do not give rise to valid copyright claims. Therefore, as the similarity between the works pertains solely to Plaintiff's [*14] ideas or concepts, the Court finds, as a matter of law, that Defendants did not infringe on Plaintiff's copyright. No reasonable juror could find that there is a substantial similarity between the works, such that is protectable by copyright. Accordingly, Plaintiff's copyright claims are dismissed. Plaintiff's allegations that defendants Keith Clinkscales and John Rollins of Blaze Magazine allowed the alleged infringement to take place must be dismissed along with the other allegations in the complaint, as the Court finds that no copyright infringement has occurred.

### Conclusion

For the above reasons, Defendants' motion to dismiss Plaintiff's complaint *is* GRANTED, and Plaintiff's complaint is DISMISSED WITH PREJUDICE.

SO ORDERED.

Richard Conway Casey, U.S.D.J.

New York, New York

Dated: March 15, 2001

LEXSEE



Positive
As of: Jun 25, 2008

JOHN C. ("JACK") BOYLE, Plaintiff, -against- STEPHENS, INC., WELLS
FARGO BANK, N.A., and WELLS FARGO NIKKO INVESTMENT ADVISORS,
Defendants.

97 Civ. 1351 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

1998 U.S. Dist. LEXIS 1968

February 23, 1998, Decided
February 25, 1998, Filed

**DISPOSITION:** [*1] Defendants' motion for reconsideration granted with respect to claims for copyright infringement; defendants' motion to dismiss plaintiff's claims for copyright infringement granted and defendants' motion for reconsideration denied with respect to claims for quantum meruit and breach of contract of bailment. Plaintiff's claims for copyright infringement dismissed with prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff individual filed a second amended complaint against defendants, a bank and investment advisors, which alleged claims for violations of the Copyright Act, 17 U.S.C.S. §§ 106(1), 106(2), and 106(4), quantum meruit, and breach of contract of bailment. Defendants sought dismissal all of the claims pursuant to Fed. R. Civ. P. 12(b)(6). The court denied defendants' motion, and defendants sought reconsideration.

**OVERVIEW:** Both the copyrighted works and most of the alleged infringing works explained a similar concept for a mutual fund. The individual's works described a mutual fund that broke down a large pool of investments into different risk allocations. Defendants' works described mutual funds, which permitted investment in different "series" of funds, based on an individual investor's retirement date. The individual's copyright did not protect the idea of an age-targeted, asset-allocated mutual fund. Also, under the merger doctrine, the copyright did not preclude others from describing such fund characteristics as the availability of individual-specific "series" and the shifting investment composition. The individual alleged that defendants' works copied certain graphics from his works. However, the use of simple graphics did not satisfy the requirement of originality. Even if it did, the merger doctrine excluded them from the umbrella of copyright protection. Finally, because individual words or short phrases could not be copyrighted, the term "series" was not protected. Additionally, the parties' works were easily distinguishable in their organization, structure, emphasis, tone, and theme.

**OUTCOME:** The court granted defendants' motion for reconsideration with respect to the claims for copyright infringement and dismissed the individual's claims for copyright infringement. The court denied defendants' motion for reconsideration with respect to the claims for quantum meruit and breach of contract of bailment.

**COUNSEL:** For Plaintiff: Raymond J. Dowd, Esq., New York, New York.

For Defendants: Michael B. Carlinsky, Esq., Barbara Moses, Esq., Lara M. Krieger, Esq., Orrick, Herrington & Sutcliffe, LLP, New York, New York.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

*OPINION AND ORDER*

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

On September 25, 1997, plaintiff filed a Second Amended Complaint ("Complaint") alleging claims for violations of the Copyright Act, 17 U.S.C. §§ 106(1), 106(2), and 106(4), quantum meruit, and breach of contract of bailment. [1] Defendants moved to dismiss all of plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(6). In an opinion issued on December 5, 1997, this Court denied defendants' motion. *See Boyle v. Stephens, Inc.,* 1997 U.S. Dist. LEXIS 19455, 97 Civ. 1351, 1997 WL 760498 (S.D.N.Y. [*2] Dec. 5, 1997) (*Boyle II*). On December 24, 1997, defendants moved for reconsideration of that opinion pursuant to Local Civil Rule 6.3. For the reasons stated below, defendants' motion for reconsideration is granted in part and denied in part.

1 Plaintiff filed his original Complaint ("Initial Complaint") on February 26, 1997, alleging copyright infringement and misappropriation of trade secrets. He withdrew that Complaint and filed an Amended Complaint on May 27, 1997, which alleged claims for copyright infringement, breach of contract, misappropriation of trade secrets and fraudulent concealment. The Court dismissed Plaintiff's claims for misappropriation of trade secrets and fraudulent concealment without leave to amend, and dismissed the remaining claims with leave to amend. *See Boyle v. Stephens, Inc.,* 1997 U.S. Dist. LEXIS 12780, 44 U.S.P.Q.2D (BNA) 1138, 1997 WL 529006 (S.D.N.Y. 1997) (*Boyle I*).

**I. Legal Standard**

The legal standards by which a Rule 6.3 Motion for Reconsideration is decided [*3] are the same as those governing former Local Rule 3(j). *Wishner v. Continental Airlines,* 1997 U.S. Dist. LEXIS 15302, 94 Civ. 8239, 1997 WL 615401, at *1 (S.D.N.Y. Oct. 6, 1997) (citing *Jones v. Trump,* 971 F. Supp. 783, 785 n.2 (S.D.N.Y. 1997)). Pursuant to Local Rule 6.3, a party seeking reargument must demonstrate that the Court overlooked controlling decisions or factual matters "that might materially have influenced its earlier decision." *Anglo American Ins. Co. v. Calfed, Inc.,* 940 F. Supp. 554, 557 (S.D.N.Y. 1996) (quoting *Morser v. AT & T Info. Sys.,* 715 F. Supp. 516, 517 (S.D.N.Y. 1989)); *see*

*also Frankel v. ICD Holdings S.A.,* 939 F. Supp. 1124, 1126 (S.D.N.Y. 1996). Local Rule 6.3 "is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been fully considered by the court." *Wishner,* 1997 WL 615401, at *1 (citing *Calfed,* 940 F. Supp. at 557); *Ades v. Deloitte & Touche,* 843 F. Supp. 888, 892 (S.D.N.Y. 1994). Parties may not use a motion for reargument to "advance new facts, issues or arguments not previously presented to the court." *Great American Ins. Co. v. J. Aron & Co.,* 1996 U.S. Dist. LEXIS 310, 94 Civ. 4420, 1996 WL 14455, at *2 (S.D.N.Y. Jan. [*4] 16, 1996) (quoting *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 1989 U.S. Dist. LEXIS 9145, 86 Civ. 6447, 1989 WL 162315, at *4 (S.D.N.Y. Aug. 4, 1989)). The decision to grant or deny a motion for reargument is within the sound discretion of the district court. *See Cohen v. Koenig,* 932 F. Supp. 505, 507 (S.D.N.Y. 1996); *Schaffer v. Soros,* 1994 U.S. Dist. LEXIS 15508, 92 Civ. 1233, 1994 WL 592891, at *1 (S.D.N.Y. Oct. 31, 1994).

**II. Copyright Claims**

*A. Factual Background on Copyright Claims*

The following factual allegations, in addition to those set forth in *Boyle I,* are assumed to be true for purposes of this motion. Plaintiff holds a copyright in two original works of authorship which describe a novel concept for a financial product called "Moneyfor" mutual funds. *See* Complaint at PP 17-19. The copyrighted works are (1) Moneyfor advertising materials; *see id.* at P 15, and Ex. A ("Direct Mail Packet"); and (2) an "Executive Summary" of Moneyfor. *See id.* at P 16, and Ex. E (the "Executive Summary").

In 1994, defendants filed with the Securities Exchange Commission a prospectus describing "LifePath" mutual funds, *see id.* at P 91, and Ex. I (the "LifePath Prospectus"), and a "Statement [*5] of Additional Information," listing LifePath's trustees and officers. *See id.* at P 113, and Ex. J (the "LifePath Addendum"). The LifePath funds are further described in a "Strategy Report" that defendants filed with the U.S. Patent and Trademark Office, *see id.* at P 109, and Ex. K (the "LifePath Report"), and in LifePath's promotional materials, *see id.,* Ex. L (the "LifePath Brochure").

Plaintiff alleges that the LifePath Prospectus, LifePath Addendum, LifePath Report, and LifePath Brochure infringe on his copyrighted works. Specifically, plaintiff asserts that a comparison of LifePath's works with his own reveals a "comprehensive non-literal similarity evidencing direct copying." *Id.* at P 96.

1998 U.S. Dist. LEXIS 1968, *

In *Boyle II*, this Court held that whether there is a comprehensive non-literal similarity between the two sets of material is for the jury to decide at trial--not for the Court to determine on a motion to dismiss. *Boyle II,* 1997 WL 70498, at 3-4. On reconsideration, I conclude that this holding was erroneous.

### A. Legal Standard for Motion to Dismiss

In considering a 12(b)(6) motion to dismiss, a district court must limit itself to "facts stated in the complaint [*6] or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 661 (2d Cir. 1996) (internal quotations omitted). A court deciding such a motion must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *Kaluczky v. City of White Plains*, 57 F.3d 202, 206 (2d Cir. 1995). Furthermore, a 12(b)(6) motion to dismiss cannot be granted simply because recovery appears remote or unlikely on the face of a complaint, because "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)). Rather, dismissal can only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bernheim*, 79 F.3d at 321 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).

### B. Deciding Copyright Infringement [*7]  Claims on a Motion to Dismiss

#### 1. Legal Standard for Copyright Infringement Claims

##### a) Generally

To state a claim for copyright infringement, a plaintiff must show (1) ownership of a valid copyright; and (2) copying of the protected elements of the copyrighted work. *Key Publications v. Chinatown Today Publ'g Enters.*, 945 F.2d 509, 514 (2d Cir. 1991) (citing *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991)). The mere fact that a work is copyrighted does not mean that every element of the work may be protected. *Feist*, 499 U.S. at 348. A copyright extends only to those components of a work that are original to the author. *Id*. at 345. Short phrases or single words do not exhibit the minimal creativity required for copyright protection. *See Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992); *see also* 37 C.F.R. § 202.1(a) (prohibiting registration of "words and short phrases

such as names, titles and slogans" for copyright protection).

Additionally, copyright protection for an original work does not extend to an idea or concept therein, "regardless of the form in which [*8]  it is described, explained, illustrated, or embodied." 17 U.S.C. 102(b) (1988); *see also Williams v. Crichton*, 84 F.3d 581, 587-88 (2d Cir. 1996). Once an idea is conceived, the copyright laws do not prevent others from exploiting it. *See Arica*, 970 F.2d at 1074.

The *expression* of an idea may be protected by copyright. However, under the "merger doctrine," a form of expression that is essential to conveying the idea is not protected; otherwise "protection of the expression would effectively accord protection to the idea itself." *Kregos v. Associated Press*, 937 F.2d 700, 705 (2d Cir. 1991) (citations omitted); *see generally* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* ("*Nimmer*") § 13.03[B][3].

##### b) Non-Literal Similarity

Plaintiff may prove that defendants copied protected elements of his work, either by direct evidence or by demonstrating that defendants had access to his work and that the parties' works are "substantially similar." *See Arica*, 970 F.2d at 1071. Under the doctrine of comprehensive non-literal similarity, the requirement of substantial similarity may be satisfied where defendants have "appropriated the fundamental [*9]  essence or structure of [a] plaintiff's work." *Id.* at 1073 (quotations and citations omitted). It is well-established that a court may determine the absence of substantial similarity as a matter of law. *See, e.g., Arica*, 970 F.2d 1067 (dismissing non-literal similarity claim on summary judgment); *Warner Bros. Inc. v. American Broad. Cos.*, 720 F.2d 231 (2d Cir. 1983) (same). When a work contains both protectable and unprotectable elements, courts must "take care to inquire only whether the protectable elements, standing alone, are substantially similar." *Crichton*, 84 F.3d at 588; *see also Key Publications*, 945 F.2d at 514; *Churchill Livingstone, Inc. v. Williams & Wilkins*, 949 F. Supp. 1045, 1050 (S.D.N.Y. 1996). Thus a court must filter out the unprotected elements of the copyrighted work--e.g., its elements that are unoriginal or that "merge" with ideas or concepts--before comparing the copyrighted and the allegedly infringing works. The court must then inquire whether a lay observer would consider the protectable elements to be substantially similar to the defendants' works. *See Crichton*, 84 F.3d at 589-90; *see generally* 4 *Nimmer* § 13.03[B][2].  [*10]

#### 2. Application of Copyright Infringement Analysis on a Motion to Dismiss

Page 3

1998 U.S. Dist. LEXIS 1968, *

The *Boyle II* opinion cited *Cognotec Servs. Ltd. v. Morgan Guar. Trust Co., 862 F. Supp. 45, 50 (S.D.N.Y. 1994),* for the proposition that a motion to dismiss is not the proper procedural mechanism for evaluating substantial similarity. *See Boyle II, 1997 WL 760498,* at n.2. However, *Cognotec* is distinguishable from the instant case. In *Cognotec,* the allegedly infringing work was a computer program used by banks to offer automated foreign exchange service to their currency trading customers. The court there followed *Computer Assocs. Int'l v. Altai, Inc., 982 F.2d 693 (2d Cir. 1992),* which set out a three-step process for determining whether the non-literal elements of computer programs are substantially similar:

> The three step procedure that *Altai* recommends that district courts apply is necessarily fact-determinative and requires detailed comparisons of computer programs. *Altai, 982 F.2d at 704, 707-10.* To adequately consider [defendant's] arguments would require a thorough and detailed factual exploration of [the copyrighted software], the various documents issued [*11] to and by [defendant], the foreign currency industry, as well as [defendant's] own program. *A motion to dismiss is not the proper procedural mechanism to make this inquiry.*

*Cognotec, 862 F. Supp. at 50* (emphasis added). However, *Altai* does not suggest that every comprehensive non-literal similarity case entails such a rigorous factual analysis. Indeed, the *Altai* court held that unlike the evaluation of artistic and literary works, ascertaining the substantial similarity of computer programs may require expert opinion, given the highly complicated and technical subject matter at the heart of such claims. *See also, Churchill Livingstone, 949 F. Supp. at 1050* (granting summary judgment after noting that the fact-intensive *Altai* test is not necessary in straightforward, textual copyright cases).

In determining copyright infringement, "the works themselves supersede and control contrary allegations and conclusions, or descriptions of the works as contained in the pleadings." *Walker v. Time Life Films, Inc., 615 F. Supp. 430, 434 (S.D.N.Y. 1985)* (citation omitted), *aff'd, 784 F.2d 44 (2d Cir. 1986).* If after examining the works themselves, this [*12] Court determines that there is no substantial similarity, then the plaintiff here can prove no facts in support of his claim which would entitle him to relief--the standard for dismissal under *Rule 12(b)(6). See Bernheim, 79 F.3d at*

*321.* A court may, therefore, dismiss a copyright infringement claim on a 12(b)(6) motion "if it concludes that no reasonable jury could find that the two works are substantially similar, or if it concludes that the similarities between the two works pertain only to unprotected elements of the works." *Boyle I, 44 U.S.P.Q.2D (BNA) at 1141* (internal quotations omitted) (quoting *Buckman v. Citicorp, 1996 U.S. Dist. LEXIS 891, 95* Civ. 0773, 1996 WL 34158, at *3 (S.D.N.Y. Jan. 30, 1996), *aff'd 101 F.3d 1393 (2d Cir. 1996)). Accord Nelson v. PRN Prods., Inc., 873 F.2d 1141, 1143-44 (8th Cir. 1989)* (dismissing copyright claim on pleadings because no substantial similarity as a matter of law); *Cory Van Rijn, Inc. v. California Raisin Advisory Bd., 697 F. Supp. 1136, 1144-45 (E.D. Cal. 1987)* (same). I now turn to determining whether the works at issue here are substantially similar.

### C. Determining Substantial Similarity

1. *Examining the Protected Elements of the Copyrighted* [*13] *Works*

Both of the copyrighted works and most of the allegedly infringing works explain a similar concept for a mutual fund. The Moneyfor Executive Summary and Direct Mail Packet describe a mutual fund that breaks down a large pool of investments into different risk allocations, thereby allowing the fund to be marketed to clients based on their individual needs. *See* Complaint, Exs. A, E. These copyrighted works explain that the mutual funds are directed, in part, at serving the needs of investors planning for retirement. A customer may purchase one of eight "series" of Moneyfor Retirement Funds by matching the series' maturity date to his or her expected date of retirement. *See id.*

Similarly, the LifePath Prospectus, the LifePath Registration, and the LifePath Brochure each describe LifePath mutual funds, which permit investment in different "series" of funds, based on an individual investor's projected retirement date. [2] *See id.,* Exs. I, K, L. According to these materials, the LifePath fund managers will modify the funds' investment composition as time progresses, so as to reduce the risk level of the investments as the maturity date approaches. *See id.*

> 2  The LifePath Addendum, which consists of a list of the "Trustees and Officers" who manage the LifePath fund, does not describe the mutual fund concept. *See* Complaint at 24, and Ex. J. Because it is commonplace to include such a list in mutual fund promotional materials, plaintiff's copyrights cannot prevent defendants from creating such a list. *See Churchill Livingstone, 949 F. Supp. at 1052* (stock elements are not copyrightable).

[*14]    Plaintiff's copyright on the Moneyfor Executive Summary and Direct Mail Packet does not, of course, protect the idea or concept of an age-targeted, asset-allocated mutual fund. Additionally, under the merger doctrine, plaintiff's copyright does not preclude others from also describing such fund characteristics as the availability of individual-specific "series" and the shifting investment composition. Otherwise, plaintiff could prevent competitors from fully describing the mutual fund concept in a prospectus or other selling materials—a result the copyright laws do not contemplate.

The Complaint alleges that the defendants' works copy certain graphics from the Moneyfor Executive Summary and Direct Mail Packet. *See id.* at PP 91-99. There are only two graphics in plaintiff's works that bear any resemblance whatsoever to a portion of the allegedly infringing works. The first is a chart that is printed in the LifePath Direct Mail Packet. The chart simply states:

| Age (nearest) | BUY—Moneyfor Retirement |
|---|---|
| 25 | Series 2029 |
| 30 | Series 2024 |
| 35 | Series 2019 |
| 40 | Series 2014 |
| 50 | Series 2009 |
| 55 | Series 1999 |
| 60 | Series 1994 |

*See id.,* Ex. A at 7, 10. The second graphic, [*15] which is included in the Moneyfor Executive Summary, states that:

All series will invest:

* 65% to 100% Stocks

* 00% to 35% Bonds

* 100% Money Market at any time !

*See id.,* Ex. E at 8.

Assuming, arguendo, that the use of such simple graphics satisfies the requirement of originality, the merger doctrine excludes them from the umbrella of copyright protection. A contrary result would prevent others marketing age-targeted, asset-allocated mutual funds from summarizing in a brief, legible form the series that are appropriate for investors of certain ages or the investment composition of those series. *See Churchill,* 949 F. Supp. 1045, 1051 ("copyright does not protect the mere individual choice of a common type of illustration").

Finally, because individual words or short phrases cannot be copyrighted, the term "series" is not protected, even if, as plaintiff asserts, he was the first in the mutual fund industry to use that term. *See* Complaint at P 25. Accordingly, neither the use of the defining characteristics of an asset-allocated retirement fund, the use of basic graphics to illustrate those characteristics,

nor the application of the term "series" in the [*16] mutual fund context are protected by copyright.

2. *Comparing the Works at Issue*

After filtering out such unprotected elements from the analysis, a court must examine the works at issue to evaluate substantial similarity. A comparison of the parties' works reveals that their organization, structure, emphasis, tone, and theme are easily distinguishable. For example, the Moneyfor Direct Mail Packet, which is addressed to prospective mutual fund clients, explains the Moneyfor concept in folksy, informal language and employs dramatic use of capitalization and punctuation marks. It also utilizes an education theme: the envelope announces "HONOR ROLL plan details inside"; the return envelope states, "THE TEACHER'S PET OF MUTUAL FUNDS"; the cover letter reads, "we hope you will join [Moneyfor's] honor roll of clients"; and the attached brochure begins, "WE GET ALL—A's—IN THE MUTUAL FUND BUSINESS." *See id.,* Ex. A at 4, 6, 7, 12. In contrast, the LifePath Prospectus is a dry, legalistic document that begins with a description of LifePath funds and explains such financial and legal topics as fees, risk factors, management, and purchase and redemption instructions. *See id.,* Ex. [*17] I. The LifePath Report and LifePath Brochure are far more restrained in tone than the Moneyfor Executive Summary, and neither includes any language or imagery remotely related to plaintiff's education theme. *See id.,* Exs. K, L.

The Moneyfor Executive Summary targets regional securities dealers and invites them to join in delivering the Moneyfor Mutual Fund to the public. *See id.*, Ex. E. The document, which uses an informal tone, has one overarching theme: the advantages to regional brokers of selling the funds. Defendants' allegedly infringing materials, on the other hand, are directed at the consuming public, and thus have an altogether different thematic emphasis--the advantage to the individual consumer of purchasing the fund. *See id.*, Exs. I, K, L.

In summary, the only similarities between the parties' works are that they both contain descriptions of age-targeted, asset-allocated mutual funds, both use graphics to illustrate the funds' characteristics, and both use the term "series" to describe the funds. Because no reasonable juror could find there exists a substantial similarity between the protected expressive elements of plaintiff's works and defendants' works, [*18] plaintiff's claims for copyright infringement must be dismissed.

### III. Quantum Meruit Claim

Defendants move to reconsider the denial of defendants' motion to dismiss the quantum meruit claim. *Boyle II* held that in most industries, "prior gratuitous, unsolicited disclosure of an idea does not create an enforceable contract implied in law, despite the defendant's use of the idea." *Boyle II*, 1997 WL 760498, at 6 and n.3 (citing *Grombach Prods. v. Fred Waring*, 293 N.Y. 609, 616, 59 N.E.2d 425 (1944); *McGhan v. Ebersol*, 608 F. Supp. 277, 285 (S.D.N.Y. 1985)). However, because plaintiff alleged that defendants asked him to disclose his idea, *see* Complaint at PP 45-48, the Court held that the quantum meruit claim could not be dismissed on the pleadings.

Defendants contend that plaintiff's allegations concerning defendants' solicitation of his idea contradict an averment made in the Initial Complaint, which plaintiff prepared *pro se*. The Initial Complaint avers that plaintiff sent his copyrighted material to defendant Stephens, Inc. ("Stephens"), requesting that the company sponsor his proposed mutual fund, and that Stephens "refused the unsolicited offer." [*19] Initial Complaint, Ex. A ("Complaint Summary") at 1.

In light of this averment, defendants contend that the Court overlooked a controlling principle of law; namely, that "a plaintiff may not avoid the effect of factual concessions made in earlier iterations of his complaint

simply by dropping them (or contradicting them) in later iterations." Defendants' Memorandum in Support of Motion for Reconsideration at 8-9 (citing *Andrews v. Metro North Commuter R.R.*, 882 F.2d 705, 707 (2d Cir. 1989); *Savino v. Computer Credit, Inc.*, 960 F. Supp. 599, 601-02 (S.D.N.Y. 1997)).

However, the authority on which defendants rely does not suggest that a litigant is estopped from making contradictory averments in successive iterations of his pleadings. To the contrary, the cases hold that making such pleadings is permissible, but that at trial, a jury may examine the inconsistent pleadings. *See Metro North*, 882 F.2d at 707; *Savino*, 960 F. Supp. at 602. Thus, even assuming, arguendo, that this doctrine applies to the pleadings of *pro se* litigants, the alleged inconsistency is appropriate for consideration by the finder of fact, not by the court on a motion to dismiss. Because defendants [*20] do not cite to any fact or controlling law that would have materially influenced the Court's decision regarding the quantum meruit claim, defendants' motion for reconsideration is denied.

### IV. Bailment Claim

In their motion for reconsideration, defendants fail to specify any fact or controlling authority that the Court overlooked in denying defendants' motion to dismiss plaintiff's claim for breach of contract of bailment. Accordingly, defendants' motion to reconsider this decision is denied.

### V. Conclusion

For the aforementioned reasons, (1) defendants' motion for reconsideration is granted with respect to the claims for copyright infringement; (2) on reconsideration, defendants' motion to dismiss plaintiff's claims for copyright infringement is granted; and (3) defendants' motion for reconsideration is denied with respect to the claims for quantum meruit and breach of contract of bailment. Accordingly, plaintiff's claims for copyright infringement are dismissed with prejudice.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

February 23, 1998

LEXSEE



Positive
As of: Jun 25, 2008

DAN BROWN and RANDOM HOUSE, INC., Plaintiffs, -against- LEWIS PERDUE, Defendant. LEWIS PERDUE, Counterclaimant, -against- DAN BROWN and RANDOM HOUSE, INC., COLUMBIA PICTURES INDUSTRIES, INC., SONY PICTURES ENTERTAINMENT INC., SONY PICTURES RELEASING CORPORATION, IMAGINE FILMS ENTERTAINMENT, LLC, Counterclaim Defendants.

04 Civ. 7417 (GBD)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2005 U.S. Dist. LEXIS 15995; 76 U.S.P.Q.2D (BNA) 1012; Copy. L. Rep. (CCH) P29,248

August 4, 2005, Decided
August 4, 2005, Filed

**SUBSEQUENT HISTORY:** Affirmed by Brown v. Perdue, 2006 U.S. App. LEXIS 13877 (2d Cir. N.Y., Apr. 18, 2006)

**DISPOSITION:** [*1] Defendant Perdue's motion for summary judgment denied and all of his counterclaims dismissed. Plaintiffs' motion for summary judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, an author and a publisher, sued defendant, also an author, under the Copyright Act of 1976, 17 U.S.C.S. § 101 et seq., seeking a declaratory judgment that the author's novel did not infringe upon the defendant's copyrighted novel. Defendant counterclaimed alleging copyright infringement. Plaintiff moved for judgment on the pleadings or for summary judgment. Defendant moved for summary judgment on the counterclaims.

**OVERVIEW:** Defendant contended that the plaintiff copied the basic premise underlying defendant's novel involving religious history and themes exposed through a criminal mystery. The court held, however, that a reasonable average lay observer would not conclude that the plaintiff's novel was substantially similar to the defendant's novel, since any slightly similar elements were on the level of generalized or otherwise unprotectable ideas. The similarities asserted by the defendant constituted unprotectable ideas, historical facts, scenes a faire, and general themes which were not original elements of plaintiff's novel. Further, the plaintiff's expression of the divine feminine and related themes was markedly different from the defendant's expression and, although both novels were mystery thrillers, the defendant's novel was action-oriented while the plaintiff's novel was complex and intellectual. Also, the fundamental essence and structure of the plots were not substantially similar, and the characters in the novels had different physical and mental attributes and played different roles. Moreover, the time sequence, pace, and setting of each of the novels were clearly different.

**OUTCOME:** The plaintiff's motion for summary judgment was granted and defendant's cross-motion was denied.

**COUNSEL:** For Dan Brown, Random House, Inc., Plaintiffs: Elizabeth A. McNamara, Davis Wright Tremaine LLP, New York, NY.

Page 1

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

**JUDGES:** GEORGE B. DANIELS, United States District Judge.

**OPINION BY:** GEORGE B. DANIELS

**OPINION**

MEMORANDUM OPINION AND ORDER

GEORGE B. DANIELS, District Judge;

Plaintiffs Dan Brown and Random House, Inc. bring suit seeking declaratory judgment that the book, *The Da Vinci Code,* does not infringe the copyrights defendant Lewis Perdue owns in his books, *Daughter of God* and *The Da Vinci Legacy.* Defendant asserted counterclaims alleging copyright infringement against plaintiffs and other counterclaim defendants.

Plaintiffs submitted a motion for judgment on the pleadings, or in the alternative, for summary judgment on their declaratory judgment claim. Defendant also moved for summary judgment on his counterclaims. The Court finds that there is no substantial similarity between Brown's book *The Da Vinci Code* and Perdue's books *Daughter of God* and *The Da Vinci Legacy.* Accordingly, defendant's motion for summary [*2] judgment is denied and plaintiffs' motion for summary judgment on their declaratory judgment claim is granted.

**BACKGROUND**

This is an action for copyright infringement under the Copyright Act of 1976, *as amended,* 17 U.S.C. §§ 101 *et seq.* (1994). Lewis Perdue claims that Dan Brown's novel, *The Da Vinci Code,* infringes upon copyrights he owns in *Daughter of God* and *The Da Vinci Legacy.* [1] Brown, who initiated this lawsuit, seeks a declaratory judgment that his work does not infringe upon Perdue's. Perdue counterclaimed, and included as counterclaim-defendants various parties associated with production of the anticipated motion picture version of Brown's *The Da Vinci Code.* Along with his copyright infringement claim, Perdue alleges unjust enrichment, and seeks an accounting of all income deriving from *The Da Vinci Code,* as well as a permanent injunction barring the distribution of the book and the motion picture adaptation. He demands damages totaling $ 150 million.

[1]   *The Da Vinci Code* was published by Doubleday, a division of defendant Random House, in March 2003. *The Da Vinci Legacy* was published in 1983 and *Daughter of God* was published in 2000.

[*3] The threshold issue for deciding whether *The Da Vinci Code* infringes on copyrights in *Daughter of God* and *The Da Vinci Legacy* involves a determination of whether the works are "substantially similar." This determination requires a "detailed examination of the works themselves." Walker v. Time Life Films, Inc., 784 F.2d 44, 49 (2d Cir.), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986).

A. *The Da Vinci Code*

*The Da Vinci Code*

[2] begins with the murder of Jacques Sauniere, the curator of the Louvre Museum, by an albino monk seeking the Holy Grail. The monk is a member of Opus Dei, a devout Catholic sect headed by Bishop Aringarosa, but is acting at the direction of a mysterious and unknown figure known simply as the "Teacher." Before dying, Sauniere leaves behind a series of clues meant for his estranged granddaughter, including disrobing and placing himself, before his death, in the position of Da Vinci's Vitruvian Man and writing a note that read "P.S. Find Robert Langdon." Langdon, a Harvard professor of religious symbology, is summoned to the Louvre by Bezu Fache, captain of the French judicial police, [*4] under the guise of helping to solve the crime. Fache, however, suspects that Langdon is involved with the murder. Also present at the crime scene is Sophie Neveu, a police cryptologist and granddaughter of the victim. Neveu recognizes that the inscription "P.S. Find Robert Langdon," is a message to her (P.S. stood for Princess Sophie). She warns Langdon that he is in danger and that he is suspected by the police of being the killer.

[2]   The synopsis of *The Da Vinci Code* from its book jacket is as follows:

While in Paris on business, Harvard symbologist Robert Langdon receives an urgent late-night phone call: the elderly curator of the Louvre has been murdered inside the museum. Near the body, police have found a baffling cipher. While working to solve the enigmatic riddle, Langdon is stunned to discover it leads to a trail of clues hidden in the works of Da Vinci — clues visible for all to see — yet ingeniously disguised by the painter.

Langdon joins forces with a gifted French cryptologist, Sophie Neveu, and learns the late curator was involved in the Priory of Sion — an actual secret society whose members included Sir Isaac Newton, Botticelli, Victor Hugo, and Da Vinci, among others.

In a breathless race through Paris, London, and beyond, Langdon and Neveu match wits with a faceless powerbroker who seems to anticipate their every move. Unless Langdon and Neveu can

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

decipher the labyrinthine puzzle in time, the Priory's ancient secret — and an explosive historical truth -- will be lost forever.

*The Da Vinci Code* heralds the arrival of a new breed of lightning-paced, intelligent thriller utterly unpredictable right up to its stunning conclusion.

[*5] Langdon and Neveu fake an escape from the Louvre, buying them enough time to further dissect and unravel the clues and riddles Sauniere left behind. Using the Fibonacci numerical sequence, the couple determine that a poem left by Sauniere was an anagram of "Leonardo da Vinci! The Mona Lisa!" Neveu and Langdon follow Sauniere's clues to a key with a symbol of the Priory of Sion hidden in the frame of "Madonna of the Rocks," a painting by Leonardo da Vinci who himself served as a Grand Master of the Priory of Sion. Neveu and Langdon are led to the Paris branch of the Depository Bank of Zurich where they are presented with yet more riddles. Solving these riddles allows Neveu and Langdon to determine the account number for Sauniere's deposit box, where they discover a carved wooden box with a cryptex - a stone cylinder invented by Da Vinci to store objects safely, which can only be opened with a proper password.

The reader learns through Langdon, who serves as an intellectual catalyst and religious historian of the novel, that Sauniere was the Grand Master of a secret society named the Priory of Sion, an organization founded centuries ago and charged with keeping the secret of the Holy [*6] Grail. The secret of the Holy Grail is the secret of the divine feminine; that Mary Magdalene was married to Jesus and that they had offspring. Through the years, the Priory of Sion protected this information and guarded the fact that Jesus and Mary Magdalene's bloodline still survives through their descendants.

Although the police converge on the bank, Langdon and Neveu escape with the help of the bank president, who was an old friend of Sauniere. They seek refuge at the home of Sir Leigh Teabing, the wealthy Royal Historian and authority on the Holy Grail. Teabing, portly and ruby faced, suffers from polio and walks with the help of aluminum braces and crutches. Teabing provides a tutorial on the legend of the Grail, shares religious history, and offers evidence that Jesus and Mary Magdalene were married and had a child. He also shares with them clues in Da Vinci's artwork of Mary Magdalene's role in early Christianity.

Teabing's home, however, serves only as a temporary refuge, as both the albino monk and the French police track Langdon and Neveu to Teabing's estate. The monk attacks, demanding the cryptex, but

with Teabing's help, the monk is subdued and Teabing, his servant [*7] Remy, Neveu and Langdon flee from his estate to the airport, where they board Teabing's private jet and head for London. During the flight, Langdon, Neveu and Teabing work together to determine the password that would unlock the cryptex. They believe that locked inside the cryptex is the location of the Holy Grail.

In London, Langdon, Neveu and Teabing search for clues to help them determine the password. The albino monk, through the help of Teabing's traitorous servant Remy, gets free, steals the cryptex from Langdon and Neveu and kidnaps Teabing. It is soon learned that Teabing is the "Teacher" and that he deceived Opus Dei into murdering Sauniere and the other Priory masters because he is obsessed with finding and releasing to the public the secret of the Holy Grail. Instead of killing Langdon and Neveu, Teabing implores Langdon to assist him in solving the password to open the cryptex. Langdon, having already determined the password and removed the contents of the cryptex, throws the cryptex in the air, presumably to destroy it. Teabing leaps to save it and falls to the ground as Fache and the police enter the room. Fache arrests Teabing, and Langdon reveals that he knew the password [*8] and saved the contents of the cryptex.

The cryptex, in fact, did not contain a map, but rather another riddle that leads Langdon and Neveu to Rosslyn Chapel in Scotland, where Neveu is reunited with her grandmother and brother, whom she thought had died long ago in a car crash. She learns that she is a descendant of Jesus and Mary Magdalene. Neveu's grandmother, during a conversation with Langdon, reveals that the possibility of the existence of the documents and proof is far more important than their actual existence. Neveu invites Langdon to stay. Although he refuses, they make plans to meet again in the near future and the two share an intimate kiss. In a final epilogue, Langdon realizes that the documents and other objects concerning Mary Magdalene are safely hidden underground in an inverted pyramid at the Louvre.

### B. *Daughter of God*

At the opening of *Daughter of God,* [3] two Americans, Zoe Ridgeway, an art assessor and broker, and her husband Seth Ridgeway, an ex-police officer turned professor of philosophy and comparative religion, are invited to Zurich by Willi Max, an elderly former Nazi. Faced with imminent death and suffocating guilt, Max wishes to return [*9] his vast collection of art, which he stole from Jews during World War II, to their rightful owners. He asks Zoe to assist him in this task.

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

3  The synopsis of *Daughter of God,* as revealed on its back cover, reads:

## A FEMALE MESSIAH?

When Zoe Ridgeway, a prominent art broker, visits Switzerland with her husband Seth, she expects to purchase the rich estate of a secretive art collector. But before Zoe can complete the transaction, she and Seth are drawn into a thousand-year-old web of conspiracy, murder, and intrigue that begins and ends with the mystery of a female Messiah, a young girl whose existence, if proven, would explode the very foundation of Western culture.

After their meeting, Max sends to Zoe's hotel a document purportedly to be one of the many lost writings of Emperor Constantine's biographer, Eusebius. The document tells the story of a second Messiah named Sophia who lived in a small remote village during the fourth century A.D. Unbeknownst to Zoe, Max has also sent to her hotel a small painting [*10] by a German artist named Frederick Stahl which the reader later learns, is the key to finding evidence to prove her existence. Sophia was an illegitimate child born into a family of merchants and was raised in isolation until she was a teenager, when she began healing people with her touch. When the reports of her existence and the miracles she performed reached Rome, the Church, fearful of her growing following, brought Sophia and all the members of her village to Byzantium and interviewed them. After the interviews, the Romans killed them all, including the scribe responsible for recording the interviews. The Church wrapped all the victims in shrouds and buried them in a mass tomb in a cave. A week later, when the Romans went to inspect the tomb, one of the shrouds was empty, but contained the image of a fifteen year old girl, Sophia. Centuries later, Hitler gained possession of the sacred shroud, the Passion of Sophia (the story of her life), and other documents that explained her divinity. Hitler used these materials to bribe the Vatican into silence regarding Nazi atrocities. Hitler then hid all the materials in Austrian salt mines.

The story returns to the present day, where [*11] a few powerful groups are found vying for possession of the Sophia materials. The reader learns that KGB officials and the Russian mafia, believing that Willi Max has possession of materials that can lead to the Sophia materials, steal Max's art, kill Max, burn down his house, and kidnap Zoe. The Russians believe that the Sophia materials can help them gain more power and wish to use the materials to blackmail the Russian Orthodox Church. Another group, led by Cardinal Neils Braun, a former archbishop of Vienna and the head of a secretive, powerful Vatican intelligence force called the

Congregation for the Doctrine of the Faith ("CDF"), also seeks possession of the Shroud. He intends to use the materials to become the next pope. Cardinal Braun tells an unnamed American about the second Messiah, and asks for the American's assistance in securing the shroud and related documents.

The story then flashes back to Seth Ridgeway, who, unable to find his wife, retreats to California despondent over his wife's disappearance. Seth is seen barely working, drinking, and spending a lot of time on his boat. He is visited by an unknown woman who reveals that the Stahl painting Max had sent to their [*12] Zurich hotel before Zoe's kidnaping may help to explain his wife's disappearance and lead him to her location. Suddenly, the boat is attacked and destroyed by unidentified gunmen. Seth escapes and finds help from George Stratten, an officer of the United States National Security Agency. Seth realizes that the painting may be in his unopened mail at UCLA. He slips away from the NSA agents assigned to watch him, retrieves the painting and leaves for Europe in search of his wife.

Meanwhile, in Europe, Zoe is held captive by the Russians in a warehouse. Over a period of a few months, she is interrogated about the painting and forced to help the Russians value their stolen art. Also held captive is a fellow art connoisseur who teaches her about the history of the "Great Goddess," and the presence of divine feminine elements in the world's religions and art. It is through their conversations that the history of the divine feminine is shared. Zoe manages to escape from the Russians and is met by the NSA's Stratton who brings her to a Zurich hotel. Seth, meanwhile, arrives in Europe and while traveling through Amsterdam and Zurich, engages in multiple gunfights with unknown assailants, at [*13] least some of them Russian. He manages to arrive at the same hotel where Zoe is staying, and they are reunited.

Together, Zoe and Seth bring the Stahl painting to a Zurich bank where bank officials use turpentine to remove the paint, revealing a gold ingot with Herman Goering's account number and safe deposit key. In Goering's safe deposit box are documents leading to the Sophia materials and instructions on how to dismantle the many traps in the salt mine where the Sophia materials are located. After another gun battle, Seth, Zoe and Stratton go to the Austrian town of Alt Aussee, where they join forces with Father Hans Morgan, a priest active in the Nazi resistance who now serves as a Church reformer determined to reveal the truth concerning Sophia.

Zoe, Seth, Stratton, Morgan and others crawl through the mineshafts to the heavily fortified salt mine and find the shroud and the Passion of the Sophia in a

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

jeweled box deep within the mine. Stratton, revealed as the unknown American who had promised to help Cardinal Braun recover the shroud, steals and escapes with the jeweled box. He brings it to Cardinal Braun, his true master, who intends to use it to blackmail the current Pope [*14] into stepping down and appointing him the successor. Just as Braun is preparing to head to Rome, Seth, Zoe and Morgen arrive at Braun's chalet and attack him. Father Morgan reveals to Braun that the Cardinal is his illegitimate son. Braun, caring only about the Shroud, dies after leaping into a fire to try and save it. In a role reversal, Zoe tells Seth that God has been good to them and that Seth should renew his lapsed faith. Prior to their ordeal, it was Seth who attempted to instill faith in Zoe. They learn that as a result of the fire at Braun's retreat, the entire structure burned except for portion of the floor in the shape of a woman where Sophia's shroud had last been. [4]

    4   Although Perdue also asserts infringement of his earlier novel, *The Da Vinci Legacy*, he offers no arguments in his moving papers in support of his claims. He argues that his "copyright infringement claims in this action are based primarily on *Daughter of God*" and that "Legacy is mentioned because Brown also plagiarized many elements of Legacy in writing *Da Vinci Code*." Perdue's Memorandum of Law at 1. Indeed, despite his later pronouncement during oral argument that he did not seek to abandon this claim, after reading *The Da Vinci Legacy* and reviewing the parties' arguments, it is clear that any infringement claim based on *The Da Vinci Legacy* also fails to survive Brown's motion for summary judgment. *The Da Vinci Legacy* concerns the quest for missing pages from Leonardo da Vinci's notebooks that contain information necessary to build a charged particle beam weapon. The hero's efforts to locate the missing pages pit him against the corrupt Bremen Legation and the evil Elect Brothers, who seek to construct the weapon. A thorough review of *The Da Vinci Legacy*'s plot, themes, characters and other elements supports a finding of noninfringement. Accordingly, to the extent that defendant Perdue continues to assert a claim of infringement based on *The Da Vinci Legacy*, that claim is also dismissed.

## [*15] COPYRIGHT INFRINGEMENT

    Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c); Nebraska v. Wyoming, 507 U.S. 584, 590, 113 S. Ct. 1689, 1694, 123 L. Ed. 2d 317 (1993). The burden of demonstrating that no factual dispute exists is on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Once the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56 (e). In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment should be granted only when no reasonable trier [*16] of fact could find in favor of the nonmoving party. Gallo v. Prudential Residential Services, Ltd., 22 F.3d 1219, 1224 (2d. Cir. 1994).

    In order to succeed on a claim of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). In the absence of direct evidence, copying is proven by showing that (1) defendant had access to the copyrighted work, and (2) there is a substantial similarity of expression in the respective works. Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc., 150 F.3d 132, 137 (2d Cir.1998). [5] Perdue's claims, therefore, turns upon a finding of substantial similarity between the two books. The test for "substantial similarity" is "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." Warner Bros. Inc. v. American Broadcasting Companies, 654 F.2d 204, 208 (2d Cir.1981) (quoting Ideal Toy v. Fab-Lu Ltd., 360 F.2d 1021, 1022 (2d Cir.1966)). [*17] [6] If the similarity concerns only noncopyrightable elements of a work, or no reasonable trier of fact could find the works substantially similar, summary judgment is appropriate. Walker v. Time Life Films, 784 F.2d 44, 48 (2d Cir. 1986).

    5   For purposes of their summary judgment motion, plaintiff-counterclaim defendants have conceded that they had access to Perdue's books.
    6   In support of his claims of substantial similarity, Perdue also submits declarations from John Gabriel Olsson, a specialist in forensic linguistics and Gary Goshgarian, a professor of English at Northeastern University. However, because substantial similarity is judged by the spontaneous response of the ordinary lay observer, expert analysis of the similarities between the two works is not determinative. See Denker v. Uhry, 820 F.Supp. 722, 729 (S.D.N.Y.

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

Dec. 8, 1992)(finding expert testimony unnecessary to assess substantial similarity if the proffered testimony does not deal with evidence or material that might help gauge the response of the lay reader").

[*18] It is "a principle fundamental to copyright law" that "a copyright does not protect an idea, but only the expression of an idea." Kregos v. Associated Press, 3 F.3d 656, 662 (2d Cir. 1993), cert. denied, 510 U.S. 1112, 114 S. Ct. 1056, 127 L. Ed. 2d 376 (1994). "The distinction between an idea and its expression is an elusive one." Id. at 587-588. Judge Learned Hand, in Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930), provides the guiding principle:

> Upon any work, . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise, the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

Id. Furthermore, "the line [lies] somewhere between the author's idea and the precise form in which he wrote it down . . . protection covers [*19] the 'pattern' of the work . . . the sequence of events, and the development of the interplay of characters." Hogan v. DC Comics, 48 F.Supp.2d 298 (S.D.N.Y. Jan 26, 1999)(citing Z. Chafee, *Reflections on the Law of Copyright*, 45 Colum.L.Rev. 503, 515 (1945)).

Similarly, *scenes a faire*, sequences of events that necessarily result from the choice of a setting or situation, do not enjoy copyright protection. Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996)(quoting Walker, 784 F.2d at 50); see also 618 F.2d 972, 979 (2d Cir. 1980)("incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic" are *scenes a faire*). Furthermore, "thematic concepts . . . which necessarily must follow from certain plot situations" are not entitled to copyright protection. Reyher v. Children's Television Workshop, 533 F.2d 87, 91 (2d Cir. 1976).

When a work contains both protectible and unprotectible elements, the Court can only inquire whether "the protectible elements, standing [*20] alone,

are substantially similar." Williams v. Crichton, 84 F.3d at 588 (quoting Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1002 (2d Cir. 1995). Any dissimilarity between the works will not automatically relieve the infringer of liability as "no copier may defend an act of plagiarism by pointing out how much of the copy he has not pirated." Rogers v. Koons, 960 F.2d 301, 308 (2d Cir.), cert. denied, 506 U.S. 934, 113 S. Ct. 365, 121 L. Ed. 2d 278 (1992). The alleged infringer will be found innocent of infringement when the similarities between the protected elements of the copyrighted works and the allegedly infringing work are of small import quantitatively or qualitatively. Id.

### A. Perdue's Specific Claims of Similarity

The *gravamen* of Perdue's complaint is that Brown copied the basic premise underlying *Daughter of God*:

> notions of a divine feminine, the unity of male and female in pagan worship, the importance of Sophia, the "Great Goddess" of the Gnostic Gospels, the fact that history is relative and is controlled by victors, not losers, the importance of the Roman Emperor Constantine [*21] in requiring a transition from a female to a male dominated religion, as well as to create a unified religion having a common dogma, the quest not only for physical objects, but for spiritual fulfillment.

Perdue's Local Rule 56.1 Statement of Undisputed Material Facts, P153; Perdue's Memorandum of Law at 5. He further argues that the following elements are common to both books: the role of the female; the Church's recasting of the great goddess as evil; the role of Emperor Constantine; Christianity's adoption of pagan practices; the existence of the divine feminine; the heroines' epiphany regarding the Great Goddess; the physical evidence of the divine feminine; the fact that there are keepers of the physical evidence; the Catholic Church's awareness of the existence of the Holy Grail and the Sophia Passion; the existence of two organizations who seek to obtain the physical evidence; similarities between Opus Dei and the Congregation for the Doctrine of Faith; the protagonists' unwillingness to participate in the struggle between the competitors to obtain the physical evidence; the female's equal claim to divinity as males and that through their union, they become much more [*22] than the sum of their parts; the enemy who acts as a wolf in sheep's clothing; the protagonists' realization that possessing the physical evidence is not as important as the understanding of what the physical evidence represents; the conclusion that the

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

hero and heroine are themselves pursued by the quest for the physical evidence; similarities between the treatment of Mary Magdalene in *The Da Vinci Code* and Sophia in *Daughter of God;* the use of historical references, particularly Constantine, in both novels; the fact that both novels incorporate the use of a gold key; the novels' similar discussion of women, the Goddess, Creation and How God became a male; similar discussions of Mother Earth; the theme that people create their own gods; and lastly, a similar discussion in both novels regarding communion.

All of these similarities, however, are unprotectible ideas, historical facts and general themes that do not represent any original elements of Perdue's work. For example, although both novels discuss Emperor Constantine and the Council of Nicea, it is without question that references to historical figures and events constitute unprotectible elements under the copyright laws, [*23] as "no claim of copyright protection can arise from the fact that plaintiff has written about such historical and factual items." Alexander v. Haley, 460 F.Supp. 40, 45 (S.D.N.Y. Sept. 21 1978)(citing Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 309 (2d Cir. 1966). Also, copyright protection does not extend to thematic concepts or scenes which must necessarily follow from similar plot situations. See Reyher, 533 F.2d at 91. Both *Daughter of God* and *The Da Vinci Code* involve the unprotectible *idea* of a mystery thriller set against a religious backdrop. As a mystery thriller, common themes of "the wolf in sheep's clothing," or the theme that "history is relative and is controlled by victors, not losers," or the theme that "through [the union of hero and heroine], they become much more than the sum of their parts," are unprotectible stock themes common to the genre. See Williams v. Crichton, 860 F.Supp. 158, 166 (S.D.N.Y. Aug 17, 1994), aff'd Williams v. Crichton, 84 F.3d 581 (2d Cir. 1996) (holding that themes commonly repeated in certain genre are not protectible [*24] by copyright as no one can own the basic idea for a story).

Indeed, it is not original in this genre to have a storyline whereby "two organizations or people who would stop at nothing, including murder, to obtain physical evidence," that there are keepers of this physical evidence, or that "the hero and heroine became unwilling participants in the struggle between the competitors to obtain the physical evidence." Furthermore, the fact that the hero and heroine realize that possessing the physical evidence is not as important as the understanding of what the physical evidence represents, or that the reader is led to conclude that the hero and heroine are themselves pursued by the quest for the physical evidence, offers nothing new to this type of story. Moreover, because *Daughter of God* and *The Da Vinci Code* share a religious backdrop, Perdue's claims that the novels share a similar theme that "people create their own gods," and that both novels have "discussions of Mother Earth" and "discussions about communion" are not afforded copyright protection. Perdue has not alleged that his unique *expression* of these ideas and themes were copied. Ideas and general literary themes [*25] themselves are unprotectible under the copyright law.

Perdue also alleges various discrete similarities between the two plots. However, although both novels discuss the Catholic Church, such discussion is expected from a thriller with religious themes and is an unprotectible *scene a faire*. See Williams v. Crichton, 84 F.3d at 587 (similar scenic elements are unprotectible *scenes a faire* that follow naturally from the work's theme rather than the author's creativity). Similarly, Perdue's claims that both novels discuss Swiss bank accounts and gold keys or that the novels begin with a murder are unprotectible scenes a faire that precludes a finding of substantial similarity. [7] Perdue's claim that there are similarities between Opus Dei and the Congregation for the Doctrine of Faith, two real and existing organizations is also unprotectible. Walker, 784 F.2d at 49 (finding that copyright protection does not extend to facts).

> 7   Indeed, although there is clearly a gold key in *The Da Vinci Code, Daughter of God* references a "very small *ingot* fixed into a recess of the wood substrate on which the paint had been applied." *Daughter of God* at 312 (emphasis added).

[*26]   A significant part of Perdue's argument focuses on the ideas and broad themes concerning the divine feminine, the important role of the female in early religion, the importance of Sophia, the "Great Goddess" of the Gnostic Gospels, and how she was re-cast by the Church as evil, the unity of male and female in pagan worship and Christianity's adoption of pagan practices as well as the importance of Emperor Constantine in requiring a transition from a female to a male dominated religion. Perdue argues that he "first incorporated these elements in" an earlier novel titled *Linz Testament* which he "extensively re-worked" into *Daughter of God.* Perdue's Memo at 5. A central theme of *The Da Vinci Code* is the suppression of the divine feminine in the Christian tradition. He claims that "the material plagiarized in [*The Da Vinci Code*] consists of an extensive and detailed synthesis of history and multiple schools of theology that Perdue created for *Daughter [of God]* and based on equally unique work expressed in *Linz [Testament]* and [*Da Vinci*] Legacy." Perdue's Facts P212.

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

Perdue argues that Brown stole his "synthesis" of differing religious beliefs emanating [*27] from the Gnostic Gospels. He has made no factual allegations, however, to support a finding that Brown copied his *expression* of these ideas. Moreover, these ideas and themes find their origin in historical facts, events and figures, as well as pre-existing works. See Hoehling, 618 F.2d at 979 (finding that, despite plaintiff's claim that specific facts, ascertained through his personal research, were copied, such facts are unprotectible, as defendants "had the right to avail [themselves] of the facts contained in [plaintiff's] book" and "to use such information, whether correct or incorrect, in their own work")(citing Greenbie v. Noble, 151 F.Supp. 45, 67 (S.D.N.Y. 1957); see also Alexander, 460 F.Supp. at 45("where common sources exist for the alleged similarities, or the material that is otherwise not original with the plaintiff, there is no infringement"). In his Author's note in *Daughter of God*, Perdue himself states that "this is a work of fiction based on fact. . . . The sections of this book dealing with the Nicean Conference and the events and religious controversies leading up to it are true and far [*28] better documented than any of the scriptures in the Hebrew or Christian Bible or the Muslim Koran." *Daughter of God* at 420. Perdue concedes that "much of his research [about the sacred feminine and the Great Goddess] involved the Gnostic Gospels, discovered at Nag Hammadi, Egypt in 1945, but not translated until the 1970's, and works commenting upon those Gospels." Perdue's 56.1 Statement, P156. Furthermore, there is no substantial similarity in the expression of the divine feminine in each book. In *The Da Vinci Code*, the divine feminine is expressed as Mary Magdalene, a true biblical figure, while in *Daughter of God*, the divine feminine figure is Sophia, a fictional second Messiah created by Perdue. As copyright protection "does not extend to facts or to true events, even if they are discovered through original research," Perdue's claims regarding these ideas and themes are unprotectible. Walker, 784 F.2d at 49.

**B. A Comparison of *The Da Vinci Code* and *Daughter of God***

The critical examination which must be conducted, in order to determine whether *The Da Vinci Code* is substantially similar to *Daughter of God* to support copyright [*29] infringement, is a review of relevant similarities between the two works "in such aspects as the total concept and feel, theme, characters, plot, sequence, pace and setting." Williams v. Crichton, 84 F.3d at 588.

**1. Thematic Expression**

"In its ordinary meaning, a theme is understood to be the underlying thought which impresses the reader of a literary production, or the text of a discourse. Using the

word 'theme' in such a sense will draw within the circle of its meaning age-old plots, the property of everyone, and not possible of legal appropriation by an individual." Roe-Lawton v. Hal E. Roach Studios, 18 F.2d 126, 127 (D.C.Cal. 1927). Indeed, thematic concepts which follow from similar plot situations are not afforded protection under the copyright laws. See Smith v. Weinstein, 578 F.Supp. 1297, 1302 (S.D.N.Y. Jan. 24, 1994). General themes expressed in *Daughter of God* are afforded no copyright protection. "The essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." Reyher, 533 F.2d at 91. [*30]

*The Da Vinci Code's* expression of the divine feminine and its related themes differ markedly from their expression in *Daughter of God*. In *The Da Vinci Code*, Mary Magdalene represents the Divine Feminine that was suppressed by the Church. Through Langdon's character, Brown shares with the reader the history and importance of women and the sacred feminine in early religion. Through Langdon's and Teabing's monologues, Neveu and the reader are introduced to the belief that Mary Magdalene was the wife of Christ and that they produced offspring. This secret, which the reader is shocked to learn represents the truth of the Holy Grail, was kept protected by a group called the Priory of Sion, whose military arm, the Knights Templar, guarded the secret with their lives. The reader eventually learns that Neveu is a descendant of Christ and Mary Magdalene.

In *Daughter of God*, a fictional second messiah named Sophia represents the Divine Feminine suppressed by the Church. Sophia, who existed around 325 A.D. in a remote mountain village near the Anatolian city of Smyrna (in present-day Turkey), was executed by the Romans after news of her miracles hit the Vatican. An early discussion [*31] between Zoe and Seth introduces the reader to Sophia and to Constantine's influence on the early church. Sophia's history is further shared through one of the villains, Cardinal Braun, who discusses it with NSA Agent Stratton, while the historical details of the Church's suppression of the divine feminine is shared through a conversation between Zoe and Thalia, a fellow captive. Evidence of Sophia's existence, and of the role the Church played in executing her, came into the hands of the Nazis during World War II. The search for this evidence is the foundation of *Daughter of God*. Rival groups, including a conservative arm of the Church, the Russian mafia and former KGB, and the heroes all strive to obtain this evidence for their own underlying purpose. Brown's expression of his religious themes in *The Da Vinci Code* differ markedly from Perdue's expression of his themes in *Daughter of God*.

**2. Total Concept and Feel**

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

The total concept and feel of a literary work is comprised of the way an author "selected, coordinated and arranged the elements of his or her work," Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 358, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), [*32] taking into consideration similarities in "mood, detail or characterization." Reyher, 533 F.2d at 91-92. Where there is a marked difference in total concept and feel, summary judgment is appropriate. Id. at 92; see also Denker v. Uhry, 820 F.Supp. 722, 731 (S.D.N.Y. 1992), aff'd, 996 F.2d 301 (2d Cir. 1993). Although both novels at issue are mystery thrillers, Daughter of God is more action-packed, with several gunfights and violent deaths. Daughter of God also includes a perilous journey through an Austrian salt mine and includes sex scenes not present in The Da Vinci Code. The Da Vinci Code, on the other hand, is an intellectual, complex treasure hunt, focusing more on the codes, number sequences, cryptexes and hidden messages left behind as clues than on any physical adventure. For example, Neveu, Langdon, Teabing and his servant's escape from the police in a Range Rover through the dark woods proceeds at such a slow pace that it cannot reasonably be called a chase scene.

Furthermore, although Daughter of God references art and discusses religious history, The Da Vinci Code's treatment of these [*33] subjects involves more detail. Brown weaves his mystery through detailed discussions of Da Vinci's art, art and religious history and mathematical formulas. An early scene, involving Neveu and Langdon's attempt to decipher the clues Sauniere left at his murder site, references Leonardo da Vinci's Vitruvian Man, the Fibonacci sequence, the Divine Proportion, Phi, and the Mona Lisa. Daughter of God's discussion of art, on the other hand, occurs principally through Thalia and Zoe's review of the art stolen by the Russians as they work to catalogue all the stolen pieces. No reasonable jury could conclude that the total concept and feel of The Da Vinci Code is substantially similar to that of Daughter of God.

### 3. Plot

A plot is "the story or narrative. It is the designed sequence of connected incidents. It is the thing which moves the [work] from cause to effect. It means, as its etymology implies, a weaving together." Golding v. RKO Radio Pictures, Inc., 193 P.2d 153, 163 (Cal.App. 2 Distr. 1948), aff'd 35 Cal.2d 690, 221 P.2d 95 (1950). Although "in its broader outline a plot is never copyrightable," Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 54 (2d Cir. 1936), [*34] alleged similarities in plot and structure at "the next level of specificity" may be protectible. Id. at 49. Courts are to determine whether the fundamental essence and structure of the novels are substantially similar. See Arden v.

Columbia Pictures Industries, Inc., 908 F.Supp. 1248, 1260 (S.D.N.Y. Dec. 7, 1995) (finding no substantial similarities between the fundamental structure and essence of each plot).

At the most general level of abstraction, both novels tell a story based on religious and historical people, places and events. The factual details that underpin each book, however, are quite different. The scenes and events show no substantial similarity of expression in the respective works. For example, while the The Da Vinci Code weaves a story with historical references to Michelangelo and Leonardo da Vinci, Opus Dei and the Priory of Sion; Daughter of God discusses Adolph Hitler and the Nazis, Hermann Goering, Frederick Stahl, and the Congregation for the Doctrine of Faith. Indeed, The Da Vinci Code's incorporation of mathematical subjects like Phi, the Divine Proportion and the Fibonacci Sequence into its story has no parallel [*35] in Daughter of God.

Daughter of God involves a husband's search for his missing wife. His search uncovers a religious secret involving a fictional second Messiah, the knowledge of which is being sought by a radical arm of the Catholic Church and by the Russian mafia and former KGB for their own evil purposes. The husband's search for his wife leads him to different parts of the globe. Furthermore, in Daughter of God, the search is for actual physical objects, including documents evidencing Sophia's existence and her burial shroud. In The Da Vinci Code, the plot centers on determining what the secret is. Langdon and Neveu's mission, as the protagonists, is to decipher, through clues left behind by her murdered grandfather as well as clues hidden in historical places and works of art, the ancient secret. Furthermore, Langdon and Neveu never actually find any physical objects. Rather, the secret they learn is that Neveu is a descendant of Christ, that her grandmother and brother are actually alive, and that Mary Magdalene's bones may be hidden beneath the inverted pyramid at the Louvre. The fundamental essence and structure of the plots are not substantially similar and [*36] offer no support to Perdue's infringement claim. The Da Vinci Code is simply a different story than that told by Daughter of God.

### 4. Characters

In determining whether characters are similar, a court looks at the "totality of [the characters'] attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of figures in [plaintiff's work]." Walker, 784 F.2d at 50 (internal quotations and citations omitted). What the character thinks, feels, says and does as well as the descriptions conveyed by the author through other characters'

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

comments fill out a viewer's understanding of the character. Warner Bros. v. American Broadcasting Cos., 720 F.2d 231, 241 (2d Cir. 1983). "At the same time, the visual perception of the character tends to create a dominant impression against which the similarity of a defendant's character may be readily compared, and significant differences readily noted." Id.

There is no substantial similarity between any of the characters in *The Da Vinci Code* and *Daughter of God*. The heroes and heroines are different in each book. In *The Da Vinci Code*, [*37] the hero is Robert Langdon, a bookish professor of symbology from Harvard. Langdon's physical attributes are not emphasized, rather, he serves as the intellectual wheel that keeps the plot moving. It is Langdon who solves most of the major riddles and questions, including the final puzzle at the climax. Interestingly, Langdon is secular, and his interests in religious history are purely academic. In *Daughter of God*, the hero is Seth Ridgeway, a former police officer who has athletic prowess and strong physical attributes. Seth retired from the police department after receiving several gunshot wounds. Although he is a professor of philosophy and religion, the book does not focus on his intellect. Unlike Langdon, Ridgeway experiences a crisis of faith because of his wife's disappearance.

The heroines also share few similarities. Sophie Neveu, the young French symbologist, was raised by her grandfather in a life of privilege. Her intellect, coupled with her knowledge of cryptology, allow her to assist in solving the many riddles and puzzles left by Sauniere. Seth Ridgeway's wife, Zoe, on the other hand, is a more mature, self-employed art appraiser. She is an expert in her field. [*38] She has been trained in detecting forgeries and grew up in a blue collar household.

Sir Leigh Teabing serves as the primary villain in *The Da Vinci Code*, but his evil role as the "Teacher," who masterminded Sauniere's execution, is not revealed until the end of the novel. He has two associates, Remy, his assistant, and Silas, the albino monk. Remy's involvement is minor while Silas serves the role as the threatening killer. Indeed, it is through Silas' hands that Sauniere and the other members of the Priory of Sion are murdered. Teabing's quest for the Holy Grail is motivated by his distaste for the Church.

*Daughter of God*, on the other hand, has many villains. One set of villains include Russian mobsters and former KGB, who desire the Sophia documents and Shroud for power. Although the Russians dominate the early part of the book, their presence is minimized after Zoe kills the Hulk, her huge Russian captor, and escapes from their detention. Another set of villains include Cardinal Braun and his lackey, NSA Agent Stratton.

Braun's desire for the Sophia materials also stems from a desire for more power. In this regard, as well as in physical attributes, he is nothing like [*39] *The Da Vinci Code*'s antagonist, Teabing, who is crippled and uses crutches when he walks. Further, although Perdue argues that Teabing and Stratton are both "shapeshifters" (because they first appear friendly and later reveal themselves as the enemy), such a characterization ignores the different roles each serves in their respective novels. Teabing is the ultimate villain in *The Da Vinci Code*. His mysterious alter-ego, the "Teacher," is smart, conniving, diligent and well planned. Stratton, on the other hand, is simply a lackey for Cardinal Braun. Stratton, from physical appearance to mental and intellectual characteristics, shares nothing in common with Teabing. Other main characters such as Bezu Fache, the police captain who chases Langdon and Neveu in *The Da Vinci Code*, Father Aringosa, the head of Opus Dei in *The Da Vinci Code*, and Father Hans Morgan, the reformist priest in *Daughter of God*, have no parallels in the other book.

### 5. Sequence, Pace and Setting

Although both *Daughter of God* and *The Da Vinci Code*, as mystery thrillers, enjoy fast paced scenes, the time sequence of each book differs considerably. *Daughter of God* takes place [*40] over many months. Indeed, after the opening sequence introducing Zoe, Seth and Max in Switzerland, Seth is found in his boat *six months later*, still suffering from Zoe's disappearance. After Seth is visited by the strange woman with information concerning Zoe on his boat, the novel proceeds at a quick but steady pace over the course of a few weeks. *The Da Vinci Code*, however, starts quickly and moves quickly. The reader immediately gets a sense that time is of the essence. The period from Sauniere's death at the Louvre to the final confrontation at Westminster Abbey, the majority of the novel, takes place over a matter of days.

The setting of each book is also different. While the *The Da Vinci Code* takes the reader from Paris to London and visits landmarks such as the Louvre Museum and Westminster Abbey, *Daughter of God* begins in Zurich, travels through southern California, Amsterdam and Italy and ends in Austria. The characters, sequence, pace and setting of each book are not substantially similar and do not support an infringement claim.

A comparison of these different novels warrants a rejection of the claim that Brown's *The Da Vinci Code* infringes upon copyrights [*41] Perdue owns in his previous works *Daughter of God* and *The Da Vinci Legacy*.

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

## REMAINING COUNTERCLAIMS

In his Third Counterclaim, Perdue alleges that "as a result of [counterclaim defendants'] illegal and improper exploitation of [his] intellectual property, [counterclaim defendants] have been unjustly enriched at the sole expense and to the sole detriment of [Perdue]." Perdue's Answer and Counterclaims P107. [8]

> 8 Although dismissal of Perdue's federal claims allows dismissal of his state common law unjust enrichment claim without prejudice to their commencement in state court, this Court exercises jurisdiction over this pendant claim and dismisses it on its merits. See United Mine Workers v. Gibbs, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).

Under the Copyright Act, state law claims are preempted if "(1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 [*42] and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." Briarpatch Limited, L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004). The works in question fall within the types of works protected under 17 U.S.C. §§ 102 and 103. Moreover, Perdue's unjust enrichment claim is based entirely on the validity of his copyright claim. He alleges no facts to support his unjust enrichment claim different from his copyright infringement claim. Accordingly, his unjust enrichment claim must also be dismissed.

Relatedly, Perdue's second counterclaim for an accounting of all income, expenses and profits related to *The Da Vinci Code*, and his fourth counterclaim for a permanent injunction enjoining counterclaim defendants from all activities related to the production of the motion picture version of *The Da Vinci Code*, must also be dismissed. His accounting claim is pled on the grounds that he is unable to ascertain the amount of money owed by plaintiffs without an accounting. As his underlying [*43] infringement claim is unsupportable, no money is owed and no accounting is necessary. Under that same principle, Perdue's derivative claim against the motion picture defendants must also be dismissed.

## CONCLUSION

A reasonable average lay observer would not conclude that *The Da Vinci Code* is substantially similar to *Daughter of God*. Any slightly similar elements are on the level of generalized or otherwise unprotectible ideas. Defendant Perdue's motion for summary judgment is denied and all of his counterclaims are dismissed. Plaintiffs' motion for summary judgment is granted. Plaintiffs are awarded declaratory judgment declaring that plaintiffs' authorship, publication and exploitation of rights in and to *The Da Vinci Code* do not infringe any copyrights owned by defendant.

Dated: New York, New York

August 4, 2005

SO ORDERED:

GEORGE B. DANIELS

United States District Judge

**APPENDIX**
**Part 2**

LEXSEE



Cited
As of: Jun 25, 2008

CBS BROADCASTING INC., SURVIVOR PRODUCTIONS, LLC, Plaintiffs, -
against- ABC, INC., GRANADA PLC, GRANADA ENTERTAINMENT USA,
Defendants.

02 Civ. 8813 (LAP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2003 U.S. Dist. LEXIS 20258

January 13, 2003, Decided
January 14, 2003, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a television network, and the producer of a television reality series, moved for a preliminary injunction in a copyright infringement action they filed against defendants, another television network, and two companies.

**OVERVIEW:** The court assumed ownership by plaintiffs for purposes of the motion. Defendants had access to plaintiffs' popular, successful television show. However, the court was persuaded by defendants' evidence of their show's independent creation. Plaintiffs did not establish that defendants copied from plaintiffs' show the elements of defendants' show that were in the pre-resting proposals. Both parties combined standard, unprotectable elements of reality shows, game shows, and other television genres, and used them separately to create the programs. For purposes of the motion, the court assumed actual copying over the later-added elements of defendants' show. Defendants' show added elements of the tabloid genre and the audience participation element of the game show genre, neither of which were found in plaintiffs' show. The court found the concept and feel of the two shows to be different. The major factor comprising this difference was the tone of the two shows. Plaintiffs' show was serious, while defendants' show was comedic. Plaintiff was not likely to succeed in showing substantial similarity. In addition, the balance of hardships tipped decidedly in favor of defendants.

**OUTCOME:** The application for a preliminary injunction was denied.

**COUNSEL:** [*1] For CBS Broadcasting, Inc, Survivor Productions, LLC, PLAINTIFFS: Lewis R Clayton, Leslie Gordan Fagen, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY USA.

For ABC, Inc, Granada, PLC, Granada Entertainment USA, DEFENDANTS: Jane W Parver, Kaye Scohler LLP, New York, NY USA.

**JUDGES:** LORETTA A. PRESKA, U.S.D.J.

**OPINION BY:** LORETTA A. PRESKA

**OPINION**

LORETTA A. PRESKA, United States District Judge:

For the reasons stated on the record in open court on January 13, 2003, plaintiff's motion for a preliminary injunction (docket # 4) was denied.

SO ORDERED

January 13, 2003

2003 U.S. Dist. LEXIS 20258, *

LORETTA A. PRESKA, U.S.D.J.

Decision

AFTERNOON SESSION

2:15 p.m.

(In open court)

THE COURT: Counsel, I'm most grateful to you and to the parties to hear this case, and to have the benefit of such excellent presentations on both sides.

I'm particularly benefited from the parties educating me about the evolution of TV shows, that is, it is a continual process involving borrowing liberally from what has gone before. Indeed, I subscribe to Mr. Parsons' characterization of the facts here as his having put a new spin on the American game show and sold it back to the Americans.

As we all agree, plaintiff will [*2] prevail on a copyright infringement case under Section 106 of the act by demonstrating "Ownership of a valid copyright, and copying the constituent elements." *Feist Publications v. Rural Telephone Serv. Co., 499 U.S. 340, 361, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991).*

Although there have been issues raised as to ownership, including documents executed following depositions, I will assume ownership by plaintiffs for today's purposes.

In this circuit, "There are two main components of [A] prima facie case of infringement: 'A plaintiff must first show that his work was actually copied, .... [and] then must show that the copying amounts to an improper or unlawful appropriate'", *Castle Rock Entertainment v. Carol Publishing Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998)* (quoting *Laurey Sens, v. Iden Group, Inc., 964 F.2d 131, 139-40, (2d Cir. 1992)*).

Because direct admissions of copying are unusual, actual copying may be established by "indirect evidence, including access to the copyrighted work, [and] similarities that are probative of copying." *Castle Rock, 150 F.3d at 137* (citations omitted).

Proof of "wide [*3] dissemination of copyrighted work establishes access in this circuit. *Boisson v. Banian, Ltd., 273 F.3d 262, 270 (2d Cir. 2001).*

The probative similarity standard has been described as follows: "When the questioning is copying as a factual matter, then similarities that, in the normal course of events, would not be expected to arise independently in the two works, are probative of defendants having copied as a factual matter from plaintiffs' work. Nimmer Section 1303(b) [at 13-11 to 13-13].

When evaluating probative similarity, a Court should compare the works in their entirety, including both protectable and unprotectable elements. *See Fisher Price, Inc., v. Well Made Toy Manufacturing Corp., 25 F.3d 119, 123 (2d Cir. 1994).*

This is appropriate, because although plaintiffs must ultimately establish infringement by showing (that defendants copied a substantial amount of protectable elements, (i.e. meet the "substantial similarity" standard), the fact that nonprotectable elements were copied, although not a basis for liability, can be probative of whether protected elements were copied, i.e. help establish probative similarity.

Defendants cannot [*4] dispute that they had access to Survivor in terms of viewing the broadcast, both in the UK and the U.S. Similarly, the extensive press coverage of Survivor makes clear that members of the television and entertainment industry, including defendant, had to be aware of the program.

However, I'm persuaded by defendants' evidence of Celebrity's independent creation, to the extent that I find crediting the testimony of Mr. Allen and Ms. Znak, that defendants had the substantive elements of the program that eventually became Celebrity in the works before Mr. Allen "rested" and before the U.S. version of Survivor aired in May of 2000.

In this respect, plaintiffs have not established that defendants copied from Survivor those elements of Celebrity that were in the pre-resting proposals. Rather, the evidence shows that both parties combined standard, unprotectable elements of reality shows, game shows and other television genres, and used them separately to create the programs.

What is less clear from the evidence is the extent to which defendants tweaked or added to the various elements of Celebrity, such as serial elimination, after becoming aware of Survivor.

Certainly it is not clear [*5] whether those elements were added as a result of actual copying from Survivor, or from Big Brother or Pop Idol. For today's purposes, however, I will assume actual copying over the later-added elements from Survivor.

As I noted previously, it's not enough for plaintiffs merely to establish copying. To prove infringement, a plaintiff must also show that the copying is illegal, because a substantial similarity exists between the defendants' work and the protectable elements of the plaintiff's work. *Streetwise Maps, Inc., v. VanDam, Inc, 159, F.3d 739, 747 (2d Cir. 1998).*

"It is 'a principle fundamental to copyright law' that 'a copyright does not protect an idea, but only the

expression of an idea.'" *Williams v. Crichton*, 84 F.3d 581, 587, (2d Cir. 1996), (quoting *Kregos, v. Associated Press*, 3 F.3d 656, 663 (2d Cir. 1993).

"Similarly, Scenes Afire, sequences of events that 'necessarily result from the choice of a setting or situation, do not enjoy copyright protection." *Williams* at 587, quoting *Walker v. Time Line Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986)

No news to anyone in this courtroom, the *Williams* Court told [*6] us "the distinction between an idea and its expression is an illusive one. As counsel have argued this morning, Judge Learned Hand provided the guiding principle to this often impenetrable inquiry in *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930): Upon any work, ...., a great number of patterns of increasing generality will fit equally well as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title. But there is a point in this series of extractions where they are no longer protected. Since otherwise the [author], could prevent the use of his 'ideas' to which apart from their expression, his property is never extended." *Williams* at 587-88.

The proscription against copyrighting ideas is codified in Section 102(b) of the copyright act. "In no case does copyright protection for an original work of authorship extend to any idea, .... concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated or embodied in such work." 17 U.S.C. Section 102 (b).

[*7] Interpreting this section in the ban on copyrighting ideas, the Second Circuit has held that copyright does not protect facts, generalized themes and ideas, subthemes, stock themes, general imagery, literary formulas, actual, true or historical events, episode or scenes a faire, scenes that necessarily result from the choice of a setting situation. *Attia v. Society of the New York Hospital*, 201 F.3d 50, 54 (2d Cir. 1999); *Warner Brothers, Inc. v. American Broadcasting Cos.*, 654 F.2d 204, 208 (2d Cir. 1981); *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 976, 978 (2d Cir. 1980); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49, 50 (2d Cir. 1986); see *Rokeach v. Avco Embassy Pictures Corp.*, 1978 U.S. Dist. LEXIS 20101, *19-20 (S.D.N.Y. Jan. 17, 1978).

Off the record.

(A discussion was held off the record)

THE COURT: Nor does copyright protect the mere duplication of short or ordinary phrases, commonly used terms, names, titles or slogans. *Narell v. Freeman*, 872

F.2d 907, 911 (9th Cir. 1989); [*8] *Boyle v. Stephens, Inc.*, 1997 U.S. Dist. LEXIS 12780, *13 (S.D.N.Y. Aug. 25, 1997); 37 C.F.R. Section 202.1(a)

However, consistent with copyright's protection of expression, the Ninth Circuit has reiterated that "protectable expression includes the specific details of an author's rendering of ideas or 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'" *Metcalf v. Bochco*, 294 F.3d 1069, 1074, (9th Cir. 2002) (quoting *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985).

Although certain similarities may not be protectable when considered individually because they are too generic or constitute scenes a faire, the *Metcalf* Court found that "the presence of so many generic similarities, and the common patterns in which they arise," may help a party "satisfy the extrinsic test" for substantial similarity and survive summary judgment. Id.

Similarly, Judge Weinfeld wrote that "even [where], a television game show is made up of entirely stock devices, an original selection, organization and presentation of such devices can nevertheless [*9] be protected, just as it is the original combination of words or notes that leads to a protectable book or song. Copying of a television producer's selection, organization and presentation of stock devices would therefore be a misappropriation." *Barns/Fraser Enterprises v. Goodson-Todman, Enterprises, Ltd.*, 1988 U.S. Dist. LEXIS 146, 5 U.S. P.Q. 2d, 1887, 1891 (S.D.N.Y. January 4, 1988).

Also relevant to this discussion of the protectability of a collection of otherwise generic ideas is the situation confronted by the Supreme Court in *Feist Publications, Inc., v. Rural Telephone Serv. Co.*, 499 U.S. 340, 349, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991).

There the Court wrote: "When a compilation author has no written expression, but rather lets the facts speak for themselves, the expressive element is more elusive. The only conceivable expression is the manner in which the compiler has selected and arranged the facts. Thus, if the selection and arrangement are original, these elements of the work are eligible for copyright protection. No matter how original the format, however, the facts themselves do not become original through association. 499 U.S. at 349. [*10]

Justice O'Connor continued to write: "This inevitably means that a copyright in a factual compilation is thin, notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement. Id.

Justice O'Connor went on to note: "As one commentator explains it: 'No matter how much original authorship the work displays, the facts and ideas it exposes are free for the taking .... the very same facts and ideas may be divorced from the context imposed by the author and restated or reshuffled by second comers, even if the author was the first to discover the facts or to propose the ideas.'" 499 U.S. at 349 (quoting *Ginsburg Creation and Commercial Value*: Copyright protection of Works of Information, 90 Columbia Law Review 1865, 1868 and N. 12 (1990).

Thus, as noted above, the Supreme Court held in *Feist* that the copyrightability of factual compilations is entitled to "thin" and "limited protection." 499 U.S. at 349, 359.

*Feist* was somewhat analogous to the situation presented [*11] here in that the Court there addressed a compilation of otherwise nonprotectable facts. Whereas here, we have a combination of nonprotectable generic ideas. A difference, however, is that the acts specifically provides for copyright in a compilation of facts.

With this lengthy background, I move on to consider the substantial similarity test.

The Court of Appeals has instructed that "when we compare products that contain both protectable and unprotectable elements, our inspection must be 'more discerning;' we must attempt to extract the unprotectable elements from our consideration and ask whether the protectable elements, standing alone, are substantially similar." *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995).

As Professor Nimmer explains, regardless of the nature of the copyrighted work "to determine whether the similarity between plaintiffs' and defendants' work is substantial, the comparison should not include unoriginal elements of the plaintiffs' work; rather, the comparison should take place after filtering out of the analysis elements of plaintiffs' work that are not protectable. Nimmer Section 13.03 E [2], pages 13-83 to 13-84.

[*12]    However, when assessing substantial similarity, the Court of Appeals does not permit a "mechanical and counter-intuitive," exercise of simply extracting unprotectable elements and comparing the remainder. *Knitwaves, Inc.*, 71 F.3d at 1003. There, the Court in affirming a finding of infringement cautioned against a rigid segregation of components of a copyrighted work because "if we took this argument to its logical conclusion, we might have to decide that there can be no originality in a painting, because all colors of paint have been used somewhere in the past." Id. (internal citation omitted).

Thus, the province of the fact finder is to examine, among other things, "the total concept and feel" of the 2 works. Id. at 1003 (citation omitted).

Going to the Court of Appeals' more recent decision in *Boisson*, it seems clear that a "more refined analysis" is required where a plaintiff's work is not wholly original but, rather, incorporates elements from the public domain. Boisson, 273 F.3d at 272.

I confess to some confusion as to the court's instructions thereafter. The next instruction in *Boisson* is 'in these instances' what must be shown is substantial [*13] similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed compilation." Id. There follows a seemingly contrary instruction "in applying this test a court is not to dissect the works at issue into separate components and compare only the copyrightable elements." 273 F.3d at 272 (citing *Knitwaves*, 71 F.3d at 1003). "To do so would be to take the 'more discerning' test to an extreme which would result in almost nothing being copyrightable because original works broken down into their composite parts would usually be little more than basic unprotectable elements like letters, colors and symbols. This outcome -- affording no copyright protection to an original compilation of unprotectable elements -- would be contrary to the Supreme Court's holding in *Feist*. Id. Fortunately, however, I need not harmonize these two rather general statements because the court went on to give more specific instructions applicable to works such as those at issue here. The court continued "when evaluating claims of infringement involving literary works, we have noted that while liability would result only if the protectable [*14] elements were substantially similar our examination would encompass" the similarities in such aspects as the total concept in feel, theme, characters, plot, sequence, pace and setting of the [plaintiff's] books and the [defendant's] citing *Williams v. Crichton*, 84 F.3d 581, 588." 273 F.3d at 273.

It has also been noted that the analysis of the "total concept and feel" of works must be conducted with caution. As Judge Haight explained in granting summary judgment with respect to a series of child cartoon characters "Courts must pay particular attention to summary judgment motions in cases where a plaintiff claims that defendant's work copies the total concept and feel" of plaintiff's work. Accepting an overly broad scope for protective total concept and feel "threatens the basic principal of copyright law: That concepts and ideas may not be copyrighted and that only a particular expression of an idea may be copyrighted." *CK Co. v. Burger King Corp.*, 1994 U.S. Dist. LEXIS 13934, 1994 WL 533253 *4 (S.D.N.Y. September 3, 1994). Professor Nimmer makes the same point rather emphatically. He writes

"The touchstone of 'total concept and feel' threatens to subvert the very essence [*15] of copyright, namely, the protection of original expression. 'Concepts' are statutorily ineligible for copyright protection; for courts do advert to a works "total concept" as the essence of its protectable character seems ill-advised in the extreme. Further, the addition of the 'feel' to the judicial inquiry being a wholly amorphous referent merely invites an abdication of analysis." Nimmer, Section 1303 [A] [1] [c], page 13-39 (emphasis in original). Consistent with these decisions and with Professor Nimmer is that the few decisions in which the Court of Appeals has found liability based on a "look and feel" argument all involved infringement of visual designs of a single static artistic work. EB Boisson, 273 F.3d 262 (quilt design); Yurman Design Inc. v. BPAG Inc., 262 F.3d 101 (2d Circuit 2001) (jewelry design); Hamil America Inc. v. GFI Inc., 193 F.3d 92 (2d Circuit 1999) (floral pattern); Knitwaves, 71 F.3d 996 (sweater designs). In each instance the defendants actually copied the plaintiff's design and the similarities between the plaintiff's and the defendants' works were overwhelming. See Boisson, 273 F.3d at 272 [*16] ("enormous amount of sameness"; "overwhelming similarities in color choices"); Yurman, 262 F.3d at 110-11 ("overwhelming impression" that the defendant's products are 'appropriations'."; Hamil, 193 F.3d at 102-03 ("both fabrics use the exact same colors in the same manner" producing "identity of design"); Knitwaves, 71 F-3 at 1004 (defendants "featured the same two full symbols" and "employed them in virtually the same manner as plaintiff" on "strikingly similar backgrounds ... in virtually the same color scheme" producing an "overwhelming similarity of the sweaters as 'concept and feel'.")

The Court of Appeals' citation to the Williams case in Boisson brings me to a case I found quite helpful to the analysis here.

There plaintiff Williams had written four children's adventure books that took place in Dinosaur World, "an imaginary present day man-made animal park for dinosaurs and other prehistoric animals where ordinary people ... can, in presumed safety, visit, tour and observe the animals in a natural but hi-tech, controlled habitat." 84 F.3d at 583. In discussing the substantial similarity analysis the Court of Appeals noted Professor Chafee's [*17] definition of the boundary between idea and expression where he stated "that 'protection' covers the pattern of the work ... the sequence of events and the development of the interplay of characters." Id. at 588 citing Chafee, reflections on the law of copyright, 45 Columbia Law Review 503, 513 (1945). The court proceeded to examine similarities in such aspects as total concept and feel, theme, characters, plot, sequence, pace and setting. Like the Court of Appeals I believe that

"examples aid us in applying these abstract principles" Id., and to that end I note several of the findings of the Williams court. For example, the court found the total concept and feel of the two works to differ substantially. It noted that "the total concept and feel of the Jurassic Park works is of a world out of control while Williams' Dinosaur World is well under control;" 84 F.3d at 589. The court also discussed the themes of the two works. It noted "any similarity in the themes of the parties' works relates to the unprotectable idea of a dinosaur zoo. Once one goes beyond this level of abstraction the similarity in themes disappears. The Jurassic Park works involve [*18] genetic engineering, ego, greed, and the consequences of man's hubris in believing that nature can be controlled. No similar themes are evident in any of the Dinosaur World books."

As well as the other elements compared, the court also noted that "the plot or sequence of events of the works likewise is not substantially similar. Although Williams points to several specific instances of similarity, we agree with the district court that such lists are 'inherently subjective and unreliable', particularly when 'the list emphasizes random similarities scattered throughout the works'. Such a scatter-shot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: Whether a lay observer would consider the works as a whole substantially similar to one another." 84 F.3d at 590 (citations omitted).

The court noted in Footnote 3 specific examples of similarity. They included: "encounters with small dinosaurs in Books I, III, and the Jurassic Park novel; encounters with brachiosaurs in Book II and the Jurassic Park movie; visits to dinosaur nurseries in both Book II and the Jurassic Park works; tours with automated vehicles and recorded [*19] guides in Books II, IV and the Jurassic Park works; stranded characters encountering ferocious dinosaurs in Book II and the Jurassic Park works; characters in boats being pursued by dinosaurs in Book III and the Jurassic Park novel; dinosaurs escaping from paddock fences in both Book III and the Jurassic Park works; and characters escaping pack-hunting dinosaurs through the intervention of another dinosaur and a helicopter in Book III and the Jurassic Park movie.

In this case in considering substantial similarity it is crucial to consider each program series as a whole, like the court did in Williams and Castle Rock, and not to segregate components rigidly as the Knitwaves court and the Williams court cautioned against.

In what I hope is plain English, I begin the analysis by agreeing with the experts that both shows combine well-known and frequently used generic elements of

earlier works. They have several of those elements in common but each series also includes well-known elements not present in the other. Before analyzing these elements more specifically, I generally credit Professor Spigel's method of analysis, that is, her analysis of the evolution of the serial TV reality [*20] show as a cycle in the reality TV genre which in turn evolved from combining characteristics of other earlier genres. Professor Spigel's analysis derives from a broad historical perspective and in my view is more logical and more persuasive because of that derivation. Although Professor Thompson also identifies elements present in the programs from prior genres, his analysis does not have the historical progression that seems necessary to understand the genres of these shows and the generic nature of the elements included. This more scatter-shot analysis employed by Professor Thompson also permitted him to identify the shared elements of the two shows as critical and the elements not shared as unimportant.

In addition, as I will discuss more later, the single paragraph on page 6 of Professor Thompson's report where he discusses the presentation or expression of the elements or concepts contains rather vague, unspecific discussion. In addition, the one example of concrete discussion of expression provided by Professor Thompson, the 8-minute tape, engages in what the Knitwaves court characterized as a rigid segregation of components and which the Williams court warned against. Aside [*21] from the lesser logical appearance of Professor Thompson's analysis, I also do not credit his method of analysis because of his continuing efforts to backtrack from his deposition testimony as illustrated by counsel on cross. I specifically note that he nowhere addressed any possible comedic appeal of Survivor in his report and did not mention any such element in connection with this case until cross examination after comedic tone had been relied upon heavily by defendants as a major difference between Survivor and Celebrity.

In his testimony Professor Thompson identified the following elements as essential to Survivor: Voyeur verite, hostile environment in the deserted island sense, not the Title VII sense, building of social alliances, challenges arising from the game show element and serial elimination. He noted that these elements were "never found in that combination in any other show" (Transcript 145). He stated "the genre it's in was only emerging and [Survivor] is one of the definitional shows that defined what that genre would become as we started to define it." (Transcript 147).

Passing from some of the other differences, I note that Celebrity also adds significant elements [*22] not found in Survivor, including elements of the Celebrity tabloid genre and the audience participation element of the game show genre. Thus the combination of elements, even under Professor Thompson's analysis, is not congruent. Even if, as Professor Thompson posits, the elements were congruent, that congruence, without more, would not establish substantial similarity in the copyright meaning because it would violate the cardinal rule of copyright that copyright does not protect an idea but only the expression of an idea. As the Metcalf court noted "instead protectable expression includes the specific details of an author's rendering of ideas or 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters'." 294 F.3d at 1074 (emphasis added, citations omitted). In Barns/Fraser, for example, Judge Weinfeld wrote that "copying a producer's selection, organization and presentation of stock devices" would be misappropriation. 5 USPQ at 1891 (emphasis added).

It is the presentation or expression element that this portion of Professor Thompson's analysis seems to miss. Here protection of the elements [*23] defining a genre, is Professor Thompson testified Survivor's elements do, without more are, as Judge Hand pointed out in Nichols, too abstract to be protected. Such protection would also cross into the dangerous territory Professor Nimmer warned about, that is, "adverting to a works 'total concept'." Nimmer, Section 1303 [A] [1] [c], page 13-39.

I note in this regard that plaintiff's counsel's argument today focused almost entirely on the protection of the combination of generic elements without addressing this presentation or expression factor. I am persuaded that the expression factor -- or, as Judge Weinfeld said, the presentation factor -- must be considered here not only because of the statute but more practically because of Dr. Spigel's comparison of I Love Lucy and the Honeymooners in her testimony. She noted that both were examples of domestic situation comedies and shared the elements of family/couple characters, plots based on gender stereotypes, laugh tracks, and a three-act structure. As she pointed out, however, these congruent elements were expressed differently in the two shows. In her testimony at pages 378 and 379 she noted that the Honeymooners was about a [*24] male character, of course played by Jackie Gleason, who was a lower-class individual, a bus driver, and who was always feeling inadequate in some way. His wife Alice was always in the know, always smarter than he, and the plots revolved around his get-rich-quick schemes and the like. I Love Lucy, on the other hand, featured Lucille Ball as the zany housewife character who wanted to get out of the house but whose husband wouldn't let her work. Professor Spigel noted that Lucy's husband, Ricky, was a band leader, the more successful one, and that they were both middle class. As Professor Spigel noted, the programs had very different kinds of plots because of the

difference story elements that were added to the similar genre.

As the testimony has also made clear, similar analysis can be made of I Dream Of Genie and Bewitched and the Jay Leno Show and the David Letterman Show.

Indeed, in light of cases cited and Professor Spigel's testimony, it is my view that providing protection to a combination of generic elements without more -- that is, without consideration of the presentation or expression of those elements -- would stifle innovation and would stifle the creative process that [*25] spawned the two shows at issue here.

All of this having been said, I now move to the "more discerning" analysis prescribed by the Court of Appeals to consider the respective shows' expressions of these abstract concepts. In so doing I acknowledge that "dissimilarity between some aspects of the works would not automatically relieve an infringer of liability for 'no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated'. It is, only when the similarities between protected elements of plaintiff's work and the allegedly infringing work are of 'small import qualitatively or quantitatively' that the defendant would be found innocent of infringement." Williams 84 F.3d at 588 citing Rogers v. Koons, 960 F.2d 301, 308 (2d Cir. 1992) cert. denied, 506 U.S. 934, 121 L. Ed. 2d 278, 113 S. Ct. 365 (1992), and Nimmer, Section 1303 [B] [1] [a]

Starting with concept and feel, that consideration seems to be more of an overall impression and obviously is composed of various expressions, some of which I will discuss as separate categories such as characters. The Williams court found the concept and feel of the works there at issue to be different in [*26] that it found, as I mentioned, Jurassic Park to portray a world out of control while plaintiff's Dinosaur World was a world well under control. Here trying to use the same type of analysis I find the concept and feel of the two shows to be different. The major factor comprising this difference. is the tone of the two shows. The tone of Survivor is one of unalterable seriousness. It is expressed by the host's unrelenting seriousness, by the contestants' cutthroat competition for food and for the million dollar prize. The seriousness of the situation is exemplified by a female contestant noting some weeks into the ordeal that she is losing her hair presumably from malnutrition. The serious concept and feel is evident, for example, in the opening scene, which again I will probably get to later. In Survivor the contestants cannot speak to each other, have been forbidden from speaking to each other as the narrator tells us. The camera focuses on their very tense faces. One or more of them, as was so delicately put in

the testimony, were barfing into barf bags. After the plane lands the contestants frantically ran to use well the five minutes they had been given to garner enough supplies [*27] to survive without additional food for 45 days.

In contrast, the tone and feel of Celebrity is one of comedy. It's expressed first in the frequent presentations of the hosts' constantly wise-cracking, as some other witness said doing schtick, and mocking the contestants. It's also expressed in the contestants' expressions. They are laughing at themselves, for example, as they descend from their posh digs shown at the outset into mud wrestling with pigs and the like. It's exemplified, for example, by a male contestant running around with the panties of the rather large politician's wife on his head.

To contrast opening scenes, in Celebrity the contestants had already met. There was no prohibition, no artificial stifling. They were pictured as chatting and laughing. They got off the helicopters easily and providing real -- and I hesitate the use the word -- comedic relief, a woman observed several of the men relieving themselves over in the bushes. There was no sign of tension of any kind. The elimination of contestants also illustrates the huge difference in concept and feel of the two shows. The elimination sequence in Survivor of course is the Tribal Council. Again, as I might discuss [*28] more later, it is a highly ritualized sequence. It takes some 8 minutes or thereabouts each time. The contestants are pictured in a dramatic march in the dark to an area of high rocks. They are accompanied by torches. It's very dramatic and there is very dramatic trible-sounding music accompanying the march. When the eliminated contestant is announced, there is the very serious ritual extinguishing of the flame, that is, of the contestant. The host speaking seriously saying each time in a ritualistic fashion "the tribe has spoken," and the eliminated contestant's immediate banishment over the bridge.

Celebrity, on the other hand, has no comparable ritual. The announcement of which contestant is to leave happens in the morning. It's light. One or more of the contestants is usually standing around drinking coffee. The eliminated contestant is announced and is then welcomed onto a completely silly-looking party barge with fireworks, waiters, and glasses of champagne, all while still dressed in dirty outdoor camping wear.

So in analyzing tone and feel, the first major difference between the two shows is the serious tone of Survivor and the comedic tone of Celebrity.

The second factor [*29]  I find evident in considering concept and feel is what the professionals have called production values. And these differing production values give a particularly different feel to the

two shows. In Survivor the overall look is one of lush, artful photography and painstaking etiquette. The camera work is of the very highest professional level. We see very artful shots of, for example, a female contestant looking into a mirror with the faces of several other contestants reflected in the mirror. It's really moving art, like National Geographic.

Celebrity in contrast is closer to the home video look creating a drastically different look and feel. Of less importance, but also contributing to the different concept and feel, is Celebrity's live action and audience participation elements that the audience is seeing in part live action from around the world as, for example, when the contestants are waking up (or filmed more than 24 hours old) and then has the opportunity to vote to influence what happens next, as the audience is constantly reminded by the hosts, creates a different feel from that of Survivor. In Survivor the audience is watching an adventure in the past with examples of more [*30] drama and more of what passes for character development in these shows because of the opportunity to edit while in some measure already knowing the outcome. Thus, trying to analyze concept and feel so as to avoid the danger of protecting ideas, which Judge Haight and Professor Nimmer warned against, I find the works to be substantially different in concept and feel.

Taking a look for a moment at setting, of course we know that both shows are set in remote, inhospitable settings. For comparison purposes I concentrated on the Survivor series filmed in Australia because Celebrity was also filmed in Australia. But I note that each series of Survivor was filmed in a different remote, inhospitable locale, for example, Borneo. Even though both of the compared series were filmed in Australia the visual expression of the remote, inhospitable setting was different. In Survivor the Australian series was filmed in the dry Outback bush area. Visually it featured low vegetation and a wide sky, often showing high wind-chiseled rocks reminiscent of Sedona.

THE COURT: Celebrity on the other hand, was filmed in the rain forest, in the jungle. It featured dense vegetation and because of the canopy [*31] layer, not much in the way of sky. The light got through, and the audience could sense from the scenery, the dampness and the humidity of the surroundings that while the same generic concept of a remote, hospitable location and even the same country was utilized by the two shows, the settings were expressed differently.

I move on to consider the characters, and consideration of the characters does seem to flow over into other elements, as I'll note.

Both shows have host and a group of real live people who are contestants. The expression of these generic

elements, however are very different, the Survivor host, Jeff Prost was unknown prior to the first series. He appears relatively infrequently in the show. He plays two roles; plays the role of judge in judging the contests, and the tribal council and perhaps banishing the loser, and he plays the role of group therapist and interviewer.

Mr. Prost is nothing but serious. He is unrelentingly serious. Although Professor Thompson apparently talked about his comedic elements in some talk show, I didn't see it, and certainly the expression of his character is not evidently comedic.

On the other hand, the hosts of Celebrity are nothing, [*32] if not funny. Although not particularly known to American audiences, it is undisputed that Ann and Deck are well known in the UK as a comedy team. Their appearance as a team as the hosts of the show signal its comedic element. They appear frequently throughout the show, much more frequently than Mr. Prost does, and they perform as comic entertainers almost in the broader sense. They tell jokes, they mock the celebrities, they wise crack, they comment sarcastically on what's going on, they perform interviews, but in a very comic, mocking-style, not in any respect serious.

Thus, the two shows' expression of the generic elements of a host is dramatically different.

As to the characters or the contestants, both shows use multiple, real people playing themselves, and to a certain extent, this character consideration flows over into a consideration of what might be called plot in these shows.

In Survivor, the contestants are regular folks about whom the audience knows nothing. They are there competing to win a million dollars. The contestants are organized into two groups of tribes who compete with each other initially, then team members vote each other off the show. And when the numbers [*33] diminish, the team structure is abandoned, and it's every man for himself.

These details combine to create fierce competition between the teams, but also among the individuals. The prospect of winning a million dollars does tend to focus the contestants' attention on the competition. Because the contestants vote each other off, individuals form mutual alliances from time to time, and there is suspicious musing and speculation by one contestant about what others are discussing when they are separated from the group.

In contrast, the contestants on Celebrity are not regular folks. They are celebrities, and the audience knows who they are and a good bit about each one of

them going into the show. There's no team structure, and the celebrities do not vote each other off.

Also the winner receives only the honorific of being king or queen of the jungle. While he or she does not win a prize like the life-changing one million dollars, any money raised goes to that winner's favorite charity.

This combination entirely changes the interactions among the contestants' so-called plot. The cut-throat competition evident in Survivor is entirely absent. If possible to quantify competition, it is [*34] materially less in Celebrity, because there's really nothing much at stake for these folks. The quality or tone or competition there is also different.

In Celebrity, it is entirely light-hearted. Also, the Celebrity characters' motivations are different. They are not competing with each other to win a million dollars. They are trying to project the best image possible to the viewing audience, whether to continue a reputation as a good guy or can-do guy or to repair a less than perfect reputation.

The result is that the characters and their interactions are expressed very differently.

A good example is in the worm-eating comparison, which I will get to later.

Thus, the expression of the characters is different, including the pattern of their interrelationships as they are developed.

As part of the plot, I also considered the tests imposed on the contestants and the elimination both shows give, consistent with their game show format. The expression of these tests, however, is different.

In Survivor, contestants are required to participate. The tests or the challenges are physically difficult, for example, requiring the group to paddle a float across a stream. The camera and the [*35] editing process focus the audience on the cut-throat competition element, first between the teams and then among the individuals. One never forgets that these people are vying for, a million dollars, and it is very serious business.

Immunity challenges are particularly serious, because a life or death decision is made as a result of the immunity challenge.

In Celebrity, the challenges are voluntary. A contestant may decline to participate. The only effect of declining to participate is the group won't get upscale rations.

I note parenthetically, if I can put a footnote in here, that the ration situation is another example of the

difference in the expresses of the hostile, remote environment idea.

In Survivor, the contestants must obtain on their own all of their food. And I note again the female contestant noting that her hair was falling out because of malnutrition. I think they get a little rice, but that is it, and they know from time to time how hungry they are.

In contrast, the celebrities have an adequate supply of rice and beans. They can have as much quantity as they want. No one is hungry, and no one's hair is falling out. The challenges or the tests only permit the celebrities [*36] to obtain higher quality rations.

So returning to the consideration of, the challenges, it's much less pressure among the celebrities. Nothing bad is going to happen. The challenges in Celebrity are not physically difficult, and are in keeping with the comedic tone. They are mostly silly, such as wrestling stars off of pigs in a mud pit, or gross, like the bug shower. But because they are essentially meaningless and silly or gross, there's no element of competition, no element of seriousness, but rather a light, game show tone.

I also reject the suggestion that the challenges had to be different because celebrities were involved.

Many celebrities, such as The Fire, the boxer, might well be in better shape than some of the lay folks, so I don't think that follows necessarily from the use of celebrities.

Also involved in plot and character interaction is the elimination of contestants.

As we've noted before, both shows involve serial elimination of contestants, but that idea is expressed differently.

In Survivor, the contestants vote each other off at the end of each episode. That they are voting each other off leaves them to form alliances. As I've noted before, because the elimination [*37] means no more shot at the million dollars, the elimination is deadly serious.

The audience sometimes sees a sense of personal betrayal felt by the eliminated contestant, because one or more of his or her supposed allies must have voted him or her off.

As I noted briefly before, the whole elimination ceremony is expressed differently. I think I don't need to do that again.

In Celebrity, in contrast in the first week, there's no elimination, the audience only votes as to which Celebrity will be tested on a particular challenge.

During the second week, the audience votes for its favorite, not for who is to leave, or its least favorite. Because the stakes are so low, because the audience is voting, and because it's not a negative vote, it's not serious, it's not taken seriously, there's no betrayal, and the hosts are wise cracking throughout the procedure. It's also very casual. The expression in the elimination sequence in the two shows is dramatically different.

In Survivor it's ritualized, it's serious, it's lengthy.

In Celebrity, it's casual, it's light-hearted. The only drama is in a second or two delay in actually saying the name of the eliminated contestant.

I also consider [*38] the other expressions that were discussed. I think in Professor Thompson's report. First, he could discuss the music. Again, the music I find to be very different.

In Survivor, the music is deep, chanting, tribal music. It adds to the sense of drama of the show.

Celebrity music isn't deep, it's not chanting, it's not particularly tribal. As an outsider, and not a professional, I would characterize it as upbeat and kicky.

Professor Thompson also discussed the interstitial shots of wildlife. Certainly both shows use that technique, but even that is expressed differently.

In Survivor, the wildlife shots emphasize the serious, dangerous nature of the animal, the crocodile's menacing jaws and tail, the menacing view of the snake's tongue.

In Celebrity, the visuals emphasize the pretty or comic features of the wildlife; the green and orange frog whose throat goes in and out, some hairy bird-like beast, maybe a bat hung upside down, and a little chimp. It's a different expression adding to the different tone of the two works.

Professor Thompson also relied on the panoramic landscape photography of both shows. I note that any show using the deserted island setup might well be expected [*39]    to use a panoramic landscape. Nevertheless, those generic shots are expressed differently here.

In Survivor, they are very pretty, they are lush, they are fabulously beautiful shots, often with a stylized speedframe photography of the clouds moving overhead adding to the drama.

In Celebrity, we see plain old landscape, with the photography perhaps one step up from home video. It is expressed thoroughly differently.

I would like to say a few words about the film clips assembled by Professor Thompson, albeit, in an exceedingly tardy fashion.

As we know, the entire tape is just under eight minutes, featuring approximately three and a half minutes of each series, taken from some 15 hours of video of each series.

As has also been noted, even within a segment on Professor Thompson's tape, the scenes shown are out of sequence and from several different episodes.

Adopting Mr. Smart's analogy, it is like looking at the dot on a serrate.

Perhaps in a more lawyer-like fashion, I find that the tapes are not -- the clips are not representative of the two series and are contrary to the analysis carried out by the Williams Court and the Court in the case considering the Seinfeld book, [*40]    that is, looking at the entire work, and I emphasize here that it is of utmost importance to review an entire series, not just to look at the clips. The clips are, as the Williams Court said, inherently subjective and unreliable, because it lists random similarities scattered throughout the work.

For example, my favorite, the worm eating scene. First, I note parenthetically that in a remote, hostile environment, or deserted island setup, eating unattractive, crawling creatures is part of the scenes a faire.

Second, as to the actual expression, in Survivor, the mood is tense and competitive. There is a great deal of pressure on the contestants to perform for their respective teams, because this is an immunity challenge. The intensity of the pressure is evident when in the clip, one of the contestants at the end bends over with a green look on her face and in the full vision vomits. It's very intense, and it was clearly played for the dramatic tension.

When the Celebrity tape of the worm-eating episode is viewed in context, the mood is significantly different. First, the result is not so important to the contestants. They already have a sufficient quantity of rations, and the [*41]    worm eating will only determine if the individual contestant earns higher quality rations for the group.

Second, the visual scene is expressed differently.

In Survivor, the unattractive black worms are set out in a tribal-looking Wheel of Fortune layout.

In Celebrity, the unattractive looking white worm appears on a banquet table with fine linens and fine China adjacent to an absolutely delicious meal, which apparently the contestants can all smell.

Third, in Celebrity, the audience has chosen a vegetarian paranormalist for this trial, and the politician's wife is seen with her arm around him in a maternal manner, essentially telling him that the lot of them are all right as is, and that he, the vegetarian, should not compromise his principles on their account. The element of life or death is absent. What is present and what is shown in the clip is an extremely kind and supportive message, not to do the awful deed. And when the vegetarian actually cranks himself up and does it, the clip shows an appreciation of his personal achievement in eating the unattractive maggot.

What is present, but what is not shown is the comic element, from his smelling the adjacent high quality meal [*42] on China and linen and kind of yelling or repeatedly saying "imaging, imaging," a reference to his paranormalism.

Although both scenes include the contestants gesticulating to crank themselves up to do the deed, one would well expect anyone doing this particular deed to do so, and the presentation, context and tone of the two worm eating scenes are entirely different.

In sum, I find that plaintiff is not likely to prove that a lay observer would consider the works as substantially similar to one another. In undertaking this analysis, I am cognizant of the Supreme Court's admonition in Feist that copyright protection in a factual compilation is thin, and by analogy, that copyright protection in a compilation of ideas must also be thin.

Indeed, the Feist Court cited Professor Ginsburg's comment to the effect that "no matter how much original authorship the work displays, the facts and ideas it exposes are free for the taking .... The very same facts and ideas may be divorced from the context imposed by the author and restated or reshuffled by second comers, even if the author was the first to discover the facts or propose the ideas."

Feist at 349.

Nevertheless, the determination [*43] in this case does not depend on the difference between "thin" protection and "normal" protection. As set out above, the different expressions of the Survivor concept in these two shows impel a finding that under either standard, CBS is not likely to succeed in showing substantial similarity.

I will move on to irreparable harm and balance of the hardships.

As we all know, plaintiffs are entitled to a preliminary injunction if they establish "one, that [they are] subject to irreparable harm;, and two, either A, that [they] will likely succeed on the merits; or B, that there

are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation. And that balancing of the hardships tips 'decidedly' in favor of the moving party." Genesee Brewing Co v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir. 1997)

"The award of a preliminary injunction is an extraordinary remedy and will not be granted absent a clear showing that the moving party has met its burden of proof." Parenting Unlimited, Inc., v. Columbia Pictures Television, Inc., 743 F. Supp. 221, 224 (S.D.N.Y. 1990). In this circuit, irreparable harm is presumed [*44] upon a showing of a likelihood of success on the merits. See e.g. Richard Feiner and Co. Inc., v. Turner Entm't Co., 98 F.3d 33, 34 (2d Cir. 1996). Here, as I've found above, plaintiffs have not shown a likelihood of success on the merits. I also find that plaintiffs have not shown sufficiently serious questions going to the merits of the case to make them a fair ground for litigation.

I make this finding particularly in light of the argument today in which plaintiffs focused almost entirely on the combination of the generic elements; although there was some lip service paid to expression; there was no discussion of expression. And indeed, in light of Professor Thompson's testimony that Survivor is the defining program in a genre, I find that plaintiffs have not, demonstrated sufficiently serious questions going to the merits.

In addition, I find that plaintiffs have not demonstrated that the balance of hardships tips "decidedly" in their favor. The test appears to be a purely equitable consideration of who will be hurt more by the decision. See Monster Communications, Inc. v. Turner Broadcasting System, Inc., 935, F. Supp. 490 (S.D.N.Y. 1996) and Downloadcard, Inc. v. Universal Music Group, Inc., 2002 U.S. Dist. LEXIS 23081 (S.D.N.Y. 2002) [*45]

Here both parties have presented some evidence of hardship resulting from an adverse ruling. If a preliminary injunction were issued at this point, defendants would be unable to proceed with the scheduled production and broadcast of a program that is to be the centerpiece of ABC's February 2003 sweeps offering. In turn, this would affect ABC's programming and ratings for months ahead and interfere with its relationships with its affiliates.

In this regard, I credit the testimony of Susan Lyne to this effect.

More damaging, however, I am persuaded that prohibiting Celebrity from airing will bring to a screeching halt the momentum ABC has generated in

regaining its ratings, and I obviously credit the testimony of Ms. Lyne to that effect.

In addition, I note that and credit the testimony of the Granada witnesses that their reputation will be harmed immeasurably by an injunction.

On the other hand, the decision not to issue an injunction may well cause plaintiffs some unspecified amount of losses in ratings and revenues, as Mr. Moonves testified.

Mr. Moonves also testified that possible plans to produce a Celebrity version of Survivor had been put on hold when CBS learned of Celebrity. [*46] Those plans, however, are fairly speculative, given the testimony that a Celebrity Survivor show was mentioned years ago and not otherwise followed up on until after Celebrity appeared.

Ultimately, however, I am easily persuaded that the balance of hardships tips decidedly in favor of ABC.

For all of the above reasons, counsel, the application for a preliminary injunction is denied.

Counsel, I thank you, again for your most professional presentations.

Is there anything else you would like to do today?

MR. FAGEN: Your Honor, are you going to be entering a written order today, tomorrow?

THE COURT: I'm happy to write bequest for preliminary injunction denied.

MR. FAGEN: I ask that because there are some, filing, things that we have to do in the clerk's office.

THE COURT: I am happy to do that right now if you wish.

MR. FAGEN: Tomorrow would be fine; Judge.

THE COURT: Yes, sir, anything else?

MR. SMART: On behalf of defendants, we thank the court

THE COURT: Good afternoon, ladies and gentlemen. Thank you again.

(Hearing concluded)

LEXSEE



Analysis
As of: Jun 25, 2008

CHIVALRY FILM PRODUCTIONS and JOSEPH ARDITO, Plaintiffs, -against-
NBC UNIVERSAL, INC., et al., Defendants.

05 Civ. 5627 (GEL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2007 U.S. Dist. LEXIS 86889

November 27, 2007, Decided
November 27, 2007, Filed

**PRIOR HISTORY:** Chivalry Film Prods. v. NBC Universal, Inc., 249 Fed. Appx. 856, 2007 U.S. App. LEXIS 23355 (2d Cir. N.Y., 2007)

**COUNSEL:** [*1] Joseph Ardito, Pro se.

Stephen F. Huff, Tom J. Ferber, Mark A. Tamoshunas, Richard J. Purcell, Pryor Cashman Shearman & Flynn LLP, New York, New York, for defendants.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

    **OPINION AND ORDER**

    GERARD E. LYNCH, District Judge

    Pro se plaintiff Joseph Ardito sued defendants, a number of motion picture production and distribution companies, for copyright infringement, claiming that two movies produced and distributed by the defendants infringed certain of plaintiff's copyrights. [1] On December 22, 2006, the Court granted defendants' motion for summary judgment, finding that no reasonable trier of fact could find the works substantially similar, and that defendants established an independent source for their films pre-dating plaintiff's copyrights. Defendants now move for attorneys' fees and related expenses pursuant to

17 U.S.C. § 505 and Fed. R. Civ. P. 54(d)(2). Defendants' motion will be granted.

    1  In this Opinion, as in the Court's previous opinions in this case, the Court refers to plaintiff in the singular, since the co-plaintiff named in the pleading is a sole proprietorship having no legal existence independent of Ardito himself. Chivalry Film Prods. v. NBC Universal, Inc., No. 05 Civ. 5627, 2006 U.S. Dist. LEXIS 1177, 2006 WL 89944, at *1 n.1 (S.D.N.Y. Jan. 11, 2006). [*2]

**BACKGROUND**

    Only those facts relevant to the current motion will be recited here.

    Plaintiff brought suit on June 16, 2005, asserting several causes of action arising out of his claim that two movies produced and distributed by certain of the defendants, *Meet the Parents* and its sequel *Meet the Fockers*, infringed his copyrights in various versions of a novel and screenplay entitled *The Tenant* or *The Dysfunctionals*. On January 11, 2006, the Court dismissed plaintiff's fraud, unjust enrichment, RICO, Lanham Act, and attorney's fees' claims, leaving plaintiff's copyright infringement claim as the sole cause of action in the case. See Chivalry Film Prods. v. NBC Universal, Inc., No. 05 Civ. 5627, 2006 U.S. Dist. LEXIS 1177, 2006 WL 89944 (S.D.N.Y. Jan. 11, 2006).

2007 U.S. Dist. LEXIS 86889, *

On June 19, 2006, defendants moved for summary judgment on the copyright infringement claim, arguing that no reasonable trier of fact could find that plaintiff had established substantial similarity of the works, or alternatively that the films were based on independent prior creations that pre-dated plaintiff's copyrights. On December 22, 2006, the Court granted defendants' motion, finding for defendants on both grounds. See Chivalry Film Prods. v. NBC Universal, Inc., No. 05 Civ. 5627, 2006 U.S. Dist. LEXIS 92956, 2006 WL 3780900 (S.D.N.Y. Dec. 22, 2006). [*3] Specifically, the Court found that "the works at issue could not be more different in 'total concept and feel.'" Id. 2006 U.S. Dist. LEXIS 92956, [WL] at *1, quoting Green v. Lindsey, 885 F. Supp. 469, 481-82 (S.D.N.Y. 1992). Furthermore, the Court found that plaintiff's "attempts to show similarity" between the works "involve[d] the most trivial and generic of incidents," and that the works were "strikingly different." Id. 2006 U.S. Dist. LEXIS 92956, [WL] at *2. Finally, the Court found that both films were based on an independent creation originally copyrighted in 1991, which pre-dated plaintiff's 1996 copyright. Id. Plaintiff appealed to the Second Circuit, which affirmed the judgment on October 30, 2007.

On January 23, 2007, defendants moved for attorneys' fees and costs pursuant to 17 U.S.C. § 505 and Fed. R. Civ. P. 54(d)(2). [1] Plaintiff did not respond to defendants' motion. Accordingly, the motion will be decided solely on the basis of defendants' submission.

2    Pursuant to Fed. R. Civ. P. 54(d)(2)(C), defendants' motion only addresses the issue of plaintiff's liability for defendants' fees and costs. See Williams v. Crichton, 891 F. Supp. 120, 122 (S.D.N.Y. 1994). Accordingly, defendants have not yet submitted documentation concerning the amount [*4] of fees and expenses incurred.

## DISCUSSION

Defendants seek an award of attorneys' fees and costs pursuant to § 505 of the Copyright Act. Under § 505, the Court "in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. . . . [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. An award of attorneys' fees is at the discretion of the district court, and prevailing defendants and plaintiffs are to be treated alike. Fogerty v. Fantasy, Inc., 510 U.S. 517, 534, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994).

While there is no precise formula for determining whether an award of fees is appropriate, and "bad faith is not a prerequisite to an award of fees" under the Copyright Act, Screenlife Establishment v. Tower Video,

Inc., 868 F. Supp. 47, 51-52 (S.D.N.Y. 1994), courts exercising their discretion consider the equitable factors of "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" Crescent Publ'g Group, Inc. v. Playboy Enters., 246 F.3d 142, 147 (2d Cir. 2001), [*5] quoting Fogerty, 510 U.S. at 534 n.19. The Second Circuit has recognized that "objective reasonableness is a factor that should be given substantial weight in determining whether an award of attorneys' fees is warranted" because "the imposition of a fee award against a copyright holder with an objectively reasonable litigation position will generally not promote the purposes of the Copyright Act." Matthew Bender & Co. v. West Publ'g Co., 240 F.3d 116, 121-22 (2d Cir. 2001); see also Baker v. Urban Outfitters, Inc., 431 F. Supp. 2d 351, 357 (S.D.N.Y. 2006). "This is because such attorney fee awards may chill litigation of close cases, preventing the clear demarcation of the boundaries of copyright law." Ariel (UK) Ltd. v. Reuters Group PLC, No. 05 Civ. 9646, 2007 U.S. Dist. LEXIS 7423, 2007 WL 194683, at *1 (S.D.N.Y. Jan. 24, 2007), quoting Hofheinz v. AMC Prods., No. 00 Civ. 5827, 2003 U.S. Dist. LEXIS 16940, at *17 (E.D.N.Y. Sept. 1, 2003), citing in turn Fogerty, 510 U.S. at 527.

"[A] number of courts in this circuit have awarded attorneys' fees to prevailing defendants solely upon a showing that the plaintiff's position was objectively unreasonable, without regard to any other equitable factor." Baker, 431 F. Supp. 2d at 357 [*6] (internal quotation marks omitted), citing Adsani v. Miller, No. 94 Civ. 9131, 1996 U.S. Dist. LEXIS 13740, 1996 WL 194326, at *12-13 (S.D.N.Y. Sept. 19, 1996). The mere fact that a defendant has prevailed, however, "does not necessarily equate with an objectively unreasonable claim." Ann Howard Designs, L.P. v. Southern Frills, Inc., 7 F. Supp. 2d 388, 390 (S.D.N.Y. 1998). "To hold otherwise would establish a per se entitlement of attorney's fees whenever issues pertaining to judgment are resolved against a copyright plaintiff. . . . This is not a correct construction of the law." Nicholls v. Tufenkian Import/Export Ventures, Inc., No. 04 Civ. 2110, 2005 U.S. Dist. LEXIS 16715, 2005 WL 1949487, at *3 (S.D.N.Y. Aug. 11, 2005)(internal quotation marks and citation omitted). Similarly, the fact that a defendant has prevailed on a motion to dismiss or on summary judgment does not require the court to award fees. See, e.g., Brown v. Perdue, No. 04 Civ. 7417, 2006 U.S. Dist. LEXIS 66563, 2006 WL 2679936 (S.D.N.Y. Sept. 15, 2006). However, if a copyright claim is "clearly without merit or otherwise patently devoid of legal or factual basis," that claim "ought to be deemed objectively unreasonable," Penguin Books U.S.A., Inc. v. New

2007 U.S. Dist. LEXIS 86889, *

Christian Church of Full Endeavor, Ltd., No. 96 Civ. 4126, 2004 U.S. Dist. LEXIS 5648, 2004 WL 728878, at *3 (S.D.N.Y. Apr. 6, 2004), [*7] and an award of fees and costs is then proper.

Defendants argue that they should be awarded attorneys' fees and costs because "[p]laintiff failed to provide *any* basis for concluding that [d]efendants infringed protectable elements of [p]laintiff's works." (Defs. Mem. 5 (emphasis in original).) The Court agrees. In its December 22 order granting summary judgment, the Court found that "[t]he works at issue could not be more different in total concept and feel," and plaintiff's arguments to the contrary were wholly "specious," masking the "striking[] differen[ces]" between the works. Chivalry Film Prods., 2006 U.S. Dist. LEXIS 92956, 2006 WL 3780900, at *1-2. Indeed, the works were "so extraordinarily different" that plaintiff principally based his copyright claim, not on the substantial similarity between the works, but on the " *absence* of similarity, alleging that defendants blatantly went through extremes in revisions and manipulation in an attempt to conceal and subterfuge said crime by revising said screenplay." Id., 2006 U.S. Dist. LEXIS 92956, [WL] at *2 (emphasis added) (internal quotation marks and citation omitted). The complete lack of any reasonable basis for plaintiff's copyright claim thus establishes that his claim was frivolous and [*8] objectively unreasonable, and an award of fees and costs is appropriate here. *See* Polsby v. St. Martin's Press, No. 97 Civ. 690, 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *3 (S.D.N.Y. Jan. 18, 2000)(awarding costs and fees against pro se copyright plaintiff based, inter alia, "on the objective lack of merit in th[e] case"); Sparaco v. Lawler, Matusky, Skelly Eng'rs, LLP., 60 F. Supp. 2d 247, 258-59 (S.D.N.Y. 1999)(holding that plaintiff's copyright claim against certain defendants was objectively unreasonable because there was no evidence of infringement); Williams v. Crichton, 891 F. Supp. 120, 122 (S.D.N.Y. 1994)(granting defendants' motion for fees on showing of objective unreasonableness).

Moreover, although the plaintiff in this case did not engage in a "campaign of vexatious litigation," Polsby, 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *2, the need for deterrence against objectively unreasonable copyright claims is significant. Just as "attorney fee awards may chill litigation of *close* cases, preventing the clear demarcation of the boundaries of copyright law," Ariel (UK) Ltd., 2007 U.S. Dist. LEXIS 194683, at *1 (emphasis added), the denial of such awards in *objectively unreasonable* cases also disserves the purposes of copyright law, by [*9] failing to protect the owners of valid copyrights from the cost of frivolous litigation. Furthermore, the denial of fees and costs to a prevailing defendant in an objectively unreasonable

copyright case may spur additional frivolous lawsuits, of exactly the sort that an award of fees and costs is designed to "chill." Id.; see Polsby, 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *2. "Future litigants should be discouraged from comparable behavior." Great Am. Fun Corp. v. Hosung N.Y. Trading, Inc., No. 96 Civ. 2986, 1997 U.S. Dist. LEXIS 3623, 1997 WL 129399, at *3 (S.D.N.Y. Mar. 21, 1999).

Finally, plaintiffs pro se status is not a sufficient basis for denying an award of fees and costs in this case. The Supreme Court in Fogerty did not specifically deem the "relative financial resources of the parties" to be a relevant factor in considering whether to award fees under the Copyright Act. Penguin Books, 2004 U.S. Dist. LEXIS 5648, 2004 WL 728878, at *5, citing Fogerty, 510 U.S. at 534 n.19. Several courts in this Circuit have awarded attorneys' fees pursuant to 17 U.S.C. § 505 against a pro se plaintiff where, as here, the defendant prevails and the plaintiff's copyright claim was objectively unreasonable, without taking into account the financial disparities between [*10] the parties. See Polsby, 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *2; see also Attia v. Soc'y of the N.Y. Hosp., 12 Fed. Appx. 78 (2d Cir. 2001)(affirming an award of costs and fees against a pro se copyright plaintiff). This is because "[t]he decision to award attorney's fees is based on whether imposition of the fees will further the goals of the Copyright Act, not on whether the losing party can afford to pay the fees." Harrison Music Corp. v. Tesfaye, 293 F. Supp. 2d 80, 85 (D.D.C. 2003), citing Mitek Holdings, Inc. v. Arce Engineering Co., 198 F.3d 840, 843 (11th Cir. 1999). Cf. Shmueli v. City of New York, No. 03 Civ. 1195, 2007 U.S. Dist. LEXIS 42012, 2007 WL 1659210, at *5 (S.D.N.Y. June 7, 2007)("The same [legal] standards apply when the litigant involved is pro se."); Harrison v. Walsh, No. 06 Civ. 13328, 2007 U.S. Dist. LEXIS 39616, 2007 WL 1576265, at *25 (S.D.N.Y. June 1, 2007)(pro se litigants are "held to the same standards of conduct and procedure as an attorney").

However, although plaintiff's pro se status does not preclude an award of fees against him, his financial resources are not altogether irrelevant. "A court that awards fees to a defendant must take into account the financial circumstances of the plaintiff" when determining how much to [*11] award. Polsby v. St. Martin's Press, No. 97 Civ. 690, 2001 U.S. Dist. LEXIS 1675, 2001 WL 180124, at *1 (S.D.N.Y. Feb. 22, 2001); see Sassower v. Field, 973 F.2d 75, 81 (2d Cir. 1992); Polsby, 2001 U.S. Dist. LEXIS 1675, 2001 WL 180124, at *1 ("This principle has been applied in cases under the Copyright Act."). Thus, any "financial disparities" between plaintiff and defendants, who are, primarily, major motion picture production and distribution

Page 3

2007 U.S. Dist. LEXIS 86889, *

companies, "may be . . . considered in determining the magnitude of" the award in this case. Penguin Books, 2004 U.S. Dist. LEXIS 5648, 2004 WL 728878, at *5, citing Lieb v. Topstone Indus., Inc., 788 F.2d 151, 156 (3d Cir. 1986); see Williams v. Crichton, No. 93 Civ. 6829, 1995 U.S. Dist. LEXIS 10699, 1995 WL 449068, at *1 (S.D.N.Y. July 26, 1995)(finding "the relative financial strength of the parties" to be "so disproportionate" that "the purposes of the Copyright Act" would be served "by a relatively small award"). Accordingly, the Court will take this factor into account, among other factors, when determining the appropriate amount of fees and costs to be assessed against plaintiff, if plaintiff makes a showing of a lack of financial resources.

## CONCLUSION

For the foregoing reasons, defendants' motion for fees and costs is granted. Defendants are directed [*12] to submit documentation of their costs and attorneys' fees, including attorneys' time sheets, by December 28, 2007. Plaintiff may submit his response, if any, by January 28, 2008.

SO ORDERED.

Dated: New York, New York

November 27, 2007

GERARD E. LYNCH

United States District Judge

LEXSEE



Analysis
As of: Jun 25, 2008

MARIE FLAHERTY, Plaintiff, -v- JASON FILARDI, GEORGE N. TOBIA, JR.,
BURNS AND LEVINSON, LLP, HYDE PARK ENTERTAINMENT, ASHOK
AMRITRAJ, DAVID HOBERMAN, TODD LIEBERMAN, WALT DISNEY
COMPANY, BUENA VISTA MOTION PICTURES COMPANY, TOUCHSTONE
PICTURES, BUNGALOW 78 PRODUCTIONS, THE KUSHNER-LOCKE
COMPANY, MEESPIERSON FILM CV, WMG FILM, JANE BARTELME,
COOKIE CAROSELLA, DANA OWENS d/b/a QUEEN LATIFAH, 7th CAVALRY
PRODUCTIONS, INC., BIG HOUSE PRODUCTIONS, INC., THE WRITERS
GUILD OF AMERICA, WEST, PETER FILARDI, WALT DISNEY
ENTERPRISES and DOES 6 THROUGH 10, inclusive, Defendants.

No. 03 Civ. 2167 (LTS)(HBP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2007 U.S. Dist. LEXIS 69202; Copy. L. Rep. (CCH) P29,452

September 17, 2007, Decided
September 19, 2007, Filed

**PRIOR HISTORY:** Flaherty v. Filardi, 2007 U.S. Dist.
LEXIS 60196 (S.D.N.Y., Aug. 14, 2007)

**COUNSEL:** [*1] MARIE FLAHERTY, ESQ., Plaintiff
Pro se, New York, New York.

QUINN EMANUEL URQUHART, OLIVER &
HEDGES, LLP, By: Jeffrey A. Conciatori, Esq., New
York, New York, Attorneys for the Disney and Big
House Defendants.

SHERIN AND LODIN, LLP, By: Robert J. Muldoon,
Jr., Esq., Boston, Massachusetts, Attorneys for the B&L
Defendants.

KENNEDY, JENNIK & MURRAY, PC, By: Susan M.
Jennik, Esq., New York, New York, Attorneys for
Defendant Writer's Guild.

**JUDGES:** LAURA TAYLOR SWAIN, United States
District Judge.

**OPINION BY:** LAURA TAYLOR SWAIN

**OPINION**

OPINION AND ORDER (INCLUDING ORDER
FOR SUPPLEMENTAL BRIEFING)

LAURA TAYLOR SWAIN, U.S.D.J.

Plaintiff Marie Flaherty ("Plaintiff" or "Flaherty"),
appearing pro se, brings this action, alleging principally
that Defendants Jason Filardi, George N. Tobia, Jr., Esq.
("Tobia"), Burns and Levinson, LLP ("B&L"), Hyde
Park Entertainment ("Hyde Park"), Ashok Amritraj
("Amritraj"), David Hoberman ("Hoberman"), Todd
Lieberman ("Lieberman"), the Walt Disney Company
("Disney"), Buena Vista Motion Pictures Group ("Buena
Vista"), Touchstone Pictures ("Touchstone"), Bungalow
78 Productions ("Bungalow 78"), the Kushner-Locke
Company ("Kushner-Locke"), Meespierson Film CV
("Meespierson"), WMG Film ("WMG"), Jane    [*2]
Bartelme ("Bartelme"), Cookie Carosella ("Carosella"),
Dana Owens d/b/a Queen Latifah ("Owens"), 7<th>
Cavalry Productions, Inc. ("7<th> Cavalry"), Big House
Productions, Inc. ("Big House"), Peter Filardi, Writer's
Guild of America West (the "Guild"), Walt Disney
Enterprises, Inc. ("Disney Enterprises"), and Does 6-10

2007 U.S. Dist. LEXIS 69202, *; Copy. L. Rep. (CCH) P29,452

(collectively, "Defendants") infringed Plaintiff's copyright in her screenplay, "Amoral Dilemma," in creating the movie "Bringing Down the House," in violation of 17 U.S.C. § 101 et seq.

This Opinion and Order addresses the following motions. Defendants Disney, Buena Vista, Touchstone, Hyde Park, Jason Filardi, Amritraj, Hoberman, Lieberman and Owens (collectively, the "Disney Defendants") move for summary judgment. Defendants Tobia and B&L (collectively, the "B&L Defendants") and Big House, Disney Enterprises, and 7<th> Cavalry (collectively, the "Big House Defendants") have joined the Disney Defendants' motion. Also before the Court are a separate summary judgment motion by the B&L Defendants and a motion by the Big House Defendants for judgment on the pleadings or, in the alternative, summary judgment.

The Court has subject matter jurisdiction of Plaintiff's copyright [*3] and Lanham Act claims pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1338(b), and of the various state law claims pursuant to 28 U.S.C. § 1367.

The Court has considered carefully all of the submissions made in connection with these matters. The pending motions are resolved as follows. The Disney Defendants' and the B&L Defendants' motions for summary judgment are granted in part but, to the extent they seek summary judgment regarding Plaintiff's claim that Defendants Filardi and Tobia initially sold the film production defendants a work ("Jailbabe.com") that infringed on Plaintiff's screenplay, they will be held in abeyance pending further submissions. The Big House Defendants' Motion for Judgment on the Pleadings is denied as moot, because the Disney Defendants' summary judgment motion, in which the Big House Defendants joined, has been granted in relevant part.

Because discovery in this action has been completed and the record on these motions is unclear as to the content of the "Jailbabe.com" work that was sold, the parties will be given an opportunity to supplement the record on this issue and, as noted above, this element of the motion practice will be held in abeyance pending the [*4] Court's receipt of the further submissions. A schedule for the submissions is set forth in the penultimate paragraph of this Opinion and Order.

By a separate Order to Show Cause, issued contemporaneously herewith, Plaintiff will be directed to show cause as to why all remaining claims against the defendants who did not join in these motions should not be dismissed in light of the Court's determinations on the merits of Plaintiff's claims as set forth in Flaherty v. Filardi, 388 F. Supp. 2d 274 (S.D.N.Y. 2005) and in this Opinion.

BACKGROUND

Familiarity with the background of the instant case, which is detailed in the Court's September 14, 2005 decision, is presumed. See Flaherty v. Filardi, 388 F. Supp. 2d 274 (S.D.N.Y. 2005). In that decision, the Court granted partial summary judgment to the moving defendants, dismissing all of Plaintiff's copyright claims to the extent they were premised on alleged similarities between Plaintiff's screenplay and the finished film "Bringing Down the House." That decision also dismissed Plaintiff's Lanham Act claim insofar as it asserted that defendants had falsely designated the origin of the finished film. Finally, the decision dismissed several of [*5] the Plaintiff's related state law claims on preemption grounds to the extent they were premised on rights protected by the Copyright Act.

Subsequent to the briefing on the summary judgment motions at issue, Plaintiff sought, and was granted, permission to file a Second Amended Complaint ("Complaint" or "SAC") that asserted the relevant remaining claims against five new Defendants, corrected the name of the Walt Disney Company, and referred to what Plaintiff characterizes as the subsequent registered derivative work "Amoral Dilemma." In the Order granting Plaintiff's request to amend, she was specifically prohibited from asserting in the SAC any federal claims premised on similarity between her screenplay(s) and the finished motion picture "Bringing Down the House" or authorship of the finished motion picture "Bringing Down the House," as those claims had already been dismissed by a previous Order, and reconsideration of that Order had been denied. See January 24, 2007, Opinion and Order. To the extent Plaintiff's Second Amended Complaint asserts any such claims, the pleading is ineffective to revive them.

The Disney Defendants move for summary judgment dismissing all of Plaintiff's [*6] remaining claims against them, namely her copyright infringement, Lanham Act and state claims relating to the draft screenplays prepared after the film production defendants had acquired a screenplay purportedly authored by Defendant Filardi. [1] The B&L Defendants move for summary judgment dismissing all of Plaintiff's claims against them, including Plaintiff's malpractice, breach of fiduciary duty, misappropriation of idea, breach of contract, unfair competition, fraud, and conversion claims.

1    As noted above, the B&L and Big House Defendants have joined in the Disney Defendants' motion.

DISCUSSION

Page 2

Summary judgment is appropriate only when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." Am. Cas. Co. v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir. 1994).

Nevertheless, to defeat a motion for summary judgment, "[o]nce the moving party has come forward with support [*7] in the form of the pleadings, depositions, interrogatory answers, admissions or affidavits that no genuine issue of material fact remains to be tried, the opposing party has the burden of providing similar support setting forth specific facts about which a genuine triable issue remains." Borthwick v. First Georgetown Sec., Inc., 892 F.2d 178, 181 (2d Cir. 1989). A party opposing a motion for summary judgment "may not rest on the pleadings but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial." Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996); see also Fed. R. Civ. P. 56(c) and (e); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

A. Plaintiff's Rule 56(f) Request

Plaintiff's response to the motions for summary judgment includes an affirmation, purportedly pursuant to Federal Rule of Civil Procedure 56(f), in which Plaintiff argues that she is in need of further discovery before she can respond to these motions. Federal Rule of Civil Procedure 56(f) provides that, "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated [*8] present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

Plaintiff acknowledges that her Rule 56(f) affirmation is "nearly verbatim to her October 6, 2006 Motion for Default Judgment." (Rule 56(f) Affirmation of Marie Flaherty in Opposition to Defendants' Motions for Summary Judgment.) For substantially the same reasons that Judge Pitman articulated in denying Plaintiff's admittedly identical motion for default judgment, this Court denies Plaintiff's Rule 56(f) application.

B. Disney Defendants' Motion for Summary Judgment

1. *Remaining Copyright Claims*

In Claims 1-4 of the SAC, Plaintiff alleges that the approximately 14 prior drafts of "Bringing Down the House" "constitute compilations, dramatizations, performances, derivations and publications" of her screenplay and thus violate her rights under the Copyright Act. (Compl. P114.) She also alleges that it was her screenplay that was pitched by Filardi to Defendant Hyde Park in March of 2000. Id. P67.)

The Disney Defendants [*9] seek summary judgment in their favor on Plaintiff's remaining copyright claims. They argue that all of the remaining copyright infringement claims must be dismissed as a matter of law, as interim drafts of a published non-infringing final work are not actionable under the Copyright Act and, in any event, Plaintiff has failed to identify substantial similarities between her screenplay and the draft screenplays. Defendants further argue that Plaintiff cannot establish that the Defendants had access to her screenplay, and cannot rebut Defendants' uncontroverted evidence of independent creation. Plaintiff does not respond to Defendants' legal argument that interim drafts of a published non-infringing final work are not actionable under the Copyright Act. That principle is, however, key to the resolution of the question of viability of Plaintiff's copyright claims concerning the content of drafts that were prepared in the course of development of the film.

As other courts in this district have held, "[s]ince the ultimate test of infringement must be the film as produced and broadcast, we do not consider the preliminary scripts." Davis v. United Artists, Inc., 547 F. Supp. 722, 724 n.9 (S.D.N.Y. 1982). [*10] "In determining copyright infringement, . . . [t]he Court considers the works as they were presented to the public." Walker v. Time Life Films, Inc., 615 F. Supp. 430, 434 (S.D.N.Y. 1985) (internal citation omitted). "Courts have routinely rejected requests to consider earlier drafts of the screenplay. Consideration of earlier versions of the screenplay is too unreliable in determining substantial similarity." Id. at 435. Accordingly, because the finished film "Bringing Down the House" is not an infringing work, [2] the drafts prepared in the course of film development and production constitute interim drafts of a published non-infringing final work, and are not actionable under the Copyright Act. The Disney, B&L and Big House Defendants are therefore entitled to summary judgment as a matter of law on the remaining copyright infringement claims premised on the notion that drafts of "Bringing Down the House" prepared during the film development and production process, including "Suburban Sista" and "In the Houze," infringed on her idea or screenplay.

2007 U.S. Dist. LEXIS 69202, *; Copy. L. Rep. (CCH) P29,452

2   See Flaherty v. Filardi, 388 F. Supp. 2d 274 (S.D.N.Y. 2005).

To the extent defendants Filardi and Tobia are, however, moving for summary [*11] judgment in their favor as to Plaintiff's claim that they initially sold film production defendant Hyde Park a screenplay that infringed on Plaintiff's intellectual property rights, they have failed to demonstrate on this record their entitlement to such judgment as a matter of law. There appears to be no dispute that this initial screenplay was a work titled "Jailbabe.com" and purportedly written by Filardi. Plaintiff alleges, as noted above, that Filardi initially pitched her screenplay to the Defendants, and thus appears to be alleging that "Jailbabe.com" infringed on her screenplay. Although, for the reasons stated above, the interim drafts of the finished motion picture are not actionable, there remains a genuine issue of fact precluding summary judgment on Plaintiff's claim that Filardi violated her rights by selling the allegedly infringing screenplay to the film production defendants in exchange for a "mid-six figure paycheck" and a three-picture deal with Hyde Park. Plaintiff also asserts claims against Defendant Tobia under the same theory, alleging that Tobia provided Filardi with access to Plaintiff's screenplay and negotiated the sale on his behalf. (Compl. P128.)

Although [*12] Defendants have proffered evidence of independent creation of a work titled "Jailbabe.com" (see November 15, 2005 Dep. of Jason Filardi at 113-116) and both parties have proffered arguments concerning the similarity (or lack thereof) to "Amoral Dilemma" of a version of "Jailbabe.com" that is in the record, [3] there is no clear, competent evidence in the record as to what document Filardi originally sold to the film production defendants. In the interests of judicial economy and the prompt resolution of this remaining aspect of the motion practice, the Court will give the parties an opportunity to make further submissions addressing this evidentiary question. In that discovery has already been completed, each side is in a position to proffer whatever evidence it would present at trial concerning the identity and content of the document in question. The summary judgment motions will be held in abeyance solely to the extent they relate to Plaintiff's claims against Defendants Filardi and Tobia concerning the sale of "Jailbabe.com."

3   See Exh. H to Aff. of Jeffery Conciatori. Although the Conciatori affidavit purports to attest to the document as a true and correct copy of "Jailbabe.com," [*13] this attorney's affidavit is insufficient to authenticate it as an evidentiary matter, nor does the Conciatori affidavit nor any

other evidentiary proffer by any party identify it specifically as the work that Filardi sold to Hyde Park.

*2. Remaining Lanham Act Claims*

The Disney Defendants, citing Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 123 S. Ct. 2041, 156 L. Ed. 2d 18 (2003), contend that they are also entitled to summary judgment with respect to Plaintiff's remaining Lanham Act claim (Claim 5 of the SAC), arguing that the protections of Section 43 of the Lanham Act do not extend to any idea, concept or communication embodied in a tangible good, and thus no Lanham Act claim can lie as to the drafts prepared in the course of development and production of "Bringing Down the House." Plaintiff argues (without providing a citation to her Complaint) that Dastar is inapplicable, as her Complaint "explicitly states that the *screenplays* that Def. Tobia and Filardi put into commerce violated Plaintiffs [sic] rights under the Lanham Act." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment, 29) (emphasis in original.)

The Supreme Court held in Dastar that the Lanham Act [*14] protects only "the producer of the tangible goods that are offered for sale, and not . . . the author of any idea, concept, or communication embodied in those goods." Dastar, 539 U.S. at 37. As another court in this district made clear, an alleged author of a screenplay embodied in a tangible good offered for sale is not the originator of the film and thus is not protected by the Lanham Act. See Smith v. New Line Cinema, No. 03 Civ. 5274(DC), 2004 U.S. Dist. LEXIS 18382, 2004 WL 2049232, at *3-4 (S.D.N.Y. Sept. 13, 2004). It is undisputed that Plaintiff was not, in this sense, the originator of the film. Accordingly, the Disney, B&L and Big House Defendants are entitled to summary judgment as a matter of law on Plaintiff's remaining Lanham Act claims, insofar as they relate to the finished film.

For substantially the reasons outlined in the preceding section of this Opinion, however, the question of the viability of any Lanham Act claim premised on Plaintiff's assertion that Filardi and Tobia sold her screenplay, in the guise of Filardi's "Jailbabe.com," to the film production defendants cannot be resolved on this record and must await the parties' further submissions.

*3. Plaintiff's Remaining State Law Claims*

The [*15] Disney Defendants argue that they are entitled to summary judgment dismissing Plaintiff's remaining state law claims against them, namely claims for unfair competition, unjust enrichment and quantum meruit to the extent those claims are premised on the alleged misappropriation or theft of Plaintiff's original

ideas and concepts, because, inter alia, her "idea" is embodied in her screenplay and her claims are thus preempted.

In response to an interrogatory served by the Defendants seeking Plaintiff's identification of any "ideas" or "concepts" she believed she had been misappropriated by Defendants, Plaintiff wrote that "the confidential and proprietary original ideas and concepts concern two friends, unlucky in love, who vent their sexual frustration by corresponding with a prisoner that they find online." (Plaintiff's Response to Defendants Permitted Contention Interrogatory, dated November 28, 2005, attached as Ex. R to the Declaration of Jeffrey A. Conciatori in Support of Defendants' Motion for Summary Judgment ("Conciatori Decl.").) Plaintiff subsequently confirmed in her deposition that her "Amoral Dilemma" screenplay was the expression of this idea. (January 30, 2006 Deposition [*16] of Plaintiff Flaherty ("Flaherty Dep."), attached as Ex. N. To Conciatori Decl., at 20:17-22:3.)

As this Court noted in its September 14, 2005, Opinion and Order, a state law claim is preempted by the Copyright Act where (1) the work to which the claim is applied falls within the scope of works protected by sections 102 or 103 of the Copyright Act, and (2) the claim addresses legal or equitable rights already protected by copyright law. See Flaherty, 388 F. Supp. 2d at 290. Because discovery subsequent to the Court's earlier ruling has established, by Plaintiff's own admission, that her "idea" is, essentially, embodied in her screenplay, her state law misappropriation claims are preempted by the Copyright Act. See Katz Dochrermann & Epstein, Inc. v. Home Box Office, No. 97 Civ. 7763(TPG), 1999 U.S. Dist. LEXIS 3971, 1999 WL 179603, at *3 (S.D.N.Y. Mar. 31, 1999) (holding that where the ideas at issue cannot, on the facts alleged, be meaningfully separated from their tangible expressions, preemption is appropriate.) Thus, the Disney, B&L and Big House Defendants are all entitled to summary judgment dismissing Plaintiff's claims for unfair competition, unjust enrichment and quantum meruit.

### 4. Remaining Fraud Claim

The [*17] Disney Defendants argue that Defendant Jason Filardi is entitled to summary judgment as a matter of law dismissing Plaintiff's New York state law fraud claim against him (SAC Claim 12), because Plaintiff is unable to identify any statements made by Defendant Jason Filardi on which she relied to her detriment. To state a cognizable fraud claim under New York law, a plaintiff must allege (i) a misrepresentation or omission of a material fact; (ii) which was false and known to be false by defendant; (iii) made for the purpose of inducing plaintiff to rely on it; (iv) justifiable and reasonable

reliance on the material misrepresentation or omission; and (v) resulting injury. See Stewart v. World Wrestling Fedn. Entm't, Inc., No. 03 Civ. 2468 RLC, 2004 U.S. Dist. LEXIS 26533, 2005 WL 66890, at *6 (S.D.N.Y. Jan. 11, 2005). Because Plaintiff has failed to identify any statements, let alone false statements, made by Defendant Jason Filardi upon which Plaintiff relied, he is entitled to summary judgment as a matter of law on her fraud claim. To the extent Plaintiff's fraud claim against Filardi is premised on his alleged collaboration with Tobia in a misrepresentation as to any similarity between Plaintiff's [*18] screenplay and "Jailbabe.com," the claim fails for the reasons set forth in Section C.3 below.

### C. B&L Defendants' Motion for Summary Judgment

#### 1. Preemption: Misappropriation of Idea and Conversion Claims

The B&L Defendants ask the Court to grant them summary judgment dismissing Plaintiff's state law claims against them, namely for legal malpractice, breach of fiduciary duty, misappropriation of idea, breach of implied contract, unfair competition, fraud, quantum meruit, unjust enrichment and conversion. The B&L Defendants argue that these claims are preempted by the Copyright Act. For the reasons explained above, Plaintiff's claims for unfair competition, quantum meruit, and unjust enrichment are preempted and thus are not viable. For substantially the same reasons, the B&L Defendants' motion for summary judgment is granted as to Plaintiff's misappropriation of idea and conversion claims. Both of these claims are rooted in Plaintiff's allegation that the B&L Defendants improperly shared her "idea" with others, [4] and thus are preempted for the reasons discussed above.

> 4    Plaintiff's misappropriation of idea claim (claim 8 of the SAC) charges that Plaintiff and Tobia entered into a confidential [*19] and fiduciary relationship and that Tobia legally represented Plaintiff. For the reasons discussed in section C.2 below, summary judgment is granted dismissing Plaintiff's fiduciary relationship and legal malpractice claims. The misappropriation of idea claim also alleges that the Defendants disclosed without Plaintiff's authorization her "unique and original idea" and did not compensate her for this. See SAC PP183-192. Plaintiff's conversion claim (claim 13 of the SAC) charges that Defendants wrongfully appropriated and disclosed Plaintiff's ideas and concepts. See SAC PP239-248. As these claims thus clearly arise from Plaintiff's contention that her ideas -- which were allegedly embodied in her screenplay -- were misappropriated, they are preempted by the Copyright Act.

To the extent Plaintiff's misappropriation claim can be construed as premised on a contractual theory rather than a general claim of entitlement to protection of her intellectual property rights, it fails on the merits. As the Second Circuit has noted, "[u]nder California law, . . . misappropriation . . . claims are actionable only to vindicate legally protected property interests, and an idea is not recognized as [*20] a property right. . . . Recovery for the appropriation of an idea, therefore, may be had only on a contractual theory." Whitfield v. Lear, 751 F.2d 90, 92 (2d Cir. 1984). There is no allegation, or any proffer of evidence of any contract (implied, express or otherwise) between Plaintiff and any of the Defendants, other than Tobia/B&L. Plaintiff's contract claims against Tobia and his firm are not viable, as explained below. Accordingly, Plaintiff's misappropriation of idea claim fails on its merits even if it is not preempted.

### 2. Legal Malpractice, Breach of Fiduciary Duty, and Breach of Contract Claims

The parties agree that Massachusetts law governs Plaintiff's legal malpractice, breach of fiduciary duty, and breach of contract/implied contract claims against Tobia and his firm. Under Massachusetts law, where the parties never entered into an express contract for legal services, an attorney-client relationship may be implied "when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice [*21] or assistance. . . . In appropriate cases the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it." DeVaux v. Am. Home Assur. Co., 387 Mass. 814, 444 N.E.2d 355, 357 (Mass. 1983) (internal citation omitted).

Plaintiff submitted two affirmations in connection with her opposition to Defendants' motions for summary judgment. Some of the information contained within these affirmations consists of conclusory legal assertions and is inconsistent Plaintiff's own prior deposition testimony. For example, while Plaintiff testified at her deposition that Defendant Tobia had flipped through her screenplay and told her repeatedly "I will see what I can do for you" (see Flaherty Dep. at 291-297), in her affirmation she conclusorily states that Tobia "agree[d] to represent [her] interests" (see Affirmation of Pro Se Plaintiff Marie Flaherty in Opposition to Defendants' Motions for Summary Judgment ("Flaherty Aff.") P20). [5] To the extent Plaintiff's affirmations conflict with her prior deposition testimony, they will be disregarded. "[A] party [*22] may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony. . . . Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996).

5    In her Response to Defendant Tobia and Burns & Levinson's Local Rule 56.1 Statement ("Plaintiff's B&L 56.1 Response"), Plaintiff challenges the accuracy of her deposition transcript. See Plaintiff's B&L 56.1 Response PP4, 9, 11, and 13. However, the Plaintiff did not, in accordance with Federal Rule of Civil Procedure 30(e), timely request any corrections to the transcript, even though the Defendants provided her with a copy of the transcript and informed her that any corrections would be due within 30 days. See Reply Decl. Of Jeffrey A. Conciatori, P13. Thus, her challenge is unavailing. See Margo v. Weiss, 213 F.3d 55, 61 (2d Cir. 2000).

Plaintiff's own proffers establish that the B&L Defendants are entitled to summary judgment as a matter of law on her legal malpractice claim. The [*23] uncontroverted record shows that Plaintiff never explicitly requested the attorney to represent her in this matter, never was told that the attorney would protect her interests, and was never billed for any services. Plaintiff's deposition testimony indicates that Plaintiff merely gave Tobia her screenplay and does not suggest any request for legal services. Thus, there is no basis upon which to imply the existence of an attorney-client relationship. See Robertson v. Gaston. Snow & Ely Bartlett, 404 Mass. 515, 536 N.E.2d 344, 351 (Mass. 1989). Further, "[Massachusetts] [c]ourts interpreting DeVaux have understood this first prong [of seeking advice or assistance from an attorney] to require concrete communication by the plaintiff requesting that the attorney represent him, or explicitly seeking individualized legal advisement." International Strategies Group, Ltd. v. Greenberg Traurig, LLP, 482 F.3d 1, 8 (1<st> Cir. 2007); see also Sheinkopf v. Stone, 927 F.2d 1259, 1266-67 (1st Cir. 1991) (no implied attorney-client relationship arose under Massachusetts law between an attorney and an investor where the investor bought into a joint investment venture managed by the attorney, even though the attorney [*24] prepared various legal documents for the investor's signature and requested that he sign them; promised to "protect" the investor; told the investor that "other clients of [the firm]" were also investing in the venture; listed the firm's address on the joint venture's legal documents; and transacted joint venture business out of his law firm office and with the assistance of his law firm secretary).

2007 U.S. Dist. LEXIS 69202, *; Copy. L. Rep. (CCH) P29,452

In addition, the uncontroverted evidence establishes that Plaintiff never detrimentally relied on any of Tobia's statements, as she and Tobia did not speak again for six months after the initial meeting in New York at which she gave him the screenplay, then spoke briefly on the phone but did not discuss any purported legal representation, and then did not speak again for three years. During this time, the Plaintiff acknowledges, she was "pitching" her screenplay to at least 10 different people. (See Flahery Dep. at 48, 332-333.) To the extent Plaintiff's argument is construed as one that she was relying on Tobia to "pitch" her screenplay for her, Plaintiff has pointed to no case law that establishes that "pitching" is a legal service that would be encompassed within the second prong of the [*25] De Vaux test. Thus, the B&L Defendants are entitled to summary judgment dismissing Plaintiff's legal malpractice claim against them.

For substantially the same reasons, the B&L Defendants are also entitled to summary judgment dismissing Plaintiff's breach of fiduciary duty claim against them (claim 7 of the SAC), as the uncontroverted evidence establishes that there was no confidential or fiduciary relationship present here sufficient to support the imposition of such a duty. See Van Brode Group v. Bowditch & Dewey, 36 Mass. App. Ct. 509, 516, 633 N.E.2d 424 (1994) (noting that, under Massachusetts law, an attorney only owes a duty of care to a third party non-client if the attorney knows the non-client is relying on the legal services the attorney is rendering).

Likewise, the B&L Defendants are entitled to summary judgment dismissing Plaintiff's breach of contract/implied contract claim against them (claim 9 of the SAC). Plaintiff alleges that the implied contract here was "that Plaintiff Flaherty's idea would be confidential based on the confidential and fiduciary relationship created by the parties through Tobia's legal representation of Flaherty," and, further alleges that this contract [*26] arises because Tobia was "under a legal obligation to treat Flaherty's idea as confidential [as] the legal representation relationship required that Tobia keep her idea confidential and that she expected to be compensated and receive screen credit" should her ideas be used to create a motion picture. (SAC P197.) As discussed above, Plaintiff's claims for breach of fiduciary relationship and legal malpractice fail, as the uncontroverted evidence establishes that there was no legal representation and no fiduciary relationship. Thus, there was no relationship upon which to imply a contract that Tobia would keep her ideas confidential. None of the elements of an implied contract claim have been made out on the facts before this Court.

3. *Plaintiff's Fraud Claim*

Regarding Plaintiff's fraud claim (claim 12 of the SAC), the B&L Defendants argue that Plaintiff has failed to proffer evidence sufficient to satisfy any of the elements of that cause of action. As noted above, to state a cognizable fraud claim, a plaintiff must allege (i) a misrepresentation or omission of a material fact; (ii) which was false and known to be false by defendant; (iii) made for the purpose of inducing plaintiff to [*27] rely on it; (iv) justifiable and reasonable reliance on the material misrepresentation or omission; and (v) resulting injury. See Stewart, 2004 U.S. Dist. LEXIS 26533, 2005 WL 66890, at *6.

Here, Plaintiff asserts that Defendant Tobia's alleged statement denying that the script for "Jailbabe.com" was "awfully familiar [sic]" to Flaherty's screenplay was a material falsehood. (SAC P229). Taking as true Plaintiff's contention that Tobia made the challenged statement and assuming (without deciding the issue) for purposes of this motion practice that the statement was materially false, Plaintiff's attempt to state a viable fraud claim is nonetheless unavailing because the alleged statement is one of opinion, not of fact. "Absent special circumstances, the representation must be one of fact and not opinion." Bank of N. Y. v. Realty Group Consultants, 186 A.D.2d 618, 619, 588 N.Y.S.2d 602 (N.Y. App. Div. 1992). [6] Further, Plaintiff's deposition testimony -- that she told a director that film similar to hers may have been sold to Disney -- precludes any possibility that Plaintiff could prove that she relied to her detriment on Tobia's allegedly false statement. [7] Accordingly, the B&L Defendants' motion for summary judgment dismissing Plaintiff's [*28] fraud claim against them [8] is granted.

6   Such special circumstances would include, for example, the existence of an employee-employer relationship between the speaker of the fraudulent statement and the plaintiff (see Forest v. Elliott Truck & Tractor Sales, Inc., 29 A.D.2d 1031, 1031-1032, 289 N.Y.S.2d 431 (N.Y. App. Div. 1968), or the presence of a landlord-tenant relationship and a lease that made certain guarantees (see Municipal Metallic Bed Mfg. Corp. v. Dobbs, 253 N.Y. 313, 171 N. E. 75 (N.Y. 1930). The record is devoid of evidence of any such special circumstances here.

7   Dep. Tr. at 332.

8   Though in her SAC Plaintiff only charges that Defendant Tobia made a fraudulent statement, she alleges that he was "working on behalf of and for the benefit of Burns & Levinson" when he made it, and that he would not have succeeded in his fraud "without the active participation and collaboration of Jason Filardi." SAC PP233-234.

2007 U.S. Dist. LEXIS 69202, *; Copy. L. Rep. (CCH) P29,452

#### 4. B&L Defendants' Request for Attorneys' Fees

The B&L Defendants ask the Court to award them reasonable attorneys' fees and costs incurred in responding to what they characterize as Plaintiff's "bad faith" affidavits submitted in opposition to summary judgment. A court has the inherent power to assess [*29] costs and attorneys' fees where a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975) (internal citations omitted). The Second Circuit has made clear that this power should be exercised with restraint and has required a particularized showing of bad faith to justify the use of the court's inherent power; declining to uphold awards under the bad-faith exception absent both "'clear evidence' that the challenged actions 'are entirely without color, and [are taken] for reasons of harassment or delay or for other improper purposes'" and "a high degree of specificity in the factual findings of [the] lower courts." Oliveri v. Thompson, 803 F.2d 1265, 1272 (2d Cir. 1986) (citations omitted).

Although the Court believes the Plaintiff may well have engaged in vexatious and delaying motion practice in this case, in light of her pro se status, and because the record does not establish that Plaintiff's affirmations are "entirely without color, and [were made] for reasons of harassment or delay or for other improper purposes," the B&L [*30] Defendants' request for attorney's fees and costs is denied.

#### D. Remaining Motions and Defendants

#### 1. Big House Defendants' Motion for Judgment on the Pleadings

The Big House Defendants joined the Disney Defendants' summary judgment motion and, in the alternative, moved for judgment on the pleadings. In light of the Court's disposition of the relevant portion of the summary judgment aspect of the motion in Defendants' favor, the motion for judgment on the pleadings is moot and need not be addressed.

#### CONCLUSION

For the reasons explained above, the pending applications are resolved as follows. Plaintiff's Rule 56(f) request is denied. The Disney Defendants' and the B&L Defendants' motions for summary judgment (docket entries 157 and 162) are granted except to the extent they seek summary judgment regarding Plaintiff's claim against Defendants Filardi and Tobia that they sold the film production defendants a work that infringed on Plaintiff's screenplay. That element of the summary judgment motion practice will be held in abeyance pending the further submissions described in the next paragraphs. The Big House Defendants' Motion for Judgment on the Pleadings (docket entry 208) is denied as moot, [*31] as its alternative motion for summary judgment has been granted in relevant part.

Defendants Filardi and Tobia are hereby ordered to supplement their evidentiary submissions as to the identity and nature of the screenplay sold by Filardi to Hyde Park. Any such submissions shall be filed with the Court (with a courtesy copy for Chambers) and served on Ms. Flaherty so as to be received by October 5, 2007. Ms. Flaherty shall file (with a courtesy copy for Chambers) and serve any such supplemental evidentiary submission so that it is received no later than October 26, 2007. Any reply submission shall be served and filed so as to be received by November 2, 2007. [9]

> 9   As noted above, discovery in this case has been closed. No further applications for the reopening of discovery, or for supplemental discovery of any kind, will be entertained. See August 14, 2007 Opinion and Order of Magistrate Judge Pitman.

The Court is also issuing today a separate Order to Show Cause in this matter.

SO ORDERED.

Dated: New York, New York

September 17, 2007

LAURA TAYLOR SWAIN

United States District Judge



Not Reported in F.Supp.                                              Page 1
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

**H**Littel v. Twentieth Century Fox Film Corp.
S.D.N.Y.,1995.

United States District Court, S.D. New York.
John S. LITTEL, Anthony Destefano, and Judalee
Productions, Inc., Plaintiffs,
v.
TWENTIETH CENTURY FOX FILM
CORPORATION, Jim Thomas, John Thomas, CBS
Fox Company, American Films and American
Entertainment Partners LP, John Davis, Shanachie
Productions, Inc., Deimos Bard Productions, Inc.,
and Fox Video, Inc., Defendants.
No. 89 Civ. 8526 (DLC).

July 7, 1995.

Robert Dembia, Levine & Dembia, New York City,
for plaintiffs.
Slade R. Metcalf, Mark H. Jackson, Squadron,
Ellenoff, Plesen, Sheinfeld & Sorkin, New York
City, for defendants.

*OPINION & ORDER*

COTE, District Judge:
*1 Plaintiffs bring this action for copyright
infringement, *inter alia*, alleging that the defendants
copied plaintiffs' book "The Predator" without
authorization in the production of the motion pictures
"Predator" and "Predator 2". Before the Court is
defendants' motion for summary judgment, or, in the
alternative, to dismiss against defendants John
Thomas and James Thomas for lack of personal
jurisdiction. For the reasons given below, defendants
motion for summary judgment is granted.

*BACKGROUND*

Procedural Background

Plaintiffs John S. Littel and Anthony Destefano are
co-authors, under the pseudonym "Anthony John", of
a book entitled "The Predator", published in 1983.
Plaintiff Judalee Productions, Inc. allegedly owns the
movie rights to that book. The defendants
collectively wrote and produced the movies

"Predator", released in 1987, and "Predator 2",
released in 1990. Plaintiffs filed their first complaint
on December 22, 1989, alleging that the motion
picture and novelization of "Predator" copied
significant portions of the plaintiffs' book, in
violation of the Copyright Act, the Lanham Act,
common law unfair competition and
"misappropriation of copyright."

On April 20, 1990, several of the individual
defendants filed a motion to dismiss the action as
against them for lack of personal jurisdiction, or, in
the alternative, to transfer the action to the United
States District Court for the Central District of
California. In an order dated May 28, 1991, the
Honorable John E. Sprizzo, to whom this case was
then assigned, denied the motion except with respect
to defendant Stan Winston, who was dismissed from
the action.

On August 9, 1991, defendants filed a motion for
summary judgment based on the theory that plaintiffs'
book was not "substantially similar" to the motion
picture "Predator". Plaintiffs then requested, and
were granted, permission to file a supplemental
complaint based on the production and distribution of
"Predator 2", which had begun in November 1990.
On October 17, 1991, plaintiffs filed a supplemental
complaint, alleging the same legal claims as the
original complaint, but adding facts relating to the
motion picture and novelization of "Predator 2" as
well as adding references to the screenplays of both
motion pictures. On January 9, 1992, defendants
supplemented their summary judgment motion in a
similar fashion. By order dated July 27, 1992, Judge
Sprizzo denied defendants' motion for summary
judgment, without opinion.

On September 13, 1994, well after the completion of
discovery, the action was reassigned to this Court. At
a conference on November 9, 1994, defendants were
granted leave to renew their motion for summary
judgment. On March 24, 1995, the defendants'
renewed motion was fully submitted to this Court,
arguing that the works in question were not
substantially similar.

*STANDARD*

Not Reported in F.Supp.                                                                Page 2
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

Summary judgment is only appropriate when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. When deciding a motion for summary judgment, a court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. of Reading, PA v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994).

*2 In the copyright context,

a district court may determine noninfringement as a matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff['s] work, or when no reasonable trier of fact could find the works substantially similar.

*Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.), *cert. denied,* 476 U.S. 1159 (1986), citing *Warner Bros., Inc. v. American Broadcasting Co.*, 654 F.2d 204, 207 (2d Cir. 1981), *aff'd,* 720 F.2d 231 (2d Cir. 1983) (Warner II). In order for summary judgment to be available, the lack of substantial similarity between the protectable aspects of the works must be "'so clear as to fall outside the range of disputed fact questions' requiring resolution at trial." *Id.* (quoting *Warner II*, 720 F.2d at 239).

### DISCUSSION

In their original and supplemental complaints, plaintiffs make several claims: copyright infringement under the Copyright Act, false designation of origin under the Lanham Act, common law unfair competition, and "misappropriation of copyright". Defendants' motion for summary judgment, and plaintiffs' opposition, address the copyright infringement claim almost exclusively. In addition to substantive defenses, plaintiffs assert that prior rulings in this action, denying defendants summary judgment on the copyright infringement claim and denying a motion to dismiss for lack of personal jurisdiction, are law of the case and argue against this Court's reconsideration of these issues.

### LAW OF THE CASE

Plaintiffs argue that Judge Sprizzo's prior rulings, denying summary judgment and denying a motion to dismiss for lack of personal jurisdiction, are law of the case. While admitting that this does not prevent the Court from hearing the motions, plaintiffs argue that there is no compelling reason to reverse the prior rulings. Defendants respond that discovery has taken place since the prior rulings, that subsequent rulings in this circuit have granted and affirmed summary judgment in similar circumstances, and that manifest injustice would result if the motion is not reheard.

When the prior decision at issue is from the same court, "[t]he law of the case doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions." *Virgin Atlantic Airways, Ltd. v. National Mediation Board*, 956 F.2d 1245, 1255 (2d Cir.) (internal citations and quotations omitted), *cert. denied,* 113 S.Ct. 67 (1992). The doctrine:

is not an inviolate rule ... and the decision whether or not to apply law-of-the-case is, in turn, informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine.... In this context, "prejudice" ..."refers to a lack of sufficiency of notice" or a lack of sufficient "opportunity to prepare armed with the knowledge that [the prior ruling is not deemed controlling]."

*3 *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991) (quoting *United States v. Birney*, 686 F.2d 102, 107 (2d Cir. 1982)). Courts generally adhere to prior rulings absent "cogent" or "compelling" reasons not to, such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Id.* (internal quotes omitted).

Plaintiffs here have had more than adequate opportunity to prepare for a rehearing of defendants' motion for summary judgment and have not shown any prejudice in this respect.[FN1] In addition, subsequent discovery addressed the subject matter of the motion, as it addressed the issue of defendants' access to plaintiffs' book, revealing that 110 copies of plaintiffs' book were sold in 10 bookstores within a fifty-mile radius of the homes of the defendant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

writers, James and John Thomas.[FN2] In addition, with respect to the motion to dismiss for lack of personal jurisdiction, Judge Sprizzo expressly granted defendants leave to re-assert the motion after the close of discovery, and it is therefore not appropriate to consider his prior ruling law of the case now that discovery has been completed. Accordingly, this Court, having reviewed the works in question, and found cogent reasons to rehear the motion for summary judgment, will do so.

*COPYRIGHT INFRINGEMENT*

There are two elements for a claim of copyright infringement: 1) ownership of a valid copyright by the plaintiff; and 2) unauthorized copying by the defendant. *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139 (2d Cir. 1992). Defendants here do not challenge the validity of plaintiffs' copyright. Because direct evidence of unauthorized copying is rarely available, "copying is generally established by showing (a) that the defendant[s] had access to the copyrighted work and (b) the substantial similarity of protectable material in the two works." *Kregos v. Associated Press,* 3 F.3d 656, 662 (2d Cir. 1993), citing *Walker,* 784 F.2d at 48.

Although the issue of substantial similarity is usually a factual determination, the Second Circuit has recognized that non-infringement may be determined as a matter of law on a motion for summary judgment "when the similarity concerns only noncopyrightable elements of plaintiff['s] work, or when no reasonable trier of fact could find the works substantially similar." *Walker,* 784 F.2d at 48 (granting summary judgment because defendants' motion picture "Fort Apache: The Bronx" was not substantially similar to plaintiff's book entitled *Fort Apache*).

It is axiomatic that copyright protection "does not extend to ideas; it protects only the means of expression employed by the author." *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61, 68 (2d Cir. 1994). As many courts have noted, this distinction is more easily stated than applied. *See, e.g., Walker,* 784 F.2d at 48. In tackling the problem, courts have often invoked the language of Judge Learned Hand, sometimes referred to as his "abstractions test":

*4 Upon any work ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir. 1930), *cert. denied,* 282 U.S. 902 (1931). In examining two works for substantial similarity, the "focus must be on the similarity of the expression of an idea or fact, not on the similarity of the facts, ideas, or concepts themselves." *Rogers v. Koons,* 960 F.2d 301, 308 (2d Cir. 1992), citing *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 912 (2d Cir. 1980). Because copyright does not protect "thematic concepts", there is no copyright protection for "scènes a faire", or "sequences of events which necessarily follow from a common theme." *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir. 1976). Therefore, "'no one infringes, unless he descends so far into what is concrete (in a work) as to invade ... (its) "expression."'" *Id.* (parentheses in original) (quoting *National Comics Publications v. Fawcett Publications,* 191 F.2d 594, 600 (2d Cir. 1951). Similarly, there is no copyright protection for familiar "stock figures" borrowed from the public domain. *See Nichols,* 45 F.2d at 121-22 ("the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly").

Although the legal question focusses on the existence of *similarities* between the works, the Second Circuit has observed that "'numerous differences tend to undercut substantial similarity.'" *Warner II,* 720 F.2d at 241 (quoting *Durham,* 630 F.2d at 913). A court should look both at the individual parts of the work and its whole, for:

just as similarity cannot be rejected by isolating as an idea each characteristic the characters have in common, it cannot be found when the total perception of all the ideas as expressed in each character is fundamentally different.

*Warner II,* 720 F.2d at 243 (television character "Great American Hero" found not to infringe upon

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 4
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

the character "Superman" as a matter of law). The general test for evaluating "substantial" similarity is "'whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Warner Bros., Inc. v. American Broadcasting Companies,* 654 F.2d 204, 208 (2d Cir. 1981) (Warner I) quoting *Ideal Toy v. Fab-Lu Ltd.,* 360 F.2d 1021, 1022 (2d Cir. 1966). Ultimately, a court must determine whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand, J.). Customarily, courts resolve the question "primarily through detailed viewing or reading of the works themselves." *Walker,* 784 F.2d at 52.

A. *Summary of the Works Considered*

\*5 The Court has read the plaintiffs' book, "The Predator", and viewed the motion pictures "Predator" and "Predator 2". In addition, the Court has reviewed the first drafts of the screenplays for the motion pictures, dated September 3, 1984, and October 6, 1989, respectively. Although plaintiffs' complaint arguably includes all drafts of the screenplays, the Court has reviewed only the first draft of each as these were the only drafts provided to the Court by the plaintiffs in their opposition to the motion, the only drafts analyzed separately by plaintiffs, the drafts emphasized by plaintiffs in their argument and comparisons to the book, and the drafts most likely to differ from the motion picture itself.[FN1]

1. *The Book: "The Predator"*

Plaintiffs' book, published in 1983, concerns the violent exploits in New York City of the "predator", an albino boy abandoned by his parents in Africa and raised by baboons. The boy had no human contact until the age of eight, when he was captured and brought to a kindly priest named Father James. While living in the priest's compound, the boy hunted with baboons at night, killing and eating other animals. Over the next ten years, Father James developed a bond with the boy, whom he named Michael, by keeping pieces of raw meat on hand to pacify him. When Father James is killed, Michael is sent to New York with the body of the priest, whose side he refuses to leave, in the company of Father Andrew

DuBrille, a co-worker of Father James who is leaving Africa.

Michael is described in various parts of the book as having red albino eyes, weak in the light but sharper than ordinary human vision in the dark. He has a keen sense of smell, "negroid" features, and gray, mottled skin. Because he never stood upright as a child, he cannot do so now, but moves adeptly on all fours. He cannot speak, and communicates only in growls and snarls. He has prehensile feet, which enable him to hang upside down in trees and rafters, long-apelike hands, and incisors which are an inch longer than his other teeth. He is exceptionally strong. His diet consists of raw, bloody meat, which he takes in his teeth and swallows whole, with the aid of a permanently dislocated jaw. We later learn that he is a vegetarian for nine months out of the year, and a pure carnivore for the remaining three months.

As the story opens, Michael has escaped from the ship (where, we later learn, he has killed two seamen and tasted his first human meat by chewing on Father James' dead body), and is prowling in Chinatown, about to make his first kill in New York. His victim is young, blonde, innocent, and unsuspecting. Throughout the remainder of the book, Michael kills a series of unsuspecting New Yorkers, consuming the bodily organs he finds most tasty and leaving the rest to rot. Using his tremendous strength, he kills his victims either by smashing their heads against the wall, twisting their heads off, or merely reaching right in for the organs he wants to eat. It is a very gory, messy and wasteful process. He begins in Chinatown, but is frightened out of his lair by the smell of gunsmoke. Later, he moves back and forth between various subway tunnels and the Central Park Zoo, an apartment building, the Waldorf Astoria Hotel, and the Macy's Thanksgiving Day Parade.

\*6 Michael is pursued by a tough police lieutenant named Anthony Touchetti, whose beat is Chinatown and Little Italy. A loner and a pragmatist who has been on the force for 15 years, Touchetti commands fearful respect from cops and hoods alike. He smokes Luckies, spent a few years as a marine in Viet Nam, and is a physically large and impressive man. His closest relationship with another police officer is apparently with his boss, Albert Freeman, who tries to protect him from the political fallout of his rash and headstrong actions. At the outset of the book

Not Reported in F.Supp.                                                                 Page 5
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

Touchetti is involved with Mei Ling, a young Asian woman whom he saved from a brutal and violent husband. Although he cares for her, he is too tough to tell her. When she turns up dead, it initially appears that she was one of Michael's victims. Later, it turns out that she was murdered by her husband, who tried to make it look like Michael's work. The pressures of the investigation and Mei Ling's death cause Touchetti's behavior to become increasingly erratic and aggressive (including heavy drinking, striking a fellow officer, and nearly killing Mei Ling's husband), and he is ultimately suspended.

In first trying to ascertain the identity of the murderer, and then to catch him, Touchetti works with Amos Butley, a nationally renowned forensic pathologist. Butley is described as a huge, shambling man who smokes cigars and, when upset, drinks scotch from a specimen jar in his lab. Butley alerts Touchetti to bite marks on the human remains discovered in Michael's lair, suggesting that the murderer is a cannibal.

Also investigating the case is Maria Rosario, an hispanic television reporter who has just been demoted from her seat as an anchor by her new female boss, who is out to get her. Deserted by her mother when very young, Rosario was raised as a strict Catholic by her father until she was sixteen, when her father was killed by loan sharks. She maintains a useful sexual entanglement with her old boss, "knows how to use her body when no one wanted to listen to words," and is desperate to break this story and save her career. At first, she and Touchetti use one another for sex and information, but eventually join forces after they have each been brutalized and humbled by the events of the story.

Professor Stuart Grossman is also interested in finding Michael. Now a professor at Columbia who endowed his own chair in anthropology, Grossman was a child prodigy who was crippled at birth and alienated from society. He is an expert on feral children, and wants to capture Michael in order to further his research on whether intelligence is hereditary or developed by one's environment. Grossman, with the help of Rosario and DuBrille, engineer an attempt to capture Michael by using baboon estrus, Rottweilers, nets, a tranquilizer, and a Starlight scope mounted inside a van. Although Rosario does get video footage of Michael, the plan

goes awry, and eventually Michael rapes Rosario and knocks DuBrille out. By virtue of his tremendous wealth, Grossman is very politically connected and successfully escapes censorship for his actions, while keeping Touchetti from interfering.

*7 The hunt for Michael builds to a crescendo at the Macy's Thanksgiving Day Parade, which Michael bursts into while trying to escape the smoke from a bloody ("pulpy fragments of human flesh oozed and sprayed out of the cars") subway crash he caused by killing the switch operator. In the mayhem that ensues, Michael throws Grossman down the subway steps, grabs Freeman's grandchild, and heads back down into the depths of the subway, pursued by Touchetti and Rosario. The final battle takes place in an old pneumatic subway station, abandoned due to political corruption in the era of Boss Tweed. After much mutual bloodletting, Touchetti saves Freeman's grandchild and douses Michael with kerosene while Rosario lights him up. Michael runs screaming into the darkness of the tunnel. The book closes with the reflections of the now quadriplegic Grossman, who believes that Michael is alive as a quiet vegetarian, but will return to reap vengeance for himself and Grossman.

### 2. The First Motion Picture: "Predator"

The movie opens with a shot of a spaceship flying through space, spinning off a part of itself that falls to a planet that is presumably earth. The scene then shifts to an unnamed Central American country, where we meet Major Alan Schaefer (known as "Dutch" and played by Arnold Schwarzenegger) and his team of five highly trained veteran soldiers. Dutch and his team have been recruited by the CIA to rescue hostages taken by Soviet-sponsored guerrillas somewhere in the jungle. Heavily armed with military-style weaponry, the team is joined by Dillon, a CIA operative who is not as jungle-ready as the remainder of the team. Shortly after being dropped into the jungle, Dutch and his team find the crashed helicopter, which contains military-style technology, and then the bodies of its presumed former occupants. The bodies are skinned, bloody, and hanging from their ankles in the trees. Dutch and his team identify the men as Green Berets, also sent in by the CIA, and begin to suspect that they are not really there to rescue hostages. Dutch's men, each having highly tuned military skills, are also puzzled by the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 6
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

fact that there seems to have been a firefight, after which everyone disappeared. At this point, the film begins to cut back and forth from the point of view of the men in the jungle, to the point of view of the eponymous predator, who has heat-seeking vision and sees the men as red shapes on a blue-green field.

The team comes across the guerilla camp, which it proceeds to destroy with an astonishing display of weaponry, physical strength, and agility. All of the guerrillas, with the exception of one female rebel, Anna, are annihilated without the loss of a single member of Dutch's team in a surgically conducted military exercise. Dutch discovers, after confronting Dillon, that his real mission was to blow up this camp and prevent a major Soviet-backed invasion.

The team, along with Anna, set off through the jungle. Trying to prevent Anna from escaping, Hawkins, one of Dutch's team, is snatched by the predator, who eventually strings him up in a tree as he did the helicopter passengers. Our first glimpse of the predator is of a shape moving through the woods. He is only visible as a series of lenses reflecting the environment around him, as if the jungle were reflected in the eye of an insect, or converted into a multitude of cubist paintings. Injured in the aftermath of his attack on the first member of Dutch's team, he drips bright green blood. The men note that the predator did not take any of his victims' weaponry, leading them to believe he is hunting for sport. The predator then takes Blain, another of Dutch's men, by blasting through his chest cavity with a laser. Again, the men note the puzzling use of high technology: there is no shrapnel, and the wound is thoroughly cauterized. The men shoot up a sizable patch of the jungle, to no avail. They next try to rig a trap on the jungle floor, which also fails. After Blain's body disappears, they begin to suspect that the predator is using the trees, and rig a trap there. While waiting, a frightened Anna, who saw the predator take Hawkins, tells the ancient story she has heard from the villagers, of hot summers just like this when men are slain, and sometimes skinned, by a creature they refer to as a "demon."

*8 The predator trips the wire of the trap and is caught briefly in the net, screaming wildly before he cuts himself free. Bloody mayhem ensues in which everyone but Anna (whom the predator has spared, apparently because she is unarmed) and Dutch is killed. Dutch flees, falling down a waterfall, and emerging from the river covered in mud. When the predator emerges from the water, his invisibility mechanism shorts out, and he becomes visible. He appears as a cross between a reptile and a man, wearing armor that covers his head and shoulders. He is equipped with what seem to be gun turrets on his shoulders, metal knives that emerge from his sleeve like fingers, and a computerized wrist radio. His hearing approximates human hearing electronically. Capable of mimicking the human voice, the only other sound he makes is a low trill. When injured, he is capable of repairing himself. His heat-seeking vision, however, fails to detect Dutch when he is covered in mud.

Dutch then busies himself preparing a trap for the predator, and we alternately watch his preparations and the actions of the predator, as he rips the skull and spinal cord from a victim and cries out in victory. We also see the predator's collection of human skulls. Finally, the predator and Dutch lock into combat, where Dutch successfully shoots and wounds the predator. Keeping the upper hand, however, the predator eventually grabs Dutch's chin in his hands and examines his skull, then lets him go. The predator moves off and removes his helmet and armor, revealing an insect-like face, with many jaws resembling pincers, and scaly reptilian skin. The battle then resumes, and after appearing to be near death on a number of occasions, Dutch finally pins the predator beneath a log in an elaborate trap he has set up. About to finish him off, Dutch stops, watches the predator punch something into his wrist computer and begin to laugh. Our last view is an aerial one from a helicopter taking Dutch and Anna out of the jungle, looking down at a massive explosion in the jungle.

### 3. First Draft of Screenplay for "Predator", dated September 3, 1984

The first draft of the screenplay for "Predator" is very similar to the movie itself, aside from the screenplay's inherent ability to provide explanations for events which the motion picture is unable to do with equal clarity. There are few noteworthy differences. The predator himself is the same, except for an emphasis on the predator's "prehensile spur" which he uses to grab victims, and secure his footing. In the opening of the screenplay, the predator is seen scanning the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 7
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

biological profiles of the various animals which inhabit the earth, eventually locking in on man as his target. The names of the characters are different, and Anna does not appear at all. The character corresponding to Dutch carries a photograph which includes a picture of an Israeli woman soldier who was apparently a love interest of his but who is now dead. There is a dream sequence, taking place while Dutch is delirious with pain and exhaustion, that flashes back to earlier events in Dutch's life. Much of the final battle between Dutch and the predator takes place in a log jam. Finally, at the end, Dutch pursues the predator back to his hunting camp outside his spaceship, where he sees human skins and other trophies before the predator dies.

### 4. The Second Motion Picture: "Predator 2"

*9 "Predator 2" opens in Los Angeles in 1997, ten years after the events of the first movie. The title character is the same, except that he is equipped with more high-tech weaponry, such as a net that pins victims to the wall, a javelin-like spear, a disk, and lasers of several varieties. Presumably because we know all about the predator from the outset, having seen "Predator", the movie is also less suspenseful, relying without respite on violence for its dramatic impact.

The opening scene takes place in the midst of open warfare between the police and a Colombian drug gang. The city is overrun by violence between the rival Colombian and Jamaican drug gangs, ineffectually battled by both the local police, and, more recently, by a federal unit. Sensationalist reporters, such as Tony Pope of "Hard Core", are seen capitalizing on the blood and violence as well as the incapacity of the police to deal with the open warfare.

Lieutenant Mike Harrigan (played by Danny Glover), flanked by his two devoted team members Danny and Leona, arrives at the battle, opens his trunk full of weaponry, and unflinchingly goes after the Colombians, managing to drive them into a nearby building. Harrigan is a seasoned police officer who has been on the force for 18 years, and although prone to excessive force, has ten commendations for valor and the best felony arrest record in the city. As in the first movie, the camera shifts in and out of the point of view of the predator's heat-seeking vision,

with the predator quickly focussing on Harrigan as a worthy target. Although he is ordered not to, Harrigan pursues the gang members into the building before they can re-arm themselves. Inside the building, the predator makes his entrance by bursting through a skylight while the Colombians are rearming, after which we see an explosion erupt from the building. Once upstairs, Harrigan pursues one of the Colombians onto the roof. The Colombian backs off the roof in terror, seeing the predator behind Harrigan. Harrigan is spooked, but sees nothing. Back inside the building, the other gang members are found dead and bloody all over the bombed-out room. They are cut to pieces, but there are no bullet wounds. One of them is found strung by his heels from the ceiling. Baffled, Harrigan and his co-horts conclude that it was the work of the Jamaican Voodoo Posse. Once outside, federal agents led by Peter Keyes arrive in a sleek helicopter. Keyes, as we later find out, is a scientist with a Ph.D. from Cornell, and is here to investigate and capture the predator for study.

Back at the station house, which is overrun with pimps and prostitutes, Harrigan is told by his boss, Captain Pilgrim, that Keyes and his agents have been given command of the city's drug interdiction efforts. Captain Pilgrim is sympathetic to Harrigan's vociferous objections, but can do nothing to prevent the federal takeover. A new officer is assigned to Harrigan's team, named Jerry Lambert, who is a little too over-eager for Harrigan. Harrigan gives him a speech, warning him not to showboat, and reminding him that the team comes first.

*10 In the next scene, Jamaican gang members break in on a Colombian leader and his girlfriend. The Colombian is strung up by his feet and the Jamaicans are preparing to cut his heart out. At that moment, the predator arrives, pinning one of the Jamaicans against the wall with his net. Harrigan and his team are seen arriving outside, are again told that they are not permitted to enter, and again go in anyway. In the building, Harrigan discovers the bodies of the gang members strung up by their feet, suspended from the ceiling. He is puzzled because both Colombians and Jamaicans are dead. Keyes arrives and kicks Harrigan, and Pope, who has snuck in and filmed the gruesome sight, out of the building. Outside, Harrigan arranges to meet Danny back at the building later. He also gets suspicious of Keyes, and tells Jerry

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 8
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

to tail him. Later that night, Danny arrives at the building before Harrigan, and breaks in. Seeing a piece of the predator's weaponry stuck high up on the wall, he climbs up to get it, only to meet his demise at the hands of the predator.

Harrigan is suspended because of his role in Danny's death, but, upon seeing Keyes in the hall, tells Keyes to stay out of his way -- Danny's death has made this personal. Having recovered the predator's weapon, Harrigan takes it to the medical examiner, Dr. Irene Edwards, a neatly and professionally dressed older woman who speaks with a slight foreign accent. She tells Harrigan that Danny was boned like a fish and that the weaponry is not made of any earthly element.

Harrigan arranges a meeting with King Willie, the leader of the Jamaican gang, in order to get information on the mysterious killer. King Willie tells Harrigan that the killer is "from the other side", a demon. Harrigan leaves, and the predator arrives to behead King Willie and remove his skull and spinal cord.

Harrigan is told by Dr. Edwards that King Willie's body had evidence of steroids, such as those found in beef. This and other clues cause Jerry and Leona to head off to the slaughterhouse district by subway. On the train, Leona and Jerry interrupt an attempted mugging, in which a gang of young toughs try to rob a man with a briefcase. The man with the briefcase pulls a gun, followed by one of the would-be muggers, and then by the whole train, in the manner of Bernie Goetz. The predator arrives in the train, wreaking havoc as he goes. Leona manages to pull the emergency brake and evacuate the train, but Jerry is killed by the predator, and Leona finds him strung up, covered in blood. The predator emerges from the train, and, as he did with Dutch in the first movie, picks Leona up by the chin. He detects that she is pregnant, and lets her go as she lapses into shock. Harrigan arrives, but finds no evidence of the predator in the subway.

Harrigan drives off in furious pursuit of the predator, finding him atop a building in the slaughterhouse district, doing a victory dance with what is presumably Jerry's skull and spinal cord in his hand. At that moment, the federal agents swarm all over Harrigan, and take him into a nearby trailer. The trailer is filled with high-tech surveillance and other equipment, including video monitors and a pheromone scanner. Keyes emerges, dressed in a metallic suit which retains heat, devised in order to fool the predator's heat-seeking vision. Keyes describes that the predator is an alien being, and that he can bend light, which makes him invisible, and that he had previously been to earth ten years before, where he exploded a large chunk of the jungle with a self-destruct mechanism. It becomes apparent to Harrigan that Keyes does not want to kill the predator, but freeze him, in order to open the doorway to a new era of scientific technology. Keyes also explains that the adjacent slaughterhouse, where the predator comes periodically to feed, is rigged as a trap, with special lighting that will make the predator visible. Soon the agents spot the predator in the warehouse, and Keyes and his men head in, with Harrigan remaining in the trailer to watch. At first the predator cannot see them and the trap appears to be working. Then, the predator seems to switch to another channel of vision and is able to see the federal agents. When Harrigan realizes this, he tries to warn the agents, then decides to go in himself, but too late to save any of Keyes' men, all of whom have been killed.

*11 In the battle with the federal agents, something sets off the sprinkler system and the water shorts the predator's invisibility device. Harrigan manages to seriously wound and down the predator, then goes in close to check and to remove the predator's helmet, exposing his reptilian face. The predator makes a grab for Harrigan as Keyes arrives with his freezing gun. The predator throws a disk which cuts through all the carcasses and then Keyes. The battle moves to the roof of the building, where Harrigan knocks the wounded predator, and himself, off the roof. Harrigan falls on ledge, knocking the predator off with his own disk. The predator crashes, ending up in the bathroom of an apartment below, where he uses a sophisticated first aid kit to repair himself. Eventually, both Harrigan and the predator end up in the trophy room of the spaceship, which is hidden underground. The predator pins Harrigan with his net, but Harrigan cuts through it with the disk. After hand to hand combat, Harrigan kills the predator with the disk. At that moment, several other predators emerge from the inner chambers of the spaceship and take the predator's body away. The last one to leave tosses Harrigan a pistol with the engraved date 1715. The spaceship prepares to leave, and Harrigan runs out just in time.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 9
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

*5. First Draft of Screenplay for "Predator 2", dated October 6, 1989*

Again, the screenplay is like the motion picture in most respects, although there are more differences between the screenplay and the motion picture "Predator 2" than was true of the screenplay and motion picture "Predator."

The screenplay is set in New York City, with most of the action taking place in Hell's Kitchen. As a result, there are references to One Police Plaza and Central Park. There are minor shifts in events and sequencing that do not affect similarities between the two works. The opening scene concerns an illegal gun buy that goes bad when the Colombian buyer decides to kill the gun dealer instead of paying for the arsenal of sophisticated weaponry he wants. The predator arrives at the scene through a skylight, just as in the movie. In the scene in which the Jamaicans threaten to take over the Colombian's heart, the predator leaves the Colombian alive, still hanging where left by the Jamaicans. When Danny returns to the scene, he retrieves a St. Christopher's medal belonging to the gun dealer killed in the first scene. When Harrigan meets with King Willie, he is at first observed by Jerry through a starlight scope. Several small, funny scenes, taking place on the street, at a hot dog stand, and at a taxidermist's shop, are present in the screenplay though not in the motion picture.

Several of the characters in the screenplay either differ, or are more filled out than in the movie. In the screenplay, Harrigan refers to an ex-wife who apparently left him for another man, and we get a brief glimpse of his boxing trophies and a messy apartment. Leona, in the screenplay, is happily married with children, although she is apparently not pregnant.

*12 In place of Dr. Edwards is Dr. James Arnow, fifty-five, "salt and pepper hair, ruddy faced, a craze of broken blood vessels around his eyes proclaiming his daily need of a scotch or two."He drinks scotch from a coffee cup with Harrigan when they discuss the weapon used to kill Danny, which left a residue made of material not known on earth.

The predator character is physically the same as in the motion picture, except that he has a penchant for

leaving behind mementos from previous carnage: the St. Christopher's medal, dreadlocks, and a paper airplane. He is also described as having "selective hearing", which enables him to screen out other noise in favor of the specific conversation which he is attuned to. Using this special hearing, he is able to hear the agents in the slaughterhouse even before he switches on his ultra-violet vision and sees them.

*B. Comparison of the Works*

1. *"The Predator" and "Predator"*[FN4]

If it were not for the fact that the book and movies bear the same title, it is hard to believe that any claim of infringement could ever have been filed here.[FN5]Although the works are each "action-packed" stories, plaintiffs as much as concede that they bear no resemblance to one another in terms of setting, plot, sequence of events, or individual scenes.[FN6]Indeed, the works emanate from entirely different genres. Plaintiffs' work has more in common with tales of nature gone awry, as in the movies about "werewolves." In contrast, the movies blend the 1980's Rambo fixation over weaponry and firepower with the decades old theme of the alien from outer space.

Plaintiffs' claim of substantial similarity between plaintiffs' book and the motion picture "Predator" and its screenplays necessarily centers on the titles of the works, the character of the predator and, to a lesser extent, the characters of Touchetti and Dutch. Neither are the two predator characters, however, substantially similar. Michael, in plaintiffs' book, is a feral child, while defendants' predator is an alien from an unknown planet. Michael is primitive, and confused by his surroundings, while defendants' predator is sophisticated and thoroughly in control. Although both kill humans in a gory fashion, Michael kills with the tremendous physical strength of his hands and teeth, while defendants' predator uses a series of high-tech weaponry unknown to man. Michael usually kills only to eat, selectively removing and swallowing whole parts of his victim's flesh. Defendants' predator kills for sport, removing and saving his victim's skulls, spinal columns, and skin as trophies. Michael does not seek out any particular victim, but kills, when he is hungry, any vulnerable target he comes across. Defendants' predator seeks out the most violent or challenging

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 10
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

targets, showing no interest in the unarmed, and actively pursuing Dutch and his team, and, in "Predator 2", Harrigan. Michael is as much victim as monster, keeping to the shadows to avoid contact where he can, fearful of his surroundings. Although his instincts are sharp, he is intellectually inferior to the other characters in the book. Defendants' predator is highly intelligent and in command, drawing on technology more powerful than any known on earth.

*13 Physically, the two villains have only their basic human shape in common. Beginning presumably as an "ordinary" African albino infant with weak red eyes, Michael has developed ape or baboon-like features, such as prehensile feet, long incisors, long ape-like fingers, tremendous strength and an inability to stand upright. Defendants' predator is most often described as reptilian: although he has the basic shape and upright stance of man, he has scaly skin and a distinctly insect-like face, only visible after he removes the sophisticated helmet and armor he wears throughout most of the movie. His hands and feet have reptilian claws, and, at least in the screenplay, he has a retractable "prehensile spur" on his foot, which makes a distinctive scraping noise when he walks and which he uses to grab victims and secure his footing. Michael's skin is gray and mottled, while defendants' predator is either invisible, or capable of changing color like a chameleon. Michael's eyesight is weak during the day, but stronger than ordinary humans in the dark, and he has acute senses of smell and hearing. Defendants' predator has heat-seeking vision, and, in "Predator 2", demonstrates his ability to use other visual frequencies as well. There is no reference whatsoever to his sense of smell and only limited reference to his "selective" hearing, which enables him to tune out other noises in favor of what he is listening for. Although he understands some words, the only sounds Michael makes are snarls and growls. Defendants' predator's aural and vocal capacities are the reverse: he is capable of imitating the human voice, although he does not appear to understand it. The characters are similar only at the most general level of abstraction; both predators kill humans in a powerful, gory and brutal fashion, and have the basic shape of a man with some prehensile ability. This commonality is one shared with countless hordes of villains.

Plaintiffs also claim substantial similarity between Dutch and Touchetti. Even allowing for the difference in setting, which creates wide disparities in their character, these two men have nothing in common beyond being tough characters pursuing a violent killer, whom they apparently defeat in a final battle. Touchetti is a police lieutenant in an embattled part of New York, Dutch is a militarily trained head of an internationally renowned "rescue team." Touchetti is a loner professionally, developing over the course of the novel a nascent ability to form a close personal attachment. Dutch, on the other hand, clearly has strong bonds with the members of his expert team, which works together in seamless unity. He has no evident personal attachments in the movie, and there is only the vaguest mention of a prior relationship in the screenplay. Touchetti comes apart during the course of the book, assaulting his girlfriend's husband and another police officer, and going on an extended drinking binge. Dutch at all times is professional and competent, even when stretched to the limits of his physical ability. Touchetti learns early on what he is pursuing, and, after giving up, pursues Michael at the end in order to save his boss's grandson. Dutch, baffled throughout much of the movie as to the predator's identity, is hunted by the predator, and only near the close of the movie, when Dutch is fighting for his life, does he successfully hunt the predator.

*14 As with the similarities between the predators, the only similarities between these two heroes is their shared similarity with the stock figure of the tough strong man battling an evil villain to the death. These figures recur in nearly every "action-packed" movie; giving plaintiffs the exclusive right to them would eviscerate the genre. For this reason, copyright law does not give protection for these generalized concepts, and there being no other similarities between the two works, no reasonable trier of fact could find the two works substantially similar. Defendants are therefore entitled to summary judgment on plaintiffs' claims with respect to the motion picture "Predator" and its screenplays.

## 2. "The Predator" and "Predator 2"

Plaintiff makes a number of claims of substantial similarity between these two works, which bear more resemblance to one another than the first motion picture did to plaintiffs' book. To begin with, both at least take place on the same continent and in an urban setting. Again, both are violent and action-packed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 11
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

#### a. *Setting*

In contrast to the first motion picture, "Predator 2", like plaintiffs' book, is set in an urban environment: the screenplay in New York and the motion picture in Los Angeles. Also like plaintiffs' book, the hero is a police lieutenant. Needless to say, placing a police story in New York does not rise to the level of protectable expression.

#### b. *Plot*

At the most general level, both works tell a suspenseful story involving a police lieutenant and a brutal killer who is ultimately vanquished by the strength and ingenuity of the lieutenant, to the dismay of another character who was hoping to capture the killer for study. This stock theme is not protected by copyright. *Walker, 784 F.2d at 50.* Moving beyond this abstraction to the more concrete details of each work, "differences in plot and structure far outweigh this general likeness."*See id.* at 49.The differences are driven in part by the vastly different nature of the two predators. Michael does not choose to come to New York. He kills and eats whatever unsuspecting New Yorkers he comes across, one by one, and makes no concerted effort to pursue Touchetti in particular, or any of the major characters. Defendants' predator, to the contrary, has specifically chosen the urban venue in search of heat and conflict. He focusses in on, and actively pursues, Harrigan, as well as powerful gang members, selectively killing only those who are armed and preserving selected specimens as trophies.

In plaintiffs' book, several parties pursue Michael, each for his own reason: DuBrille, because he feels guilty for Michael's predicament; Touchetti, first in order to solve the crime, then because he thinks Michael has killed his girlfriend, and finally in order to save his boss's grandchild; Rosario, in order to get a story which could rescue her career; and Grossman, in order to research the origin of intelligence. The distinct motivations and personalities of these characters interact to form several subplots, such as Touchetti's relationship with Mei Ling and her husband, and the character transformation that both he and Rosario undergo which precipitates a deepening of their relationship. In terms of its visceral impact, the novel appeals to both violence and sex.

*15 "Predator 2", however, is non-stop violence: between rival drug gangs, between the police and the drug gangs, and between the predator and everyone else. The predator does not restrain himself to one victim at a time, but kills whole rooms full of gang members in the blink of an eye. Open warfare permeates the entire motion picture, with the sole plot line consisting of the predator's pursuit of Harrigan and other powerful figures, and Harrigan's final pursuit of him.

#### c. *Sequence of Events and Individual Scenes*

The two works do not share a similar sequence of events other than the pursuit and eventual vanquishment of the predator. Even isolated events, such as the attempted capture scenes and the final battle, are similar only in their most generalized themes.

As discussed earlier, the attempts to capture the predator alive in each work are distinctly different: one is led by a wealthy outcast who has actively recruited and manipulated others to try to catch Michael in a primitive trap in Central Park using baboon estrus; the other is conducted by an elite team of federal agents using sophisticated technology to trap the predator in a slaughterhouse.

A final one-on-one battle scene in which the hero nearly dies but ends up vanquishing the villain can hardly be said to be original or unique to plaintiffs' work, and the details of each battle are not similar. One takes place in an abandoned subway tunnel, and includes Touchetti, Rosario, a small boy, and Michael. Although Touchetti does most of the battling, Michael is ultimately immersed in flame through the joint efforts of both Touchetti and Rosario. The corresponding scene in defendants' work is entirely between Harrigan and the predator. It begins in the slaughterhouse, moves to the rooftop, then into an apartment in the building, and finally into the predator's spaceship.

Other scenes common to both works are endemic to New York, in which both plaintiffs' book and defendants' screenplay are situated. These include scenes in a subway, Central Park, One Police Plaza, and a manhole. Others, such as the forensics lab, are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 12
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

an inevitable part of the police/crime genre.

#### d. Characters

In addition to their claim that the two predator characters are substantially similar, plaintiffs claim that several other characters in "Predator 2" are substantially similar to those in their book. Plaintiffs compare Touchetti with Harrigan, Freeman with Pilgrim, Rosario with a combination of Leona Williams and Tony Pope, Grossman with Keyes, and Amos Butley with James Arrow. In examining similarities between the characters, "we must consider the 'totality of [their] attributes and traits' as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in the book." *Walker,* 784 F.2d at 50 (quoting *Warner II,* 720 F.2d at 241).

Touchetti and Harrigan are both tough police lieutenants prone to violence, and both are referred to as "Lou", a common police department nickname for lieutenant. Both are suspended for misbehavior, and both have a sympathetic superior officer. Touchetti appears to work with no particular "team", and, at the outset of the book, his tough exterior makes it difficult for him to form meaningful bonds with others (even other police officers respect him largely out of fear). As he becomes increasingly horrified and frustrated by the investigation, and after the death of Mei Ling and an ensuing binge, Touchetti gradually begins to show sensitivity to others. Touchetti's suspension has nothing to do with the pursuit of Michael, coming as a result of a violent encounter in which Touchetti nearly kills Mei Ling's husband.

*16 Harrigan works closely with Leona and Danny, later joined by Jerry. In the motion picture, we know nothing whatsoever about his personal life; Harrigan is purely a professional animal. In the screenplay, there is a fleeting reference to an ex-wife, and a glimpse of a messy apartment. Harrigan is largely one-dimensional, with the deepest look into his character occurring when we are shown the statistics of his career while our superiors consider his suspension. Harrigan's suspension comes as a direct result of an over-avid investigation into the killings, which results in Danny's death. Neither the suspension, nor Danny's death, transform Harrigan in any noticeable way, except to enrage him and cause

him to press on more furiously to solve the case.

Plaintiffs also compare the bosses of the two heroes, Captains Freeman and Pilgrim. These characters, however, are too sketchily drawn to constitute much more than a vaguely sympathetic boss who values the contributions of his lieutenant, while recognizing that he is a bit rough around the edges. The characters are insufficiently particular and concrete so as to represent anything more than the idea behind them. *See Nichols,* 45 F.2d at 119 (certain characters were "so faintly indicated as to be no more than stage properties").

Plaintiffs' allegation that the reporter Maria Rosario reappears in defendants' work as both Leona Williams and Tony Pope strains credulity. Maria Rosario is a calculating bombshell, who uses those in her life to get what she wants, and is interested in Michael's story only to save her job. After she is attacked and brutally raped by Michael, she undergoes a transformation which enables her to see that she needs other people in her life, and begins a relationship with Touchetti. Both Leona and Tony Pope are very sketchily drawn characters: particularly Pope, who is only seen toting a camera in pursuit of lurid footage. Leona is loyal, professional and fierce. In the movie, we know nothing about her personal life other than the fact that she is pregnant, a fact we discover at the same moment that she goes into shock and disappears from the film. In the screenplay, we get a brief glimpse of her kindly husband and a passing reference to her children. There is no hint of a relationship between Harrigan and Leona that is anything other than professional friendship, nor is she portrayed as the sexual bombshell that Rosario is.

Aside from having done graduate work at Ivy league institutions that begin with "C", there is also no similarity between Grossman with Keyes. Grossman is a perverse figure, a paraplegic from birth now dying from multiple sclerosis, alienated from society and willing to use his tremendous wealth and power to manipulate anyone who gets in the way of his personal mission. He intentionally puts any number of lives at risk in an attempt to capture Michael, including sending Rosario and DuBrille alone and unarmed into a deserted subway tunnel. His proposed method of capturing Michael is not particularly sophisticated, using dogs, a net, and a tranquilizer. He is cruel and vindictive, ordering his Rottweilers to

Not Reported in F.Supp.                                                    Page 13
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

attack and nearly kill his dog trainer when the trainer does not live up to Grossman's expectations during the attempted capture. He wants Michael so that he can conduct research into whether Hobbes or Locke was correct about human intelligence: is it learned from the environment or inherited? Keyes, as with the other motion picture characters, is more sketchily drawn, but appears to be a boyish-faced character of vague background. He is head of the federal unit which ousts Harrigan of his drug interdiction authority, and has a team of trained professionals assisting him in an attempt to capture the predator. He is the only one who knows who the predator is, and that the predator or another of his kind have been to earth ten years before. His proposed method of capturing the predator is highly technical, involving, *inter alia,* pheromone detectors, nitrogen gas, and heat-retaining suits. He wants to freeze the predator and study his technological abilities, in order to begin a new era of technological advancement.

*17 The last comparison of characters that plaintiffs make is between Amos Butley, the forensic pathologist, and James Arnow, a forensic pathologist appearing in the screenplay but replaced by Irene Edwards in the motion picture. Amos Butley, "one of the best known forensic pathologists in the country," is described as looking like Burl Ives, only bigger. When upset by the horrifying corpses he has been examining, he drinks scotch from a specimen glass. He becomes actively involved in the investigation, helping Touchetti dig up the body of Father James, attending a meeting at Grossman's townhouse, showing up at the Waldorf-Astoria where Touchetti is wounded, and telling Touchetti and Rosario a story about an episode in his life when he was forced to eat human meat in order to survive. Arnow appears only briefly in the screenplay, and is described as visibly in need of a daily scotch or two, which he drinks from a coffee cup. He performs a spectrographic analysis of the residue from the weapon used to kill Danny, and later tells Harrigan that bovine steroids were present in a sample taken from a crime scene.

Again, none of the similarities between these characters can be seen as anything other than generalized concepts and stock characters.

### e. *The Works as a Whole*

The "feel" of the works is also very different, with plaintiffs' work emphasizing the darker side of urban life, including scenes in subway tunnels and abandoned buildings. Defendants' motion picture, though equally violent, has a glitzy feel enhanced by shots of the jungle surrounding Los Angeles, the glass buildings, and the bright light of the city.

In addition to the claimed similarities above, plaintiffs presented the court with multiple volumes of textual analysis of the various works.[FN] It is important to note, however, that "comparison of secondary or descriptive materials cannot prove substantial similarity under the copyright laws."*Walker,* 784 F.2d at 51. Reviewing unified artistic works by dissection neglects to pay proper attention to the works as a whole. *See, e.g., id., at 50.*When the works as a whole are examined, the claimed similarities either disappear or are reduced to ideas, scènes a faire, and stock figures.

Accordingly, defendants are entitled to summary judgment on plaintiffs' claims with respect to the motion picture "Predator 2", together with its screenplays.

### PLAINTIFFS' OTHER CLAIMS

Although the motion papers were addressed nearly exclusively to the copyright infringement claims, plaintiffs also makes claims of false designation of origin under the Lanham Act, common law unfair competition, and misappropriation of copyright. With respect to the Lanham Act claim, the court's finding that the works were not substantially similar "seriously undermines the theory that the film itself was designed to mislead viewers into associating it" with plaintiffs' book. *Id.* at 52.Given the absence of such similarity, no reasonable trier of fact could find that defendants' works were "likely to mislead or confuse customers" as required under the Lanham Act.*L & F Products v. Proctor & Gamble Co.,* 45 F.3d 709, 711 (2d Cir. 1995). As for the state law claims of unfair competition and misappropriation, they are "preempted by the federal copyright laws to the extent it seeks protection against copying of [plaintiffs'] book." *Walker,* 784 F.2d at 53. Accordingly, defendants are entitled to summary judgment on these claims as well.

### ABSENCE OF PERSONAL JURISDICTION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

**\*18** Because this Court grants summary judgment to the defendants, it is not necessary to consider defendants' alternative motion to dismiss for lack of personal jurisdiction.

*CONCLUSION*

Defendants' motion for summary judgment is granted in full.

SO ORDERED:

> FN1. By Order dated November 30, 1994, this Court ordered defendants to serve their motion papers by December 16, 1994. Plaintiffs were given three months, until March 16, 1995, to prepare their opposition papers. Plaintiffs did not request an extension of this time period.

> FN2. Defendants have moved here with respect to access and substantial similarity, although it is necessary only to reach substantial similarity.

> FN3. The Court has not reviewed the novelizations of the two motion pictures, although defendants include them in their motion. This is because plaintiffs, in their opposition papers, do not analyze the novelizations separately from the motion pictures themselves. For purposes of this motion, therefore, it is assumed that the novelizations do not differ materially from the motion pictures upon which they are based.

> FN4. In their motion papers, plaintiffs' often address the defendants' allegedly infringing works as a unit, combining references to both motion pictures and the numerous screenplays. The legal question, however, is whether each individual work has infringed on plaintiffs' copyright in their book. Accordingly, the two motion pictures and their respective screenplays are addressed separately.

> FN5. The original screenplay for "Predator" was actually entitled "Hunters". The title was changed to "Predator" after Twentieth-Century Fox Film Corporation discovered trademark problems with the name "Hunters".

> FN6. In voluminous submissions, plaintiffs make a line-by-line comparison encompassing all of the works at issue here. For example, plaintiffs point out that the word "Stygian" appears in the screenplay for the first motion picture and in plaintiffs' book.

> FN7. As noted earlier, plaintiffs present a line-by-line analysis of the works, pointing out the similarity of words used in each, such as the word "grisly", which appears in plaintiffs' book and the second motion picture, though spelled "grizzly" in the latter work.

S.D.N.Y.,1995.
Littel v. Twentieth Century Fox Film Corp.
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media L. Rep. 2249

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**APPENDIX**
**Part 3**

LEXSEE



Analysis
As of: Jun 25, 2008


CLIFTON MALLERY a/k/a ENJAI OMAA EELE and AMNAU KARAM EELE,
Plaintiffs, -v- NBC UNIVERSAL, INC., NBC UNIVERSAL TELEVISION STUDIO,
TAILWIND PRODUCTIONS, TIM KRING, DENNIS HAMMER, ALLAN
ARKUSH, JEPH LOEB and BRYAN FULLER, Defendants.


07 Civ. 2250 (DLC)


UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK


2007 U.S. Dist. LEXIS 88960


December 3, 2007, Decided
December 3, 2007, Filed


**SUBSEQUENT HISTORY:** Motion denied by, Judgment entered by Mallery v. NBC Universal, Inc., 2008 U.S. Dist. LEXIS 12835 (S.D.N.Y., Feb. 21, 2008)

**COUNSEL:** [*1] For Plaintiffs: John A. Coleman, Jr., Freidberg Cohen Coleman & Pinkas, LLP, New York, NY.

For Defendants: Marcia Beth Paul, Davis Wright Tremaine LLP, New York, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*OPINION AND ORDER*

DENISE COTE, District Judge:

Plaintiffs Clifton Mallery a/k/a Enjai Omaa Eele and Amnau Karam Eele ("plaintiffs") bring this action against the defendants NBC Universal, Inc., NBC Universal Television Studio, Tailwind Productions, Tim Kring, Dennis Hammer, Allan Arkush, Jeph Loeb, and Bryan Fuller ("defendants") alleging that the television series *Heroes,* which is (collectively) written, produced, and broadcast by the defendants, infringes the copyrights held by the plaintiffs in their 777-page handwritten novel *The Twins: Journey of the Soul* ("The Twins"), their short

film based on *Twins* entitled *The Letter,* and their painting series *Envious of America.* On June 15, 2007, defendants moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated below, the motion to dismiss is converted to a motion for summary judgment and is granted.

BACKGROUND

The following facts are taken from the complaint. Plaintiffs are "divination artists" [*2] known professionally as "The Twins." On April 22, 2005, plaintiffs screened their short film *The Letter* at Hunter College in New York City, exhibited paintings from their series *Envious of America,* and presented a lecture on their art. At this event, they also made available excerpts from their novel *The Twins.* Persons identifying themselves as writers from defendant Tim Kring's ("Kring") television show *Crossing Jordan* attended the event and "are believed to have taken copies" of those materials. Plaintiffs also screened *The Letter* at several other venues, and sent excerpts of *The Twins* along with a copy of *The Letter* to several entertainment executives, including to a corporate affiliate of defendants NBC Universal and NBC Universal Television Studio.

Defendant Kring conceived the idea for the television series *Heroes* around October or November of 2005. *Heroes* debuted on NBC in September 2006, and twenty-three episodes of the series had aired at the time the motion to dismiss was filed, constituting the first

season of the series. Plaintiffs allege that *Heroes* is "so strikingly similar" to their works *The Twins, The Letter,* and *Envious of America* that Kring and the other defendants [*3] "must have had access to and copied" their work.

## DISCUSSION

### I. Governing Copyright Standards

"Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying." *Tufenkian Import/Export Ventures, Inc v. Einstein Moomjy, Inc.,* 338 F.3d 127, 131 (2d Cir. 2003) (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998)). In order to prevail on a claim for infringement, a copyright holder must show (1) "that his work was actually copied," and (2) "that the copying amounts to an improper or unlawful appropriation." *Castle Rock Entm't,* 150 F.3d at 137 (citation omitted).

Under the first prong, "[b]ecause direct evidence of [actual] copying is seldom available, a plaintiff may establish copying circumstantially by demonstrating that the person who composed the defendant's work had access to the copyrighted material, and that there are similarities between the two works that are probative of copying." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51 (2d Cir. 2003) (citation omitted). Similarities between the works are "probative" if, "under all the circumstances, [they] make independent creation unlikely." *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 140 (2d Cir. 1992) [*4] (citation omitted).

The second prong requires a plaintiff to demonstrate "unlawful appropriation." This reflects a recognition that even where "actual copying" may have occurred, not all such copying is actionable under the copyright laws. To establish "unlawful appropriation," a plaintiff must demonstrate "substantial similarity" between the original and allegedly infringing works. *Tufenkian Import/Export Ventures,* 338 F.3d at 131 (citation omitted). The works are "substantially similar" if the similarities are "more than de minimis," and if "it was protected expression in the earlier work that was copied." *Id.* (citation omitted). Where the copying is not literal or does not plagiarize the protected work, infringement may nonetheless occur. *Id. at 132-33.* To determine whether a defendant has infringed a plaintiff's copyright in these circumstances, a court must "analyze the . . . works closely to figure out in what respects, if any, they are similar, and then determine whether these similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking." *Id. at 134-35.*

For [*5] the purposes of this motion, defendants do not contest that the plaintiffs hold registered copyrights in *The Twins, The Letter,* or *Envious of America,* [1] or deny that they had access to these works. Rather, defendants argue that there is simply no "substantial similarity" between these works and the television show *Heroes,* and that plaintiffs' copyright infringement claim therefore fails as a matter of law. Plaintiffs counter by pointing out both general and specific similarities between the works in question.

> 1 Although the defendants' do not press this argument, it may be noted that the complaint itself and the record to date do not reflect that *Envious of America,* or any of the paintings that make up that series, have been registered with the copyright office.

In light of the arguments presented, this motion is properly treated as a motion for summary judgment. Whether certain works are substantially similar to one another is a question of fact to be resolved by a jury. *Cf. Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 111 (2d Cir. 2001) (citing *Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 355, 118 S. Ct. 1279, 140 L. Ed. 2d 438 (1998)). "However, a district court may determine noninfringement as a [*6] matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff work, or when no reasonable trier of fact could find the works substantially similar." *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48 (2d Cir. 1986); *see also Williams v. Crichton,* 84 F.3d 581, 587 (2d Cir. 1996). Although the defendants filed their motion pursuant to Fed. R. Civ. P. 12(b)(6), the arguments raised in the defendants' motion papers and in the plaintiffs' opposition have focused almost exclusively on these questions -- *i.e.,* whether the alleged similarities relate to noncopyrightable elements and whether any reasonable observer could consider the works substantially similar -- and thus it is appropriate to convert this motion to one for summary judgment in order to address the merits of the arguments raised by the parties. [2] Before a discussion of the merits can proceed, however, it is first necessary briefly to review the works in question.

> 2 A district court must ordinarily give notice to the parties before converting a motion to dismiss to a motion for summary judgment. *See, e.g., Kopec v. Coughlin,* 922 F.2d 152, 154-55 (2d Cir. 1991). "A [*7] party is deemed to have notice that a motion may be converted," however, "if that party should reasonably have recognized the possibility that such a conversion would occur." *Sira v. Morton,* 380 F.3d 57, 68 (2d Cir. 2004) (citation omitted). Given the arguments raised by

the parties (as well as the cases cited, which almost exclusively resolve such arguments on motions for summary judgment), the parties should have reasonably recognized that the instant motion could be converted to one for summary judgment. In any event, the parties have suffered no prejudice as a result of the conversion, as the works in question are the only documents it is necessary to review in order to resolve the questions presented by the motion; thus, "all material made pertinent to [a motion for summary judgment] by Rule 56" is already before the Court. Fed. R. Civ. P. 12(b).

II. Summary of Works at Issue

A. *The Twins*

*The Twins* is a 777-page, handwritten novel co-authored by the plaintiffs. It chronicles the lives of Idai and Hadah, "twins" who are separated before birth into two different wombs by their grandmother, a mystic named Madame Naomi Dachette. "The Twins," as they are referred to, are born in the same [*8] small town in Louisiana, and are aware from a young age that they possess certain special abilities, which are partly genetic and partly spiritual in origin. Early in the novel, for example, Idai predicts the crash of a plane carrying Dylan Renway, an inhabitant of the town. This prediction is embodied in a "sketch" made by Idai. Idai attempts to warn Dylan's mother about the crash, but she ignores Idai's warning, and Idai later sees in the newspaper that his prediction came true. Later in the novel, Idai will also make predictive sketches relating to, among other things, the Columbine shootings and George W. Bush's election in Florida.

The female twin, Hadah, also has the ability to see the future, which she depicts in artwork affixed to the backs of doors. Hadah also has several other powers, including the ability to make her enemies bleed using only her mind, and to transcend space and time. (Idai also appears to share these powers.) In addition, Idai and Hadah are both skilled martial artists.

The Twins are initiated into the Li-Maa Divination Clan by their grandmother, a "Diviner" who is the head of the Clan, as well as Servitor Ti-Qui Saru, a Diviner and "Nem-Fa" who can, among [*9] other things, walk through walls. The initiation rituals are elaborate and mystical. For example, the "opening the ground" ritual involves, *inter alia*, a sheet of fire in which "500,000 faces" appear and enter Hadah's body, and a stone that rises out of the ground and pulls Hadah down into the earth.

Idai and Hadah's families attempt, for a time, to hide The Twins' special abilities, and during this time Idai works as an engineer for oil companies in Texas, Kuwait, and Mexico, and Hadah works as a salesperson at a jewelry store and fashion model. Idai and Hadah eventually marry, and live in Los Angeles, Miami, and Manhattan.

In addition to tracing the origins and experiences of Idai and Hadah, *The Twins* follows numerous additional storylines and characters. For example, the novel tells the story of Olagaia Atune, who is born into poverty in Cuba, becomes an art dealer in America, discovers his own special powers -- such as the ability to erase people's memories -- and searches for The Twins and two sacred twin statues. A character by the name of Professor Heinman also searches for The Twins, along with other people with "special abilities." Maitre Jess, a Hatian voodoo priestess, is [*10] a rival of Madame Dachette's with whom The Twins do battle. Maitre Jess's story is, in turn, intertwined with the story of several families from Cuba, including the Atune, Ferrer, Vega, and Illadro families, some of whom become involved with Maitre Jess, The Twins, the Santeria religion, and drug and organ trafficking.

The bulk of the novel concerns the intersecting story lines of the characters listed above (along with many others) and the physical and spiritual conflict between The Twins and Maitre Jess. In the last twenty-five pages, Idai makes another sketch prophesying the future, this time predicting that two planes will destroy the Twin Towers on September 11. [3] The Twins are initially hesitant to share this new "divination" with anyone, recalling that their predictions -- such as their prediction of the Columbine shootings -- are often ignored. The Twins overcome this initial reluctance and travel to the Port Authority to tell someone about their divination, and there they learn that Larry Silverstein is about to buy the doomed buildings. The Twins meet with several people who work for Silverstein in an attempt to warn him about the impending attack. They agree to pass on The [*11] Twins' warning to Silverstein, but apparently to no avail, as the novel ends with The Twins watching the first plane hit the Twin Towers.

> 3  The copyright page of the novel states that it was written in June of 2001. Presumably, plaintiffs proffer the novel itself as proof of their own powers.

The tone and pacing of *The Twins* is sprawling and mystical. The narrative is an undifferentiated stream of description and dialogue without guiding punctuation, and the novel shifts repeatedly between various settings, including Louisiana, Cuba, Miami, Texas, Africa, Paris, New York, and more ethereal realms.

## B. *The Letter*

*The Letter* is a short film that plaintiffs assert is based on *The Twins*. The film deals with The Twins' purported efforts to warn Robert De Niro and his company, Tribeca Films, of the September 11 attacks. *The Letter* opens with a photograph of outer space, which is then superimposed on two figures (presumably The Twins), who walk down a hallway towards a wall on which there are several hand-drawn images. The most prominent image is a symbol that plaintiffs refer to as a "cosmogram": a circle bisected by two straight lines, dividing it into four equal quadrants, as in a simplified [*12] Celtic cross. Background music begins to play -- a somewhat playful and repetitive tune driven by an acoustic guitar and a single male voice -- and the camera zooms into the center of the circle.

As the music continues to play, the captions state that, "[i]n March 2001 four views to September 11, 2001 were hand delivered by The Twins to Jane Rosenthal at Tribeca Films, owned by Robert De [] Niro." These "four views" are then catalogued. They are entitled: (1) "1st View: SIXTH RACE (c) 1995." This "view" is an image of the painting "Sixth Race," created by plaintiffs, which depicts several ghostly figures gathered around a central figure who appears to be wearing military medals. A photograph of George Bush and Alan Greenspan standing in a similar posture is then superimposed over this image, which plaintiffs state represents a "validation" of the "prediction" contained in the painting. (2) "2nd View: Compliant (c) 1999." Various symbols (crosses, letters, "cosmograms," etc.) appear one-by-one on the screen in several dozen rows to the sound of a typewriter. The bottom-right corner of the screen contains a section of a "cosmogram." [4] (3) "3rd View: AMNAU'S DIVINING BOARD (c) 2000." This [*13] "view" depicts a door on which various newspaper articles, photographs, and other assorted materials (*e.g.,* a packet of sugar from the United Nations) are mounted, including one scrap of paper that refers to the World Trade Center. (4) "4th View: The Atta Page (c) 2001." This portion of the video slowly reveals a hand-drawn sketch that depicts, *inter alia,* two planes crashing into the Twin Towers, the name "Atta," and the date and time of the September 11 attacks.

> 4   Plaintiffs assert that the coded symbols "are used to predict the attacks of September 11," although *The Letter* itself does not suggest that interpretation.

After the "four views" are described, the captions and video explain that these works, which plaintiffs assert predicted the September 11 attacks, were sent to Tribeca films and rejected. A pair of disembodied eyes then appears on the screen; the eyes are slowly revealed to be those of Mohamed Atta. Another video sequence shows photographs of Robert De Niro and Jane Rosenthal delivering food via boat to workers at Ground Zero, and of "The Twins" crying following the September 11 attacks.

## C. *Envious of America*

The complaint states that *Envious of America* is a "series of [*14] oil-on-canvas paintings" painted in 1995 that have been exhibited at several galleries across the country. Plaintiffs assert that "The Sixth Race," which is depicted in *The Letter* and discussed in *The Twins,* is a part of that series.

## D. *Heroes*

*Heroes* is an hour-long, weekly television series about ordinary people who discover that they posses extraordinary powers, and the complications, adventures, and dangers that follow. Key characters include Isaac Mendez, a comic-book artist and drug addict from New York who can "paint the future" when high on heroin; Claire Bennet, a cheerleader from Texas who can heal herself; Mr. Bennet, Claire's adoptive father, who works for an unnamed organization that tracks people with special abilities; Mr. Bennet's assistant, "The Haitian," who can erase people's memories and block the use of certain heroes' powers; Hiro Nakamura, an office worker from Japan who can bend time and space; Matt Parkman, a policeman who can read minds; Nathan Petrelli, a politician running for Congress, who can fly; Peter Petrelli, Nathan's brother, who can "absorb" the powers of others; Sylar, a serial killer who robs others of their powers; Mohinder Suresh, a professor from [*15] India who, following in the footsteps of his slain father, seeks out those with special abilities in order to validate his father's genetic theories; and numerous others. As Mohinder and his father explain, the special powers possessed by these characters are the result of genetic changes caused by the human evolutionary process. During the twenty-three episodes of the first season, *Heroes* follows each of these characters as they discover their abilities and how they are meant to be used.

In an early episode, Issac paints a picture while high on heroin showing the destruction of New York City by what appears to be an atomic bomb, and Hiro -- during a brief visit to the future -- also sees the same event. Through various plot twists, several of the heroes mentioned above undertake a quest to prevent this attack, during which time the heroes are also being hunted down by Sylar, who seeks to kill them, and sought out by Mohinder, who seeks to study and help them. Toward the end of the first season, Issac is killed by Sylar, but in the final episode the destruction of the city is averted when

Peter -- who, it turns out, is the source of the explosion -- is flown by his brother Nathan to [*16] a point high above the city, where Peter can explode without harming anyone.

*Heroes* is suffused with a general air of suspense, due to the gradual revelation of various plot elements, the mysterious nature and origins of the heroes' powers, and the haunting musical soundtrack. The series is also characterized by a visual theme that calls to mind the show's comic-book predecessors in the superhero genre, including captions rendered in a "handwritten" comic-book style.

### III. Analysis and Comparison

Plaintiffs allege that *Heroes* infringes on their copyrights in *The Twins, The Letter,* and *Envious of America.* Having reviewed these works in some detail, it is readily apparent that these claims are wholly without merit, as nearly every instance of alleged similarity between *Heroes* and the plaintiffs' work relates to unprotectable ideas rather than protectable expression and, viewed more broadly, the "total concept and feel" of these works are profoundly different. [5] *Castle Rock,* 150 F.3d at 140.

> 5  The parties contest whether plaintiffs' works can be considered in the aggregate for the purposes of evaluating their copyright infringement claim. As the discussion below indicates, resolution of this [*17] question is not necessary, as plaintiffs' claim fails regardless of the manner in which their works are considered.

Plaintiffs' complaint contains a litany of alleged "substantial similarities" between *Heroes* and either *The Twins, The Letter,* or both. [6] Plaintiffs focus particularly on the similarities between Idai from *The Twins* and Isaac Mendez of *Heroes,* noting that both (1) are "minorities" (Idai is African-American and plaintiffs presume Issac Mendez to be Latino), (2) have the ability to "paint the future"; (3) often paint in oil on large canvasses; (3) create depictions of "two landmark New York City buildings being destroyed" (Idai the Twin Towers, Issac the Empire State and Chrysler Buildings); (4) create paintings of a bus being destroyed in the future, which prediction is then validated in a newspaper article; and (5) attempt to stop the destruction of those buildings.

> 6  Although the infringement claim also makes reference to *Envious of America,* the complaint does not assert any similarities between *Heroes* and that painting series specifically. (Various references are made, however, to the plaintiffs "work" as a whole.)

Plaintiffs' allegations regarding the similarities between [*18] Idai and Isaac cannot form the basis for a copyright infringement claim for several reasons. On the most general level, a "minority artist" who has the ability to paint the future is an "idea" that is not protected under the copyright laws. As Judge Hand memorably noted in the landmark case of *Nichols v. Universal Pictures Corp.,* 45 F.2d 119 (2d Cir. 1930):

> If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play. . . .

*Id.* at 121. In addition, (1) painting a future in which tragic and destructive events take place, such as the destruction of landmark buildings in New York City; (2) having a prediction confirmed by a newspaper report; and (3) making an attempt to prevent a tragic event in light of a prediction of the future, are simply "*scenes a faire,* [or] sequences of events that necessarily result from the choice of a setting or situation, [*19] [which] do not enjoy copyright protection." *Williams,* 84 F.3d at 587 (citation omitted).

Of course, it must be recognized that "[a] character is an aggregation of the particular talents and traits his creator selected for him. That each one may be an idea does not diminish the expressive aspect of the combination." *Warner Bros. v. Am. Broadcasting Cos.,* 720 F.2d 231, 243 (2d Cir. 1983). That said, "just as similarity cannot be rejected by isolating as an idea each characteristic the characters have in common, it cannot be found when the total perception of all the ideas as expressed in each character is fundamentally different." *Id.* That is the case here. In sum, Idai is a member of the fictional Li-Maa Divination Clan, as well as an engineer and martial artist, and is one of a set of spiritual twins; Issac is a comic-book artist and drug addict whose ability to paint the future is only unlocked when he is high on heroin. The "total perception" of these characters could hardly be more different, and the plaintiffs' argument that they are "identical but for the change in race" does not withstand scrutiny.

The other alleged instances of similarity between *Heroes* and the plaintiffs' works [*20] similarly fail to contribute to a valid claim of copyright infringement, as they also allege copying of unprotectable ideas such as a

"stopping the catastrophe story arc," the depiction of a "cosmogram" (which appears in one scene in *Heroes,* as well as in *The Letter* and *The Twins),* the use of symbols "to signal a plot event," characters with "extraordinary abilities," and the use of "block capital letters" in title sequences. [7] While the line between mere "ideas" and protected "expression" is famously difficult to fix precisely, *see, e.g., Nichols,* 45 F.2d at 121, these alleged "similarities" are textbook examples of the former.

> [7] It may also be noted that the letters used in the title sequences of *The Letter* and *Heroes* are not typographically similar, and thus plaintiffs' claim seems to be based solely on the use of white "block capital letters" against a largely black background in both works.

The DVD submitted by plaintiffs in their opposition to the instant motion specifically identifies many of the alleged similarities between *Heroes* and *The Letter,* and only underscores the plaintiffs' failure to identify any actionable copying. For example, plaintiffs allege that "close up eye [*21] images are used" in both works in a way that is "virtually identical." In support of this claim, the DVD shows (1) the moment in *The Letter* in which Mohamed Atta's eyes are floating alone on the screen, after which his full face is revealed, and (2) a clip from *Heroes* in which the camera is tightly zoomed in on one character's eyes, then rapidly zooms out. Plaintiffs also argue that there are "twin characters" in both *The Letter* and *Heroes;* in support, the DVD shows an image from *The Letter* of The Twins walking down a hallway, followed by various scenes from *Heroes* in which there are two characters together on screen. Needless to say, close-ups of eyes and the depiction of two people simultaneously on screen -- or, as plaintiffs put it, the "twinning" of characters -- are not examples of protectable expression under the copyright laws. The absurd results that would follow from holding otherwise need not be enumerated. In sum, having "analyze[d] the . . . works closely to figure out in what respects, if any, they are similar," it must be concluded that whatever similarities may be said to exist between *Heroes* and plaintiffs' works are not "due to protected aesthetic expressions original [*22] to the allegedly infringed work," but rather related to ideas "in the original that [are] free for the taking." *Tufenkian Import/Export Ventures,* 338 F.3d at 134-35.

Plaintiffs also argue that the similarities they have identified are evidence of a "total concept and feel" shared by their works and *Heroes. See, e.g., Castle Rock,* 150 F.3d at 140. It is well established that "substantial similarity" may be found where a later work appropriates the "total concept and feel," theme, characters, plot, sequence, pace, and setting" of an earlier work, even if

no single instance of alleged copying is itself actionable. *Id.; see also Tufenkian Import/Export Ventures,* 338 F.3d at 134. As the summaries above indicate, however, there is simply no "plausible claim that there is a common aesthetic appeal between" *Heroes* and *The Twins, The Letter,* or *Envious of America. Castle Rock,* 150 F.3d at 140. While plaintiffs have pointed out several highly generalized similarities in characterization (*e.g.,* the ability to paint the future or erase people's memories) visual elements (*e.g.,* the use of symbols, block lettering), and plot points (*e.g.,* a threat to Manhattan, a solar eclipse), this "scattershot" [*23] listing "fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another," even without scrutinizing the plaintiffs' works to isolate their protected elements. *Williams,* 84 F.3d at 590. Having reviewed the works in question, no reasonable juror could find that they are substantially similar.

"Once one goes beyond th[e] level of abstraction" on which the plaintiffs' proffered similarities lie, "the similarity [between the works] disappears." *Id.* at 589. *Heroes* is a hour-long suspense/drama that mixes moments of action, humor, and mystery as it follows an eclectic, international group of genetically enhanced heroes and their quest to prevent a catastrophic explosion in New York -- an explosion that may be caused, it turns out, by one of their own number. *The Letter,* by contrast, is a fifteen-minute, documentary-style film with a jaunty soundtrack that presents an account of The Twins' attempt to warn Robert De Niro and Tribeca Films about September 11. While, on the most abstract level, both of these works concern the prevention of a tragic and violent event in New York, the "two stories are not similar in mood, details [*24] or characterization," and, indeed, differ in nearly every relevant way. *Reyher v. Children's Television Workshop,* 533 F.2d 87, 92 (2d Cir. 1976). *The Twins* also presents a stark contrast to *Heroes;* it is a sprawling, fantastical story about, among many other things, two spiritual "twins" who are married to one another and are members of a mysterious "Divination Clan." Although the novel shares various superficial similarities with *Heroes,* as described in the complaint, the context, presentation, plot lines, narrative structure, and style of the two works are substantially different; indeed, the "the ordinary observer, unless he set out to detect" the similarities, "would be disposed to overlook them" -- precisely the opposite of what the copyright law requires to support an infringement claim. *Boisson v. Banian, Ltd.,* 273 F.3d 262, 272 (2d Cir. 2001).

This conclusion is confirmed by a review of the case law, which reveals that creations far more comparable than *Heroes* and the plaintiffs' works have been found

not to be "substantially similar" as a matter of law. *See, e.g., Williams, 84 F.3d 581* (comparing children's book about visit to a dinosaur zoo to *Jurassic Park*); *Walker v. Time Life Films, Inc., 784 F.2d 44 (2d Cir. 1986)* [*25] (book *Fort Apache* and film "Fort Apache: The Bronx"); *Warner Bros., 720 F.2d 231* (works containing the character "Superman" and television show "The Greatest American Hero"); *Reyher, 533 F.2d 87* (children's book *My Mother Is the Most Beautiful Woman In The World* and short illustrated story for children "The Most Beautiful Woman In The World"); *Nichols, 45 F.2d 119* ("Abie's Irish Rose" and "The Cohens and the Kellys"). A review of these authorities and a comparison of the works at issue here compels the conclusion that "no reasonable trier of fact could find the works substantially similar." *Walker, 784 at 48*. Plaintiffs' infringement claim must therefore be dismissed.

CONCLUSION

The defendants' June 15, 2007, motion to dismiss is converted to a motion for summary judgment and is granted. An Order to be issued in connection with this Opinion will establish a schedule for addressing the defendants' request for costs and fees pursuant to 17 U.S.C. § 505.

SO ORDERED:

Dated: New York, New York

December 3, 2007

/s/ Denise Cote

DENISE COTE

United States District Judge

LEXSEE



Analysis
As of: Jun 25, 2008

**CLIFTON MALLERY a/k/a ENJAI OMAA EELE and AMNAU KARAM EELE,
Plaintiffs, -v- NBC UNIVERSAL, INC., NBC UNIVERSAL TELEVISION STUDIO,
TAILWIND PRODUCTIONS, TIM KRING, DENNIS HAMMER, ALLAN
ARKUSH, JEPH LOEB and BRYAN FULLER, Defendants.**

**07 Civ. 2250 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**2008 U.S. Dist. LEXIS 20893**

**March 18, 2008, Decided
March 18, 2008, Filed**

**PRIOR HISTORY:** Mallery v. NBC Universal, Inc.,
2008 U.S. Dist. LEXIS 12835 (S.D.N.Y., Feb. 21, 2008)

**COUNSEL:** [*1] Appearances:

For Plaintiffs: John A. Coleman, Jr., Freidberg Cohen
Coleman & Pinkas, LLP, New York, NY.

For Defendants: Marcia Beth Paul, Lacy H. Koonce,
Davis Wright Tremaine LLP, New York, NY; Hilary
Lane, NBC Universal, Inc., Legal Department, New
York, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*MEMORANDUM OPINION AND ORDER*

DENISE COTE, District Judge:

Plaintiffs Clifton Mallery a/k/a Enjai Omaa Eele and
Amnau Karam Eele ("plaintiffs") brought this action
against the defendants NBC Universal, Inc., NBC
Universal Television Studio, Tailwind Productions, Tim
Kring, Dennis Hammer, Allan Arkush, Jeph Loeb, and
Bryan Fuller ("defendants") alleging that the television
series *Heroes*, which is (collectively) written, produced,
and broadcast by the defendants, infringed the copyrights

held by the plaintiffs in their 777-page handwritten novel
*The Twins: Journey of the Soul* ("*The Twins*"), their short
film based on *The Twins* entitled *The Letter,* and their
painting series *Envious of America.* Defendants moved to
dismiss, and the motion was converted to a motion for
summary judgment and granted in an Opinion dated
December 3, 2007. Mallery v. NBC Universal, Inc., No.
07 Civ. 2250 (DLC), 2007 U.S. Dist. LEXIS 88960,
2007 WL 4258196 (S.D.N.Y. Dec. 3, 2007) [*2] (the
"December 2007 Opinion"). As the prevailing party in
this copyright action, defendants have now filed an
application for attorney's fees pursuant to 17 U.S.C. §
505 in the amount of $ 99,106.45. For the reasons stated
below, that application is granted.

DISCUSSION

The Copyright Act permits a court "in its discretion"
to award costs, including a "reasonable attorney's fee," to
the prevailing party in a copyright infringement action.
17 U.S.C. § 505. In deciding whether to award such costs
and fees, courts may consider, among other factors,
"frivolousness, motivation, objective unreasonableness
(both in the factual and in the legal components of the
case) and the need in particular circumstances to advance
considerations of compensation and deterrence." Fogerty
v. Fantasy, Inc., 510 U.S. 517, 534 n.19, 114 S. Ct. 1023,
127 L. Ed. 2d 455 (1994) (citation omitted). The Court of
Appeals has held that the factor of "objective
unreasonableness" should be given "substantial weight"
in conducting the analysis called for in *Fogerty, Matthew*

*Bender & Co., Inc. v. West Publ'g Co.*, 240 F.3d 116, 122 (2d Cir. 2001), and courts of this Circuit have awarded fees under § 505 based on a finding of objective unreasonableness alone. *See,* [*3] *e.g., Adsani v. Miller,* No. 94 Civ. 9131 (DLC), 1996 U.S. Dist. LEXIS 13740, 1996 WL 531858, *13 (S.D.N.Y. Sept. 19, 1996) (citing cases); *see also Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 357 (S.D.N.Y. 2006). In any event, these factors must be applied in a manner that is "faithful to the purposes of the Copyright Act," *Fogerty,* 510 U.S. at 534 n.19, which is "'[t]o promote the Progress of Science and useful Arts.'" *Id.* at 527 (quoting U.S. Const. art. I, § 8, cl. 8)). As both the prevention of infringement and the successful defense of unmeritorious copyright claims can further this goal, the Supreme Court has held that awards under § 505 are equally available to prevailing defendants and prevailing plaintiffs. *Id.* at 526-27, 533.

Although a finding that a defendant is entitled to summary judgment does not automatically entitle that defendant to attorney's fees pursuant to § 505, *see Adsani,* 1996 U.S. Dist. LEXIS 13740 at *42, 1996 WL 531858, at *16 (citing *CK Co. v. Burger King Corp.*, No. 92 Civ. 1488 (CSH), 1995 U.S. Dist. LEXIS 823, 1995 WL 29488, *1 (S.D.N.Y. Jan. 26, 1995)), the December 2007 Opinion demonstrates that the plaintiffs' copyright infringement claims were objectively unreasonable. As described in that Opinion, a careful review of the plaintiffs' [*4] works and *Heroes* television program reveals that the plaintiffs' "claims are wholly without merit, as nearly every instance of alleged similarity between *Heroes* and the plaintiffs' work relates to unprotectable ideas rather than protectable expression and, viewed more broadly, the 'total concept and feel' of these works are profoundly different." December 2007 Opinion, at *6 (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 140 (2d Cir. 1998)). In particular, the plaintiffs' argument that the use of a "stopping the catastrophe" story arc, symbols, close-up images of eyes, "twin" characters (*i.e.,* characters that often appear together on screen), and block lettering in title sequences made *Heroes* and the plaintiffs' works substantially similar bordered on the frivolous, both legally and factually. *Id.* at *7. The comparison plaintiffs attempted to draw between Isaac Mendez of *Heroes* and the characters depicted in the plaintiffs' work was likewise objectively unreasonable as a matter of law, *id.* at *6, and fact. *Id.* at *7.

Plaintiffs argue in opposition to the fee application that "determinations about substantial similarity are rarely obvious," citing *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 444 (9th Cir. 1991), [*5] and that the plaintiffs "truly believe" that, in light of alleged similarities, defendants did copy their work. Even assuming the truth of both of these statements, however, plaintiffs' claims

remain objectively unreasonable, as the profound dissimilarity between their works and *Heroes* was indeed "obvious" in this case, and plaintiffs' professed subjective belief to the contrary is thus itself unreasonable and entitled to no weight here. In addition, an award under § 505 in this case would "advance considerations of compensation and deterrence," *Fogerty,* 510 U.S. at 534 n.19 (citation omitted), as "failing to award attorney's fees to defendants . . . would invite others to bring similarly unreasonable actions without fear of any consequences." *Earth Flag Ltd. v. Alamo Flag Co.*, 154 F. Supp. 2d 663, 668 (S.D.N.Y. 2001). It is therefore appropriate to award attorney's fees to the defendants under § 505.

Thus, it is now necessary to consider whether the $ 99,106.45 requested by the defendants represents a "reasonable attorney's fee." 17 U.S.C. § 505. In making this determination, courts should apply "the lodestar method," which "emphasiz[es] a comparison to rates of lawyers of similar [*6] skill and experience in the community," *Crescent Publishing Group, Inc. v. Playboy Enters., Inc.*, 246 F.3d 142, 150 (2d Cir. 2001) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433-34, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983) (42 U.S.C. § 1988)), while keeping in mind that, "for prevailing parties with private counsel, the actual billing arrangement" should be considered "a significant, though not necessarily controlling, factor in determining what fee is 'reasonable.'" *Id.* at 151.

Defendants have submitted in support of their application detailed billing reports stating the rates charged by defense counsel and the hours spent on each litigation task. Plaintiffs do not argue that defense counsel's rates are unreasonable, but rather that the time spent drafting the defendants' motion papers--145.5 hours, by plaintiffs' count--"seems excessive." Having reviewed the billing records, as well as defendants' submissions in connection with the motion to dismiss, plaintiffs' argument on this point is rejected. The plaintiffs' claims stemmed from a sprawling tale in a lengthy hand-written novel, a film, and a series of paintings, and a host of alleged similarities with a successful television series. To address the entirety of [*7] the plaintiffs' claims, it was entirely reasonable for the defendants to expend this effort on their motion practice.

Finally, both of the plaintiffs have submitted identical, three-sentence affidavits reporting, in substance, that they "have no home, no job, no regular income, no money and no financial assets," and requesting that the Court take these facts into account in addressing defendants' application. While it is not contested that the relative financial status of the parties may be an appropriate consideration in determining

2008 U.S. Dist. LEXIS 20893, *

whether an award under § 505 is reasonable, *see Adsani, 1996 U.S. Dist. LEXIS 13740, 1996 WL 531858, at * 16,* plaintiffs' brief, unsupported affidavits are insufficient to alter the analysis in this case. The otherwise reasonable award sought by the defendants will therefore not be reduced on the basis of claimed financial hardship.

CONCLUSION

The defendants' application for $ 99,106.45 in attorney's fees under 17 U.S.C. § 505 is granted. The Clerk of Court shall close the case.

SO ORDERED:

Dated: New York, New York

March 18, 2008

DENISE COTE

United States District Judge

LEXSEE



Warning
As of: Jun 25, 2008

**ASTRUD OLIVEIRA, a.k.a. ASTRUD GILBERTO, Plaintiff, -against- FRITO-LAY, INC., PEPSICO, INC., BBDO WORLDWIDE INC. and OMNICOM GROUP INC., Defendants.**

**96 Civ. 9289 (LAP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1997 U.S. Dist. LEXIS 8299; 43 U.S.P.Q.2D (BNA) 1455**

**June 11, 1997, Decided
June 13, 1997, FILED**

**DISPOSITION:** [*1] Defendants' motion to dismiss granted except with respect to plaintiff's Lanham Act claim.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Pursuant to Fed. R. Civ. P. 12(b)(6), defendants moved to dismiss plaintiff's claims alleging violations of N.Y. Gen. Bus. Law §§ 133 and 349-350, N.Y. Civ. Rights Law §§ 50-51, and the Lanham Act, 15 U.S.C.S. § 1125(a), which arose from improper use of a recorded song in a television commercial.

**OVERVIEW:** Plaintiff alleged that defendants' use of her recorded song in an advertisement violated the Lanham Act, 15 U.S.C.S. § 1125(a), because it led the public to believe she endorsed the product. The court found that the public's belief that plaintiff approved of defendants' use of her voice was enough to satisfy the consumer confusion requirement of the Lanham Act. The court also found that plaintiff had not alleged a property right to support a state law unfair competition claim, that she had not alleged injury as a consumer to support false advertising claims, and that she could not claim defamation because she could not show that her reputation had been injured. The court also found that the right to privacy under N.Y. Civ. Rights Law §§ 50-51 did not extend to voice appropriation and that plaintiff's

common law copyright expired with the song's first publication.

**OUTCOME:** The court dismissed all but the Lanham Act claim, holding that plaintiff did not allege a property right for unfair competition claims, that defendants' trade name did not appear in the commercial, that plaintiff's reputation was not injured, and that privacy rights did not extend to the voice.

**COUNSEL:** For ASTRUD OLIVEIRA aka Astrud Gilberto, plaintiff: Annemarie Franklin, Annemarie Franklin, Esq., New York, NY.

**JUDGES:** LORETTA A. PRESKA, U.S.D.J.

**OPINION BY:** LORETTA A. PRESKA

**OPINION**

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, District Judge:

Plaintiff Astrud Oliveira, a.k.a. Astrud Gilberto ("Gilberto") brings several causes of action based on the alleged improper use of her recording of "The Girl from Ipanema" by defendants in a television commercial advertisement for Frito-Lay Baked Lays Potato Crisps ("Baked Lays"). Defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to

Case 1:08-cv-01228-LTS    Document 19-4    Filed 06/27/2008    Page 13 of 18

1997 U.S. Dist. LEXIS 8299, *; 43 U.S.P.Q.2D (BNA) 1455

dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted.

## BACKGROUND

Plaintiff is a singer and recording artist known to the general public for her recording of "The Girl from Ipanema" made in 1964. (Plaintiff's Amended Complaint ("Am. Compl.") P 3). A single recording of this song was released containing lyrics sung by Gilberto and is presently available to the public on a Poly-gram Label. (*Id.* P 6).

Defendant Frito-Lay, Inc. ("Frito-Lay") [*2] is a corporation and subsidiary of defendant Pepsico, Inc. ("Pepsico"), a corporation headquartered in Purchase, New York. (*Id.* P 4). Defendants market snack food products nationwide, including in the Southern District of New York. (*Id.*). Defendant BBDO Worldwide, Inc. ("BBDO"), headquartered in New York, is a subsidiary of defendant Omnicom Group, Inc. ("Omnicom"), also headquartered in New York. Both Omnicom and BBDO are engaged in the advertising business nationwide producing advertisements for a variety of clients including defendants Frito-Lay and Pepsico.

Plaintiff alleges that she owns the common law copyright in the original recording of the "The Girl from Ipanema" and has not assigned this right nor authorized anyone to use her performance of the song without her permission. (*Id.* PP 7, 9). Plaintiff also alleges that as a result of the publicity, advertising and marketing with respect to the song, the general public associates the song with Gilberto. (*Id.* P 8).

In 1996 defendants produced a television commercial for Baked Lays, a snack food product of Frito-Lay. The commercial features the Muppet character "Miss Piggy" eating Baked Lays and "singing" while [*3] the lyrics from "The Girl from Ipanema" play in the background. (*Id.* P 10). Based on the unauthorized use of her voice in this commercial, plaintiff asserts six different claims. Plaintiff asserts a federal claim of false implied endorsement under the Lanham Act, 15 U.S.C. § 1125(a). In addition, plaintiff asserts several state law claims, including violations of common law copyright and unfair competition law, violations of New York General Business Law §§ 133, 349-350, defamation and, finally, a violation of right to publicity as protected by New York Civil Rights Law §§ 50, 51. Defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Procedure to dismiss plaintiff's claims. For the reasons set forth below, defendant's motion is denied in part and granted in part.

## DISCUSSION

### I. Standard Applicable to a Motion to Dismiss

When deciding a motion to dismiss under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations of the complaint and must draw all inferences in favor of the pleader. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993); *see City of Los Angeles v. Preferred Communications, Inc.*, 476 [*4] U.S. 488, 493, 90 L. Ed. 2d 480, 106 S. Ct. 2034 (1986); *Miree v. DeKalb County*, 433 U.S. 25, 27 n.2, 53 L. Ed. 2d 557, 97 S. Ct. 2490 (1977) (both referring to "well-pleaded allegations"). "'The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" *International Audiotext Network, Inc. v. American Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied sub nom. Cortec Indus., Inc. v. Westinghouse Credit Corp.*, 503 U.S. 960, 118 L. Ed. 2d 208, 112 S. Ct. 1561 (1992)). Dismissal is proper only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957), *quoted by Scheuer v. Rhodes*, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); *accord Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994). "The latter principle is to be applied with particular strictness when the plaintiff complains of a civil rights violation." *Branum* [*5] *v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991). Applying these standards to plaintiff's first cause of action, I find that plaintiff has stated a claim upon which relief may be granted. With respect to plaintiff's remaining causes of action, however, plaintiff has not stated a claim upon which relief may be granted. Therefore, defendants' motion is denied with respect to plaintiff's first cause of action and granted with respect to plaintiff's second through sixth causes of action.

In bringing their motion to dismiss, defendants rely in part on a videotape of the allegedly infringing television commercial. Plaintiff challenges reference to the video in assessing the adequacy of the complaint on this motion to dismiss. A "complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *International Audiotext*, 62 F.3d at 72. Even where a plaintiff has chosen not to attach a document as an exhibit or incorporate it by reference, I may properly consider any document integral to the complaint "without converting the proceeding to one for summary judgment." *Id.* Because the television commercial is [*6] integral to the complaint, I will consider it in ruling on defendants' motion to dismiss. Although I am not obligated to accept the allegations of plaintiff's complaint with respect to the interpretation of the video of the commercial, I will resolve any ambiguities in plaintiff's

favor. Id. (citing *Doe v. City of New York*, 15 F.3d 264, 266 (2d Cir. 1994)).

## II. Plaintiff's Lanham Act Claim

Plaintiff has brought a claim under the Lanham Act for false implied endorsement. The Lanham Act prohibits false descriptions of products and their origins and is intended to cover a wide variety of unfair competitive practices "resulting in actual or potential deception." *Allen v. National Video, Inc.*, 610 F. Supp. 612, 625 (S.D.N.Y. 1985) (citations omitted); *see also L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc.*, 79 F.3d 258, 262 (2d Cir. 1996). To state a claim under the Act, plaintiff must allege the following three elements: (1) the involvement of goods or services; (2) an effect on interstate commerce; and (3) a false designation of origin or false description of the goods or services. *Allen*, 610 F. Supp. at 625.

No dispute exists with respect [*7] to whether plaintiff has adequately alleged the first two elements. Defendants assert that plaintiff has failed to allege adequately the third element. Plaintiff alleges that the use of her voice in the commercial creates the false impression that she has impliedly endorsed Baked Lays. The Lanham Act has been extended to cover "misleading statements that a product or service has been endorsed by a public figure." *Allen*, 610 F. Supp. at 626 (citing *Geisner v. Poynter Products, Inc.*, 283 F. Supp. 261 (S.D.N.Y. 1968)); *see also Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204-05 (2d Cir. 1979) (explaining that to state a claim of consumer confusion under the Lanham Act, "the public's belief that the mark's owner sponsored or otherwise approved the use satisfies the confusion requirement").

To establish a false implied endorsement claim, plaintiff must still allege factors, also referred to as the *Polaroid* factors, establishing consumer confusion. *Standard & Poor's Corp., Inc. v. Commodity Exchange*, 683 F.2d 704, 708 (2d Cir. 1982). The factors generally considered by the [*8] Court of Appeals to determine whether consumer confusion exists are as follows: "(1) the strength of plaintiff's mark and name; (2) the similarity of plaintiff's and defendant's marks; (3) the proximity of plaintiff's and defendant's products; (4) evidence of actual confusion as to source or sponsorship; (5) sophistication of the defendant's audience; and (6) defendant's good or bad faith." *Tin Pan Apple, Inc. v. Miller Brewing Co., Inc.*, 737 F. Supp. 826, 834 (S.D.N.Y. 1990) (citing *Standard & Poor's*, 683 F.2d at 708 (citing *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S. Ct. 36, 7 L. Ed. 2d 25 (1961))). Because these

factors were not developed in the context of a false implied endorsement claim, I find Judge Motley's adaptation of these factors in *Allen* to offer more relevant guidance. Under Judge Motley's interpretation, the first factor might be articulated as "the extent to which plaintiff has developed a favorable association for [her] mark in the public mind" -- "mark" in this context meaning plaintiff's voice and singing style. Because the present motion is to dismiss plaintiff's complaint, I [*9] must accept plaintiff's factual allegations with respect to her reputation with the public as true.

The second element, the similarity of marks, speaks to the similarity of the plaintiff to the individual used by defendant. There is no dispute that plaintiff is singing "The Girl from Ipanema" in the background; however, it is not clear from plaintiff's complaint whether plaintiff alleges that Miss Piggy's noshing and swallowing intermixed with sporadic humming is an attempt to sing and thereby confuse who is actually performing the song or whether plaintiff concedes that she alone is singing the song, in which case there is no question of similarity of marks because there is identity of marks.

The third factor -- the proximity of the products -- is more problematic in the context of this false implied endorsement claim. In *Allen*, Allen was able to point to an obvious association with the movie production business and he was "strongly identified with movies in the public mind." *Allen*, 610 F. Supp. at 628. Plaintiff has not alleged nor does it seem likely that she could allege any association with defendant's mark, Baked Lays, or with the alluring bikini-clad pig scarfing down [*10] chips in the commercial, Miss Piggy. However, the Lanham Act does not require that plaintiff's and defendant's marks be in competition, id. (citing *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266 (7th Cir. 1976), but only that some "intersection" of audiences for both marks is involved. *Allen v. Men's World Outlet, Inc.*, 679 F. Supp. 360, 368 (S.D.N.Y. 1988). There is no obvious reason that fans of Gilberto would be drawn to Baked Lays, nor is there any reason that they would not be. Therefore, because I must accept plaintiff's allegations as true, I must assume the intersection of audiences alleged to be true; thus, the proximity of products factor is satisfied by the simultaneous appearance of both marks in the same commercial.

Although evidence of actual confusion may be probative, it need not be alleged to assert a Lanham Act consumer confusion claim. Id. In any event, plaintiff has alleged that the use of "The Girl from Ipanema" constitutes a false implied endorsement, and the "'public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.'" *Pirone*, 894 F.2d at 584

Case 1:08-cv-01228-LTS    Document 19-4    Filed 06/27/2008    Page 15 of 18

1997 U.S. Dist. LEXIS 8299, *; 43 U.S.P.Q.2D (BNA) 1455

(quoting [*11] *Dallas Cowboys Cheerleaders, Inc.*, 604 F.2d at 205). With respect to the fifth factor -- audience sophistication, plaintiff has not alleged any particular level of sophistication of the defendants' audience. It is difficult to imagine how plaintiff could prove or explain any audience simultaneously so sophisticated, on the one hand, that they would recognize and associate the song with Gilberto, but, on the other hand, they would be so unsophisticated as to understand Miss Piggy to be herself singing the song while shovelling Baked Lays in her mouth -- or that the mere use of her voice as backdrop is in fact a singing endorsement of Baked Lays. However, it is not entirely implausible that plaintiff could properly allege an audience capable of interpreting the presence of the background music as an implied endorsement of Baked Lays. [1] Furthermore, because a motion to dismiss is "not to seek out the sufficiency of evidence," plaintiff's allegation suffices to state a claim for false implied endorsement. *Tin Pan Apple, Inc.*, 737 F. Supp. at 835. Therefore, defendants' motion with respect to plaintiff's Lanham Act claim is denied.

> 1   Although plaintiff's allegation of endorsement may survive a preliminary motion to dismiss, it is difficult to imagine how this claim could survive a motion for summary judgment, particularly where the strength of the commercial advertisement appears to be the endorsement of Baked Lays by another celebrity, Miss Piggy.

### [*12] III. Plaintiff's New York Law Claims

*A. Unfair Competition*

   Among the state law claims plaintiff alleges is a claim of misappropriation of her common law copyright and a claim for unfair competition under New York common law. The tort of unfair competition has been called "a broad and flexible doctrine" encompassing "any form of commercial immorality." *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.* 199 Misc. 786, 792, 796, 101 N.Y.S.2d 483, 488-89, 492 (Sup. Ct. 1950), *aff'd mem*, 279 A.D. 632, 107 N.Y.S.2d 795 (1951). The tort implies the misappropriation for commercial advantage "the 'benefit' or property right belonging to another." *Id.* at 793, 101 N.Y.S.2d at 489. Thus, to assert a claim of unfair competition or misappropriation, as a threshold matter, plaintiff must first allege a cognizable property right.

   Because the recording was made in 1964, plaintiff's recording is not subject to statutory protection under the Federal Copyright Act of 1976. Because of the publication of the recording prior to defendants' use, the 1909 Copyright Act offers no common law protection for plaintiff's recording either. *Goldstein v. California*, 412 U.S. [*13] 546, 563-66, 93 S. Ct. 2303, 2314-15, 37 L. Ed. 2d 163 (1973). "Common-law copyright protects the author's interest prior to publication and allows the author to control the first publication of the work." *Sanga Music, Inc. v. EMI Blackwood Music, Inc.*, 55 F.3d 756, 758-59 (2d Cir. 1995) (citing 17 U.S.C. § 2(1909 Act)). "Common-law copyright is extinguished upon the publication of the work by the author, or upon the publication by another with the author's consent." *Id.* (citing *Hemingway's Estate v. Random House, Inc.*, 23 N.Y.2d 341, 244 N.E.2d 250, 254 & n.1, 255-56, 296 N.Y.S.2d 771, 776 & n.1, 778-79 (1968)); *Roy Export Co. v. C.B.S., Inc.*, 672 F.2d 1095, 1101-02 (2d Cir. 1982) (discussing common law copyright protection prior to 1978 and stating that "the publication divests him of his common-law copyright, and he secures no statutory protection because he has not affixed a statutory notice in his name").

   Plaintiff concedes publication of the recording and has not alleged that the publication was without her permission. However, the Court of Appeals has recognized an exception with respect to the first publication rule "where a [publisher] has purchased the [*14] right of first publication under circumstances which show that the author has no intention to donate his work to the public, copyright notice in the [publisher's] name is sufficient to obtain a valid copyright on behalf of the beneficial owner, the author or proprietor." *Sanga*, 55 F.3d at 760 (citing *Goodis v. United Artists Television, Inc.*, 425 F.2d 397, 399 (2d Cir. 1970)); *see also Roy Export Co.*, 672 F.2d at 1102 (requiring a more extensive factual basis for finding that publication has divested an author of her common law copyright protection). To discern an intention to preserve property rights, the court looks to the circumstances of the licensing of the first publication and the manner of publication. *Id.* Thus to overcome the presumption that, as a matter of law, plaintiff's common law copyright was relinquished upon publication of the recording, plaintiff must plead such exceptional circumstances. Plaintiff has not plead any exceptional circumstances surrounding the first publication evincing an intent to preserve her common law copyright rights. Because plaintiff has failed to allege adequately a cognizable property interest, I need not address whether [*15] plaintiff has alleged sufficient economic damages under *Agee v. Paramount Communications, Inc.*, 59 F.3d 317, 327 (2d Cir. 1995) (affirming dismissal of state law claim for unfair competition where plaintiff "failed to plead facts indicating that his record sales or licensing revenues" were affected by the use of a sound recording in a television commercial) to sustain her claim for misappropriation and unfair competition. Thus, plaintiff's claim for unfair competition is dismissed.

1997 U.S. Dist. LEXIS 8299, *; 43 U.S.P.Q.2D (BNA) 1455

The Federal Rules of Civil Procedure permit a party to amend its pleadings by leave of the court. Fed. R. Civ. P. 15(a). Leave of the court "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962). The decision whether to grant such a motion rests within the discretion of the district court. Foman, 371 U.S. at 182. However, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion." Id. Among the reasons that justify denying leave to amend are:

> undue delay, bad faith or dilatory motive [*16] on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment. . . .

Id.; Evans v. Syracuse City Sch. Dist., 704 F.2d 44, 46 (2d Cir. 1983); S.S. Silberblatt, Inc. v. East Harlem Pilot Block Bldg. 1 Hous. Dev. Fund Co., 608 F.2d 28, 42 (2d Cir. 1979); State of New York v. Cedar Park Concrete Corp., 741 F. Supp. 494, 496 (S.D.N.Y. 1990). Because I do not find any of the above reasons exist to justify refusal of a request to replead, plaintiff is granted leave to replead. Therefore defendants' motion to dismiss plaintiff's unfair competition claim is granted, and plaintiff is granted leave to replead her copyright violation claim.

B. Statutory Protection of Tradenames under New York Law

Section 133 of the New York General Business Law protects tradenames from unlawful infringement by prohibiting the use of someone else's name, style or symbol as part of one's own name with an intent to deceive the public. Section 133 provides as follows:

> No person, firm or corporation shall, with intent to deceive or mislead the public, [*17] assume, adopt or use as, or as part of, a corporate, assumed or trade name, for advertising purposes or for the purposes of trade, or for any other purpose, any name, designation or style, or any symbol or simulation thereof, or a part of any name, designation or style, or any symbol or simulation thereof, which may deceive or mislead the public as to the identity of such person, firm or corporation or as to the connection of

> such person, firm or corporation with any other person, firm or corporation . . . .

N.Y. Gen. Bus. Law § 133 (McKinney 1988). To state a claim under § 133 plaintiff must allege that defendants used her name or symbol as part of defendants' "corporate, assumed or trade name" for purposes of advertising with an intent to deceive. Although the name of defendants' product, Baked Lays, appears in the commercial, neither the corporate, assumed or trade name of defendants appear. Nor does the appearance of the product name during the playing of plaintiff's singing voice state a claim under this section. Accordingly, defendants' motion to dismiss plaintiff's claim under § 133 of the New York General Business Law is granted.

C. False Advertising

Plaintiff [*18] has also brought a claim for false advertising pursuant to New York General Business Law §§ 349, 350. The purpose of §§ 349-350 is "to protect the public and to provide a remedy for injuries resulting from consumer fraud". Ciccolo v. Chicago Research & Trading Group Ltd., 161 A.D.2d 364, 364, 555 N.Y.S.2d 318, 319 (1st Dep't 1990); see also H20 Swimwear, Ltd. v. Lomas, 164 A.D.2d 804, 806, 560 N.Y.S.2d 19, 21 (1st Dep't 1990) (stating that § 349 "has been held to apply solely to matters affecting the public interest"). To state a claim for false advertising under these sections, plaintiff must allege (1) false advertising as defined in § 350-a and (2) injury. S.O.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp., 84 F.3d 629, 636 (2d Cir. 1996) (citing Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 532, 647 N.E.2d 741, 745 (N.Y. 1995)); Galerie Furstenberg v. Coffaro, 697 F. Supp. 1282, 1291 (S.D.N.Y. 1988) (quoting McDonald v. North Shore Yacht Sales, Inc., 134 Misc. 2d 910, 513 N.Y.S.2d 590, 593 (1987)). Under § 350-a "false advertising" is defined as an advertising that is "misleading in a material [*19] respect." N.Y. Gen. Bus. Law § 350-a (McKinney 1988). Plaintiff has alleged that the false implied endorsement of Baked Lays is a deliberate attempt to mislead consumers. For purposes of a motion to dismiss, it would be improper to conclude that a false implied endorsement cannot, as a matter of law, be misleading in a material respect.

Defendants contend that plaintiff's false advertising claim should be dismissed for failure to allege the type of injury contemplated by §§ 349-350. Although "the purpose of the private right of action was to permit 'private enforcement' against 'injuries resulting from consumer fraud,'" Galerie Furstenberg, 697 F. Supp. 1282, 1292 (citations omitted), an individual's right to

sue depends upon the nature of her injury. *Id.* Unless plaintiff alleges injury in her role as a consumer that affects the public interest, plaintiff may not recover under §§ 349-350. *Id.; S.O.K.F.C., Inc.,* 84 F.3d at 636 (stating that § 349 requires conduct "potentially affecting similarly situated customers") (quoting *Oswego Laborers' Local 214,* 85 N.Y.2d at 26, 623 N.Y.S.2d at 533, 647 N.E.2d at 745); *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, [*20] 264 (2d Cir. 1995) ("The critical question [under § 349] is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor"). The gist of plaintiff's claim is that her right to market her symbol or style has been usurped and not that she has suffered any injury as a consumer which injury affects the public interest. Therefore, defendants' motion to dismiss plaintiff's false advertising claim is granted.

### D. *Defamation*

Plaintiff alleges in her fifth cause of action that the doubling of plaintiff's voice with that of Miss Piggy's as well as the association of plaintiff with Miss Piggy constitutes defamation. Plaintiff's complaint does not specify whether the doubling and association are defamatory on their face, libel *per se,* or by reference to extrinsic fact, libel by innuendo. *Cole Fischer Rogow, Inc. v. Carl Ally, Inc.,* 29 A.D.2d 423, 427, 288 N.Y.S.2d 556, 562 (1st Dep't 1968) (specifying the two broad categories of libel). Under New York law, a publication is libelous *per se* "if it tends to expose a person to hatred, contempt or aversion, or to induce an unsavory opinion of [her] in the minds of a [*21] substantial number of the community, even though it may impute no moral turpitude to [her or] . . . tends to disparage [her] in the way of [her] office, profession or trade.'" *Ladany v. William Morrow & Co., Inc.,* 465 F. Supp. 870, 875 (S.D.N.Y. 1978) (quoting *Bordoni v. New York Times Co., Inc.,* 400 F. Supp. 1223, 1225 (quotations omitted)); *accord Davis v. Ross,* 754 F.2d 80, 82 (2d Cir. 1985); *Silberman v. Georges,* 91 A.D.2d 520, 521, 456 N.Y.S.2d 395, 397 (1st Dep't 1982). Plaintiff has not alleged, nor would it be possible to construe her complaint as alleging that the purported doubling and the association expose Gilberto to hatred, contempt, or aversion. On the contrary, many noted celebrities and actors have seen to fit to appear simultaneously with Miss Piggy and have yet to claim any injury to their reputation. [2]

> 2 Although Miss Piggy was discussed in a recent publication as an example of an "unruly woman," Kathleen Rowe, *The Unruly Woman: Gender and the genres of Laughter* (U. of Texas: 1995), this has not discouraged corporate sponsors from inviting her to appear in benefits,

nor has it discouraged the likes of Michael Jordan, Bobby Short and other celebrities from appearing publicly with her.

[*22] To state a claim of defamation where the standard of libel *per se* is not met, plaintiff must allege both defamatory meaning, or innuendo, and special damages. *Herink v. Harper & Row Publishers, Inc.,* 607 F. Supp. 657, 660 (S.D.N.Y. 1985) (citing *Ladany,* 465 F. Supp. at 875); *Silberman,* 91 A.D.2d at 521, 456 N.Y.S.2d at 397. Plaintiff must allege extrinsic facts that create the defamatory innuendo. Whether the advertisement is capable of the libelous meaning alleged through innuendo is an issue of law for the court to decide. *WDM Planning, Inc. v. United Credit Corp.,* 47 N.Y.2d 50, 53, 389 N.E.2d 1099, 1100, 416 N.Y.S.2d 579, 580 (1979) (citing *Tracy v. Newsday, Inc.,* 5 N.Y.2d 134, 136, 182 N.Y.S.2d 1, 3, 155 N.E.2d 853, 854); *Cole Fischer Rogow, Inc.,* 29 A.D.2d at 427, 288 N.Y.S.2d at 562. Furthermore, the plain and obvious meaning of the advertisement "'cannot be altered or changed by innuendo.'" *Id.* (citing *Kloor v. New York Herald Co.,* 200 A.D. 90, 91, 192 N.Y.S. 465, 466). Plaintiff has not alleged the extrinsic facts that form the basis of the innuendo alleged; thus, I cannot determine whether the advertisement is susceptible to a libellous [*23] interpretation. Therefore, defendants' motion to dismiss plaintiff's defamation claim is granted, but plaintiff is granted leave to amend her defamation claim to allege the extrinsic facts forming the basis of libel by innuendo.

### E. *Right to Privacy*

New York has never recognized a right to privacy as part of its common law. *Arrington v. New York Times Co.,* 55 N.Y.2d 433, 439-40, 434 N.E.2d 1319, 449 N.Y.S.2d 941, 943 (1982), *cert. denied,* 459 U.S. 1146, 103 S. Ct. 787, 74 L. Ed. 2d 994 (1983). New York statutory law does however recognize a limited right to privacy under Civil Rights Law §§ 50, 51. *Groden v. Random House, Inc.,* 61 F.3d 1045, 1049 (2d Cir. 1995); *Pirone v. MacMillan, Inc.,* 894 F.2d 579, 584 (2d Cir. 1990). "The right to privacy recognized by the Civil Rights law has been strictly construed, both because it is in derogation of New York law, *Shields v. Gross,* 58 N.Y.2d 338, 448 N.E.2d 108, 461 N.Y.S.2d 254, 257 (1983), and because of potential conflict with the First Amendment particularly where public figures are involved." *Ann-Margret v. High Society Magazine, Inc.,* 498 F. Supp. 401, 404 (S.D.N.Y. 1980); *Allen v. National Video, Inc.,* [*24] 610 F. Supp. 612, 620-21 (S.D.N.Y. 1980). To state a claim under the New York Civil Rights Law, plaintiff must allege (1) the use of her name, portrait or picture (2) for commercial or trade purposes (3) without written permission.

Plaintiff's claim fails to clear the first hurdle. Although use of a look-a-like may be actionable under § 50, *Ali v. Playgirl, Inc.*, 447 F. Supp. 723 (S.D.N.Y. 1978); *Onassis v. Christian Dior-New York, Inc.*, 122 Misc. 2d 603, 472 N.Y.S.2d 254 (Sup. Ct. N.Y. Co. 1984), *aff'd*, 488 N.Y.S.2d 943 (1st Dep't 1985); *Young v. Greneker Studios, Inc.*, 175 Misc. 1027, 26 N.Y.S.2d 357, 358 (Sup. Ct. N.Y. Co. 1941), no look-a-like or recognizable representation of the plaintiff is present in the commercial. Plaintiff alleges that defendants have used a caricature of plaintiff's likeness in the commercial. Miss Piggy -- a well known celebrity in her own right -- in no way resembles Gilberto or evokes her likeness, and any suggestion to the contrary is ludicrous. [3] Plaintiff has not alleged nor am I aware of any instance in which Gilberto appears seated pool-side singing "The Girl from Ipanema" while potato chips fall into her cleavage. To the extent [*25] that the commercial may evoke an association with Gilberto or the style of Gilberto through the use of the recording of her voice, such association or evocation is not actionable under the Civil Rights Law. *Tin Pan Apple, Inc.*, 737 F. Supp. at 838 (holding that New York Civil Rights Law does not apply to misappropriation of voice); *Allen*, 610 F. Supp. at 623 (discussing "the long-standing requirement under section 51 that the commercial use complained of amount to a 'portrait or picture' of an individual, not merely the suggestion of some aspect of a person's public persona"); *see also Lahr v. Adell Chemical Co.*, 300 F.2d 256, 258 (1st Cir. 1962) (refusing to construe "name" in §§ 50-51 to a voice that plaintiff claimed connoted his identity); *Trump v. Pavion, Ltd.*, 1991 U.S. Dist. LEXIS 11713, 1991 WL 167964 at *5 (S.D.N.Y. Aug. 22, 1991); *Lombardo v. Doyle, Dane & Bernbach, Inc.*, 58 A.D.2d 620, 396 N.Y.S.2d 661 (2d Dep't 1977) (television commercial's depiction of plaintiff's style of conducting "Auld Lang Syne" in New Year's Eve setting held not actionable where plaintiff's name was not used and impersonator did not resemble plaintiff). Therefore, defendants' motion with respect to plaintiff's [*26] claim under New York Civil Rights Law is granted.

3    Although the question of recognizable likeness is ordinarily one for the jury, *Cohen v. Herbal Concepts, Inc.*, 63 N.Y.2d 379, 384, 482 N.Y.S.2d 457, 459, 472 N.E.2d 307 (1984), this is one of those rare instances in which a court can conclude as a matter of law that no reasonable jury could find that Miss Piggy resembles Gilberto.

## CONCLUSION

Defendants' motion to dismiss is granted except with respect to plaintiff's Lanham Act claim. Furthermore, plaintiff may replead her state law claim for unfair competition and defamation within thirty days of this Order. Counsel shall inform the Court by letter no later than June 18 of the status of settlement discussions.

Dated: New York, New York

*June 11, 1997*

LORETTA A. PRESKA, U.S.D.J.