Charles S. Sims
Adam D. Siegartel
Proskauer Rose LLP
1585 Broadway
New York, New York 10036
Tel: 212.969.3000
Fax: 212.969.2900
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| MICHAEL G. PORTO (a.k.a. GUY MICHAELS) | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 08 Civ. 1228 (LTS)(GWG) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN ADLY GUIRGIS, LABYRINTH THEATER COMPANY, PHILIP SEYMOUR HOFFMAN, FABER AND FABER, INC., AND DRAMATISTS PLAY SERVICE, INC., | : | **DECLARATION OF STEPHEN ADLY GUIRGIS** |
| | : | |
| Defendants. | : | |

---

Stephen Adly Guirgis declares under penalty of perjury as follows:

1.        I am the author and sole creator of the play *The Last Days of Judas Iscariot*, a true copy of which is attached to this Declaration as Exhibit 1.

My Professional Background, Awards, and Accomplishments

2.        *The Last Days of Judas Iscariot* is not the first play that I have written that concerns Biblical themes and ideology – in fact, it is the fourth. Before creating *The Last Days of Judas Iscariot*, I wrote *Jesus Hopped the A Train*, *Our Lady of 121st Street*, and *In Arabia, We'd All Be Kings*, all of which incorporate Biblical themes and ideology. All four of these plays

1

were originally produced by defendant LAByrinth Theater Company (of which I am a member) and directed by defendant Philip Seymour Hoffman.

3.     *The Last Days of Judas Iscariot* has received much critical acclaim and was named one of the ten best plays of 2005 by both *Time* and *Entertainment Weekly* magazines. The play opened in March 2005 in New York City and has been produced throughout the United States and in Canada and England as well. Its production locations include New York City, Los Angeles, London, Toronto, Boston, Chicago, Philadelphia, Dallas, Austin, and St. Louis.

4.     As discussed in my short biography at the beginning of the Exhibit 1 published script, my other religious-themed plays have also won a variety of awards. Specifically, *Jesus Hopped the A Train* won the Edinburgh Fringe First Award, the *Detroit Free Press* Best Play of the Year, the Barrymore Award, and received a Laurence Olivier nomination as London's best new play; *Our Lady of 121st Street* received Best Play nominations from the Lucille Lortel Foundation, the Drama Desk, and the Outer Critics Circle, and was one of ten chosen for *Best Plays of 2003* (the annual chronicle of U.S. theater); and *In Arabia, We'd All Be Kings* was named one of the 10 Best of 1999 by *Time Out New York* and was a Critics Pick in *Time Out London*.

5.     My biography within Exhibit 1 also lists several of my other awards and accomplishments, including the following: in 2003 I was awarded a 2004 TCG fellowship; I was named one of 2004's 25 New Faces of Independent Film by *Filmmaker* magazine; I am the recipient of new play commissions from Manhattan Theatre Club and South Coast Repertory; and I am a member of New Dramatists, the Actors Studio Playwrights and Directors Unit, and the MCC Playwrights' Coalition. In 2006 I was also a recipient of the Whiting Award given by the Mrs. Giles Whiting Foundation and the PEN/Laura Pels Foundation Award. My plays have been performed throughout the United States and on five continents.

2

6.    In addition to being a playwright I have also written for television, and my television writing credits include *The Sopranos*, *NYPD Blue*, and *UC: Undercover*. I am also an actor and have appeared both in plays and films, including the play *Guinea Pig Solo*, produced at the Public Theater in New York, and in the films *Palindromes* (directed by the well-known director Todd Solondz) and *Jailbait* (starring opposite the well-known actor Michael Pitt).

My Independent Creation of *The Last Days of Judas Iscariot*

7.    I conceived of *The Last Days of Judas Iscariot* on my own and wrote every word of the play myself, without the assistance of any other person. I had never heard of plaintiff or plaintiff's novel *Judas on Appeal* directly or indirectly before or during the time that I was writing *The Last Days of Judas Iscariot*, and I had never had *Judas on Appeal* seen, read, and/or described to me in any way directly or indirectly until September 2007 at the earliest, when plaintiff's prior counsel contacted my agent regarding this matter.

8.    I have also never heard of plaintiff except in the context of this lawsuit, and I know nothing of plaintiff's literary output. Prior to September 2007 I had never spoken to any person, to my knowledge or belief then or now, who had read plaintiff's novel *Judas on Appeal*, and while I was drafting *The Last Days of Judas Iscariot* I had no access whatsoever to *Judas on Appeal*. In sum, nothing in *The Last Days of Judas Iscariot* is copied from or based on any of plaintiff's works, including *Judas on Appeal*.

Origins of *The Last Days of Judas Iscariot*

9.    The "idea" for *The Last Days of Judas Iscariot* was mine alone, and in fact the Introduction that is included within Exhibit 1 details the origins of this idea. This Introduction is dated 2005 and was published before I ever heard or learned of plaintiff or *Judas on Appeal*, directly or indirectly.

3

10.     Growing up I had approximately ten years of parochial education.  As discussed in the Introduction, I was raised a Catholic, and Judas' story, which I first heard when I was a child, troubled and frightened me, and contradicted my notion of an all-loving and all-merciful God. The story had a formative and critical impact on my growth and development beginning when I was just nine or ten years old, and as recited in the Introduction the story led directly to my withdrawal and disconnect from the Church and organized religion.

11.     As I reached my twenties, however, I began to once again seek a larger spiritual and religious element in my life.  With my personal background in mind, I initially conceived of the idea for *The Last Days of Judas Iscariot* in advance of a 2002 LAByrinth Theater annual summer workshop.  By the time that I arrived for the workshop, I had written approximately eighteen pages of the script.   During the initial workshop and during subsequent LAByrinth summer workshops as well – and of course in the interim between workshops – I drafted, adjusted, and refined the play, always on the basis of the material that I first created and presented during the 2002 LAByrinth workshop.  The LAByrinth workshops enabled me to smooth the work and gave it better dramatic shape as I refined the play for the stage, but workshop activities did not alter its essential content.  I remained the sole author of the play at all times, up through the completion of the finished and published *The Last Days of Judas Iscariot* script at issue in this action.

12.     In total, it took me several years to write *The Last Days of Judas Iscariot*. Drafting the play entailed a long and painful process of cutting and shaping, and during the drafting I wrote and saved approximately eighty-seven different drafts.

13.     I created the dialogue and characteristics for several of the play's characters with specific LAByrinth Theater Company actors in mind.  For example, I created the Satan character

4

specifically for the LAByrinth actor Eric Bogosian.  In my opinion, Eric is particularly adept at

playing hip but swarmy characters, and Eric's ability to play such characters was one of the

reasons why I initially conceived of – and ultimately depicted – Satan in a Gucci suit.

My Extensive Research Efforts in Connection With *The Last Days of Judas Iscariot*

14.     I conducted a wealth of research regarding historical and Christian theological

concepts in connection with my creation and drafting of *The Last Days of Judas Iscariot*.  I read

books, I watched movies, and I had repeated conversations with at least four different clergymen

that lasted many hours.  One of the clergymen whom I spoke with repeatedly while drafting the

play, Father James Martin, *wrote his own book* that chronicles our discussions and interactions,

entitled *A Jesuit Off-Broadway* (Father Martin is Associate Editor of *America Magazine*).  In

turn, the clergymen whom I spoke with referred me to many books and other secondary sources

that I reviewed as part of my research, including the following: *Judas*, by Kim Paffinger;

*Consider Jesus*, by Elizabeth Johnson; *Pontius Pilate*, by Anne Wroe; *The Roman Way*, by Edith

Hamilton; *The Daily Study Bible*, by William Barclay; *An Introduction to the New Testament*, by

Raymond E. Brown; *New Seeds of Contemplation*, by Thomas Merton; *The HarperCollins

Biblical Commentary*, edited by Paul Achtmeier; *The New Jerome Biblical Commentary*, by

Jerome Murphy-O'Connor, et al.; and *The Death of the Messiah*, by Raymond E. Brown.

15.     The only portions of *The Last Days of Judas Iscariot* that are not entirely my

independent and original creation are (a) pre-existing quotations from well-known writers or

philosophers that are scattered throughout the play (for example, the final lines of the play

include a quotation by the poet W.H. Auden, which is introduced by a character saying "W.H.

Auden was a poet who once said . . ." [see pages 110-11 in Exhibit 1]), and (b) well-established

and widely-accepted historical or Christian theological concepts concerning the lives of Jesus,

Judas, and other historical characters that I discovered and learned about through my research and discussions. Both these pre-existing quotations and the well-established historical and theological concepts were incorporated into *The Last Days of Judas Iscariot* as a result of my own artistic creativity and originality.

Comparison of the Two Scripts Attached to Plaintiff's Amended Complaint

16.    As mentioned above, a true copy of *The Last Days of Judas Iscariot* is attached as Exhibit 1 to this Declaration. More specifically, attached as Exhibit 1 to this Declaration is a copy of the script that was published by defendant Faber and Faber, Inc., which I understand was also attached to plaintiff's Amended Complaint. Although the Faber and Faber published script includes introductory and afterword pages not included in the script published by defendant Dramatists Play Service, Inc. (also attached to plaintiff's Amended Complaint), and although the pagination of the two works is different, the scripts included in both published versions appear to be either substantively or completely identical, and any differences between the published scripts appear to be immaterial.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 26, 2008 in New York, New York.

_____
STEPHEN ADLY GUIRGIS

**EXHIBIT 1**
**Part 1**
**GUIRGIS DECLARTION**



**ACT 2**

**"SIC DEUS DILEXIT MUNDUM"**

JUDAS: I wasted my prime, man. And then I wasted my prime after my prime.

SATAN: Well, I think you'll prolly get fucked tonight, bro.

JUDAS: Ya think so?

SATAN: Yeah, I'm pretty sure.

JUDAS: I wanna nother fuckin' drink. Tonight man, I'm gonna drink this fuckin' bar!

SATAN: Hey, Judas, lemme ask you something: Who is this Jesus of Nazareth guy I've been hearing about?

JUDAS: Jesus of Nazareth?

SATAN: Yeah—I heard he's some kinda somebody.

JUDAS: Some kinda somebody?

SATAN: Yeah, that's what I heard.

JUDAS: Aw, fuck that guy, man—he's a bitch!

YUSEF EL-FAYOUMY *rises triumphantly*

EL-FAYOUMY: *"FUCK THAT GUY, HE'S A BITCH"!!!! Your Honor! Nothing further!*

JUDGE LITTLEFIELD: Cross?

CUNNINGHAM: . . . Not at this time.

JUDGE LITTLEFIELD: Lou, stick around.

SATAN: I know the drill.

*The gavel bangs.*

JUDGE LITTLEFIELD: Meal break! Fifteen minutes!

EL-FAYOUMY: Fabiana, free for lunch?

*Gavel bangs. Lights fade.*

*Cross-fade to JUDAS's lair. JESUS is there with his bucket, alone.*

STEPHEN ADLY GUIRGIS

SAINT MONICA *appears with* MARY MAGDALENE.

SAINT MONICA: Hey, y'all. This is Mary Mags—she the only bitch I let hang with me up here. Tell 'em whatchu gotta say.

MARY MAGDALENE: My name is Mary of Magdala. I was a disciple of Jesus, I was present at the crucifixion, and I was the first person He appeared to after the resurrection.

SAINT MONICA: Bitch got *clout!*

MARY MAGDALENE: I was one of the founders of the Christian faith, and I was known for my ability, in times of difficulty, to be able to turn the hearts of the Apostles towards the Good.

SAINT MONICA: The good!

MARY MAGDALENE: Some people think I was a whore.

SAINT MONICA: Misogynist bitches!

MARY MAGDALENE: Other people think Jesus was my husband.

SAINT MONICA: Femin-o-tic bitches!

MARY MAGDALENE: I was not a whore.

SAINT MONICA: "Pimps up, Hos *Down.*"

MARY MAGDALENE: I was an unmarried woman in a town of ill repute.

SAINT MONICA: *Ill* repute!

MARY MAGDALENE: And also, I was not the wife of Jesus either.

SAINT MONICA: Still love ya!

MARY MAGDALENE: But, I am pretty sure that I was his best friend. We shared an intimacy that I cannot put to words except to say we saw into each other's hearts and were in love with what we found . . .

THE LAST DAYS OF JUDAS ISCARIOT

59

MARY MAGDALENE: I also knew Judas Iscariot very well.

SAINT MONICA: Gangsta!

MARY MAGDALENE: Out of the Twelve, he was the most moody and the most impetuous, and yet, he was my favorite.

SAINT MONICA: Tupac!

MARY MAGDALENE: And in some ways, I think he was Jesus's favorite too . . . Judas was almost an alter ego to Jesus—he was the shadow to Jesus's light. He was the sour to the sweet and the cool to the warm. They often walked together, more often than not arguing—no one could get a rise out of Jesus like Judas could. I can remember times when Jesus emerged from an argument with Judas positively furious—shaking his head wildly, snorting, and clicking his teeth, red-faced with exasperation—and he would tell me what they had been fighting about—still agitated—but, inevitably, he would end up staring into space and sighing—smiling. I think that if someone were to say that Judas was good for Jesus that they would not be mistaken . . .

SAINT MONICA: Not mistaken!

MARY MAGDALENE: When I think of Judas, my heart breaks.

SAINT MONICA: But Mary Mags: If we are all eternal, and if Human Life is only the first mile in a *billion*, do you honestly believe that God could abandon any mothahfuckah so soon in the journey?

MARY MAGDALENE: I don't know. Jesus never talks about it. That's how I know His heart hurts worse than mine.

*The gavel bangs.*

JUDGE LITTLEFIELD: Next witness!

CUNNINGHAM: Defense calls Sigmund Freud, Your Honor.

BAILIFF: Name!

SIGMUND FREUD: Doctor Sigmund Shlomo Freud.

CUNNINGHAM: Doctor Freud, would it be accurate to say you qualify as an expert in the field of modern psychiatry?

SIGMUND FREUD: Fräulein—I AM modern psychiatry.

EL-FAYOUMY: Objection, Your Honor!—the witness is boasting!

JUDGE LITTLEFIELD: Overruled!

EL-FAYOUMY: But a "booster," Your Eminence—it is distasteful, really!

JUDGE LITTLEFIELD: Siddown, El-Fayoumy!

EL-FAYOUMY: I lunge to obey you, your grace—but let the record reflect that Prosecution has grave reservations about this man's alleged so-called "standing" as a psychiatric expert!

SIGMUND FREUD: Perhaps a quick jaunt to London for a leisurely perusal of "The Standard Edition of *The Complete Psychological Works of Sigmund Freud Volumes One Through Twenty-Four*" would set your mind at ease.

EL-FAYOUMY: *Perhaps it would if you were indeed* . . . . . . . . . . . . Oh. I see. Right. Yes. Of course. Uh. . . . Yes.

*He sits.*

CUNNINGHAM: Doctor Freud, you are, in fact, the "Founder of Psychoanalysis," correct?

SIGMUND FREUD: I am.

CUNNINGHAM: You maintained a private practice in neuropathology for nearly a half century; is that not so?

SIGMUND FREUD: It is.

CUNNINGHAM: You were on the cover of *Time* magazine in an issue dedicated to the greatest scientific minds of the twentieth century.

SIGMUND FREUD: I was.

CUNNINGHAM: Are you familiar with the case history of one Judas Iscariot?

SIGMUND FREUD: Most certainly.

CUNNINGHAM: Doctor Freud, in your expert opinion, can a suicide victim be precertified as psychotic?

SIGMUND FREUD: Without question. Man's instinct for self-preservation is his most supple and reflexive muscle. When that muscle fails, it is because his mind has failed. A decision to take one's own life can only be precipitated by a failure of the mind—an irrational rebellion against man's most basic instinct—to endure and live. Therefore, yes—the victim of suicide must be precertified as, indeed, psychotic.

CUNNINGHAM: In your expert opinion, Doctor Freud, was Judas Iscariot a psychotic?

SIGMUND FREUD: Without question.

CUNNINGHAM: And are psychotics responsible for their actions?

SIGMUND FREUD: No, they are not. For example, say I have a bad bout of influenza. As a result of my bad influenza, I sneeze rudely, but involuntarily, in your face. The next day, you wake up with the same flu. Did I cause your flu? No. My flu caused your flu. I only sneezed because I was sick.

CUNNINGHAM: In your opinion, Doctor Freud, does Judas Iscariot belong in Hell?

SIGMUND FREUD: No, he does not.

CUNNINGHAM: Explain.

SIGMUND FREUD: Suicide is a direct sign of mental illness.

CUNNINGHAM: But did he become mentally ill *after* allegedly betraying Jesus of Nazareth, or was he mentally ill to begin with?

SIGMUND FREUD: Preprogrammed, yes. You must understand: Normal people do not kill themselves—even under extreme duress.

CUNNINGHAM: And what would you say to people who would

say that Judas brought about his own mental illness by betraying Jesus and getting him crucified?

SIGMUND FREUD: I would say this: Number One, you cannot conjure or "bring about" mental illness. Number Two, any God who punishes the mentally ill is not worth worshipping. And, Number Three: "an ounce of prevention is worth a pound of cure"—the person who could have prevented this tragedy was Jesus, not Judas. He chose not to.

CUNNINGHAM: But isn't Judas responsible because he did what he did of his own free will?

SIGMUND FREUD: Fräulein, I once had a suicidal patient leap through my fourth-floor window to her death. She exercised her free will—did I bill her estate for the broken plate-glass window she leapt through? Of course not! My friend Winston Churchill, who provided me safe haven from the Nazis in 1938, likes to say: "The price of greatness is *responsibility*." I believe firmly in taking responsibility. So, after the unfortunate woman's death, I exercised responsibility for *my* greatness—by moving my offices to the ground floor. I should think God would have done the same.

CUNNINGHAM: Your witness.

EL-FAYOUMY: Doctor Freud, yes, sorry for the mix-up before.

FREUD *yawns big and disdainfully.*

SIGMUND FREUD (*re: the yawn*): Excuse me.

EL-FAYOUMY: So, Herr Doktor—I must admit I am intimidated to be in the midst of such greatness. After all, you are a "genius," correct?

SIGMUND FREUD: Correct.

EL-FAYOUMY: An "expert"?

SIGMUND FREUD: Yes.

EL-FAYOUMY: A big brain.

SIGMUND FREUD: Unequivocally.

EL-FAYOUMY: Yes. "Unequivocally." Yes. Nice word. And it rolls off your tongue so effortlessly—really, I am impressed.

FREUD *again yawns big and disdainfully.*

A little tired, are we, Doctor? Perhaps a kilo or two of *fine-grade Bolivian flake* would restore your pep?!

SIGMUND FREUD: Excuse me?

EL-FAYOUMY: "Cocaine, Doctor! "Blow," "Flake," "Rock"—"She don't lie"—does she, Doc?!!!

SIGMUND FREUD: What?

EL-FAYOUMY: Over a twelve-year span, you consumed cocaine in what can only be categorized as Prodigiously Massive Quantities, correct?

SIGMUND FREUD: As part of my research, yes.

EL-FAYOUMY: "Research"—yes. And after twelve years of round-the-clock research, you finally came to the conclusion that ingesting staggering amounts of powder up your nose was, perhaps, unhealthy?

SIGMUND FREUD: I was trying to determine its medicinal value.

EL-FAYOUMY: Is that your real nose?

SIGMUND FREUD: Your mother denied you her breast, didn't she?

EL-FAYOUMY: I'll thank you to let me ask the questions, Doctor Fried.

SIGMUND FREUD: Freud!

EL-FAYOUMY: Oh, yes, Freud, of course. Forgive me, I made a "you"-slip, didn't I? . . . Anyway, last question Mr. Expert Genius: Doctor Freud: You were an avowed atheist all your life, correct?

SIGMUND FREUD: Correct.

EL-FAYOUMY: And then you died and found out what?

SIGMUND FREUD: I experienced anti-Semitism as a child—it prejudiced me against all religion.

EL-FAYOUMY: Einstein experienced prejudice—but he wasn't wrong like you, was he? My cousin Wagui can't count to ten without drooling, but he wasn't wrong like you either, was he? Was he?!!!

SIGMUND FREUD: Intelligence and Faith are two different things!

EL-FAYOUMY: Are they, Doctor Freud? Because I would say that you can't have one without the other. But, of course, I'm not a brilliant genius expert like you, am I?

SIGMUND FREUD: I had a wonderful vibrant mind and my intellectual curiosity was boundless!

EL-FAYOUMY *makes a violin-playing gesture.*

EL-FAYOUMY: Good day, doctor, go blow your nose—you are excused!

CUNNINGHAM (*rising*): Doctor Freud, do sane people commit suicide—yes or no?

SIGMUND FREUD: No!

(*Toward* EL-FAYOUMY): Though they can sometimes be tempted to *murder!*

EL-FAYOUMY: Go murder an eight-ball, egghead!

JUDGE LITTLEFIELD: That's enough! Next witness!

*Gavel bangs.*

Next witness!

EL-FAYOUMY: Irresistibly Alluring Majesty. Prosecution calls Legendary Hawaiian Singer and Popular Entertainer Don Ho to the stand!

JUDGE LITTLEFIELD: Don Ho's not dead!

EL-FAYOUMX: Oh. . . Well, thank god for that. In that case, Prosecution calls Caiaphas the Elder, High Priest of the Sanhedrin, to the stand!

JUDGE LITTLEFIELD (rising): Right . . . Ladies and gentlemen of the jury, at this time, I must excuse myself from these proceedings until such time as said witness has concluded testimony. Before his ascension into the Lap of the Lord, Caiaphas the Elder and I were partners in a successful chain of Kosher Pizza Parlors in East Purgatory—For that reason, at this time, I must step down. Bailiff!!! Get your ass over there, put on those glasses, and adjudicate—pronto! Proceed.

JUDGE exits as EL-FAYOUMX approaches CUNNINGHAM.

EL-FAYOUMX: Fabiana, may I borrow a pen?

CUNNINGHAM: Only if I can shove it through your eye.

EL-FAYOUMX (confidentially): Fabiana, how can I prove my sincerity to you? Even though you are always here and I am always here—still—I think of you when you aren't here even though you are always here.

BAILIFF: Next witness, please!

EL-FAYOUMX: Yes—I obey.

(To CUNNINGHAM): Later we shall discuss.

(To BAILIFF): Yes. Julius zee Bailiff, correct? May I call you Julius?

BAILIFF: All right.

EL-FAYOUMX: How about Jules?

BAILIFF: I guess.

EL-FAYOUMX: So tell me J—shall we commence?

BAILIFF: That'd be good.

EL-FAYOUMX: Wise J: Prosecution calls Caiaphas the Elder!

CAIAPHAS enters.

Caiaphas the Elder, High Priest of the Sanhedrin, hello to you.

CAIAPHAS THE ELDER: Hello.

EL-FAYOUMX: "Shalom"?—as it were.

CAIAPHAS THE ELDER: Shalom.

EL-FAYOUMX: Caiaphas the Elder: Perhaps you can clear this up—is there a Caiaphas the Younger?

CAIAPHAS THE ELDER: No.

EL-FAYOUMX: And yet, you are the Elder?

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMX: I see. Yes. Thank you. My cousin Amghad Wahba owes me five bucks now. So, Caiaphas the Elder: In the Bible, it says that Judas Iscariot made an approach to you—a dark and nefarious approach—to offer up the location of Jesus of Nazareth, and to, in fact, turn him in to you and the authorities. Correct?

CAIAPHAS THE ELDER: Correct.

EL-FAYOUMX: Caiaphas the Elder: Are you saying that it was Judas Iscariot who approached you, and not the other way around?

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMX: Because I saw in a film once, Caiaphas the Elder, where it was you who approached him.

CAIAPHAS THE ELDER: It was Judas Iscariot who approached me at the Temple, not the other way around.

EL-FAYOUMX: Yes. But still, even though your statement is indeed confirmed by all four Gospels, Caiaphas the Elder, I must ask you again: Did you approach Judas Iscariot about betraying his leader and Messiah, Jesus of Nazareth?

CAIAPHAS THE ELDER: I did not.

EL-FAYOUMX: Why not? Jesus was a big headache to you, no? You were legitimately concerned that the high jinks of Jesus would lead to an uprising and a resulting crushing Roman Massacre of your Jewish people in retribution, weren't you?

CAIAPHAS THE ELDER: I was.

EL-FAYOUMY: So, why not reach out and touch someone, Caiaphas the Elder?

CAIAPHAS THE ELDER: Are you asking me why I didn't try to approach one of the Apostles initially?

EL-FAYOUMY: Yes.

CAIAPHAS THE ELDER: I didn't think it would work.

EL-FAYOUMY: Why not?

CAIAPHAS THE ELDER: There is an old rabbinical saying: "Let them kill you, but do not cross the line." During my eighteen-year reign as head of the Sanhedrin and Guardian of the Temple, I dealt with countless Messiahs, zealots, rebels, and fanatical believers. My experience in these matters taught me: They get killed, yes, but as a rule—they do not cross the line.

EL-FAYOUMY: "Cross the line," yes—this means what?

CAIAPHAS THE ELDER: To betray your ideals. Your conscience. The law.

EL-FAYOUMY: Judas crossed that line, didn't he?

CAIAPHAS THE ELDER: He did.

EL-FAYOUMY: He betrayed the ideal in betraying Jesus—The Rabbinical Ideal. He crossed the line.

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: Do you admire that?

CAIAPHAS THE ELDER: No. I do not.

EL-FAYOUMY: But why not? We all cross the line sometimes, don't we?

CAIAPHAS THE ELDER: We are all capable of crossing the line. Thankfully, we do not all do it.

EL-FAYOUMY: But really, Caiaphas the Elder, what's the big deal? You cross a line, so what? Just draw yourself another line, correct?

CAIAPHAS THE ELDER: No. Not correct.

EL-FAYOUMY: Why not?

CAIAPHAS THE ELDER: The line comes from God, doesn't it! The line is given. We do not create it, and thus, it is not ours to modify. It is only ours to Obey or Betray.

EL-FAYOUMY: I see. Caiaphas the Elder: When *Pontius Pilate* first arrived in Judea, he visited you in the Temple, did he not?

CAIAPHAS THE ELDER: He did.

EL-FAYOUMY: And as a show of his force and might, Pontius Pilate attempted to place symbols of Rome in the Temple, which was, to your people, a great desecration of your Holy place of worship, correct?

CAIAPHAS THE ELDER: Correct.

EL-FAYOUMY: It would have constituted a worshipping of False Idols, yes?

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: Caiaphas the Elder, when you saw Pontius Pilate attempting this, what did you do?

CAIAPHAS THE ELDER: I told him that he must remove the pagan symbols.

EL-FAYOUMY: And what did Pilate say to that?

CAIAPHAS THE ELDER: I believe the gist of his reply was: "What are you gonna do about it, Curly?"

EL-FAYOUMY: And what *did* you do?

CAIAPHAS THE ELDER: . . . I knelt before him—

EL-FAYOUMY: —and begged for mercy?

CAIAPHAS THE ELDER: No.

EL-FAYOUMY: Groveled for forgiveness?

CAIAPHAS THE ELDER: No! I removed my headdress, bared my throat to him, and bade him slit it.

EL-FAYOUMY: In other words, Caiaphas the Elder, you "let him kill you, but you did not cross the line."

CAIAPHAS THE ELDER: I guess so. Yes.

EL-FAYOUMY: You did not cross the line!

CAIAPHAS THE ELDER: No. I did not.

EL-FAYOUMY: Judas crossed it, though—didn't he?

CAIAPHAS THE ELDER: He did.

EL-FAYOUMY: Interesting. And, by the way, what was the result of your standoff with Pilate regarding the sanctity of the Temple?

CAIAPHAS THE ELDER: Pilate backed off.

EL-FAYOUMY: He didn't put up the pagan symbols, did he?

CAIAPHAS THE ELDER: No.

EL-FAYOUMY: You held the line.

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: Your integrity castrated him, didn't it—his little Roman balls rolling down the Temple hill like withered purple grapes! Yes!

CAIAPHAS THE ELDER: I have no response to that.

EL-FAYOUMY: As well you shouldn't! Now then, last question: Caiaphas the Elder, it has been said that in Western Culture, the most prized virtue is Honesty, but in Eastern Culture—which would include Judea at that time—in Eastern Culture, the most prized virtue was and is Loyalty. Caiaphas the Elder: Do you agree with said hypothesis?

CAIAPHAS THE ELDER: Counselor, there are six hundred thirteen Sacred Laws in our Torah. Complying with these Laws requires Honesty and Loyalty. But the most important requirement of The Law is Obedience to it. That is what is most prized.

EL-FAYOUMY: Yes. Fair enough. But in your opinion, was Judas Iscariot "loyal"?

CAIAPHAS THE ELDER: Obviously not.

EL-FAYOUMY: Was he "honest"?

CAIAPHAS THE ELDER: No.

EL-FAYOUMY: Caiaphas the Elder: Was Judas Iscariot obedient?

CAIAPHAS THE ELDER: To his own will and desires—yes. I believe that he was.

EL-FAYOUMY: And to service that will and those desires, Judas crossed the line. Didn't he?

CAIAPHAS THE ELDER: He served a necessary purpose, but as a fellow Jew, I confess he disgusted me.

EL-FAYOUMY: Caiaphas the Elder, I thank you—and may I add, you are much more handsome in person than when they portray you on the silver screen!

CUNNINGHAM rises.

CUNNINGHAM: "High Priest of the Sanhedrin!"—that was an extremely powerful and prestigious position in Judea—correct?

CAIAPHAS THE ELDER: Correct.

CUNNINGHAM: In fact, except for the Roman governor and King Herod, the "High Priest" was, in actuality, the most powerful position in Judea, was it not?

CAIAPHAS THE ELDER: Yes.

CUNNINGHAM: Would you mind looking me in the eye when you respond to a question?

CAIAPHAS THE ELDER: My position was very important. As High Priest, I maintained the Sacred Laws, the safety of the populace, and our tradition.

CUNNINGHAM: Caiaphas—Is there a reason you won't meet my gaze? Or is ignoring women simply another component of the tradition you were charged to maintain?

EL-FAYOUMY (rising): Objection, Julius! The witness is not just a Holy Man—but a very Holy man! Defense counsel is aware she is a juicy pulchritudinous dish—and yet, the

witness is being berated for merely avoiding the salacious temptations of her intoxicatingly firm and fervently aromatic flesh! I move to censure, really!!

CUNNINGHAM: I withdraw the question.

EL-FAYOUMY: Sexy Vixen—you are warned!

BAILIFF: Hey!

EL-FAYOUMY: Oh! Julius! Yes! Forgive me! She makes my organs bounce! Yes. Uh.

(To CUNNINGHAM): Sorry.

(To BAILIFF): Yes.

*He sits.*

CUNNINGHAM: Caiaphas, you stated to the Prosecution that Judas Iscariot "crossed the line" and that he "disgusted you"—correct?

CAIAPHAS THE ELDER: Correct.

CUNNINGHAM: Well then maybe you can help me out here, because I'm a little confused. Judas Iscariot handed Jesus of Nazareth over to you, correct?

CAIAPHAS THE ELDER: Yes.

CUNNINGHAM: And then *you* handed Jesus of Nazareth over to Pontius Pilate, correct?

CAIAPHAS THE ELDER: I did.

CUNNINGHAM: So what exactly is the difference between you and Judas Iscariot—'cuz unless I'm missing something here, I fail to see it.

CAIAPHAS THE ELDER: Between me and Judas? Big difference.

CUNNINGHAM: Caiaphas, you were a rabbi and a Jew. Jesus was a rabbi and a Jew. Is it not crossing the line for one rabbi to hand over another rabbi to be killed by pagans?

CAIAPHAS THE ELDER: Jesus was a blaspheming, seditious rabbi, and I did not know for sure that he would be killed.

CUNNINGHAM: But the penalty for sedition was crucifixion, correct?

CAIAPHAS THE ELDER: That was the Roman charge, not mine.

CUNNINGHAM: Yes. Your charge was Blasphemy—and what was the penalty for Blasphemy, Caiaphas?

CAIAPHAS THE ELDER: Your Honor, I will not sit here and be blamed for the death of Christ yet again!

CUNNINGHAM: No one's blaming you for the death of Christ, Caiaphas. I'm simply asking you a question which I am directing you to answer now before this court: You charged Jesus with Blasphemy. What was the penalty for Blasphemy, Caiaphas?

CAIAPHAS THE ELDER: "Stoning, followed by hanging."

CUNNINGHAM: So then, how can you sit there and pretend that you didn't know for sure that Jesus of Nazareth would be killed?

CAIAPHAS THE ELDER: Jesus could have easily saved himself.

CUNNINGHAM: Saved himself how?

CAIAPHAS THE ELDER: By retracting his Blasphemous claims! Our Torah has six hundred thirteen Sacred Laws—I can't even count how many Jesus broke or treated with wanton disregard and disdain! He broke the laws that came from the God of Abraham, Isaac, and Jacob! He violated the word of God. He violated the Laws of Moses. He consorted with the Unclean, and women, and prostitutes. He performed Miracles on the Sabbath, He proclaimed himself Messiah! He forgave sin! *Who was he to forgive sin?!* Only God can do that! If that's not crossing the line, then I don't know what is!!

CUNNINGHAM: Jesus was fulfilling your Old Testament prophecies of Isaiah to the letter—

CAIAPHAS THE ELDER: —He was also fulfilling the prophecies in Deuteronomy which warned against "False Messiahs and Marvel workers"! It would have been one thing had he

confined himself to the forests and rivers spouting his ravings as the Baptist did, but at the Great Temple?! I would have been derelict not to put a stop to it. He was whipping people! Kicking them. Threatening to destroy the Temple! Calling it a Den of Thieves! If someone did that in your Saint Patrick's Cathedral, would you not arrest them?!

CUNNINGHAM: And yet, Judas Iscariot, who came forward in the face of this "great threat," is in your eyes not a patriot, but a traitor. A traitor who, in your words, "disgusted you." Why is that, Caiaphas?

CAIAPHAS THE ELDER: Because he handed Jesus over for money.

CUNNINGHAM: And why did you hand Jesus over, Caiaphas?

CAIAPHAS THE ELDER: The words and deeds of Jesus were leading towards rebellion—and the price of rebellion under Roman rule was a bloodbath. A massacre, Counselor. So I determined that it were better to have one man dead than a thousand—that's why.

CUNNINGHAM: I see. So, you were looking out for the Common Jewish Man, is that correct?

CAIAPHAS THE ELDER: I was.

CUNNINGHAM: Were you a Common Jewish Man, Caiaphas?

CAIAPHAS THE ELDER: In the eyes of God, we are all the same.

CUNNINGHAM: But how about in the eyes of the Common Jewish Man? You were seen as an Aristocrat, weren't you?

CAIAPHAS THE ELDER: I came from wealth.

CUNNINGHAM: Would you say that you were popular with the Common Jewish Man?

CAIAPHAS THE ELDER: My job was a sacred one—not a popularity contest.

CUNNINGHAM: The high Temple taxes that you inflicted on your people, would you say that made you more popular with the Common Jewish Man or less popular?

EL-FAYOUMY: Objection, Your Honor! Vixen is badgering!

BAILIFF: Sustained!

CUNNINGHAM: The exchange rates at the Temple were also extremely unfavorable to the Common Jewish Man, and the purification pools outside the Temple—where the Common Jewish Man was required *by law* to be cleansed before being permitted to enter the Temple—the purification pools were not free either, were they?!

BAILIFF: Cunningham!

CAIAPHAS THE ELDER: No no, I'll answer: The laws were the laws and the rates were the rates.

CUNNINGHAM: And did you have a sliding scale for the poor?

CAIAPHAS THE ELDER: No.

CUNNINGHAM: So the poor—who constituted a large percentage of the Common Jewish Man at that time—remained impure and unclean and were denied the right of worship.

CAIAPHAS THE ELDER: You've made your point.

CUNNINGHAM: No, I don't think I have! Your position, Caiaphas, did not require you to be popular with the Common Jewish Man, did it?!

CAIAPHAS THE ELDER: My position required me to answer to God.

CUNNINGHAM: Did God appoint you High Priest of the Sanhedrin?

CAIAPHAS THE ELDER: It was with God's Blessing—

CUNNINGHAM: —It was with *Rome's* blessing, Caiaphas! You were appointed by *Rome*, and at the end of the day, for the eighteen years you served, that's who you had to answer to, and that's who you were required to be popular with! And the day you showed Rome that you couldn't handle your own people was the day you'd have been thrown out on your ass—isn't that true?!

CUNNINGHAM: Well then for your sake, Caiaphas, I sure hope that your God has a more forward-thinking attitude than Judas's God does. Step down, you're excused.

EL-FAYOUMY: Caiaphas the Elder, Judas approached you—correct?

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: He didn't have to approach you, Caiaphas the Elder, did he?

CAIAPHAS THE ELDER: No.

EL-FAYOUMY: And yet he did.

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: Of his own free will.

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: And accepted payment for his betrayal.

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: Payment. Judas did not say, "Caiaphas the Elder, put your money away, mister, this one's on the arm," right? Is that it?

CAIAPHAS THE ELDER: Right.

EL-FAYOUMY: Caiaphas the Elder, I think we all realize the precarious position you were in, trying to protect your citizens from Roman reprisal.

CAIAPHAS THE ELDER: And it makes you feel good to say that, doesn't it? After two thousand years of persecution and vilification, you finally get around to saying: "Hey, we know it wasn't you and your people's fault." Is that it?

EL-FAYOUMY: Good Caiaphas the Elder, I was only trying to—

CAIAPHAS THE ELDER: Win your case, right? I tell you what: You people call me, I come. You question, I answer—but please—never say that you realize the position I was in, because you have no idea the position I was in. And never try to excuse or forgive me, because I'm not interested in your forgiveness. God's forgiveness: This interests me. Yours? I could care less. Why? Because you have no idea. The

CAIAPHAS THE ELDER: I belonged to God, not Rome! My job was to uphold the six hundred thirteen Sacred Laws, and to protect my Temple and my People—and that's what I did!

CUNNINGHAM: And was not Jesus of Nazareth one of your people, Caiaphas?! Whether he was a messiah, or a prophet, or a Holy Man, or a crazy man—was he not one of your own?! And was it not considered the height of treachery to betray Jewish blood to your oppressors?! Come on, Caiaphas! Tell us that it did not prick your conscience to turn Jesus, a fellow Jew, over to the Romans! Tell us that handing over a fellow rabbi to his certain death at the hands of the enemy didn't violate your sense of "crossing the line" and your knowledge of the law! Tell us, Caiaphas, that at the end of the day, there was a difference—in the eyes of God— between what you did and what Judas did!

Beat.

This is Purgatory, Caiaphas—I've got all day.

CAIAPHAS THE ELDER: . . . In terms of result: No difference.

CUNNINGHAM: How about in terms of follow-through: Judas recanted and tried to return the silver, did he not?

CAIAPHAS THE ELDER: He did.

CUNNINGHAM: And did you, Caiaphas, do anything at all to try to prevent Jesus's death?

CAIAPHAS THE ELDER: No.

CUNNINGHAM: And therein lies the real difference between you and Judas Iscariot, does it not? And yet, you sit here and say how Judas "crossed the line" and that he "disgusted" you! And if that's true, Caiaphas, then I wonder, how you must've felt about yourself.

CAIAPHAS THE ELDER: That's between me and God.

people who need forgiving? The people who perpetrated the lies and exaggerations that became sacrosanct fact and led to hatred and violence for the past two thousand years? They are the ones who need forgiving—and not by you—but by me—me—and my people. It's the Writers of the Gospel who need forgiveness—not me. No, sir, I know what it is to suffer. Do you? I don't think so.

(To BAILIFF): Julius: My best to Frank.

EL-FAYOUMY: You're very handsome, Caiaphas.

CAIAPHAS THE ELDER: If I am, it's 'cuz God made me, not 'cuz you said so. Good day.

CAIAPHAS *ambles off wearily. Gavel bangs. Crossfade to* SAINT THOMAS.

SAINT THOMAS: My name is Thomas. At the Last Supper, I was the first one to say that I would die for Jesus, and I was also the first one to head for the hills doing ninety when the Romans came and arrested him. And then, when Jesus resurrected himself, I was also the guy who said I wouldn't believe He was who He said He was unless I could see with my own eyes the holes in His hands and personally inspect them and touch them—as if I was some qualified medical examiner, like Quincy or something. But the thing of it was, Jesus showed them to me. And not only that, He let me touch them. In a ministry based entirely on the virtues of Faith, He gave me proof. I had no Faith, and he gave it to me for free. I don't know why I got the benefit of my doubt, and Judas didn't get help with his. And I'm not saying this 'cuz I liked the guy—'cuz personally, I thought Judas was a bit of a jerk-off. Actually, "fuckin' dick" would be more accurate. Judas was the kinda guy—at least with me—where, one minute he's your friend, and the next minute, he's

making fun of you in front of everybody. He used to like to say that the reason Jesus had to do the Miracle of the Loaves and the Fishes was because I ate all the food when no one was looking. Stuff like that. But then other times, he could be real nice, like, once we were partnered together to go into town to heal people and cast out demons, and well, I had some problems that day—everyone I tried to heal ended up getting worse. In fact, this one lady I almost blinded and another guy started going into convulsions—but Judas fixed it. He healed them—he really did—and that tells me his faith was genuine. And when we got back to camp that night, he didn't tell anybody how I messed up. In fact, he said I did a good job, and I appreciated that. I knew Jesus knew it was bullshit, but I appreciated the gesture. I thought it showed largeness on Judas's part. And the thing is, Judas was kind of a dick, but he wasn't shallow or petty. He really was pretty large. He wasn't the best, but he was far from the worst. Jesus liked him, liked him a lot, in fact. Judas was right up there in the top three with Mary Magdalene and Peter, who, by the way, could also be a dick sometimes, too. The trick with Peter was: Never talk about fish. The guy was crazy for fish. Say something wrong about a fish and forgetaboutit. The guy would go crazy. Anyways—some people say Judas did what he did 'cuz he was greedy. Personally, I think that's bullshit. The guy wasn't wandering around the desert for three years with Jesus and a bunch of ragamuffins like us 'cuz he was looking to get rich. Other people say that The Devil got into him. Again, bullshit. Judas was loyal to a fault. Obsessively loyal, even. Judas would have taken on 'The Devil and his entire army, one against a thousand, if he had to, and he woulda done it with relish. Other people say Judas did it 'cuz he knew the ship was sinking and he was trying to get himself a nut to not have something to fall back on.

Listen: Judas was not a "fall-back" guy, he was one hundred percent "fall forward." And to me, that deserves some consideration. I was not fall forward. Not by a long shot. And neither were most of the others. Judas was a dick, but he deserved better. Just one Saint's opinion.

JUDGE *enters.*

Next witness!

CUNNINGHAM: . . . Your Honor, at this time, Defense would like to introduce exhibit A-fourteen, *ancient surveillance footage* of an event that occurred less than twenty-four hours after Jesus's arrest. Lights, please.

*A squad room in Jerusalem.*

SOLDIER 1: Pilate gonna kick yo ass!

SOLDIER 2: Pilate gonna see that ass—he gonna kick it two times!

SOLDIER 3: Yo—when Pilate see this mothahfuckah's ass, he gonna be like: "Centurion! It's time to whup ass!"

SOLDIER 1: He gonna rape yo wives!

SOLDIER 2: He gonna take yo cattle!

SOLDIER 3: He gonna kick yo cattle's ass, too!

SOLDIER 1: And yo sheep and yo lambs!

SOLDIER 2: Pilate gonna cancel yo granmutha's WIC check, B!

PILATE *enters.*

PILATE: What's all this damn ruckus about!

SOLDIERS: All hail Pontius Pilate: Hail, hail, hail!

PILATE: Is there a problem here?

SOLDIER 1: Judas is trying to recant!

PILATE: Hold up a minute, who!

SOLDIER 3: Judas Iscariot—from the Jesus of Nazareth crew.

SOLDIER 2: This stinky mothahfuckah right here!

JUDAS: Jesus is an innocent man—please, please—

SOLDIER 1: Should we start whupping ass now?

JUDAS: He's innocent! Please. Please. Jesus is innocent.

PILATE: C'mon now, Judas, them "San-who-saids"—hold up a sec.

(*To* SOLDIER 2): Yo Curt—what they call themselves?

SOLDIER 2: Sanhedrin, sir.

PILATE: Right. Judas, them SandHeadsSons paid you thirty pieces of silver, now that's four months' wages, that ain't no chicken feed.

JUDAS: I made a mistake, please, please, you don't understand, man—

PILATE: I understand perfectly. You sold out your brother, now you feel guilty, so you tryin' 'a come in here talkin' 'bout "It was dark, I kissed the wrong muthahfuckah," but we Romans, man—Romans don't dance that song.

JUDAS: I'm recanting—

PILATE: You can't recant!

(*To his boys*): Hey, fellas, remember the last Semite strolled up in here talkin' 'bout "I recant"?!

(*To* JUDAS): Believe me, J-Crew, you doan wanna do that. Whatchu need to do is relax, brother—take the wifey to a puppet show, sumpthin'. This ain't nuthin' but a little PR opportunity before the holidays, chus all—

JUDAS: —But he's innocent. Please. Please—

PILATE: Hey now, lissen: Judas, we don't give no good goddamn 'bout this Jesus—He just a muthahfuckah talks a lotta shit. Everybody talks shit, even *I've* been known to talk a little shit on the once in a while. Thing is: We ain't tryin' to lay down no heavy charge on that Nazareth boy—

we just gonna beat down his ass a little, make them Sanhen-ja-call-its happy so's we can all live in peace. I mean: Dontchu wanna live in peace, Judas? Ain't that what it's all about?

I mean after all, brother, ain't like we lookin' to crucify the muthabfuckah!

*Fade back to courtroom.*

CUNNINGHAM: Defense calls Pontius Pilate!

EL-FAYOUMY: I *object*!

JUDGE LITTLEFIELD: On what grounds?

EL-FAYOUMY: On the grounds that it is objectionable!

JUDGE LITTLEFIELD: Overruled!

EL-FAYOUMY: But, your holiness, really, it *is* objectionable: I sense it, although I cannot put it into words.

JUDGE LITTLEFIELD: Overruled!

BAILIFF: Name!

PILATE: Pontius Pilate.

CUNNINGHAM: Pontius Pilate?

PILATE: That's right, baby.

EL-FAYOUMY (*rising*): But are you a *licensed* pilot?!

JUDGE LITTLEFIELD: Siddown, El-Fayoumy!

CUNNINGHAM: Pontius Pilate . . . Judas Iscariot came down to your tent to recant his testimony—correct?

PILATE: On the advice of counsel, I cite my right to plead the Fifth Amendment.

CUNNINGHAM: You then told Judas Iscariot that Jesus was only gonna receive a "beat down," correct?

PILATE: On the advice of counsel, I cite my right to plead the Fifth Amendment.

CUNNINGHAM: You bear responsibility for the death of Jesus Christ—not Judas Iscariot, but you— Isn't that correct, Pontius Pilate?!

PILATE: On the advice of counsel, blah blah blah.

(*To* JUDGE): Your Honor, I got a two p.m. tee time—can I go now?

JUDGE LITTLEFIELD: This won't take long, Pontius.

CUNNINGHAM: Judas came to your office and begged you on bended knee to take the money and release Jesus, and you refused him! Judas recanted. He tried to return the money—first to the Sanhedrin and then to you. Do you deny that?

PILATE: Hey, if I had messed up as bad as that cat had, I woulda tried to rebate them ducats, too.

CUNNINGHAM: So you admit that Judas did try?

PILATE: No. I do not admit that he tried. Did you hear me admit that?

CUNNINGHAM: We all know what happened, Pilate—We just saw the tape!

PILATE: Ain't nuthin' on that "so-called" tape implicates me of anything but trying to find a peacefully nonlethal solution to a potentially incendiary problem.

CUNNINGHAM: Right. Mister Pilate, you were the Fifth Prefect of Judea, correct?

PILATE: Correct.

CUNNINGHAM: A "Prefect" being what?

PILATE: Governor. Also known as "Procurator." My official title was "Hedg-e-mon."

CUNNINGHAM: "Hedg-e-mon"?

PILATE: Translated from the Greek, it means "Excellency."

CUNNINGHAM: I see. And you governed or procurated over Judea from twenty-six to thirty-six A.D., correct?

PILATE: Longest ten years of my life.

CUNNINGHAM: Why do you say that?

PILATE: You ever *been* to Judea, missy? It ain't Paris, France— believe that.

CUNNINGHAM: I see.

PILATE: Yeah, that Moses musta read the map backwards— misplaced his bifocals, sumpthin'—'cuz if that was the "promised land," shit, them Jews shoulda held out for a better Promise.

CUNNINGHAM: You didn't care for Judea much?

PILATE: Care for it? Armpit of the Empire, if you ask me. No atmosphere, nuthin'. Hot. Dirty. Dusty. Flies everywhere. Complete lack of Culture and Amusements. I'd a rather spent ten years up inside the crack a my ass . . . But Augustus ordered me to keep the peace there, so I obeyed my Emperor, and did my duty.

CUNNINGHAM: And kept the peace?

PILATE: The Pax Romana, baby, the prime directive—dass right.

CUNNINGHAM: And, under your rule, how was the peace kept in Judea, Mister Pilate?

PILATE: By any means necessary.

CUNNINGHAM: Violently?

PILATE: Violently or otherwise—they was free to have it any ways they wanted.

CUNNINGHAM: According to Philo of Alexandria, who wrote about you in forty-one C.E., your tenure as Governor of Rome was known for its "constantly repeated executions without trial, wanton injustices, graft, and ceaseless and grievous cruelty"—care to comment?

PILATE: No, I do not.

CUNNINGHAM: During your reign as Procurator in Jerusalem, how many deaths did you order?

PILATE: A lot—don't apologize for it either. Them Jews was rowdy.

CUNNINGHAM: "Rowdy"?

PILATE: Dass right—rowdy. As in: not docile. As in: a muthahfuckah had to put his foot down.

CUNNINGHAM: And you put it down, didn't you?

PILATE: Damn skippy I did. Orders from Rome—what's a brothah to do?

CUNNINGHAM: During your tenure in Judea, how many Crucifixions would you say you ordered?

PILATE: A lot less than my predecessor—that's for damn sure! That muthahfuckah would crucify a Semite for yellin' "Fire" at a barbecue—man would go buck-wild from *jump*! Me! I reduced Crucifixions in Palestine by seventy percent, and now, that's documented.

CUNNINGHAM: Well, that's lovely, Mister Pilate, but I'll direct you now to answer the question posed to you.

PILATE: Which was what?

CUNNINGHAM: How many Crucifixions did you preside over during your time in Jerusalem?

PILATE: I'd say . . . a few hundred—give or take. So what?

CUNNINGHAM: Over seven hundred Crucifixions while you were on assignment in Judea. Does that sound about right?

PILATE: Sound good to me. Sure.

CUNNINGHAM: And you publicly washed your hands of how many of them, Mister Pilate?

*Pause.*

PILATE: I don't know what you mean by that.

CUNNINGHAM: I mean that, other than Jesus of Nazareth, out of over seven hundred Crucifixions and countless executions, did you ever—in any other instance—publicly wash your hands and attempt to abdicate responsibility for your actions, Mister Pilate?

*Pause.*

PILATE: I don't recall.

CUNNINGHAM: You backpedaled because you knew it was wrong, didn't you?

PILATE: Romans don't have backpedals.

CUNNINGHAM: You knew Jesus was a Holy Man or a fool, but whatever he was, you believed him when he said that his Kingdom wasn't on Earth, didn't you?

PILATE: See, now, I don't recall that conversation.

CUNNINGHAM: You don't "recall" that conversation? You know what, Mister Pilate, why don't you say that again so I can slap a perjury charge on you! You ordered the death of Christ—you and you alone—and then you pawned it off on Jesus's "reticence" and Judas's "impetuousness" and the "politics" of the Sanhedrin and the "rowdiness" of the Jewish people—is that not the case, Pontius Pilate?! Yes or No?!

PILATE: You can go on squawking if you want to—my conscience is clean. What you need to do is take it up with them Jews.

CUNNINGHAM: Mister Pilate, were the High Priests of Jerusalem authorized to order a death sentence?

PILATE: No they were not.

CUNNINGHAM: Was King Herod authorized to issue a death sentence?

PILATE: No he was not.

CUNNINGHAM: How about the Jewish people themselves—were they free to issue death sentences at their whim and fancy?

PILATE: No.

CUNNINGHAM: One man, Mister Pilate. In all of Judea, one man alone had the authority to put another man to death. Who was that man, Mister Pilate?

PILATE: Am I on trial here? 'Cuz last time I checked, it was your client, Judas Iscariot, freezing his narrow ass off in the ninth Circle of Hell—not me!

CUNNINGHAM: My client recanted with a remorseful heart and was ignored!

PILATE: Then you need to take that up with them Jews, not me. I mean, this ain't some new theory I'm introducing to ya! It's documented. Ain't no Sherlock Holmes/Nancy Drew Mystery here, lady. Them Jews was cantankerous. Ornery. They worshipped a Jealous, Angry, and Vengeful God—and guess what? Surprise, surprise: They was angry, jealous, and vengeful themselves. I never had a problem in Judea wasn't caused by some rabble-rousing, no-account Jew. Believe me, sister—you need to talk to them, not me.

CUNNINGHAM: It's always the Jews, Mister Pilate, isn't it?

PILATE: Well, it sure as shit was in Judea, missy . . .

CUNNINGHAM: You wanna know what I really think, Mister Pilate? I think this whole story about you hemming and hawing about what to do with Jesus is just a load of made-up crap written by Jewish Christian Evangelists seeking to broaden the appeal of the Jesus story to the Roman Empire. There is nothing that we know about you, Mister Pilate—absolutely nothing—that suggests for even a second that you would have even a passing hesitation about putting *any* Jew to death—let alone a revolutionary figure like Jesus who was being proclaimed the Messiah, who had entered the city of Jerusalem to crowds of cheering supporters, and who had the very next day incited a riot at the Temple. You hated your assignment, you hated Judea, and Mister Pilate, you hated Jews. Hated them. You hated the Jews because they consexed you. You hated them because they fought back. You hated them because they clung to their religious beliefs and were willing to die for them. But most of all, I think,

you hated them because you knew they were stronger than you. I think that bothered you a great deal. I think, Mister Pilate, that it made you resentful and vengeful and furious. I think it made you feel small and inadequate. I think it gave you skin irritations and nervous tics. I think it kept you up nights and made you count the days until you could return to the safe, bourgeois comfort of Rome. That's what I think. I think you're hiding behind historical inaccuracies and outright lies, Mister Pilate. I think that you're a liar and a fraud. I think that when Jesus was put before you, you did not see a God or a prophet, you did not see a lunatic or an innocent, you didn't even see a human being. I think, Mister Pilate, that what you saw before you that morning was just one more Jew, and you didn't hesitate. Why would you? . . . . . . You didn't wash your hands, Pontius Pilate—History did it for you. Isn't that true?

PILATE *rises.*

PILATE: I think I've had enough here.

CUNNINGHAM: If you were a man, Pilate—you'd own up to the truth!

PILATE: The truth?! Whose truth you talkin' about, Red? The truth is I was made a saint in the Ethiopian Church! The truth is I was named a martyr for the Christian Church in three-forty-eight A.D. That's the damn "truth"!

CUNNINGHAM: A Christian martyr?

PILATE: Did I stutter, girlie?

CUNNINGHAM: Well, I guess that's what they mean about History being "a lie agreed to."

PILATE: A "lie"?! Whatchu know about what's a lie and what's the truth?! Whatchu know about my history?! Alls you got to go on is some book written four different ways by four

different Jews wasn't even there in the first place! And whatchu know about my life *after* Palestine? Whatchu know about what I mighta did or didn't do when I got back home to the Motherland? Dass right—you don't know jack—do you? They didn't write down that part of the story, did they? Shit—I'm a tell you something: You and your presumptious nature reminds me more and more of my ex-wife Rhonda every minute—and believe me that ain't no compliment! Yes, I met that Jesus boy—seemed like a fine fellow! He dressed like a hobo and smelled like a goat, but give the boy a shave and a shower, and he woulda been basically all right. And I'll tell you something else: Unlike Judas, that Nazarene boy had character. He didn't come up on me begging and groveling—crying like a bitch. He faced me like a man, like a Roman almost, and that impressed me. I was willing to just have him be clubbed in his head for a couple hours—redirect his youthful energies—but them Jews—they wasn't havin' none a that! You can say what you want to, think what you want to, but them Jews was fixin' to pitch a fit until that boy was served up for lunch like chicken in the skillet! And they had the numbers on us that weekend—two hundred thousand strong converging on the city for they High Holidays and ready to rumble at the drop! I did what I had to do to preserve the damn peace! Why?! 'Cuz that was my damn job! I did my job! I did my damn job and now you wanna call me a liar?! Question my veracity and my character?! I am a Roman, lady! One hundred percent, 24/7, we never close! Underneath my ball sac is stamped: VERITAS! And that means TRUTH! And that means my honor is defined by my integrity and my integrity is defined by my truth! And I defy you—here and now—to produce one shred of evidence to support your wild and defamatory claims! Shit! You better check the résumé two times before

you start tryin' t'a sweep your dirt under a Roman's rug! I am clean like Dove and Ready for Love, missy! I live in Heaven! Where you live at, girlfriend?! Shit I'll tell you what, though: When you get your head straightened out, gimme a call some time if you want to—I'll take you down to the Aqueduct for a Pizza and a Tussle. Show you my tattoos . . . . . . Any more questions?

CUNNINGHAM: I think, Mister Pilate, that you've told us all we need to know.

PILATE: Okay, then, I'm a roll out, now, boo—work on my short game.

JUDGE LITTLEFIELD: The witness is excused.

PILATE (*strutting off magisterially*): Hail Caesar, baby!

EL-FAYOUMY *rises.*

EL-FAYOUMY: Your Excellency! "Hedg-e-mon"?! Just one question if I may?!

PILATE: What's that?

EL-FAYOUMY: Yes . . . I wonder if you would tell the court— Hedge—the following: If indeed Judas Iscariot came to your tent to recant—and I'm not saying he did or didn't—and by the way, the only Gospel that says *anything* at all about Judas recanting is Matthew, so it's three against one and the one in question was not only a Greek, but a drunken Greek and a card cheat—but anyway—please tell us now if you will please: Good Sir, Hedge, when Judas came to your tent to allegedly recant, if in fact he did, which, I am in no way seeking confirmation of herewith, *HOWEVER*, if, by chance, the gin-soaked Greek was miraculously correct and Judas did in fact attempt to recant and return the tarnished silver, tell us please—*AND THIS IS VERY IMPORTANT*— Hedge: Did you get the sense or impression that Judas was

recanting out of a genuine *REMORSE* and concern for Jesus, *or* do you think he was seeking to undo the damage out of a neck-saving, *fear* of the dire consequences and everlasting repercussions of betraying Our Rightful and most Exalted and Just Lord and Savior, Jesus Christ, the Divine Son of Man? . . .

*Beat.*

PILATE: I am a man—and defense counsel may dispute this— who happens to know something about Remorse—personal and otherwise. In my day, I stared into the eyes of perhaps ten thousand accused men and sat in judgment of them. I spared a few, and executed plenty. I sent people to face the whip, the cell, the gallows, and the cross. And I sent a few home, as well. Remorse is rare, but when you see it, it is unmistakable. Judas Iscariot had no Remorse—His Fear left no room for it. His Fear was one hundred percent Ego-Driven and Self-Serving. One hundred percent panic. Zero percent remorse. If you believe nothing else—believe that.

EL-FAYOUMY: "Hedge"—thank you. Thank you, indeed.

*The gavel bangs.*

JUDGE LITTLEFIELD: Next witness!

CUNNINGHAM *rises.*

CUNNINGHAM: Your Honor, Defense reconjures Satan to the stand.

JUDGE LITTLEFIELD: Lou, you can come in now . . . Bailiff! Go fetch him! Go fetch Satan!

BAILIFF: Alone!

JUDGE LITTLEFIELD: Go!

SATAN *enters, quite perturbed.*

Ah! . . . Have a seat, Lou.

SATAN: I want to file a formal fuckin' complaint, Frank!

JUDGE LITTLEFIELD: Aw, this ain't about the turkey roll in the cafeteria again, now, is it, Lou?

SATAN: No, Frank, this is not about the turkey roll in the cafeteria. What this is about, Frank, is I recognized a couple of your court officers at the vending machines, okay? Ask me how I recognized them, Frank.

JUDGE LITTLEFIELD: Lou—

SATAN: No! Don't you fuckin' "Lou" me—you little fag—God's been fuckin' *stealing souls* again, hasn't he?!

JUDGE LITTLEFIELD: El-Fayoumy! Escort the jury out!

EL-FAYOUMY: Yes. Right this way, please.

SATAN (*to* BUTCH, *as* EL-FAYOUMY *leads them out*): And you! Honeywell! You're on my fuckin' list, hayseed—so don't expect any last-second reprieves. Shorts and tank tops, Stretch—pack light!

*They exit.*

JUDGE LITTLEFIELD: This is unacceptable behavior, Lou.

SATAN: Don't tell me what's unacceptable—Those two court officers were mine, Frank—their souls in Hell, safe and secure! What? I don't got enough to contend with?—now I gotta deal with God cruisin' the barnyards of Hell poaching condemned poultry like some kind of silver-fox-tailed thief in the fuckin' night?? This is bullshit, Frank, and you know it—and I'm not leaving here this time without my satisfaction—so you better do something about it right fucking now!

JUDGE LITTLEFIELD: Do something like what?

SATAN: Number One: I'm not testifying at any more of these circle jerks no more—I'm not some wind-up doll to be summoned and dismissed like a fuckin' toy, Number Two: I want two souls before I leave here today—so take a memo, and pass it on upstairs. I'll take you and whoever.

JUDGE LITTLEFIELD: Me?

SATAN: Yeah, you. I shoulda claimed you off the dung heap after Lee's surrender . . . And I want some Darvon . . . And a tall bourbon neat.

(*To* CUNNINGHAM): What the fuck are you looking at?

CUNNINGHAM: I'd like to start my questioning.

SATAN: Why? You got some place you gotta be, dirtbag?

CUNNINGHAM: No. When you're done crying, just let me know.

SATAN: Um, I'm sorry—maybe you can clear this up for me—but is today "Fuck-With-Someone-Who-Can-Rip-Your-Heart-Out-Through-Your-Miserable-Dried-Up-Cunt Day"? Is that what day this is? 'Cuz, unless I'm mistaken, I'm pretty sure that Today is not that Day.

CUNNINGHAM: Today is your day to answer my questions—when you're through behaving like a petulant child, that is.

JUDGE LITTLEFIELD: Cunningham! Cunningham, I am directing you to hit the off-switch on them flapping gums of yours until further notice! And you, Lou, with all due respect to your stature and station—could ya cut me a break here, please!

SATAN: Frank, I've always been good to you—

JUDGE LITTLEFIELD: —and I to you—is that not so! Now listen: Your complaint is duly noted and will be kicked upstairs at the conclusion of today's testimony, okay? Now I need to call the damn jury back in here. And what I need to know—from the both of youse—is that when I move to do

so, that you two will conduct yourselves with a deportment in adjustment to the solemnity of these proceedings. Now, can I have your words on that?

CUNNINGHAM: I'm ready to proceed, Your Honor.

JUDGE LITTLEFIELD: With civility?

CUNNINGHAM: If I'm met with civility.

SATAN: You know what, Cunningham? All those excuses you got wedged between that dubious cleavage of yours: your mother, the bulimia, the herpes, the booze, the abortions, the rape, the bipolar pharmaceutical adventures, the twin suicide attempts and the abject failures at every relationship you ever attempted—all those things do nothing to Band-Aid the simple fact that There Comes a Time When the World Stops Rewarding Potential—and when that time came for you, you threw yourself the world's biggest pity party and dedicated the rest of your short, pathetic, inconsequential life to finding fault everywhere fuckin' else but in the return gaze of your own cosmetically altered reflection. Okay?

EL-FAYOUMY: Satan, please—you are perhaps out of bounds here!

SATAN: El-Fayoumy, on a good day, your cock measures three and a half inches erect and it goes off on a hair trigger if you so much as sneeze . . . Worse than that, you're a Flatterer, and your Love of God is utterly false—as is your hair color. And the sole reason you're so hot for this nasty train wreck over here is because you're addicted to tragedy and punishment—not because you *think* you're a piece of shit, but because, El-Fayoumy, the truth is: Your self-diagnosis is correct: You're a bag of hot air and a weakling—and you will never, ever, be loved.

(To CUNNINGHAM): You'll never be loved either, Cunningham, and that's because you're incapable of giving it—but you already knew that about yourself, didn't you?

(To JUDGE): You can bring in the jury now, Frank. Never let it be said that the Prince of Tyre stood in the way of Truth.

JUDGE LITTLEFIELD (To SATAN): No more outbursts.

SATAN: I'm a buddha floating on a lily pad.

JUDGE LITTLEFIELD (Calling out): El-Fayoumy—bring 'em on in!

EL-FAYOUMY: Uh . . . Sir, yes, sir, sir!

EL-FAYOUMY open door (To jury): Take your seats, please—Do not tarry.

Jury enters,

JUDGE LITTLEFIELD: Counselor, you may begin.

CUNNINGHAM: Mister Satan—

SATAN: I apologize for my earlier behavior, counselor—I had some bad fish at lunch.

CUNNINGHAM: Mister Satan, you've had a long-standing feud with God, correct?

SATAN: No. I love God.

CUNNINGHAM: You love God?

SATAN: Very much. God made me.

CUNNINGHAM: Okay, you say God made you—

SATAN: God did make me—it says so in the Bible.

CUNNINGHAM: I know about the Bible, Mister Satan. It also says in the Bible, in . . . in Matthew I believe. In Matthew, it, it says: "A good tree cannot bear bad fruit," correct?

SATAN: Correct.

CUNNINGHAM: So are you saying that you are good? Or are you saying that God is bad?

SATAN: I would never say that God is bad.

CUNNINGHAM: So, then, are you telling this court that you're good?

SATAN: I don't know—are you good, Counselor?

CUNNINGHAM: That's not what I asked you!

SATAN: I'm sorry.

CUNNINGHAM: Just answer the question.

SATAN: I don't believe in Good and Bad. What I believe in is Truth.

CUNNINGHAM: Fine. According to Job and Nehemiah, God created you in the first three days. True?

SATAN: True.

CUNNINGHAM: You were an "Angel."

SATAN: True.

CUNNINGHAM: You were present when God created Earth.

SATAN: True.

CUNNINGHAM: Then God created man and gave *him—not you*—dominion over the Earth. True?

SATAN: True.

CUNNINGHAM: You were, in fact, ordered by God to serve man. True?

SATAN: True.

CUNNINGHAM: According to Genesis and Ezekiel, you then tempted Eve to eat the Apple in order to prove to God that He had made an error in giving Man dominion over the Earth. At which point, according to Luke, you then "fell from Heaven like lightning" and became God's Adversary. And ever since that day, you have competed for Souls with God in order to try to prove the point that Man is not worthy to rule over the Earth. Isn't that true, Mister Satan?!

SATAN: I don't compete with God. God competes with himself.

CUNNINGHAM: That's not what I asked you.

SATAN: I'm trying to answer your question—

CUNNINGHAM: No, you are not trying to answer my question!

SATAN: Your Honor, I'm trying to form a response here—

JUDGE LITTLEFIELD: Let him answer, Cunningham!

EL-FAYOUMY: Your Honor, it does seem to me—

JUDGE LITTLEFIELD: Quiet! (*To* SATAN): Proceed.

SATAN: Thank you. Look, I didn't make you people, God did, okay? But there was a design flaw in the creation: He gave you Free Will—and to balance that out, you were designed to *Self-Correct*. But, unlike the "Free-Will" muscle, the "Self-Correct" muscle is not a particular favorite of the *Homo sapiens*. I'd say *"Self-Correct"* falls somewhere between "Colonoscopy" and "Firing Squad" on most people's holiday "wish" lists. At any rate, the truth is: I don't have to actively compete for human souls—I don't have to lull or flatter or tempt or deceive—because with God at the helm and you people running around wreaking havoc; I'll be honest, I spend most of my time on a sofa watching one-hour dramas on HBO.

CUNNINGHAM: And what? Getting tossed out of Heaven—that didn't bother you at all?

SATAN: There's a concept, Cunningham, called Playing the Cards You Are Dealt—One can either accept that concept or one can slowly lose one's mind, heart, and soul. I'd like to be more helpful to you here, but really, that's what it all comes down to.

CUNNINGHAM: Is that so?

SATAN: I'm just a fallen angel tryin' ta keep my dick hard in a monotheistic society—anything else you wanna ask?

CUNNINGHAM: Your Honor, this witness is clearly lying—I move that his entire testimony be stricken from the record.

JUDGE LITTLEFIELD: I'll not allow that, sorry—you conjured him, what comes out of his mouth is your responsibility.

CUNNINGHAM: But he's obviously lying!

SATAN: You oughta expand your consciousness, Counselor.

CUNNINGHAM: Your Honor!

JUDGE LITTLEFIELD: Unless you have another question, Cunningham, I suggest you step down now.

CUNNINGHAM: But—

JUDGE LITTLEFIELD: Forward or Back! You've been instructed, now what'll it be?

*A small beat.*

CUNNINGHAM: Why do you love God, Mister Satan?!

SATAN: What's not to love?

CUNNINGHAM: Specifically, Mister Satan! What specifically do you love about God?

SATAN: I don't know where to begin.

CUNNINGHAM: Pick a spot.

SATAN: I love God because He is All-Powerful and All-Forgiving. I love God because his Justice is perfect. I love God because God loves me.

CUNNINGHAM: God loves you?!

SATAN: Very much. Gift basket at Christmas—Hallmark Greetings on all the major holidays.

CUNNINGHAM: Stop it! If God loves you, then why did he throw you out of his Kingdom?!

SATAN: He didn't throw me out—I left.

CUNNINGHAM: That's not what it says in the Bible!

SATAN: Yeah, they fudged that part, you're right—but that's because you people really only respond to fear and threat—If they told you straight up that there was no lock to the Gates of Heaven, then you'd have no incentive at all to even try to be halfway decent.

CUNNINGHAM: In other words, God lied!

SATAN: God didn't write the Bible—you do know that, right?

CUNNINGHAM: Of course I know that!

SATAN: Then why would you say that God lied?

CUNNINGHAM: Mister Satan—does God love Judas Iscariot? Yes or No?!

SATAN: God loves everybody.

CUNNINGHAM: And yet Judas is in Hell—so what use is God's Love to Judas if my client is allowed to languish in Damnation?

SATAN: Your client is free to leave whenever he wants to—in fact, I wish he would—I could use the room.

CUNNINGHAM: That's not true and you know it!

SATAN: Look, maybe you should sit down and catch your breath—

CUNNINGHAM: —The real truth is that God's Love for us is Conditional—isn't that right! You failed to meet God's conditions, and he threw you in the trash! Judas failed—and he's in a catatonic stupor!

SATAN: Your client succumbed to Despair—

CUNNINGHAM: Yes! And if Human Despair is so powerful as to render God powerless over it, then what does that say about God?! It says one of two things, Mister Satan: Either God's not All-Powerful and therefore useless—or—God's Love is Conditional, which renders that Love false and Unworthy! Which one is it?!

SATAN: Cunningham, please don't take this personally, but your father never really loved you or wanted you, right? And the only reason your mother didn't abort you was because she was afraid of scarring—I think she told you that once, didn't she—

CUNNINGHAM: Mister Satan!—

SATAN: —Just because your parents resented you doesn't mean that God does.

CUNNINGHAM: —Mister Satan, I asked you a direct question and I am demanding from you a direct answer!

SATAN: The direct answer is that you are completely wrong.

CUNNINGHAM: Is God Powerless or Spiteful—I am ordering you to answer!

SATAN (*not unkindly*): You're powerless and spiteful, Cunningham—not God.

CUNNINGHAM: Your Honor, he's not answering!

JUDGE LITTLEFIELD: Whaddya want me to do about it?

CUNNINGHAM: But he's not answering!

SATAN: Open your heart to God, Cunningham.

CUNNINGHAM: Shut up! (*To* JUDGE) Your Honor?!

JUDGE LITTLEFIELD: I suggest you step down, Cunningham.

CUNNINGHAM: But I'm not finished!

JUDGE LITTLEFIELD: Then finish!

CUNNINGHAM: But Your Honor, this isn't fair!

JUDGE LITTLEFIELD: It is what it is, Cunningham!

CUNNINGHAM: But Your Honor—

JUDGE LITTLEFIELD: Cunningham—

CUNNINGHAM: Your Honor—

JUDGE LITTLEFIELD: What, Cunningham? What?

*Pause.*

CUNNINGHAM (*To* SATAN): You're a fuckin' liar!

SATAN: I'm truly sorry you feel that way.

*Pause.*

CUNNINGHAM: . . . . . Nothing further.

JUDGE LITTLEFIELD: El-Fayoumy: Cross?

EL-FAYOUMY *surveys* CUNNINGHAM, *then* SATAN, *then back to* CUNNINGHAM.

EL-FAYOUMY: No cross. No.

JUDGE LITTLEFIELD: You're excused.

SATAN: Thanks, Frank.

(*To the lawyers*): Counselors: You availed yourselves as expected. And by the way, El-Fayoumy, you're completely wrong, too. I'll be in couch.

*And he is gone.*

JUDGE LITTLEFIELD: Next witness!

*Blackout. A beat.*

JESUS *makes his way to* JUDAS. *He speaks to us.*

JESUS: Right now, I am in Fallujah. I am in Darfur. I am on Sixty-third and Park having dinner with Ellen Barkin and Ron Perelman . . . Right now, I'm on Lafayette and Astor waiting to hit you up for change so I can get high. I'm taking a walk through the Rose Garden with George Bush. I'm helping Donald Rumsfeld get a good night's sleep . . . I was in that cave with Osama, and on that plane with Mohamed Atta . . . And what I want you to *know* is that your work has barely begun. And what I want you to *trust* is the efficacy of divine love if practiced consciously. And what I need you to *believe* is that if you hate who I love, you do not know me at all. And make no mistake, "Who I Love" is every last one. I *am* every last one. People ask of me: Where are you? Where are you? . . . Verily I ask of you to ask yourself: Where are you? Where are *you*?

Judas.

*No response.*

Judas.

*Beat. JUDAS slowly emerges from his frozen state of catatonia.*

JUDAS: . . . . . . Who's that?

JESUS: Is it ever anybody else, Judas?

*Pause.*

I miss you.

JUDAS: Uh-huh.

JESUS: I miss you, Judas.

*JESUS lays a hand on him.*

JUDAS: *DON'T FUCKIN' TOUCH ME!*

JESUS: Judas.

JUDAS: *I SAID TAKE YOUR FUCKIN' HANDS OFF ME—TAKE 'EM OFF!*

JESUS: I'm sorry, I'm—

JUDAS: *—JUST BACK OFF MY GRILL, MAN! BACK OFF!*

JESUS: I'm sorry.

JUDAS: *BACK OFF MORE!*

JESUS: I'm sorry.

*Pause.*

Judas: If a thousand strangers spit on me and kick me as they pass, I will smile. But if the brother of my heart gives me only a passing hard look, then, Judas—I will not sleep that night, nor sleep—at all—till he will let me love him again.

JUDAS: *NO!!*

JESUS: No, what?

JUDAS: No more fuckin' fortune cookies, that's what! You wanna say something, I can't stop you—you wanna

apologize, fine, apologize and go, just—for once—speak like a normal fuckin' person!

JESUS: I'm not a normal person, Judas, and I'm not here to apologize. I am who I am and not what you demand me to be. I'm always going to be who I am and what I am, and when have you ever heard me deliver my message any differently, Judas? When?

JUDAS: I . . . Just, go away.

JESUS: I won't go away.

JUDAS: Well, that'd be a first.

JESUS: I have never gone away, Judas . . . Look at me,

*JUDAS does.*

I love you, Judas. And all I want—all I want—is to be not just near you—but *with* you.

JUDAS: Shoulda thought of that before.

JESUS: Before what?

JUDAS: Just get the fuck outta here, okay?

JESUS: Judas—

JUDAS: Don't fuckin' Judas me—*You're not wanted here,* okay, Mister Fuckin'-Above-It-All?!

JESUS: I'm not above it all—I'm right here in it, don't you see that?

JUDAS: *And don't you get that I don't fuckin' care?!*

JESUS: You think your suffering is a one-way street?! It's not! It's the exact opposite of not!

JUDAS: You got a lot of fuckin' nerve—

JESUS: —and you've got no nerve at all! Where's your *heart* in all this, Judas? You think you were with me for any other reason than that? It was your heart, Judas. You were all *heart*. You were my heart! Don't you know that!

JUDAS: I'll tell you what I know: I watched you trip over your

own dusty feet to heal the sick, the blind, the lame, the unclean—*any two-bit stranger stubbed their fuckin' toe!* When some lowly distant relative—too cheap to buy enough wine for his own fuckin' wedding—suddenly runs out of booze—no problem, you just "presto change-o"—*and it was fuckin' Miller time in ol' Canaan again, wasn't it, bro! But when I fuckin' needed you—where the fuck were you, huh?!*

JESUS: Judas—

JUDAS: You forgave Peter and bullshit Thomas—you knocked Paul of Tarsus off a horse—you raised Lazarus *from the fuckin' dead*—but me! Me! Your "heart"? . . . *What about me?!?!! What about me, Jesus?! Huh?!* You just, you just—I made a mistake! And if that was wrong, then you should have told me! And if a broken heart wasn't sufficient reason to hang, *THEN YOU SHOULD HAVE TOLD ME THAT, TOO!*

JESUS: Don't you think . . . that if I knew that it would have changed your mind . . . that I would have?

*Pause.*

JUDAS: All I know is that you broke me unfixable—and that I'm here . . . And, you wanna know when you delivered your message differently? At the Temple, Jesus—that's when. And you were beautiful there. And you left there three inches taller. And we all saw it. I loved you. That's all I did. And that's the truth. And now I'm here.

JESUS: Judas—What if I were to tell you that you are not here? That you are with me in my Kingdom even now, and that you have been there since the morning of my Ascension and that you have never left?

*JUDAS spits in JESUS's face.*

JUDAS: That's what I think about you.

JESUS: *doesn't wipe it off.*

JESUS: I love you, Judas.

*Pause.*

I love you.

JUDAS: *Just stop!*

JESUS: Don't you see me here, Judas?

JUDAS: *I see a lot of things!*

JESUS: You see alotta things?

JUDAS: *That's right!*

JESUS: How about him? Do you see him?

*SATAN appears.*

Do you know him? Call unto him. Touch him. He is not there. Because he does not exist, Judas. Rather, they must conjure him, and still he is but a vapor blown away by a hummingbird's breath. He is false. He is a lie. He is not real. Touch him. Go ahead.

JUDAS: I don't wanna touch him.

JESUS: Stand up, Judas.

JUDAS: You know I can't do that!

JESUS: No. What I know—is that you can.

JUDAS: Get the fuck over yourself!

JESUS: Will you feed my lambs, Judas? . . . Will you take care of my little sheep? . . . Will you feed my lambs?!

JUDAS: "Feed your lambs"?

JESUS: You know exactly what I'm asking you.

JUDAS: Go away!

JESUS: If you don't love me, Judas—then you're gonna have to look me in my eyes and say it.

JUDAS: I don't love you.

JESUS: If you don't love me, then why are you here?

JUDAS: Go!

JESUS: Judas! ... Judas, don't you know what would happen the very instant you got down on your knees?

JUDAS: Why on my knees? They shoulda buried me standing up—'cuz I been on my knees my whole life! You left me.

*JUDAS is slowly reverting to his frozen catatonic state.*

JESUS: I'm right here.

JUDAS: I would have never believed that you could have left me.

JESUS: I never left you.

JUDAS: That you didn't love me.

JESUS: I do love you.

JUDAS: Why ... didn't you make me good enough ... so that you could've loved me?

JESUS: ... Please take my hands, Judas. Please.

JUDAS: Where are they?

JESUS: Right here.

JUDAS: I can't see them.

JESUS: They're right here.

JUDAS: *Where are you going?!*

JESUS: I'm right here.

JUDAS: *Don't leave me!*

JESUS: I'm here.

JUDAS: I can't hurt ...

JESUS: I love you, Judas.

JUDAS: I can't ...

JESUS: Please stay.

JUDAS: I can't hurt ...

JESUS: Please love me, Judas.

JUDAS: I can't.

*JUDAS is frozen again.*

*A long beat.*

*BUTCH HONEYWELL enters JUDAS'S lair with a twelve-pack of Canadian beer. BUTCH looks around, clears his throat, takes off his cap.*

BUTCH HONEYWELL: Um, uh, Mister Iscariot? Uh, Mister Iscariot, I, uh, I don't know if you can hear me, but, I just—I just wanted to introduce myself, if, if I could. I'm, uh, Butch Honeywell. I was the foreman of the jury at your trial there ... and ... well, we found you guilty, Mister Iscariot. ... I'm real sorry about that ... Oh, uh ... I brought you a twelve-pack of beer. Actually, guess it's a five-pack now, but, anyway ... Here. I don't know if you drink beer, but it's good stuff ... Anyways, I'll just set it down right beside you right here ... Okay then.

*BUTCH goes to leave, then stops.*

... So ... I think I'm dead, Mister Iscariot, and, I'm a little concerned about that 'cuz I don't think my soul's ready for judgment, but nobody else has so far corroborated that I'm dead so, I just don't bring it up, but, the fact is that if this is a dream, it's the longest damn dream I've ever endured—and really, I just ... I really miss my wife, Mister Iscariot. Is it okay if I tell you that?

*Beat. BUTCH pops a beer. Sips. Pause.*

I remember, I was with these two girls that night, when I first seent my wife, Mister Iscariot. It was a party at Jimmy Rayburn's house 'cuz Jimmy's momma worked till midnight so he had the house to himself, and, you know, me and these two girls—Suzie Heller and Della Mae Robbins—we were just talkin', smokin' cigarettes, out on Mrs. Rayburn's deck away from the party. I was depressed over sumpthin' or other—prolly 'cuz school was ending—plus I had just been in the school play—I had played Tom in *The Glass Menagerie*—it was the first time I had ever acted, and everyone said I was real good. But now, the play was over, and school was almost over, and, for the part in the play, they had given me this real short haircut—like 1940s style—and my ears, Mister Iscariot, I don't know if you can notice, but, they stick out a little bit, so, with the short haircut and all, I was feeling a little self-conscious and dumb, and, anyway, just not too cheery . . . So anyways, I'm out there on the deck talkin' to Suzie and Della—and all a the sudden I see this girl inside at the party. She had, I guess, just arrived, and she had on a red jacket. It was a cheerleading jacket, from the high school just across the state line in Virginia—The Red Raiders—and I remember, all I saw was blonde hair, and a red jacket, and this smile that was—even from a distance—just kinda electrifying to the heart, ya know? 'Bout a minute later, the sliding door to the deck opens, and this girl, she comes out by herself, and she's heading towards us—turns out she's friends with Della from back in the day, from, I don't know, Girl Scouts, Brownies, sumpthin' like that. Anyways, she walks over—and she was so beautiful, that I remember thinkin' to myself—and this is exactly word for word what I thought—"I ain't even gonna bother talkin' to this girl." So she comes over, says hello, and I just excuse myself right off the deck and head back inside,

fixin' ta say my "good-byes" and skedaddle . . . And anyways, I try to leave, but then, Jimmy handed me a beer, and someone else started passin' a bottle of Rebel Yell, and before you know it, you know, bong hits and whatnot, and anyways a little later I'm sittin' on the couch when this girl—my future wife—she just comes up to me by herself and she says: "I saw you in that play the other night. You made me cry" . . . Two days later, we went out on a date . . . On the way back, I was driving her home, and we passed by this house where my friend Dave Hoghe used to live who had died . . . I hadn't been by his house since he passed. The family didn't live there no more. But when I saw the house, I got struck with this feeling, and I asked her if she wouldn't mind if we just pulled up in front of that house and just sat for a moment. She said: "Sure." So I parked, and we just sat in the car for a while. Quiet. Not sayin' nothin'. And before I knew it, Mister Iscariot, I was tearing up—'cuz this kid, he had been a real good friend of mine, ya know—and then, I just started crying, Mister Iscariot. I couldn't help myself and I couldn't shut it off. And I was real embarrassed, and she just, she just held me while tears and snot and whatnot just poured outta me and onto her little white sweater . . . And she didn't mind about that . . . She didn't mind at all . . . At some point, I drove her home, and we got to her door, and we started to kiss, and, well, God, it was like, I'll tell ya—it was like peaches and dynamite . . . And before I left, I apologized to her about the crying and all, and she said: "Don't be a jackass, Butch Honeywell," and I smiled, but then I went on to explain my meaning, which was—you know—if you want a girl to think you're sensitive or something, then maybe taking her to the house of your dead friend and crying all over her pretty white sweater might be a good way to pull it off, and, you know what

she said, Mister Iscariot? . . . She looked at me for a good long while with them all the way dazzling eyes of hers and then she just said: "Well, if it was a trick . . . then I'm tricked" . . . . . . . . Three years into our marriage, I took a job teaching at the State College—I was popular with the students 'cuz I found a way to make 'em wanna learn. One night, at the end of the semester, they took me out for beers. I ended up havin' an assignation with one of the coeds—young lady named Lucy. And I went home that night, got into bed next to my wife drunk as a skunk and I remember, before I passed out, I was lookin' at her. I always liked to look at her when she was sleeping 'cuz she always looked so good. I had a little nickname for her, I useta call her "my little baby dinosaur," 'cuz that's how she looked like when she slept—like one of those cute cute cartoon little baby dinosaurs—like a little brontosaurus, but cute . . . Anyways, when I woke up the next mornin', she was still sleepin', and what I had done the night before came back to me, and I looked at my wife, and, boy, she looked exactly the same as always, but, somehow, she just wasn't my little baby dinosaur no more, ya know? And she woke up, and she didn't know nuthin' 'bout nuthin', and everything was exactly the same as if the night before had never happened, except, it wasn't the same, and I knew it. And I had no idea why I had done what I done. But I had done it. And it couldn't be changed. My girl, she got up and fixed blueberry French toast with maple walnut pecans. I didn't eat it. No way I coulda eaten it. Nuthin' was ever the same after that mornin', Mister Iscariot, ya know? I tried a lot of things to make it better, the only thing that did was more beer and women . . . Do you know who W. H. Auden was, Mister Iscariot? W. H. Auden was a poet who once said: "God may reduce you on Judgement Day to tears of shame, reciting by

heart the poems you would have written, had your life been good" . . . She was my poem, Mister Iscariot. Her and the kids. But mostly . . . her . . . You cashed in Silver, Mister Iscariot, but me? Me, I threw away Gold . . . That's a fact. That's a natural fact.

*A long beat.*

*JESUS sighs, takes off his shirt, plunges it in the bucket, rinses it, and begins to wash JUDAS's feet. JESUS washes meticulously and with care. He washes. And washes. Perhaps the water is mixed with tears.*

*Lights fade.*

*The end.*

## Acknowledgments

Much Grateful Thanks Firstly to the Following: The LAByrinth Theater Company, George C. Wolfe, Mara Manus, Michael Hurst, Peter Dubois, Irene Cabrera, Celise Kalke, Steven Showalter, Jordan Thaler, Heidi Griffiths, Kenneth Leslie and all the ushers and staff at The Public Theater; Marieke Gaboury, Sallie D. Sanders, Amanda Woods, Abby Marcus, Veronica R. Bainbridge, Monique Carboni, Brian Roff, Michael Almereyda, Terrence Morris, Robin L. Cook, John Concado, Courtney Wetzel, Ashley Hanna, Florencia Lozano, Chris Rubino, Monica Moore, Maddalena Deichman, Andromache Chalfant, Mimi O'Donnell, Japhy Weideman, Darron L. West, Madonna Badger, Kimberly Braswell, Colin Calender, David Deblinger, Michael J. Fine, Lulie Haddad, Ruth Hendl, Jeffrey A. Horwitz, Margo Lion, John Marcus, Ricardo E. Oquendo, Daryl Roth, John Gould Rubin, Carlo Alban, Simone Allmen, Vanessa Aspillaga, Liche Ariza, Dick Benedek, Maggie Bofill, John Buzzetti, Elizabeth Canavan, Andrea Ciannavei, Rebecca Cohen, Beth Cole, Alexis Croucher, Billy Crudup, Kim Director, Faber and Faber, Rev. Dr. James A. Forbes Jr. of the Riverside Church, the Gersh Agency, Bob Glaudini, Charles Goforth, Robyn Goodman, Marie Therese Guirgis, Maurice and Therese Guirgis, Mark Hammer, HBO Films, Ron Cephas Jones, Jen Konawal, Diane Landers, Brett C. Leonard, Trevor Long, MCC Playwrights'



**APPENDIX**
**Part 2**

LEXSEE


Cited
As of: Jun 25, 2008

CBS BROADCASTING INC., SURVIVOR PRODUCTIONS, LLC, Plaintiffs, -
against- ABC, INC., GRANADA PLC, GRANADA ENTERTAINMENT USA,
Defendants.

02 Civ. 8813 (LAP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2003 U.S. Dist. LEXIS 20258

January 13, 2003, Decided
January 14, 2003, Filed

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiffs, a television
network, and the producer of a television reality series,
moved for a preliminary injunction in a copyright
infringement action they filed against defendants,
another television network, and two companies.

OVERVIEW: The court assumed ownership by
plaintiffs for purposes of the motion. Defendants had
access to plaintiffs' popular, successful television show.
However, the court was persuaded by defendants'
evidence of their show's independent creation. Plaintiffs
did not establish that defendants copied from plaintiffs'
show the elements of defendants' show that were in the
pre-testing proposals. Both parties combined standard,
unprotectable elements of reality shows, game shows,
and other television genres, and used them separately to
create the programs. For purposes of the motion, the
court assumed actual copying over the later-added
elements of defendants' show. Defendants' show added
elements of the tabloid genre and the audience
participation element of the game show genre, neither of
which were found in plaintiffs' show. The court found
the concept and feel of the two shows to be different.
The major factor comprising this difference was the tone
of the two shows. Plaintiffs' show was serious, while
defendants' show was comedic. Plaintiff was not likely to
succeed in showing substantial similarity. In addition, the

balance of hardships tipped decidedly in favor of
defendants.

OUTCOME: The application for a preliminary
injunction was denied.

COUNSEL: [*1] For CBS Broadcasting, Inc, Survivor
Productions, LLC, PLAINTIFFS: Lewis R Clayton,
Leslie Gordan Fagen, Paul, Weiss, Rifkind, Wharton &
Garrison, New York, NY USA.

For ABC, Inc, Granada, PLC, Granada Entertainment
USA, DEFENDANTS: Jane W Parver, Kaye Scohler
LLP, New York, NY USA.

JUDGES: LORETTA A. PRESKA, U.S.D.J.

OPINION BY: LORETTA A. PRESKA

OPINION

   LORETTA A. PRESKA, United States District
Judge:

   For the reasons stated on the record in open court on
January 13, 2003, plaintiff's motion for a preliminary
injunction (docket # 4) was denied.

   SO ORDERED

   January 13, 2003

LORETTA A. PRESKA, U.S.D.J.

Decision

AFTERNOON SESSION

2:15 p.m.

(In open court)

THE COURT: Counsel, I'm most grateful to you and to the parties to hear this case, and to have the benefit of such excellent presentations on both sides.

I'm particularly benefited from the parties educating me about the evolution of TV shows, that is, it is a continual process involving borrowing liberally from what has gone before. Indeed, I subscribe to Mr. Parsons' characterization of the facts here as his having put a new spin on the American game show and sold it back to the Americans.

As we all agree, plaintiff will [*2] prevail on a copyright infringement case under Section 106 of the act by demonstrating "Ownership of a valid copyright, and copying the constituent elements." *Feist Publications v. Rural Telephone Serv. Co.*, 499 U.S. 340, 361, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991).

Although there have been issues raised as to ownership, including documents executed following depositions, I will assume ownership by plaintiffs for today's purposes.

In this circuit, "There are two main components of [A] prima facie case of infringement: 'A plaintiff must first show that his work was actually copied, .... [and] then must show that the copying amounts to an improper or unlawful appropriate'", *Castle Rock Entertainment v. Carol Publishing Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Laurey Sens, v. Iden Group, Inc.*, 964 F.2d 131, 139-40, (2d Cir. 1992)).

Because direct admissions of copying are unusual, actual copying may be established by "indirect evidence, including access to the copyrighted work, [and] similarities that are probative of copying." *Castle Rock*, 150 F.3d at 137 (citations omitted).

Proof of "wide [*3] dissemination of copyrighted work establishes access in this circuit. *Boisson v. Banian, Ltd.*, 273 F.3d 262, 270 (2d Cir. 2001).

The probative similarity standard has been described as follows: "When the questioning is copying as a factual matter, then similarities that, in the normal course of events, would not be expected to arise independently in the two works, are probative of defendants having copied as a factual matter from plaintiffs' work. Nimmer Section 1303(b) [at 13-11 to 13-13].

When evaluating probative similarity, a Court should compare the works in their entirety, including both protectable and unprotectable elements. *See Fisher Price, Inc., v. Well Made Toy Manufacturing Corp.*, 25 F.3d 119, 123 (2d Cir. 1994).

This is appropriate, because although plaintiffs must ultimately establish infringement by showing (that defendants copied a substantial amount of protectable elements, (i.e. meet the "substantial similarity" standard), the fact that nonprotectable elements were copied, although not a basis for liability, can be probative of whether protected elements were copied, i.e. help establish probative similarity.

Defendants cannot [*4] dispute that they had access to Survivor in terms of viewing the broadcast, both in the UK and the U.S. Similarly, the extensive press coverage of Survivor makes clear that members of the television and entertainment industry, including defendant, had to be aware of the program.

However, I'm persuaded by defendants' evidence of Celebrity's independent creation, to the extent that I find crediting the testimony of Mr. Allen and Ms. Znak, that defendants had the substantive elements of the program that eventually became Celebrity in the works before Mr. Allen "rested" and before the U.S. version of Survivor aired in May of 2000.

In this respect, plaintiffs have not established that defendants copied from Survivor those elements of Celebrity that were in the pre-resting proposals. Rather, the evidence shows that both parties combined standard, unprotectable elements of reality shows, game shows and other television genres, and used them separately to create the programs.

What is less clear from the evidence is the extent to which defendants tweaked or added to the various elements of Celebrity, such as serial elimination, after becoming aware of Survivor.

Certainly it is not clear [*5] whether those elements were added as a result of actual copying from Survivor, or from Big Brother or Pop Idol. For today's purposes, however, I will assume actual copying over the later-added elements from Survivor.

As I noted previously, it's not enough for plaintiffs merely to establish copying. To prove infringement, a plaintiff must also show that the copying is illegal, because a substantial similarity exists between the defendants' work and the protectable elements of the plaintiff's work. *Streetwise Maps, Inc., v. VanDam, Inc,* 159, F.3d 739, 747 (2d Cir. 1998).

"It is 'a principle fundamental to copyright law' that 'a copyright does not protect an idea, but only the

expression of an idea.'" *Williams v. Crichton*, 84 F.3d 581, 587, (2d Cir. 1996), (quoting *Kregos, v. Associated Press*, 3 F.3d 656, 663 (2d Cir. 1993).

"Similarly, Scenes Afire, sequences of events that 'necessarily result from the choice of a setting or situation, do not enjoy copyright protection." *Williams* at 587, quoting *Walker v. Time Line Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986)

No news to anyone in this courtroom, the *Williams* Court told [*6] us "the distinction between an idea and its expression is an illusive one. As counsel have argued this morning, Judge Learned Hand provided the guiding principle to this often impenetrable inquiry in *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930): Upon any work, ...., a great number of patterns of increasing generality will fit equally well as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title. But there is a point in this series of extractions where they are no longer protected. Since otherwise the [author], could prevent the use of his 'ideas' to which apart from their expression, his property is never extended." *Williams at 587-88*.

The proscription against copyrighting ideas is codified in Section 102(b) of the copyright act. "In no case does copyright protection for an original work of authorship extend to any idea, .... concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated or embodied in such work." 17 U.S.C. Section 102 (b).

[*7]  Interpreting this section in the ban on copyrighting ideas, the Second Circuit has held that copyright does not protect facts, generalized themes and ideas, subthemes, stock themes, general imagery, literary formulas, actual, true or historical events, episode or scenes a faire, scenes that necessarily result from the choice of a setting situation. *Attia v. Society of the New York Hospital*, 201 F.3d 50, 54 (2d Cir. 1999); *Warner Brothers, Inc. v. American Broadcasting Cos.*, 654 F.2d 204, 208 (2d Cir. 1981); *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 978 (2d Cir. 1980); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49, 50 (2d Cir. 1986); see *Rokeach v. Avco Embassy Pictures Corp.*, 1978 U.S. Dist. LEXIS 20101, *19-20 (S.D.N.Y. Jan. 17, 1978).

Off the record.

(A discussion was held off the record)

THE COURT: Nor does copyright protect the mere duplication of short or ordinary phrases, commonly used terms, names, titles or slogans. *Narell v. Freeman*, 872

F.2d 907, 911 (9th Cir. 1989); [*8]  *Boyle v. Stephens, Inc.*, 1997 U.S. Dist. LEXIS 12780, *13 (S.D.N.Y. Aug. 25, 1997); 37 C.F.R. Section 202.1(a)

However, consistent with copyright's protection of expression, the Ninth Circuit has reiterated that "protectable expression includes the specific details of an author's rendering of ideas or 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'" *Metcalf v. Bochco*, 294 F.3d 1069, 1074, (9th Cir. 2002) (quoting *Berkic v. Crichton, 761 F.2d 1289, 1293 (9th Cir. 1985).

Although certain similarities may not be protectable when considered individually because they are too generic or constitute scenes a faire, the *Metcalf* Court found that "the presence of so many generic similarities, and the common patterns in which they arise," may help a party "satisfy the extrinsic test" for substantial similarity and survive summary judgment. Id.

Similarly, Judge Weinfeld wrote that "even [where], a television game show is made up of entirely stock devices, an original selection, organization and presentation of such devices can nevertheless [*9]  be protected, just as it is the original combination of words or notes that leads to a protectable book or song. Copying of a television producer's selection, organization and presentation of stock devices would therefore be a misappropriation." *Barns/Fraser Enterprises v. Goodson-Todman, Enterprises, Ltd.*, 1988 U.S. Dist. LEXIS 146, 5 U.S. P.Q. 2d, 1887, 1891 (S.D.N.Y. January 4, 1988).

Also relevant to this discussion of the protectability of a collection of otherwise generic ideas is the situation confronted by the Supreme Court in *Feist Publications, Inc., v. Rural Telephone Serv. Co.*, 499 U.S. 340, 349, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991).

There the Court wrote: "When a compilation author has no written expression, but rather lets the facts speak for themselves, the expressive element is more elusive. The only conceivable expression is the manner in which the compiler has selected and arranged the facts. Thus, if the selection and arrangement are original, these elements of the work are eligible for copyright protection. No matter how original the format, however, the facts themselves do not become original through association. 499 U.S. at 349. [*10]

Justice O'Connor continued to write: "This inevitably means that a copyright in a factual compilation is thin, notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement. Id.

Justice O'Connor went on to note: "As one commentator explains it: 'No matter how much original authorship the work displays, the facts and ideas it exposes are free for the taking .... the very same facts and ideas may be divorced from the context imposed by the author and restated or reshuffled by second comers, even if the author was the first to discover the facts or to propose the ideas.'" 499 U.S. at 349 (quoting *Ginsburg Creation and Commercial Value:* Copyright protection of Works of Information, 90 Columbia Law Review 1865, 1868 and N. 12 (1990).

Thus, as noted above, the Supreme Court held in *Feist* that the copyrightability of factual compilations is entitled to "thin" and "limited protection." 499 U.S. at 349, 359.

*Feist* was somewhat analogous to the situation presented [*11] here in that the Court there addressed a compilation of otherwise nonprotectable facts. Whereas here, we have a combination of nonprotectable generic ideas. A difference, however, is that the acts specifically provides for copyright in a compilation of facts.

With this lengthy background, I move on to consider the substantial similarity test.

The Court of Appeals has instructed that "when we compare products that contain both protectable and unprotectable elements, our inspection must be 'more discerning;' we must attempt to extract the unprotectable elements from our consideration and ask whether the protectable elements, standing alone, are substantially similar." *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1002 (2d Cir. 1995).

As Professor Nimmer explains, regardless of the nature of the copyrighted work "to determine whether the similarity between plaintiffs' and defendants' work is substantial, the comparison should not include unoriginal elements of the plaintiffs' work; rather, the comparison should take place after filtering out of the analysis elements of plaintiffs' work that are not protectable. Nimmer Section 13.03 E [2], pages 13-83 to 13-84.

[*12] However, when assessing substantial similarity, the Court of Appeals does not permit a "mechanical and counter-intuitive," exercise of simply extracting unprotectable elements and comparing the remainder. *Knitwaves, Inc.,* 71 F.3d at 1003. There, the Court in affirming a finding of infringement cautioned against a rigid segregation of components of a copyrighted work because "if we took this argument to its logical conclusion, we might have to decide that there can be no originality in a painting, because all colors of paint have been used somewhere in the past." Id. (internal citation omitted).

Thus, the province of the fact finder is to examine, among other things, "the total concept and feel" of the 2 works. Id. at 1003 (citation omitted).

Going to the Court of Appeals' more recent decision in *Boisson,* it seems clear that a "more refined analysis" is required where a plaintiff's work is not wholly original but, rather, incorporates elements from the public domain. *Boisson, 273 F.3d at 272.*

I confess to some confusion as to the court's instructions thereafter. The next instruction in *Boisson* is 'in these instances' what must be shown is substantial [*13] similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed compilation. Id. There follows a seemingly contrary instruction "in applying this test a court is not to dissect the works at issue into separate components and compare only the copyrightable elements." 273 F.3d at 272 (citing *Knitwaves, 71 F.3d at 1003*). "To do so would be to take the 'more discerning' test to an extreme which would result in almost nothing being copyrightable because original works broken down into their composite parts would usually be little more than basic unprotectable elements like letters, colors and symbols. This outcome -- affording no copyright protection to an original compilation of unprotectable elements -- would be contrary to the Supreme Court's holding in Feist. Id. Fortunately, however, I need not harmonize these two rather general statements because the court went on to give more specific instructions applicable to works such as those at issue here. The court continued "when evaluating claims of infringement involving literary works, we have noted that while liability would result only if the protectable [*14] elements were substantially similar our examination would encompass" the similarities in such aspects as the total concept in feel, theme, characters, plot, sequence, pace and setting of the [plaintiffs'] books and the [defendant's] citing *Williams v. Crichton, 84 F.3d 581, 588." 273 F.3d at 273.*

It has also been noted that the analysis of the "total concept and feel" of works must be conducted with caution. As Judge Haight explained in granting summary judgment with respect to a series of child cartoon characters "Courts must pay particular attention to summary judgment motions in cases where a plaintiff claims that defendant's work copies the total concept and feel" of plaintiff's work. Accepting an overly broad scope for protective total concept and feel "threatens the basic principal of copyright law: That concepts and ideas may not be copyrighted and that only a particular expression of an idea may be copyrighted." *CK Co. v. Burger King Corp., 1994 U.S. Dist. LEXIS 13934, 1994 WL 533253 *4 (S.D.N.Y. September 3, 1994).* Professor Nimmer makes the same point rather emphatically. He writes

"The touchstone of 'total concept and feel' threatens to subvert the very essence [*15] of copyright, namely, the protection of original expression. 'Concepts' are statutorily ineligible for copyright protection; for courts do advert to a works "total concept" as the essence of its protectable character seems ill-advised in the extreme. Further, the addition of the 'feel' to the judicial inquiry being a wholly amorphous referent merely invites an abdication of analysis." Nimmer, Section 1303 [A] [1] [c], page 13-39 (emphasis in original). Consistent with these decisions and with Professor Nimmer is that the few decisions in which the Court of Appeals has found liability based on a "look and feel" argument all involved infringement of visual designs of a single static artistic work. EB Boisson, 273 F.3d 262 (quilt design); Yurman Design Inc. v. BPAG Inc., 262 F.3d 101 (2d Circuit 2001) (jewelry design); Hamil America Inc. v. GFI Inc., 193 F.3d 92 (2d Circuit 1999) (floral pattern); Knitwaves, 71 F.3d 996 (sweater designs). In each instance the defendants actually copied the plaintiff's design and the similarities between the plaintiff's and the defendants' works were overwhelming. See Boisson, 273 F.3d at 272 [*16] ("enormous amount of sameness"; "overwhelming similarities in color choices"); Yurman, 262 F.3d at 110-11 ("overwhelming impression" that the defendant's products are 'appropriations'."; Hamil, 193 F.3d at 102-03 ("both fabrics use the exact same colors in the same manner" producing "identity of design"); Knitwaves, 71 F-3 at 1004 (defendants "featured the same two full symbols" and "employed them in virtually the same manner as plaintiff" on "strikingly similar backgrounds ... in virtually the same color scheme" producing an "overwhelming similarity of the sweaters as 'concept and feel'.")

The Court of Appeals' citation to the Williams case in Boisson brings me to a case I found quite helpful to the analysis here.

There plaintiff Williams had written four children's adventure books that took place in Dinosaur World, "an imaginary present day man-made animal park for dinosaurs and other prehistoric animals where ordinary people ... can, in presumed safety, visit, tour and observe the animals in a natural but hi-tech, controlled habitat." 84 F.3d at 583. In discussing the substantial similarity analysis the Court of Appeals noted Professor Chafee's [*17] definition of the boundary between idea and expression where he stated "that 'protection' covers the pattern of the work ... the sequence of events and the development of the interplay of characters." Id. at 588 citing Chafee, reflections on the law of copyright, 45 Columbia Law Review 503, 513 (1945). The court proceeded to examine similarities in such aspects as total concept and feel, theme, characters, plot, sequence, pace and setting. Like the Court of Appeals I believe that

"examples aid us in applying these abstract principles" Id., and to that end I note several of the findings of the Williams court. For example, the court found the total concept and feel of the two works to differ substantially. It noted that "the total concept and feel of the Jurassic Park works is of a world out of control while Williams' Dinosaur World is well under control;" 84 F.3d at 589. The court also discussed the themes of the two works. It noted "any similarity in the themes of the parties' works relates to the unprotectable idea of a dinosaur zoo. Once one goes beyond this level of abstraction the similarity in themes disappears. The Jurassic Park works involve [*18] genetic engineering, ego, greed, and the consequences of man's hubris in believing that nature can be controlled. No similar themes are evident in any of the Dinosaur World books."

As well as the other elements compared, the court also noted that "the plot or sequence of events of the works likewise is not substantially similar. Although Williams points to several specific instances of similarity, we agree with the district court that such lists are 'inherently subjective and unreliable', particularly when 'the list emphasizes random similarities scattered throughout the works'. Such a scatter-shot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: Whether a lay observer would consider the works as a whole substantially similar to one another." 84 F.3d at 590 (citations omitted).

The court noted in Footnote 3 specific examples of similarity. They included: "encounters with small dinosaurs in Books I, III, and the Jurassic Park novel; encounters with brachiosaurs in Book II and the Jurassic Park movie; visits to dinosaur nurseries in both Book II and the Jurassic Park works; tours with automated vehicles and recorded [*19] guides in Books II, IV and the Jurassic Park works; stranded characters encountering ferocious dinosaurs in Book II and the Jurassic Park works; characters in boats being pursued by dinosaurs in Book III and the Jurassic Park novel; dinosaurs escaping from paddock fences in both Book III and the Jurassic Park works; and characters escaping pack-hunting dinosaurs through the intervention of another dinosaur and a helicopter in Book III and the Jurassic Park movie.

In this case in considering substantial similarity it is crucial to consider each program series as a whole, like the court did in Williams and Castle Rock, and not to segregate components rigidly as the Knitwaves court and the Williams court cautioned against.

In what I hope is plain English, I begin the analysis by agreeing with the experts that both shows combine well-known and frequently used generic elements of

earlier works. They have several of those elements in common but each series also includes well-known elements not present in the other. Before analyzing these elements more specifically, I generally credit Professor Spigel's method of analysis, that is, her analysis of the evolution of the serial TV reality [*20] show as a cycle in the reality TV genre which in turn evolved from combining characteristics of other earlier genres. Professor Spigel's analysis derives from a broad historical perspective and in my view is more logical and more persuasive because of that derivation. Although Professor Thompson also identifies elements present in the programs from prior genres, his analysis does not have the historical progression that seems necessary to understand the genres of these shows and the generic nature of the elements included. This more scatter-shot analysis employed by Professor Thompson also permitted him to identify the shared elements of the two shows as critical and the elements not shared as unimportant.

In addition, as I will discuss more later, the single paragraph on page 6 of Professor Thompson's report where he discusses the presentation or expression of the elements or concepts contains rather vague, unspecific discussion. In addition, the one example of concrete discussion of expression provided by Professor Thompson, the 8-minute tape, engages in what the Knitwaves court characterized as a rigid segregation of components and which the Williams court warned against. Aside [*21] from the lesser logical appearance of Professor Thompson's analysis, I also do not credit his method of analysis because of his continuing efforts to backtrack from his deposition testimony as illustrated by counsel on cross. I specifically note that he nowhere addressed any possible comedic appeal of Survivor in his report and did not mention any such element in connection with this case until cross examination after comedic tone had been relied upon heavily by defendants as a major difference between Survivor and Celebrity.

In his testimony Professor Thompson identified the following elements as essential to Survivor: Voyeur verite, hostile environment in the deserted island sense, not the Title VII sense, building of social alliances, challenges arising from the game show element and serial elimination. He noted that these elements were "never found in that combination in any other show" (Transcript 145). He stated "the genre it's in was only emerging and [Survivor] is one of the definitional shows that defined what that genre would become as we started to define it." (Transcript 147).

Passing from some of the other differences, I note that Celebrity also adds significant elements [*22] not found in Survivor, including elements of the Celebrity tabloid genre and the audience participation element of

the game show genre. Thus the combination of elements, even under Professor Thompson's analysis, is not congruent. Even if, as Professor Thompson posits, the elements were congruent, that congruence, without more, would not establish substantial similarity in the copyright meaning because it would violate the cardinal rule of copyright that copyright does not protect an idea but only the expression of an idea. As the Metcalf court noted "instead protectable expression includes the specific details of an author's rendering of ideas or 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters'." 294 F.3d at 1074 (emphasis added, citations omitted). In Barris/Fraser, for example, Judge Weinfeld wrote that "copying a producer's selection, organization and presentation of stock devices" would be misappropriation. 5 USPQ at 1891 (emphasis added).

It is the presentation or expression element that this portion of Professor Thompson's analysis seems to miss. Here protection of the elements [*23] defining a genre, is Professor Thompson testified Survivor's elements do, without more are, as Judge Hand pointed out in Nichols, too abstract to be protected. Such protection would also cross into the dangerous territory Professor Nimmer warned about, that is, "adverting to a works 'total concept'." Nimmer, Section 1303 [A] [1] [c], page 13-39.

I note in this regard that plaintiff's counsel's argument today focused almost entirely on the protection of the combination of generic elements without addressing this presentation or expression factor. I am persuaded that the expression factor -- or, as Judge Weinfeld said, the presentation factor -- must be considered here not only because of the statute but more practically because of Dr. Spigel's comparison of I Love Lucy and the Honeymooners in her testimony. She noted that both were examples of domestic situation comedies and shared the elements of family/couple characters, plots based on gender stereotypes, laugh tracks, and a three-act structure. As she pointed out, however, these congruent elements were expressed differently in the two shows. In her testimony at pages 378 and 379 she noted that the Honeymooners was about a [*24] male character, of course played by Jackie Gleason, who was a lower-class individual, a bus driver, and who was always feeling inadequate in some way. His wife Alice was always in the know, always smarter than he, and the plots revolved around his get-rich-quick schemes and the like. I Love Lucy, on the other hand, featured Lucille Ball as the zany housewife character who wanted to get out of the house but whose husband wouldn't let her work. Professor Spigel noted that Lucy's husband, Ricky, was a band leader, the more successful one, and that they were both middle class. As Professor Spigel noted, the programs had very different kinds of plots because of the

difference story elements that were added to the similar genre.

As the testimony has also made clear, similar analysis can be made of I Dream Of Genie and Bewitched and the Jay Leno Show and the David Letterman Show.

Indeed, in light of cases cited and Professor Spigel's testimony, it is my view that providing protection to a combination of generic elements without more -- that is, without consideration of the presentation or expression of those elements -- would stifle innovation and would stifle the creative process that [*25] spawned the two shows at issue here.

All of this having been said, I now move to the "more discerning" analysis prescribed by the Court of Appeals to consider the respective shows' expressions of these abstract concepts. In so doing I acknowledge that "dissimilarity between some aspects of the works would not automatically relieve an infringer of liability for 'no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated'. It is, only when the similarities between protected elements of plaintiff's work and the allegedly infringing work are of 'small import qualitatively or quantitatively' that the defendant would be found innocent of infringement." Williams 84 F.3d at 588 citing Rogers v. Koons, 960 F.2d 301, 308 (2d Cir. 1992) cert. denied, 506 U.S. 934, 121 L. Ed. 2d 278, 113 S. Ct. 365 (1992), and Nimmer, Section 1303 [B] [1] [a]

Starting with concept and feel, that consideration seems to be more of an overall impression and obviously is composed of various expressions, some of which I will discuss as separate categories such as characters. The Williams court found the concept and feel of the works there at issue to be different in [*26] that it found, as I mentioned, Jurassic Park to portray a world out of control while plaintiff's Dinosaur World was a world well under control. Here trying to use the same type of analysis I find the concept and feel of the two shows to be different. The major factor comprising this difference. is the tone of the two shows. The tone of Survivor is one of unalterable seriousness. It is expressed by the host's unrelenting seriousness, by the contestants' cutthroat competition for food and for the million dollar prize. The seriousness of the situation is exemplified by a female contestant noting some weeks into the ordeal that she is losing her hair presumably from malnutrition. The serious concept and feel is evident, for example, in the opening scene, which again I will probably get to later. In Survivor the contestants cannot speak to each other, have been forbidden from speaking to each other as the narrator tells us. The camera focuses on their very tense faces. One or more of them, as was so delicately put in

the testimony, were barfing into barf bags. After the plane lands the contestants frantically ran to use well the five minutes they had been given to garner enough supplies [*27] to survive without additional food for 45 days.

In contrast, the tone and feel of Celebrity is one of comedy. It's expressed first in the frequent presentations of the hosts' constantly wise-cracking, as some other witness said doing schtick, and mocking the contestants. It's also expressed in the contestants' expressions. They are laughing at themselves, for example, as they descend from their posh digs shown at the outset into mud wrestling with pigs and the like. It's exemplified, for example, by a male contestant running around with the panties of the rather large politician's wife on his head.

To contrast opening scenes, in Celebrity the contestants had already met. There was no prohibition, no artificial stifling. They were pictured as chatting and laughing. They got off the helicopters easily and providing real -- and I hesitate the use the word -- comedic relief, a woman observed several of the men relieving themselves over in the bushes. There was no sign of tension of any kind. The elimination of contestants also illustrates the huge difference in concept and feel of the two shows. The elimination sequence in Survivor of course is the Tribal Council. Again, as I might discuss [*28] more later, it is a highly ritualized sequence. It takes some 8 minutes or thereabouts each time. The contestants are pictured in a dramatic march in the dark to an area of high rocks. They are accompanied by torches. It's very dramatic and there is very dramatic trible-sounding music accompanying the march. When the eliminated contestant is announced, there is the very serious ritual extinguishing of the flame, that is, of the contestant. The host speaking seriously saying each time in a ritualistic fashion "the tribe has spoken," and the eliminated contestant's immediate banishment over the bridge.

Celebrity, on the other hand, has no comparable ritual. The announcement of which contestant is to leave happens in the morning. It's light. One or more of the contestants is usually standing around drinking coffee. The eliminated contestant is announced and is then welcomed onto a completely silly-looking party barge with fireworks, waiters, and glasses of champagne, all while still dressed in dirty outdoor camping wear.

So in analyzing tone and feel, the first major difference between the two shows is the serious tone of Survivor and the comedic tone of Celebrity.

The second factor [*29]    I find evident in considering concept and feel is what the professionals have called production values. And these differing production values give a particularly different feel to the

two shows. In Survivor the overall look is one of lush, artful photography and painstaking etiquette. The camera work is of the very highest professional level. We see very artful shots of, for example, a female contestant looking into a mirror with the faces of several other contestants reflected in the mirror. It's really moving art, like National Geographic.

Celebrity in contrast is closer to the home video look creating a drastically different look and feel. Of less importance, but also contributing to the different concept and feel, is Celebrity's live action and audience participation elements that the audience is seeing in part live action from around the world as, for example, when the contestants are waking up (or filmed more than 24 hours old) and then has the opportunity to vote to influence what happens next, as the audience is constantly reminded by the hosts, creates a different feel from that of Survivor. In Survivor the audience is watching an adventure in the past with examples of more [*30] drama and more of what passes for character development in these shows because of the opportunity to edit while in some measure already knowing the outcome. Thus, trying to analyze concept and feel so as to avoid the danger of protecting ideas, which Judge Haight and Professor Nimmer warned against, I find the works to be substantially different in concept and feel.

Taking a look for a moment at setting, of course we know that both shows are set in remote, inhospitable settings. For comparison purposes I concentrated on the Survivor series filmed in Australia because Celebrity was also filmed in Australia. But I note that each series of Survivor was filmed in a different remote, inhospitable locale, for example, Borneo. Even though both of the compared series were filmed in Australia the visual expression of the remote, inhospitable setting was different. In Survivor the Australian series was filmed in the dry Outback bush area. Visually it featured low vegetation and a wide sky, often showing high wind-chiseled rocks reminiscent of Sedona.

THE COURT: Celebrity on the other hand, was filmed in the rain forest, in the jungle. It featured dense vegetation and because of the canopy [*31] layer, not much in the way of sky. The light got through, and the audience could sense from the scenery, the dampness and the humidity of the surroundings that while the same generic concept of a remote, hospitable location and even the same country was utilized by the two shows, the settings were expressed differently.

I move on to consider the characters, and consideration of the characters does seem to flow over into other elements, as I'll note.

Both shows have host and a group of real live people who are contestants. The expression of these generic

elements, however are very different, the Survivor host, Jeff Prost was unknown prior to the first series. He appears relatively infrequently in the show. He plays two roles; plays the role of judge in judging the contests, and the tribal council and perhaps banishing the loser, and he plays the role of group therapist and interviewer.

Mr. Prost is nothing but serious. He is unrelentingly serious. Although Professor Thompson apparently talked about his comedic elements in some talk show, I didn't see it, and certainly the expression of his character is not evidently comedic.

On the other hand, the hosts of Celebrity are nothing, [*32] if not funny. Although not particularly known to American audiences, it is undisputed that Ann and Deck are well known in the UK as a comedy team. Their appearance as a team as the hosts of the show signal its comedic element. They appear frequently throughout the show, much more frequently than Mr. Prost does, and they perform as comic entertainers almost in the broader sense. They tell jokes, they mock the celebrities, they wise crack, they comment sarcastically on what's going on, they perform interviews, but in a very comic, mocking-style, not in any respect serious.

Thus, the two shows' expression of the generic elements of a host is dramatically different.

As to the characters or the contestants, both shows use multiple, real people playing themselves, and to a certain extent, this character consideration flows over into a consideration of what might be called plot in these shows.

In Survivor, the contestants are regular folks about whom the audience knows nothing. They are there competing to win a million dollars. The contestants are organized into two groups of tribes who compete with each other initially, then team members vote each other off the show. And when the numbers [*33] diminish, the team structure is abandoned, and it's every man for himself.

These details combine to create fierce competition between the teams, but also among the individuals. The prospect of winning a million dollars does tend to focus the contestants' attention on the competition. Because the contestants vote each other off, individuals form mutual alliances from time to time, and there is suspicious musing and speculation by one contestant about what others are discussing when they are separated from the group.

In contrast, the contestants on Celebrity are not regular folks. They are celebrities, and the audience knows who they are and a good bit about each one of

them going into the show. There's no team structure, and the celebrities do not vote each other off.

Also the winner receives only the honorific of being king or queen of the jungle. While he or she does not win a prize like the life-changing one million dollars, any money raised goes to that winner's favorite charity.

This combination entirely changes the interactions among the contestants' so-called plot. The cut-throat competition evident in Survivor is entirely absent. If possible to quantify competition, it is [*34] materially less in Celebrity, because there's really nothing much at stake for these folks. The quality or tone or competition there is also different.

In Celebrity, it is entirely light-hearted. Also, the Celebrity characters' motivations are different. They are not competing with each other to win a million dollars. They are trying to project the best image possible to the viewing audience, whether to continue a reputation as a good guy or can-do guy or to repair a less than perfect reputation.

The result is that the characters and their interactions are expressed very differently.

A good example is in the worm-eating comparison, which I will get to later.

Thus, the expression of the characters is different, including the pattern of their interrelationships as they are developed.

As part of the plot, I also considered the tests imposed on the contestants and the elimination both shows give, consistent with their game show format. The expression of these tests, however, is different.

In Survivor, contestants are required to participate. The tests or the challenges are physically difficult, for example, requiring the group to paddle a float across a stream. The camera and the [*35] editing process focus the audience on the cut-throat competition element, first between the teams and then among the individuals. One never forgets that these people are vying for, a million dollars, and it is very serious business.

Immunity challenges are particularly serious, because a life or death decision is made as a result of the immunity challenge.

In Celebrity, the challenges are voluntary. A contestant may decline to participate. The only effect of declining to participate is the group won't get upscale rations.

I note parenthetically, if I can put a footnote in here, that the ration situation is another example of the

difference in the expresses of the hostile, remote environment idea.

In Survivor, the contestants must obtain on their own all of their food. And I note again the female contestant noting that her hair was falling out because of malnutrition. I think they get a little rice, but that is it, and they know from time to time how hungry they are.

In contrast, the celebrities have an adequate supply of rice and beans. They can have as much quantity as they want. No one is hungry, and no one's hair is falling out. The challenges or the tests only permit the celebrities [*36] to obtain higher quality rations.

So returning to the consideration of, the challenges, it's much less pressure among the celebrities. Nothing bad is going to happen. The challenges in Celebrity are not physically difficult, and are in keeping with the comedic tone. They are mostly silly, such as wrestling stars off of pigs in a mud pit, or gross, like the bug shower. But because they are essentially meaningless and silly or gross, there's no element of competition, no element of seriousness, but rather a light, game show tone.

I also reject the suggestion that the challenges had to be different because celebrities were involved.

Many celebrities, such as The Fire, the boxer, might well be in better shape than some of the lay folks, so I don't think that follows necessarily from the use of celebrities.

Also involved in plot and character interaction is the elimination of contestants.

As we've noted before, both shows involve serial elimination of contestants, but that idea is expressed differently.

In Survivor, the contestants vote each other off at the end of each episode. That they are voting each other off leaves them to form alliances. As I've noted before, because the elimination [*37] means no more shot at the million dollars, the elimination is deadly serious.

The audience sometimes sees a sense of personal betrayal felt by the eliminated contestant, because one or more of his or her supposed allies must have voted him or her off.

As I noted briefly before, the whole elimination ceremony is expressed differently. I think I don't need to do that again.

In Celebrity, in contrast in the first week, there's no elimination, the audience only votes as to which Celebrity will be tested on a particular challenge.

2003 U.S. Dist. LEXIS 20258, *

During the second week, the audience votes for its favorite, not for who is to leave, or its least favorite. Because the stakes are so low, because the audience is voting, and because it's not a negative vote, it's not serious, it's not taken seriously, there's no betrayal, and the hosts are wise cracking throughout the procedure. It's also very casual. The expression in the elimination sequence in the two shows is dramatically different.

In Survivor it's ritualized, it's serious, it's lengthy.

In Celebrity, it's casual, it's light-hearted. The only drama is in a second or two delay in actually saying the name of the eliminated contestant.

I also consider [*38] the other expressions that were discussed. I think in Professor Thompson's report. First, he could discuss the music. Again, the music I find to be very different.

In Survivor, the music is deep, chanting, tribal music. It adds to the sense of drama of the show.

Celebrity music isn't deep, it's not chanting, it's not particularly tribal. As an outsider, and not a professional, I would characterize it as upbeat and kicky.

Professor Thompson also discussed the interstitial shots of wildlife. Certainly both shows use that technique, but even that is expressed differently.

In Survivor, the wildlife shots emphasize the serious, dangerous nature of the animal, the crocodile's menacing jaws and tail, the menacing view of the snake's tongue.

In Celebrity, the visuals emphasize the pretty or comic features of the wildlife; the green and orange frog whose throat goes in and out, some hairy bird-like beast, maybe a bat hung upside down, and a little chimp. It's a different expression adding to the different tone of the two works.

Professor Thompson also relied on the panoramic landscape photography of both shows. I note that any show using the deserted island setup might well be expected [*39] to use a panoramic landscape. Nevertheless, those generic shots are expressed differently here.

In Survivor, they are very pretty, they are lush, they are fabulously beautiful shots, often with a stylized speedframe photography of the clouds moving overhead adding to the drama.

In Celebrity, we see plain old landscape, with the photography perhaps one step up from home video. It is expressed thoroughly differently.

I would like to say a few words about the film clips assembled by Professor Thompson, albeit, in an exceedingly tardy fashion.

As we know, the entire tape is just under eight minutes, featuring approximately three and a half minutes of each series, taken from some 15 hours of video of each series.

As has also been noted, even within a segment on Professor Thompson's tape, the scenes shown are out of sequence and from several different episodes.

Adopting Mr. Smart's analogy, it is like looking at the dot on a serrate.

Perhaps in a more lawyer-like fashion, I find that the tapes are not -- the clips are not representative of the two series and are contrary to the analysis carried out by the Williams Court and the Court in the case considering the Seinfeld book, [*40] that is, looking at the entire work, and I emphasize here that it is of utmost importance to review an entire series, not just to look at the clips. The clips are, as the Williams Court said, inherently subjective and unreliable, because it lists random similarities scattered throughout the work.

For example, my favorite, the worm eating scene. First, I note parenthetically that in a remote, hostile environment, or deserted island setup, eating unattractive, crawling creatures is part of the scenes a faire.

Second, as to the actual expression, in Survivor, the mood is tense and competitive. There is a great deal of pressure on the contestants to perform for their respective teams, because this is an immunity challenge. The intensity of the pressure is evident when in the clip, one of the contestants at the end bends over with a green look on her face and in the full vision vomits. It's very intense, and it was clearly played for the dramatic tension.

When the Celebrity tape of the worm-eating episode is viewed in context, the mood is significantly different. First, the result is not so important to the contestants. They already have a sufficient quantity of rations, and the [*41] worm eating will only determine if the individual contestant earns higher quality rations for the group.

Second, the visual scene is expressed differently.

In Survivor, the unattractive black worms are set out in a tribal-looking Wheel of Fortune layout.

In Celebrity, the unattractive looking white worm appears on a banquet table with fine linens and fine China adjacent to an absolutely delicious meal, which apparently the contestants can all smell.

Third, in Celebrity, the audience has chosen a vegetarian paranormalist for this trial, and the politician's wife is seen with her arm around him in a maternal manner, essentially telling him that the lot of them are all right as is, and that he, the vegetarian, should not compromise his principles on their account. The element of life or death is absent. What is present and what is shown in the clip is an extremely kind and supportive message, not to do the awful deed. And when the vegetarian actually cranks himself up and does it, the clip shows an appreciation of his personal achievement in eating the unattractive maggot.

What is present, but what is not shown is the comic element, from his smelling the adjacent high quality meal [*42] on China and linen and kind of yelling or repeatedly saying "imaging, imaging," a reference to his paranormalism.

Although both scenes include the contestants gesticulating to crank themselves up to do the deed, one would well expect anyone doing this particular deed to do so, and the presentation, context and tone of the two worm eating scenes are entirely different.

In sum, I find that plaintiff is not likely to prove that a lay observer would consider the works as substantially similar to one another. In undertaking this analysis, I am cognizant of the Supreme Court's admonition in Feist that copyright protection in a factual compilation is thin, and by analogy, that copyright protection in a compilation of ideas must also be thin.

Indeed, the Feist Court cited Professor Ginsburg's comment to the effect that "no matter how much original authorship the work displays, the facts and ideas it exposes are free for the taking .... The very same facts and ideas may be divorced from the context imposed by the author and restated or reshuffled by second comers, even if the author was the first to discover the facts or propose the ideas."

Feist at 349.

Nevertheless, the determination [*43] in this case does not depend on the difference between "thin" protection and "normal" protection. As set out above, the different expressions of the Survivor concept in these two shows impel a finding that under either standard, CBS is not likely to succeed in showing substantial similarity.

I will move on to irreparable harm and balance of the hardships.

As we all know, plaintiffs are entitled to a preliminary injunction if they establish "one, that [they are] subject to irreparable harm;, and two, either A, that [they] will likely succeed on the merits; or B, that there

are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation. And that balancing of the hardships tips 'decidedly' in favor of the moving party." Genesee Brewing Co v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir. 1997)

"The award of a preliminary injunction is an extraordinary remedy and will not be granted absent a clear showing that the moving party has met its burden of proof." Parenting Unlimited, Inc., v. Columbia Pictures Television, Inc., 743 F. Supp. 221, 224 (S.D.N.Y. 1990). In this circuit, irreparable harm is presumed [*44] upon a showing of a likelihood of success on the merits. See e.g. Richard Feiner and Co. Inc., v. Turner Entm't Co., 98 F.3d 33, 34 (2d Cir. 1996). Here, as I've found above, plaintiffs have not shown a likelihood of success on the merits. I also find that plaintiffs have not shown sufficiently serious questions going to the merits of the case to make them a fair ground for litigation.

I make this finding particularly in light of the argument today in which plaintiffs focused almost entirely on the combination of the generic elements; although there was some lip service paid to expression; there was no discussion of expression. And indeed, in light of Professor Thompson's testimony that Survivor is the defining program in a genre, I find that plaintiffs have not, demonstrated sufficiently serious questions going to the merits.

In addition, I find that plaintiffs have not demonstrated that the balance of hardships tips "decidedly" in their favor. The test appears to be a purely equitable consideration of who will be hurt more by the decision. See Monster Communications, Inc. v. Turner Broadcasting System, Inc., 935, F. Supp. 490 (S.D.N.Y. 1996) and Downloadcard, Inc. v. Universal Music Group, Inc., 2002 U.S. Dist. LEXIS 23081 (S.D.N.Y. 2002) [*45]

Here both parties have presented some evidence of hardship resulting from an adverse ruling. If a preliminary injunction were issued at this point, defendants would be unable to proceed with the scheduled production and broadcast of a program that is to be the centerpiece of ABC's February 2003 sweeps offering. In turn, this would affect ABC's programming and ratings for months ahead and interfere with its relationships with its affiliates.

In this regard, I credit the testimony of Susan Lyne to this effect.

More damaging, however, I am persuaded that prohibiting Celebrity from airing will bring to a screeching halt the momentum ABC has generated in

2003 U.S. Dist. LEXIS 20258, *

regaining its ratings, and I obviously credit the testimony of Ms. Lyne to that effect.

In addition, I note that and credit the testimony of the Granada witnesses that their reputation will be harmed immeasurably by an injunction.

On the other hand, the decision not to issue an injunction may well cause plaintiffs some unspecified amount of losses in ratings and revenues, as Mr. Moonves testified.

Mr. Moonves also testified that possible plans to produce a Celebrity version of Survivor had been put on hold when CBS learned of Celebrity. [*46] Those plans, however, are fairly speculative, given the testimony that a Celebrity Survivor show was mentioned years ago and not otherwise followed up on until after Celebrity appeared.

Ultimately, however, I am easily persuaded that the balance of hardships tips decidedly in favor of ABC.

For all of the above reasons, counsel, the application for a preliminary injunction is denied.

Counsel, I thank you, again for your most professional presentations.

Is there anything else you would like to do today?

MR. FAGEN: Your Honor, are you going to be entering a written order today, tomorrow?

THE COURT: I'm happy to write bequest for preliminary injunction denied.

MR. FAGEN: I ask that because there are some, filing, things that we have to do in the clerk's office.

THE COURT: I am happy to do that right now if you wish.

MR. FAGEN: Tomorrow would be fine; Judge.

THE COURT: Yes, sir, anything else?

MR. SMART: On behalf of defendants, we thank the court

THE COURT: Good afternoon, ladies and gentlemen. Thank you again.

(Hearing concluded)

LEXSEE



Analysis
As of: Jun 25, 2008

**CHIVALRY FILM PRODUCTIONS and JOSEPH ARDITO, Plaintiffs, -against-
NBC UNIVERSAL, INC., et al., Defendants.**

05 Civ. 5627 (GEL)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

2007 U.S. Dist. LEXIS 86889

**November 27, 2007, Decided
November 27, 2007, Filed**

**PRIOR HISTORY:** Chivalry Film Prods. v. NBC
Universal, Inc., 249 Fed. Appx. 856, 2007 U.S. App.
LEXIS 23355 (2d Cir. N.Y., 2007)

**COUNSEL:** [*1] Joseph Ardito, Pro se.

Stephen F. Huff, Tom J. Ferber, Mark A. Tamoshunas,
Richard J. Purcell, Pryor Cashman Shearman & Flynn
LLP, New York, New York, for defendants.

**JUDGES:** GERARD E. LYNCH, United States District
Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge

Pro se plaintiff Joseph Ardito sued defendants, a
number of motion picture production and distribution
companies, for copyright infringement, claiming that two
movies produced and distributed by the defendants
infringed certain of plaintiff's copyrights. [1] On December
22, 2006, the Court granted defendants' motion for
summary judgment, finding that no reasonable trier of
fact could find the works substantially similar, and that
defendants established an independent source for their
films pre-dating plaintiff's copyrights. Defendants now
move for attorneys' fees and related expenses pursuant to

17 U.S.C. § 505 and Fed. R. Civ. P. 54(d)(2).
Defendants' motion will be granted.

1    In this Opinion, as in the Court's previous
opinions in this case, the Court refers to plaintiff
in the singular, since the co-plaintiff named in the
pleading is a sole proprietorship having no legal
existence independent of Ardito himself.
Chivalry Film Prods. v. NBC Universal, Inc., No.
05 Civ. 5627, 2006 U.S. Dist. LEXIS 1177, 2006
WL 89944, at *1 n.1 (S.D.N.Y. Jan. 11, 2006).
[*2]

**BACKGROUND**

Only those facts relevant to the current motion will
be recited here.

Plaintiff brought suit on June 16, 2005, asserting
several causes of action arising out of his claim that two
movies produced and distributed by certain of the
defendants, *Meet the Parents* and its sequel *Meet the
Fockers*, infringed his copyrights in various versions of a
novel and screenplay entitled *The Tenant* or *The
Dysfunctionals*. On January 11, 2006, the Court
dismissed plaintiff's fraud, unjust enrichment, RICO,
Lanham Act, and attorney's fees' claims, leaving
plaintiff's copyright infringement claim as the sole cause
of action in the case. See Chivalry Film Prods. v. NBC
Universal, Inc., No. 05 Civ. 5627, 2006 U.S. Dist.
LEXIS 1177, 2006 WL 89944 (S.D.N.Y. Jan. 11, 2006).

On June 19, 2006, defendants moved for summary judgment on the copyright infringement claim, arguing that no reasonable trier of fact could find that plaintiff had established substantial similarity of the works, or alternatively that the films were based on independent prior creations that pre-dated plaintiff's copyrights. On December 22, 2006, the Court granted defendants' motion, finding for defendants on both grounds. See Chivalry Film Prods. v. NBC Universal, Inc., No. 05 Civ. 5627, 2006 U.S. Dist. LEXIS 92956, 2006 WL 3780900 (S.D.N.Y. Dec. 22, 2006). [*3] Specifically, the Court found that "the works at issue could not be more different in 'total concept and feel.'" Id. 2006 U.S. Dist. LEXIS 92956, [WL] at *1, quoting Green v. Lindsey, 885 F. Supp. 469, 481-82 (S.D.N.Y. 1992). Furthermore, the Court found that plaintiff's "attempts to show similarity" between the works "involve[d] the most trivial and generic of incidents," and that the works were "strikingly different." Id. 2006 U.S. Dist. LEXIS 92956, [WL] at *2. Finally, the Court found that both films were based on an independent creation originally copyrighted in 1991, which pre-dated plaintiff's 1996 copyright. Id. Plaintiff appealed to the Second Circuit, which affirmed the judgment on October 30, 2007.

On January 23, 2007, defendants moved for attorneys' fees and costs pursuant to 17 U.S.C. § 505 and Fed. R. Civ. P. 54(d)(2). [1] Plaintiff did not respond to defendants' motion. Accordingly, the motion will be decided solely on the basis of defendants' submission.

> 2    Pursuant to Fed. R. Civ. P. 54(d)(2)(C), defendants' motion only addresses the issue of plaintiff's liability for defendants' fees and costs. See Williams v. Crichton, 891 F. Supp. 120, 122 (S.D.N.Y. 1994). Accordingly, defendants have not yet submitted documentation concerning the amount [*4] of fees and expenses incurred.

## DISCUSSION

Defendants seek an award of attorneys' fees and costs pursuant to § 505 of the Copyright Act. Under § 505, the Court "in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. . . . [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. An award of attorneys' fees is at the discretion of the district court, and prevailing defendants and plaintiffs are to be treated alike. Fogerty v. Fantasy, Inc., 510 U.S. 517, 534, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994).

While there is no precise formula for determining whether an award of fees is appropriate, and "bad faith is not a prerequisite to an award of fees" under the Copyright Act, Screenlife Establishment v. Tower Video,

Inc., 868 F. Supp. 47, 51-52 (S.D.N.Y. 1994), courts exercising their discretion consider the equitable factors of "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" Crescent Publ'g Group, Inc. v. Playboy Enters., 246 F.3d 142, 147 (2d Cir. 2001), [*5] quoting Fogerty, 510 U.S. at 534 n.19. The Second Circuit has recognized that "objective reasonableness is a factor that should be given substantial weight in determining whether an award of attorneys' fees is warranted" because "the imposition of a fee award against a copyright holder with an objectively reasonable litigation position will generally not promote the purposes of the Copyright Act." Matthew Bender & Co. v. West Publ'g Co., 240 F.3d 116, 121-22 (2d Cir. 2001); see also Baker v. Urban Outfitters, Inc., 431 F. Supp. 2d 351, 357 (S.D.N.Y. 2006). "This is because such attorney fee awards may chill litigation of close cases, preventing the clear demarcation of the boundaries of copyright law." Ariel (UK) Ltd. v. Reuters Group PLC, No. 05 Civ. 9646, 2007 U.S. Dist. LEXIS 7423, 2007 WL 194683, at *1 (S.D.N.Y. Jan. 24, 2007), quoting Hofheinz v. AMC Prods., No. 00 Civ. 5827, 2003 U.S. Dist. LEXIS 16940, at *17 (E.D.N.Y. Sept. 1, 2003), citing in turn Fogerty, 510 U.S. at 527.

"[A] number of courts in this circuit have awarded attorneys' fees to prevailing defendants solely upon a showing that the plaintiff's position was objectively unreasonable, without regard to any other equitable factor." Baker, 431 F. Supp. 2d at 357 [*6] (internal quotation marks omitted), citing Adsani v. Miller, No. 94 Civ. 9131, 1996 U.S. Dist. LEXIS 13740, 1996 WL 194326, at *12-13 (S.D.N.Y. Sept. 19, 1996). The mere fact that a defendant has prevailed, however, "does not necessarily equate with an objectively unreasonable claim." Ann Howard Designs, L.P. v. Southern Frills, Inc., 7 F. Supp. 2d 388, 390 (S.D.N.Y. 1998). "To hold otherwise would establish a per se entitlement of attorney's fees whenever issues pertaining to judgment are resolved against a copyright plaintiff. . . . This is not a correct construction of the law." Nicholls v. Tufenkian Import/Export Ventures, Inc., No. 04 Civ. 2110, 2005 U.S. Dist. LEXIS 16715, 2005 WL 1949487, at *3 (S.D.N.Y. Aug. 11, 2005)(internal quotation marks and citation omitted). Similarly, the fact that a defendant has prevailed on a motion to dismiss or on summary judgment does not require the court to award fees. See, e.g., Brown v. Perdue, No. 04 Civ. 7417, 2006 U.S. Dist. LEXIS 66563, 2006 WL 2679936 (S.D.N.Y. Sept. 15, 2006). However, if a copyright claim is "clearly without merit or otherwise patently devoid of legal or factual basis," that claim "ought to be deemed objectively unreasonable," Penguin Books U.S.A., Inc. v. New

Christian Church of Full Endeavor, Ltd., No. 96 Civ. 4126, 2004 U.S. Dist. LEXIS 5648, 2004 WL 728878, at *3 (S.D.N.Y. Apr. 6, 2004), [*7] and an award of fees and costs is then proper.

Defendants argue that they should be awarded attorneys' fees and costs because "[p]laintiff failed to provide *any* basis for concluding that [d]efendants infringed protectable elements of [p]laintiff's works." (Defs. Mem. 5 (emphasis in original).) The Court agrees. In its December 22 order granting summary judgment, the Court found that "[t]he works at issue could not be more different in total concept and feel," and plaintiff's arguments to the contrary were wholly "specious," masking the "striking[] differen[ces]" between the works. Chivalry Film Prods., 2006 U.S. Dist. LEXIS 92956, 2006 WL 3780900, at *1-2. Indeed, the works were "so extraordinarily different" that plaintiff principally based his copyright claim, not on the substantial similarity between the works, but on the " *absence* of similarity, alleging that defendants blatantly went through extremes in revisions and manipulation in an attempt to conceal and subterfuge said crime by revising said screenplay." Id., 2006 U.S. Dist. LEXIS 92956, [WL] at *3 (emphasis added) (internal quotation marks and citation omitted). The complete lack of any reasonable basis for plaintiff's copyright claim thus establishes that his claim was frivolous and [*8] objectively unreasonable, and an award of fees and costs is appropriate here. *See* Polsby v. St. Martin's Press, No. 97 Civ. 690, 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *3 (S.D.N.Y. Jan. 18, 2000)(awarding costs and fees against pro se copyright plaintiff based, inter alia, "on the objective lack of merit in th[e] case"); Sparaco v. Lawler, Matusky, Skelly Eng'rs, LLP, 60 F. Supp. 2d 247, 258-59 (S.D.N.Y. 1999)(holding that plaintiff's copyright claim against certain defendants was objectively unreasonable because there was no evidence of infringement); Williams v. Crichton, 891 F. Supp. 120, 122 (S.D.N.Y. 1994)(granting defendants' motion for fees on showing of objective unreasonableness).

Moreover, although the plaintiff in this case did not engage in a "campaign of vexatious litigation," Polsby, 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *2, the need for deterrence against objectively unreasonable copyright claims is significant. Just as "attorney fee awards may chill litigation of *close* cases, preventing the clear demarcation of the boundaries of copyright law," Ariel (UK) Ltd., 2007 U.S. Dist. LEXIS 7423, 2007 WL 194683, at *1 (emphasis added), the denial of such awards in *objectively unreasonable* cases also disserves the purposes of copyright law, by [*9] failing to protect the owners of valid copyrights from the cost of frivolous litigation. Furthermore, the denial of fees and costs to a prevailing defendant in an objectively unreasonable

copyright case may spur additional frivolous lawsuits, of exactly the sort that an award of fees and costs is designed to "chill." Id.; see Polsby, 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *2. "Future litigants should be discouraged from comparable behavior." Great Am. Fun Corp. v. Hosung N.Y. Trading, Inc., No. 96 Civ. 2986, 1997 U.S. Dist. LEXIS 3623, 1997 WL 129399, at *3 (S.D.N.Y. Mar. 21, 1999).

Finally, plaintiffs pro se status is not a sufficient basis for denying an award of fees and costs in this case. The Supreme Court in Fogerty did not specifically deem the "relative financial resources of the parties" to be a relevant factor in considering whether to award fees under the Copyright Act. Penguin Books, 2004 U.S. Dist. LEXIS 5648, 2004 WL 728878, at *5, citing Fogerty, 510 U.S. at 534 n.19. Several courts in this Circuit have awarded attorneys' fees pursuant to 17 U.S.C. § 505 against a pro se plaintiff where, as here, the defendant prevails and the plaintiff's copyright claim was objectively unreasonable, without taking into account the financial disparities between [*10] the parties. See Polsby, 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *2; see also Attia v. Soc'y of the N.Y. Hosp., 12 Fed. Appx. 78 (2d Cir. 2001)(affirming an award of costs and fees against a pro se copyright plaintiff). This is because "[t]he decision to award attorney's fees is based on whether imposition of the fees will further the goals of the Copyright Act, not on whether the losing party can afford to pay the fees." Harrison Music Corp. v. Tesfaye, 293 F. Supp. 2d 80, 85 (D.D.C. 2003), citing Mitek Holdings, Inc. v. Arce Engineering Co., 198 F.3d 840, 843 (11th Cir. 1999). Cf. Shmueli v. City of New York, No. 03 Civ. 1195, 2007 U.S. Dist. LEXIS 42012, 2007 WL 1659210, at *5 (S.D.N.Y. June 7, 2007)("The same [legal] standards apply when the litigant involved is pro se."); Harrison v. Walsh, No. 06 Civ. 13328, 2007 U.S. Dist. LEXIS 39616, 2007 WL 1576265, at *25 (S.D.N.Y. June 1, 2007)(pro se litigants are "held to the same standards of conduct and procedure as an attorney").

However, although plaintiffs pro se status does not preclude an award of fees against him, his financial resources are not altogether irrelevant. "A court that awards fees to a defendant must take into account the financial circumstances of the plaintiff" when determining how much to [*11] award. Polsby v. St. Martin's Press, No. 97 Civ. 690, 2001 U.S. Dist. LEXIS 1675, 2001 WL 180124, at *1 (S.D.N.Y. Feb. 22, 2001); see Sassower v. Field, 973 F.2d 75, 81 (2d Cir. 1992); Polsby, 2001 U.S. Dist. LEXIS 1675, 2001 WL 180124, at *1 ("This principle has been applied in cases under the Copyright Act."). Thus, any "financial disparities" between plaintiff and defendants, who are, primarily, major motion picture production and distribution

companies, "may be . . . considered in determining the magnitude of" the award in this case. Penguin Books, 2004 U.S. Dist. LEXIS 5648, 2004 WL 728878, at *5, citing Lieb v. Topstone Indus., Inc., 788 F.2d 151, 156 (3d Cir. 1986); see Williams v. Crichton, No. 93 Civ. 6829, 1995 U.S. Dist. LEXIS 10699, 1995 WL 449068, at *1 (S.D.N.Y. July 26, 1995)(finding "the relative financial strength of the parties" to be "so disproportionate" that "the purposes of the Copyright Act" would be served "by a relatively small award"). Accordingly, the Court will take this factor into account, among other factors, when determining the appropriate amount of fees and costs to be assessed against plaintiff, if plaintiff makes a showing of a lack of financial resources.

## CONCLUSION

For the foregoing reasons, defendants' motion for fees and costs is granted. Defendants are directed [*12] to submit documentation of their costs and attorneys' fees, including attorneys' time sheets, by December 28, 2007. Plaintiff may submit his response, if any, by January 28, 2008.

SO ORDERED.

Dated: New York, New York

November 27, 2007

GERARD E. LYNCH

**United States District Judge**

LEXSEE



Analysis
As of: Jun 25, 2008

MARIE FLAHERTY, Plaintiff, -v- JASON FILARDI, GEORGE N. TOBIA, JR.,
BURNS AND LEVINSON, LLP, HYDE PARK ENTERTAINMENT, ASHOK
AMRITRAJ, DAVID HOBERMAN, TODD LIEBERMAN, WALT DISNEY
COMPANY, BUENA VISTA MOTION PICTURES COMPANY, TOUCHSTONE
PICTURES, BUNGALOW 78 PRODUCTIONS, THE KUSHNER-LOCKE
COMPANY, MEESPIERSON FILM CV, WMG FILM, JANE BARTELME,
COOKIE CAROSELLA, DANA OWENS d/b/a QUEEN LATIFAH, 7th CAVALRY
PRODUCTIONS, INC., BIG HOUSE PRODUCTIONS, INC., THE WRITERS
GUILD OF AMERICA, WEST, PETER FILARDI, WALT DISNEY
ENTERPRISES and DOES 6 THROUGH 10, inclusive, Defendants.

No. 03 Civ. 2167 (LTS)(HBP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2007 U.S. Dist. LEXIS 69202; Copy. L. Rep. (CCH) P29,452

September 17, 2007, Decided
September 19, 2007, Filed

**PRIOR HISTORY:** Flaherty v. Filardi, 2007 U.S. Dist.
LEXIS 60196 (S.D.N.Y., Aug. 14, 2007)

**COUNSEL:** [*1] MARIE FLAHERTY, ESQ., Plaintiff
Pro se, New York, New York.

QUINN EMANUEL URQUHART, OLIVER &
HEDGES, LLP, By: Jeffrey A. Conciatori, Esq., New
York, New York, Attorneys for the Disney and Big
House Defendants.

SHERIN AND LODGIN, LLP, By: Robert J. Muldoon,
Jr., Esq., Boston, Massachusetts, Attorneys for the B&L
Defendants.

KENNEDY, JENNIK & MURRAY, PC, By: Susan M.
Jennik, Esq., New York, New York, Attorneys for
Defendant Writer's Guild.

**JUDGES:** LAURA TAYLOR SWAIN, United States
District Judge.

**OPINION BY:** LAURA TAYLOR SWAIN

**OPINION**

OPINION AND ORDER (INCLUDING ORDER
FOR SUPPLEMENTAL BRIEFING)

LAURA TAYLOR SWAIN, U.S.D.J.

Plaintiff Marie Flaherty ("Plaintiff" or "Flaherty"),
appearing pro se, brings this action, alleging principally
that Defendants Jason Filardi, George N. Tobia, Jr., Esq.
("Tobia"), Burns and Levinson, LLP ("B&L"), Hyde
Park Entertainment ("Hyde Park"), Ashok Amritraj
("Amritraj"), David Hoberman ("Hoberman"), Todd
Lieberman ("Lieberman"), the Walt Disney Company
("Disney"), Buena Vista Motion Pictures Group ("Buena
Vista"), Touchstone Pictures ("Touchstone"), Bungalow
78 Productions ("Bungalow 78"), the Kushner-Locke
Company ("Kushner-Locke"), Meespierson Film CV
("Meespierson"), WMG Film ("WMG"), Jane [*2]
Bartelme ("Bartelme"), Cookie Carosella ("Carosella"),
Dana Owens d/b/a Queen Latifah ("Owens"), 7<th>
Cavalry Productions, Inc. ("7<th> Cavalry"), Big House
Productions, Inc. ("Big House"), Peter Filardi, Writer's
Guild of America West (the "Guild"), Walt Disney
Enterprises, Inc. ("Disney Enterprises"), and Does 6-10

(collectively, "Defendants") infringed Plaintiff's copyright in her screenplay, "Amoral Dilemma," in creating the movie "Bringing Down the House," in violation of 17 U.S.C. § 101 et seq.

This Opinion and Order addresses the following motions. Defendants Disney, Buena Vista, Touchstone, Hyde Park, Jason Filardi, Amritraj, Hoberman, Lieberman and Owens (collectively, the "Disney Defendants") move for summary judgment. Defendants Tobia and B&L (collectively, the "B&L Defendants") and Big House, Disney Enterprises, and 7<th> Cavalry (collectively, the "Big House Defendants") have joined the Disney Defendants' motion. Also before the Court are a separate summary judgment motion by the B&L Defendants and a motion by the Big House Defendants for judgment on the pleadings or, in the alternative, summary judgment.

The Court has subject matter jurisdiction of Plaintiff's copyright [*3] and Lanham Act claims pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1338(b), and of the various state law claims pursuant to 28 U.S.C. § 1367.

The Court has considered carefully all of the submissions made in connection with these matters. The pending motions are resolved as follows. The Disney Defendants' and the B&L Defendants' motions for summary judgment are granted in part but, to the extent they seek summary judgment regarding Plaintiff's claim that Defendants Filardi and Tobia initially sold the film production defendants a work ("Jailbabe.com") that infringed on Plaintiff's screenplay, they will be held in abeyance pending further submissions. The Big House Defendants' Motion for Judgment on the Pleadings is denied as moot, because the Disney Defendants' summary judgment motion, in which the Big House Defendants joined, has been granted in relevant part.

Because discovery in this action has been completed and the record on these motions is unclear as to the content of the "Jailbabe.com" work that was sold, the parties will be given an opportunity to supplement the record on this issue and, as noted above, this element of the motion practice will be held in abeyance pending the [*4] Court's receipt of the further submissions. A schedule for the submissions is set forth in the penultimate paragraph of this Opinion and Order.

By a separate Order to Show Cause, issued contemporaneously herewith, Plaintiff will be directed to show cause as to why all remaining claims against the defendants who did not join in these motions should not be dismissed in light of the Court's determinations on the merits of Plaintiff's claims as set forth in Flaherty v. Filardi, 388 F. Supp. 2d 274 (S.D.N.Y. 2005) and in this Opinion.

## BACKGROUND

Familiarity with the background of the instant case, which is detailed in the Court's September 14, 2005 decision, is presumed. See Flaherty v. Filardi, 388 F. Supp. 2d 274 (S.D.N.Y. 2005). In that decision, the Court granted partial summary judgment to the moving defendants, dismissing all of Plaintiff's copyright claims to the extent they were premised on alleged similarities between Plaintiff's screenplay and the finished film "Bringing Down the House." That decision also dismissed Plaintiff's Lanham Act claim insofar as it asserted that defendants had falsely designated the origin of the finished film. Finally, the decision dismissed several of [*5] the Plaintiff's related state law claims on preemption grounds to the extent they were premised on rights protected by the Copyright Act.

Subsequent to the briefing on the summary judgment motions at issue, Plaintiff sought, and was granted, permission to file a Second Amended Complaint ("Complaint" or "SAC") that asserted the relevant remaining claims against five new Defendants, corrected the name of the Walt Disney Company, and referred to what Plaintiff characterizes as the subsequent registered derivative work "Amoral Dilemma." In the Order granting Plaintiff's request to amend, she was specifically prohibited from asserting in the SAC any federal claims premised on similarity between her screenplay(s) and the finished motion picture "Bringing Down the House" or authorship of the finished motion picture "Bringing Down the House," as those claims had already been dismissed by a previous Order, and reconsideration of that Order had been denied. See January 24, 2007, Opinion and Order. To the extent Plaintiff's Second Amended Complaint asserts any such claims, the pleading is ineffective to revive them.

The Disney Defendants move for summary judgment dismissing all of Plaintiff's [*6] remaining claims against them, namely her copyright infringement, Lanham Act and state claims relating to the draft screenplays prepared after the film production defendants had acquired a screenplay purportedly authored by Defendant Filardi. [1] The B&L Defendants move for summary judgment dismissing all of Plaintiff's claims against them, including Plaintiff's malpractice, breach of fiduciary duty, misappropriation of idea, breach of contract, unfair competition, fraud, and conversion claims.

> 1    As noted above, the B&L and Big House Defendants have joined in the Disney Defendants' motion.

## DISCUSSION

2007 U.S. Dist. LEXIS 69202, *; Copy. L. Rep. (CCH) P29,452

Summary judgment is appropriate only when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." Am. Cas. Co. v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir. 1994).

Nevertheless, to defeat a motion for summary judgment, "[o]nce the moving party has come forward with support [*7] in the form of the pleadings, depositions, interrogatory answers, admissions or affidavits that no genuine issue of material fact remains to be tried, the opposing party has the burden of providing similar support setting forth specific facts about which a genuine triable issue remains." Borthwick v. First Georgetown Sec., Inc., 892 F.2d 178, 181 (2d Cir. 1989). A party opposing a motion for summary judgment "may not rest on the pleadings but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial." Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996); see also Fed. R. Civ. P. 56(c) and (e); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

### A. Plaintiff's Rule 56(f) Request

Plaintiff's response to the motions for summary judgment includes an affirmation, purportedly pursuant to Federal Rule of Civil Procedure 56(f), in which Plaintiff argues that she is in need of further discovery before she can respond to these motions. Federal Rule of Civil Procedure 56(f) provides that, "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated [*8] present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

Plaintiff acknowledges that her Rule 56(f) affirmation is "nearly verbatim to her October 6, 2006 Motion for Default Judgment." (Rule 56(f) Affirmation of Marie Flaherty in Opposition to Defendants' Motions for Summary Judgment.) For substantially the same reasons that Judge Pitman articulated in denying Plaintiff's admittedly identical motion for default judgment, this Court denies Plaintiff's Rule 56(f) application.

### B. Disney Defendants' Motion for Summary Judgment

### 1. Remaining Copyright Claims

In Claims 1-4 of the SAC, Plaintiff alleges that the approximately 14 prior drafts of "Bringing Down the House" "constitute compilations, dramatizations, performances, derivations and publications" of her screenplay and thus violate her rights under the Copyright Act. (Compl. P114.) She also alleges that it was her screenplay that was pitched by Filardi to Defendant Hyde Park in March of 2000. Id. P67.)

The Disney Defendants [*9] seek summary judgment in their favor on Plaintiff's remaining copyright claims. They argue that all of the remaining copyright infringement claims must be dismissed as a matter of law, as interim drafts of a published non-infringing final work are not actionable under the Copyright Act and, in any event, Plaintiff has failed to identify substantial similarities between her screenplay and the draft screenplays. Defendants further argue that Plaintiff cannot establish that the Defendants had access to her screenplay, and cannot rebut Defendants' uncontroverted evidence of independent creation. Plaintiff does not respond to Defendants' legal argument that interim drafts of a published non-infringing final work are not actionable under the Copyright Act. That principle is, however, key to the resolution of the question of viability of Plaintiff's copyright claims concerning the content of drafts that were prepared in the course of development of the film.

As other courts in this district have held, "[s]ince the ultimate test of infringement must be the film as produced and broadcast, we do not consider the preliminary scripts." Davis v. United Artists, Inc., 547 F. Supp. 722, 724 n.9 (S.D.N.Y. 1982). [*10] "In determining copyright infringement, . . . [t]he Court considers the works as they were presented to the public." Walker v. Time Life Films, Inc., 615 F. Supp. 430, 434 (S.D.N.Y. 1985) (internal citation omitted). "Courts have routinely rejected requests to consider. earlier drafts of the screenplay. Consideration of earlier versions of the screenplay is too unreliable in determining substantial similarity." Id. at 435. Accordingly, because the finished film "Bringing Down the House" is not an infringing work, [2] the drafts prepared in the course of film development and production constitute interim drafts of a published non-infringing final work, and are not actionable under the Copyright Act. The Disney, B&L and Big House Defendants are therefore entitled to summary judgment as a matter of law on the remaining copyright infringement claims premised on the notion that drafts of "Bringing Down the House" prepared during the film development and production process, including "Suburban Sista" and "In the Houze," infringed on her idea or screenplay.

2007 U.S. Dist. LEXIS 69202, *; Copy. L. Rep. (CCH) P29,452

2   See Flaherty v. Filardi, 388 F. Supp. 2d 274 (S.D.N.Y. 2005).

To the extent defendants Filardi and Tobia are, however, moving for summary [*11] judgment in their favor as to Plaintiff's claim that they initially sold film production defendant Hyde Park a screenplay that infringed on Plaintiff's intellectual property rights, they have failed to demonstrate on this record their entitlement to such judgment as a matter of law. There appears to be no dispute that this initial screenplay was a work titled "Jailbabe.com" and purportedly written by Filardi. Plaintiff alleges, as noted above, that Filardi initially pitched her screenplay to the Defendants, and thus appears to be alleging that "Jailbabe.com" infringed on her screenplay. Although, for the reasons stated above, the interim drafts of the finished motion picture are not actionable, there remains a genuine issue of fact precluding summary judgment on Plaintiff's claim that Filardi violated her rights by selling the allegedly infringing screenplay to the film production defendants in exchange for a "mid-six figure paycheck" and a three-picture deal with Hyde Park. Plaintiff also asserts claims against Defendant Tobia under the same theory, alleging that Tobia provided Filardi with access to Plaintiff's screenplay and negotiated the sale on his behalf. (Compl. P128.)

Although [*12] Defendants have proffered evidence of independent creation of a work titled "Jailbabe.com" (see November 15, 2005 Dep. of Jason Filardi at 113-116) and both parties have proffered arguments concerning the similarity (or lack thereof) to "Amoral Dilemma" of a version of "Jailbabe.com" that is in the record, ³ there is no clear, competent evidence in the record as to what document Filardi originally sold to the film production defendants. In the interests of judicial economy and the prompt resolution of this remaining aspect of the motion practice, the Court will give the parties an opportunity to make further submissions addressing this evidentiary question. In that discovery has already been completed, each side is in a position to proffer whatever evidence it would present at trial concerning the identity and content of the document in question. The summary judgment motions will be held in abeyance solely to the extent they relate to Plaintiff's claims against Defendants Filardi and Tobia concerning the sale of "Jailbabe.com."

3   See Exh. H to Aff. of Jeffery Conciatori. Although the Conciatori affidavit purports to attest to the document as a true and correct copy of "Jailbabe.com," [*13] this attorney's affidavit is insufficient to authenticate it as an evidentiary matter, nor does the Conciatori affidavit nor any

other evidentiary proffer by any party identify it specifically as the work that Filardi sold to Hyde Park.

### 2. Remaining Lanham Act Claims

The Disney Defendants, citing Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 123 S. Ct. 2041, 156 L. Ed. 2d 18 (2003), contend that they are also entitled to summary judgment with respect to Plaintiff's remaining Lanham Act claim (Claim 5 of the SAC), arguing that the protections of Section 43 of the Lanham Act do not extend to any idea, concept or communication embodied in a tangible good, and thus no Lanham Act claim can lie as to the drafts prepared in the course of development and production of "Bringing Down the House." Plaintiff argues (without providing a citation to her Complaint) that Dastar is inapplicable, as her Complaint "explicitly states that the screenplays that Def. Tobia and Filardi put into commerce violated Plaintiffs [sic] rights under the Lanham Act." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment, 29) (emphasis in original.)

The Supreme Court held in Dastar that the Lanham Act [*14] protects only "the producer of the tangible goods that are offered for sale, and not . . . the author of any idea, concept, or communication embodied in those goods." Dastar, 539 U.S. at 37. As another court in this district made clear, an alleged author of a screenplay embodied in a tangible good offered for sale is not the originator of the film and thus is not protected by the Lanham Act. See Smith v. New Line Cinema, No. 03 Civ. 5274(DC), 2004 U.S. Dist. LEXIS 18382, 2004 WL 2049232, at *3-4 (S.D.N.Y. Sept. 13, 2004). It is undisputed that Plaintiff was not, in this sense, the originator of the film. Accordingly, the Disney, B&L and Big House Defendants are entitled to summary judgment as a matter of law on Plaintiff's remaining Lanham Act claims, insofar as they relate to the finished film.

For substantially the reasons outlined in the preceding section of this Opinion, however, the question of the viability of any Lanham Act claim premised on Plaintiff's assertion that Filardi and Tobia sold her screenplay, in the guise of Filardi's "Jailbabe.com," to the film production defendants cannot be resolved on this record and must await the parties' further submissions.

### 3. Plaintiff's Remaining State Law Claims

The [*15] Disney Defendants argue that they are entitled to summary judgment dismissing Plaintiff's remaining state law claims against them, namely claims for unfair competition, unjust enrichment and quantum meruit to the extent those claims are premised on the alleged misappropriation or theft of Plaintiff's original

ideas and concepts, because, inter alia, her "idea" is embodied in her screenplay and her claims are thus preempted.

In response to an interrogatory served by the Defendants seeking Plaintiff's identification of any "ideas" or "concepts" she believed to have been misappropriated by Defendants, Plaintiff wrote that "the confidential and proprietary original ideas and concepts concern two friends, unlucky in love, who vent their sexual frustration by corresponding with a prisoner that they find online." (Plaintiff's Response to Defendants Permitted Contention Interrogatory, dated November 28, 2005, attached as Ex. R to the Declaration of Jeffrey A. Conciatori in Support of Defendants' Motion for Summary Judgment ("Conciatori Decl.").) Plaintiff subsequently confirmed in her deposition that her "Amoral Dilemma" screenplay was the expression of this idea. (January 30, 2006 Deposition [*16] of Plaintiff Flaherty ("Flaherty Dep."), attached as Ex. N. To Conciatori Decl., at 20:17-22:3.)

As this Court noted in its September 14, 2005, Opinion and Order, a state law claim is preempted by the Copyright Act where (1) the work to which the claim is applied falls within the scope of works protected by sections 102 or 103 of the Copyright Act, and (2) the claim addresses legal or equitable rights already protected by copyright law. See Flaherty, 388 F. Supp. 2d at 290. Because discovery subsequent to the Court's earlier ruling has established, by Plaintiff's own admission, that her "idea" is, essentially, embodied in her screenplay, her state law misappropriation claims are preempted by the Copyright Act. See Katz Dochrermann & Epstein, Inc. v. Home Box Office, No. 97 Civ. 7763(TPG), 1999 U.S. Dist. LEXIS 3971, 1999 WL 179603, at *3 (S.D.N.Y. Mar. 31, 1999) (holding that where the ideas at issue cannot, on the facts alleged, be meaningfully separated from their tangible expressions, preemption is appropriate.) Thus, the Disney, B&L and Big House Defendants are all entitled to summary judgment dismissing Plaintiff's claims for unfair competition, unjust enrichment and quantum meruit.

### 4. Remaining Fraud Claim

The [*17] Disney Defendants argue that Defendant Jason Filardi is entitled to summary judgment as a matter of law dismissing Plaintiff's New York state law fraud claim against him (SAC Claim 12), because Plaintiff is unable to identify any statements made by Defendant Jason Filardi on which she relied to her detriment. To state a cognizable fraud claim under New York law, a plaintiff must allege (i) a misrepresentation or omission of a material fact; (ii) which was false and known to be false by defendant; (iii) made for the purpose of inducing plaintiff to rely on it; (iv) justifiable and reasonable

reliance on the material misrepresentation or omission; and (v) resulting injury. See Stewart v. World Wrestling Fedn. Entm't, Inc., No. 03 Civ. 2468 RLC, 2004 U.S. Dist. LEXIS 26533, 2005 WL 66890, at *6 (S.D.N.Y. Jan. 11, 2005). Because Plaintiff has failed to identify any statements, let alone false statements, made by Defendant Jason Filardi upon which Plaintiff relied, he is entitled to summary judgment as a matter of law on her fraud claim. To the extent Plaintiff's fraud claim against Filardi is premised on his alleged collaboration with Tobia in a misrepresentation as to any similarity between Plaintiff's [*18] screenplay and "Jailbabe.com," the claim fails for the reasons set forth in Section C.3 below.

### C. B&L Defendants' Motion for Summary Judgment

#### 1. Preemption: Misappropriation of Idea and Conversion Claims

The B&L Defendants ask the Court to grant them summary judgment dismissing Plaintiff's state law claims against them, namely for legal malpractice, breach of fiduciary duty, misappropriation of idea, breach of implied contract, unfair competition, fraud, quantum meruit, unjust enrichment and conversion. The B&L Defendants argue that these claims are preempted by the Copyright Act. For the reasons explained above, Plaintiff's claims for unfair competition, quantum meruit, and unjust enrichment are preempted and thus are not viable. For substantially the same reasons, the B&L Defendants' motion for summary judgment is granted as to Plaintiff's misappropriation of idea and conversion claims. Both of these claims are rooted in Plaintiff's allegation that the B&L Defendants improperly shared her "idea" with others, [4] and thus are preempted for the reasons discussed above.

> 4    Plaintiff's misappropriation of idea claim (claim 8 of the SAC) charges that Plaintiff and Tobia entered into a confidential [*19] and fiduciary relationship and that Tobia legally represented Plaintiff. For the reasons discussed in section C.2 below, summary judgment is granted dismissing Plaintiff's fiduciary relationship and legal malpractice claims. The misappropriation of idea claim also alleges that the Defendants disclosed without Plaintiff's authorization her "unique and original idea" and did not compensate her for this. See SAC PP183-192. Plaintiff's conversion claim (claim 13 of the SAC) charges that Defendants wrongfully appropriated and disclosed Plaintiff's ideas and concepts. See SAC PP239-248. As these claims thus clearly arise from Plaintiff's contention that her ideas — which were allegedly embodied in her screenplay — were misappropriated, they are preempted by the Copyright Act.

To the extent Plaintiff's misappropriation claim can be construed as premised on a contractual theory rather than a general claim of entitlement to protection of her intellectual property rights, it fails on the merits. As the Second Circuit has noted, "[u]nder California law, . . . misappropriation . . . claims are actionable only to vindicate legally protected property interests, and an idea is not recognized as [*20] a property right. . . . Recovery for the appropriation of an idea, therefore, may be had only on a contractual theory." Whitfield v. Lear, 751 F.2d 90, 92 (2d Cir. 1984). There is no allegation, or any proffer of evidence of any contract (implied, express or otherwise) between Plaintiff and any of the Defendants, other than Tobia/B&L. Plaintiff's contract claims against Tobia and his firm are not viable, as explained below. Accordingly, Plaintiff's misappropriation of idea claim fails on its merits even if it is not preempted.

### 2. Legal Malpractice, Breach of Fiduciary Duty, and Breach of Contract Claims

The parties agree that Massachusetts law governs Plaintiff's legal malpractice, breach of fiduciary duty, and breach of contract/implied contract claims against Tobia and his firm. Under Massachusetts law, where the parties never entered into an express contract for legal services, an attorney-client relationship may be implied "when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice [*21] or assistance. . . . In appropriate cases the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it." DeVaux v. Am. Home Assur. Co., 387 Mass. 814, 444 N.E.2d 355, 357 (Mass. 1983) (internal citation omitted).

Plaintiff submitted two affirmations in connection with her opposition to Defendants' motions for summary judgment. Some of the information contained within these affirmations consists of conclusory legal assertions and is inconsistent Plaintiff's own prior deposition testimony. For example, while Plaintiff testified at her deposition that Defendant Tobia had flipped through her screenplay and told her repeatedly "I will see what I can do for you" (see Flaherty Dep. at 291-297), in her affirmation she conclusorily states that Tobia "agree[d] to represent [her] interests" (see Affirmation of Pro Se Plaintiff Marie Flaherty in Opposition to Defendants' Motions for Summary Judgment ("Flaherty Aff.") P20). [5] To the extent Plaintiff's affirmations conflict with her prior deposition testimony, they will be disregarded. "[A] party [*22] may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion

that, by omission or addition, contradicts the affiant's previous deposition testimony. . . . Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not "genuine" issues for trial." Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996).

5    In her Response to Defendant Tobia and Burns & Levinson's Local Rule 56.1 Statement ("Plaintiff's B&L 56.1 Response"), Plaintiff challenges the accuracy of her deposition transcript. See Plaintiff's B&L 56.1 Response PP4, 9, 11, and 13. However, the Plaintiff did not, in accordance with Federal Rule of Civil Procedure 30(e), timely request any corrections to the transcript, even though the Defendants provided her with a copy of the transcript and informed her that any corrections would be due within 30 days. See Reply Decl. Of Jeffrey A. Conciatori, P13. Thus, her challenge is unavailing. See Margo v. Weiss, 213 F.3d 55, 61 (2d Cir. 2000).

Plaintiff's own proffers establish that the B&L Defendants are entitled to summary judgment as a matter of law on her legal malpractice claim. The [*23] uncontroverted record shows that Plaintiff never explicitly requested the attorney to represent her in this matter, never was told that the attorney would protect her interests, and was never billed for any services. Plaintiff's deposition testimony indicates that Plaintiff merely gave Tobia her screenplay and does not suggest any request for legal services. Thus, there is no basis upon which to imply the existence of an attorney-client relationship. See Robertson v. Gaston, Snow & Ely Bartlett, 404 Mass. 515, 536 N.E.2d 344, 351 (Mass. 1989). Further, "[Massachusetts] [c]ourts interpreting DeVaux have understood this first prong [of seeking advice or assistance from an attorney] to require concrete communication by the plaintiff requesting that the attorney represent him, or explicitly seeking individualized legal advisement." International Strategies Group, Ltd. v. Greenberg Traurig, LLP, 482 F.3d 1, 8 (1<st> Cir. 2007); see also Sheinkopf v. Stone, 927 F.2d 1259, 1266-67 (1st Cir. 1991) (no implied attorney-client relationship arose under Massachusetts law between an attorney and an investor where the investor bought into a joint investment venture managed by the attorney, even though the attorney [*24] prepared various legal documents for the investor's signature and requested that he sign them; promised to "protect" the investor; told the investor that "other clients of [the firm]" were also investing in the venture; listed the firm's address on the joint venture's legal documents; and transacted joint venture business out of his law firm office and with the assistance of his law firm secretary).

2007 U.S. Dist. LEXIS 69202, *; Copy. L. Rep. (CCH) P29,452

In addition, the uncontroverted evidence establishes that Plaintiff never detrimentally relied on any of Tobia's statements, as she and Tobia did not speak again for six months after the initial meeting in New York at which she gave him the screenplay, then spoke briefly on the phone but did not discuss any purported legal representation, and then did not speak again for three years. During this time, the Plaintiff acknowledges, she was "pitching" her screenplay to at least 10 different people. (See Flahery Dep. at 48, 332-333.) To the extent Plaintiff's argument is construed as one that she was relying on Tobia to "pitch" her screenplay for her, Plaintiff has pointed to no case law that establishes that "pitching" is a legal service that would be encompassed within the second prong of the [*25] De Vaux test. Thus, the B&L Defendants are entitled to summary judgment dismissing Plaintiff's legal malpractice claim against them.

For substantially the same reasons, the B&L Defendants are also entitled to summary judgment dismissing Plaintiff's breach of fiduciary duty claim against them (claim 7 of the SAC), as the uncontroverted evidence establishes that there was no confidential or fiduciary relationship present here sufficient to support the imposition of such a duty. See Van Brode Group v. Bowditch & Dewey, 36 Mass. App. Ct. 509, 516, 633 N.E.2d 424 (1994) (noting that, under Massachusetts law, an attorney only owes a duty of care to a third party non-client if the attorney knows the non-client is relying on the legal services the attorney is rendering).

Likewise, the B&L Defendants are entitled to summary judgment dismissing Plaintiff's breach of contract/implied contract claim against them (claim 9 of the SAC). Plaintiff alleges that the implied contract here was "that Plaintiff Flaherty's idea would be confidential based on the confidential and fiduciary relationship created by the parties through Tobia's legal representation of Flaherty," and, further alleges that this contract [*26] arises because Tobia was "under a legal obligation to treat Flaherty's idea as confidential [as] the legal representation relationship required that Tobia keep her idea confidential and that she expected to be compensated and receive screen credit." (SAC P197.) As discussed above, Plaintiff's claims for breach of fiduciary relationship and legal malpractice fail, as the uncontroverted evidence establishes that there was no legal representation and no fiduciary relationship. Thus, there was no relationship upon which to imply a contract that Tobia would keep her ideas confidential. None of the elements of an implied contract claim have been made out on the facts before this Court.

3. *Plaintiff's Fraud Claim*

Regarding Plaintiff's fraud claim (claim 12 of the SAC), the B&L Defendants argue that Plaintiff has failed to proffer evidence sufficient to satisfy any of the elements of that cause of action. As noted above, to state a cognizable fraud claim, a plaintiff must allege (i) a misrepresentation or omission of a material fact; (ii) which was false and known to be false by defendant; (iii) made for the purpose of inducing plaintiff to [*27] rely on it; (iv) justifiable and reasonable reliance on the material misrepresentation or omission; and (v) resulting injury. See Stewart, 2004 U.S. Dist. LEXIS 26533, 2005 WL 66890, at *6.

Here, Plaintiff asserts that Defendant Tobia's alleged statement denying that the script for "Jailbabe.com" was "awfully familiar [sic]" to Flaherty's screenplay was a material falsehood. (SAC P229). Taking as true Plaintiff's contention that Tobia made the challenged statement and assuming (without deciding the issue) for purposes of this motion practice that the statement was materially false, Plaintiff's attempt to state a viable fraud claim is nonetheless unavailing because the alleged statement is one of opinion, not of fact. "Absent special circumstances, the representation must be one of fact and not opinion." Bank of N. Y. v. Realty Group Consultants, 186 A.D.2d 618, 619, 588 N.Y.S.2d 602 (N.Y. App. Div. 1992). [6] Further, Plaintiff's deposition testimony -- that she told a director that film similar to hers may have been sold to Disney -- precludes any possibility that Plaintiff could prove that she relied to her detriment on Tobia's allegedly false statement. [7] Accordingly, the B&L Defendants' motion for summary judgment dismissing Plaintiff's [*28] fraud claim against them [8] is granted.

6  Such special circumstances would include, for example, the existence of an employee-employer relationship between the speaker of the fraudulent statement and the plaintiff (see Forest v. Elliott Truck & Tractor Sales, Inc., 29 A.D.2d 1031, 1031-1032, 289 N.Y.S.2d 431 (N.Y. App. Div. 1968), or the presence of a landlord-tenant relationship and a lease that made certain guarantees (see Municipal Metallic Bed Mfg. Corp. v. Dobbs, 253 N.Y. 313, 171 N. E. 75 (N.Y. 1930). The record is devoid of evidence of any such special circumstances here.

7  Dep. Tr. at 332.

8  Though in her SAC Plaintiff only charges that Defendant Tobia made a fraudulent statement, she alleges that he was "working on behalf of and for the benefit of Burns & Levinson" when he made it, and that he would not have succeeded in his fraud "without the active participation and collaboration of Jason Filardi." SAC PP233-234.

2007 U.S. Dist. LEXIS 69202, *; Copy. L. Rep. (CCH) P29,452

### 4. B&L Defendants' Request for Attorneys' Fees

The B&L Defendants ask the Court to award them reasonable attorneys' fees and costs incurred in responding to what they characterize as Plaintiff's "bad faith" affidavits submitted in opposition to summary judgment. A court has the inherent power to assess [*29] costs and attorneys' fees where a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975) (internal citations omitted). The Second Circuit has made clear that this power should be exercised with restraint and has required a particularized showing of bad faith to justify the use of the court's inherent power; declining to uphold awards under the bad-faith exception absent both "'clear evidence' that the challenged actions 'are entirely without color, and [are taken] for reasons of harassment or delay or for other improper purposes'" and "a high degree of specificity in the factual findings of [the] lower courts." Oliveri v. Thompson, 803 F.2d 1265, 1272 (2d Cir. 1986) (citations omitted).

Although the Court believes the Plaintiff may well have engaged in vexatious and delaying motion practice in this case, in light of her pro se status, and because the record does not establish that Plaintiff's affirmations are "entirely without color, and [were made] for reasons of harassment or delay or for other improper purposes," the B&L [*30] Defendants' request for attorney's fees and costs is denied.

### D. Remaining Motions and Defendants

#### 1. Big House Defendants' Motion for Judgment on the Pleadings

The Big House Defendants joined the Disney Defendants' summary judgment motion and, in the alternative, moved for judgment on the pleadings. In light of the Court's disposition of the relevant portion of the summary judgment aspect of the motion in Defendants' favor, the motion for judgment on the pleadings is moot and need not be addressed.

### CONCLUSION

For the reasons explained above, the pending applications are resolved as follows. Plaintiff's Rule 56(f) request is denied. The Disney Defendants' and the B&L Defendants' motions for summary judgment (docket entries 157 and 162) are granted except to the extent they seek summary judgment regarding Plaintiff's claim against Defendants Filardi and Tobia that they sold the film production defendants a work that infringed on Plaintiff's screenplay. That element of the summary judgment motion practice will be held in abeyance pending the further submissions described in the next paragraphs. The Big House Defendants' Motion for Judgment on the Pleadings (docket entry 208) is denied as moot, [*31] as its alternative motion for summary judgment has been granted in relevant part.

Defendants Filardi and Tobia are hereby ordered to supplement their evidentiary submissions as to the identity and nature of the screenplay sold by Filardi to Hyde Park. Any such submissions shall be filed with the Court (with a courtesy copy for Chambers) and served on Ms. Flaherty so as to be received by October 5, 2007. Ms. Flaherty shall file (with a courtesy copy for Chambers) and serve any such supplemental evidentiary submission so that it is received no later than October 26, 2007. Any reply submission shall be served and filed so as to be received by November 2, 2007. [9]

> 9 As noted above, discovery in this case has been closed. No further applications for the reopening of discovery, or for supplemental discovery of any kind, will be entertained. See August 14, 2007 Opinion and Order of Magistrate Judge Pitman.

The Court is also issuing today a separate Order to Show Cause in this matter.

SO ORDERED.

Dated: New York, New York

September 17, 2007

LAURA TAYLOR SWAIN

United States District Judge



Not Reported in F.Supp.                                                                Page 1
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

**H**Littel v. Twentieth Century Fox Film Corp.
S.D.N.Y.,1995.

United States District Court, S.D. New York.
John S. LITTEL, Anthony Destefano, and Judalee Productions, Inc., Plaintiffs,
v.
TWENTIETH CENTURY FOX FILM CORPORATION, Jim Thomas, John Thomas, CBS Fox Company, American Films and American Entertainment Partners LP, John Davis, Shanachie Productions, Inc., Deimos Bard Productions, Inc., and Fox Video, Inc., Defendants.
No. 89 Civ. 8526 (DLC).

July 7, 1995.

Robert Dembia, Levine & Dembia, New York City, for plaintiffs.
Slade R. Metcalf, Mark H. Jackson, Squadron, Ellenoff, Plesen, Sheinfeld & Sorkin, New York City, for defendants.

*OPINION & ORDER*

COTE, District Judge:
*1 Plaintiffs bring this action for copyright infringement, *inter alia*, alleging that the defendants copied plaintiffs' book "The Predator" without authorization in the production of the motion pictures "Predator" and "Predator 2". Before the Court is defendants' motion for summary judgment, or, in the alternative, to dismiss against defendants John Thomas and James Thomas for lack of personal jurisdiction. For the reasons given below, defendants motion for summary judgment is granted.

*BACKGROUND*

Procedural Background

Plaintiffs John S. Littel and Anthony Destefano are co-authors, under the pseudonym "Anthony John", of a book entitled "The Predator", published in 1983. Plaintiff Judalee Productions, Inc. allegedly owns the movie rights to that book. The defendants collectively wrote and produced the movies "Predator", released in 1987, and "Predator 2", released in 1990. Plaintiffs filed their first complaint on December 22, 1989, alleging that the motion picture and novelization of "Predator" copied significant portions of the plaintiffs' book, in violation of the Copyright Act, the Lanham Act, common law unfair competition and "misappropriation of copyright."

On April 20, 1990, several of the individual defendants filed a motion to dismiss the action as against them for lack of personal jurisdiction, or, in the alternative, to transfer the action to the United States District Court for the Central District of California. In an order dated May 28, 1991, the Honorable John E. Sprizzo, to whom this case was then assigned, denied the motion except with respect to defendant Stan Winston, who was dismissed from the action.

On August 9, 1991, defendants filed a motion for summary judgment based on the theory that plaintiffs' book was not "substantially similar" to the motion picture "Predator". Plaintiffs then requested, and were granted, permission to file a supplemental complaint based on the production and distribution of "Predator 2", which had begun in November 1990. On October 17, 1991, plaintiffs filed a supplemental complaint, alleging the same legal claims as the original complaint, but adding facts relating to the motion picture and novelization of "Predator 2" as well as adding references to the screenplays of both motion pictures. On January 9, 1992, defendants supplemented their summary judgment motion in a similar fashion. By order dated July 27, 1992, Judge Sprizzo denied defendants' motion for summary judgment, without opinion.

On September 13, 1994, well after the completion of discovery, the action was reassigned to this Court. At a conference on November 9, 1994, defendants were granted leave to renew their motion for summary judgment. On March 24, 1995, the defendants' renewed motion was fully submitted to this Court, arguing that the works in question were not substantially similar.

*STANDARD*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                           Page 2
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

Summary judgment is only appropriate when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. When deciding a motion for summary judgment, a court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. v. Reading, PA v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994).

*2 In the copyright context,

a district court may determine noninfringement as a matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff['s] work, or when no reasonable trier of fact could find the works substantially similar.

*Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.), cert. denied, 476 U.S. 1159 (1986), citing *Warner Bros., Inc. v. American Broadcasting Co.*, 654 F.2d 204, 207 (2d Cir. 1981), aff'd, 720 F.2d 231 (2d Cir. 1983) (Warner II). In order for summary judgment to be available, the lack of substantial similarity between the protectable aspects of the works must be "'so clear as to fall outside the range of disputed fact questions' requiring resolution at trial." *Id.* (quoting *Warner II*, 720 F.2d at 239).

### DISCUSSION

In their original and supplemental complaints, plaintiffs make several claims: copyright infringement under the Copyright Act, false designation of origin under the Lanham Act, common law unfair competition, and "misappropriation of copyright". Defendants' motion for summary judgment, and plaintiffs' opposition, address the copyright infringement claim almost exclusively. In addition to substantive defenses, plaintiffs assert that prior rulings in this action, denying defendants summary judgment on the copyright infringement claim and denying a motion to dismiss for lack of personal jurisdiction, are law of the case and argue against this Court's reconsideration of these issues.

### LAW OF THE CASE

Plaintiffs argue that Judge Sprizzo's prior rulings, denying summary judgment and denying a motion to dismiss for lack of personal jurisdiction, are law of the case. While admitting that this does not prevent the Court from hearing the motions, plaintiffs argue that there is no compelling reason to reverse the prior rulings. Defendants respond that discovery has taken place since the prior rulings, that subsequent rulings in this circuit have granted and affirmed summary judgment in similar circumstances, and that manifest injustice would result if the motion is not reheard.

When the prior decision at issue is from the same court, "[t]he law of the case doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions." *Virgin Atlantic Airways, Ltd. v. National Mediation Board*, 956 F.2d 1245, 1255 (2d Cir.) (internal citations and quotations omitted), cert. denied, 113 S.Ct. 67 (1992). The doctrine:

is not an inviolate rule ... and the decision whether or not to apply law-of-the-case is, in turn, informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine.... In this context, "prejudice" ..."refers to a lack of sufficiency of notice" or a lack of sufficient "opportunity to prepare armed with the knowledge that [the prior ruling is not deemed controlling]."

*3 *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991) (quoting *United States v. Birney*, 686 F.2d 102, 107 (2d Cir. 1982)). Courts generally adhere to prior rulings absent "cogent" or "compelling" reasons not to, such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Id.* (internal quotes omitted).

Plaintiffs here have had more than adequate opportunity to prepare for a rehearing of defendants' motion for summary judgment and have not shown any prejudice in this respect. [FN1] In addition, subsequent discovery addressed the subject matter of the motion, as it addressed the issue of defendants' access to plaintiffs' book, revealing that 110 copies of plaintiffs' book were sold in 10 bookstores within a fifty-mile radius of the homes of the defendant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                     Page 3
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

writers, James and John Thomas.[FN2] In addition, with respect to the motion to dismiss for lack of personal jurisdiction, Judge Sprizzo expressly granted defendants leave to re-assert the motion after the close of discovery, and it is therefore not appropriate to consider his prior ruling law of the case now that discovery has been completed. Accordingly, this Court, having reviewed the works in question, and found cogent reasons to rehear the motion for summary judgment, will do so.

*COPYRIGHT INFRINGEMENT*

There are two elements for a claim of copyright infringement: 1) ownership of a valid copyright by the plaintiff; and 2) unauthorized copying by the defendant. *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139 (2d Cir. 1992). Defendants here do not challenge the validity of plaintiffs' copyright. Because direct evidence of unauthorized copying is rarely available, "copying is generally established by showing (a) that the defendant[s] had access to the copyrighted work and (b) the substantial similarity of protectable material in the two works." *Kregos v. Associated Press,* 3 F.3d 656, 662 (2d Cir. 1993), citing *Walker,* 784 F.2d at 48.

Although the issue of substantial similarity is usually a factual determination, the Second Circuit has recognized that non-infringement may be determined as a matter of law on a motion for summary judgment "when the similarity concerns only noncopyrightable elements of plaintiff['s] work, or when no reasonable trier of fact could find the works substantially similar." *Walker,* 784 F.2d at 48 (granting summary judgment because defendants' motion picture "Fort Apache: The Bronx" was not substantially similar to plaintiff's book entitled *Fort Apache*).

It is axiomatic that copyright protection "does not extend to ideas; it protects only the means of expression employed by the author." *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61, 68 (2d Cir. 1994). As many courts have noted, this distinction is more easily stated than applied. *See, e.g., Walker,* 784 F.2d at 48. In tackling the problem, courts have often invoked the language of Judge Learned Hand, sometimes referred to as his "abstractions test":

*4 Upon any work ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir. 1930), *cert. denied,* 282 U.S. 902 (1931). In examining two works for substantial similarity, the "focus must be on the similarity of the expression of an idea or fact, not on the similarity of the facts, ideas, or concepts themselves." *Rogers v. Koons,* 960 F.2d 301, 308 (2d Cir. 1992), citing *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 912 (2d Cir. 1980). Because copyright does not protect "thematic concepts", there is no copyright protection for "scènes a faire", or "sequences of events which necessarily follow from a common theme." *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir. 1976). Therefore, "'no one infringes, unless he descends so far into what is concrete (in a work) as to invade ... (its) "expression."'" *Id.* (parentheses in original) (quoting *National Comics Publications v. Fawcett Publications,* 191 F.2d 594, 600 (2d Cir. 1951). Similarly, there is no copyright protection for familiar "stock figures" borrowed from the public domain. *See Nichols,* 45 F.2d at 121-22 ("the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly").

Although the legal question focusses on the existence of *similarities* between the works, the Second Circuit has observed that "'numerous differences tend to undercut substantial similarity.'" *Warner II,* 720 F.2d at 241 (quoting *Durham,* 630 F.2d at 913). A court should look both at the individual parts of the work and its whole, for:

just as similarity cannot be rejected by isolating as an idea each characteristic the characters have in common, it cannot be found when the total perception of all the ideas as expressed in each character is fundamentally different.

*Warner II,* 720 F.2d at 243 (television character "Great American Hero" found not to infringe upon

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

the character "Superman" as a matter of law). The general test for evaluating "substantial" similarity is "'whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Warner Bros., Inc. v. American Broadcasting Companies,* 654 F.2d 204, 208 (2d Cir. 1981) (Warner I) quoting *Ideal Toy v. Fab-Lu Ltd.,* 360 F.2d 1021, 1022 (2d Cir. 1966). Ultimately, a court must determine whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand, J.). Customarily, courts resolve the question "primarily through detailed viewing or reading of the works themselves." *Walker,* 784 F.2d at 52.

*A. Summary of the Works Considered*

**\*5** The Court has read the plaintiffs' book, "The Predator", and viewed the motion pictures "Predator" and "Predator 2". In addition, the Court has reviewed the first drafts of the screenplays for the motion pictures, dated September 3, 1984, and October 6, 1989, respectively. Although plaintiffs' complaint arguably includes all drafts of the screenplays, the Court has reviewed only the first draft of each as these were the only drafts provided to the Court by the plaintiffs in their opposition to the motion, the only drafts analyzed separately by plaintiffs, the drafts emphasized by plaintiffs in their argument and comparisons to the book, and the drafts most likely to differ from the motion picture itself.[FN1]

*1. The Book: "The Predator"*

Plaintiffs' book, published in 1983, concerns the violent exploits in New York City of the "predator", an albino boy abandoned by his parents in Africa and raised by baboons. The boy had no human contact until the age of eight, when he was captured and brought to a kindly priest named Father James. While living in the priest's compound, the boy hunted with baboons at night, killing and eating other animals. Over the next ten years, Father James developed a bond with the boy, whom he named Michael, by keeping pieces of raw meat on hand to pacify him. When Father James is killed, Michael is sent to New York with the body of the priest, whose side he refuses to leave, in the company of Father Andrew

DuBrille, a co-worker of Father James who is leaving Africa.

Michael is described in various parts of the book as having red albino eyes, weak in the light but sharper than ordinary human vision in the dark. He has a keen sense of smell, "negroid" features, and gray, mottled skin. Because he never stood upright as a child, he cannot do so now, but moves adeptly on all fours. He cannot speak, and communicates only in growls and snarls. He has prehensile feet, which enable him to hang upside down in trees and rafters, long-apelike hands, and incisors which are an inch longer than his other teeth. He is exceptionally strong. His diet consists of raw, bloody meat, which he takes in his teeth and swallows whole, with the aid of a permanently dislocated jaw. We later learn that he is a vegetarian for nine months out of the year, and a pure carnivore for the remaining three months.

As the story opens, Michael has escaped from the ship (where, we later learn, he has killed two seamen and tasted his first human meat by chewing on Father James' dead body), and is prowling in Chinatown, about to make his first kill in New York. His victim is young, blonde, innocent, and unsuspecting. Throughout the remainder of the book, Michael kills a series of unsuspecting New Yorkers, consuming the bodily organs he finds most tasty and leaving the rest to rot. Using his tremendous strength, he kills his victims either by smashing their heads against the wall, twisting their heads off, or merely reaching right in for the organs he wants to eat. It is a very gory, messy and wasteful process. He begins in Chinatown, but is frightened out of his lair by the smell of gunsmoke. Later, he moves back and forth between various subway tunnels and the Central Park Zoo, an apartment building, the Waldorf Astoria Hotel, and the Macy's Thanksgiving Day Parade.

**\*6** Michael is pursued by a tough police lieutenant named Anthony Touchetti, whose beat is Chinatown and Little Italy. A loner and a pragmatist who has been on the force for 15 years, Touchetti commands fearful respect from cops and hoods alike. He smokes Luckies, spent a few years as a marine in Viet Nam, and is a physically large and impressive man. His closest relationship with another police officer is apparently with his boss, Albert Freeman, who tries to protect him from the political fallout of his rash and headstrong actions. At the outset of the book

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                  Page 5
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

Touchetti is involved with Mei Ling, a young Asian woman whom he saved from a brutal and violent husband. Although he cares for her, he is too tough to tell her. When she turns up dead, it initially appears that she was one of Michael's victims. Later, it turns out that she was murdered by her husband, who tried to make it look like Michael's work. The pressures of the investigation and Mei Ling's death cause Touchetti's behavior to become increasingly erratic and aggressive (including heavy drinking, striking a fellow officer, and nearly killing Mei Ling's husband), and he is ultimately suspended.

In first trying to ascertain the identity of the murderer, and then to catch him, Touchetti works with Amos Butley, a nationally renowned forensic pathologist. Butley is described as a huge, shambling man who smokes cigars and, when upset, drinks scotch from a specimen jar in his lab. Butley alerts Touchetti to bite marks on the human remains discovered in Michael's lair, suggesting that the murderer is a cannibal.

Also investigating the case is Maria Rosario, an hispanic television reporter who has just been demoted from her seat as an anchor by her new female boss, who is out to get her. Deserted by her mother when very young, Rosario was raised as a strict Catholic by her father until she was sixteen, when her father was killed by loan sharks. She maintains a useful sexual entanglement with her old boss, "knows how to use her body when no one wanted to listen to words," and is desperate to break this story and save her career. At first, she and Touchetti use one another for sex and information, but eventually join forces after they have each been brutalized and humbled by the events of the story.

Professor Stuart Grossman is also interested in finding Michael. Now a professor at Columbia who endowed his own chair in anthropology, Grossman was a child prodigy who was crippled at birth and alienated from society. He is an expert on feral children, and wants to capture Michael in order to further his research on whether intelligence is hereditary or developed by one's environment. Grossman, with the help of Rosario and DuBrille, engineer an attempt to capture Michael by using baboon estrus, Rottweilers, nets, a tranquilizer, and a Starlight scope mounted inside a van. Although Rosario does get video footage of Michael, the plan

goes awry, and eventually Michael rapes Rosario and knocks DuBrille out. By virtue of his tremendous wealth, Grossman is very politically connected and successfully escapes censorship for his actions, while keeping Touchetti from interfering.

*7 The hunt for Michael builds to a crescendo at the Macy's Thanksgiving Day Parade, which Michael bursts into while trying to escape the smoke from a bloody ("pulpy fragments of human flesh oozed and sprayed out of the cars") subway crash he caused by killing the switch operator. In the mayhem that ensues, Michael throws Grossman down the subway steps, grabs Freeman's grandchild, and heads back down into the depths of the subway, pursued by Touchetti and Rosario. The final battle takes place in an old pneumatic subway station, abandoned due to political corruption in the era of Boss Tweed. After much mutual bloodletting, Touchetti saves Freeman's grandchild and douses Michael with kerosene while Rosario lights him up. Michael runs screaming into the darkness of the tunnel. The book closes with the reflections of the now quadriplegic Grossman, who believes that Michael is alive as a quiet vegetarian, but will return to reap vengeance for himself and Grossman.

### 2. The First Motion Picture: "Predator"

The movie opens with a shot of a spaceship flying through space, spinning off a part of itself that falls to a planet that is presumably earth. The scene then shifts to an unnamed Central American country, where we meet Major Alan Schaefer (known as "Dutch" and played by Arnold Schwarzenegger) and his team of five highly trained veteran soldiers. Dutch and his team have been recruited by the CIA to rescue hostages taken by Soviet-sponsored guerrillas somewhere in the jungle. Heavily armed with military-style weaponry, the team is joined by Dillon, a CIA operative who is not as jungle-ready as the remainder of the team. Shortly after being dropped into the jungle, Dutch and his team find the crashed helicopter, which contains military-style technology, and then the bodies of its presumed former occupants. The bodies are skinned, bloody, and hanging from their ankles in the trees. Dutch and his team identify the men as Green Berets, also sent in by the CIA, and begin to suspect that they are not really there to rescue hostages. Dutch's men, each having highly tuned military skills, are also puzzled by the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 6
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

fact that there seems to have been a firefight, after which everyone disappeared. At this point, the film begins to cut back and forth from the point of view of the men in the jungle, to the point of view of the eponymous predator, who has heat-seeking vision and sees the men as red shapes on a blue-green field.

The team comes across the guerilla camp, which it proceeds to destroy with an astonishing display of weaponry, physical strength, and agility. All of the guerrillas, with the exception of one female rebel, Anna, are annihilated without the loss of a single member of Dutch's team, in a surgically conducted military exercise. Dutch discovers, after confronting Dillon, that his real mission was to blow up this camp and prevent a major Soviet-backed invasion.

The team, along with Anna, set off through the jungle. Trying to prevent Anna from escaping, Hawkins, one of Dutch's team, is snatched by the predator, who eventually strings him up in a tree as he did the helicopter passengers. Our first glimpse of the predator is of a shape moving through the woods. He is only visible as a series of lenses reflecting the environment around him, as if the jungle were reflected in the eye of an insect, or converted into a multitude of cubist paintings. Injured in the aftermath of his attack on the first member of Dutch's team, he drips bright green blood. The men note that the predator did not take any of his victims' weaponry, leading them to believe he is hunting for sport. The predator then takes Blain, another of Dutch's men, by blasting through his chest cavity with a laser. Again, the men note the puzzling use of high technology: there is no shrapnel, and the wound is thoroughly cauterized. The men shoot up a sizable patch of the jungle, to no avail. They next try to rig a trap on the jungle floor, which also fails. After Blain's body disappears, they begin to suspect that the predator is using the trees, and rig a trap there. While waiting, a frightened Anna, who saw the predator take Hawkins, tells the ancient story she has heard from the villagers, of hot summers just like this when men are slain, and sometimes skinned, by a creature they refer to as a "demon."

*8 The predator trips the wire of the trap and is caught briefly in the net, screaming wildly before he cuts himself free. Bloody mayhem ensues in which everyone but Anna (whom the predator has spared, apparently because she is unarmed) and Dutch is killed. Dutch flees, falling down a waterfall, and emerging from the river covered in mud. When the predator emerges from the water, his invisibility mechanism shorts out, and he becomes visible. He appears as a cross between a reptile and a man, wearing armor that covers his head and shoulders. He is equipped with what seem to be gun turrets on his shoulders, metal knives that emerge from his sleeve like fingers, and a computerized wrist radio. His hearing approximates human hearing electronically. Capable of mimicking the human voice, the only other sound he makes is a low trill. When injured, he is capable of repairing himself. His heat-seeking vision, however, fails to detect Dutch when he is covered in mud.

Dutch then busies himself preparing a trap for the predator, and we alternately watch his preparations and the actions of the predator, as he rips the skull and spinal cord from a victim and cries out in victory. We also see the predator's collection of human skulls. Finally, the predator and Dutch lock into combat, where Dutch successfully shoots and wounds the predator. Keeping the upper hand, however, the predator eventually grabs Dutch's chin in his hands and examines his skull, then lets him go. The predator moves off and removes his helmet and armor, revealing an insect-like face, with many jaws resembling pincers, and scaly reptilian skin. The battle then resumes, and after appearing to be near death on a number of occasions, Dutch finally pins the predator beneath a log in an elaborate trap he has set up. About to finish him off, Dutch stops, watches the predator punch something into his wrist computer and begin to laugh. Our last view is an aerial one from a helicopter taking Dutch and Anna out of the jungle, looking down at a massive explosion in the jungle.

3. *First Draft of Screenplay for "Predator", dated September 3, 1984*

The first draft of the screenplay for "Predator" is very similar to the movie itself, aside from the screenplay's inherent ability to provide explanations for events which the motion picture is unable to do with equal clarity. There are few noteworthy differences. The predator himself is the same, except for an emphasis on the predator's "prehensile spur" which he uses to grab victims, and secure his footing. In the opening of the screenplay, the predator is seen scanning the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                           Page 7
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

biological profiles of the various animals which inhabit the earth, eventually locking in on man as his target. The names of the characters are different, and Anna does not appear at all. The character corresponding to Dutch carries a photograph which includes a picture of an Israeli woman soldier who was apparently a love interest of his but who is now dead. There is a dream sequence, taking place while Dutch is delirious with pain and exhaustion, that flashes back to earlier events in Dutch's life. Much of the final battle between Dutch and the predator takes place in a log jam. Finally, at the end, Dutch pursues the predator back to his hunting camp outside his spaceship, where he sees human skins and other trophies before the predator dies.

#### 4. The Second Motion Picture: "Predator 2"

*9 "Predator 2" opens in Los Angeles in 1997, ten years after the events of the first movie. The title character is the same, except that he is equipped with more high-tech weaponry, such as a net that pins victims to the wall, a javelin-like spear, a disk, and lasers of several varieties. Presumably because we know all about the predator from the outset, having seen "Predator", the movie is also less suspenseful, relying without respite on violence for its dramatic impact.

The opening scene takes place in the midst of open warfare between the police and a Colombian drug gang. The city is overrun by violence between the rival Colombian and Jamaican drug gangs, ineffectually battled by both the local police, and, more recently, by a federal unit. Sensationalist reporters, such as Tony Pope of "Hard Core", are seen capitalizing on the blood and violence as well as the incapacity of the police to deal with the open warfare.

Lieutenant Mike Harrigan (played by Danny Glover), flanked by his two devoted team members Danny and Leona, arrives at the battle, opens his trunk full of weaponry, and unflinchingly goes after the Colombians, managing to drive them into a nearby building. Harrigan is a seasoned police officer who has been on the force for 18 years, and although prone to excessive force, has ten commendations for valor and the best felony arrest record in the city. As in the first movie, the camera shifts in and out of the point of view of the predator's heat-seeking vision,

with the predator quickly focussing on Harrigan as a worthy target. Although he is ordered not to, Harrigan pursues the gang members into the building before they can re-arm themselves. Inside the building, the predator makes his entrance by bursting through a skylight while the Colombians are rearming, after which we see an explosion erupt from the building. Once upstairs, Harrigan pursues one of the Colombians onto the roof. The Colombian backs off the roof in terror, seeing the predator behind Harrigan. Harrigan is spooked, but sees nothing. Back inside the building, the other gang members are found dead and bloody all over the bombed-out room. They are cut to pieces, but there are no bullet wounds. One of them is found strung by his heels from the ceiling. Baffled, Harrigan and his co-horts conclude that it was the work of the Jamaican Voodoo Posse. Once outside, federal agents led by Peter Keyes arrive in a sleek helicopter. Keyes, as we later find out, is a scientist with a Ph.D. from Cornell, and is here to investigate and capture the predator for study.

Back at the station house, which is overrun with pimps and prostitutes, Harrigan is told by his boss, Captain Pilgrim, that Keyes and his agents have been given command of the city's drug interdiction efforts. Captain Pilgrim is sympathetic to Harrigan's vociferous objections, but can do nothing to prevent the federal takeover. A new officer is assigned to Harrigan's team, named Jerry Lambert, who is a little too over-eager for Harrigan. Harrigan gives him a speech, warning him not to showboat, and reminding him that the team comes first.

*10 In the next scene, Jamaican gang members break in on a Colombian leader and his girlfriend. The Colombian is strung up by his feet and the Jamaicans are preparing to cut his heart out. At that moment, the predator arrives, pinning one of the Jamaicans against the wall with his net. Harrigan and his team are seen arriving outside, are again told that they are not permitted to enter, and again go in anyway. In the building, Harrigan discovers the bodies of the gang members strung up by their feet, suspended from the ceiling. He is puzzled because both Colombians and Jamaicans are dead. Keyes arrives and kicks Harrigan, and Pope, who has snuck in and filmed the gruesome sight, out of the building. Outside, Harrigan arranges to meet Danny back at the building later. He also gets suspicious of Keyes, and tells Jerry

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

to tail him. Later that night, Danny arrives at the building before Harrigan, and breaks in. Seeing a piece of the predator's weaponry stuck high up on the wall, he climbs up to get it, only to meet his demise at the hands of the predator.

Harrigan is suspended because of his role in Danny's death, but, upon seeing Keyes in the hall, tells Keyes to stay out of his way -- Danny's death has made this personal. Having recovered the predator's weapon, Harrigan takes it to the medical examiner, Dr . Irene Edwards, a neatly and professionally dressed older woman who speaks with a slight foreign accent. She tells Harrigan that Danny was boned like a fish and that the weaponry is not made of any earthly element.

Harrigan arranges a meeting with King Willie, the leader of the Jamaican gang, in order to get information on the mysterious killer. King Willie tells Harrigan that the killer is "from the other side", a demon. Harrigan leaves, and the predator arrives to behead King Willie and remove his skull and spinal cord.

Harrigan is told by Dr. Edwards that King Willie's body had evidence of steroids, such as those found in beef. This and other clues cause Jerry and Leona to head off to the slaughterhouse district by subway. On the train, Leona and Jerry interrupt an attempted mugging, in which a gang of young toughs try to rob a man with a briefcase. The man with the briefcase pulls a gun, followed by one of the would-be muggers, and then by the whole train, in the manner of Bernie Goetz. The predator arrives in the train, wreaking havoc as he goes. Leona manages to pull the emergency brake and evacuate the train, but Jerry is killed by the predator, and Leona finds him strung up, covered in blood. The predator emerges from the train, and, as he did with Dutch in the first movie, picks Leona up by the chin. He detects that she is pregnant, and lets her go as she lapses into shock. Harrigan arrives, but finds no evidence of the predator in the subway.

Harrigan drives off in furious pursuit of the predator, finding him atop a building in the slaughterhouse district, doing a victory dance with what is presumably Jerry's skull and spinal cord in his hand. At that moment, the federal agents swarm all over Harrigan, and take him into a nearby trailer. The trailer is filled with high-tech surveillance and other

equipment, including video monitors and a pheromone scanner. Keyes emerges, dressed in a metallic suit which retains heat, devised in order to fool the predator's heat-seeking vision. Keyes describes that the predator is an alien being, and that he can bend light, which makes him invisible, and that he had previously been to earth ten years before, where he exploded a large chunk of the jungle with a self-destruct mechanism. It becomes apparent to Harrigan that Keyes does not want to kill the predator, but freeze him, in order to open the doorway to a new era of scientific technology. Keyes also explains that the adjacent slaughterhouse, where the predator comes periodically to feed, is rigged as a trap, with special lighting that will make the predator visible. Soon the agents spot the predator in the warehouse, and Keyes and his men head in, with Harrigan remaining in the trailer to watch. At first the predator cannot see them and the trap appears to be working. Then, the predator seems to switch to another channel of vision and is able to see the federal agents. When Harrigan realizes this, he tries to warn the agents, then decides to go in himself, but too late to save any of Keyes' men, all of whom have been killed.

*11 In the battle with the federal agents, something sets off the sprinkler system and the water shorts the predator's invisibility device. Harrigan manages to seriously wound and down the predator, then goes in close to check and to remove the predator's helmet, exposing his reptilian face. The predator makes a grab for Harrigan as Keyes arrives with his freezing gun. The predator throws a disk which cuts through all the carcasses and then Keyes. The battle moves to the roof of the building, where Harrigan knocks the wounded predator, and himself, off the roof. Harrigan falls on ledge, knocking the predator off with his own disk. The predator crashes, ending up in the bathroom of an apartment below, where he uses a sophisticated first aid kit to repair himself. Eventually, both Harrigan and the predator end up in the trophy room of the spaceship, which is hidden underground. The predator pins Harrigan with his net, but Harrigan cuts through it with the disk. After hand to hand combat, Harrigan kills the predator with the disk. At that moment, several other predators emerge from the inner chambers of the spaceship and take the predator's body away. The last one to leave tosses Harrigan a pistol with the engraved date 1715. The spaceship prepares to leave, and Harrigan runs out just in time.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 9
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

*5. First Draft of Screenplay for "Predator 2", dated
October 6, 1989*

Again, the screenplay is like the motion picture in
most respects, although there are more differences
between the screenplay and the motion picture
"Predator 2" than was true of the screenplay and
motion picture "Predator."

The screenplay is set in New York City, with most of
the action taking place in Hell's Kitchen. As a result,
there are references to One Police Plaza and Central
Park. There are minor shifts in events and sequencing
that do not affect similarities between the two works.
The opening scene concerns an illegal gun buy that
goes bad when the Colombian buyer decides to kill
the gun dealer instead of paying for the arsenal of
sophisticated weaponry he wants. The predator
arrives at the scene through a skylight, just as in the
movie. In the scene in which the Jamaicans threaten
to take over the Colombian's heart, the predator leaves
the Colombian alive, still hanging where left by the
Jamaicans. When Danny returns to the scene, he
retrieves a St. Christopher's medal belonging to the
gun dealer killed in the first scene. When Harrigan
meets with King Willie, he is at first observed by
Jerry through a starlight scope. Several small, funny
scenes, taking place on the street, at a hot dog stand,
and at a taxidermist's shop, are present in the
screenplay though not in the motion picture.

Several of the characters in the screenplay either
differ, or are more filled out than in the movie. In the
screenplay, Harrigan refers to an ex-wife who
apparently left him for another man, and we get a
brief glimpse of his boxing trophies and a messy
apartment. Leona, in the screenplay, is happily
married with children, although she is apparently not
pregnant.

*12 In place of Dr. Edwards is Dr. James Arnow,
fifty-five, "salt and pepper hair, ruddy faced, a craze
of broken blood vessels around his eyes proclaiming
his daily need of a scotch or two."He drinks scotch
from a coffee cup with Harrigan when they discuss
the weapon used to kill Danny, which left a residue
made of material not known on earth.

The predator character is physically the same as in
the motion picture, except that he has a penchant for
leaving behind mementos from previous carnage: the
St. Christopher's medal, dreadlocks, and a paper
airplane. He is also described as having "selective
hearing", which enables him to screen out other noise
in favor of the specific conversation which he is
attuned to. Using this special hearing, he is able to
hear the agents in the slaughterhouse even before he
switches on his ultra-violet vision and sees them.

*B. Comparison of the Works*

1. *"The Predator" and "Predator"*[FN4]

If it were not for the fact that the book and movies
bear the same title, it is hard to believe that any claim
of infringement could ever have been filed
here.[FN5]Although the works are each "action-packed"
stories, plaintiffs as much as concede that they bear
no resemblance to one another in terms of setting,
plot, sequence of events, or individual
scenes.[FN6]Indeed, the works emanate from entirely
different genres. Plaintiffs' work has more in
common with tales of nature gone awry, as in the
movies about "werewolves." In contrast, the movies
blend the 1980's Rambo fixation over weaponry and
firepower with the decades old theme of the alien
from outer space.

Plaintiffs' claim of substantial similarity between
plaintiffs' book and the motion picture "Predator" and
its screenplays necessarily centers on the titles of the
works, the character of the predator and, to a lesser
extent, the characters of Touchetti and Dutch. Neither
are the two predator characters, however,
substantially similar. Michael, in plaintiffs' book, is a
feral child, while defendants' predator is an alien
from an unknown planet. Michael is primitive, and
confused by his surroundings, while defendants'
predator is sophisticated and thoroughly in control.
Although both kill humans in a gory fashion, Michael
kills with the tremendous physical strength of his
hands and teeth, while defendants' predator uses a
series of high-tech weaponry unknown to man.
Michael usually kills only to eat, selectively
removing and swallowing whole parts of his victim's
flesh. Defendants' predator kills for sport, removing
and saving his victim's skulls, spinal columns, and
skin as trophies. Michael does not seek out any
particular victim, but kills, when he is hungry, any
vulnerable target he comes across. Defendants'
predator seeks out the most violent or challenging

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 10
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

targets, showing no interest in the unarmed, and actively pursuing Dutch and his team, and, in "Predator 2", Harrigan. Michael is as much victim as monster, keeping to the shadows to avoid contact where he can, fearful of his surroundings. Although his instincts are sharp, he is intellectually inferior to the other characters in the book. Defendants' predator is highly intelligent and in command, drawing on technology more powerful than any known on earth.

*13 Physically, the two villains have only their basic human shape in common. Beginning presumably as an "ordinary" African albino infant with weak red eyes, Michael has developed ape or baboon-like features, such as prehensile feet, long incisors, long ape-like fingers, tremendous strength and an inability to stand upright. Defendants' predator is most often described as reptilian: although he has the basic shape and upright stance of man, he has scaly skin and a distinctly insect-like face, only visible after he removes the sophisticated helmet and armor he wears throughout most of the movie. His hands and feet have reptilian claws, and, at least in the screenplay, he has a retractable "prehensile spur" on his foot, which makes a distinctive scraping noise when he walks and which he uses to grab victims and secure his footing. Michael's skin is gray and mottled, while defendants' predator is either invisible, or capable of changing color like a chameleon. Michael's eyesight is weak during the day, but stronger than ordinary humans in the dark, and he has acute senses of smell and hearing. Defendants' predator has heat-seeking vision, and, in "Predator 2", demonstrates his ability to use other visual frequencies as well. There is no reference whatsoever to his sense of smell and only limited reference to his "selective" hearing, which enables him to tune out other noises in favor of what he is listening for. Although he understands some words, the only sounds Michael makes are snarls and growls. Defendants' predator's aural and vocal capacities are the reverse: he is capable of imitating the human voice, although he does not appear to understand it. The characters are similar only at the most general level of abstraction; both predators kill humans in a powerful, gory and brutal fashion, and have the basic shape of a man with some prehensile ability. This commonality is one shared with countless hordes of villains.

Plaintiffs also claim substantial similarity between Dutch and Touchetti. Even allowing for the difference in setting, which creates wide disparities in their character, these two men have nothing in common beyond being tough characters pursuing a violent killer, whom they apparently defeat in a final battle. Touchetti is a police lieutenant in an embattled part of New York, Dutch is a militarily trained head of an internationally renowned "rescue team." Touchetti is a loner professionally, developing over the course of the novel a nascent ability to form a close personal attachment. Dutch, on the other hand, clearly has strong bonds with the members of his expert team, which works together in seamless unity. He has no evident personal attachments in the movie, and there is only the vaguest mention of a prior relationship in the screenplay. Touchetti comes apart during the course of the book, assaulting his girlfriend's husband and another police officer, and going on an extended drinking binge. Dutch at all times is professional and competent, even when stretched to the limits of his physical ability. Touchetti learns early on what he is pursuing, and, after giving up, pursues Michael at the end in order to save his boss's grandson. Dutch, baffled throughout much of the movie as to the predator's identity, is hunted by the predator, and only near the close of the movie, when Dutch is fighting for his life, does he successfully hunt the predator.

*14 As with the similarities between the predators, the only similarities between these two heroes is their shared similarity with the stock figure of the tough strong man battling an evil villain to the death. These figures recur in nearly every "action-packed" movie; giving plaintiffs the exclusive right to them would eviscerate the genre. For this reason, copyright law does not give protection for these generalized concepts, and there being no other similarities between the two works, no reasonable trier of fact could find the two works substantially similar. Defendants are therefore entitled to summary judgment on plaintiffs' claims with respect to the motion picture "Predator" and its screenplays.

2. "The Predator" and "Predator 2"

Plaintiff makes a number of claims of substantial similarity between these two works, which bear more resemblance to one another than the first motion picture did to plaintiffs' book. To begin with, both at least take place on the same continent and in an urban setting. Again, both are violent and action-packed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 11
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

#### a. *Setting*

In contrast to the first motion picture, "Predator 2", like plaintiffs' book, is set in an urban environment: the screenplay in New York and the motion picture in Los Angeles. Also like plaintiffs' book, the hero is a police lieutenant. Needless to say, placing a police story in New York does not rise to the level of protectable expression.

#### b. *Plot*

At the most general level, both works tell a suspenseful story involving a police lieutenant and a brutal killer who is ultimately vanquished by the strength and ingenuity of the lieutenant, to the dismay of another character who was hoping to capture the killer for study. This stock theme is not protected by copyright. *Walker, 784 F.2d at 50.* Moving beyond this abstraction to the more concrete details of each work, "differences in plot and structure far outweigh this general likeness."*See id.* at 49.The differences are driven in part by the vastly different nature of the two predators. Michael does not choose to come to New York. He kills and eats whatever unsuspecting New Yorkers he comes across, one by one, and makes no concerted effort to pursue Touchetti in particular, or any of the major characters. Defendants' predator, to the contrary, has specifically chosen the urban venue in search of heat and conflict. He focusses in on, and actively pursues, Harrigan, as well as powerful gang members, selectively killing only those who are armed and preserving selected specimens as trophies.

In plaintiffs' book, several parties pursue Michael, each for his own reason: DuBrille, because he feels guilty for Michael's predicament; Touchetti, first in order to solve the crime, then because he thinks Michael has killed his girlfriend, and finally in order to save his boss's grandchild; Rosario, in order to get a story which could rescue her career; and Grossman, in order to research the origin of intelligence. The distinct motivations and personalities of these characters interact to form several subplots, such as Touchetti's relationship with Mei Ling and her husband, and the character transformation that both he and Rosario undergo which precipitates a deepening of their relationship. In terms of its visceral impact, the novel appeals to both violence

and sex.

**\*15** "Predator 2," however, is non-stop violence: between rival drug gangs, between the police and the drug gangs, and between the predator and everyone else. The predator does not restrain himself to one victim at a time, but kills whole rooms full of gang members in the blink of an eye. Open warfare permeates the entire motion picture, with the sole plot line consisting of the predator's pursuit of Harrigan and other powerful figures, and Harrigan's final pursuit of him.

#### c. *Sequence of Events and Individual Scenes*

The two works do not share a similar sequence of events other than the pursuit and eventual vanquishment of the predator. Even isolated events, such as the attempted capture scenes and the final battle, are similar only in their most generalized themes.

As discussed earlier, the attempts to capture the predator alive in each work are distinctly different: one is led by a wealthy outcast who has actively recruited and manipulated others to try to catch Michael in a primitive trap in Central Park using baboon estrus; the other is conducted by an elite team of federal agents using sophisticated technology to trap the predator in a slaughterhouse.

A final one-on-one battle scene in which the hero nearly dies but ends up vanquishing the villain can hardly be said to be original or unique to plaintiffs' work, and the details of each battle are not similar. One takes place in an abandoned subway tunnel, and includes Touchetti, Rosario, a small boy, and Michael. Although Touchetti does most of the battling, Michael is ultimately immersed in flame through the joint efforts of both Touchetti and Rosario. The corresponding scene in defendants' work is entirely between Harrigan and the predator. It begins in the slaughterhouse, moves to the rooftop, then into an apartment in the building, and finally into the predator's spaceship.

Other scenes common to both works are endemic to New York, in which both plaintiffs' book and defendants' screenplay are situated. These include scenes in a subway, Central Park, One Police Plaza, and a manhole. Others, such as the forensics lab, are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 12
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

an inevitable part of the police/crime genre.

### d. Characters

In addition to their claim that the two predator characters are substantially similar, plaintiffs claim that several other characters in "Predator 2" are substantially similar to those in their book. Plaintiffs compare Touchetti with Harrigan, Freeman with Pilgrim, Rosario with a combination of Leona Williams and Tony Pope, Grossman with Keyes, and Amos Butley with James Arnow. In examining similarities between the characters, "we must consider the 'totality of [their] attributes and traits' as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in the book."*Walker*, 784 F.2d at 50 (quoting *Warner II*, 720 F.2d at 241).

Touchetti and Harrigan are both tough police lieutenants prone to violence, and both are referred to as "Lou", a common police department nickname for lieutenant. Both are suspended for misbehavior, and both have a sympathetic superior officer. Touchetti appears to work with no particular "team", and, at the outset of the book, his tough exterior makes it difficult for him to form meaningful bonds with others (even other police officers respect him largely out of fear). As he becomes increasingly horrified and frustrated by the investigation, and after the death of Mei Ling and an ensuing binge, Touchetti gradually begins to show sensitivity to others. Touchetti's suspension has nothing to do with the pursuit of Michael, coming as a result of a violent encounter in which Touchetti nearly kills Mei Ling's husband.

*16 Harrigan works closely with Leona and Danny, later joined by Jerry. In the motion picture, we know nothing whatsoever about his personal life; Harrigan is purely a professional animal. In the screenplay, there is a fleeting reference to an ex-wife, and a glimpse of a messy apartment. Harrigan is largely one-dimensional, with the deepest look into his character occurring when we are shown the statistics of his career while our superiors consider his suspension. Harrigan's suspension comes as a direct result of an over-avid investigation into the killings, which results in Danny's death. Neither the suspension, nor Danny's death, transform Harrigan in any noticeable way, except to enrage him and cause

him to press on more furiously to solve the case.

Plaintiffs also compare the bosses of the two heroes, Captains Freeman and Pilgrim. These characters, however, are too sketchily drawn to constitute much more than a vaguely sympathetic boss who values the contributions of his lieutenant, while recognizing that he is a bit rough around the edges. The characters are insufficiently particular and concrete so as to represent anything more than the idea behind them. *See Nichols*, 45 F.2d at 119 (certain characters were "so faintly indicated as to be no more than stage properties").

Plaintiffs' allegation that the reporter Maria Rosario reappears in defendants' work as both Leona Williams and Tony Pope strains credulity. Maria Rosario is a calculating bombshell, who uses those in her life to get what she wants, and is interested in Michael's story only to save her job. After she is attacked and brutally raped by Michael, she undergoes a transformation which enables her to see that she needs other people in her life, and begins a relationship with Touchetti. Both Leona and Tony Pope are very sketchily drawn characters: particularly Pope, who is only seen toting a camera in pursuit of lurid footage. Leona is loyal, professional and fierce. In the movie, we know nothing about her personal life other than the fact that she is pregnant, a fact we discover at the same moment that she goes into shock and disappears from the film. In the screenplay, we get a brief glimpse of her kindly husband and a passing reference to her children. There is no hint of a relationship between Harrigan and Leona that is anything other than professional friendship, nor is she portrayed as the sexual bombshell that Rosario is.

Aside from having done graduate work at Ivy league institutions that begin with "C", there is also no similarity between Grossman with Keyes. Grossman is a perverse figure, a paraplegic from birth now dying from multiple sclerosis, alienated from society and willing to use his tremendous wealth and power to manipulate anyone who gets in the way of his personal mission. He intentionally puts any number of lives at risk in an attempt to capture Michael, including sending Rosario and DuBrille alone and unarmed into a deserted subway tunnel. His proposed method of capturing Michael is not particularly sophisticated, using dogs, a net, and a tranquilizer. He is cruel and vindictive, ordering his Rottweilers to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 13
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

attack and nearly kill his dog trainer when the trainer does not live up to Grossman's expectations during the attempted capture. He wants Michael so that he can conduct research into whether Hobbes or Locke was correct about human intelligence: is it learned from the environment or inherited? Keyes, as with the other motion picture characters, is more sketchily drawn, but appears to be a boyish-faced character of vague background. He is head of the federal unit which ousts Harrigan of his drug interdiction authority, and has a team of trained professionals assisting him in an attempt to capture the predator. He is the only one who knows who the predator is, and that the predator or another of his kind have been to earth ten years before. His proposed method of capturing the predator is highly technical, involving, *inter alia,* pheromone detectors, nitrogen gas, and heat-retaining suits. He wants to freeze the predator and study his technological abilities, in order to begin a new era of technological advancement.

*17 The last comparison of characters that plaintiffs make is between Amos Butley, the forensic pathologist, and James Arnow, a forensic pathologist appearing in the screenplay but replaced by Irene Edwards in the motion picture. Amos Butley, "one of the best known forensic pathologists in the country," is described as looking like Burl Ives, only bigger. When upset by the horrifying corpses he has been examining, he drinks scotch from a specimen glass. He becomes actively involved in the investigation, helping Touchetti dig up the body of Father James, attending a meeting at Grossman's townhouse, showing up at the Waldorf-Astoria where Touchetti is wounded, and telling Touchetti and Rosario a story about an episode in his life when he was forced to eat human meat in order to survive. Arnow appears only briefly in the screenplay, and is described as visibly in need of a daily scotch or two, which he drinks from a coffee cup. He performs a spectrographic analysis of the residue from the weapon used to kill Danny, and later tells Harrigan that bovine steroids were present in a sample taken from a crime scene.

Again, none of the similarities between these characters can be seen as anything other than generalized concepts and stock characters.

### e. *The Works as a Whole*

The "feel" of the works is also very different, with plaintiffs' work emphasizing the darker side of urban life, including scenes in subway tunnels and abandoned buildings. Defendants' motion picture, though equally violent, has a glitzy feel enhanced by shots of the jungle surrounding Los Angeles, the glass buildings, and the bright light of the city.

In addition to the claimed similarities above, plaintiffs presented the court with multiple volumes of textual analysis of the various works.[FN] It is important to note, however, that "comparison of secondary or descriptive materials cannot prove substantial similarity under the copyright laws."*Walker,* 784 F.2d at 51. Reviewing unified artistic works by dissection neglects to pay proper attention to the works as a whole. *See, e.g., id., at* 50.When the works as a whole are examined, the claimed similarities either disappear or are reduced to ideas, scènes a faire, and stock figures.

Accordingly, defendants are entitled to summary judgment on plaintiffs' claims with respect to the motion picture "Predator 2", together with its screenplays.

### PLAINTIFFS' OTHER CLAIMS

Although the motion papers were addressed nearly exclusively to the copyright infringement claims, plaintiffs also makes claims of false designation of origin under the Lanham Act, common law unfair competition, and misappropriation of copyright. With respect to the Lanham Act claim, the court's finding that the works were not substantially similar "seriously undermines the theory that the film itself was designed to mislead viewers into associating it" with plaintiffs' book. *Id.* at 52.Given the absence of such similarity, no reasonable trier of fact could find that defendants' works were "likely to mislead or confuse customers" as required under the Lanham Act.*L & F Products v. Proctor & Gamble Co.,* 45 F.3d 709, 711 (2d Cir. 1995). As for the state law claims of unfair competition and misappropriation, they are "preempted by the federal copyright laws to the extent it seeks protection against copying of [plaintiffs'] book." *Walker,* 784 F.2d at 53. Accordingly, defendants are entitled to summary judgment on these claims as well.

### ABSENCE OF PERSONAL JURISDICTION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media
L. Rep. 2249
(Cite as: Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.))

Page 14

*18 Because this Court grants summary judgment to the defendants, it is not necessary to consider defendants' alternative motion to dismiss for lack of personal jurisdiction.

### CONCLUSION

Defendants' motion for summary judgment is granted in full.

SO ORDERED:

FN1. By Order dated November 30, 1994, this Court ordered defendants to serve their motion papers by December 16, 1994. Plaintiffs were given three months, until March 16, 1995, to prepare their opposition papers. Plaintiffs did not request an extension of this time period.

FN2. Defendants have moved here with respect to access and substantial similarity, although it is necessary only to reach substantial similarity.

FN3. The Court has not reviewed the novelizations of the two motion pictures, although defendants include them in their motion. This is because plaintiffs, in their opposition papers, do not analyze the novelizations separately from the motion pictures themselves. For purposes of this motion, therefore, it is assumed that the novelizations do not differ materially from the motion pictures upon which they are based.

FN4. In their motion papers, plaintiffs' often address the defendants' allegedly infringing works as a unit, combining references to both motion pictures and the numerous screenplays. The legal question, however, is whether each individual work has infringed on plaintiffs' copyright in their book. Accordingly, the two motion pictures and their respective screenplays are addressed separately.

FN5. The original screenplay for "Predator" was actually entitled "Hunters". The title

was changed to "Predator" after Twentieth-Century Fox Film Corporation discovered trademark problems with the name "Hunters".

FN6. In voluminous submissions, plaintiffs make a line-by-line comparison encompassing all of the works at issue here. For example, plaintiffs point out that the word "Stygian" appears in the screenplay for the first motion picture and in plaintiffs' book.

FN7. As noted earlier, plaintiffs present a line-by-line analysis of the works, pointing out the similarity of words used in each, such as the word "grisly", which appears in plaintiffs' book and the second motion picture, though spelled "grizzly" in the latter work.

S.D.N.Y.,1995.
Littel v. Twentieth Century Fox Film Corp.
Not Reported in F.Supp., 1995 WL 404939 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,481, 37 U.S.P.Q.2d 1353, 23 Media L. Rep. 2249

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 1**
**Part 2**
**GUIRGIS DECLARTION**



ACT 2

"SIC DEUS DILEXIT MUNDUM"

JUDAS:  I wasted my prime, man. And then I wasted my prime after my prime.

SATAN:  Well, I think you'll prolly get fucked tonight, bro.

JUDAS:  Ya think so?

SATAN:  Yeah. I'm pretty sure.

JUDAS:  I wanna 'nother fuckin' drink. Tonight man, I'm gonna drink this fuckin' bar!

SATAN:  Hey, Judas, lemme ask you something: Who is this Jesus of Nazareth guy I've been hearing about?

JUDAS:  Jesus of Nazareth?

SATAN:  Yeah—I heard he's some kinda somebody.

JUDAS:  Some kinda somebody?

SATAN:  Yeah, that's what I heard.

JUDAS:  Aw, fuck that guy, man—he's a bitch!

YUSEF EL-FAYOUMY *rises triumphantly.*

EL-FAYOUMY:  *"FUCK THAT GUY, HE'S A BITCH?"!!!! Your Honor! Nothing further!*

JUDGE LITTLEFIELD:  Cross?

CUNNINGHAM:  . . . Not at this time.

JUDGE LITTLEFIELD:  Lou, stick around.

SATAN:  I know the drill.

*The gavel bangs.*

JUDGE LITTLEFIELD:  Meal break! Fifteen minutes!

EL-FAYOUMY:  Fabiana, free for lunch?

*Gavel bangs. Lights fade.*

*Cross-fade to JUDAS' lair. JESUS is there with his bucket, alone.*

STEPHEN ADLY GUIRGIS

SAINT MONICA *appears with* MARY MAGDALENE.

**SAINT MONICA:** Hey, y'all. This is Mary Mags—she the only bitch I let hang with me up here. Tell 'em whatchu gotta say.

**MARY MAGDALENE:** My name is Mary of Magdala. I was a disciple of Jesus, I was present at the crucifixion, and I was the first person He appeared to after the resurrection.

**SAINT MONICA:** Bitch got *class!*

**MARY MAGDALENE:** I was one of the founders of the Christian faith, and I was known for my ability, in times of difficulty, to be able to turn the hearts of the Apostles towards the Good.

**SAINT MONICA:** The good!

**MARY MAGDALENE:** Some people think I was a whore.

**SAINT MONICA:** Misogynist bitches!

**MARY MAGDALENE:** Other people think Jesus was my husband.

**SAINT MONICA:** Femin-o-tic bitches!

**MARY MAGDALENE:** I was not a whore.

**SAINT MONICA:** "Pimps up, Hos *Down!*"

**MARY MAGDALENE:** I was an unmarried woman in a town of ill repute.

**SAINT MONICA:** *Ill* repute!

**MARY MAGDALENE:** And also, I was not the wife of Jesus either.

**SAINT MONICA:** Still love ya!

**MARY MAGDALENE:** But, I am pretty sure that I was his best friend. We shared an intimacy that I cannot put to words except to say we saw into each other's hearts and were in love with what we found . . .

**THE LAST DAYS OF JUDAS ISCARIOT**



SAINT MONICA: Love!

MARY MAGDALENE: I also knew Judas Iscariot very well.

SAINT MONICA: Gangsta!

MARY MAGDALENE: Out of the Twelve, he was the most moody and the most impetuous, and yet, he was my favorite.

SAINT MONICA: Tupac!

MARY MAGDALENE: And in some ways, I think he was Jesus's favorite too . . . Judas was almost an alter ego to Jesus—he was the shadow to Jesus's light. He was the sour to the sweet and the cool to the warm. They often walked together, more often than not arguing—no one could get a rise out of Jesus like Judas could. I can remember times when Jesus emerged from an argument with Judas positively furious—shaking his head wildly, snorting, and clicking his teeth, red-faced with exasperation—and he would tell me what they had been fighting about—still agitated—but, inevitably, he would end up staring into space and sighing—smiling. I think that if someone were to say that Judas was good for Jesus that they would not be mistaken . . .

SAINT MONICA: Not mistaken!

MARY MAGDALENE: When I think of Judas, my heart breaks.

SAINT MONICA: But Mary Mags: If we are all eternal, and if Human Life is only the first mile in a *billion*, do you honestly believe that God could abandon any mothahfuckah so soon in the journey?

MARY MAGDALENE: I don't know. Jesus never talks about it. That's how I know His heart hurts worse than mine.

*The gavel bangs.*

JUDGE LITTLEFIELD: Next witness!

CUNNINGHAM: Defense calls Sigmund Freud, Your Honor.

BAILIFF: Name!

SIGMUND FREUD: Doctor Sigmund Shlomo Freud.

CUNNINGHAM: Doctor Freud, would it be accurate to say you qualify as an expert in the field of modern psychiatry?

SIGMUND FREUD: Fräulein—I AM modern psychiatry.

EL-FAYOUMY: Objection, Your Honor!—the witness is boasting!

JUDGE LITTLEFIELD: Overruled!

EL-FAYOUMY: But a "boaster," Your Eminence—it is distasteful, really!

JUDGE LITTLEFIELD: Siddown, El-Fayoumy!

EL-FAYOUMY: I lunge to obey you, your grace—but let the record reflect that Prosecution has grave reservations about this man's alleged so-called "standing" as a psychiatric expert!

SIGMUND FREUD: Perhaps a quick jaunt to London for a leisurely perusal of "The Standard Edition of *The Complete Psychological Works of Sigmund Freud Volumes One Through Twenty-Four*" would set your mind at ease.

EL-FAYOUMY: *Perhaps it would if you were indeed* . . . . . . . . . . . .
    Oh. I see. Right. Yes. Of course. Uh . . . Yes.

*He sits.*

CUNNINGHAM: Doctor Freud, you are, in fact, the "Founder of Psychoanalysis," correct?

SIGMUND FREUD: I am.

CUNNINGHAM: You maintained a private practice in neuropathology for nearly a half century; is that not so?

SIGMUND FREUD: It is.

CUNNINGHAM: You were on the cover of *Time* magazine in an issue dedicated to the greatest scientific minds of the twentieth century.

SIGMUND FREUD: I was.

CUNNINGHAM: Are you familiar with the case history of one Judas Iscariot?

SIGMUND FREUD: Most certainly.

CUNNINGHAM: Doctor Freud, in your expert opinion, can a suicide victim be precertified as psychotic?

SIGMUND FREUD: Without question. Man's instinct for self-preservation is his most supple and reflexive muscle. When that muscle fails, it is because his mind has failed. A decision to take one's own life can only be precipitated by a failure of the mind—an irrational rebellion against man's most basic instinct—to endure and live. Therefore, yes—the victim of suicide must be precertified as, indeed, psychotic.

CUNNINGHAM: In your expert opinion, Doctor Freud, was Judas Iscariot a psychotic?

SIGMUND FREUD: Without question.

CUNNINGHAM: And are psychotics responsible for their actions?

SIGMUND FREUD: No, they are not. For example, say I have a bad bout of influenza. As a result of my bad influenza, I sneeze rudely, but involuntarily, in your face. The next day, you wake up with the same flu. Did I cause your flu? No. My flu caused your flu. I only sneezed because I was sick.

CUNNINGHAM: In your opinion, Doctor Freud, does Judas Iscariot belong in Hell?

SIGMUND FREUD: No, he does not.

CUNNINGHAM: Explain.

SIGMUND FREUD: Suicide is a direct sign of mental illness.

CUNNINGHAM: But did he become mentally ill *after* allegedly betraying Jesus of Nazareth, or was he mentally ill to begin with?

SIGMUND FREUD: Preprogrammed, yes. You must understand: Normal people do not kill themselves—even under extreme duress.

CUNNINGHAM: And what would you say to people who would

say that Judas brought about his own mental illness by betraying Jesus and getting him crucified?

SIGMUND FREUD: I would say this: Number One, you cannot conjure or "bring about" mental illness. Number Two, any God who punishes the mentally ill is not worth worshipping. And, Number Three: "an ounce of prevention is worth a pound of cure"—the person who could have prevented this tragedy was Jesus, not Judas. He chose not to.

CUNNINGHAM: But isn't Judas responsible because he did what he did of his own free will?

SIGMUND FREUD: Fräulein, I once had a suicidal patient leap through my fourth-floor window to her death. She exercised her free will—did I bill her estate for the broken plate-glass window she leapt through? Of course not! My friend Winston Churchill, who provided me safe haven from the Nazis in 1938, likes to say: "The price of greatness is *responsibility*." I believe firmly in taking responsibility. So, after the unfortunate woman's death, I exercised responsibility for *my* greatness by moving my offices to the ground floor. I should think God would have done the same.

CUNNINGHAM: Your witness.

EL-FAYOUMY: Doctor Freud, yes, sorry for the mix-up before.

FREUD *yawns big and disdainfully*.

SIGMUND FREUD (*re: the yawn*): Excuse me.

EL-FAYOUMY: So, Herr Doktor—I must admit I am intimidated to be in the midst of such greatness. After all, you are a "genius," correct?

SIGMUND FREUD: Correct.

EL-FAYOUMY: An "expert"?

SIGMUND FREUD: Yes.

EL-FAYOUMY: A big brain.

SIGMUND FREUD: Unequivocally.

EL-FAYOUMY: Yes. "Unequivocally." Yes. Nice word. And it rolls off your tongue so effortlessly—really, I am impressed.

FREUD *again yawns big and disdainfully.*

A little tired, are we, Doctor? Perhaps a kilo or two of *fine-grade Bolivian flake* would restore your pep?!

SIGMUND FREUD: Excuse me?

EL-FAYOUMY: Cocaine, Doctor! "Blow," "Flake," "Rock"—"She don't lie"—does she, Doc?!!!

SIGMUND FREUD: What?

EL-FAYOUMY: Over a twelve-year span, you consumed cocaine in what can only be categorized as Prodigiously Massive Quantities, correct?

SIGMUND FREUD: As part of my research, yes.

EL-FAYOUMY: "Research"—yes. And after twelve years of round-the-clock research, you finally came to the conclusion that ingesting staggering amounts of powder up your nose was, perhaps, unhealthy?

SIGMUND FREUD: I was trying to determine its medicinal value.

EL-FAYOUMY: Is that your real nose?

SIGMUND FREUD: Your mother denied you her breast, didn't she?

EL-FAYOUMY: I'll thank you to let me ask the questions, Doctor Fried.

SIGMUND FREUD: Freud!

EL-FAYOUMY: Oh, yes, Freud, of course. Forgive me, I made a "you" slip, didn't I? . . . Anyway, last question Mr. Expert Genius: Doctor Freud: You were an avowed atheist all your life, correct?

SIGMUND FREUD: Correct.

EL-FAYOUMY: And then you died and found out what?

SIGMUND FREUD: I experienced anti-Semitism as a child—it prejudiced me against all religion.

EL-FAYOUMY: Einstein experienced prejudice—but he wasn't wrong like you, was he? My cousin Wagui can't count to ten without drooling, but he wasn't wrong like you either, was he? Was he?!!!

SIGMUND FREUD: Intelligence and Faith are two different things!

EL-FAYOUMY: Are they, Doctor Freud? Because I would say that you can't have one without the other. But, of course, I'm not a brilliant genius expert like you, am I?

SIGMUND FREUD: I had a wonderful vibrant mind and my intellectual curiosity was boundless!

EL-FAYOUMY *makes a violin-playing gesture.*

EL-FAYOUMY: Good day, doctor, go blow your nose—you are excused!

CUNNINGHAM (*rising*): Doctor Freud, do sane people commit suicide—yes or no?

SIGMUND FREUD: No!

(*Towards* EL-FAYOUMY): Though they can sometimes be tempted to *murder!*

EL-FAYOUMY: Go murder an eight-ball, egghead!

JUDGE LITTLEFIELD: That's enough! Next witness!

*Gavel bangs.*

Next witness!

EL-FAYOUMY: Irresistibly Alluring Majesty, Prosecution calls Legendary Hawaiian Singer and Popular Entertainer Don Ho to the stand!

JUDGE LITTLEFIELD: Don Ho's not dead!

EL-FAYOUMY: Oh . . . Well, thank god for that. In that case, Prosecution calls Caiaphas the Elder, High Priest of the Sanhedrin, to the stand!

JUDGE LITTLEFIELD (*rising*): Right . . . Ladies and gentlemen of the jury, at this time, I must excuse myself from these proceedings until such time as said witness has concluded testimony. Before his ascension into the Lap of the Lord, Caiaphas the Elder and I were partners in a successful chain of Kosher Pizza Parlors in East Purgatory—For that reason, at this time, I must step down. *Bailiff!!!* Get your ass over there, put on those glasses, and adjudicate—pronto! Proceed.

*JUDGE exits as EL-FAYOUMY approaches CUNNINGHAM.*

EL-FAYOUMY: Fabiana, may I borrow a pen?

CUNNINGHAM: Only if I can shove it through your eye.

EL-FAYOUMY (*confidentially*): Fabiana, how can I prove my sincerity to you? Even though you are always here and I am always here—still—I think of you when you aren't here even though you are always here.

BAILIFF: Next witness, please!

EL-FAYOUMY: Yes—I obey.

(*To* CUNNINGHAM): Later we shall discuss.

(*To* BAILIFF): Yes, Julius zee Bailiff, correct? May I call you Julius?

BAILIFF: All right.

EL-FAYOUMY: How about Jules?

BAILIFF: I guess.

EL-FAYOUMY: So tell me J—shall we commence?

BAILIFF: That'd be good.

EL-FAYOUMY: Wise J: Prosecution calls Caiaphas the Elder!

*CAIAPHAS enters.*

Caiaphas the Elder, High Priest of the Sanhedrin, hello to you.

CAIAPHAS THE ELDER: Hello.

EL-FAYOUMY: "Shalom"—as it were.

CAIAPHAS THE ELDER: Shalom.

EL-FAYOUMY: Caiaphas the Elder: Perhaps you can clear this up—is there a Caiaphas the Younger?

CAIAPHAS THE ELDER: No.

EL-FAYOUMY: And yet, you are the Elder?

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: I see. Yes. Thank you. My cousin Amghad Wahba owes me five bucks now. So, Caiaphas the Elder: In the Bible, it says that Judas Iscariot made an approach to you—a dark and nefarious approach—to offer up the location of Jesus of Nazareth, and to, in fact, turn him in to you and the authorities. Correct?

CAIAPHAS THE ELDER: Correct.

EL-FAYOUMY: Caiaphas the Elder: Are you saying that it was Judas Iscariot who approached you, and not the other way around?

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: Because I saw in a film once, Caiaphas the Elder, where it was *you* who approached *him*.

CAIAPHAS THE ELDER: It was Judas Iscariot who approached me at the Temple, not the other way around.

EL-FAYOUMY: Yes. But still, even though your statement is indeed confirmed by all four Gospels, Caiaphas the Elder, I must ask you again: Did you approach Judas Iscariot about betraying his leader and Messiah, Jesus of Nazareth?

CAIAPHAS THE ELDER: I did not.

EL-FAYOUMY: Why not? Jesus was a big headache to you, no? You were legitimately concerned that the high jinks of Jesus would lead to an uprising and a resulting crushing Roman Massacre of your Jewish people in retribution, weren't you?

CAIAPHAS THE ELDER: I was.

EL-FAYOUMY: So, why not reach out and touch someone, Caiaphas the Elder?

CAIAPHAS THE ELDER: Are you asking me why I didn't try to approach one of the Apostles initially?

EL-FAYOUMY: Yes.

CAIAPHAS THE ELDER: I didn't think it would work.

EL-FAYOUMY: Why not?

CAIAPHAS THE ELDER: There is an old rabbinical saying: "Let them kill you, but do not cross the line." During my eighteen-year reign as head of the Sanhedrin and Guardian of the Temple, I dealt with countless Messiahs, zealots, rebels, and fanatical believers. My experience in these matters taught me: They get killed, yes, but as a rule—they do not cross the line.

EL-FAYOUMY: "Cross the line," yes—this means what?

CAIAPHAS THE ELDER: To betray your ideals. Your conscience. The law.

EL-FAYOUMY: Judas crossed that line, didn't he?

CAIAPHAS THE ELDER: He did.

EL-FAYOUMY: He betrayed the ideal in betraying Jesus—The Rabbinical Ideal. He crossed the line.

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: Do you admire that?

CAIAPHAS THE ELDER: No. I do not.

EL-FAYOUMY: But why not? We all cross the line sometimes, don't we?

CAIAPHAS THE ELDER: We are all capable of crossing the line. Thankfully, we do not all do it.

EL-FAYOUMY: But really, Caiaphas the Elder, what's the big deal? You cross a line, so what? Just draw yourself another line, correct?

CAIAPHAS THE ELDER: No. Not correct.

EL-FAYOUMY: Why not?

CAIAPHAS THE ELDER: The line comes from God, doesn't it? The line is given. We do not create it, and thus, it is not ours to modify. It is only ours to Obey or Betray.

EL-FAYOUMY: I see. Caiaphas the Elder: When Pontius Pilate first arrived in Judea, he visited you in the Temple, did he not?

CAIAPHAS THE ELDER: He did.

EL-FAYOUMY: And as a show of his force and might, Pontius Pilate attempted to place symbols of Rome in the Temple, which was, to your people, a great desecration of your Holy place of worship, correct?

CAIAPHAS THE ELDER: Correct.

EL-FAYOUMY: It would have constituted a worshipping of False Idols, yes?

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: Caiaphas the Elder, when you saw Pontius Pilate attempting this, what did you do?

CAIAPHAS THE ELDER: I told him that he must remove the pagan symbols.

EL-FAYOUMY: And what did Pilate say to that?

CAIAPHAS THE ELDER: I believe the gist of his reply was: "What are you gonna do about it, Curly?"

EL-FAYOUMY: And what did you do?

CAIAPHAS THE ELDER: . . . I knelt before him—

EL-FAYOUMY: —and begged for mercy?

CAIAPHAS THE ELDER: No.

EL-FAYOUMY: Groveled for forgiveness?

CAIAPHAS THE ELDER: No! I removed my headdress, bared my throat to him, and bade him slit it.

EL-FAYOUMY: In other words, Caiaphas the Elder, you "let him kill you, but you did not cross the line."

CAIAPHAS THE ELDER: I guess so. Yes.

EL-FAYOUMY: You did not cross the line!

CAIAPHAS THE ELDER: No. I did not.

EL-FAYOUMY: Judas crossed it, though—didn't he?

CAIAPHAS THE ELDER: He did.

EL-FAYOUMY: Interesting. And, by the way, what was the result of your standoff with Pilate regarding the sanctity of the Temple?

CAIAPHAS THE ELDER: Pilate backed off.

EL-FAYOUMY: He didn't put up the pagan symbols, did he?

CAIAPHAS THE ELDER: No.

EL-FAYOUMY: You held the line.

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: Your integrity castrated him, didn't it—his little Roman balls rolling down the Temple hill like withered purple grapes! Yes?!

CAIAPHAS THE ELDER: I have no response to that.

EL-FAYOUMY: As well you shouldn't! Now then, last question: Caiaphas the Elder, it has been said that in Western Culture, the most prized virtue is Honesty, but in Eastern Culture—which would include Judea at that time—in Eastern Culture, the most prized virtue was and is Loyalty. Caiaphas the Elder: Do you agree with said hypothesis?

CAIAPHAS THE ELDER: Counselor, there are six hundred thirteen Sacred Laws in our Torah. Complying with these Laws requires Honesty *and* Loyalty. But the most important requirement of The Law is *Obedience* to it. That is what is most prized.

EL-FAYOUMY: Yes. Fair enough. But in your opinion, was Judas Iscariot "loyal"?

CAIAPHAS THE ELDER: Obviously not.

EL-FAYOUMY: Was he "honest"?

CAIAPHAS THE ELDER: No.

EL-FAYOUMY: Caiaphas the Elder: Was Judas Iscariot obedient?

CAIAPHAS THE ELDER: To his own will and desires—yes. I believe that he was.

EL-FAYOUMY: And to service that will and those desires, Judas crossed the line. Didn't he?

CAIAPHAS THE ELDER: He served a necessary purpose, but as a fellow Jew, I confess he disgusted me.

EL-FAYOUMY: Caiaphas the Elder, I thank you—and may I add, you are much more handsome in person than when they portray you on the silver screen!

CUNNINGHAM *rises.*

CUNNINGHAM: "High Priest of the Sanhedrin"—that was an extremely powerful and prestigious position in Judea—correct?

CAIAPHAS THE ELDER: Correct.

CUNNINGHAM: In fact, except for the Roman governor and King Herod, the "High Priest" was, in actuality, the most powerful position *in* Judea, was it not?

CAIAPHAS THE ELDER: Yes.

CUNNINGHAM: Would you mind looking me in the eye when you respond to a question?

CAIAPHAS THE ELDER: My position was very important. As High Priest, I maintained the Sacred Laws, the safety of the populace, and our tradition.

CUNNINGHAM: Caiaphas—Is there a reason you won't meet my gaze? Or is ignoring women simply another component of the tradition you were charged to maintain?

EL-FAYOUMY (*rising*): Objection, Julius! The witness is not just a Holy Man—but a very Holy man! Defense counsel is aware she is a juicy pulchritudinous dish—and yet, the

witness is being berated for merely avoiding the salacious temptations of her intoxicatingly firm and fervently aromatic flesh! I move to censure, really!!

CUNNINGHAM: I withdraw the question.

EL-FAYOUMY: Sexy Vixen—you are warned!

BAILIFF: Hey!

EL-FAYOUMY: Oh! Julius! Yes! Forgive me! She makes my organs bounce! Yes. Uh.

(To CUNNINGHAM): Sorry.

(To BAILIFF): Yes.

*He sits.*

CUNNINGHAM: Caiaphas, you stated to the Prosecution that Judas Iscariot "crossed the line" and that he "disgusted you"—correct?

CAIAPHAS THE ELDER: Correct.

CUNNINGHAM: Well then maybe you can help me out here, because I'm a little confused. Judas Iscariot handed Jesus of Nazareth over to you, correct?

CAIAPHAS THE ELDER: Yes.

CUNNINGHAM: And then *you* handed Jesus of Nazareth over to Pontius Pilate, correct?

CAIAPHAS THE ELDER: I did.

CUNNINGHAM: So what exactly is the difference between you and Judas Iscariot—'cuz unless I'm missing something here, I fail to see it.

CAIAPHAS THE ELDER: Between me and Judas? Big difference.

CUNNINGHAM: Caiaphas, you were a rabbi and a Jew, Jesus was a rabbi and a Jew, Is it not crossing the line for one rabbi to hand over another rabbi to be killed by pagans?

CAIAPHAS THE ELDER: Jesus was a blaspheming, seditious rabbi, and I did not know for sure that he would be killed.

CUNNINGHAM: But the penalty for sedition was crucifixion, correct?

CAIAPHAS THE ELDER: That was the Roman charge, not mine.

CUNNINGHAM: Yes. Your charge was Blasphemy—and what was the penalty for Blasphemy, Caiaphas?

CAIAPHAS THE ELDER: Your Honor, I will not sit here and be blamed for the death of Christ yet again!

CUNNINGHAM: No one's blaming you for the death of Christ, Caiaphas. I'm simply asking you a question which I am directing you to answer now before this court: You charged Jesus with Blasphemy. What was the penalty for Blasphemy, Caiaphas?

CAIAPHAS THE ELDER: "Stoning, followed by hanging."

CUNNINGHAM: So then, how can you sit there and pretend that you didn't know for sure that Jesus of Nazareth would be killed?

CAIAPHAS THE ELDER: Jesus could have easily saved himself.

CUNNINGHAM: Saved himself how?

CAIAPHAS THE ELDER: By retracting his Blasphemous claims! Our Torah has six hundred thirteen Sacred Laws—I can't even count how many Jesus broke or treated with wanton disregard and disdain! He broke the laws that came from the God of Abraham, Isaac, and Jacob! He violated the word of God. He violated the Laws of Moses. He consorted with the Unclean, and women, and prostitutes. He performed Miracles on the Sabbath, He proclaimed himself Messiah! He forgave sin! *Who was he to forgive sin?!* Only God can do that! If that's not crossing the line, then I don't know what is!!

CUNNINGHAM: Jesus was fulfilling your Old Testament prophecies of Isaiah to the letter—

CAIAPHAS THE ELDER: —He was also fulfilling the prophecies in Deuteronomy which warned against "False Messiahs and Marvel workers"! It would have been one thing he had he

confined himself to the forests and rivers spouting his ravings as the Baptist did, but at the Great Temple?! I would have been derelict not to put a stop to it. He was whipping people! Kicking them. Threatening to destroy the Temple! Calling it a Den of Thieves! If someone did that in your Saint Patrick's Cathedral, would you not arrest them?!

CUNNINGHAM: And yet, Judas Iscariot, who came forward in the face of this "great threat," is in your eyes not a patriot, but a traitor. A traitor who, in your words, "disgusted you." Why is that, Caiaphas?

CAIAPHAS THE ELDER: Because he handed Jesus over for money.

CUNNINGHAM: And why did you hand Jesus over, Caiaphas?

CAIAPHAS THE ELDER: The words and deeds of Jesus were leading towards rebellion—and the price of rebellion under Roman rule was a bloodbath. A massacre, Counselor. So I determined that it were better to have one man dead than a thousand—that's why.

CUNNINGHAM: I see. So, you were looking out for the Common Jewish Man, is that correct?

CAIAPHAS THE ELDER: I was.

CUNNINGHAM: Were you a Common Jewish Man, Caiaphas?

CAIAPHAS THE ELDER: In the eyes of God, we are all the same.

CUNNINGHAM: But how about in the eyes of the Common Jewish Man? You were seen as an Aristocrat, weren't you?

CAIAPHAS THE ELDER: I came from wealth.

CUNNINGHAM: Would you say that you were popular with the Common Jewish Man?

CAIAPHAS THE ELDER: My job was a sacred one—not a popularity contest.

CUNNINGHAM: The high Temple taxes that you inflicted on your people, would you say that made you more popular with the Common Jewish Man or less popular?

EL-FAYOUMY: Objection, Your Honor! Vixen is badgering!

BAILIFF: Sustained!

CUNNINGHAM: The exchange rates at the Temple were also extremely unfavorable to the Common Jewish Man, and the purification pools outside the Temple—where the Common Jewish Man was required *by law* to be cleansed before being permitted to enter the Temple—the purification pools were not free either, were they?!

BAILIFF: Cunningham!

CAIAPHAS THE ELDER: No no, I'll answer: The laws were the laws and the rates were the rates.

CUNNINGHAM: And did you have a sliding scale for the poor?

CAIAPHAS THE ELDER: No.

CUNNINGHAM: So the poor—who constituted a large percentage of the Common Jewish Man at that time—remained impure and unclean and were denied the right of worship.

CAIAPHAS THE ELDER: You've made your point.

CUNNINGHAM: No, I don't think I have! Your position, Caiaphas, did not require you to be popular with the Common Jewish Man, did it?

CAIAPHAS THE ELDER: My position required me to answer to God.

CUNNINGHAM: Did God appoint you High Priest of the Sanhedrin?

CAIAPHAS THE ELDER: It was with God's Blessing—

CUNNINGHAM: —It was with *Rome's* blessing, Caiaphas! You were appointed by *Rome*, and at the end of the day, for the eighteen years you served, that's who you had to answer to, and that's who you were required to be popular with! And the day you showed Rome that you couldn't handle your own people was the day you'd have been thrown out on your ass—isn't that true?!

CAIAPHAS THE ELDER: I belonged to God, not Rome! My job was to uphold the six hundred thirteen Sacred Laws, and to protect my Temple and my People—and that's what I did!

CUNNINGHAM: And was not Jesus of Nazareth one of your people, Caiaphas?! Whether he was a messiah, or a prophet, or a Holy Man, or a crazy man—was he not one of your own?! And was it not considered the height of treachery to betray Jewish blood to your oppressors?! Come on, Caiaphas! Tell us that it did not prick your conscience to turn Jesus, a fellow Jew, over to the Romans! Tell us that handing over a fellow rabbi to his certain death at the hands of the enemy didn't violate your sense of "crossing the line" and your knowledge of the law! Tell us, Caiaphas, that at the end of the day, there was a *difference*—in the eyes of *God*—between what you did and what Judas did!

*Beat.*

This is Purgatory, Caiaphas—I've got it all day.

CAIAPHAS THE ELDER: . . . In terms of result: No difference.

CUNNINGHAM: How about in terms of follow-through: Judas recanted and tried to return the silver, did he not?

CAIAPHAS THE ELDER: He did.

CUNNINGHAM: And did you, Caiaphas, do anything at all to try to prevent Jesus's death?

CAIAPHAS THE ELDER: No.

CUNNINGHAM: And therein lies the real difference between you and Judas Iscariot, does it not? And yet, you sit here and say how Judas "crossed the line" and that he "disgusted" you! And if that's true, Caiaphas, then I wonder, how you must've felt about yourself.

CAIAPHAS THE ELDER: That's between me and God.

CUNNINGHAM: Well then for your sake, Caiaphas, I sure hope that your God has a more forward-thinking attitude than Judas's God does. Step down, you're excused.

EL-FAYOUMY: Caiaphas the Elder, Judas approached you—correct?

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: He didn't have to approach you, Caiaphas the Elder, did he?

CAIAPHAS THE ELDER: No.

EL-FAYOUMY: And yet he did.

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: Of his own free will.

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: And accepted payment for his betrayal.

CAIAPHAS THE ELDER: Yes.

EL-FAYOUMY: Payment. Judas did not say, "Caiaphas the Elder, put your money away, mister, this one's on the arm," right?

CAIAPHAS THE ELDER: Right.

EL-FAYOUMY: Caiaphas the Elder, I think we all realize the precarious position you were in, trying to protect your citizens from Roman reprisal.

CAIAPHAS THE ELDER: And it makes you feel good to say that, doesn't it? After two thousand years of persecution and vilification, you finally get around to saying: "Hey, we know it wasn't your and your people's fault." Is that it?

EL-FAYOUMY: Good Caiaphas the Elder, I was only trying to—

CAIAPHAS THE ELDER: Win your case, right? I tell you what: You people call me, I come. You question, I answer—but please—never say that you realize the position I was in, because you have no idea the position I was in. And never try to excuse or forgive me, because I'm not interested in your forgiveness. God's forgiveness: This interests me. Yours? I could care less. Why? Because you have no idea. The

people who need forgiving? The people who perpetrated the lies and exaggerations that became sacrosanct fact and led to hatred and violence for the past two thousand years? They are the ones who need forgiving—and not by you—but by me—me—and my people. It's the Writers of the Gospel who need forgiveness—not me. No, sir. I know what it is to suffer. Do you? I don't think so.

(To BAILIFF): Julius: My best to Frank.

EL-FAYOUMY: You're very handsome, Caiaphas.

CAIAPHAS THE ELDER: If I am, it's 'cuz God made me, not 'cuz you said so. Good day.

CAIAPHAS *ambles off wearily. Gavel bangs. Cross-fade to* SAINT THOMAS.

SAINT THOMAS: My name is Thomas. At the Last Supper, I was the first one to say that I would die for Jesus, and I was also the first one to head for the hills doing ninety when the Romans came and arrested him. And then, when Jesus resurrected himself, I was also the guy who said I wouldn't believe He was who He said He was unless I could see with my own eyes the holes in His hands and personally inspect them and touch them—as if I was some qualified medical examiner, like Quincy or something. But the thing of it was, Jesus showed them to me. And not only that, He let me touch them. In a ministry based entirely on the virtues of Faith, He gave me proof. I had no Faith, and he gave it to me for free. I don't know why I got the benefit of my doubt, and Judas didn't get help with his. And I'm not saying this 'cuz I liked the guy—'cuz personally, I thought Judas was a bit of a jerk-off. Actually, "fuckin' dick" would be more accurate. Judas was the kinda guy—at least with me—where, one minute he's your friend, and the next minute, he's

making fun of you in front of everybody. He used to like to say that the reason Jesus had to do the Miracle of the Loaves and the Fishes because I ate all the food when no one was looking. Stuff like that. But then other times, he could be real nice, like, once we were partnered together to go into town to heal people and cast out demons, and well, I had some problems that day—everyone I tried to heal ended up getting worse. In fact, this one lady I almost blinded and another guy started going into convulsions—but Judas fixed it. He healed them—he really did—and that tells me his faith was genuine. And when we got back to camp that night, he didn't tell anybody how I messed up. In fact, he said I did a good job, and I appreciated that. I knew Jesus knew it was bullshit, but I appreciated the gesture. I thought it showed largeness on Judas's part. And the thing is, Judas was kind of a dick, but he wasn't shallow or petty. He really was pretty large. He wasn't the best, but he was far from the worst. Jesus liked him, liked him a lot, in fact. Judas was right up there in the top three with Mary Magdalene and Peter, who, by the way, could also be a dick sometimes, too. The trick with Peter was: Never talk about fish. The guy was crazy for fish. Say something wrong about a fish and forgettaboutit. The guy would go crazy. Anyways—some people say Judas did what he did 'cuz he was greedy. Personally, I think that's bullshit. The guy wasn't wandering around the desert for three years with Jesus and a bunch of ragamuffins like us 'cuz he was looking to get rich. Other people say that The Devil got into him. Again, bullshit. Judas was loyal to a fault. Obsessively loyal, even. Judas would have taken on The Devil and his entire army, one against a thousand, if he had to, and he would a done it with relish. Other people say Judas did it 'cuz he knew the ship was sinking and he was trying to get himself a nut to have something to fall back on.

Lissen: Judas was not a "fall-back" guy, he was one hundred percent "fall forward." And to me, that deserves some consideration. I was not fall forward. Not by a long shot. And neither were most of the others. Judas was a dick, but he deserved better. Just one Saint's opinion.

JUDGE *enters.*

Next witness!

CUNNINGHAM: . . . Your Honor, at this time, Defense would like to introduce exhibit A-fourteen, *ancient surveillance footage* of an event that occurred less than twenty-four hours after Jesus's arrest. Lights, please.

*A squad room in Jerusalem.*

SOLDIER 1: Pilate gonna kick yo ass!
SOLDIER 2: Pilate gonna see that ass—he gonna kick it two times!
SOLDIER 3: Yo—when Pilate see this mothahfuckah's ass, he gonna be like: "Centurion! It's time to whup ass!"
SOLDIER 1: He gonna rape yo wives!
SOLDIER 2: He gonna take yo cattle!
SOLDIER 3: He gonna kick yo cattle's ass, too!
SOLDIER 1: And yo sheep and yo lambs!
SOLDIER 2: Pilate gonna cancel yo granmutha's WIC check, B!

PILATE *enters.*

PILATE: What's all this damn ruckus about?!
SOLDIERS: All hail Pontius Pilate! Hail, hail, hail!
PILATE: Is there a problem here?
SOLDIER 1: Judas is trying to recant!

STEPHEN ADLY GUIRGIS

80

PILATE: Hold up a minute, who?!
SOLDIER 3: Judas Iscariot—from the Jesus of Nazareth crew.
SOLDIER 2: This stinky mothahfuckah right here!
JUDAS: Jesus is an innocent man—please, please—
SOLDIER 1: Should we start whupping ass now?
JUDAS: He's innocent! Please. Please. Jesus is innocent.
PILATE: C'mon now, Judas, them "San-who-saids"—hold up a sec.
(*To* SOLDIER 2): Yo Curt—what they call themselves?
SOLDIER 2: Sanhedrin, sir.
PILATE: Right. Judas, them SandHeadsSons paid you thirty pieces of silver, now that's four months' wages, that ain't no chicken feed.
JUDAS: I made a mistake, please, please, you don't understand, man—
PILATE: I understand perfectly. You sold out your brother, now you feel guilty, so you tryin' ta come in here talkin' 'bout "It was dark, I kissed the wrong muthahfuckah," but we Romans, man—Romans don't dance that song.
JUDAS: I'm recanting—
PILATE: You can't recant!
(*To his boys*): Hey, fellas, remember the last Semite strolled up in here talkin' 'bout "I recant"?!
(*To* JUDAS): Believe me, J-Crew, you doan wanna do that. Whatchu need to do is relax, brother—take the wifey to a puppet show, sumpthin'. This ain't nuthin' but a little PR opportunity before the holidays, thass all—
JUDAS: —But he's innocent. Please. Please—
PILATE: Hey now, lissen: Judas, we don't give no good goddamn 'bout this Jesus—He just a muthahfuckah talks a lotta shit. Everybody talks shit, even I've been known to talk a little shit on the once in a while. Thing is: We ain't tryin' to lay down no heavy charge on that Nazareth boy—

THE LAST DAYS OF JUDAS ISCARIOT

81

we just gonna beat down his ass a little, make them Sanhen-ja-call-its happy so's we can all live in peace. I mean: Dontchu wanna live in peace, Judas? Ain't that what it's all about?

I mean after all, brother, ain't like we lookin' to crucify the muthafuckah!

*Fade back to courtroom.*

CUNNINGHAM: Defense calls Pontius Pilate!

EL-FAYOUMY: I object!

JUDGE LITTLEFIELD: On what grounds?

EL-FAYOUMY: On the grounds that it is objectionable!

JUDGE LITTLEFIELD: Overruled!

EL-FAYOUMY: But, your holiness, really, it *is* objectionable: I sense it, although I cannot put it into words.

JUDGE LITTLEFIELD: Overruled!

BAILIFF: Name!

PILATE: Pontius Pilate.

CUNNINGHAM: Pontius Pilate?

PILATE: That's right, baby.

EL-FAYOUMY (*rising*): But are you a *licensed* pilot?!

JUDGE LITTLEFIELD: Siddown, El-Fayoumy!

CUNNINGHAM: Pontias Pilate . . . Judas Iscariot came down to your tent to recant his testimony—correct?

PILATE: On the advice of counsel, I cite my right to plead the Fifth Amendment.

CUNNINGHAM: You then told Judas Iscariot that Jesus was only gonna receive a "beat down," correct?

PILATE: On the advice of counsel, I cite my right to plead the Fifth Amendment.

CUNNINGHAM: You bear responsibility for the death of Jesus Christ—not Judas Iscariot, but you— Isn't that correct, Pontius Pilate?!

PILATE: On the advice of counsel, blah blah blah.

(*TO JUDGE*): Your Honor, I got a two p.m. tee time—can I go now?

JUDGE LITTLEFIELD: This won't take long, Pontius.

CUNNINGHAM: Judas came to your office and begged you on bended knee to take the money and release Jesus, and you refused him! Judas recanted. He tried to return the money—first to the Sanhedrin and then to you. Do you deny that?

PILATE: Hey, if I had messed up as bad as that cat had, I woulda tried to rebate them ducats, too.

CUNNINGHAM: So you admit that Judas did try?

PILATE: No. I do not admit that he tried. Did you hear me admit that?

CUNNINGHAM: We all know what happened, Pilate—We just saw the tape!

PILATE: Ain't nuthin' on that "so-called" tape implicates me of anything but trying to find a peacefully nonlethal solution to a potentially incendiary problem.

CUNNINGHAM: Right. Mister Pilate, you were the Fifth Prefect of Judea, correct?

PILATE: Correct.

CUNNINGHAM: A "Prefect" being what?

PILATE: Governor. Also known as "Procurator." My official title was "Hedg-e-mon."

CUNNINGHAM: "Hedg-e-mon"?

PILATE: Translated from the Greek, it means "Excellency."

CUNNINGHAM: I see. And you governed or procurated over Judea from twenty-six to thirty-six A.D., correct?

PILATE: Longest ten years of my life.

CUNNINGHAM: Why do you say that?

PILATE: You ever *been* to Judea, missy? It ain't Paris, France—believe that.

CUNNINGHAM: I see.

PILATE: Yeah, that Moses musta read the map backwards—misplaced his bifocals, sumpthin'—'cuz if that was the "promised land," shit, them Jews shoulda held out for a better Promise.

CUNNINGHAM: You didn't care for Judea much?

PILATE: Care for it? Armpit of the Empire, if you ask me. No atmosphere, nuthin'. Hot. Dirty. Dusty. Flies everywhere. Complete lack of Culture and Amusements. I'd a rather spent ten years up inside the crack a my ass ... But Augustus ordered me to keep the peace there, so I obeyed my Emperor, and did my duty.

CUNNINGHAM: And kept the peace?

PILATE: The Pax Romana, baby, the prime directive—dass right.

CUNNINGHAM: And, under your rule, how was the peace kept in Judea, Mister Pilate?

PILATE: By any means necessary.

CUNNINGHAM: Violently?

PILATE: Violently or otherwise—they was free to have it any ways they wanted.

CUNNINGHAM: According to Philo of Alexandria, who wrote about you in forty-one C.E., your tenure as Governor of Rome was known for its "constantly repeated executions without trial, wanton injustices, graft, and ceaseless and grievous cruelty"—care to comment?

PILATE: No, I do not.

CUNNINGHAM: During your reign as Procurator in Jerusalem, how many deaths did you order?

PILATE: A lot—don't apologize for it either. Them Jews was rowdy.

CUNNINGHAM: "Rowdy"?

PILATE: Dass right—rowdy. As in: not docile. As in: a muthahfuckah had to put his foot down.

CUNNINGHAM: And you put it down, didn't you?

PILATE: Damn skippy I did. Orders from Rome—what's a brotha to do?

CUNNINGHAM: During your tenure in Judea, how many Crucifixions would you say you ordered?

PILATE: A lot less than my predecessor—that's for damn sure! That muthahfuckah would crucify a Semite for yellin' "Fire" at a barbecue—man would go buck-wild from *jump! Me?* I reduced Crucifixions in Palestine by seventy percent, and now, that's documented.

CUNNINGHAM: Well, that's lovely, Mister Pilate, but I'll direct you now to answer the question posed to you.

PILATE: Which was what?

CUNNINGHAM: How many Crucifixions did you preside over during your time in Jerusalem?

PILATE: I'd say . . . a few hundred—give or take. So what?

CUNNINGHAM: Over seven hundred Crucifixions while you were on assignment in Judea. Does that sound about right?

PILATE: Sound good to me. Sure.

CUNNINGHAM: And you publicly washed your hands of how many of them, Mister Pilate?

*Pause.*

PILATE: I don't know what you mean by that.

CUNNINGHAM: I mean that, other than Jesus of Nazareth, out of over seven hundred Crucifixions and countless executions, did you ever—in any other instance—publicly wash your hands and attempt to abdicate responsibility for your actions, Mister Pilate?

*Pause.*

PILATE: I don't recall.

CUNNINGHAM: You backpedaled because you knew it was wrong, didn't you?

PILATE: Romans don't have backpedals.

CUNNINGHAM: You knew Jesus was a Holy Man or a fool, but whatever he was, you believed him when he said that his Kingdom wasn't on Earth, didn't you?

PILATE: See, now, I don't recall that conversation.

CUNNINGHAM: You don't "recall" that conversation?! You know what, Mister Pilate, why don't you say that again so I can slap a perjury charge on you! You ordered the death of Christ—you and you alone—and then you pawned it off on Jesus's "reticence" and Judas's "impetuousness" and the "politics" of the Sanhedrin and the "rowdiness" of the Jewish people—is that nor the case, Pontias Pilate?! Yes or No?!

PILATE: You can go on squawking if you want to—my conscience is clean. What you need to do is take it up with them Jews.

CUNNINGHAM: Mister Pilate, were the High Priests of Jerusalem authorized to order a death sentence?

PILATE: No they were not.

CUNNINGHAM: Was King Herod authorized to issue a death sentence?

PILATE: No he was not.

CUNNINGHAM: How about the Jewish people themselves—were they free to issue death sentences at their whim and fancy?

PILATE: No.

CUNNINGHAM: One man, Mister Pilate. In all of Judea, one man alone had the authority to put another man to death. Who was that man, Mister Pilate?

PILATE: Am I on trial here? 'Cuz last time I checked, it was your client, Judas Iscariot, freezing his narrow ass off in the ninth Circle of Hell—not me!

CUNNINGHAM: My client recanted with a remorseful heart and was ignored!

PILATE: Then you need to take that up with them Jews, not me. I mean, this ain't some new theory I'm introducing to ya! It's documented. Ain't no Sherlock Holmes/Nancy Drew Mystery here, lady: Them Jews was cantankerous. Ornery. They worshipped a Jealous, Angry, and Vengeful God—and guess what? Surprise, surprise: They was angry, jealous, and vengeful themselves. I never had a problem in Judea wasn't caused by some rabble-rousing, no-account Jew. Believe me, sister—you need to talk to them, not me.

CUNNINGHAM: It's always the Jews, Mister Pilate, isn't it?

PILATE: Well, it sure as shit was in Judea, missy . . .

CUNNINGHAM: You wanna know what I really think, Mister Pilate? I think this whole story about you hemming and hawing about what to do with Jesus is just a load of made-up crap written by Jewish Christian Evangelists seeking to broaden the appeal of the Jesus story to the Roman Empire. There is nothing that we know about you, Mister Pilate—absolutely nothing—that suggests for even a second that you would have even a passing hesitation about putting *any* Jew to death—let alone a revolutionary figure like Jesus who was being proclaimed the Messiah, who had entered the city of Jerusalem to crowds of cheering supporters, and who had the very next day incited a riot at the Temple. You hated your assignment, you hated Judea, and Mister Pilate, you hated Jews. Hated them. You hated the Jews because they contested you. You hated them because they fought back. You hated them because they clung to their religious beliefs and were willing to die for them. But most of all, I think,

you hated them because you knew they were stronger than you. I think that bothered you a great deal. I think, Mister Pilate, that it made you resentful and vengeful and furious. I think it made you feel small and inadequate. I think it gave you skin irritations and nervous tics. I think it kept you up nights and made you count the days until you could return to the safe, bourgeois comfort of Rome. That's what I think. I think you're hiding behind historical inaccuracies and outright lies, Mister Pilate. I think that you're a liar and a fraud. I think that when Jesus was put before you, you did not see a God or a prophet, you did not see a lunatic or an innocent, you didn't even see a human being. I think, Mister Pilate, that what you saw before you that morning was just one more Jew, and you didn't hesitate. Why would you? . . . . . . You didn't wash your hands, Pontius Pilate—History did it for you. Isn't that true?

PILATE *rises*.

PILATE: I think I've had enough here.

CUNNINGHAM: If you were a man, Pilate—you'd own up to the truth!

PILATE: The truth?! Whose truth you talkin' about, Red?! The truth is I was made a saint in the Ethiopian Church! The truth is I was named a martyr for the Christian Church in three-forty-eight A.D. That's the damn "truth"!

CUNNINGHAM: A Christian martyr?

PILATE: Did I stutter, girlie?

CUNNINGHAM: Well, I guess that's what they mean about History being "a lie agreed to."

PILATE: A "lie"?! Whatchu know about what's a lie and what's the truth?! Whatchu know about my history?! Alls you got to go on is some book written four different ways by four

different Jews wasn't even there in the first place! And whatchu know about my life *after* Palestine? Whatchu know about what I mighta did or didn't do when I got back home to the Motherland? Dass right—you don't know jack—do you? They didn't write down that part of the story, did they? Shit—I'm a tell you something: You and your presumptious nature reminds me more and more of my ex-wife Rhonda every minute—and believe me that ain't no compliment! Yes, I met that Jesus boy—seemed like a fine fellow! He dressed like a hobo and smelled like a goat, but give the boy a shave and a shower, and he woulda been basically all right. And I'll tell you something else: Unlike Judas, that Nazarene boy had character. He didn't come up on me begging and groveling—crying like a bitch. He faced me like a man, like a Roman almost, and that impressed me. I was willing to just have him be clubbed in his head for a couple hours—redirect his youthful energies—but them Jews—they wasn't havin' none a that! You can say what you want to, think what you want to, but them Jews was fixin' to pitch a fit until that boy was served up for lunch like chicken in the skillet! And they had the numbers on us that weekend—two hundred thousand strong converging on the city for they High Holidays and ready to rumble at the drop! I did what I had to do to preserve the damn peace! Why?! 'Cuz that was my damn job! I did my job! I did my damn job and now you wanna call me a liar?! Question my veracity and my character?! I am a Roman, lady! One hundred percent, 24/7, we never close! Underneath my ball sac is stamped: VERITAS! And that means TRUTH! And that means my honor is defined by my integrity and my integrity is defined by my truth! And I defy you—here and now—to produce one shred of evidence to support your wild and defamatory claims! Shit! You better check the résumé two times before

you start tryin' ta sweep your dirt under a Roman's rug! I am clean like Dove and Ready for Love, missy! I live in Heaven! Where you live at, girlfriend?! Shit! I'll tell you what, though: When you get your head straightened out, gimme a call some time if you want to—I'll take you down to the Aqueduct for a Pizza and a Tussle. Show you my tattoos . . . . . . Any more questions?

CUNNINGHAM: I think, Mister Pilate, that you've told us all we need to know.

PILATE: Okay, then, I'm a roll out, now, boo—work on my short game.

JUDGE LITTLEFIELD: The witness is excused.

PILATE (*strutting off magisterially*): Hail Caesar, baby!

EL-FAYOUMY *rises.*

EL-FAYOUMY: Your Excellency! "Hedge-c-mon"?! Just one question if I may?!

PILATE: What's that?

EL-FAYOUMY: Yes . . . I wonder if you would tell the court— Hedge—the following: If indeed Judas Iscariot came to your tent to recant—and I'm not saying he did or didn't—and by the way, the only Gospel that says *anything* at all about Judas recanting is Matthew, so it's three against one and the one in question was not only a Greek, but a drunken Greek and a card cheat—but anyway—please tell us now if you will please: Good Sir, Hedge, when Judas came to your tent to allegedly recant, if in fact he did, which, I am in no way seeking confirmation of herewith, *HOWEVER,* if, by chance, the gin-soaked Greek was miraculously correct and Judas did in fact attempt to recant and return the tarnished silver, tell us please—*AND THIS IS VERY IMPORTANT—* Hedge: Did you get the sense or impression that Judas was

recanting out of a genuine *REMORSE* and concern for Jesus, *or* do you think he was seeking to undo the damage out of a neck-saving *fear* of the dire consequences and everlasting repercussions of betraying Our Rightful and most Exalted and Just Lord and Savior, Jesus Christ, the Divine Son of Man? . . .

*Beat.*

PILATE: I am a man—and defense counsel may dispute this— who happens to know something about Remorse—personal and otherwise. In my day, I stared into the eyes of perhaps ten thousand accused men and sat in judgment of them. I spared a few, and executed plenty. I sent people to face the whip, the cell, the gallows, and the cross. And I sent a few home, as well. Remorse is rare, but when you see it, it is unmistakable. Judas Iscariot had no Remorse—His Fear left no room for it. His Fear was one hundred percent Ego-Driven and Self-Serving. One hundred percent panic. Zero percent remorse. If you believe nothing else—believe that.

EL-FAYOUMY: "Hedge"—thank you. Thank you, indeed.

*The gavel bangs.*

JUDGE LITTLEFIELD: Next witness!

CUNNINGHAM *rises.*

CUNNINGHAM: Your Honor, Defense reconjures Satan to the stand.

JUDGE LITTLEFIELD: Lou, you can come in now . . . Bailiff! Go fetch him! Go fetch Satan!

BAILIFF: Alone?

JUDGE LITTLEFIELD: Go!

SATAN *enters, quite perturbed.*

Ah! . . . Have a seat, Lou.

SATAN: I want to file a formal fuckin' complaint, Frank!

JUDGE LITTLEFIELD: Aw, this ain't about the turkey roll in the cafeteria again, now, is it, Lou?

SATAN: No, Frank, this is not about the turkey roll in the cafeteria. What this is about, Frank, is I recognized a couple of your court officers at the vending machines, okay? Ask me how I recognized them, Frank.

JUDGE LITTLEFIELD: Lou—

SATAN: No! Don't you fuckin' "Lou" me—you little fag— God's been fuckin' *stealing souls* again, hasn't he?!

JUDGE LITTLEFIELD: El-Fayoumy! Escort the jury out!

EL-FAYOUMY: Yes. Right this way, please.

SATAN (*to* BUTCH, *as* EL-FAYOUMY *leads them out*): And you! Honeywell! You're on my fuckin' list, hayseed—so don't expect any last-second reprieves. Shorts and tank tops, Stretch—pack light!

*They exit.*

JUDGE LITTLEFIELD: This is unacceptable behavior, Lou.

SATAN: Don't tell me what's unacceptable—Those two court officers were mine, Frank—their souls in Hell, safe and secure! What? I don't got enough to contend with?—*now* I gotta deal with God cruisin' the barnyards of Hell poaching condemned poultry like some kind of silver-fox-tailed thief in the fuckin' night?! This is bullshit, Frank, and you know it—and I'm not leaving here this time without my satisfaction—so you better do something about it right fucking now!

JUDGE LITTLEFIELD: Do something like what?

SATAN: Number One: I'm not testifying at any more of these circle jerks no more—I'm not some wind-up doll to be summoned and dismissed like a fuckin' toy. Number Two: I want two souls before I leave here today—so take a memo, and pass it on upstairs. I'll take you and whoever.

JUDGE LITTLEFIELD: Me?

SATAN: Yeah, you. I shoulda claimed you off the dung heap after Lee's surrender . . . And I want some Darvon . . . And a tall bourbon neat.

(*To* CUNNINGHAM): What the fuck are you looking at?

CUNNINGHAM: I'd like to start my questioning.

SATAN: Why? You got some place you gotta be, dirtbag?

CUNNINGHAM: No. When you're done crying, just let me know.

SATAN: Um, I'm sorry—maybe you can clear this up for me— but it is today "Fuck-With-Someone-Who-Can-Rip-Your-Heart-Out-Through-Your-Miserable-Dried-Up-Cunt Day"? Is that what day this is? 'Cuz, unless I'm mistaken, I'm pretty sure that Today is not that Day.

CUNNINGHAM: Today is your day to answer my questions— when you're through behaving like a petulant child, that is.

JUDGE LITTLEFIELD: Cunningham! Cunningham, I am directing you to hit the off-switch on them flapping gums of yours until further notice! And you, Lou, with all due respect to your stature and station—could ya cut me a break here, please?!

SATAN: Frank, I've always been good to you—

JUDGE LITTLEFIELD: —and I to you—is that not so? Now lissen: Your complaint is duly noted and will be kicked upstairs at the conclusion of today's testimony, okay? Now I need to call the damn jury back in here. And what I need to know—from the both of youse—is that when I move to do

so, that you two will conduct yourselves with a deportment in adjustment to the solemnity of these proceedings. Now, can I have your words on that?

CUNNINGHAM: I'm ready to proceed, Your Honor.

JUDGE LITTLEFIELD: With civility?

CUNNINGHAM: If I'm met with civility.

SATAN: You know what, Cunningham? All those excuses you got wedged between that dubious cleavage of yours: your mother, the bulimia, the herpes, the booze, the abortions, the rape, the bipolar pharmaceutical adventures, the twin suicide attempts and the abject failures at every relationship you ever attempted—all those things do nothing to Band-Aid the simple fact that There Comes a Time When the World Stops Rewarding Potential—and when that time came for you, you threw yourself the world's biggest pity party and dedicated the rest of your short, pathetic, inconsequential life to finding fault everywhere fuckin' else but in the return gaze of your own cosmetically altered reflection. Okay?

EL-FAYOUMY: Satan, please—you are perhaps out of bounds here!

SATAN: El-Fayoumy, on a good day, your cock measures three and a half inches erect and it goes off on a hair trigger if you so much as sneeze . . . Worse than that, you're a Flatterer, and your Love of God is utterly false—as is your hair color. And the sole reason you're so hot for this nasty train wreck over here is because you're addicted to tragedy and punishment—not because you *think* you're a piece of shit, but because, El-Fayoumy, the truth is: Your self-diagnosis is correct: You're a bag of hot air and a weakling—and you will never, ever, be loved.

(To CUNNINGHAM): You'll never be loved either, Cunningham, and that's because you're incapable of giving it—but you already knew that about yourself, didn't you?

(To JUDGE): You can bring in the jury now, Frank. Never let it be said that the Prince of Tyre stood in the way of Truth.

JUDGE LITTLEFIELD (To SATAN): No more outbursts.

SATAN: I'm a buddha floating on a lily pad.

JUDGE LITTLEFIELD (Calling out): El-Fayoumy—bring 'em on in!

EL-FAYOUMY: Uh . . . Sir, yes, sir, sir!

EL-FAYOUMY opens door. (To jury): Take your seats, please—Do not tarry.

Jury enters.

JUDGE LITTLEFIELD: Counselor, you may begin.

CUNNINGHAM: Mister Satan—

SATAN: I apologize for my earlier behavior, counselor—I had some bad fish at lunch.

CUNNINGHAM: Mister Satan, you've had a long-standing feud with God, correct?

SATAN: No. I love God.

CUNNINGHAM: You love God?

SATAN: Very much. God made me.

CUNNINGHAM: Okay, you say God made you—

SATAN: God did make me—it says so in the Bible.

CUNNINGHAM: I know about the Bible, Mister Satan. It also says about the Bible, in . . . in Matthew I believe. In Matthew, it, it says: "A good tree cannot bear bad fruit," correct?

SATAN: Correct.

CUNNINGHAM: So are you saying that you are good? Or are you saying that God is bad?

SATAN: I would never say that God is bad.

CUNNINGHAM: So, then, are you telling this court that you're good?

SATAN: I don't know—are you good, Counselor?

CUNNINGHAM: That's not what I asked you!

SATAN: I'm sorry.

CUNNINGHAM: Just answer the question.

SATAN: I don't believe in Good and Bad. What I believe in is Truth.

CUNNINGHAM: Fine. According to Job and Nehemiah, God created you in the first three days. True?

SATAN: True.

CUNNINGHAM: You were an "Angel."

SATAN: True.

CUNNINGHAM: You were present when God created Earth.

SATAN: True.

CUNNINGHAM: Then God created man and gave *him—not you*—dominion over the Earth. True?

SATAN: True.

CUNNINGHAM: You were, in fact, ordered by God to serve man. True?

SATAN: True.

CUNNINGHAM: According to Genesis and Ezekiel, you then tempted Eve to eat the Apple in order to prove to God that He had made an error in giving Man dominion over the Earth. At which point, according to Luke, you then "fell from Heaven like lightning" and became God's Adversary. And ever since that day, you have competed for Souls with God in order to try to prove the point that Man is not worthy to rule over the Earth. Isn't that true, Mister Satan?!

SATAN: I don't compete with God. God competes with himself.

CUNNINGHAM: That's not what I asked you.

SATAN: I'm trying to answer your question—

CUNNINGHAM: No, you are not trying to answer my question!

SATAN: Your Honor, I'm trying to form a response here—

JUDGE LITTLEFIELD: Let him answer, Cunningham!

EL-FAYOUMY: Your Honor, it does seem to me—

JUDGE LITTLEFIELD: Quiet! (To SATAN): Proceed.

SATAN: Thank you. Look, I didn't make you people, God did, okay? But there was a design flaw in the creation: He gave you Free Will—and to balance that out, you were designed to *Self-Correct*. But, unlike the "Free-Will" muscle, the "Self-Correct" muscle is not a particular favorite of the *Homo sapiens*. I'd say *"Self-Correct"* falls somewhere between "Colonoscopy" and "Firing Squad" on most people's holiday "wish" lists. At any rate, the truth is: I don't have to actively compete for human souls—I don't have to lull or flatter or tempt or deceive—because with God at the helm and you people running around wreaking havoc: I'll be honest, I spend most of my time on a sofa watching one-hour dramas on HBO.

CUNNINGHAM: And what? Getting tossed out of Heaven—that didn't bother you at all?

SATAN: There's a concept, Cunningham, called Playing the Cards You Are Dealt—One can either accept that concept or one can slowly lose one's mind, heart, and soul. I'd like to be more helpful to you here, but really, that's what it all comes down to.

CUNNINGHAM: Is that so?

SATAN: I'm just a fallen angel tryin' ta keep my dick hard in a monotheistic society—anything else you wanna ask?

CUNNINGHAM: Your Honor, this witness is clearly lying—I move that his entire testimony be stricken from the record.

JUDGE LITTLEFIELD: I'll not allow that, sorry—you conjured him, what comes out of his mouth is your responsibility.

CUNNINGHAM: But he's obviously lying!

SATAN: You oughta expand your consciousness, Counselor.

CUNNINGHAM: Your Honor!

JUDGE LITTLEFIELD: Unless you have another question, Cunningham, I suggest you step down now.

CUNNINGHAM: But—

JUDGE LITTLEFIELD: Forward or Back! You've been instructed, now what'll it be?

*A small beat.*

CUNNINGHAM: Why do you love God, Mister Satan?!

SATAN: What's not to love?

CUNNINGHAM: Specifically, Mister Satan! What specifically do you love about God?

SATAN: I don't know where to begin.

CUNNINGHAM: Pick a spot!

SATAN: I love God because He is All-Powerful and All-Forgiving. I love God because his Justice is perfect. I love God because God loves me.

CUNNINGHAM: God loves you?!

SATAN: Very much. Gift basket at Christmas—Hallmark Greetings on all the major holidays.

CUNNINGHAM: Stop it! If God loves you, then why did he throw you out of his Kingdom?!

SATAN: He didn't throw me out—I left.

CUNNINGHAM: That's not what it says in the Bible!

SATAN: Yeah, they fudged that part, you're right—but that's because you people really only respond to fear and threat—If they told you straight up that there was no lock to the Gates of Heaven, then you'd have no incentive at all to even try to be halfway decent.

CUNNINGHAM: In other words, God lied!

SATAN: God didn't write the Bible—you do know that, right?

CUNNINGHAM: Of course I know that!

SATAN: Then why would you say that God lied?

CUNNINGHAM: Mister Satan—does God love Judas Iscariot? Yes or No?!

SATAN: God loves everybody.

CUNNINGHAM: And yet Judas is in Hell—so what use is God's Love to Judas if my client is allowed to languish in Damnation?

SATAN: Your client is free to leave whenever he wants to—in fact, I wish he would—I could use the room.

CUNNINGHAM: That's not true and you know it!

SATAN: Look, maybe you should sit down and catch your breath—

CUNNINGHAM: —The real truth is that God's Love for us is Conditional—isn't that right?! You failed to meet God's conditions, and he threw you in the trash! Judas failed—and he's in a catatonic stupor!

SATAN: Your client succumbed to Despair—

CUNNINGHAM: Yes! And if Human Despair is so powerful as to render God powerless over it, then what does that say about God?! It says one of two things, Mister Satan: Either God's not All-Powerful and therefore useless—or—God's Love is Conditional, which renders that Love false and Unworthy! Which one is it?!

SATAN: Cunningham, please don't take this personally, but your father never really loved you or wanted you, right? And the only reason your mother didn't abort you was because she was afraid of scarring—I think she told you that once, didn't she—

CUNNINGHAM: Mister Satan!—

SATAN: —Just because your parents resented you doesn't mean that God does.

CUNNINGHAM: —Mister Satan, I asked you a direct question and I am demanding from you a direct answer!

SATAN: The direct answer is that you are completely wrong.

CUNNINGHAM: Is God Powerless or Spiteful—I am ordering you to answer!

SATAN (*not unkindly*): You're powerless and spiteful, Cunningham—not God.

CUNNINGHAM: Your Honor, he's not answering!

JUDGE LITTLEFIELD: Whaddya want me to do about it?

CUNNINGHAM: But he's not answering!

SATAN: Open your heart to God, Cunningham.

CUNNINGHAM: Shut up! (*To* JUDGE) Your Honor?!

JUDGE LITTLEFIELD: I suggest you step down, Cunningham.

CUNNINGHAM: But I'm not finished!

JUDGE LITTLEFIELD: Then finish!

CUNNINGHAM: But Your Honor, this isn't fair!

JUDGE LITTLEFIELD: It is what it is, Cunningham!

CUNNINGHAM: But Your Honor—

JUDGE LITTLEFIELD: Cunningham—

CUNNINGHAM: Your Honor—

JUDGE LITTLEFIELD: What, Cunningham? What?

*Pause.*

CUNNINGHAM (*To* SATAN): You're a fuckin' liar!!

SATAN: I'm truly sorry you feel that way.

*Pause.*

CUNNINGHAM: . . . . . Nothing further.

JUDGE LITTLEFIELD: El-Fayoumy: Cross?

EL-FAYOUMY *surveys* CUNNINGHAM, *then* SATAN, *then back to* CUNNINGHAM.

EL-FAYOUMY: No cross. No.

JUDGE LITTLEFIELD: You're excused.

SATAN: Thanks, Frank.

(*To the lawyers*): Counselors: You availed yourselves as expected. And by the way, El-Fayoumy, you're completely wrong, too. I'll be in touch.

*And he is gone.*

JUDGE LITTLEFIELD: Next witness!

*Blackout. A beat.*

JESUS *makes his way to* JUDAS. *He speaks to us.*

JESUS: Right now, I am in Fallujah. I am in Darfur. I am on Sixty-third and Park having dinner with Ellen Barkin and Ron Perelman . . . Right now, I'm on Lafayette and Astor waiting to hit you up for change so I can get high. I'm taking a walk through the Rose Garden with George Bush. I'm helping Donald Rumsfeld get a good night's sleep . . . I was in that cave with Osama, and on that plane with Mohamed Atta . . . And what I want you to *know* is that your work has barely begun. And what I want you to *trust* is the efficacy of divine love if practiced consciously. And what I need you to *believe* is that if you hate who I love, you do not know me at all. And make no mistake, "Who I Love" is every last one. I *am* every last one. People ask of me: Where are you? Where are you? . . . Verily I ask of you to ask yourself: Where are *you?* Where are *you?*
Judas.

*No response.*

Judas.

*Beat. JUDAS slowly emerges from his frozen state of catatonia.*

JUDAS: . . . . . Who's that?
JESUS: Is it ever anybody else, Judas?

*Pause.*

I miss you.
JUDAS: Uh-huh.
JESUS: I miss you, Judas.

*JESUS lays a hand on him.*

JUDAS: *DON'T FUCKIN' TOUCH ME!*
JESUS: Judas.
JUDAS: *I SAID TAKE YOUR FUCKIN' HANDS OFF ME—*
    *TAKE 'EM OFF!*
JESUS: I'm sorry, I'm—
JUDAS: *—JUST BACK OFF MY GRILL, MAN! BACK OFF!*
JESUS: I'm sorry.
JUDAS: *BACK OFF MORE!*
JESUS: I'm sorry.

*Pause.*

Judas: If a thousand strangers spit on me and kick me as they pass, I will smile. But if the brother of my heart gives me only a passing hard look, then, Judas—I will not sleep that night, nor sleep—at all—till he will let me love him again.
JUDAS: NO!!
JESUS: No, what?
JUDAS: No more fuckin' fortune cookies, that's what! You wanna say something, I can't stop you—you wanna

apologize, fine, apologize and go, just—for once—speak like a normal fuckin' person!
JESUS: I'm not a normal person, Judas, and I'm not here to apologize. I am who I am and not what you demand me to be. I'm always going to be who I am and what I am, and when have you ever heard me deliver my message any differently, Judas? When?
JUDAS: I . . . Just, go away.
JESUS: I won't go away.
JUDAS: Well, that'd be a first.
JESUS: I have never gone away, Judas . . . Look at me.

*JUDAS does.*

I love you, Judas. And all I want—all I want—is to be not just near you—but *with* you.
JUDAS: Shoulda thought of that before.
JESUS: Before what?
JUDAS: Just get the fuck outta here, okay?
JESUS: Judas—
JUDAS: Don't fuckin' Judas me—*You're not wanted here,* okay, Mister Fuckin'-Above-It-All!
JESUS: I'm not above it all—I'm right here in it, don't you see that?
JUDAS: *And don't you get that I don't fuckin' care?!*
JESUS: You think your suffering is a one-way street?! It's not! It's the exact opposite of not!
JUDAS: You got a lot of fuckin' nerve—
JESUS: —and you've got no nerve at all! Where's your *heart* in all this, Judas? You think you were with me for any other reason than that?! It was your heart, Judas. You were *all heart.* You were my heart! Don't you know that?!
JUDAS: I'll tell you what I know: I watched you trip over your

own dusty feet to heal the sick, the blind, the lame, the unclean—*any two-bit stranger stubbed their fuckin' toe!* When some lowly distant relative—too cheap to buy enough wine for his own fuckin' wedding—suddenly runs out of booze—no problem, you just "presto change-o"—*and it was fuckin' Miller time in ol' Canaan again, wasn't it, bro?! But when I fuckin' needed you—where the fuck were you, huh?!*

JESUS: Judas—

JUDAS: You forgave Peter and bullshit Thomas—you knocked Paul of Tarsus off a horse—you raised Lazarus from the *fuckin' dead*—but me! Me! Your "heart"? . . . *What about me?!! What about me, Jesus?! Huh?!* You just, you just—I made a mistake! And if that was wrong, then you should have told me! And if a broken heart wasn't sufficient reason to hang, *THEN YOU SHOULD HAVE TOLD ME THAT, TOO!*

JESUS: Don't you think . . . that if I knew that it would have changed your mind . . . that I would have?

*Pause.*

JUDAS: All I know is that you broke me unfixable—and that I'm here . . . And, you wanna know when you delivered your message differently? At the Temple, Jesus—that's when. And you were beautiful there. And you left there three inches taller. And we all saw it. I loved you. That's all I did. And that's the truth. And now I'm here.

JESUS: Judas—What if I were to tell you that you are not here? That you are with me in my Kingdom even now, and that you have been there since the morning of my Ascension and that you have never left?

*JUDAS spits in JESUS's face.*

JUDAS: That's what I think about you.

JESUS *doesn't wipe it off.*

JESUS: I love you, Judas.

*Pause.*

I love you.

JUDAS: *Just stop!*

JESUS: Don't you see me here, Judas?

JUDAS: *I see a lot of things!*

JESUS: You see alotta things?

JUDAS: *That's right!*

JESUS: How about him? Do you see him?

*SATAN appears.*

Do you know him? Call unto him. Touch him. He is not there. Because he does not exist, Judas. Rather, they must conjure him, and still he is but a vapor blown away by a hummingbird's breath. He is false. He is a lie. He is not real. Touch him. Go ahead.

JUDAS: I don't wanna touch him.

JESUS: Stand up, Judas.

JUDAS: You know I can't do that!

JESUS: No. What I know—is that you can.

JUDAS: Get the fuck over yourself!

JESUS: Will you feed my lambs, Judas? . . . Will you take care of my little sheep? . . . Will you feed my lambs?!

JUDAS: "Feed your lambs"?

JESUS: You know exactly what I'm asking you.

JUDAS: Go away!

JESUS: If you don't love me, Judas—then you're gonna have to look me in my eyes and say it.

JUDAS: I don't love you.

JESUS: If you don't love me, then why are you here?

JUDAS: Go!

JESUS: Judas! . . . Judas, don't you know what would happen the very instant you got down on your knees?

JUDAS: Why on my knees? They shoulda buried me standing up—'cuz I been on my knees my whole life! You left me,

JUDAS *is slowly reverting to his frozen catatonic state.*

JESUS: I'm right here.

JUDAS: I would have never believed that you could have left me.

JESUS: I never left you.

JUDAS: That you didn't love me.

JESUS: I do love you.

JUDAS: Why . . . didn't you make me good enough . . . so that you could've loved me?

JESUS: . . . Please take my hands, Judas. Please.

JUDAS: Where are they?

JESUS: Right here.

JUDAS: I can't see them.

JESUS: They're right here.

JUDAS: *Where are you going?!*

JESUS: I'm right here.

JUDAS: *Don't leave me!*

JESUS: I'm here.

JUDAS: I can't hurt . . .

JESUS: I love you, Judas.

JUDAS: I can't . . .

JESUS: Please stay.

JUDAS: I can't hurt . . .

JESUS: Please love me, Judas.

JUDAS: I can't.

JUDAS *is frozen again.*

*A long beat.*

BUTCH HONEYWELL *enters* JUDAS'S *lair with a twelve-pack of Canadian beer.* BUTCH *looks around, clears his throat, takes off his cap.*

BUTCH HONEYWELL: Um, uh, Mister Iscariot? Uh, Mister Iscariot, I, uh, I don't know if you can hear me, but, I just—I just wanted to introduce myself, if, if I could. I'm, uh, Butch Honeywell. I was the foreman of the jury at your trial there . . . and . . . well, we found you guilty, Mister Iscariot . . . I'm real sorry about that . . . Oh, uh . . . I brought you a twelve-pack of beer. Actually, guess it's a five-pack now, but, anyway . . . Here. I don't know if you drink beer, but it's good stuff . . . Anyways, I'll just set it down right beside you right here . . . Okay then.

BUTCH *goes to leave, then stops.*

. . . So . . . I think I'm dead, Mister Iscariot, and, I'm a little concerned about that 'cuz I don't think my soul's ready for judgment, but nobody else has so far corroborated that I'm dead so, I just don't bring it up, but, the fact is that if this is a dream, it's the longest damn dream I've ever endured—and really, I just . . . I really miss my wife, Mister Iscariot. Is it okay if I tell you that?

*Beat.* BUTCH *pops a beer. Sips. Pause.*

I remember, I was with these two girls that night, when I first seent my wife, Mister Iscariot. It was a party at Jimmy Rayburn's house 'cuz Jimmy's momma worked till midnight so he had the house to himself, and, you know, me and these two girls—Suzie Heller and Della Mae Robbins—we were just talkin', smokin' cigarettes, out on Mrs. Rayburn's deck away from the party. I was depressed over sumpthin' or other—prolly 'cuz school was ending—plus I had just been in the school play—I had played Tom in *The Glass Menagerie*—it was the first time I had ever acted, and everyone said I was real good. But now, the play was over, and school was almost over, and, for the part in the play, they had given me this real short haircut—like 1940s style—and my ears, Mister Iscariot, I don't know if you can notice, but, they stick out a little bit, so, with the short haircut and all, I was feeling a little self-conscious and dumb, and, anyway, just not too cheery . . . So anyways, I'm out there on the deck talkin' to Suzie and Della—and all a the sudden I see this girl inside at the party. She had, I guess, just arrived, and she had on a red jacket. It was a cheerleading jacket from the high school just across the state line in Virginia—The Red Raiders—and I remember, all I saw was blonde hair, and a red jacket, and this smile that was—even from a distance—just kinda electrifying to the heart, ya know? 'Bout a minute later, the sliding door to the deck opens, and this girl, she comes out by herself, and she's heading towards us—turns out she's friends with Della from back in the day, from, I don't know, Girl Scouts, Brownies, sumpthin' like that. Anyways, she walks over—and she was so beautiful, that I remember thinkin' to myself—and this is exactly word for word what I thought—"I ain't even gonna bother talkin' to this girl." So she comes over, says hello, and I just excuse myself right off the deck and head back inside,

fixin' ta say my "good-byes" and skedaddle. . . And anyways, I try to leave, but then, Jimmy handed me a beer, and someone else started passin' a bottle of Rebel Yell, and before you know it, you know, bong hits and whatnot, and anyways a little later I'm sittin' on the couch when this girl—my future wife—she just comes up to me by herself and she says: "I saw you in that play the other night. You made me cry" . . . Two days later, we went out on a date . . . On the way back, I was driving her home, and we passed by this house where my friend Dave Hogbe used to live who had died . . . I hadn't been by his house since he passed. The family didn't live there no more. But when I saw the house, I got struck with this feeling, and I asked her if she wouldn't mind if we just pulled up in front of that house and just sat for a moment. She said: "Sure." So I parked, and we just sat in the car for a while. Quiet. Not sayin' nothin'. And before I knew it, Mister Iscariot, I was tearing up—'cuz this kid, he had been a real good friend of mine, ya know—and then, I just started crying, Mister Iscariot. I couldn't help myself and I couldn't shut it off. And I was real embarrassed, and she just, she just held me while tears and snot and whatnot just poured outta me and onto her little white sweater . . . And she didn't mind about that . . . She didn't mind at all . . . At some point, I drove her home, and we got to her door, and we started to kiss, and, well, God, it was like, I'll tell ya—it was like peaches and dynamite . . . And before I left, I apologized to her about the crying and all, and she said: "Don't be a jackass, Butch Honeywell," and I smiled, but then I went on to explain my meaning, which was—you know—if you want a girl to think you're sensitive or something, then maybe taking her to the house of your dead friend and crying all over her pretty white sweater might be a good way to pull it off, and, you know what

she said, Mister Iscariot? . . . She looked at me for a good long while with them all the way dazzling eyes of hers and then she just said: "Well, if it was a trick . . . then I'm tricked" . . . . . . . . Three years into our marriage, I took a job teaching at the State College—I was popular with the students 'cuz I found a way to make 'em wanna learn. One night, at the end of the semester, they took me out for beers. I ended up havin' an assignation with one of the coeds—young lady named Lucy. And I went home that night, got into bed next to my wife drunk as a skunk and I remember, before I passed out, I was lookin' at her. I always liked to look at her when she was sleeping 'cuz she always looked so good. I had a little nickname for her, I useta call her "my little baby dinosaur," 'cuz that's how she looked like when she slept—like one of those cute cartoon little baby dinosaurs—like a little brontosaurus, but cute . . . Anyways, when I woke up the next mornin', she was still sleepin', and what I had done the night before came back to me, and I looked at my wife, and, boy, she looked exactly the same as always, but, somehow, she just wasn't my little baby dinosaur no more, ya know? And she woke up, and she didn't know nuthin' 'bout nuthin', and everything was exactly the same as if the night before had never happened, except, it wasn't the same, and I knew it. And I had no idea why I had done what I done. But I had done it. And it couldn't be changed. My girl, she got up and fixed blueberry French toast with maple walnut pecans. I didn't eat it. No way I coulda eaten it. Nuthin' was ever the same after that morning, Mister Iscariot, ya know? I tried a lot of things to make it better, the only thing that did was more beer and women . . . Do you know who W. H. Auden was, Mister Iscariot? W. H. Auden was a poet who once said: "God may reduce you on Judgement Day to tears of shame, reciting by

heart the poems you would have written, had your life been good" . . . She was my poem, Mister Iscariot. Her and the kids. But mostly . . . her . . . You cashed in Silver, Mister Iscariot, but me? Me, I threw away Gold . . . That's a fact. That's a natural fact.

*A long beat.*

*JESUS sighs, takes off his shirt, plunges it in the bucket, rinses it, and begins to wash JUDAS's feet. JESUS washes meticulously and with care. He washes. And washes. Perhaps the water is mixed with tears.*

*Lights fade.*

*The end*

## Acknowledgments

Much Grateful Thanks Firstly to the Following: The LAByrinth Theater Company, George C. Wolfe, Mara Manus, Michael Hurst, Peter Dubois, Irene Cabrera, Celise Kalke, Steven Showalter, Jordan Thaler, Heidi Griffiths, Kenneth Leslie and all the ushers and staff at The Public Theater; Marieke Gaboury, Sallie D. Sanders, Amanda Woods, Abby Marcus, Veronica R. Bainbridge, Monique Carboni, Brian Roff, Michael Almereyda, Terrence Morris, Robin L. Cook, John Concado, Courtney Wetzel, Ashley Hanna, Florencia Lozano, Chris Rubino, Monica Moore, Maddalena Deichman, Andromache Chalfant, Mimi O'Donnell, Japhy Weideman, Darron L. West, Madonna Badger, Kimberly Braswell, Colin Calender, David Deblinger, Michael J. Fine, Lulie Haddad, Ruth Hendl, Jeffrey A. Horwitz, Margo Lion, John Marcus, Ricardo E. Oquendo, Daryl Roth, John Gould Rubin, Carlo Alban, Simone Allmen, Vanessa Aspillaga, Liche Ariza, Dick Benedek, Maggie Bofill, John Buzzetti, Elizabeth Canavan, Andrea Ciannavei, Rebecca Cohen, Beth Cole, Alexis Croucher, Billy Crudup, Kim Director, Faber and Faber, Rev. Dr. James A. Forbes Jr. of the Riverside Church, the Gersh Agency, Bob Glaudini, Charles Goforth, Robyn Goodman, Marie Therese Guirgis, Maurice and Therese Guirgis, Mark Hammer, HBO Films, Ron Cephas Jones, Jen Konawal, Diane Landers, Brett C. Leonard, Trevor Long, MCC Playwrights'

Coalition, Chris McGarry, Sara Murphy, New River Dramatists and Mark Woods and Meir Ribalow and Big Bill Baker in Healing Springs, North Carolina, Dierdre O'Connell, Ana Ortiz, Sarah Almond, Denise Oswald, Richie Petrocelli, Michael Pitt, Ira Pittelman, Portia, Father Raymond Rafferty of Corpus Christi Church, Joselin Reyes, Nancy Rose and Ira Shreck, Brendan Sexton, John Patrick Shanley, Marshall Sharer, Jamey Sheridan, Todd Solondz, Erana Stennett, Arielle Tepper, Sister Mary Tyler O.P., Sam Wilsche, David Zayas, and Emily Ziff.

Secondly: I can't even imagine what writing this play would have been like without the theological advice and spiritual guidance of Father Jim Martin, S.J. My mom always says that back in the day, Priests were Men of God who were Our Friends. Father Jim was exactly that. His knowledge, enthusiasm, and gentle caring was essential not only to my writing process, but to the rehearsals and the production as well. Father Jim is a real priest, a real man, and the Real Deal.

Thirdly: Philip Seymour Hoffman. Incredible director. Trusted collaborator. Treasured friend.

Fourthly: John Ortiz. The other blessing of my creative life. His confidence and faith in me since we were kids is a debt I can never repay. All heart. Gigantic.

Fifthly: The Original Cast. Sam Rockwell and Yul Vázquez committed to the play before there was a script and never hedged. Liza Colón-Zayas, Elizabeth Rodriguez, Yetta Gottesman, and Craig "Mums" Grant committed on, like, page 9. Eric Bogosian signed on at about page 20. Jeffrey DeMunn took a leap of faith and said yes based on a reading (page 50?) and a phone call. The great Adrian Martinez endured an audition, even though we had already worked together once before. John Ortiz stayed in town—and in debt—to play Jesus, even when Jesus had no lines. Salvatore

Inzerillo asked me if he'd at least get to play a part "with some meat on the bone." I said: "Probably not." Sal said yes anyway. Stephen McKinley Henderson was the steal of the draft. Deborah Rush and Kohl Sudduth gave incredible auditions and then said yes to supporting and still developing roles in an unfinished script. Callie Thorne was the last actor we saw, just a few days before the first rehearsal. I can't really remember her audition, but I'll never forget her performance and her commitment. I can never ever thank these actors enough. They were all unique and beautiful, fierce, committed, talented, willing, and generous. Truly.

Lastly and most important: God. I struggle with God. I struggle with Life. I want simple answers and easy solutions. I want to do it on my own and always be in control. Mostly, I want to avoid the uncomfortable, which only leads to more discomfort. God is, I think, perhaps, The Unavoidable, and writing, for me, is the curse that brings me a little bit closer to that Unavoidable entity that ultimately allows me freedom and access to my work and to my life. Some people are curious about a writer's "creative process." I can't explain mine except to say that God is the starting point and the finish line. In other words, when all else fails—and it always does—I pray.

ACKNOWLEDGMENTS

ACKNOWLEDGMENTS