Darren M. Geliebter
The Dorf Law Firm, LLP
845 Third Avenue, 6th Floor
New York, NY 10022
Tel: 212-233-4444
Fax: 212-452-2048
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL G. PORTO (a.k.a. GUY MICHAELS),

                       Plaintiff,

                                  Civil Action No. 08 Civ.1228 (LTS)(GWG)

    -against-

STEPHEN ADLY GUIRGIS, LABYRINTH
THEATER COMPANY, PHILIP SEYMOUR
HOFFMAN, FABER AND FABER, INC., AND
DRAMATISTS PLAY SERVICE, INC.,

                       Defendants.

---

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT AND FOR AN AWARD OF COSTS AND ATTORNEYS' FEES UNDER 17 U.S.C. § 505

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................iii

PRELIMINARY STATEMENT.............................................................................1

STATEMENT OF FACTS......................................................................................3

ARGUMENT

POINT 1:    DUE TO THE HIGHLY FACTUAL NATURE OF
            THE INQUIRY REQUIRED, COPYRIGHT
            INFRINGEMENT CASES ARE RARELY DISMISSED
            ON 12(b)(6) MOTIONS AND MOTIONS FOR
            SUMMARY JUDGMENT ARE RARELY GRANTED...........4

            A.   COPYRIGHT INFRINGEMENT CLAIMS
                 RARELY DISMISSED ON 12(b)(6) MOTIONS..........4

            B.   SUMMARY JUDGMENT IS RARELY GRANTED......6

            C.   PLAINTIFF HAS ADEQUATELY ALLEGED
                 THE ELEMENTS OF A CLAIM OF COPYRIGHT
                 INFRINGEMENT...................................................8

POINT II:   UNDER THE "ORDINARY OBSERVER TEST" A
            REASONABLE JURY COULD FIND THAT
            DEFENDANTS UNLAWFULLY APPROPRIATED
            THE WORK...............................................................11

            A.   DEFENDANTS ATTEMPT TO ELIMINATE
                 THE RESPECTIVE SIMILARITIES FROM THE
                 INFRINGEMENT ANALYSIS CONTRARY TO
                 THE PROPER APPLICATION OF THE ORDINARY
                 OBSERVER TEST................................................11

            B.   DISSIMILARITIES DO NOT EXCUSE
                 INFRINGEMENT...................................................14

POINT III:  COMPARATIVE ANALYSIS OF THE TWO WORKS
            EXHIBITING THAT THERE ARE TRIABLE ISSUES
            OF FACT WITH RESPECT TO SUBSTANTIAL SIMILARITY
            OF PROTECTABLE EXPRESSION....................................15

            A.   PLOT/SEQUENCE OF EVENTS............................15

i

B.    DIALOGUE...................................................15

C.    CHARACTERS...............................................16

D.    TOTAL CONCEPT AND FEEL............................ 17

E.    DETAILED COMPARATIVE ANALYSIS OF
      SIMILARITIES................................................18

POINT IV:    ATTORNEY'S FEES ARE NOT AUTOMATICALLY
             AWARDED TO A PREVAILING PARTY........................28

POINT V:    OBJECTIVE REASONABLENESS OF PLAINTIFF'S
            CLAIMS IS THE PARAMOUNT ISSUE.............................29

POINT VI:    AWARDING ATTORNEYS' FEES WOULD NOT FURTHER
             THE PURPOSE OF THE COPYRIGHT ACT......................30

POINT VII:    PLAINTIFF'S ACTION NOT MOTIVATED OR CONDUCTED
              IN BAD FAITH..............................................31

CONCLUSION...........................................................33

## TABLE OF AUTHORITIES

CASES                                                                    PAGE #

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.
202 (1986)...........................................................................................................................6

Arica Inst. v. Palmer, 970 F.2d 1067, 1072 (2d Cir. 1992)........................................11

Arnstein v. Porter, 154 F.2d 464 (2d Cir. 1946).........................................................7

Bell v. Blaze Magazine, No. 99 Civ. 12342 (RCC), 2001 U.S. Dist.
LEXIS 2783, at *8-9 (S.D.N.Y. Mar. 16, 2001).......................................................5

Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)......................................................9

Bickhardt v. Ratner, 871 F.Supp. 613 (S.D.N.Y. 1994)..............................................7

Boisson v. Banian, Ltd., 273 F.3d 262 (2d Cir. 2001).................................................11

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L.Ed. 2d 265, 106 S. Ct.
2548 (1986).........................................................................................................6

Cognotec Servs., Ltd. v. Guar. Trust Co. of New York, 862 F.Supp.
45, 50 (S.D.N.Y. 1994).........................................................................................5

Cruden v. Bank of New York, 957 F.2d 961 (2d Cir. 1992)........................................7

Davidov v. Tapemeasure Enterprises, Inc., 1993 WL 88234 *3
(S.D.N.Y., Mar 24, 1993)....................................................................................4

D'Amico v. City of New York, 132 F.3d 145, 148 (2d Cir. 1998).............................7

Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991)......................12

Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 (1994)............................................29, 30

Folio Impressions, Inc. v. Byer Cal, 937 F.2d 759 (2d Cir. 1991)............................11

Gal v. Viacom Intern., Inc., 403 F.Supp.2d 294 (S.D.N.Y. 2005)......................17-18

Great Am. Fun Corp. v. Housing New York Trading Inc., 935 F.Supp.
488, 489 (S.D.N.Y. 1996).....................................................................................5

Great Importations, Inc. v. Caffco International, Inc., No. 95 Civ. 0514,
1997 WL 603410, at *1 (S.D.N.Y. Sept. 30, 1997)................................................30

Gund, Inc. v. Applause, Inc., 809 F.Supp. 304, 308 (S.D.N.Y. 1993)......................11

Hoeling v. Universal City Studios, Inc., 618 F.2d 972 (2d Cir. 1980).....................7

Hofheinz v. AMC Products. No. 00 Civ 5827, 2003 U.S. Dist. LEXIS
16940, at *17 (E.D.N.Y. Sept. 1, 2003).............................................................29

Hogan v. DC Comics, 983 F.Supp. 82, 86 (N.D.N.Y. 1997)................................9-10

Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 200)....................................6-7

Ideal Toy Corp. v. Fab-Lu, Ltd., 360 F.2d 1021, 1022 (2d Cir. 1966)....................11

Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 699
(2d Cir. 1994)..............................................................................................8

Kepner-Tregoe, Inc. v. Leadership Software, Inc., 12 F.3d 527, 535-36 (5th Cir.)........21

Knickerbocker Toy Co. v. Winterbrook Corp., 554 F. Supp. 1309 (D.N.H. 1982)........12

Lieb v. Topstone Industries, Inc., 788 F.2d 151, 156 (1986)..................................29

Masquerade Novelty, Inc. v. Unique Indus., Inc., 912 F.2d 663, 669
(3rd Cir. 1990)..............................................................................................12

Matthew Bender & Co. v. West Publishing Co., 240 F.3d 116, 121-122
(2d Cir. 2001)........................................................................................29, 30

Metcalf v. Bochco, 294 F.3d 1069 (9th Cir. 2002)..........................................13-14

Mulberry Thai Silks v. K & K Neckwear, 897 F.Supp. 789, 792 (S.D.N.Y. 1995).......12

New York State Energy Research and Development Authority v. Nuclear
Fuel Services, Inc., 666 F.2d 787 (2d Cir. 1981).................................................7

Nicholls v. Tufenkian Import/Export Ventures, Inc., 367 F.Supp.2d
514, 520 (S.D.N.Y. 2005)...............................................................................4

Paramount Pictures Corp. v. Carol Publ'g Group, 11 F.Supp. 2d 329, 333
(S.D.N.Y. 1998)............................................................................................16

R. Dakin & Co. v. A&L Novelty Co., 444 F.Sup. 1080 (E.D.N.Y. 1978)..................12

Rogers v. Koons, 960 F.2d 301, 308 (2d Cir. 1992)............................................17

Schering Corp. v. Home Ins. Co., 712 F.2d 4 (2d Cir. 1983)..................................7

Shaw v. Lindheim, 919 F.2d 1353, 1363 (9th Cir. 1990)...................................17

Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936).................14

Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000)........................................................9

Twisted Records v. Rauhofer, 2005 Copr. L. Dec. P 28979, 2005 WL
517328 (S.D.N.Y. 2005)...................................................................................6

Warner Brothers, Inc. v. American Broadcasting Companies, 720 F.2d 231
(2d Cir. 1983)..........................................................................................7, 9

Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996).......................................5, 14

Williams v. Deutsche Bank Securities, Inc., 2005 WL 1414436, *2-3
(S.D.N.Y. 2005).........................................................................................8, 9

## STATUTES AND RULES

17 U.S.C. §505...........................................................................................28

Federal Rules of Civil Procedure 12(b)(6)...............................................*passim*

Federal Rules of Civil Procedure 56(c).............................................6, *passim*

## PRELIMINARY STATEMENT

On this pre-answer, pre-discovery, motion to dismiss the Amended Complaint, the only question is whether a reasonable jury, properly instructed by the Court and according Plaintiff the benefit of all reasonable factual inferences, could conclude that Defendants' Script infringes Plaintiff's copyright in his Work; *i.e.*, that the two works are "substantially similar." In this Memorandum of Law, we will explain why a reasonable jury could reach that conclusion.

While Defendants argue ardently that the similarities between the two works are, as a matter of law, unprotectable, we respectfully disagree, and will explain why a reasonable jury, properly instructed by the Court, could conclude that the similarities between the two works are copyright protectable expression.

Defendants' approach is to parse the similarities, attempting to debunk each of them separately and eliminate them from the infringement analysis, which is contrary to the applicable caselaw. We submit that not only is Defendants' characterization of these similarities incorrect, but that additionally, a) the *totality* of the similarities between the works tells the true story of the infringement, that b) *dissimilarity* between some aspects of the works should not relieve the Defendants of liability for the parts that were appropriated, and that c) substantial similarity of dialogue may be found in analogous, paraphrased language. We further submit that a reasonable jury, properly instructed by the Court, would be entitled to consider the works as a whole and with these aforementioned principles in mind, in accordance with the "total concept and feel" test, and to conclude that there is substantial overall similarity between the two works.

1

Admittedly, Defendants have cited cases in which courts in this District, faced with particularly egregious examples of non-infringement, have dismissed the claims prior to trial. But most of the cases on which they rely were decided subsequent to the completion of discovery on summary judgment motions or after trial. This point could be particularly important here, because of Defendants' position with respect to independent creation and acess to plainitff's book (which was publicized in a leading New York City tabloid and sold on Amazon.com), since most if not all of the facts concerning access and independent creation are in Defendants' possession and would have to be ferreted out in discovery (for example, any purchases Defendants may or may not have made of Plaintiff's book).

Plaintiff should be permitted to develop a complete record during discovery with respect to the issue of access, independent creation, and all other relevant matters. This additional factor, along with the core factors noted above, argues strongly in favor of denying Defendants' motion.[1]

We now turn to a brief summary of the facts applicable to this pre-answer motion to dismiss. Our factual summary will be followed by our discussion of the applicable law with particular focus on why we believe that a reasonable jury could find in plaintiff's favor in this case.

---

[1] Even absent any direct proof of access, it is implied due to the sale of plaintiff's book on Amazon.com and its publicizing in a major New York metropolitan tabloid. Furthermore, access is conceded by Defendants for purposes of this Motion.

## STATEMENT OF FACTS

On or about March 25, 2008, Plaintiff Michael G. Porto filed his Amended Complaint (the "Complaint"), alleging, *inter alia,* that Defendants took the original novel which he had created, *Judas On Appeal* ("the Work" or "Plaintiff's Work"), and copied substantial portions of it (in fact, the "heart" of his story), incorporating these elements into a play, *The Last Days of Judas Iscariot,* which script was published in book form through two publishers ("the Script" or "Defendants' Script"). The Complaint contained the registration numbers which Mr. Porto received from the U.S. Copyright Office upon registering the Work. In his Complaint, Plaintiff also included a partial list of certain similarities found in the Work and the Defendants' Script which illustrated the nature of Defendants' copying. He alleged that these and other similarities were substantial, that they were found throughout the Defendants' Script, and concerned copyright-protectable expression from the Plaintiff's Work. Mr. Porto adequately alleged that Defendants had access to his Work.

Before any discovery was taken and before an answer was filed responding to the allegations in the Complaint, Defendants filed this motion to dismiss the Amended Complaint or in the alternative for summary judgment, also seeking an award of costs and attorneys' fees.

## ARGUMENT

### POINT I

### DUE TO THE HIGHLY FACTUAL NATURE OF THE INQUIRY REQUIRED, COPYRIGHT INFRINGEMENT CASES ARE RARELY DISMISSED ON 12(b)(6) MOTIONS AND MOTIONS FOR SUMMARY JUDGMENT ARE RARELY GRANTED

To state a claim for copyright infringement, a plaintiff must allege that (a) he is the rightful holder of a copyright in the original material allegedly infringed; and (b) that defendant copied his work without permission. *Nicholls v. Tufenkian Import/Export Ventures, Inc.*, 367 F.Supp.2d 514, 520 (S.D.N.Y. 2005)(citations omitted). Where no direct evidence of copying is available, copying may be shown indirectly by showing that defendants had access to the original work and that the two works are substantially similar. *Id* at 521. Because Defendants do not dispute that Plaintiff is the legal copyright holder of *Judas On Appeal*, and have for the purposes of this motion conceded access, the only remaining question is whether Plaintiff has adequately alleged that the two works are "substantially similar."

### A.    COPYRIGHT INFRINGMENT CLAIMS RARELY DISMISSED ON 12(b)(6) MOTIONS

In determining whether substantial similarity exists between two works, courts follow the "ordinary observer test;" that is, they attempt to determine "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Davidov v. Tapemeasure Enterprises, Inc.*, 1993 WL 88234 3 (S.D.N.Y., Mar 24, 1993). In light of the "ordinary observer test," it is not surprising that the courts have consistently held that, as Judge Patterson has stated, "[a] determination of

4

the extent of similarity that will constitute substantial similarity presents a highly fact specific question. For that reason, copyright cases are rarely dismissed on a 12(b)(6) motion." *Nicholls v. Tufenkian Import/Export Ventures, Inc.*, 2004 WL 13991873 (S.D.N.Y.)(citations omitted). "The question of substantial similarity should be reserved for the trier of fact- or at least the summary judgment stage." *Great Am. Fun Corp. v. Housing New York Trading Inc.*, 935 F.Supp. 488, 489 (S.D.N.Y. 1996). "A motion to dismiss is not the proper procedural mechanism to make this factual inquiry." *Cognotec Servs., Ltd. V. Morgan Guar. Trust Co. of New York*, 862 F.Supp. 45, 50 (S.D.N.Y. 1994).

Contrary to the suggestions of Defendants, courts do not tend to dismiss copyright claims on Rule 12(b)(6) motions. In fact, this procedure is almost never employed in copyright infringement cases concerning literary works. A case cited by Defendants for this proposition, *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996), did not address a motion to dismiss but rather an appeal from the district court's *granting summary judgment*—after the completion of all discovery. No discovery has been conducted in this case.

The other cases cited by Defendants purporting to endorse early dismissal each dismissed genuinely frivolous copyright claims, such as: an inmate's *idea* for a new magazine about his fellow convicts' interest in rap music. *Bell v. Blaze Magazine*, No. 99 Civ. 12342 (RCC), 2001 U.S. Dist. LEXIS 2783, at *8-9 (S.D.N.Y. Mar. 16, 2001). These cases were dismissed because, even if everything alleged in the Complaint were true, they were simply not valid copyright infringement claims.

This case, in contrast, concerns the *expressions* contained in Plaintiff's original book and subsequent use of these expressions in Defendants' Script and live performance, all in the context of a very similar, almost identical premise (i.e., both are fictional accounts of a modern-day trial of Judas Iscariot to decide whether or not his soul should be allowed into Heaven). These copyright-protectable expressions are substantially similar in each work, thus capable of supporting an infringement claim which cannot be definitively resolved at least until after the discovery process has run its course and regardless should appropriately be decided by a jury.

Lastly, Defendants have included voluminous extra-pleading materials (affidavits, exhibits) which the court may not properly consider. See *Twisted Records v. Rauhofer*, 2005 Copr. L. Dec. P 28979, 2005 WL 517328 (S.D.N.Y. 2005) (reliance on evidence outside the pleadings is improper on Rule 12(b)(6) motion).

## B.    SUMMARY JUDGMENT IS RARELY GRANTED

Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment only when "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed. 202 (1986). The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *Id.* at 256; See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The burden then shifts to the non-moving party to establish that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. A fact is "material," if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."

See Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001); Cruden v. Bank of New York, 957 F.2d 961 (2d Cir. 1992); Bickhardt v. Ratner, 871 F.Supp. 613 (S.D.N.Y. 1994)(Leisure, J.)).

In determining whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the moving party. See D'Amico v. City of New York, 132 F.3d 145, 148 (2d Cir. 1998), cert. denied, 141 L.Ed.2 151, 118 S.Ct. 2075 (1998). Disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment. If the party opposing summary judgment sets forth a reasonable interpretation of a material fact that conflicts with the interpretation suggested by the movant, then summary judgment must be denied. Schering Corp. v. Home Ins. Co., 712 F.2d 4 (2d Cir. 1983); New York State Energy Research and Development Authority v. Nuclear Fuel Services, Inc., 666 F.2d 787 (2d Cir. 1981).

In the context of copyright infringement, in order for summary judgment to be available, the lack of substantial similarity between the copyrightable aspects of the works must be "so clear as to fall outside the range of disputed fact questions," requiring resolution at trial. See Warner Brothers, Inc. v. American Broadcasting Companies, 720 F.2d 231 (2d Cir. 1983). Moreover, courts have traditionally frowned upon granting summary judgment in copyright infringement cases because substantial similarity is customarily an extreme question of fact. See Arnstein v. Porter, 154 F.2d 464 (2d Cir. 1946); see Hoeling v. Universal City Studios. Inc., 618 F.2d 972 (2d Cir. 1980).

Lastly, we would like to draw attention to Defendants' inclusion of an Affidavit from Stephen Adly Guirgis that speaks to the alleged independent creation of the Script.

Initially it must be noted that this is irrelevant in that the Defendants' motion is based upon a single ground, lack of substantial similarity. Its inclusion, however, can possibly be seen as a subtle attempt to influence the ultimate decision to its favor. However, all it actually does is highlight the fact that this pre-Answer attempt to dispose of the case is premature. It is manifestly unfair that the Defendants can include such an Affidavit without the Plaintiffs having the opportunity to conduct discovery regarding the issue of access and independent creation. Perhaps, for example, discovery would uncover the fact that Defendants or someone closely connected to Defendants purchased Plaintiff's book on Amazon.com (where it was and is still available for purchase). While not technically relevant to the substantial similarity analysis, this fact would surely weigh in the back of the minds of anyone analyzing the facts of this dispute. Instead, as it now stands, Defendants' affidavit remains unchallenged and only capable of prejudicing the Plaintiff's case.

## C.   PLAINTIFF HAS ADEQUATELY ALLEGED THE ELEMENTS OF A CLAIM OF COPYRIGHT INFRINGEMENT

On a 12(b)(6) motion, the Court is constrained to accept "as true the facts alleged in the complaint," and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Williams v. Deutsche Bank Securities, Inc.*, 2005 WL 1414435, *2-3 (S.D.N.Y. 2005) (*citing Thomas v. City of New York*, 143 F.3d 31, 36-37 (2d Cir. 1998); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699 (2d Cir. 1994)).

The "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,*, 79 F.3d 318, ,321 (2d Cir. 1996) (citations omitted). Because all reasonable inferences are to be drawn in the plaintiff's favor, this often makes it "difficult to resolve [certain questions] as a matter of law." *Williams*, 2005 WL 1414435 at *3 (citations omitted). On a 12(b)(6) motion the court is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). "The court's task on a Rule 12(b)(6) motion is not to rule on the merits of plaintiff's claims, but to decide whether, presuming all factual allegations in the complaint to be true, and drawing all reasonable inferences in the plaintiff's favor, the plaintiff could prove any set of facts which would entitle him to relief." *Weiss v. Wittcoff*, 966 F.2d 109, 112 (2d Cir. 1992) (citations omitted).

"As other courts have noted, the determination of the extent of similarity that will constitute substantial similarity—and hence an infringing similarity—presents one of the most difficult questions in copyright law." *Hogan v. DC Comics*, 983 F.Supp. 82, 86 (N.D.N.Y. 1997)(citing *Warner Bros., Inc. v. American Broadcasting Companies, Inc.*, 654 F.2d 204 (2nd Cir, 1981). In *Hogan*, on a motion for reconsideration the court adhered to its earlier ruling denying defendants' motion to dismiss plaintiff's complaint because the similarities alleged in the Complaint were not "clearly contradicted by the works themselves." *Hogan, supra,* 938 F.Supp. at 86. Even though the court viewed the listed similarities between the works as "arguably commonplace, or at least sometimes found in other works," it determined that plaintiff had met its *prima facie* burden because "on a motion to dismiss[,] the facts must be liberally construed in the light most favorable

9

to the plaintiff." *Id.*[2] Citing *Great Am. Fun* and *Cognotec*, the court in *Hogan* noted that the similarity determination was "necessarily fact specific," and while acknowledging that "few courts" have found lack of similarity as a matter of law, stated that "a court must be cautious of making that determination at such an early stage in the proceedings." *Id*.

Here, as in *Hogan*, Plaintiff has sufficiently alleged that Defendants copied the protected expression in his novel and has met his prima facie burden in this case, because Defendants have conceded access. The Complaint includes a partial example of similarities which are not "clearly contradicted" by a comparison of the two works at issue. And even if the similarities are considered "arguably commonplace, or at least sometimes found in other works" as Defendants have asserted (which characterization we deny), Plaintiff has still, as in *Hogan*, met his *prima facie* burden. Furthermore, we will submit a much more detailed list and analysis of the respective similarities in subsequent sections of this Memorandum.

Perhaps Defendants can reasonably argue to the contrary. But that is precisely the point. It is for the jury, after reading and reviewing the materials and assessing the arguments of counsel, to determine whether the works are substantially similar and unlawful appropriation of copyrightable material has occurred. On a motion to dismiss, where each and every one of Plaintiff's allegations must be taken as true and all

---

[2] The works in *Hogan* dealt with vampires. The list of similarities included: "...both protagonists are part human and part vampire;...both protagonists search to uncover their past;...both protagonists struggle with good and evil;...both protagonists have sinister genealogies;...both works involve initiation into the vampire world through killing others; and...both protagonists develop a romantic relationship with a woman vampire." *Hogan*, 983 at 86.

inferences drawn in Plaintiff's favor, this Court should deny Defendants' premature motion.

## POINT II

## UNDER THE "ORDINARY OBSERVER TEST" A REASONABLE JURY COULD FIND THAT DEFENDANTS UNLAWFULLY APPROPRIATED THE WORK

Unlawful appropriation exists if there is substantial similarity between the two works under the "ordinary observer" test, which asks "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work. *Ideal Toy Corp. v. Fab-Lu, Ltd.*, 360 F.2d 1021, 1022 (2d Cir. 1966); *Arica Inst. V. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992). "The key to the ordinary observer test is therefore the similarities rather than the differences." *Gund, Inc. v. Applause, Inc.*, 809 F.Supp. 304, 308 (S.D.N.Y. 1993). The test asks whether the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and describe the aesthetic appeal of the two works as the same." *Boisson v. Banian, Ltd.*, 273 F.3d 262 (2d Cir. 2001) (*citing Folio Impressions. Inc. v. Byer Cal.*, 937 F.2d 759 (2d Cir. 1991)).

It is unmistakable that there is substantial similarity between the respective works.

## A.    DEFENDANT ATTEMPTS TO ELIMINATE THE RESPECTIVE SIMILARITIES FROM THE INFRINGEMENT ANALYSIS CONTRARY TO THE PROPER APPLICATION OF THE ORDINARY OBSERVER TEST

Defendants repeatedly attempt to parse the similarities, attempting to debunk each of them separately. In doing so, Defendants attempt to discredit the expression and similarities as not unique enough and thus not to be considered in the substantial similarity analysis. However, the Plaintiff's Work was independently created and need

11

not be novel or unique. It does, however, possess "at least some minimum degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991).

Defendants also make a point to highlight their credentials and alleged quality of workmanship. This is entirely irrelevant to the analysis of this subject motion and can only have been included to gain favor with the Court and distract the reader, to divert attention away from the relevant, underlying facts (i.e., the substantial similarities).

Because originality of the author is a necessary condition to the validity of the copyright, it follows that a certificate of registration, properly obtained within the prescribed five-year period, constitutes *prima facie* evidence of the author's originality. *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 669 (3d Cir. 1990) (burden on defendant to prove "that the plaintiff's product was copied from other works or similarly probative evidence as to originality"). Thus, a court exercising the discretion reposed in it would usually be well advised to adhere to the rule under the 1909 Act according such certificate a *prima facie* presumption effect, absent circumstances that call into question the reliability of the facts contained in the certificate.

Thus, with respect to the issue of plaintiff's originality, upon introduction of a properly registered certificate the burden shifts to defendant to prove that plaintiff copied from a prior source and, hence, was not original. *Mulberry Thai Silks v. K & K Neckwear*, 897 F. Supp. 789, 792 (S.D.N.Y 1995). *Nor is it sufficient for defendant to offer evidence of prior similar works in the absence of evidence that plaintiff copied from such works. R. Dakin & Co. v. A&L Novelty Co.*, 444 F. Supp. 1080 (E.D.N.Y. 1978). See *Knickerbocker Toy Co. v. Winterbrook Corp.*, 554 F. Supp. 1309 (D.N.H. 1982), in which for purposes of defendant's motion for summary judgment, the court was

unwilling to assume that any of the features of plaintiff's Raggedy Ann and Raggedy
Andy dolls had been copied from the original illustrations contained in the Raggedy Ann
books. Therefore, *for purposes of deciding the subject motion, all of the distracting
third-party materials cited and included as exhibits in Defendants' motion papers
which were included to offer evidence of prior similar works, must be ignored.*

Defendants cherry-pick a handful of similarities, analyze them in a vacuum, out-
of-context, in order to eliminate them from the substantial similarity analysis altogether.
Plaintiff admits that some of these similarities, when taken completely out-of-context,
and analyzed piecemeal, may not be enough to cross the line into substantial similarity,
and thus, infringement. It is the *totality* of these similarities, when analyzed in context
*together*, that leads a reasonable observer to believe that infringement has occurred. This
is the essence of applying the "total concept and feel" principle.

Defendants' attempts to exclude the noted similarities from the analysis is
erroneous and contrary to precedent. Under this Circuit's "ordinary observer" test, the
court determines substantial similarity by comparing the works as a whole, including any
elements that may be uncopyrightable, and by asking whether the infringing work
captured the "total concept and feel" of the original from the viewpoint of an "ordinary
observer."

Application of the "ordinary observer" test, however, would focus on the impact
of the works as a whole, including their respective uses of *scenes a faire*, and might result
in a finding of substantial similarity based on the selection, coordination, and
arrangement of these historical vignettes. *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir.

2002) (overall selection and sequencing of generic plot and character elements may be protectible).

Clearly, even if some of the similarities are "non-actionable" in and of themselves as Defendants have erroneously asserted, the proper application of the "ordinary observer" test would mandate that they be considered in the substantial similarity analysis in this case.

## B.    DISSIMILARITIES DO NOT EXCUSE INFRINGEMENT

Defendants also attempt to highlight the various dissimilarities, often using their own opinions and (mis)characterizations of such dissimilarities. Defendants' assertions are their *opinions and (mis)characterizations* of the expressions being copied.

In undertaking the substantial similarity analysis, courts should be aware that

> *dissimilarity* between some aspects of the works will not automatically relieve the infringer of liability, for 'no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated.' It is only when similarities between the protected elements of plaintiff's work and the allegedly infringing work are of 'small import quantitatively or qualitatively' that the defendant will be found innocent of infringement.

*Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996)(quoting *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992)).

An infringer must not be permitted to "excuse the wrong by showing how much of his work he did not pirate," which would violate one of the most fundamental principles in all of copyright law. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) (L. Hand, J.). In this case, Defendants attempt to focus on dissimilarities (many of which we believe are mischaracterized as such) between the respective works with the aim of relieving the Defendants of liability for the actual

14

similarities that exist, similarities that speak to the very heart of Plaintiff's novel, and are thus of significant import, both quantitatively and qualitatively.

## POINT III

## COMPARATIVE ANALYSIS OF THE TWO WORKS EXHIBITING THAT THERE ARE TRIABLE ISSUES OF FACT WITH RESPECT TO SUBSTANTIAL SIMILARITY OF PROTECTABLE EXPRESSION

The most influential elements used to evaluate the overall impression created by the works at issue in a copyright infringement case are:

A.    PLOT/SEQUENCE OF EVENTS: the Plaintiff's Work is a fictional account of a modern-day trial of Judas Iscariot to decide whether or not his soul should be allowed into Heaven. Defendants' Script is also a fictional account of a modern-day trial[3] of Judas Iscariot to decide whether or not his soul should be allowed into Heaven. Both works take place in a modern courtroom setting wherein witnesses called to testify include, among others, Jesus, Satan, Caiaphas, Pontius Pilate, Peter (a.k.a. Simon) and both works incorporate a random combination of historical figures, with both works ultimately ending with Jesus forgiving Judas (or at least expressing some significant form of forgiveness) and in both works Judas finds himself in the "Kingdom" of Heaven.

B.    DIALOGUE: As will be set forth in greater detail below, there are many examples of dialogue extracted directly from the Plaintiff's Work and placed in the Defendants' Script, spoken by the same characters, under similar circumstances, for the

---

[3] Defendants attempt to characterize the Script as not taking place in a modern courtroom setting; however, it can not be denied that the trial of Judas in Defendants' Script is a trial following modern courtroom customs and procedures, containing participants dressed in modern apparel, and speaking in modern lingo and parlance; in other words, it gives the ordinary observer the impression of being a modern-day trial of Judas Iscariot.

same essential purpose. The only difference is that the Script paraphrases by using analogous words, usually in the form of a profanity-laced, clichéd urban vernacular. It is established in this Circuit that substantial similarity can be found in analogous language.

There are indeed contiguous expressive similarities in dialogue that are meaningful here. If not verbatim, the particular dialogue is near verbatim in meaning, and at the very least *analogous*. The syntax was simply changed to a clichéd, profanity-laced urban dialect in order to cosmetically mask the copying. Such similarities are self-evident and can be weighty. *Paramount Pictures Corp. v. Carol Publ'g Group*, 11 F. Supp. 2d 329, 333 (S.D.N.Y. 1998), aff'd, 181 F.3d 83 (2d Cir. 1999). Substantial similarity of dialogue may indeed also be found in analogous language.

C.      CHARACTERS: As noted above, many of the same characters appear in both works. And while Defendant argues that such characters would *have* to be included in a work on this given topic, this is not the end of the analysis. It's the combination of identical characters, examples of analogous dialogue, similar ending, similar premise, the similar roles that some of the same characters play in the respective works, etc. that is probative of infringement. And even many of the characters that appear in one of the works but not the other are similar to each other in that each are historical figures that are somewhat random (i.e., they are not Biblical or are not inherently relevant to a story about Judas Iscariot). For example, the Plaintiff's Work includes characters such as Karl Marx, John Calvin, and Aristotle, while Defendants' Script includes characters such as Mother Teresa and Sigmund Freud.

16

## D.    TOTAL CONCEPT AND FEEL

The amount of similarities which occur throughout the works certainly raise issues of fact and when taken together clearly state a claim for which relief may be granted and provide enough to survive a motion to dismiss at this early stage of litigation.

Numerous events occurring in a similar combination, or a parallel in the fictional relationships and interactions of the characters- in other words- similar events in similar sequence- is a key to finding substantial similarity. *Shaw v. Lindheim*, 919 F.2d at 1353, 13(9th Cir. 1990) ("Even if none of these plot elements is remarkably unusual in and of itself the fact that both scripts (entitled The Equalizer) contain all of these similar events should give rise to a triable question of substantial similarity of protected expression.").

In the instant case, we have more than just mere plot similarities; we have plot similarities *and* many examples of expression extracted from Plaintiff's Work and used in Defendants' Script. The similarities in the plot are accompanied by protected details of expression.

In a recent case in the Southern District of New York in which a copyright holder in a screenplay brought an infringement action against the publishers and author of a novel, the publisher brought a motion to dismiss. Judge Haight held that obvious differences between copyrighted screenplay and allegedly infringing novel did not preclude the conclusion that substantial similarity existed between those works. *Gal v. Viacom Intern., Inc.*, 403 F.Supp.2d 294 (S.D.N.Y. 2005). These obvious differences[4], which included character and subjects not found in the screenplay and a different way of

---

[4] Among the "obvious differences" between the Novel and the Screenplay: told through different viewpoints; the Screenplay had no character analogous to a significant character in the Novel, and the subject of terrorism is not in Defendants' work but is in Plaintiff's.

telling the story, did not preclude the conclusion that substantial similarity existed
between those works, where it was clear that there were similarities between those works
and enough specificity existed for allegations of infringement of copyrightable
expressions of ideas: "[d]espite differences between the Screenplay and the Novel, when
the similarities are viewed through the prism of Rule 12(b)(6) I am unable to conclude
that "no reasonable trier of fact could find the works substantially similar." (*Id.* At 307
citing *Walker*, 784 F.2d at 48). This is clearly the rationale that should be adhered to in
the instant case.

## F.    DETAILED COMPARATIVE ANALYSIS OF SIMILARITIES

### 1st Similarity- Both Works Fictional Accounts of Modern-Day Trial of Judas Iscariot To Decide Whether His Soul Should Be Allowed into Heaven

Plaintiff's book "Judas On Appeal" is a fictional account of a modern-day trial of
Judas Iscariot to decide whether or not his soul should be allowed into Heaven.
Defendants' Script "The Last Days of Judas Iscariot" is also a fictional account of a trial
of Judas Iscariot to decide whether or not his soul should be allowed into Heaven.
Defendants' counsel tries to distinguish the settings of the respective works by noting that
its script is not a modern-day trial, but instead takes place in a "time-bending" world.
However, despite Defendants' counsel's characterization, the impression on the ordinary
observer would be that of a modern-day courtroom setting when one considers the clearly
modern-day vernacular, clothing, courtroom procedures, etc. The key point is that it is
*not* a period piece taking place in the time that Judas Iscariot actually lived. As will be
expounded upon below, this is merely the starting point from which the many similarities
between the respective works should be compared, similarities that are not merely

18

uncopyrightable elements that must be excluded from the substantial similarity inquiry.
To the contrary, when one objectively reviews the many similarities of expression
between the respective works, the infringement is clear (or at the very least, a reasonable
trier of fact could find the works substantially similar).

## 2nd Similarity: Identical and Analogous Characters in Both Works; Many Identical Characters Serve Same Role in Both Works

Plaintiff's Work takes place in a modern courtroom setting wherein the witnesses
called to testify include, among others, Jesus, Satan, Caiaphas, Pontius Pilate, Peter
(a.k.a. Simon) and incorporates a random assortment of historical figures otherwise
irrelevant to a story about Biblical characters such as Judas (i.e., Aristotle, and Karl
Marx), ultimately ending with Jesus expressing forgiveness to Judas.

Defendants' Script also takes place in a modern courtroom setting (or at least a
courtroom within which many participants dress in modern clothing and speak in modern
vernacular and adhere to modern trial procedures) wherein the witnesses called to testify
include Jesus, Satan, Caiaphas, Pontius Pilate, Peter (a.k.a. Simon) and also incorporates
a random assortment of historical figures otherwise irrelevant to a story about Biblical
characters such as Judas (i.e., Sigmund Freud, Mother Teresa), and also ultimately ends
with Jesus expressing forgiveness to Judas.

These initial similarities set the tone and the context within which the subsequent,
detailed similarities must be analyzed (i.e., specific portions were lifted from Plaintiff's
Work and incorporated into Defendants' Script via paraphrasing and use of analogous
language).

### 3rd Similarity: Satan Appears in Both Works Dressed in Modern Formal/Semi-Formalwear and Speaks Some Virtually Identical Dialogue in Both

In plaintiff's book, Satan appears and testifies dressed in modern human formalwear – a black tuxedo, and testifies that Judas was *"easy,"* suggesting that no effort was required to obtain his soul- that Judas's soul was *"handed to him on a silver platter."* (Page 151) In Defendants' Script, Satan also appears similarly dressed in modern human semi-formalwear – a Gucci suit, and also testifies that he did not have to do anything to obtain Judas's soul- that Judas "...*didn't require nudging. Judas was a gimme...*" (Page 35).

Defendants try to disqualify this similarity (along with the others) by raising examples of other works that have had Satan dress in modern formalwear. This is an example of the Defendants cherry-picking a similarity completely out of context in an attempt to disqualify it from the substantial similarity analysis, which is contrary to the "total concept and feel" doctrine adhered to in this Circuit as well as the "ordinary observer" test, in which the court determines substantial similarity by comparing the works *as a whole*, including any elements that may be uncopyrightable.

While we strenuously would argue that these and all the other similarities are elements that are all copyrightable expression in and of themselves, the point here is that even if some of them were "uncopyrightable," they must still be considered in the substantial similarity analysis, despite defendants' suggestions to the contrary. The dialogue quoted here also illustrates an important point that is recurring throughout the respective works. Defendants' Script literally extracts dialogue from plaintiff's book and simply paraphrases it using analogous language. The fact that Defendants' characters paraphrase using a lot of profanity and clichéd "urban" vernacular does not change this

20

fact. And as was discussed in earlier sections of this Memorandum, it is well established that substantial similarity of *dialogue* may be found in *analogous language*. Judge Weiner of the Fifth Circuit provided this explanation:

> As an analogy, consider the familiar quote from *Romeo and Juliet*: "O Romeo, Romeo! Wherefore art thou Romeo?" Reformulating this quote in a manner analogous to LSI's modification of K-T's copyrighted language, we might write: "Ah Romeo, Romeo! Why did you have to be born Romeo?" Are these two quotes alike only in conceptual substance? Obviously not! Yes, they both express the same concept: why did Juliet have to fall in love with Romeo, scion of Montague- her family's bitterest foe? But they are also quite alike in expression. They are not identical, but they are alike. Both sentences embrace the dramatic repetition of Romeo's name. Both sentences are phrased as questions. Both have the quality of a sigh: the gasping resignation of a woman marveling at the fateful irony of life. Although the two sentences are not identical, they are manifestly similar in expression, as well as in conceptual content.

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 535-36 (5th Cir.).

## 4th Similarity: Satan, as a Witness, Ridicules The Lawyer Questioning Him in Both Works

In pages 149- 150 of Plaintiff's Work, Satan ridicules the questioning lawyer by emphasizing where his soul was (in Hell). The lawyer (Calvin) responds as follows: "I have told the court of my soul's residence. It does not seem necessary to attempt to ridicule me further." In Defendants' Script at page 66, Satan also ridicules the lawyer (Cunningham) in this profanity-laced diatribe:

> Satan: You know what, Cunningham: all those excuses you got wedged between that dubious cleavage of yours: your mother, the bulimia, the herpes, the booze, the abortions, the rape, the bipolar pharmaceutical adventures, the twin suicide attempts and the abject failures at every relationship you ever attempted- all those things do nothing to band-aid the simple fact that there comes a time when the world stops rewarding potential- and when that time came for you, you threw yourself the world's biggest pity party and dedicated the rest of your short, pathetic, inconsequential life to finding fault everywhere fuckin' else but in the return gaze of your own cosmetically altered reflection. Okay?

5ᵗʰ Similarity: The Theme of Despair Addressed by Satan on The Witness Stand in Both Works

In Plaintiff's Work, the following dialogue takes place at Page 150:

Calvin (lawyer):    Did you know Judas Iscariot was completely filled with remorse when he realized Jesus Christ was going to be crucified?

Satan:    Yes, I knew.

Calvin:    Did you know Judas Iscariot was in complete despair, and he would then go hang himself from a tree?

Satan:    Yes, I did.

In Defendants' Script, the following dialogue is spoken by Satan to Cunningham on Page 69:

Satan:    Your client succumbed to despair–

This is another example of the common, similar themes and dialogue that exist between the respective works.

6ᵗʰ Similarity: Testimony of Caiaphas

In Plaintiff's book, Caiaphas testifies that Judas had blasphemed (Page 110), that Caiaphas feared Roman reprisals (Page 112) and that he did not approach Judas about betraying Jesus (Page 111). In Defendants' Script, Caiaphas similarly testifies that Judas had blasphemed (Page 51), also testifies that he feared Roman reprisals (Page 52), and also testifies that he did not approach Judas about betraying Jesus (Page 47).

Again, this and the other similarities should not be analyzed in a vacuum, out of context. This and the other similarities should be analyzed in the context of the other

22

many direct similarities between the respective works, which leads to the substantial similarity in the "total concept and feel" of the respective works.

## 7th Similarity: Testimony of Peter/Simon

In Plaintiff's book, Peter/Simon recounts on the witness stand the events at the Last Supper when Jesus told Judas to betray him with Jesus stating *"What thou hast to do, do it quickly."* (Page 44) In Defendants' Script, Peter/Simon similarly recounts this event on the witness stand, indicating that Jesus said the following to Judas: *"do what you gotta do."* Again, specific dialogue extracted from Plaintiff's Work and incorporated into Defendants' Script, simply changing the wording to use analogous, modern-day vernacular. While the two sentences are not identical, they are manifestly similar in expression, as well as in conceptual content.

Furthermore, let's not lose sight of the fact that every time the Defendants' Script uses modern-sounding prose like this (which is used throughout the script), it clearly establishes in the mind of the ordinary observer that this story takes place in a modern setting, as does Plaintiff's story.

## 8th Similarity: Testimony of Pontius Pilate

In Plaintiff's Work, Pontius Pilate disparages the Jewish people in his testimony and further refers to the killing of Jesus as merely resulting in "one less Jew." In Defendants' Script, Pontius Pilate similarly disparages the Jewish people while testifying and similarly is asked if he considered Jesus to be merely "one more Jew." Specifically (all emphasis added):

### In Plaintiff's Work (Page 126):

Pilate: Since he [Jesus] was a Jew, it made not a bit of difference to Rome. *One less Jew* did not mean the end of the world.

23

In Defendants' Script (Page 62):

Attorney speaking to Pilate:   I think, Mr. Pilate, that what you saw before you that morning was just *one more Jew*, and you didn't hesitate.

Again, Defendants would like the court to ignore this similarity due to the fact that the anti-Semitism of Pilate is a common theme. This may be the case, but once again this would be taking this direct similarity out of context (and would also be asking the Court to consider the exhibits attached to Adam D. Siegartel's Affidavit) which are not allowed to be considered at this time, as discussed earlier in the Memorandum). The similarity goes further than the "idea" that Pilate was anti-Semitic. In both works Pilate testifies in a modern courtroom setting and disparages Jews in that setting. And in both sections of both works, the killing of Jesus is referred to as resulting in "one less Jew" (Plaintiff's Work), and "one more Jew" (Defendants' Script) respectively. The extreme similarity of the prose used in very similar context is impossible to ignore, especially when viewed in the context of the overall similarities of the respective works and the other multiple, specific similarities in dialogue.

9th Similarity: Suggestion that Trial of Judas Granted By God

In both works, the hearing/trial of Judas was granted/approved by God or suggested to have been granted by God. Specifically, in Plaintiff's Work, Mr. Worthington (CEO of the television station) states "Judas Iscariot has been granted a hearing on his appeal to enter Heaven..." and then Michael Sarto states: "Who granted the hearing for the appeal?" Mr. Worthington responds "How am I to know? I guess it had to be God Himself..." (Pages 3-4). In Defendants' Script, the court session commences with the bailiff calling "God and the Kingdom of Heaven and Earth versus

24

Judas Iscariot"! (Page 15). The Judge then yells at the bailiff to which the bailiff

responds: "She got a writ signed by God, sir." Cunningham, the lawyer then states "Your

Honor, this petition is signed by God." (Page 17).

## 10th Similarity: Similar Testimony of Caiaphas

In Plaintiff's Work, Caiaphas testifies as a witness as he does in Defendants'

Script. In Plaintiff's Work, the following takes place (emphasis added):

Attorney:    "Why did you vote to arrest Jesus Christ? Did He commit a crime of some
             sort?:

Caiaphas:    "He had committed the crime of *blasphemy*."

In Defendants' Script, the following takes place:

Caiaphas The Elder:  Jesus was a *blaspheming*, seditious rabbi, and I did not know for
                     sure that he would be killed.

In Plaintiff's Work:

Attorney:    *Did you or anyone else from the Sanhedrin approach Judas Iscariot and
             make him an offer of some kind to induce him to betray Jesus Christ?*

Caiaphas:    *No, I did not...*

In Defendants'Script:

Cunningham (attorney):    "...Caiaphas the Elder, I must ask you again: *Did you
                         approach Judas Iscariot about betraying his leader and
                         Messiah, Jesus of Nazareth?*

Caiaphas The Elder:    *I did not.*

In Plaintiff's Work:

Caiaphas:    Jesus Christ was preaching doctrines which were contrary to our beliefs.
             Since we were under the yoke of the Romans, we feared reprisals. It was
             something that was not wanted. I'm speaking of Roman reprisals.

In Defendants' Script:

Caiaphas:    The words and deeds of Jesus were leading towards rebellion – and the price of rebellion under Roman rule was a bloodbath. A massacre, Counselor. So I determined that it were better to have one man dead than a thousand – that's why.

Clearly, there are multiple direct similarities in the content of the testimony of Caiaphas in both works. In fact, there are multiple points of dialogue that are extracted from Plaintiff's Work, to be merely paraphrased in Defendant's Script: a) the subject of blasphemy, b) the attorney asking Caiaphas if he approached Judas about betraying Jesus, and then c) in his identical response "I did not" in both works.

## 11th Similarity: Suggestion that Judas Would Have Been Better Off Had He Never Been Born

In Plaintiff's Work, Peter states the following while on the witness stand recounting what transpired between Jesus and Judas (Pages 43-44): "...The Master said to Judas, 'The Son of Man indeed goes His way, as it is written of Him, but woe to that man whom the Son of Man is betrayed. It is better for that man if he had not been born.'

In Defendants' Script, the following dialogue transpires (Page 39):

Satan:    Right, I'd say that if this clown we're talking about betrayed the Messiah, that, probably, "*it would've been better for that man if he had never been born*"

Judas:    Never been born?!

Satan:    Hey—you asked.

26

## 12th Similarity: The Theme of Predestination Is Addressed in Both Works

Despite Defendants' assertions to the contrary, the theme of predestination is present in their Script (and is also a predominant theme in Plaintiff's Work). For example, this theme is suggested at the bottom of Page 43 when Sigmund Freud states "Pre-programmed, yes" and further testifies on Page 44 ""An ounce of prevention is worth a pound of cure"---the person who could have prevented this tragedy was Jesus, not Judas. He chose not to." This statement suggests the logical extension and result of Jesus' choice to not prevent Judas' betrayal—that it was predestined.

Furthermore, as previously noted, this concept of predestination is suggested in Defendants' Script when Peter/Simon recounts the events of the Last Supper when Jesus says to Judas: "do what you gotta do."

## 13th Similarity: Jesus Expresses Forgiveness To Judas At the End of Both Works

In Plaintiff's Work, Jesus ultimately expresses forgiveness to Judas in the following passage: "...My Father has offered forgiveness to Judas Iscariot. He has instructed Peter, the Gatekeeper of Heaven, to allow the soul of Judas Iscariot to enter the Kingdom of Heaven immediately." (Page 305)

In Defendants' Script, Jesus states the following to Judas:

Page 72: "...I love you, Judas. And all I want---all I want—is to be not just near you--but WITH you."

Page 73: "Judas- What if I were to tell you that you are not here? That you are with me in my kingdom even now, and that you have been there since the morning of my ascension and that you have never left?"

27

Furthermore, in Defendants' Script, the following happens at the very end of the play: "Jesus sighs, takes off his shirt, plunges it in the bucket, rinses, and begins to wash Judas' feet..." This is how the Script ends. (Page 77)

Essentially, both works end with Jesus expressing or suggesting forgiveness to Judas. In both endings, it is suggested that Judas is in Jesus' "Kingdom." In Defendants' Script, Jesus expresses forgiveness to Judas three separate times (through actions as well as words) and in Plaintiff's Work it is expressed in the quote noted above.

In summary, a review of each work will show that the "total concept and feel" of the two works are substantially similar. This is exactly the determination that a lay-observer juror would be most qualified to make and therefore must be allowed to do so. Thus, Defendants' motion to dismiss or in the alternative for summary judgment should be denied, and Plaintiff should be allowed to have an impartial jury review the merits of his case and find that Defendants copied his original work.

The amount of similarities which occur throughout the works and are set forth in detail above, definitely raise issues of fact and when taken together clearly state a claim for which relief may be granted and provide enough to survive a motion to dismiss at this early stage of litigation.

## POINT IV

## ATTORNEY'S FEES ARE NOT AUTOMATICALLY AWARDED TO A PREVAILING PARTY

The Copyright Act provides that a "court in its discretion may allow the recovery of full costs by or against any party...[and] may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. §505. The legal standard to apply

when deciding whether to award attorneys' fees is the same for plaintiffs and defendants. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994). However, prevailing party status does not automatically require an award of attorney's fees. "The word 'may' [in section 505 of the Copyright Act] clearly connotes discretion...The automatic awarding of attorney's fee to the prevailing party would pretermit the [court's] exercise of that discretion." *Id.* at 533.

## POINT V

## OBJECTIVE REASONABLENESS OF PLAINTIFF'S CLAIMS IS THE PARAMOUNT ISSUE

In determining whether an award of attorney's fees is warranted, the district court must consider several factors directly related to the non-prevailing party's claims and conduct including, but not limited to: frivolousness; improper motivation; bad faith; objective reasonableness; the need, if any, to advance considerations of compensation and deterrence; and whether imposing an award advances the purpose of the Copyright Act. *Fogerty*, 510 U.S. at 534 fn.19 *citing Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 156 (1986). The objective reasonableness factor is accorded substantial weight in this Circuit because "[T]he imposition of a fee award against a copyright holder with an objectively reasonable litigation position will generally not promote the purposes of the Copyright Act," *Matthew Bender & Co. v. West Publishing Co.*, 240 F.3d 116, 121-122 (2d Cir. 2001) and "may chill litigation of close cases, preventing the clear demarcation of the boundaries of copyright law." *Hofheinz v. AMC Products*, No. 00 Civ 5827, 2003 U.S. Dist. LEXIS 16940, at *17 (E.D.N.Y. Sept. 1, 2003) citing *Fogerty*, 510 U.S. at 527,

29

The facts in this case conclusively prove that Plaintiff's claims are objectively reasonable.

## POINT VI

## AWARDING ATTORNEYS' FEES WOULD NOT FURTHER THE PURPOSE OF THE COPYRIGHT ACT

The "principle purpose of the [Copyright Act] is to encourage the origination of creative works by attaching enforceable property rights to them." *Matthew Bender & Co. v. West Publishing Co.*, 240 F.3d at 122. An author's right, under the Copyright Act, to secure a fair return for his creative labor serves as an important incentive in achieving the ultimate aim of the Copyright Act (i.e. to stimulate artistic creativity for the general public good). *Fogerty v. Fantasy, Inc.*, 510 U.S. at 526-527. "To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement." *Id* at 527. Because the purpose of the Copyright Act may be furthered by both the prosecution of, or the defense against, a meritorious copyright claim, the fact that a defendant successfully prevails against a copyright holder with a meritorious claim does not mean that an award of attorney's fees to the prevailing defendant "furthers the purpose of the Copyright Act."

Second, an award of fees in favor of Defendants in an action such as this would have a "chilling effect on future plaintiffs seeking to protect their copyrights…[Plaintiffs] would have to choose between losing their rights or risking that a court might disagree with them as to infringement and award substantial fees." *Great Importations, Inc. v. Caffco International, Inc.*, No. 95 Civ. 0514, 1997 WL 603410, at *1 (S.D.N.Y. Sept. 30, 1997).

## POINT VII

## PLAINTIFF'S ACTION NOT MOTIVATED OR CONDUCTED IN BAD FAITH

Courts will not impose an award of attorney's fees in instances where the non-prevailing party's claim was not improperly motivated or litigated in bad faith. Defendants refer to the series of four letters (included as Exhibit 13 to Adam D. Siegartel's Affidavit) exchanged between Plaintiff's prior counsel and Stephen Adly Guirgis' prior counsel before Plaintiff filed his Complaint as evidence of bad faith in order to support this request. Siegartel's Affidavit correctly states that infringement was alleged and that Plaintiff's counsel wrote on December 21, 2007 that "the concept of Judas receiving forgiveness by Jesus Christ as set forth in a modern courtroom scene" is an "idea." Obviously, Plaintiff's prior counsel did not have the necessary expertise in copyright law to fully set forth the full and true nature and extent of the infringement claim as subsequently set forth in the Amended Complaint and this Memorandum. Therefore, Mr. Guirgis' counsel in two separate letters predictably rejected the claim of copyright infringement, explaining that copyright protection only extends to the expression of ideas and not the ideas themselves and that plaintiff's counsel had not demonstrated that Mr. Guirgis had infringed upon plaintiff's protectable expression. Of course, Plaintiff went on to hire new counsel and the full nature and extent of the alleged infringement has since been set forth in much greater specificity and clearly extends well beyond the mere "idea" of Judas receiving forgiveness by Jesus Christ as set forth in a modern courtroom scene.

Furthermore, Siegartel's Affidavit attaches as Exhibit 14 a June 26, 2008 letter from myself in which I "concede that it "is clear" that a "a modern-day trial of Judas Iscariot to decide whether or not his soul should be allowed into Heaven" is "an idea, one that is not entitled to protection."" This is a transparent attempt to take my words, and the nature of Plaintiff's claim, completely out of context. It is also symptomatic of the consistent strategy employed by Defendants throughout their motion papers- to attempt to cherry-pick points that are convenient to Defendants' position and analyze them completely out of context. In fact, my letter stated the following on Page 3:

> The nature of the copying herein is not necessarily exact; the defendants instead literally take up to twenty-five original, protectible elements of expression from plaintiff's book and incorporate them into his own screenplay using a different syntax and grammatical structure. Substantial similarity of *dialogue* may be found in *analogous language*. This copying of the approximately twenty-five elements must not be considered out of context; instead, these approximately twenty-five substantial similarities between the respective works should be analyzed in the context of the practically identical premise shared by the works: a modern-day trial of Judas Iscariot to decide whether or not his soul should be allowed into Heaven. Again, it is clear that this idea and premise, *in and of itself, is just that: an idea, one that is not entitled to protection. However, when the approximately twenty-five additional similarities, all of which never took place in the Bible, are analyzed within the context of the practically identical overriding premise, the infringement becomes much clearer. (emphasis added)* These..similarities...are not mere stock plot devices, general plot outlines or superficial similarities. Instead, defendants' screenplay incorporates specific events, discussions, and outcomes, that when taken together as a whole, are not mere skeleton similarities; instead, they rise to the level of substantial similarity...

Clearly, Plaintiff's actions are not conducted in bad faith but instead motivated by a legitimate desire to enforce his rights under the Copyright Law (which was also exhibited well prior to Defendants writing the infringing Script through the proper registration of his book with the Copyright Office as well as with the Writer's Guild of America, East (dated 4/23/1999)).

32

## CONCLUSION

Defendants' motion to dismiss or in the alternative for summary judgment should be denied in its entirety, as there are numerous material issues of fact that can only be resolved by a jury; Furthermore, Defendants' motion for an award of costs and attorneys' fees should be denied and the parties should proceed to discovery.

Dated: New York, New York
August 18, 2008

THE DORF LAW FIRM, LLP

By: _Darren M. Geliebter_

Darren M. Geliebter (DMG-0665)
845 Third Avenue, 6th Floor
New York, NY 10022
(212) 233-4444
*Attorneys for Plaintiff*

33

## CERTIFICATE OF SERVICE

On the 18th day of August, 2008, a true and correct copy of PLAINTIFF'S

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO

DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT AND FOR AN

AWARD OF COSTS AND ATTORNEYS' FEES UNDER 17 U.S.C. §505 was served

via e-mail and first-class mail, to the following attorneys representing the Defendants:


Charles S. Sims
Adam D. Siegartel
Proskauer Rose LLP
1585 Broadway
New York, NY 10036
Tel: 212-969-3000
Fax: 212-969-2900
*Counsel for Defendants*


August 18, 2008

Darren M. Geliebter (DMG 0665)
The Dorf Law Firm, LLP
845 Third Avenue, 6th Floor
New York, NY 10022
(212) 233-4444
*Attorney for Plaintiff*