Charles S. Sims
Adam D. Siegartel
Proskauer Rose LLP
1585 Broadway
New York, New York 10036
Tel: 212.969.3000
Fax: 212.969.2900
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MICHAEL G. PORTO (a.k.a. GUY MICHAELS) | : | |
| Plaintiff, | : | Civil Action No. 08 Civ. 1228 (LTS)(GWG) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN ADLY GUIRGIS, LABYRINTH THEATER COMPANY, PHILIP SEYMOUR HOFFMAN, FABER AND FABER, INC., AND DRAMATISTS PLAY SERVICE, INC., | : | **ORAL ARGUMENT REQUESTED** |
| | : | |
| Defendants. | : | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT, AND FOR AN AWARD OF COSTS AND ATTORNEYS' FEES UNDER 17 U.S.C. § 505**

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ............................................................................. 1

REPLY ARGUMENT ........................................................................................ 3

I.  Uncopyrightable Elements Must Be Excluded ...................................... 3

II.  The Court May – And Should – Consider The Materials Attached To
Defendants' Motion ........................................................................... 4

III.  The Parties' Works Are Radically Different In All Meaningful Respects,
Including Total Concept And Feel ........................................................ 7

A.  Plaintiff Does Not Rebut – And Generally Ignores – Defendants'
Arguments ............................................................................. 7

B.  Plaintiff's New Alleged Similarities Are Also Unprotectable Or
Mischaracterize The Parties' Works ........................................ 8

IV.  Plaintiff Does Not Oppose Dismissal Of Plaintiff's Claims For Indirect
Infringement And Common Law Unfair Competition ............................ 11

V.  Defendants Are Entitled To Reasonable Attorneys' Fees And Costs Under
17 U.S.C. § 505 – Plaintiff's Claims Are Objectively Unreasonable, And
Although Bad Faith Is Not Required, Plaintiff Has Litigated In Bad Faith As
Well .................................................................................................. 12

CONCLUSION ................................................................................................ 14

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Boisson v. Banian, Ltd.*,
    273 F.3d 262 (2d Cir. 2001).........................................................................3

*Brown v. Perdue*,
    No. 04 Civ. 7417 (GBD), 2005 U.S. Dist. LEXIS 15995 (S.D.N.Y. Aug. 4, 2005) .............5, 6

*CBS Broadcasting Inc. v. ABC, Inc.*,
    No. 02 Civ. 8813 (LAP), 2003 U.S. Dist. LEXIS 20258 (S.D.N.Y. Jan. 13, 2003).............3, 10

*Chivalry Film Prods. v. NBC Universal, Inc.*,
    No. 05 Civ. 5627 (GEL), 2007 U.S. Dist. LEXIS 86889 (S.D.N.Y. Nov. 27, 2007)........12, 13

*Douglas v. Osteen*,
    No. 07-3925, 2008 U.S. Dist. LEXIS 40152 (E.D. Pa. May 16, 2008)...................................6

*Flaherty v. Filardi*,
    388 F. Supp. 2d 274 (S.D.N.Y. 2005)..................................................................4

*Gal v. Viacom Int'l, Inc.*,
    518 F. Supp. 2d 526 (S.D.N.Y. 2007)..................................................................5

*Knitwaves, Inc. v. Lollytogs Ltd.*,
    71 F.3d 996 (2d Cir. 1995)..................................................................................3

*Mallery v. NBC Universal, Inc.*,
    No. 07 Civ. 2250 (DLC), 2007 U.S. Dist. LEXIS 88960 (S.D.N.Y. Dec. 3, 2007)....10, 11, 13

*Screenlife Establishment v. Tower Video, Inc.*,
    868 F. Supp. 47 (S.D.N.Y. 1994) ..................................................................12

*Silberstein v. Fox Entm't Group, Inc.*,
    424 F. Supp. 2d 616 (S.D.N.Y. 2004)..................................................................3, 11

*Tabachnik v. Dorsey*,
    No. 04 Civ. 9865, 2005 U.S. Dist. LEXIS 14267 (S.D.N.Y. July 15, 2005), *aff'd*
    257 Fed. Appx. 409 (2d Cir. 2007)..................................................................5

*Torah Soft Ltd. v. Drosnin*,
    136 F. Supp. 2d 276 (S.D.N.Y. 2001)..................................................................5

*Twentieth Century Fox Film. Corp. v. Marvel Enters.*,
    155 F. Supp. 2d 1 (S.D.N.Y. 2001) ..................................................................4

*Twentieth Century Fox Film. Corp. v. Marvel Enters.,*
    220 F. Supp. 2d 289 (S.D.N.Y. 2002).................................................................................4-5

*Twisted Records, Inc. v. Rauhofer,*
    No. 03 Civ. 2644 (DF), 2005 U.S. Dist. LEXIS 3313 (S.D.N.Y. Mar. 3, 2005).......................5

*U2 Home Entm't, Inc. v. Kylin TV, Inc.,*
    No. 06-CV-02770 (DLI) (RLM), 2007 U.S. Dist. LEXIS 50131 (E.D.N.Y. July 11,
    2007) ...............................................................................................................................4

*Warner Bros, Inc. v. Am. Broad. Cos.,*
    720 F.2d 231 (2d Cir. 1983)...............................................................................................4

*Williams v. Crichton,*
    84 F.3d 581 (2d Cir. 1996)...........................................................................................3, 10

*Williams v. Crichton,*
    891 F. Supp. 120 (S.D.N.Y. 1994) ..............................................................................12, 13


STATUTES

Copyright Act, 17 U.S.C. § 505...............................................................................2, 11, 12, 13


OTHER AUTHORITIES

F.R.E. 201 ...........................................................................................................................1, 4

F.R.E. 201(b).........................................................................................................................4

F.R.E. 201(d).........................................................................................................................4

F.R.E. 201(f) ........................................................................................................................4

Rule 12 .................................................................................................................................5

Rule 12(b)(6).........................................................................................................................5

Rule 56 .................................................................................................................................5

## PRELIMINARY STATEMENT

Plaintiff's and defendants' works are fundamentally dissimilar and plaintiff cannot – and does not – present anything that can change or obscure this dispositive fact. The court need only read plaintiff's novel and defendants' script (or watch defendants' play) to have all of the information it needs to conclude that no reasonable factfinder could find in plaintiff's favor on the issue of substantial similarity. Plaintiff hinges his case on the "total concept and feel" of the parties' works, but not only is the total feel of the works radically different, but so is each element that comprises this overall feel, including story and narrative structure, language, plot, setting, theme, tone, and every other meaningful variable that can be used to compare creative texts.

The fundamental differences between defendants' play and plaintiff's novel are inescapable when the works are considered in their entirety – and indeed defendants urge the court to read both parties' works in full in order to fully appreciate their differences. However, plaintiff is mistaken when he argues that uncopyrightable elements may be included in the substantial similarity analysis. The Southern District of New York and the Second Circuit Court of Appeals have repeatedly and uniformly concluded that uncopyrightable elements (*e.g.*, ideas and well-established historical facts) must be excluded from the substantial similarity inquiry – and many legal citations to this effect are included below. Although plaintiff in his memorandum of law (MOL) criticizes defendants for "parsing" the alleged similarities (at 1, 11), examining – and discarding – unprotectable elements is proper and in keeping with the exclusion of such elements from the substantial similarity analysis.

Plaintiff also incorrectly argues that this Court must consider the parties' works in a vacuum, and may not take judicial notice of Biblical passages, well-established theological concepts, historical facts, and other unquestionably authentic materials as part of the substantial similarity analysis. In accordance with Rule 201 of the Federal Rules of Evidence, courts routinely take judicial notice of such facts and materials at the motion to dismiss stage in substantial similarity

copyright cases. Furthermore, plaintiff myopically characterizes defendants' motion as only one to dismiss, when defendants' motion is one to dismiss or in the alternative for summary judgment.

Accordingly, for the reasons discussed in defendants' opening papers and in this reply, the court should grant defendants' motion and hold that as a matter of law, defendants' play *The Last Days of Judas Iscariot* is not substantially similar in protectable expression to *Judas on Appeal*.

Moving beyond plaintiff's claim for direct infringement, plaintiff offers no response to defendants' argument that there can be no contributory or various infringement without direct infringement, and accordingly plaintiff's indirect infringement claims must be dismissed as well. Similarly, Plaintiff does not devote even a single sentence to rebutting defendants' argument that plaintiff's common law unfair competition claim is preempted by the Copyright Act. As discussed in defendants' opening MOL (at 32-33), courts have repeatedly held such common law unfair competition claims preempted, and the same result is warranted here.

Finally, defendants are entitled to their reasonable attorneys' fees and costs under the Copyright Act, 17 U.S.C. § 505 – a frequent result following a grant of summary judgment or a motion to dismiss on substantial similarity grounds. Plaintiff *agrees* that objective unreasonableness is the "paramount issue" in the context of fees and costs (plaintiff's MOL at 29). Plaintiff, however, asserts without any legal support that there can be no objective unreasonableness without bad faith (plaintiff's MOL at 31). Defendants already demonstrated in their opening MOL (at 34) that this is incorrect, and as elaborated below courts routinely award attorneys' fees and costs on the basis of objective unreasonability without also finding bad faith. Here, plaintiff's claims are not only objectively unreasonable but frivolous, and a costs and fees award is warranted and appropriate.

For these reasons and the reasons included in defendants' initial moving papers, defendants respectfully submit that this court should grant defendants' motion in full.

# REPLY ARGUMENT

## I.    Uncopyrightable Elements Must Be Excluded

Defendants agree that the "total concept and feel" of the parties' works are relevant.  Indeed, defendants included a section specifically devoted to "overall thrust, mood, and feel" in their opening memorandum of law (at 31).  However, uncopyrightable elements must be excluded from the substantial similarity analysis, including when assessing the total feel of the works, and plaintiff is wrong to argue otherwise.[1]

For example, the Second Circuit has instructed that "[w]hen we determine that a work contains both protectible and unprotectible elements, *we must take care to inquire only whether the protectible elements standing alone are substantially similar.*"  *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996) (emphasis added).  The *Williams* court expressly considered the "total concept and feel" of the works as well as plot, characters, setting, and other variables, and ultimately concluded that "nearly all the similarities between the works arise from noncopyrightable elements, and thus the district court correctly concluded that the works are not substantially similar."  *Id.* at 588-89; *see also Silberstein v. Fox Entm't Group, Inc.*, 424 F. Supp. 2d 616, 631 (S.D.N.Y. 2004) (an evaluation of substantial similarity requires "a careful assessment of the 'total concept and feel' of the works at issue, *after the non-protectible elements have been eliminated from consideration*") (emphasis added; citing *Boisson v. Banian, Ltd.*, 273 F.3d 262 (2d Cir. 2001) and *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996 (2d Cir. 1995)).[2]

---

[1] *See, e.g.,* plaintiff's MOL at 20 (mistakenly arguing that within the Court's ordinary observer test, "the court determines substantial similarity by comparing the works *as a whole*, including any elements that may be uncopyrightable") (emphasis in original).

[2] *See also CBS Broadcasting Inc. v. ABC, Inc.*, No. 02 Civ. 8813 (LAP), 2003 U.S. Dist. LEXIS 20258, at *14 (S.D.N.Y. Jan. 13, 2003) ("Accepting an overly broad scope for protective total concept and feel threatens the basic principal [sic] of copyright law: That concepts and ideas may not be copyrighted and that only a particular expression of an idea may be copyrighted").

Similarly, courts have repeatedly held that a court may determine non-infringement as a matter of law "either because the similarity between the two works *concerns only non-copyrightable elements of the plaintiff's work* or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *See, e.g., Flaherty v. Filardi*, 388 F. Supp. 2d 274, 286 (S.D.N.Y. 2005) (emphasis added; internal ellipsis omitted; quoting *Warner Bros, Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 239-40 (2d Cir. 1983)) (Swain, J.). Here, defendants' motion should be granted for *both* of these reasons.

**II.    The Court May – And Should – Consider The Materials Attached To Defendants' Motion**

Rule 201 of the Federal Rules of Evidence instructs that a court may take judicial notice of a fact that is "not subject to reasonable dispute." Such facts are defined as either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See* F.R.E. 201(b). The rule instructs that it is mandatory for the court to take judicial notice "if requested by a party and supplied with the necessary information." *See* F.R.E. 201(d). Finally, "judicial notice may be taken at any stage of the proceeding." *See* F.R.E. 201(f).

Accordingly, in infringement cases courts routinely take judicial notice of relevant materials, including at the motion to dismiss stage. *See, e.g., Twentieth Century Fox Film. Corp. v. Marvel Enters.*, 155 F. Supp. 2d 1, 41 and 41 n.71 (S.D.N.Y. 2001) (citing F.R.E. 201 and taking notice of "generalized plot scenario . . . common to fiction in general and science fictional works in particular," as it is "a matter of common and general knowledge in its jurisdiction"); *Twentieth Century Fox Film. Corp. v. Marvel Enters.*, 220 F. Supp. 2d 289, 296 (S.D.N.Y. 2002) (taking judicial notice of website content); *U2 Home Entm't, Inc. v. Kylin TV, Inc.*, No. 06-CV-02770 (DLI) (RLM), 2007 U.S. Dist. LEXIS 50131, at *11 (E.D.N.Y. July 11, 2007) (citing F.R.E. 201 and

taking judicial notice of "facts within the public domain" submitted by defendants in support of 12(b)(6) motion filed in lieu of an answer).[3]

There is no barrier to the Court taking judicial notice of the materials attached to defendants' moving papers, which outlined Biblical passages, well-established Christian theology, and historical facts within the public domain, are not subject to reasonable dispute, are generally known within this jurisdiction, and are included within sources whose accuracy cannot be reasonably questioned (any one of these characteristics being sufficient for judicial notice). Although judicial notice would be proper if defendants had only moved to dismiss under Rule 12, judicial notice is particularly appropriate here given that defendants also moved for summary judgment. *See, e.g., Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 546 (S.D.N.Y. 2007) (granting summary judgment on lack of substantial similarity and taking judicial notice of third-party works cited by defendants that included similar themes and plot devices).[4]

---

[3] *See also Tabachnik v. Dorsey*, No. 04 Civ. 9865, 2005 U.S. Dist. LEXIS 14267, at *6-7 (S.D.N.Y. July 15, 2005), *aff'd*, 257 Fed. Appx. 409 (2d Cir. 2007) ("Courts may also take judicial notice of facts within the public domain and public records if such facts and records are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *Torah Soft Ltd. v. Drosnin*, 136 F. Supp. 2d 276, 286 (S.D.N.Y. 2001) (Old Testament is in the public domain and unprotectable in a copyright lawsuit).

[4] Indeed, the *only case* that plaintiff cites to support its position that this court may not consider defendants' unquestionably authentic materials, *Twisted Records, Inc. v. Rauhofer*, No. 03 Civ. 2644 (DF), 2005 U.S. Dist. LEXIS 3313 (S.D.N.Y. Mar. 3, 2005), addressed a Rule 12(b)(6) motion only and the court expressly held that the moving party's materials outside of the pleadings *could* be considered as part of a summary judgment motion. *See id.* at *15. Furthermore, the *Twisted* court held that the court could convert the Rule 12(b)(6) motion to a summary judgment motion, provided that all parties had "a reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *See id.* at *13-14. Thus, even if defendants here had not moved for summary judgment – and obviously they did – plaintiff had a reasonable opportunity to present its own countervailing materials in opposition to defendants' motion. The fact that plaintiff did not take advantage of this opportunity does not justify plaintiff's attempt to restrict this court and exclude consideration of defendants' materials.

A recent decision directly on-point is *Brown v. Perdue,* No. 04 Civ. 7417 (GBD), 2005 U.S. Dist. LEXIS 15995 (S.D.N.Y. Aug. 4, 2005), which also addressed a motion for judgment on the pleadings or in the alternative for summary judgment in the copyright/substantial similarity context – and with respect to religious-themed works no less. *See id.* at *1. The court held that as a matter of law the well-known novel *The Da Vinci Code* was not substantially similar to the literary works *Daughter of God* and *The Da Vinci Legacy*. The court rejected all alleged similarities because "[a]ll of these similarities, however, are unprotectible ideas, historical facts and general themes that do not represent any original elements . . . . [R]eferences to historical figures and events constitute unprotectible elements under the copyright laws." *See id.* at *22-23. To reach this conclusion the court necessarily took notice of well-established religious and historical figures and events, and did not formalistically confine itself to the information within plaintiff's complaint and the parties' competing works. Similarly here, the court may – and should – take judicial notice of passages from the Old Testament and the Gospels, well-established historical and theological concepts, as well as indisputable cultural understandings (*e.g.*, that the Devil wearing formal attire is an oft-repeated and starkly unoriginal plot device).[5]

---

[5] For a second recent copyright/substantial similarity decision in which the court necessarily took notice of the larger religious and historical context while granting defendant's motion to dismiss – and did not simply compare the parties' works in a vacuum – *see Douglas v. Osteen,* No. 07-3925, 2008 U.S. Dist. LEXIS 40152, at *2, 9 (E.D. Pa. May 16, 2008). The court held that plaintiff's book *Prayer Power in the Eyes of Faith* was not substantially similar to defendant's book *Your Best Life Now: 7 Steps to Living at Your Full Potential*, both of which recounted biblical stories and presented motivational prayers and anecdotes. The court wrote that "[t]he two books at issue in this case are motivational religious books. It is unsurprising that they contain the same biblical stories, similar expressions and phrases, and similar literary styles because the two books explore the same idea, namely, religious motivation." *See id.* at *9.

III.    **The Parties' Works Are Radically Different In All Meaningful Respects,**
**Including Total Concept And Feel**

A.    Plaintiff Does Not Rebut – And Generally Ignores – Defendants' Arguments

Defendants' opening papers catalogued the many significant ways in which plaintiff's novel

and defendants' play are fundamentally dissimilar – including with respect to narrative and story

structure, setting, plot, language, theme, characters, and, finally and consequently, overall thrust,

mood, and feel. *See* defendants' opening MOL at 18-31.  Defendants also comprehensively

discussed why each and every one of plaintiff's alleged similarities cited in the complaint is a

non-actionable idea, a well-established historical or Christian theological concept, and/or simply a

non-existent similarity mischaracterized by plaintiff. *See id.* at 13-18.[6]  Plaintiff has not rebutted any

of defendants' arguments, which need not be repeated here.

Plaintiff accuses defendants of "cherry-pick[ing] a handful of similarities" in order to

demonstrate no substantial similarity (plaintiff's MOL at 13), but every one of the alleged

similarities addressed in defendants' moving papers was initially cited in plaintiff's complaint

(at ¶¶ 21-26) – defendants simply followed plaintiff's lead.  Regardless, plaintiff does not even

attempt to address defendants' arguments, for example, that many of plaintiff's alleged similarities

---

[6] These alleged similarities are the following: (1) the unprotectable idea of Judas standing trial;
(2) Caiaphas' statements that are lifted directly from the four Gospels of the New Testament;
(3) Pontius Pilate's statements that are well-established and widespread in the relevant Biblical
and historical literature; (4) a single statement by Peter that plaintiff not only lifted directly from
the Gospels, but that is also expressed completely differently in the parties' works ("what thou
hast to do, do it quickly" versus "do what you gotta do"); (5) the utterly commonplace depiction
of Satan wearing formal or semi-formal attire, and the related widespread and unoriginal concept
that Judas was easy for Satan to co-opt, which is also expressed entirely differently in the two
works (Judas was "handed to him on a silver platter" versus Judas "didn't require nudging, Judas
was a gimme"); and (6) the use of overlapping New Testament characters who (i) are portrayed
completely differently in the two works, (ii) are dictated entirely by the subject matter of Judas'
alleged betrayal, and (iii) are all included in many other creative works that focus upon Jesus'
life (*e.g.*, Mel Gibson's "The Passion of the Christ" and Martin Scorsese's "The Last Temptation
of Christ"), namely, Jesus and Judas, Saint Peter, Pontius Pilate, Caiaphas, and Satan.

are lifted straight from the New Testament and are commonplace Christian theological concepts. *See, e.g.*, plaintiff's MOL at 23 (discussing Peter's testimony as the "7th Similarity" but completely ignoring New Testament derivation); 23-24 (discussing Pontius Pilate as the "8th Similarity" but completely ignoring widespread recitation in the Christian theological literature).

Plaintiff's opposition even resorts to double-counting. Both Plaintiff's "6th Similarity" ("Testimony of Caiaphas") and "10th Similarity" ("Similar Testimony of Caiaphas") concern the *exact same alleged similarities. See id.* at 22-23; 25-26. And yet in neither discussion does plaintiff address that Caiaphas' testimony is taken directly from the Gospels of the New Testament.

B.     Plaintiff's New Alleged Similarities Are Also Unprotectable Or Mischaracterize The Parties' Works

Plaintiff presents several new alleged similarities that were not included in plaintiff's complaint, *but that are as hollow as the "similarities" addressed previously*. These new similarities are either unprotectable or mischaracterize the parties' works, and in any event are insufficient to preclude the court from holding no substantial similarity as a matter of law.

Plaintiff's first new alleged similarity is that Satan "ridicules" a lawyer in both works. *See* plaintiff's MOL at 21. The argument that Satan ridiculing someone could be an indication of substantial similarity is preposterous. Not only is this plot device completely unoriginal, but as the excerpted language in plaintiff's MOL makes clear (at 21), the manner in which the parties express Satan's demeaning behavior is completely different.

Plaintiff's second new alleged similarity is that both works suggest that Judas would have been better off if never born. But like many of plaintiff's other alleged similarities, this idea is *straight from the Gospels*, in this case the Gospels of Mark and Matthew (14:21 and 26:24, respectively). *See* Siegartel Reply Decl., Exh. 1 (relevant passages from *The New Oxford Annotated*

*Bible* and *King James Version of the Bible*; as discussed above the court may and should take judicial notice of the Bible).

Plaintiff's argument that this Gospels passage demonstrates substantial similarity is indicative of plaintiff's bad faith, as *plaintiff's own novel copies the Gospels language virtually word for word,* and now plaintiff charges that defendants' inclusion of a similar concept (with different language) is evidence of copyright infringement. *See* plaintiff's MOL at 26 (quoting plaintiff's novel: "The Master said to Judas, 'The Son of Man indeed goes His way, as it is written of Him, but woe to that man whom the Son of Man is betrayed. It is better for that Man if he had not been born'").

Plaintiff's third new alleged similarity is that each work includes the "suggestion" that God orders Judas' appeal. *See* plaintiff's MOL at 24-25. Not only is this isolated plot device insufficient to demonstrate substantial similarity (indeed, God would be an obvious character to permit such an appeal), but again the parties' expressions of this idea are radically different and could not be the basis for any reasonable juror to find substantial similarity.[7]

Plaintiff's final two new similarities are that Judas' "despair" is cited in both parties' works, and that both works incorporate the theme of predestination. However, as already anticipated by defendants' opening brief, the expression of these themes in the two works is not remotely similar. Whereas the overarching theme of plaintiff's novel is predestination, the overarching theme of

---

[7] In defendants' play Judas' lawyer (Cunningham) gets a writ from God only after Judge Littlefield rejects Cunningham's writ from Saint Peter – a rejection that follows a lengthy debate between the Judge and Cunningham. And following that rejection, Saint Monica recounts that Saint Monica got the writ from God because Cunningham pestered Saint Monica so much that Saint Monica visited Judas personally (depicted on stage) and became convinced of the merits of Judas' appeal. None of these plot elements are included in any way in plaintiff's novel. Instead, as plaintiff acknowledges in his brief (at 24), his novel simply includes cursory dialogue in which plaintiff's narrator asks "Who granted the hearing for the appeal?," to which his boss responds "How am I to know? I guess it has to be God Himself."

defendants' play is despair.  *See* defendants' opening MOL at 27-28 for a longer discussion regarding the works' very different themes and the resulting extreme differences in copyrightable expression.  Even the passages cited in plaintiff's MOL regarding despair and predestation are not in any way similar.  *See* plaintiff's MOL at 22, 27.  Furthermore, plaintiff clinging to the single word "despair" – within creative works that are more than one hundred pages long – is exactly the kind of "scattershot" approach that courts have disavowed.[8]

Finally, as the materials attached to the Siegartel Reply Declaration make clear (Exhibits 2 and 3), Judas' despair and potential predestation are well-established in the historical and religious literature (*e.g.*, the Gospels at Matthew 27:3-5 and John 13:21-31), and also are commonly included in other creative works that focus upon Judas' betrayal (*e.g.*, Mel Gibson's "The Passion of the Christ").  As discussed above, the Court may and should take judicial notice of the pervasive use of these themes.

In sum, the Court must disregard uncopyrightable elements as part of the substantial similarity inquiry.  In this case that means disregarding the vast majority of plaintiff's alleged similarities, which are largely unprotectable ideas and/or well-established and commonly-accepted historical and Christian theological concepts (plaintiff's remaining alleged similarities are mischaracterizations of the parties' works).  However, even if the Court considers the parties' works in their entirety, defendants' play *The Last Days of Judas Iscariot* is so fundamentally dissimilar to *Judas on Appeal* that no reasonable jury could find them substantially similar with respect to

---

[8] *See, e.g., Williams v. Crichton*, 84 F.3d at 590 (2d Cir. 1996) (affirming summary judgment where any similarities were "scattered throughout the works"); *Mallery v. NBC Universal, Inc.*, No. 07 Civ. 2250 (DLC), 2007 U.S. Dist. LEXIS 88960, at *22-23 (S.D.N.Y. Dec. 3, 2007) (criticizing plaintiff's "scattershot listing" of alleged similarities); *CBS Broadcasting Inc. v. ABC, Inc.*, No. 02 Civ. 8813 (LAP), 2003 U.S. Dist. LEXIS 20258, at *18 (S.D.N.Y. Jan. 13, 2003) ("scatter-shot approach cannot support a finding of substantial similarity").

protectable expression.  Accordingly, plaintiff's baseless claim for direct copyright infringement should be rejected and defendants' motion granted.[9]

## IV.    Plaintiff Does Not Oppose Dismissal Of Plaintiff's Claims For Indirect Infringement And Common Law Unfair Competition

Plaintiff does not devote even a single sentence to rebutting defendants' arguments that (1) plaintiff's claims for contributory and vicarious copyright infringement are insupportable as a matter of law because there can be no indirect copyright infringement without direct infringement; and (2) as courts have repeatedly held, plaintiff's common law unfair competition claim is preempted by the Copyright Act.  *See* defendants' opening MOL at 31-33.  Accordingly defendants are entitled to summary judgment on plaintiff's claims for contributory and vicarious copyright infringement and common law unfair competition.

---

[9] Plaintiff misconstrues the significance of substantial similarity at this stage of the litigation. Plaintiff incorrectly writes (at 4) that substantial similarity is relevant because in the absence of direct evidence of copying, plaintiff may indirectly demonstrate copying by showing substantial similarity and defendant's access to plaintiff's work.  If correct plaintiff could attempt to defeat defendants' motion by arguing that even without substantial similarity, this litigation should proceed so that plaintiff could demonstrate direct evidence of copying (rendering substantial similarity immaterial).  In fact the absence of substantial similarity is dispositive because even when actual copying is shown (whether directly or indirectly), "plaintiff must then show that the copying amounts to an improper appropriation *by demonstrating that substantial similarity to protected material exists* between the protected material in plaintiff's work and the defendant's allegedly infringing work."  *Silberstein*, 424 F. Supp. 2d at 624 (S.D.N.Y. 2004) (emphasis added); *see also Mallery*, 2007 U.S. Dist. LEXIS 88960, at *4 ("even where 'actual copying' may have occurred, not all such copying is actionable under the copyright laws.  To establish 'unlawful appropriation,' a plaintiff must demonstrate 'substantial similarity'").  Because plaintiff is unable as a matter of law to show substantial similarity as to protected material, it is impossible for plaintiff to demonstrate actionable copyright infringement (here of course there was also no actual copying, although access is conceded for this motion).  The absence of substantial similarity also disposes of plaintiff's irrelevant argument (at 2) that plaintiff is entitled to discovery regarding access and independent creation, issues that are immaterial in the absence of substantial similarity.

V.    **Defendants Are Entitled To Reasonable Attorneys' Fees And Costs Under
17 U.S.C. § 505 – Plaintiff's Claims Are Objectively Unreasonable, And Although
Bad Faith Is Not Required, Plaintiff Has Litigated In Bad Faith As Well**

Defendants agree with plaintiff's concession (at 29) that "the objective reasonableness of plaintiff's claims is the paramount issue" in connection with defendants' fees and costs motion. *See* defendants' opening MOL at 33-35 (providing supportive caselaw and discussing the objective unreasonableness of plaintiff's position).

Plaintiff's defense to defendants' motion relies upon the incorrect premise that such an award also requires improper motivation or bad faith. *See* plaintiff's MOL at 31. Plaintiff does not cite a single supportive decision, which is not surprising considering that it is well-established that "bad faith *is not* a prerequisite to an award of fees under the Copyright Act."[10]

Nonetheless, even if it was necessary to demonstrate bad faith, plaintiff's conduct both before and during this litigation has evidenced a clear pattern of bad faith which, in conjunction with the objective unreasonableness of plaintiff's position, amply warrants an award of attorneys' fees and costs. As discussed in greater detail in defendants' opening brief (at 35), defendant Stephen Guirgis' counsel explained to plaintiff's counsel multiple times *before* the complaint was filed – in writing and after plaintiff threatened litigation – that there was no colorable claim of copyright infringement. Nonetheless, plaintiff proceed to file this objectively unreasonable lawsuit, putting defendants through the entirely unwarranted expense of defending this litigation and preparing this motion.

And plaintiff has included in his motion papers misleading and disingenuous arguments that go far beyond good faith advocacy. As discussed above plaintiff has alleged substantial similarity based upon concepts that *plaintiff himself copied virtually word from word from the Gospels.*

---

[10] *Chivalry Film Prods. v. NBC Universal, Inc.*, No. 05 Civ. 5627 (GEL), 2007 U.S. Dist. LEXIS 86889, at *4 (S.D.N.Y. Nov. 27, 2007) (quoting *Screenlife Establishment v. Tower Video, Inc.*, 868 F. Supp. 47 (S.D.N.Y. 1994)) (emphasis added); *Williams v. Crichton*, 891 F. Supp. 120, 121 (S.D.N.Y. 1994) (same).

Plaintiff also discusses the same exact alleged similarity regarding Caiaphas two separate times – and numbers it both Plaintiff's "6th Similarity" and "10th Similarity." Finally, plaintiff's motion papers are replete with absurd and indefensible statements such as that defendants' "syntax was simply changed to a clichéd, profanity-laced urban dialect in order to cosmetically mask the copying," and that the parties' works have "similar endings" because "Judas finds himself in the 'Kingdom' of Heaven." *See* plaintiff's MOL at 15, 16, 28.[11]

In sum, this is precisely the kind of case in which an award of costs and fees is warranted. Plaintiff's and defendants' works are fundamentally different in every meaningful way and share no expression whatsoever. The alleged similarities are inherently unprotectable for a litany of reasons. Courts in this Circuit routinely award costs and attorneys' fees under § 505 following a grant of summary judgment or a motion to dismiss on substantial similarity grounds, including where plaintiff's claims are objectively unreasonable and alleged similarities relate exclusively to ideas and other unprotectable elements. *See, e.g.,* the *Mallery*, *Chivalry*, and *Williams* decisions cited in defendants' opening MOL at 34. Although bad faith is not a prerequisite to this award, plaintiff has clearly litigated in bad faith. Finally, given plaintiff's attempt to obtain settlement value from, or free publicity at the expense of, famous defendants (including a highly-regarded and well-known playwright and an Academy Award-winning actor), an award of costs and fees is particularly appropriate.

---

[11] As discussed in defendants' opening papers (at 22), defendants' play ends with Judas losing, remaining in hell, and in utter misery as he begs Jesus not to leave, while plaintiff's story concludes with Judas winning his appeal, being permitted to enter heaven, "leap[ing] into the air," and "kissing Jesus' robe."

## CONCLUSION

For all of the foregoing reasons, defendants' motion to dismiss or in the alternative for summary judgment should be granted, as should defendants' motion for an award of reasonable attorneys' fees and costs under 17 U.S.C. § 505.

Dated: September 8, 2008
     New York, New York

PROSKAUER ROSE LLP

Charles S. Sims
Adam D. Siegartel
1585 Broadway
New York, New York 10036
Tel: 212.969.3000
Fax: 212.969.2900
*Attorneys for Defendants*

14

LEXSEE



Positive
As of: Sep 08, 2008

DAN BROWN and RANDOM HOUSE, INC., Plaintiffs, -against- LEWIS PERDUE,
Defendant. LEWIS PERDUE, Counterclaimant, -against- DAN BROWN and
RANDOM HOUSE, INC., COLUMBIA PICTURES INDUSTRIES, INC., SONY
PICTURES ENTERTAINMENT INC., SONY PICTURES RELEASING
CORPORATION, IMAGINE FILMS ENTERTAINMENT, LLC, Counterclaim
Defendants.

04 Civ. 7417 (GBD)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2005 U.S. Dist. LEXIS 15995; 76 U.S.P.Q.2D (BNA) 1012; Copy. L. Rep. (CCH)
P29,248

August 4, 2005, Decided
August 4, 2005, Filed

SUBSEQUENT HISTORY: Affirmed by Brown v.
Perdue, 2006 U.S. App. LEXIS 13877 (2d Cir. N.Y.,
Apr. 18, 2006)

DISPOSITION:    [*1] Defendant Perdue's motion for
summary judgment denied and all of his counterclaims
dismissed. Plaintiffs' motion for summary judgment
granted.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiffs, an author and a
publisher, sued defendant, also an author, under the
Copyright Act of 1976, 17 U.S.C.S. § 101 et seq.,
seeking a declaratory judgment that the author's novel
did not infringe upon the defendant's copyrighted novel.
Defendant    counterclaimed    alleging    copyright
infringement. Plaintiff moved for judgment on the
pleadings or for summary judgment. Defendant moved
for summary judgment on the counterclaims.

OVERVIEW: Defendant contended that the plaintiff
copied the basic premise underlying defendant's novel
involving religious history and themes exposed through a
criminal mystery. The court held, however, that a
reasonable average lay observer would not conclude that
the plaintiff's novel was substantially similar to the
defendant's novel, since any slightly similar elements
were on the level of generalized or otherwise
unprotectable ideas. The similarities asserted by the
defendant constituted unprotectable ideas, historical
facts, scenes a faire, and general themes which were not
original elements of plaintiff's novel. Further, the
plaintiff's expression of the divine feminine and related
themes was markedly different from the defendant's
expression and, although both novels were mystery
thrillers, the defendant's novel was action-oriented while
the plaintiff's novel was complex and intellectual. Also,
the fundamental essence and structure of the plots were
not substantially similar, and the characters in the novels
had different physical and mental attributes and played
different roles. Moreover, the time sequence, pace, and
setting of each of the novels were clearly different.

OUTCOME: The plaintiff's motion for summary
judgment was granted and defendant's cross-motion was
denied.

COUNSEL: For Dan Brown, Random House, Inc.,
Plaintiffs: Elizabeth A. McNamara, Davis Wright
Tremaine LLP, New York, NY.

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

**JUDGES:** GEORGE B. DANIELS, United States District Judge.

**OPINION BY:** GEORGE B. DANIELS

**OPINION**

MEMORANDUM OPINION AND ORDER

GEORGE B. DANIELS, District Judge;

Plaintiffs Dan Brown and Random House, Inc. bring suit seeking declaratory judgment that the book, *The Da Vinci Code*, does not infringe the copyrights defendant Lewis Perdue owns in his books, *Daughter of God* and *The Da Vinci Legacy*. Defendant asserted counterclaims alleging copyright infringement against plaintiffs and other counterclaim defendants.

Plaintiffs submitted a motion for judgment on the pleadings, or in the alternative, for summary judgment on their declaratory judgment claim. Defendant also moved for summary judgment on his counterclaims. The Court finds that there is no substantial similarity between Brown's book *The Da Vinci Code* and Lewis Perdue's books *Daughter of God* and *The Da Vinci Legacy*. Accordingly, defendant's motion for summary [*2] judgment is denied and plaintiffs' motion for summary judgment on their declaratory judgment claim is granted.

**BACKGROUND**

This is an action for copyright infringement under the Copyright Act of 1976, *as amended, 17 U.S.C. §§ 101 et seq. (1994)*. Lewis Perdue claims that Dan Brown's novel, *The Da Vinci Code*, infringes upon copyrights he owns in *Daughter of God* and *The Da Vinci Legacy*. [1] Brown, who initiated this lawsuit, seeks a declaratory judgment that his work does not infringe upon Perdue's. Perdue counterclaimed, and included as counterclaim-defendants various parties associated with production of the anticipated motion picture version of Brown's *The Da Vinci Code*. Along with his copyright infringement claim, Perdue alleges unjust enrichment, and seeks an accounting of all income deriving from *The Da Vinci Code*, as well as a permanent injunction barring the distribution of the book and the motion picture adaptation. He demands damages totaling $ 150 million.

1     *The Da Vinci Code* was published by Doubleday, a division of defendant Random House, in March 2003. *The Da Vinci Legacy* was published in 1983 and *Daughter of God* was published in 2000.

[*3] The threshold issue for deciding whether *The Da Vinci Code* infringes on copyrights in *Daughter of God* and *The Da Vinci Legacy* involves a determination of whether the works are "substantially similar." This determination requires a "detailed examination of the works themselves." *Walker v. Time Life Films, Inc., 784 F.2d 44, 49 (2d Cir.), cert. denied, 476 U.S. 1159. 106 S.Ct. 2278. 90 L.Ed.2d 721 (1986).*

**A. *The Da Vinci Code***

*The Da Vinci Code*

[1] begins with the murder of Jacques Sauniere, the curator of the Louvre Museum, by an albino monk seeking the Holy Grail. The monk is a member of Opus Dei, a devout Catholic sect headed by Bishop Aringarosa, but is acting at the direction of a mysterious and unknown figure known simply as the "Teacher." Before dying, Sauniere leaves behind a series of clues meant for his estranged granddaughter, including disrobing and placing himself, before his death, in the position of Da Vinci's Vitruvian Man and writing a note that read "P.S. Find Robert Langdon." Langdon, a Harvard professor of religious symbology, is summoned to the Louvre by Bezu Fache, captain of the French judicial police, [*4] under the guise of helping to solve the crime. Fache, however, suspects that Langdon is involved with the murder. Also present at the crime scene is Sophie Neveu, a police cryptologist and granddaughter of the victim. Neveu recognizes that the inscription "P.S. Find Robert Langdon," is a message to her (P.S. stood for Princess Sophie). She warns Langdon that he is in danger and that he is suspected by the police of being the killer.

2     The synopsis of *The Da Vinci Code* from its book jacket is as follows:

While in Paris on business, Harvard symbologist Robert Langdon receives an urgent late-night phone call: the elderly curator of the Louvre has been murdered inside the museum. Near the body, police have found a baffling cipher. While working to solve the enigmatic riddle, Langdon is stunned to discover it leads to a trail of clues hidden in the works of Da Vinci -- clues visible for all to see -- yet ingeniously disguised by the painter.

Langdon joins forces with a gifted French cryptologist, Sophie Neveu, and learns the late curator was involved in the Priory of Sion -- an actual secret society whose members included Sir Isaac Newton, Botticelli, Victor Hugo, and Da Vinci, among others.

In a breathless race through Paris, London, and beyond, Langdon and Neveu match wits with a faceless powerbroker who seems to anticipate their every move. Unless Langdon and Neveu can

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

decipher the labyrinthine puzzle in time, the Priory's ancient secret -- and an explosive historical truth -- will be lost forever.

*The Da Vinci Code* heralds the arrival of a new breed of lightning-paced, intelligent thriller utterly unpredictable right up to its stunning conclusion.

[*5] Langdon and Neveu fake an escape from the Louvre, buying them enough time to further dissect and unravel the clues and riddles Sauniere left behind. Using the Fibonacci numerical sequence, the couple determine that a poem left by Sauniere was an anagram of "Leonardo da Vinci! The Mona Lisa!" Neveu and Langdon follow Sauniere's clues to a key with a symbol of the Priory of Sion hidden in the frame of "Madonna of the Rocks," a painting by Leonardo da Vinci who himself served as a Grand Master of the Priory of Sion. Neveu and Langdon are led to the Paris branch of the Depository Bank of Zurich where they are presented with yet more riddles. Solving these riddles allows Neveu and Langdon to determine the account number for Sauniere's deposit box, where they discover a carved wooden box with a cryptex - a stone cylinder invented by Da Vinci to store objects safely, which can only be opened with a proper password.

The reader learns through Langdon, who serves as an intellectual catalyst and religious historian of the novel, that Sauniere was the Grand Master of a secret society named the Priory of Sion, an organization founded centuries ago and charged with keeping the secret of the Holy [*6] Grail. The secret of the Holy Grail is the secret of the divine feminine; that Mary Magdalene was married to Jesus and that they had offspring. Through the years, the Priory of Sion protected this information and guarded the fact that Jesus and Mary Magdalene's bloodline still survives through their descendants.

Although the police converge on the bank, Langdon and Neveu escape with the help of the bank president, who was an old friend of Sauniere. They seek refuge at the home of Sir Leigh Teabing, the wealthy Royal Historian and authority on the Holy Grail. Teabing, portly and ruby faced, suffers from polio and walks with the help of aluminum braces and crutches. Teabing provides a tutorial on the legend of the Grail, shares religious history, and offers evidence that Jesus and Mary Magdalene were married and had a child. He also shares with them clues in Da Vinci's artwork of Mary Magdalene's role in early Christianity.

Teabing's home, however, serves only as a temporary refuge, as both the albino monk and the French police track Langdon and Neveu to Teabing's estate. The monk attacks, demanding the cryptex, but with Teabing's help, the monk is subdued and Teabing, his servant [*7] Remy, Neveu and Langdon flee from his estate to the airport, where they board Teabing's private jet and head for London. During the flight, Langdon, Neveu and Teabing work together to determine the password that would unlock the cryptex. They believe that locked inside the cryptex is the location of the Holy Grail.

In London, Langdon, Neveu and Teabing search for clues to help them determine the password. The albino monk, through the help of Teabing's traitorous servant Remy, gets free, steals the cryptex from Langdon and Neveu and kidnaps Teabing. It is soon learned that Teabing is the "Teacher" and that he deceived Opus Dei into murdering Sauniere and the other Priory masters because he is obsessed with finding and releasing to the public the secret of the Holy Grail. Instead of killing Langdon and Neveu, Teabing implores Langdon to assist him in solving the password to open the cryptex. Langdon, having already determined the password and removed the contents of the cryptex, throws the cryptex in the air, presumably to destroy it. Teabing leaps to save it and falls to the ground as Fache and the police enter the room. Fache arrests Teabing, and Langdon reveals that he knew the password [*8] and saved the contents of the cryptex.

The cryptex, in fact, did not contain a map, but rather another riddle that leads Langdon and Neveu to Rosslyn Chapel in Scotland, where Neveu is reunited with her grandmother and brother, whom she thought had died long ago in a car crash. She learns that she is a descendant of Jesus and Mary Magdalene. Neveu's grandmother, during a conversation with Langdon, reveals that the possibility of the existence of the documents and proof is far more important than their actual existence. Neveu invites Langdon to stay. Although he refuses, they make plans to meet again in the near future and the two share an intimate kiss. In a final epilogue, Langdon realizes that the documents and other objects concerning Mary Magdalene are safely hidden underground in an inverted pyramid at the Louvre.

### B. *Daughter of God*

At the opening of *Daughter of God,* [3] two Americans, Zoe Ridgeway, an art assessor and broker, and her husband Seth Ridgeway, an ex-police officer turned professor of philosophy and comparative religion, are invited to Zurich by Willi Max, an elderly former Nazi. Faced with imminent death and suffocating guilt, Max wishes to return [*9] his vast collection of art, which he stole from Jews during World War II, to their rightful owners. He asks Zoe to assist him in this task.

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

3  The synopsis of *Daughter of God,* as revealed on its back cover, reads:

### A FEMALE MESSIAH?

When Zoe Ridgeway, a prominent art broker, visits Switzerland with her husband Seth, she expects to purchase the rich estate of a secretive art collector. But before Zoe can complete the transaction, she and Seth are drawn into a thousand-year-old web of conspiracy, murder, and intrigue that begins and ends with the mystery of a female Messiah, a young girl whose existence, if proven, would explode the very foundation of Western culture.

After their meeting, Max sends to Zoe's hotel a document purportedly to be one of the many lost writings of Emperor Constantine's biographer, Eusebius. The document tells the story of a second Messiah named Sophia who lived in a small remote village during the fourth century A.D. Unbeknownst to Zoe, Max has also sent to her hotel a small painting [*10] by a German artist named Frederick Stahl which the reader later learns, is the key to finding evidence to prove her existence. Sophia was an illegitimate child born into a family of merchants and was raised in isolation until she was a teenager, when she began healing people with her touch. When the reports of her existence and the miracles she performed reached Rome, the Church, fearful of her growing following, brought Sophia and all the members of her village to Byzantium and interviewed them. After the interviews, the Romans killed them all, including the scribe responsible for recording the interviews. The Church wrapped all the victims in shrouds and buried them in a mass tomb in a cave. A week later, when the Romans went to inspect the tomb, one of the shrouds was empty, but contained the image of a fifteen year old girl, Sophia. Centuries later, Hitler gained possession of the sacred shroud, the Passion of Sophia (the story of her life), and other documents that explained her divinity. Hitler used these materials to bribe the Vatican into silence regarding Nazi atrocities. Hitler then hid all the materials in Austrian salt mines.

The story returns to the present day, where [*11] a few powerful groups are found vying for possession of the Sophia materials. The reader learns that KGB officials and the Russian mafia, believing that Willi Max has possession of materials that can lead to the Sophia materials, steal Max's art, kill Max, burn down his house, and kidnap Zoe. The Russians believe that the Sophia materials can help them gain more power and wish to use the materials to blackmail the Russian Orthodox Church. Another group, led by Cardinal Neils Braun, a former archbishop of Vienna and the head of a secretive, powerful Vatican intelligence force called the Congregation for the Doctrine of the Faith ("CDF"), also seeks possession of the Shroud. He intends to use the materials to become the next pope. Cardinal Braun tells an unnamed American about the second Messiah, and asks for the American's assistance in securing the shroud and related documents.

The story then flashes back to Seth Ridgeway, who, unable to find his wife, retreats to California despondent over his wife's disappearance. Seth is seen barely working, drinking, and spending a lot of time on his boat. He is visited by an unknown woman who reveals that the Stahl painting Max had sent to their [*12] Zurich hotel before Zoe's kidnaping may help to explain his wife's disappearance and lead him to her location. Suddenly, the boat is attacked and destroyed by unidentified gunmen. Seth escapes and finds help from George Stratten, an officer of the United States National Security Agency. Seth realizes that the painting may be in his unopened mail at UCLA. He slips away from the NSA agents assigned to watch him, retrieves the painting and leaves for Europe in search of his wife.

Meanwhile, in Europe, Zoe is held captive by the Russians in a warehouse. Over a period of a few months, she is interrogated about the painting and forced to help the Russians value their stolen art. Also held captive is a fellow art connoisseur who teaches her about the history of the "Great Goddess," and the presence of divine feminine elements in the world's religions and art. It is through their conversations that the history of the divine feminine is shared. Zoe manages to escape from the Russians and is met by the NSA's Stratton who brings her to a Zurich hotel. Seth, meanwhile, arrives in Europe and while traveling through Amsterdam and Zurich, engages in multiple gunfights with unknown assailants, at [*13] least some of them Russian. He manages to arrive at the same hotel where Zoe is staying, and they are reunited.

Together, Zoe and Seth bring the Stahl painting to a Zurich bank where bank officials use turpentine to remove the paint, revealing a gold ingot with Herman Goering's account number and safe deposit key. In Goering's safe deposit box are documents leading to the Sophia materials and instructions on how to dismantle the many traps in the salt mine where the Sophia materials are located. After another gun battle, Seth, Zoe and Stratton go to the Austrian town of Alt Aussee, where they join forces with Father Hans Morgan, a priest active in the Nazi resistance who now serves as a Church reformer determined to reveal the truth concerning Sophia.

Zoe, Seth, Stratton, Morgan and others crawl through the mineshafts to the heavily fortified salt mine and find the shroud and the Passion of the Sophia in a

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

jeweled box deep within the mine. Stratton, revealed as the unknown American who had promised to help Cardinal Braun recover the shroud, steals and escapes with the jeweled box. He brings it to Cardinal Braun, his true master, who intends to use it to blackmail the current Pope [*14] into stepping down and appointing him the successor. Just as Braun is preparing to head to Rome, Seth, Zoe and Morgen arrive at Braun's chalet and attack him. Father Morgan reveals to Braun that the Cardinal is his illegitimate son. Braun, caring only about the Shroud, dies after leaping into a fire to try and save it. In a role reversal, Zoe tells Seth that God has been good to them and that Seth should renew his lapsed faith. Prior to their ordeal, it was Seth who attempted to instill faith in Zoe. They learn that as a result of the fire at Braun's retreat, the entire structure burned except for portion of the floor in the shape of a woman where Sophia's shroud had last been. [4]

4 Although Perdue also asserts infringement of his earlier novel, *The Da Vinci Legacy,* he offers no arguments in his moving papers in support of his claims. He argues that his "copyright infringement claims in this action are based primarily on *Daughter of God*" and that "*Legacy* is mentioned because Brown also plagiarized many elements of Legacy in writing *Da Vinci Code.*" Perdue's Memorandum of Law at 1. Indeed, despite his later pronouncement during oral argument that he did not seek to abandon this claim, after reading *The Da Vinci Legacy* and reviewing the parties' arguments, it is clear that any infringement claim based on *The Da Vinci Legacy* also fails to survive Brown's motion for summary judgment. *The Da Vinci Legacy* concerns the quest for missing pages from Leonardo da Vinci's notebooks that contain information necessary to build a charged particle beam weapon. The hero's efforts to locate the missing pages pit him against the corrupt Bremen Legation and the evil Elect Brothers, who seek to construct the weapon. A thorough review of *The Da Vinci* Legacy's plot, themes, characters and other elements supports a finding of noninfringement. Accordingly, to the extent that defendant Perdue continues to assert a claim of infringement based on *The Da Vinci Legacy,* that claim is also dismissed.

## [*15] COPYRIGHT INFRINGEMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c); Nebraska v. Wyoming, 507 U.S. 584, 590, 113 S. Ct. 1689, 1694, 123 L. Ed. 2d 317 (1993). The burden of demonstrating that no factual dispute exists is on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Once the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56 (e). In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment should be granted only when no reasonable trier [*16] of fact could find in favor of the nonmoving party. Gallo v. Prudential Residential Services, Ltd., 22 F.3d 1219, 1224 (2d. Cir. 1994).

In order to succeed on a claim of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). In the absence of direct evidence, copying is proven by showing that (1) defendant had access to the copyrighted work, and (2) there is a substantial similarity of expression in the respective works. Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc., 150 F.3d 132, 137 (2d Cir.1998). [5] Perdue's claims, therefore, turns upon a finding of substantial similarity between the two books. The test for "substantial similarity" is "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." Warner Bros. Inc. v. American Broadcasting Companies, 654 F.2d 204, 208 (2d Cir.1981) (quoting Ideal Toy v. Fab-Lu Ltd., 360 F.2d 1021, 1022 (2d Cir.1966)). [*17] [6] If the similarity concerns only noncopyrightable elements of a work, or no reasonable trier of fact could find the works substantially similar, summary judgment is appropriate. Walker v. Time Life Films, 784 F.2d 44, 48 (2d Cir. 1986).

5 For purposes of their summary judgment motion, plaintiff-counterclaim defendants have conceded that they had access to Perdue's books.
6 In support of his claims of substantial similarity, Perdue also submits declarations from John Gabriel Olsson, a specialist in forensic linguistics and Gary Goshgarian, a professor of English at Northeastern University. However, because substantial similarity is judged by the spontaneous response of the ordinary lay observer, expert analysis of the similarities between the two works is not determinative. See Denker v. Uhry, 820 F.Supp. 722, 729 (S.D.N.Y.

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

Dec. 8, 1992)(finding expert testimony unnecessary to assess substantial similarity if the proffered testimony does not deal with evidence or material that might help gauge the response of the lay reader).

[*18] It is "a principle fundamental to copyright law" that "a copyright does not protect an idea, but only the expression of an idea." Kregos v. Associated Press, 3 F.3d 656, 662 (2d Cir. 1993), cert. denied, 510 U.S. 1112, 114 S. Ct. 1056, 127 L. Ed. 2d 376 (1994). "The distinction between an idea and its expression is an elusive one." Id. at 587-588. Judge Learned Hand, in Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930), provides the guiding principle:

> Upon any work, . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise, the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

Id. Furthermore, "the line [lies] somewhere between the author's idea and the precise form in which he wrote it down . . . protection covers [*19] the 'pattern' of the work . . . the sequence of events, and the development of the interplay of characters." Hogan v. DC Comics, 48 F.Supp.2d 298 (S.D.N.Y. Jan 26, 1999)(citing Z. Chafee, Reflections on the Law of Copyright, 45 Colum.L.Rev. 503, 515 (1945)).

Similarly, scenes a faire, sequences of events that necessarily result from the choice of a setting or situation, do not enjoy copyright protection. Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996)(quoting Walker, 784 F.2d at 50); see also Hoehling v. Universal City Studios, inc., 618 F.2d 972, 979 (2d Cir. 1980)('incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic" are scenes a faire). Furthermore, "thematic concepts . . . which necessarily must follow from certain plot situations" are not entitled to copyright protection. Reyher v. Children's Television Workshop, 533 F.2d 87, 91 (2d Cir. 1976).

When a work contains both protectible and unprotectible elements, the Court can only inquire whether "the protectible elements, standing [*20] alone,

are substantially similar." Williams v. Crichton, 84 F.3d at 588 (quoting Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1002 (2d Cir. 1995). Any dissimilarity between the works will not automatically relieve the infringer of liability as "no copier may defend an act of plagiarism by pointing out how much of the copy he has not pirated." Rogers v. Koons, 960 F.2d 301, 308 (2d Cir.), cert. denied, 506 U.S. 934, 113 S. Ct. 365, 121 L. Ed. 2d 278 (1992). The alleged infringer will be found innocent of infringement when the similarities between the protected elements of the copyrighted works and the allegedly infringing work are of small import quantitatively or qualitatively. Id.

## A. Perdue's Specific Claims of Similarity

The gravamen of Perdue's complaint is that Brown copied the basic premise underlying Daughter of God:

> notions of a divine feminine, the unity of male and female in pagan worship, the importance of Sophia, the "Great Goddess" of the Gnostic Gospels, the fact that history is relative and is controlled by victors, not losers, the importance of the Roman Emperor Constantine [*21] in requiring a transition from a female to a male dominated religion, as well as to create a unified religion having a common dogma, the quest not only for physical objects, but for spiritual fulfillment.

Perdue's Local Rule 56.1 Statement of Undisputed Material Facts, P153; Perdue's Memorandum of Law at 5. He further argues that the following elements are common to both books: the role of the female; the Church's recasting of the great goddess as evil; the role of Emperor Constantine; Christianity's adoption of pagan practices; the existence of the divine feminine; the heroines' epiphany regarding the Great Goddess; the physical evidence of the divine feminine; the fact that there are keepers of the physical evidence; the Catholic Church's awareness of the existence of the Holy Grail and the Sophia Passion; the existence of two organizations who seek to obtain the physical evidence; similarities between Opus Dei and the Congregation for the Doctrine of Faith; the protagonists' unwillingness to participate in the struggle between the competitors to obtain the physical evidence; the female's equal claim to divinity as males and that through their union, they become much more [*22] than the sum of their parts; the enemy who acts as a wolf in sheep's clothing; the protagonists' realization that possessing the physical evidence is not as important as the understanding of what the physical evidence represents; the conclusion that the

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

hero and heroine are themselves pursued by the quest for the physical evidence; similarities between the treatment of Mary Magdalene in *The Da Vinci Code* and Sophia in *Daughter of God;* the use of historical references, particularly Constantine, in both novels; the fact that both novels incorporate the use of a gold key; the novels' similar discussion of women, the Goddess, Creation and How God became a male; similar discussions of Mother Earth; the theme that people create their own gods; and lastly, a similar discussion in both novels regarding communion.

All of these similarities, however, are unprotectible ideas, historical facts and general themes that do not represent any original elements of Perdue's work. For example, although both novels discuss Emperor Constantine and the Council of Nicea, it is without question that references to historical figures and events constitute unprotectible elements under the copyright laws, [*23] as "no claim of copyright protection can arise from the fact that plaintiff has written about such historical and factual items." Alexander v. Haley, 460 F.Supp. 40, 45 (S.D.N.Y. Sept. 21 1978)(citing Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 309 (2d Cir. 1966). Also, copyright protection does not extend to thematic concepts or scenes which must necessarily follow from similar plot situations. See Reyher, 533 F.2d at 91. Both *Daughter of God* and *The Da Vinci Code* involve the unprotectible *idea* of a mystery thriller set against a religious backdrop. As a mystery thriller, common themes of "the wolf in sheep's clothing," or the theme that "history is relative and is controlled by victors, not losers," or the theme that "through [the union of hero and heroine], they become much more than the sum of their parts," are unprotectible stock themes common to the genre. See Williams v. Crichton, 860 F.Supp. 158, 166 (S.D.N.Y. Aug. 17, 1994), aff'd Williams v. Crichton, 84 F.3d 581 (2d Cir. 1996) (holding that themes commonly repeated in certain genre are not protectible [*24] by copyright as no one can own the basic idea for a story).

Indeed, it is not original in this genre to have a storyline whereby "two organizations or people who would stop at nothing, including murder, to obtain physical evidence," that there are keepers of this physical evidence, or that "the hero and heroine became unwilling participants in the struggle between the competitors to obtain the physical evidence." Furthermore, the fact that the hero and heroine realize that possessing the physical evidence is not as important as the understanding of what the physical evidence represents, or that the reader is led to conclude that the hero and heroine are themselves pursued by the quest for the physical evidence, offers nothing new to this type of story. Moreover, because *Daughter of God* and *The Da Vinci Code* share a

religious backdrop, Perdue's claims that the novels share a similar theme that "people create their own gods," and that both novels have "discussions of Mother Earth" and "discussions about communion" are not afforded copyright protection. Perdue has not alleged that his unique *expression* of these ideas and themes were copied. Ideas and general literary themes [*25] themselves are unprotectible under the copyright law.

Perdue also alleges various discrete similarities between the two plots. However, although both novels discuss the Catholic Church, such discussion is expected from a thriller with religious themes and is an unprotectible *scene a faire*. See Williams v. Crichton, 84 F.3d at 587 (similar scenic elements are unprotectible *scenes a faire* that follow naturally from the work's theme rather than the author's creativity). Similarly, Perdue's claims that both novels discuss Swiss bank accounts and gold keys or that the novels begin with a murder are unprotectible scenes a faire that precludes a finding of substantial similarity. [7] Perdue's claim that there are similarities between Opus Dei and the Congregation for the Doctrine of Faith, two real and existing organizations is also unprotectible. Walker, 784 F.2d at 49 (finding that copyright protection does not extend to facts).

> 7  Indeed, although there is clearly a gold key in *The Da Vinci Code, Daughter of God* references a "very small *ingot* fixed into a recess of the wood substrate on which the paint had been applied." *Daughter of God* at 312 (emphasis added).

[*26]  A significant part of Perdue's argument focuses on the ideas and broad themes concerning the divine feminine, the important role of the female in early religion, the importance of Sophia, the "Great Goddess" of the Gnostic Gospels, and how she was re-cast by the Church as evil, the unity of male and female in pagan worship and Christianity's adoption of pagan practices as well as the importance of Emperor Constantine in requiring a transition from a female to a male dominated religion. Perdue argues that he "first incorporated these elements in" an earlier novel titled *Linz Testament* which he "extensively re-worked" into *Daughter of God.* Perdue's Memo at 5. A central theme of *The Da Vinci Code* is the suppression of the divine feminine in the Christian tradition. He claims that "the material plagiarized in [*The Da Vinci Code*] consists of an extensive and detailed synthesis of history and multiple schools of theology that Perdue created for *Daughter [of God]* and based on equally unique work expressed in *Linz [Testament]* and *[Da Vinci] Legacy."* Perdue's Facts P212.

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

Perdue argues that Brown stole his "synthesis" of differing religious beliefs emanating [*27] from the Gnostic Gospels. He has made no factual allegations, however, to support a finding that Brown copied his *expression* of these ideas. Moreover, these ideas and themes find their origin in historical facts, events and figures, as well as pre-existing works. See Hoehling, 618 F.2d at 979 (finding that, despite plaintiff's claim that specific facts, ascertained through his personal research, were copied, such facts are unprotectible, as defendants "had the right to avail [themselves] of the facts contained in [plaintiff's] book" and "to use such information, whether correct or incorrect, in their own work")(citing Greenbie v. Noble, 151 F.Supp. 45, 67 (S.D.N.Y. 1957); see also Alexander, 460 F.Supp. at 45("where common sources exist for the alleged similarities, or the material that is similar is otherwise not original with the plaintiff, there is no infringement"). In his Author's note in *Daughter of God*, Perdue himself states that "this is a work of fiction based on fact. . . . The sections of this book dealing with the Nicean Conference and the events and religious controversies leading up to it are true and far [*28] better documented than any of the scriptures in the Hebrew or Christian Bible or the Muslim Koran." *Daughter of God* at 420. Perdue concedes that "much of his research [about the sacred feminine and the Great Goddess] involved the Gnostic Gospels, discovered at Nag Hammadi, Egypt in 1945, but not translated until the 1970's, and works commenting upon those Gospels." Perdue's 56.1 Statement, P156. Furthermore, there is no substantial similarity in the expression of the divine feminine in each book. In *The Da Vinci Code*, the divine feminine is expressed as Mary Magdalene, a true biblical figure, while in *Daughter of God*, the divine feminine figure is Sophia, a fictional second Messiah created by Perdue. As copyright protection "does not extend to facts or to true events, even if they are discovered through original research," Perdue's claims regarding these ideas and themes are unprotectible. Walker, 784 F.2d at 49.

## B. A Comparison of *The Da Vinci Code* and *Daughter of God*

The critical examination which must be conducted, in order to determine whether *The Da Vinci Code* is substantially similar to *Daughter of God* to support copyright [*29] infringement, is a review of relevant similarities between the two works "in such aspects as the total concept and feel, theme, characters, plot, sequence, pace and setting." Williams v. Crichton, 84 F.3d at 588.

### 1. Thematic Expression

"In its ordinary meaning, a theme is understood to be the underlying thought which impresses the reader of a literary production, or the text of a discourse. Using the word 'theme' in such a sense will draw within the circle of its meaning age-old plots, the property of everyone, and not possible of legal appropriation by an individual." Roe-Lawton v. Hal E. Roach Studios, 18 F.2d 126, 127 (D.C.Cal. 1927). Indeed, thematic concepts which follow from similar plot situations are not afforded protection under the copyright laws. See Smith v. Weinstein, 578 F.Supp. 1297, 1302 (S.D.N.Y. Jan. 24, 1994). General themes expressed in *Daughter of God* are afforded no copyright protection. "The essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." Reyher, 533 F.2d at 91. [*30]

*The Da Vinci* Code's expression of the divine feminine and its related themes differ markedly from their expression in *Daughter of God*. In *The Da Vinci Code,* Mary Magdalene represents the Divine Feminine that was suppressed by the Church. Through Langdon's character, Brown shares with the reader the history and importance of women and the sacred feminine in early religion. Through Langdon's and Teabing's monologues, Neveu and the reader are introduced to the belief that Mary Magdalene was the wife of Christ and that they produced offspring. This secret, which the reader is shocked to learn represents the truth of the Holy Grail, was kept protected by a group called the Priory of Sion, whose military arm, the Knights Templar, guarded the secret with their lives. The reader eventually learns that Neveu is a descendant of Christ and Mary Magdalene.

In *Daughter of God*, a fictional second messiah named Sophia represents the Divine Feminine suppressed by the Church. Sophia, who existed around 325 A.D. in a remote mountain village near the Anatolian city of Smyrna (in present-day Turkey), was executed by the Romans after news of her miracles hit the Vatican. An early discussion [*31] between Zoe and Seth introduces the reader to Sophia and to Constantine's influence on the early church. Sophia's history is further shared through one of the villains, Cardinal Braun, who discusses it with NSA Agent Stratton, while the historical details of the Church's suppression of the divine feminine is shared through a conversation between Zoe and Thalia, a fellow captive. Evidence of Sophia's existence, and of the role the Church played in executing her, came into the hands of the Nazis during World War II. The search for this evidence is the foundation of *Daughter of God*. Rival groups, including a conservative arm of the Church, the Russian mafia and former KGB, and the heroes all strive to obtain this evidence for their own underlying purpose. Brown's expression of his religious themes in *The Da Vinci Code* differ markedly from Perdue's expression of his themes in *Daughter of God*.

### 2. Total Concept and Feel

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

The total concept and feel of a literary work is comprised of the way an author "selected, coordinated and arranged the elements of his or her work," Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 358, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), [*32] taking into consideration similarities in "mood, detail or characterization." Reyher, 533 F.2d at 91-92. Where there is a marked difference in total concept and feel, summary judgment is appropriate. Id. at 92; see also Denker v. Uhry, 820 F.Supp. 722, 731 (S.D.N.Y. 1992), aff'd, 996 F.2d 301 (2d Cir. 1993). Although both novels at issue are mystery thrillers, Daughter of God is more action-packed, with several gunfights and violent deaths. Daughter of God also includes a perilous journey through an Austrian salt mine and includes sex scenes not present in The Da Vinci Code. The Da Vinci Code, on the other hand, is an intellectual, complex treasure hunt, focusing more on the codes, number sequences, cryptexes and hidden messages left behind as clues than on any physical adventure. For example, Neveu, Langdon, Teabing and his servant's escape from the police in a Range Rover through the dark woods proceeds at such a slow pace that it cannot reasonably be called a chase scene.

Furthermore, although Daughter of God references art and discusses religious history, The Da Vinci Code's treatment of these [*33] subjects involves more detail. Brown weaves his mystery through detailed discussions of Da Vinci's art, art and religious history and mathematical formulas. An early scene, involving Neveu and Langdon's attempt to decipher the clues Sauniere left at his murder site, references Leonardo da Vinci's Vitruvian Man, the Fibonacci sequence, the Divine Proportion, Phi, and the Mona Lisa. Daughter of God's discussion of art, on the other hand, occurs principally through Thalia and Zoe's review of the art stolen by the Russians as they work to catalogue all the stolen pieces. No reasonable jury could conclude that the total concept and feel of The Da Vinci Code is substantially similar to that of Daughter of God.

### 3. Plot

A plot is "the story or narrative. It is the designed sequence of connected incidents. It is the thing which moves the [work] from cause to effect. It means, as its etymology implies, a weaving together." Golding v. RKO Radio Pictures, Inc., 193 P.2d 153, 163 (Cal.App. 2 Distr. 1948), aff'd 35 Cal.2d 690, 221 P.2d 95 (1950). Although "in its broader outline a plot is never copyrightable," Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 54 (2d Cir. 1936), [*34] alleged similarities in plot and structure at "the next level of specificity" may be protectible. Id. at 49. Courts are to determine whether the fundamental essence and structure of the novels are substantially similar. See Arden v.

Columbia Pictures Industries, Inc., 908 F.Supp. 1248, 1260 (S.D.N.Y. Dec. 7, 1995) (finding no substantial similarities between the fundamental structure and essence of each plot).

At the most general level of abstraction, both novels tell a story based on religious and historical people, places and events. The factual details that underpin each book, however, are quite different. The scenes and events show no substantial similarity of expression in the respective works. For example, while the The Da Vinci Code weaves a story with historical references to Michelangelo and Leonardo da Vinci, Opus Dei and the Priory of Sion; Daughter of God discusses Adolph Hitler and the Nazis, Hermann Goering, Frederick Stahl, and the Congregation for the Doctrine of Faith. Indeed, The Da Vinci Code's incorporation of mathematical subjects like Phi, the Divine Proportion and the Fibonacci Sequence into its story has no parallel [*35] in Daughter of God.

Daughter of God involves a husband's search for his missing wife. His search uncovers a religious secret involving a fictional second Messiah, the knowledge of which is being sought by a radical arm of the Catholic Church and by the Russian mafia and former KGB for their own evil purposes. The husband's search for his wife leads him to different parts of the globe. Furthermore, in Daughter of God, the search is for actual physical objects, including documents evidencing Sophia's existence and her burial shroud. In The Da Vinci Code, the plot centers on determining what the secret is. Langdon and Neveu's mission, as the protagonists, is to decipher, through clues left behind by her murdered grandfather as well as clues hidden in historical places and works of art, the ancient secret. Furthermore, Langdon and Neveu never actually find any physical objects. Rather, the secret they learn is that Neveu is a descendant of Christ, that her grandmother and brother are actually alive, and that Mary Magdalene's bones may be hidden beneath the inverted pyramid at the Louvre. The fundamental essence and structure of the plots are not substantially similar and [*36] offer no support to Perdue's infringement claim. The Da Vinci Code is simply a different story than that told by Daughter of God.

### 4. Characters

In determining whether characters are similar, a court looks at the "totality of [the characters'] attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of figures in [plaintiff's work]." Walker, 784 F.2d at 50 (internal quotations and citations omitted). What the character thinks, feels, says and does as well as the descriptions conveyed by the author through other characters'

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

comments fill out a viewer's understanding of the character. Warner Bros. v. American Broadcasting Cos., 720 F.2d 231, 241 (2d Cir. 1983). "At the same time, the visual perception of the character tends to create a dominant impression against which the similarity of a defendant's character may be readily compared, and significant differences readily noted." Id.

There is no substantial similarity between any of the characters in *The Da Vinci Code* and *Daughter of God.* The heroes and heroines are different in each book. In *The Da Vinci Code,* [*37] the hero is Robert Langdon, a bookish professor of symbology from Harvard. Langdon's physical attributes are not emphasized, rather, he serves as the intellectual wheel that keeps the plot moving. It is Langdon who solves most of the major riddles and questions, including the final puzzle at the climax. Interestingly, Langdon is secular, and his interests in religious history are purely academic. In *Daughter of God,* the hero is Seth Ridgeway, a former police officer who has athletic prowess and strong physical attributes. Seth retired from the police department after receiving several gunshot wounds. Although he is a professor of philosophy and religion, the book does not focus on his intellect. Unlike Langdon, Ridgeway experiences a crisis of faith because of his wife's disappearance.

The heroines also share few similarities. Sophie Neveu, the young French symbologist, was raised by her grandfather in a life of privilege. Her intellect, coupled with her knowledge of cryptology, allow her to assist in solving the many riddles and puzzles left by Sauniere. Seth Ridgeway's wife, Zoe, on the other hand, is a more mature, self-employed art appraiser. She is an expert in her field. [*38] She has been trained in detecting forgeries and grew up in a blue collar household.

Sir Leigh Teabing serves as the primary villain in *The Da Vinci Code,* but his evil role as the "Teacher," who masterminded Sauniere's execution, is not revealed until the end of the novel. He has two associates, Remy, his assistant, and Silas, the albino monk. Remy's involvement is minor while Silas serves the role as the threatening killer. Indeed, it is through Silas' hands that Sauniere and the other members of the Priory of Sion are murdered. Teabing's quest for the Holy Grail is motivated by his distaste for the Church.

*Daughter of God,* on the other hand, has many villains. One set of villains include Russian mobsters and former KGB, who desire the Sophia documents and Shroud for power. Although the Russians dominate the early part of the book, their presence is minimized after Zoe kills the Hulk, her huge Russian captor, and escapes from their detention. Another set of villains include Cardinal Braun and his lackey, NSA Agent Stratton.

Braun's desire for the Sophia materials also stems from a desire for more power. In this regard, as well as in physical attributes, he is nothing like [*39] *The Da Vinci Code's* antagonist, Teabing, who is crippled and uses crutches when he walks. Further, although Perdue argues that Teabing and Stratton are both "shapeshifters" (because they first appear friendly and later reveal themselves as the enemy), such a characterization ignores the different roles each serves in their respective novels. Teabing is the ultimate villain in *The Da Vinci Code.* His mysterious alter-ego, the "Teacher," is smart, conniving, diligent and well planned. Stratton, on the other hand, is simply a lackey for Cardinal Braun. Stratton, from physical appearance to mental and intellectual characteristics, shares nothing in common with Teabing. Other main characters such as Bezu Fache, the police captain who chases Langdon and Neveu in *The Da Vinci Code,* Father Aringosa, the head of Opus Dei in *The Da Vinci Code,* and Father Hans Morgan, the reformist priest in *Daughter of God,* have no parallels in the other book.

**5. Sequence, Pace and Setting**

Although both *Daughter of God* and *The Da Vinci Code,* as mystery thrillers, enjoy fast paced scenes, the time sequence of each book differs considerably. *Daughter of God* takes place [*40] over many months. Indeed, after the opening sequence introducing Zoe, Seth and Max in Switzerland, Seth is found in his boat *six months later,* still suffering from Zoe's disappearance. After Seth is visited by the strange woman with information concerning Zoe on his boat, the novel proceeds at a quick but steady pace over the course of a few weeks. *The Da Vinci Code,* however, starts quickly and moves quickly. The reader immediately gets a sense that time is of the essence. The period from Sauniere's death at the Louvre to the final confrontation at Westminster Abbey, the majority of the novel, takes place over a matter of days.

The setting of each book is also different. While the *The Da Vinci Code* takes the reader from Paris to London and visits landmarks such as the Louvre Museum and Westminster Abbey, *Daughter of God* begins in Zurich, travels through southern California, Amsterdam and Italy and ends in Austria. The characters, sequence, pace and setting of each book are not substantially similar and do not support an infringement claim.

A comparison of these different novels warrants a rejection of the claim that Brown's *The Da Vinci Code* infringes upon copyrights [*41] Perdue owns in his previous works *Daughter of God and The Da Vinci Legacy.*

2005 U.S. Dist. LEXIS 15995, *; 76 U.S.P.Q.2D (BNA) 1012;
Copy. L. Rep. (CCH) P29,248

## REMAINING COUNTERCLAIMS

In his Third Counterclaim, Perdue alleges that "as a result of [counterclaim defendants'] illegal and improper exploitation of [his] intellectual property, [counterclaim defendants] have been unjustly enriched at the sole expense and to the sole detriment of [Perdue]." Perdue's Answer and Counterclaims P107. [8]

> 8  Although dismissal of Perdue's federal claims allows dismissal of his state common law unjust enrichment claim without prejudice to their commencement in state court, this Court exercises jurisdiction over this pendant claim and dismisses it on its merits. See United Mine Workers v. Gibbs, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).

Under the Copyright Act, state law claims are preempted if "(1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 [*42] and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." Briarpatch Limited, L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004). The works in question fall within the types of works protected under 17 U.S.C. §§ 102 and 103. Moreover, Perdue's unjust enrichment claim is based entirely on the validity of his copyright claim. He alleges no facts to support his unjust enrichment claim different from his copyright infringement claim. Accordingly, his unjust enrichment claim must also be dismissed.

Relatedly, Perdue's second counterclaim for an accounting of all income, expenses and profits related to *The Da Vinci Code*, and his fourth counterclaim for a permanent injunction enjoining counterclaim defendants from all activities related to the production of the motion picture version of *The Da Vinci Code*, must also be dismissed. His accounting claim is pled on the grounds that he is unable to ascertain the amount of money owed by plaintiffs without an accounting. As his underlying [*43] infringement claim is unsupportable, no money is owed and no accounting is necessary. Under that same principle, Perdue's derivative claim against the motion picture defendants must also be dismissed.

## CONCLUSION

A reasonable average lay observer would not conclude that *The Da Vinci Code* is substantially similar to *Daughter of God*. Any slightly similar elements are on the level of generalized or otherwise unprotectible ideas. Defendant Perdue's motion for summary judgment is denied and all of his counterclaims are dismissed. Plaintiffs' motion for summary judgment is granted. Plaintiffs are awarded declaratory judgment declaring that plaintiffs' authorship, publication and exploitation of rights in and to *The Da Vinci Code* do not infringe any copyrights owned by defendant.

Dated: New York, New York

August 4, 2005

SO ORDERED:

GEORGE B. DANIELS

United States District Judge



LEXSEE



Cited
As of: Sep 08, 2008

CBS BROADCASTING INC., SURVIVOR PRODUCTIONS, LLC, Plaintiffs, -
against- ABC, INC., GRANADA PLC, GRANADA ENTERTAINMENT USA,
Defendants.

02 Civ. 8813 (LAP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2003 U.S. Dist. LEXIS 20258

January 13, 2003, Decided
January 14, 2003, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a television
network, and the producer of a television reality series,
moved for a preliminary injunction in a copyright
infringement action they filed against defendants,
another television network, and two companies.

**OVERVIEW:** The court assumed ownership by
plaintiffs for purposes of the motion. Defendants had
access to plaintiffs' popular, successful television show.
However, the court was persuaded by defendants'
evidence of their show's independent creation. Plaintiffs
did not establish that defendants copied from plaintiffs'
show the elements of defendants' show that were in the
pre-resting proposals. Both parties combined standard,
unprotectable elements of reality shows, game shows,
and other television genres, and used them separately to
create the programs. For purposes of the motion, the
court assumed actual copying over the later-added
elements of defendants' show. Defendants' show added
elements of the tabloid genre and the audience
participation element of the game show genre, neither of
which were found in plaintiffs' show. The court found
the concept and feel of the two shows to be different.
The major factor comprising this difference was the tone
of the two shows. Plaintiffs' show was serious, while
defendants' show was comedic. Plaintiff was not likely to
succeed in showing substantial similarity. In addition, the

balance of hardships tipped decidedly in favor of
defendants.

**OUTCOME:** The application for a preliminary
injunction was denied.

**COUNSEL:** [*1] For CBS Broadcasting, Inc, Survivor
Productions, LLC, PLAINTIFFS: Lewis R Clayton,
Leslie Gordan Fagen, Paul, Weiss, Rifkind, Wharton &
Garrison, New York, NY USA.

For ABC, Inc, Granada, PLC, Granada Entertainment
USA, DEFENDANTS: Jane W Parver, Kaye Scohler
LLP, New York, NY USA.

**JUDGES:** LORETTA A. PRESKA, U.S.D.J.

**OPINION BY:** LORETTA A. PRESKA

**OPINION**

LORETTA A. PRESKA, United States District
Judge:

For the reasons stated on the record in open court on
January 13, 2003, plaintiff's motion for a preliminary
injunction (docket # 4) was denied.

SO ORDERED

January 13, 2003

2003 U.S. Dist. LEXIS 20258, *

LORETTA A. PRESKA, U.S.D.J.

Decision

AFTERNOON SESSION

2:15 p.m.

(In open court)

THE COURT: Counsel, I'm most grateful to you and to the parties to hear this case, and to have the benefit of such excellent presentations on both sides.

I'm particularly benefited from the parties educating me about the evolution of TV shows, that is, it is a continual process involving borrowing liberally from what has gone before. Indeed, I subscribe to Mr. Parsons' characterization of the facts here as his having put a new spin on the American game show and sold it back to the Americans.

As we all agree, plaintiff will [*2] prevail on a copyright infringement case under Section 106 of the act by demonstrating "Ownership of a valid copyright, and copying the constituent elements." *Feist Publications v. Rural Telephone Serv. Co., 499 U.S. 340, 361, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991).*

Although there have been issues raised as to ownership, including documents executed following depositions, I will assume ownership by plaintiffs for today's purposes.

In this circuit, "There are two main components of [A] prima facie case of infringement: 'A plaintiff must first show that his work was actually copied, .... [and] then must show that the copying amounts to an improper or unlawful appropriate'", *Castle Rock Entertainment v. Carol Publishing Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998)* (quoting *Laurey Sens. v. Idea Group, Inc., 964 F.2d 131, 139-40, (2d Cir. 1992)).*

Because direct admissions of copying are unusual, actual copying may be established by "indirect evidence, including access to the copyrighted work, [and] similarities that are probative of copying." *Castle Rock, 150 F.3d at 137* (citations omitted).

Proof of "wide [*3] dissemination of copyrighted work establishes access in this circuit. *Boisson v. Banian, Ltd., 273 F.3d 262, 270 (2d Cir. 2001).*

The probative similarity standard has been described as follows: "When the questioning is copying as a factual matter, then similarities that, in the normal course of events, would not be expected to arise independently in the two works, are probative of defendants having copied as a factual matter from plaintiffs' work. Nimmer Section 1303(b) [at 13-11 to 13-13].

When evaluating probative similarity, a Court should compare the works in their entirety, including both protectable and unprotectable elements. *See Fisher Price, Inc., v. Well Made Toy Manufacturing Corp., 25 F.3d 119, 123 (2d Cir. 1994).*

This is appropriate, because although plaintiffs must ultimately establish infringement by showing (that defendants copied a substantial amount of protectable elements, (i.e. meet the "substantial similarity" standard), the fact that nonprotectable elements were copied, although not a basis for liability, can be probative of whether protected elements were copied, i.e. help establish probative similarity.

Defendants cannot [*4] dispute that they had access to Survivor in terms of viewing the broadcast, both in the UK and the U.S. Similarly, the extensive press coverage of Survivor makes clear that members of the television and entertainment industry, including defendant, had to be aware of the program.

However, I'm persuaded by defendants' evidence of Celebrity's independent creation, to the extent that I find crediting the testimony of Mr. Allen and Ms. Znak, that defendants had the substantive elements of the program that eventually became Celebrity in the works before Mr. Allen "rested" and before the U.S. version of Survivor aired in May of 2000.

In this respect, plaintiffs have not established that defendants copied from Survivor those elements of Celebrity that were in the pre-resting proposals. Rather, the evidence shows that both parties combined standard, unprotectable elements of reality shows, game shows and other television genres, and used them separately to create the programs.

What is less clear from the evidence is the extent to which defendants tweaked or added to the various elements of Celebrity, such as serial elimination, after becoming aware of Survivor.

Certainly it is not clear [*5] whether those elements were added as a result of actual copying from Survivor, or from Big Brother or Pop Idol. For today's purposes, however, I will assume actual copying over the later-added elements from Survivor.

As I noted previously, it's not enough for plaintiffs merely to establish copying. To prove infringement, a plaintiff must also show that the copying is illegal, because a substantial similarity exists between the defendants' work and the protectable elements of the plaintiff's work. *Streetwise Maps, Inc., v. VanDam, Inc, 159, F.3d 739, 747 (2d Cir. 1998).*

"It is 'a principle fundamental to copyright law' that 'a copyright does not protect an idea, but only the

expression of an idea.'" *Williams v. Crichton*, 84 F.3d 581, 587, (2d Cir. 1996), (quoting *Kregos, v. Associated Press*, 3 F.3d 656, 663 (2d Cir. 1993).

"Similarly, Scenes Afire, sequences of events that 'necessarily result from the choice of a setting or situation, do not enjoy copyright protection." *Williams* at 587, quoting *Walker v. Time Line Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986).

No news to anyone in this courtroom, the *Williams* Court told [*6] us "the distinction between an idea and its expression is an illusive one. As counsel have argued this morning, Judge Learned Hand provided the guiding principle to this often impenetrable inquiry in *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930): Upon any work, ...., a great number of patterns of increasing generality will fit equally well as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title. But there is a point in this series of extractions where they are no longer protected. Since otherwise the [author], could prevent the use of his 'ideas' to which apart from their expression, his property is never extended." *Williams* at 587-88.

The proscription against copyrighting ideas is codified in Section 102(b) of the copyright act. "In no case does copyright protection for an original work of authorship extend to any idea, . . . . concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated or embodied in such work." 17 U.S.C. Section 102 (b).

[*7] Interpreting this section in the ban on copyrighting ideas, the Second Circuit has held that copyright does not protect facts, generalized themes and ideas, subthemes, stock themes, general imagery, literary formulas, actual, true or historical events, episode or scenes a faire, scenes that necessarily result from the choice of a setting situation. *Attia v. Society of the New York Hospital*, 201 F.3d 50, 54 (2d Cir. 1999); *Warner Brothers, Inc. v. American Broadcasting Cos.*, 654 F.2d 204, 208 (2d Cir. 1981); *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 976, 978 (2d Cir. 1980); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49, 50 (2d Cir. 1986); *see Rokeach v. Avco Embassy Pictures Corp.*, 1978 U.S. Dist. LEXIS 20101, *19-20 (S.D.N.Y. Jan. 17, 1978).

Off the record.

(A discussion was held off the record)

THE COURT: Nor does copyright protect the mere duplication of short or ordinary phrases, commonly used terms, names, titles or slogans. *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989); [*8] *Boyle v. Stephens, Inc.*, 1997 U.S. Dist. LEXIS 12780, *13 (S.D.N.Y Aug. 25, 1997); 37 C.F.R. Section 202.1(a)

However, consistent with copyright's protection of expression, the Ninth Circuit has reiterated that "protectable expression includes the specific details of an author's rendering of ideas or 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'" *Metcalf v. Bochco*, 294 F.3d 1069, 1074, (9th Cir. 2002) (quoting *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985).

Although certain similarities may not be protectable when considered individually because they are too generic or constitute scenes a faire, the *Metcalf* Court found that "the presence of so many generic similarities, and the common patterns in which they arise," may help a party "satisfy the extrinsic test" for substantial similarity and survive summary judgment. Id.

Similarly, Judge Weinfeld wrote that "even [where], a television game show is made up of entirely stock devices, an original selection, organization and presentation of such devices can nevertheless [*9] be protected, just as it is the original combination of words or notes that leads to a protectable book or song. Copying of a television producer's selection, organization and presentation of stock devices would therefore be a misappropriation." *Barns/Fraser Enterprises v. Goodson-Todman, Enterprises, Ltd.*, 1988 U.S. Dist. LEXIS 146, 5 U.S. P.Q. 2d, 1887, 1891 (S.D.N.Y. January 4, 1988).

Also relevant to this discussion of the protectability of a collection of otherwise generic ideas is the situation confronted by the Supreme Court in *Feist Publications, Inc., v. Rural Telephone Serv. Co.*, 499 U.S. 340, 349, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991).

There the Court wrote: "When a compilation author has no written expression, but rather lets the facts speak for themselves, the expressive element is more elusive. The only conceivable expression is the manner in which the compiler has selected and arranged the facts. Thus, if the selection and arrangement are original, these elements of the work are eligible for copyright protection. No matter how original the format, however, the facts themselves do not become original through association. 499 U.S. at 349. [*10]

Justice O'Connor continued to write: "This inevitably means that a copyright in a factual compilation is thin, notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement. Id.

2003 U.S. Dist. LEXIS 20258, *

Justice O'Connor went on to note: "As one commentator explains it: 'No matter how much original authorship the work displays, the facts and ideas it exposes are free for the taking .... the very same facts and ideas may be divorced from the context imposed by the author and restated or reshuffled by second comers, even if the author was the first to discover the facts or to propose the ideas.'" 499 U.S. at 349 (quoting *Ginsburg Creation and Commercial Value*: Copyright protection of Works of Information, 90 Columbia Law Review 1865, 1868 and N. 12 (1990).

Thus, as noted above, the Supreme Court held in *Feist* that the copyrightability of factual compilations is entitled to "thin" and "limited protection." 499 U.S. at 349, 359.

*Feist* was somewhat analogous to the situation presented [*11] here in that the Court there addressed a compilation of otherwise nonprotectable facts. Whereas here, we have a combination of nonprotectable generic ideas. A difference, however, is that the acts specifically provides for copyright in a compilation of facts.

With this lengthy background, I move on to consider the substantial similarity test.

The Court of Appeals has instructed that "when we compare products that contain both protectable and unprotectable elements, our inspection must be 'more discerning;' we must attempt to extract the unprotectable elements from our consideration and ask whether the protectable elements, standing alone, are substantially similar." *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995).

As Professor Nimmer explains, regardless of the nature of the copyrighted work "to determine whether the similarity between plaintiffs' and defendants' work is substantial, the comparison should not include unoriginal elements of the plaintiffs' work; rather, the comparison should take place after filtering out of the analysis elements of plaintiffs' work that are not protectable. Nimmer Section 13.03 E [2], pages 13-83 to 13-84.

[*12] However, when assessing substantial similarity, the Court of Appeals does not permit a "mechanical and counter-intuitive," exercise of simply extracting unprotectable elements and comparing the remainder. *Knitwaves, Inc.* 71 F.3d at 1003. There, the Court in affirming a finding of infringement cautioned against a rigid segregation of components of a copyrighted work because "if we took this argument to its logical conclusion, we might have to decide that there can be no originality in a painting, because all colors of paint have been used somewhere in the past." Id. (internal citation omitted).

Thus, the province of the fact finder is to examine, among other things, "the total concept and feel" of the 2 works. Id. at 1003 (citation omitted).

Going to the Court of Appeals' more recent decision in Boisson, it seems clear that a "more refined analysis" is required where a plaintiff's work is not wholly original but, rather, incorporates elements from the public domain. Boisson, 273 F.3d at 272.

I confess to some confusion as to the court's instructions thereafter. The first instruction in Boisson is 'in these instances' what must be shown is substantial [*13] similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed compilation." Id. There follows a seemingly contrary instruction "in applying this test a court is not to dissect the works at issue into separate components and compare only the copyrightable elements." 273 F.3d at 272 (citing Knitwaves, 71 F.3d at 1003). "To do so would be to take the 'more discerning' test to an extreme which would result in almost nothing being copyrightable because original works broken down into their composite parts would usually be little more than basic unprotectable elements like letters, colors and symbols. This outcome -- affording no copyright protection to an original compilation of unprotectable elements -- would be contrary to the Supreme Court's holding in Feist. Id. Fortunately, however, I need not harmonize these two rather general statements because the court went on to give more specific instructions applicable to works such as those at issue here. The court continued "when evaluating claims of infringement involving literary works, we have noted that while liability would result only if the protectable [*14] elements were substantially similar our examination would encompass" the similarities in such aspects as the total concept in feel, theme, characters, plot, sequence, pace and setting of the [plaintiff's] books and the [defendant's] citing Williams v. Crichton, 84 F.3d 581, 588." 273 F.3d at 273.

It has also been noted that the analysis of the "total concept and feel" of works must be conducted with caution. As Judge Haight explained in granting summary judgment with respect to a series of child cartoon characters "Courts must pay particular attention to summary judgment motions in cases where a plaintiff claims that defendant's work copies the total concept and feel" of plaintiff's work. Accepting an overly broad scope for protective total concept and feel "threatens the basic principal of copyright law: That concepts and ideas may not be copyrighted and that only a particular expression of an idea may be copyrighted." CK Co. v. Burger King Corp., 1994 U.S. Dist. LEXIS 13934, 1994 WL 533253 *4 (S.D.N.Y. September 3, 1994). Professor Nimmer makes the same point rather emphatically. He writes

2003 U.S. Dist. LEXIS 20258, *

"The touchstone of 'total concept and feel' threatens to subvert the very essence [*15] of copyright, namely, the protection of original expression. 'Concepts' are statutorily ineligible for copyright protection; for courts do advert to a works "total concept" as the essence of its protectable character seems ill-advised in the extreme. Further, the addition of the 'feel' to the judicial inquiry being a wholly amorphous referent merely invites an abdication of analysis." Nimmer, Section 1303 [A] [1] [c], page 13-39 (emphasis in original). Consistent with these decisions and with Professor Nimmer is that the few decisions in which the Court of Appeals has found liability based on a "look and feel" argument all involved infringement of visual designs of a single static artistic work. EB Boisson, 273 F.3d 262 (quilt design); Yurman Design Inc. v. BPAG Inc., 262 F.3d 101 (2d Circuit 2001) (jewelry design); Hamil America Inc. v. GFI Inc., 193 F.3d 92 (2d Circuit 1999) (floral pattern); Knitwaves, 71 F.3d 996 (sweater designs). In each instance the defendants actually copied the plaintiff's design and the similarities between the plaintiff's and the defendant's works were overwhelming. See Boisson, 273 F.3d at 272 [*16] ("enormous amount of sameness"; "overwhelming similarities in color choices"); Yurman, 262 F.3d at 110-11 ("overwhelming impression" that the defendant's products are 'appropriations'."; Hamil, 193 F.3d at 102-03 ("both fabrics use the exact same colors in the same manner" producing "identity of design"); Knitwaves, 71 F-3 at 1004 (defendants "featured the same two full symbols" and "employed them in virtually the same manner as plaintiff" on "strikingly similar backgrounds ... in virtually the same color scheme" producing an "overwhelming similarity of the sweaters as 'concept and feel'.")

The Court of Appeals' citation to the Williams case in Boisson brings me to a case I found quite helpful to the analysis here.

There plaintiff Williams had written four children's adventure books that took place in Dinosaur World, "an imaginary present day man-made animal park for dinosaurs and other prehistoric animals where ordinary people ... can, in presumed safety, visit, tour and observe the animals in a natural but hi-tech, controlled habitat." 84 F.3d at 583. In discussing the substantial similarity analysis the Court of Appeals noted Professor Chafee's [*17] definition of the boundary between idea and expression where he stated "that 'protection' covers the pattern of the work ... the sequence of events and the development of the interplay of characters." Id. at 588 citing Chafee, reflections on the law of copyright, 45 Columbia Law Review 503, 513 (1945). The court proceeded to examine similarities in such aspects as total concept and feel, theme, characters, plot, sequence, pace and setting. Like the Court of Appeals I believe that

"examples aid us in applying these abstract principles" Id., and to that end I note several of the findings of the Williams court. For example, the court found the total concept and feel of the two works to differ substantially. It noted that "the total concept and feel of the Jurassic Park works is of a world out of control while Williams' Dinosaur World is well under control;" 84 F.3d at 589. The court also discussed the themes of the two works. It noted "any similarity in the themes of the parties' works relates to the unprotectable idea of a dinosaur zoo. Once one goes beyond this level of abstraction the similarity in themes disappears. The Jurassic Park works involve [*18] genetic engineering, ego, greed, and the consequences of man's hubris in believing that nature can be controlled. No similar themes are evident in any of the Dinosaur World books."

As well as the other elements compared, the court also noted that "the plot or sequence of events of the works likewise is not substantially similar. Although Williams points to several specific instances of similarity, we agree with the district court that such lists are 'inherently subjective and unreliable', particularly when 'the list emphasizes random similarities scattered throughout the works'. Such a scatter-shot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: Whether a lay observer would consider the works as a whole substantially similar to one another." 84 F.3d at 590 (citations omitted).

The court noted in Footnote 3 specific examples of similarity. They included: "encounters with small dinosaurs in Books I, III, and the Jurassic Park novel; encounters with brachiosaurs in Book II and the Jurassic Park movie; visits to dinosaur nurseries in both Book II and the Jurassic Park works; tours with automated vehicles and recorded [*19] guides in Books II, IV and the Jurassic Park works; stranded characters encountering ferocious dinosaurs in Book II and the Jurassic Park works; characters in boats being pursued by dinosaurs in Book III and the Jurassic Park novel; dinosaurs escaping from paddock fences in both Book III and the Jurassic Park works; and characters escaping pack-hunting dinosaurs through the intervention of another dinosaur and a helicopter in Book III and the Jurassic Park movie.

In this case in considering substantial similarity it is crucial to consider each program series as a whole, like the court did in Williams and Castle Rock, and not to segregate components rigidly as the Knitwaves court and the Williams court cautioned against.

In what I hope is plain English, I begin the analysis by agreeing with the experts that both shows combine well-known and frequently used generic elements of

2003 U.S. Dist. LEXIS 20258, *

earlier works. They have several of those elements in common but each series also includes well-known elements not present in the other. Before analyzing these elements more specifically, I generally credit Professor Spigel's method of analysis, that is, her analysis of the evolution of the serial TV reality [*20] show as a cycle in the reality TV genre which in turn evolved from combining characteristics of other earlier genres. Professor Spigel's analysis derives from a broad historical perspective and in my view is more logical and more persuasive because of that derivation. Although Professor Thompson also identifies elements present in the programs from prior genres, his analysis does not have the historical progression that seems necessary to understand the genres of these shows and the generic nature of the elements included. This more scatter-shot analysis employed by Professor Thompson also permitted him to identify the shared elements of the two shows as critical and the elements not shared as unimportant.

In addition, as I will discuss more later, the single paragraph on page 6 of Professor Thompson's report where he discusses the presentation or expression of the elements or concepts contains rather vague, unspecific discussion. In addition, the one example of concrete discussion of expression provided by Professor Thompson, the 8-minute tape, engages in what the Knitwaves court characterized as a rigid segregation of components and which the Williams court warned against. Aside [*21] from the lesser logical appearance of Professor Thompson's analysis, I also do not credit his method of analysis because of his continuing efforts to backtrack from his deposition testimony as illustrated by counsel on cross. I specifically note that he nowhere addressed any possible comedic appeal of Survivor in his report and did not mention any such element in connection with this case until cross examination after comedic tone had been relied upon heavily by defendants as a major difference between Survivor and Celebrity.

In his testimony Professor Thompson identified the following elements as essential to Survivor: Voyeur verite, hostile environment in the deserted island sense, not the Title VII sense, building of social alliances, challenges arising from the game show element and serial elimination. He noted that these elements were "never found in that combination in any other show" (Transcript 145). He stated "the genre it's in was only emerging and [Survivor] is one of the definitional shows that defined what that genre would become as we started to define it." (Transcript 147).

Passing from some of the other differences, I note that Celebrity also adds significant elements [*22] not found in Survivor, including elements of the Celebrity tabloid genre and the audience participation element of the game show genre. Thus the combination of elements, even under Professor Thompson's analysis, is not congruent. Even if, as Professor Thompson posits, the elements were congruent, that congruence, without more, would not establish substantial similarity in the copyright meaning because it would violate the cardinal rule of copyright that copyright does not protect an idea but only the expression of an idea. As the Metcalf court noted "instead protectable expression includes the specific details of an author's rendering of ideas or 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters'." 294 F.3d at 1074 (emphasis added, citations omitted). In Barns/Fraser, for example, Judge Weinfeld wrote that "copying a producer's selection, organization and presentation of stock devices" would be misappropriation. 5 USPQ at 1891 (emphasis added).

It is the presentation or expression element that this portion of Professor Thompson's analysis seems to miss. Here protection of the elements [*23] defining a genre, is Professor Thompson testified Survivor's elements do, without more are, as Judge Hand pointed out in Nichols, too abstract to be protected. Such protection would also cross into the dangerous territory Professor Nimmer warned about, that is, "adverting to a works 'total concept'." Nimmer, Section 1303 [A] [1] [c], page 13-39.

I note in this regard that plaintiff's counsel's argument today focused almost entirely on the protection of the combination of generic elements without addressing this presentation or expression factor. I am persuaded that the expression factor -- or, as Judge Weinfeld said, the presentation factor -- must be considered here not only because of the statute but more practically because of Dr. Spigel's comparison of I Love Lucy and the Honeymooners in her testimony. She noted that both were examples of domestic situation comedies and shared the elements of family/couple characters, plots based on gender stereotypes, laugh tracks, and a three-act structure. As she pointed out, however, these congruent elements were expressed differently in the two shows. In her testimony at pages 378 and 379 she noted that the Honeymooners was about a [*24] male character, of course played by Jackie Gleason, who was a lower-class individual, a bus driver, and who was always feeling inadequate in some way. His wife Alice was always in the know, always smarter than he, and the plots revolved around his get-rich-quick schemes and the like. I Love Lucy, on the other hand, featured Lucille Ball as the zany housewife character who wanted to get out of the house but whose husband wouldn't let her work. Professor Spigel noted that Lucy's husband, Ricky, was a band leader, the more successful one, and that they were both middle class. As Professor Spigel noted, the programs had very different kinds of plots because of the

difference story elements that were added to the similar genre.

As the testimony has also made clear, similar analysis can be made of I Dream Of Genie and Bewitched and the Jay Leno Show and the David Letterman Show.

Indeed, in light of cases cited and Professor Spigel's testimony, it is my view that providing protection to a combination of generic elements without more -- that is, without consideration of the presentation or expression of those elements -- would stifle innovation and would stifle the creative process that [*25] spawned the two shows at issue here.

All of this having been said, I now move to the "more discerning" analysis prescribed by the Court of Appeals to consider the respective shows' expressions of these abstract concepts. In so doing I acknowledge that "dissimilarity between some aspects of the works would not automatically relieve an infringer of liability for 'no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated'. It is, only when the similarities between protected elements of plaintiff's work and the allegedly infringing work are of 'small import qualitatively or quantitatively' that the defendant would be found innocent of infringement." Williams 84 F.3d at 588 citing Rogers v. Koons, 960 F.2d 301, 308 (2d Cir. 1992) cert. denied, 506 U.S. 934, 121 L. Ed. 2d 278, 113 S. Ct. 365 (1992), and Nimmer, Section 1303 [B] [1] [a]

Starting with concept and feel, that consideration seems to be more of an overall impression and obviously is composed of various expressions, some of which I will discuss as separate categories such as characters. The Williams court found the concept and feel of the works there at issue to be different in [*26] that it found, as I mentioned, Jurassic Park to portray a world out of control while plaintiff's Dinosaur World was a world well under control. Here trying to use the same type of analysis I find the concept and feel of the two shows to be different. The major factor comprising this difference. is the tone of the two shows. The tone of Survivor is one of unalterable seriousness. It is expressed by the host's unrelenting seriousness, by the contestants' cutthroat competition for food and for the million dollar prize. The seriousness of the situation is exemplified by a female contestant noting some weeks into the ordeal that she is losing her hair presumably from malnutrition. The serious concept and feel is evident, for example, in the opening scene, which again I will probably get to later. In Survivor the contestants cannot speak to each other, have been forbidden from speaking to each other as the narrator tells us. The camera focuses on their very tense faces. One or more of them, as was so delicately put in

the testimony, were barfing into barf bags. After the plane lands the contestants frantically ran to use well the five minutes they had been given to garner enough supplies [*27] to survive without additional food for 45 days.

In contrast, the tone and feel of Celebrity is one of comedy. It's expressed first in the frequent presentations of the hosts' constantly wise-cracking, as some other witness said doing schtick, and mocking the contestants. It's also expressed in the contestants' expressions. They are laughing at themselves, for example, as they descend from their posh digs shown at the outset into mud wrestling with pigs and the like. It's exemplified, for example, by a male contestant running around with the panties of the rather large politician's wife on his head.

To contrast opening scenes, in Celebrity the contestants had already met. There was no prohibition, no artificial stifling. They were pictured as chatting and laughing. They got off the helicopters easily and providing real -- and I hesitate the use the word -- comedic relief, a woman observed several of the men relieving themselves over in the bushes. There was no sign of tension of any kind. The elimination of contestants also illustrates the huge difference in concept and feel of the two shows. The elimination sequence in Survivor of course is the Tribal Council. Again, as I might discuss [*28] more later, it is a highly ritualized sequence. It takes some 8 minutes or thereabouts each time. The contestants are pictured in a dramatic march in the dark to an area of high rocks. They are accompanied by torches. It's very dramatic and there is very dramatic trible-sounding music accompanying the march. When the eliminated contestant is announced, there is the very serious ritual extinguishing of the flame, that is, of the contestant. The host speaking seriously saying each time in a ritualistic fashion "the tribe has spoken," and the eliminated contestant's immediate banishment over the bridge.

Celebrity, on the other hand, has no comparable ritual. The announcement of which contestant is to leave happens in the morning. It's light. One or more of the contestants is usually standing around drinking coffee. The eliminated contestant is announced and is then welcomed onto a completely silly-looking party barge with fireworks, waiters, and glasses of champagne, all while still dressed in dirty outdoor camping wear.

So in analyzing tone and feel, the first major difference between the two shows is the serious tone of Survivor and the comedic tone of Celebrity.

The second factor [*29]    I find evident in considering concept and feel is what the professionals have called production values. And these differing production values give a particularly different feel to the

two shows. In Survivor the overall look is one of lush, artful photography and painstaking etiquette. The camera work is of the very highest professional level. We see very artful shots of, for example, a female contestant looking into a mirror with the faces of several other contestants reflected in the mirror. It's really moving art, like National Geographic.

Celebrity in contrast is closer to the home video look creating a drastically different look and feel. Of less importance, but also contributing to the different concept and feel, is Celebrity's live action and audience participation elements that the audience is seeing in part live action from around the world as, for example, when the contestants are waking up (or filmed more than 24 hours old) and then has the opportunity to vote to influence what happens next, as the audience is constantly reminded by the hosts, creates a different feel from that of Survivor. In Survivor the audience is watching an adventure in the past with examples of more [*30] drama and more of what passes for character development in these shows because of the opportunity to edit while in some measure already knowing the outcome. Thus, trying to analyze concept and feel so as to avoid the danger of protecting ideas, which Judge Haight and Professor Nimmer warned against, I find the works to be substantially different in concept and feel.

Taking a look for a moment at setting, of course we know that both shows are set in remote, inhospitable settings. For comparison purposes I concentrated on the Survivor series filmed in Australia because Celebrity was also filmed in Australia. But I note that each series of Survivor was filmed in a different remote, inhospitable locale, for example, Borneo. Even though both of the compared series were filmed in Australia the visual expression of the remote, inhospitable setting was different. In Survivor the Australian series was filmed in the dry Outback bush area. Visually it featured low vegetation and a wide sky, often showing high wind-chiseled rocks reminiscent of Sedona.

THE COURT: Celebrity on the other hand, was filmed in the rain forest, in the jungle. It featured dense vegetation and because of the canopy [*31] layer, not much in the way of sky. The light got through, and the audience could sense from the scenery, the dampness and the humidity of the surroundings that while the same generic concept of a remote, hospitable location and even the same country was utilized by the two shows, the settings were expressed differently.

I move on to consider the characters, and consideration of the characters does seem to flow over into other elements, as I'll note.

Both shows have host and a group of real live people who are contestants. The expression of these generic elements, however are very different, the Survivor host, Jeff Prost was unknown prior to the first series. He appears relatively infrequently in the show. He plays two roles; plays the role of judge in judging the contests, and the tribal council and perhaps banishing the loser, and he plays the role of group therapist and interviewer.

Mr. Prost is nothing but serious. He is unrelentingly serious. Although Professor Thompson apparently talked about his comedic elements in some talk show, I didn't see it, and certainly the expression of his character is not evidently comedic.

On the other hand, the hosts of Celebrity are nothing, [*32] if not funny. Although not particularly known to American audiences, it is undisputed that Ann and Deck are well known in the UK as a comedy team. Their appearance as a team as the hosts of the show signal its comedic element. They appear frequently throughout the show, much more frequently than Mr. Prost does, and they perform as comic entertainers almost in the broader sense. They tell jokes, they mock the celebrities, they wise crack, they comment sarcastically on what's going on, they perform interviews, but in a very comic, mocking-style, not in any respect serious.

Thus, the two shows' expression of the generic elements of a host is dramatically different.

As to the characters or the contestants, both shows use multiple, real people playing themselves, and to a certain extent, this character consideration flows over into a consideration of what might be called plot in these shows.

In Survivor, the contestants are regular folks about whom the audience knows nothing. They are there competing to win a million dollars. The contestants are organized into two groups of tribes who compete with each other initially, then team members vote each other off the show. And when the numbers [*33] diminish, the team structure is abandoned, and it's every man for himself.

These details combine to create fierce competition between the teams, but also among the individuals. The prospect of winning a million dollars does tend to focus the contestants' attention on the competition. Because the contestants vote each other off, individuals form mutual alliances from time to time, and there is suspicious musing and speculation by one contestant about what others are discussing when they are separated from the group.

In contrast, the contestants on Celebrity are not regular folks. They are celebrities, and the audience knows who they are and a good bit about each one of

2003 U.S. Dist. LEXIS 20258, *

them going into the show. There's no team structure, and the celebrities do not vote each other off.

Also the winner receives only the honorific of being king or queen of the jungle. While he or she does not win a prize like the life-changing one million dollars, any money raised goes to that winner's favorite charity.

This combination entirely changes the interactions among the contestants' so-called plot. The cut-throat competition evident in Survivor is entirely absent. If possible to quantify competition, it is [*34] materially less in Celebrity, because there's really nothing much at stake for these folks. The quality or tone or competition there is also different.

In Celebrity, it is entirely light-hearted. Also, the Celebrity characters' motivations are different. They are not competing with each other to win a million dollars. They are trying to project the best image possible to the viewing audience, whether to continue a reputation as a good guy or can-do guy or to repair a less than perfect reputation.

The result is that the characters and their interactions are expressed very differently.

A good example is in the worm-eating comparison, which I will get to later.

Thus, the expression of the characters is different, including the pattern of their interrelationships as they are developed.

As part of the plot, I also considered the tests imposed on the contestants and the elimination both shows give, consistent with their game show format. The expression of these tests, however, is different.

In Survivor, contestants are required to participate. The tests or the challenges are physically difficult, for example, requiring the group to paddle a float across a stream. The camera and the [*35] editing process focus the audience on the cut-throat competition element, first between the teams and then among the individuals. One never forgets that these people are vying for, a million dollars, and it is very serious business.

Immunity challenges are particularly serious, because a life or death decision is made as a result of the immunity challenge.

In Celebrity, the challenges are voluntary. A contestant may decline to participate. The only effect of declining to participate is the group won't get upscale rations.

I note parenthetically, if I can put a footnote in here, that the ration situation is another example of the

difference in the expresses of the hostile, remote environment idea.

In Survivor, the contestants must obtain on their own all of their food. And I note again the female contestant noting that her hair was falling out because of malnutrition. I think they get a little rice, but that is it, and they know from time to time how hungry they are.

In contrast, the celebrities have an adequate supply of rice and beans. They can have as much quantity as they want. No one is hungry, and no one's hair is falling out. The challenges or the tests only permit the celebrities [*36] to obtain higher quality rations.

So returning to the consideration of, the challenges, it's much less pressure among the celebrities. Nothing bad is going to happen. The challenges in Celebrity are not physically difficult, and are in keeping with the comedic tone. They are mostly silly, such as wrestling stars off of pigs in a mud pit, or gross, like the bug shower. But because they are essentially meaningless and silly or gross, there's no element of competition, no element of seriousness, but rather a light, game show tone.

I also reject the suggestion that the challenges had to be different because celebrities were involved.

Many celebrities, such as The Fire, the boxer, might well be in better shape than some of the lay folks, so I don't think that follows necessarily from the use of celebrities.

Also involved in plot and character interaction is the elimination of contestants.

As we've noted before, both shows involve serial elimination of contestants, but that idea is expressed differently.

In Survivor, the contestants vote each other off at the end of each episode. That they are voting each other off leaves them to form alliances. As I've noted before, because the elimination [*37] means no more shot at the million dollars, the elimination is deadly serious.

The audience sometimes sees a sense of personal betrayal felt by the eliminated contestant, because one or more of his or her supposed allies must have voted him or her off.

As I noted briefly before, the whole elimination ceremony is expressed differently. I think I don't need to do that again.

In Celebrity, in contrast in the first week, there's no elimination, the audience only votes as to which Celebrity will be tested on a particular challenge.

2003 U.S. Dist. LEXIS 20258, *

During the second week, the audience votes for its favorite, not for who is to leave, or its least favorite. Because the stakes are so low, because the audience is voting, and because it's not a negative vote, it's not serious, it's not taken seriously, there's no betrayal, and the hosts are wise cracking throughout the procedure. It's also very casual. The expression in the elimination sequence in the two shows is dramatically different.

In Survivor it's ritualized, it's serious, it's lengthy.

In Celebrity, it's casual, it's light-hearted. The only drama is in a second or two delay in actually saying the name of the eliminated contestant.

I also consider [*38] the other expressions that were discussed, I think in Professor Thompson's report. First, he could discuss the music. Again, the music I find to be very different.

In Survivor, the music is deep, chanting, tribal music. It adds to the sense of drama of the show.

Celebrity music isn't deep, it's not chanting, it's not particularly tribal. As an outsider, and not a professional, I would characterize it as upbeat and kicky.

Professor Thompson also discussed the interstitial shots of wildlife. Certainly both shows use that technique, but even that is expressed differently.

In Survivor, the wildlife shots emphasize the serious, dangerous nature of the animal, the crocodile's menacing jaws and tail, the menacing view of the snake's tongue.

In Celebrity, the visuals emphasize the pretty or comic features of the wildlife; the green and orange frog whose throat goes in and out, some hairy bird-like beast, maybe a bat hung upside down, and a little chimp. It's a different expression adding to the different tone of the two works.

Professor Thompson also relied on the panoramic landscape photography of both shows. I note that any show using the deserted island setup might well be expected [*39]  to use a panoramic landscape. Nevertheless, those generic shots are expressed differently here.

In Survivor, they are very pretty, they are lush, they are fabulously beautiful shots, often with a stylized speedframe photography of the clouds moving overhead adding to the drama.

In Celebrity, we see plain old landscape, with the photography perhaps one step up from home video. It is expressed thoroughly differently.

I would like to say a few words about the film clips assembled by Professor Thompson, albeit, in an exceedingly tardy fashion.

As we know, the entire tape is just under eight minutes, featuring approximately three and a half minutes of each series, taken from some 15 hours of video of each series.

As has also been noted, even within a segment on Professor Thompson's tape, the scenes shown are out of sequence and from several different episodes.

Adopting Mr. Smart's analogy, it is like looking at the dot on a serrate.

Perhaps in a more lawyer-like fashion, I find that the tapes are not -- the clips are not representative of the two series and are contrary to the analysis carried out by the *Williams* Court and the Court in the case considering the Seinfeld book, [*40]  that is, looking at the entire work, and I emphasize here that it is of utmost importance to review an entire series, not just to look at the clips. The clips are, as the *Williams* Court said, inherently subjective and unreliable, because it lists random similarities scattered throughout the work.

For example, my favorite, the worm eating scene. First, I note parenthetically that in a remote, hostile environment, or deserted island setup, eating unattractive, crawling creatures is part of the scenes a faire.

Second, as to the actual expression, in Survivor, the mood is tense and competitive. There is a great deal of pressure on the contestants to perform for their respective teams, because this is an immunity challenge. The intensity of the pressure is evident when in the clip, one of the contestants at the end bends over with a green look on her face and in the full vision vomits. It's very intense, and it was clearly played for the dramatic tension.

When the Celebrity tape of the worm-eating episode is viewed in context, the mood is significantly different. First, the result is not so important to the contestants. They already have a sufficient quantity of rations, and the [*41]  worm eating will only determine if the individual contestant earns higher quality rations for the group.

Second, the visual scene is expressed differently.

In Survivor, the unattractive black worms are set out in a tribal-looking Wheel of Fortune layout.

In Celebrity, the unattractive looking white worm appears on a banquet table with fine linens and fine China adjacent to an absolutely delicious meal, which apparently the contestants can all smell.

2003 U.S. Dist. LEXIS 20258, *

Third, in Celebrity, the audience has chosen a vegetarian paranormalist for this trial, and the politician's wife is seen with her arm around him in a maternal manner, essentially telling him that the lot of them are all right as is, and that he, the vegetarian, should not compromise his principles on their account. The element of life or death is absent. What is present and what is shown in the clip is an extremely kind and supportive message, not to do the awful deed. And when the vegetarian actually cranks himself up and does it, the clip shows an appreciation of his personal achievement in eating the unattractive maggot.

What is present, but what is not shown is the comic element, from his smelling the adjacent high quality meal [*42] on China and linen and kind of yelling or repeatedly saying "imaging, imaging," a reference to his paranormalism.

Although both scenes include the contestants gesticulating to crank themselves up to do the deed, one would well expect anyone doing this particular deed to do so, and the presentation, context and tone of the two worm eating scenes are entirely different.

In sum, I find that plaintiff is not likely to prove that a lay observer would consider the works as substantially similar to one another. In undertaking this analysis, I am cognizant of the Supreme Court's admonition in *Feist* that copyright protection in a factual compilation is thin, and by analogy, that copyright protection in a compilation of ideas must also be thin.

Indeed, the *Feist* Court cited Professor Ginsburg's comment to the effect that "no matter how much original authorship the work displays, the facts and ideas it exposes are free for the taking .... The very same facts and ideas may be divorced from the context imposed by the author and restated or reshuffled by second comers, even if the author was the first to discover the facts or propose the ideas."

Feist at 349.

Nevertheless, the determination [*43] in this case does not depend on the difference between "thin" protection and "normal" protection. As set out above, the different expressions of the Survivor concept in these two shows impel a finding that under either standard, CBS is not likely to succeed in showing substantial similarity.

I will move on to irreparable harm and balance of the hardships.

As we all know, plaintiffs are entitled to a preliminary injunction if they establish "one, that [they are] subject to irreparable harm;, and two, either A, that [they] will likely succeed on the merits; or B, that there

are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation. And that balancing of the hardships tips 'decidedly' in favor of the moving party." *Genesee Brewing Co v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997)

"The award of a preliminary injunction is an extraordinary remedy and will not be granted absent a clear showing that the moving party has met its burden of proof." *Parenting Unlimited, Inc., v. Columbia Pictures Television, Inc.*, 743 F. Supp. 221, 224 (S.D.N.Y. 1990). In this circuit, irreparable harm is presumed [*44] upon a showing of a likelihood of success on the merits. *See e.g. Richard Feiner and Co. Inc., v. Turner Entm't Co.*, 98 F.3d 33, 34 (2d Cir. 1996). Here, as I've found above, plaintiffs have not shown a likelihood of success on the merits. I also find that plaintiffs have not shown sufficiently serious questions going to the merits of the case to make them a fair ground for litigation.

I make this finding particularly in light of the argument today in which plaintiffs focused almost entirely on the combination of the generic elements; although there was some lip service paid to expression; there was no discussion of expression. And indeed, in light of Professor Thompson's testimony that Survivor is the defining program in a genre, I find that plaintiffs have not, demonstrated sufficiently serious questions going to the merits.

In addition, I find that plaintiffs have not demonstrated that the balance of hardships tips "decidedly" in their favor. The test appears to be a purely equitable consideration of who will be hurt more by the decision. See *Monster Communications, Inc. v. Turner Broadcasting System. Inc.*, 935. F. Supp. 490 (S.D.N.Y. 1996) and *Downloadcard, Inc. v. Universal Music Group, Inc.*, 2002 U.S. Dist. LEXIS 23081 (S.D.N.Y. 2002) [*45]

Here both parties have presented some evidence of hardship resulting from an adverse ruling. If a preliminary injunction were issued at this point, defendants would be unable to proceed with the scheduled production and broadcast of a program that is to be the centerpiece of ABC's February 2003 sweeps offering. In turn, this would affect ABC's programming and ratings for months ahead and interfere with its relationships with its affiliates.

In this regard, I credit the testimony of Susan Lyne to this effect.

More damaging, however, I am persuaded that prohibiting Celebrity from airing will bring to a screeching halt the momentum ABC has generated in

2003 U.S. Dist. LEXIS 20258, *

regaining its ratings, and I obviously credit the testimony of Ms. Lyne to that effect.

In addition, I note that and credit the testimony of the Granada witnesses that their reputation will be harmed immeasurably by an injunction.

On the other hand, the decision not to issue an injunction may well cause plaintiffs some unspecified amount of losses in ratings and revenues, as Mr. Moonves testified.

Mr. Moonves also testified that possible plans to produce a Celebrity version of Survivor had been put on hold when CBS learned of Celebrity. [*46] Those plans, however, are fairly speculative, given the testimony that a Celebrity Survivor show was mentioned years ago and not otherwise followed up on until after Celebrity appeared.

Ultimately, however, I am easily persuaded that the balance of hardships tips decidedly in favor of ABC.

For all of the above reasons, counsel, the application for a preliminary injunction is denied.

Counsel, I thank you, again for your most professional presentations.

Is there anything else you would like to do today?

MR. FAGEN: Your Honor, are you going to be entering a written order today, tomorrow?

THE COURT: I'm happy to write bequest for preliminary injunction denied.

MR. FAGEN: I ask that because there are some, filing, things that we have to do in the clerk's office.

THE COURT: I am happy to do that right now if you wish.

MR. FAGEN: Tomorrow would be fine; Judge.

THE COURT: Yes, sir, anything else?

MR. SMART: On behalf of defendants, we thank the court

THE COURT: Good afternoon, ladies and gentlemen. Thank you again.

(Hearing concluded)



LEXSEE



Analysis
As of: Sep 08, 2008

CHIVALRY FILM PRODUCTIONS and JOSEPH ARDITO, Plaintiffs, -against-
NBC UNIVERSAL, INC., et al., Defendants.

05 Civ. 5627 (GEL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2007 U.S. Dist. LEXIS 86889

November 27, 2007, Decided
November 27, 2007, Filed

**PRIOR HISTORY:** Chivalry Film Prods. v. NBC
Universal, Inc., 249 Fed. Appx. 856, 2007 U.S. App.
LEXIS 23355 (2d Cir. N.Y., 2007)

**COUNSEL:** [*1] Joseph Ardito, Pro se.

Stephen F. Huff, Tom J. Ferber, Mark A. Tamoshunas,
Richard J. Purcell, Pryor Cashman Shearman & Flynn
LLP, New York, New York, for defendants.

**JUDGES:** GERARD E. LYNCH, United States District
Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

### OPINION AND ORDER

GERARD E. LYNCH, District Judge

Pro se plaintiff Joseph Ardito sued defendants, a
number of motion picture production and distribution
companies, for copyright infringement, claiming that two
movies produced and distributed by the defendants
infringed certain of plaintiff's copyrights. [1] On December
22, 2006, the Court granted defendants' motion for
summary judgment, finding that no reasonable trier of
fact could find the works substantially similar, and that
defendants established an independent source for their
films pre-dating plaintiff's copyrights. Defendants now
move for attorneys' fees and related expenses pursuant to

17 U.S.C. § 505 and Fed. R. Civ. P. 54(d)(2).
Defendants' motion will be granted.

1    In this Opinion, as in the Court's previous
opinions in this case, the Court refers to plaintiff
in the singular, since the co-plaintiff named in the
pleading is a sole proprietorship having no legal
existence independent of Ardito himself.
Chivalry Film Prods. v. NBC Universal, Inc., No.
05 Civ. 5627, 2006 U.S. Dist. LEXIS 1177, 2006
WL 89944, at *1 n.1 (S.D.N.Y. Jan. 11, 2006).
[*2]

**BACKGROUND**

Only those facts relevant to the current motion will
be recited here.

Plaintiff brought suit on June 16, 2005, asserting
several causes of action arising out of his claim that two
movies produced and distributed by certain of the
defendants, *Meet the Parents* and its sequel *Meet the
Fockers*, infringed his copyrights in various versions of a
novel and screenplay entitled *The Tenant* or *The
Dysfunctionals*. On January 11, 2006, the Court
dismissed plaintiff's fraud, unjust enrichment, RICO,
Lanham Act, and attorney's fees' claims, leaving
plaintiff's copyright infringement claim as the sole cause
of action in the case. See Chivalry Film Prods. v. NBC
Universal, Inc., No. 05 Civ. 5627, 2006 U.S. Dist.
LEXIS 1177, 2006 WL 89944 (S.D.N.Y. Jan. 11, 2006).

2007 U.S. Dist. LEXIS 86889, *

On June 19, 2006, defendants moved for summary judgment on the copyright infringement claim, arguing that no reasonable trier of fact could find that plaintiff had established substantial similarity of the works, or alternatively that the films were based on independent prior creations that pre-dated plaintiff's copyrights. On December 22, 2006, the Court granted defendants' motion, finding for defendants on both grounds. See Chivalry Film Prods. v. NBC Universal, Inc., No. 05 Civ. 5627, 2006 U.S. Dist. LEXIS 92956, 2006 WL 3780900 (S.D.N.Y. Dec. 22, 2006).  [*3] Specifically, the Court found that "the works at issue could not be more different in 'total concept and feel.'" Id. 2006 U.S. Dist. LEXIS 92956, [WL] at *1, quoting Green v. Lindsey, 885 F. Supp. 469, 481-82 (S.D.N.Y. 1992). Furthermore, the Court found that plaintiff's "attempts to show similarity" between the works "involve[d] the most trivial and generic of incidents," and that the works were "strikingly different." Id. 2006 U.S. Dist. LEXIS 92956, [WL] at *2. Finally, the Court found that both films were based on an independent creation originally copyrighted in 1991, which pre-dated plaintiff's 1996 copyright. Id. Plaintiff appealed to the Second Circuit, which affirmed the judgment on October 30, 2007.

On January 23, 2007, defendants moved for attorneys' fees and costs pursuant to 17 U.S.C. § 505 and Fed. R. Civ. P. 54(d)(2). [2] Plaintiff did not respond to defendants' motion. Accordingly, the motion will be decided solely on the basis of defendants' submission.

> 2    Pursuant to Fed. R. Civ. P. 54(d)(2)(C), defendants' motion only addresses the issue of plaintiff's liability for defendants' fees and costs. See Williams v. Crichton, 891 F. Supp. 120, 122 (S.D.N.Y. 1994). Accordingly, defendants have not yet submitted documentation concerning the amount [*4] of fees and expenses incurred.

## DISCUSSION

Defendants seek an award of attorneys' fees and costs pursuant to § 505 of the Copyright Act. Under § 505, the Court "in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. . . . [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. An award of attorneys' fees is at the discretion of the district court, and prevailing defendants and plaintiffs are to be treated alike. Fogerty v. Fantasy, Inc., 510 U.S. 517, 534, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994).

While there is no precise formula for determining whether an award of fees is appropriate, and "bad faith is not a prerequisite to an award of fees" under the Copyright Act, Screenlife Establishment v. Tower Video,

Inc., 868 F. Supp. 47, 51-52 (S.D.N.Y. 1994), courts exercising their discretion consider the equitable factors of "'frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" Crescent Publ'g Group, Inc. v. Playboy Enters., 246 F.3d 142, 147 (2d Cir. 2001), [*5] quoting Fogerty, 510 U.S. at 534 n.19. The Second Circuit has recognized that "objective reasonableness is a factor that should be given substantial weight in determining whether an award of attorneys' fees is warranted" because "the imposition of a fee award against a copyright holder with an objectively reasonable litigation position will generally not promote the purposes of the Copyright Act." Matthew Bender & Co. v. West Publ'g Co., 240 F.3d 116, 121-22 (2d Cir. 2001); see also Baker v. Urban Outfitters, Inc., 431 F. Supp. 2d 351, 357 (S.D.N.Y. 2006). "This is because such attorney fee awards may chill litigation of close cases, preventing the clear demarcation of the boundaries of copyright law." Ariel (UK) Ltd. v. Reuters Group PLC, No. 05 Civ. 9646, 2007 U.S. Dist. LEXIS 7423, 2007 WL 194683, at *1 (S.D.N.Y. Jan. 24, 2007), quoting Hofheinz v. AMC Prods., No. 00 Civ. 5827, 2003 U.S. Dist. LEXIS 16940, at *17 (E.D.N.Y. Sept. 1, 2003), citing in turn Fogerty, 510 U.S. at 527.

"[A] number of courts in this circuit have awarded attorneys' fees to prevailing defendants solely upon a showing that the plaintiff's position was objectively unreasonable, without regard to any other equitable factor." Baker, 431 F. Supp. 2d at 357 [*6] (internal quotation marks omitted), citing Adsani v. Miller, No. 94 Civ. 9131, 1996 U.S. Dist. LEXIS 13740, 1996 WL 194326, at *12-13 (S.D.N.Y. Sept. 19, 1996). The mere fact that a defendant has prevailed, however, "does not necessarily equate with an objectively unreasonable claim." Ann Howard Designs, L.P. v. Southern Frills, Inc., 7 F. Supp. 2d 388, 390 (S.D.N.Y. 1998). "To hold otherwise would establish a per se entitlement of attorney's fees whenever issues pertaining to judgment are resolved against a copyright plaintiff. . . . This is not a correct construction of the law." Nicholls v. Tufenkian Import/Export Ventures, Inc., No. 04 Civ. 2110, 2005 U.S. Dist. LEXIS 16715, 2005 WL 1949487, at *3 (S.D.N.Y. Aug. 11, 2005)(internal quotation marks and citation omitted). Similarly, the fact that a defendant has prevailed on a motion to dismiss or on summary judgment does not require the court to award fees. See, e.g., Brown v. Perdue, No. 04 Civ. 7417, 2006 U.S. Dist. LEXIS 66563, 2006 WL 2679936 (S.D.N.Y. Sept. 15, 2006). However, if a copyright claim is "clearly without merit or otherwise patently devoid of legal or factual basis," that claim "ought to be deemed objectively unreasonable," Penguin Books U.S.A., Inc. v. New

2007 U.S. Dist. LEXIS 86889, *

Christian Church of Full Endeavor, Ltd., No. 96 Civ. 4126, 2004 U.S. Dist. LEXIS 5648, 2004 WL 728878, at *3 (S.D.N.Y. Apr. 6, 2004), [*7] and an award of fees and costs is then proper.

Defendants argue that they should be awarded attorneys' fees and costs because "[p]laintiff failed to provide *any* basis for concluding that [d]efendants infringed protectable elements of [p]laintiff's works." (Defs. Mem. 5 (emphasis in original).) The Court agrees. In its December 22 order granting summary judgment, the Court found that "[t]he works at issue could not be more different in total concept and feel," and plaintiff's arguments to the contrary were wholly "specious," masking the "striking[] differen[ces]" between the works. Chivalry Film Prods., 2006 U.S. Dist. LEXIS 92956, 2006 WL 3780900, at *1-2. Indeed, the works were "so extraordinarily different" that plaintiff principally based his copyright claim, not on the substantial similarity between the works, but on the "*absence* of similarity, alleging that defendants blatantly went through extremes in revisions and manipulation in an attempt to conceal and subterfuge said crime by revising said screenplay." Id., 2006 U.S. Dist. LEXIS 92956, [WL] at *2 (emphasis added) (internal quotation marks and citation omitted). The complete lack of any reasonable basis for plaintiff's copyright claim thus establishes that his claim was frivolous and [*8] objectively unreasonable, and an award of fees and costs is appropriate here. *See* Polsby v. St. Martin's Press, No. 97 Civ. 690, 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *3 (S.D.N.Y. Jan. 18, 2000)(awarding costs and fees against pro se copyright plaintiff based, inter alia, "on the objective lack of merit in th[e] case"); Sparaco v. Lawler, Matusky, Skelly Eng'rs, LLP, 60 F. Supp. 2d 247, 258-59 (S.D.N.Y. 1999)(holding that plaintiff's copyright claim against certain defendants was objectively unreasonable because there was no evidence of infringement); Williams v. Crichton, 891 F. Supp. 120, 122 (S.D.N.Y. 1994)(granting defendants' motion for fees on showing of objective unreasonableness).

Moreover, although the plaintiff in this case did not engage in a "campaign of vexatious litigation," Polsby, 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *2, the need for deterrence against objectively unreasonable copyright claims is significant. Just as "attorney fee awards may chill litigation of *close* cases, preventing the clear demarcation of the boundaries of copyright law," Ariel (UK) Ltd., 2007 U.S. Dist. LEXIS 7423, 2007 WL 194683, at *1 (emphasis added), the denial of such awards in *objectively unreasonable* cases also disserves the purposes of copyright law, by [*9] failing to protect the owners of valid copyrights from the cost of frivolous litigation. Furthermore, the denial of fees and costs to a prevailing defendant in an objectively unreasonable

copyright case may spur additional frivolous lawsuits, of exactly the sort that an award of fees and costs is designed to "chill." Id.; see Polsby, 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *2. "Future litigants should be discouraged from comparable behavior." Great Am. Fun Corp. v. Hosung N.Y. Trading, Inc., No. 96 Civ. 2986, 1997 U.S. Dist. LEXIS 3623, 1997 WL 129399, at *3 (S.D.N.Y. Mar. 21, 1999).

Finally, plaintiff's pro se status is not a sufficient basis for denying an award of fees and costs in this case. The Supreme Court in Fogerty did not specifically deem the "relative financial resources of the parties" to be a relevant factor in considering whether to award fees under the Copyright Act. Penguin Books, 2004 U.S. Dist. LEXIS 7423, 2004 WL 728878, at *5, citing Fogerty, 510 U.S. at 534 n.19. Several courts in this Circuit have awarded attorneys' fees pursuant to 17 U.S.C. § 505 against a pro se plaintiff where, as here, the defendant prevails and the plaintiff's copyright claim was objectively unreasonable, without taking into account the financial disparities between [*10] the parties. See Polsby, 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *2; see also Attia v. Soc'y of the N.Y. Hosp., 12 Fed. Appx. 78 (2d Cir. 2001)(affirming an award of costs and fees against a pro se copyright plaintiff). This is because "[t]he decision to award attorney's fees is based on whether imposition of the fees will further the goals of the Copyright Act, not on whether the losing party can afford to pay the fees." Harrison Music Corp. v. Tesfaye, 293 F. Supp. 2d 80, 85 (D.D.C. 2003), citing Mitek Holdings, Inc. v. Arce Engineering Co., 198 F.3d 840, 843 (11th Cir. 1999). Cf. Shmueli v. City of New York, No. 03 Civ. 1195, 2007 U.S. Dist. LEXIS 42012, 2007 WL 1659210, at *5 (S.D.N.Y. June 7, 2007)("The same [legal] standards apply when the litigant involved is pro se."); Harrison v. Walsh, No. 06 Civ. 13328, 2007 U.S. Dist. LEXIS 39616, 2007 WL 1576265, at *25 (S.D.N.Y. June 1, 2007)(pro se litigants are "held to the same standards of conduct and procedure as an attorney").

However, although plaintiff's pro se status does not preclude an award of fees against him, his financial resources are not altogether irrelevant. "A court that awards fees to a defendant must take into account the financial circumstances of the plaintiff" when determining how much to [*11] award. Polsby v. St. Martin's Press, No. 97 Civ. 690, 2001 U.S. Dist. LEXIS 1675, 2001 WL 180124, at *1 (S.D.N.Y. Feb. 22, 2001); see Sassower v. Field, 973 F.2d 75, 81 (2d Cir. 1992); Polsby, 2001 U.S. Dist. LEXIS 1675, 2001 WL 180124, at *1 ("This principle has been applied in cases under the Copyright Act."). Thus, any "financial disparities" between plaintiff and defendants, who are, primarily, major motion picture production and distribution

2007 U.S. Dist. LEXIS 86889, *

companies, "may be . . . considered in determining the magnitude of" the award in this case. Penguin Books, 2004 U.S. Dist. LEXIS 5648, 2004 WL 728878, at *5, citing Lieb v. Topstone Indus., Inc., 788 F.2d 151, 156 (3d Cir. 1986); see Williams v. Crichton, No. 93 Civ. 6829, 1995 U.S. Dist. LEXIS 10699, 1995 WL 449068, at *1 (S.D.N.Y. July 26, 1995)(finding "the relative financial strength of the parties" to be "so disproportionate" that "the purposes of the Copyright Act" would be served "by a relatively small award"). Accordingly, the Court will take this factor into account, among other factors, when determining the appropriate amount of fees and costs to be assessed against plaintiff, if plaintiff makes a showing of a lack of financial resources.

## CONCLUSION

For the foregoing reasons, defendants' motion for fees and costs is granted. Defendants are directed [*12] to submit documentation of their costs and attorneys' fees, including attorneys' time sheets, by December 28, 2007. Plaintiff may submit his response, if any, by January 28, 2008.

SO ORDERED.

Dated: New York, New York

November 27, 2007

GERARD E. LYNCH

United States District Judge



LEXSEE



Cited
As of: Sep 08, 2008

**HERMAN DOUGLAS, SR., Plaintiff, v. JOEL OSTEEN, ET AL., Defendants.**

**CIVIL ACTION NO. 07-3925**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**560 F. Supp. 2d 362; 2008 U.S. Dist. LEXIS 40152; 87 U.S.P.Q.2D (BNA) 1146**

**May 16, 2008, Filed**

**SUBSEQUENT HISTORY:** As Amended, May 16, 2008.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff copyright holder filed a pro se suit against defendants, an author, his publisher, and unnamed others, alleging tortious interference with contractual relations claims and violations of the U.S. Copyright Act, 17 U.S.C.S. §§ 101-810, the Lanham Act, 15 U.S.C.S. §§ 1051-1129, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL). The author and publisher filed Fed. R. Civ. P. 12(b)(6) dismissal motions.

**OVERVIEW:** The holder alleged that there were substantial similarities in the words, expressions, biblical stories, and literary method used in the author's book and in his own literary work. The court held that the holder failed to assert an actionable copyright infringement claim under 17 U.S.C.S. § 501. He did not allege that the author actually copied any of the original elements of his work. 37 C.F.R. § 202.1(a) made clear that there was no copyright protection for the title of the holder's work, and pursuant to 17 U.S.C.S. § 102(b) and 37 C.F.R. § 202.1(b) there was no protection for matters in the public domain, such as the Bible stories. The holder's trademark infringement claim under 15 U.S.C.S. § 1125(a) failed. His assertion, that the author repeatedly used the work's title in his book, was patently false. The holder did not sufficiently allege facts showing that the portion of that title that was used by the author had acquired a

secondary meaning, such that its use created a likelihood of confusion. The failure of the holder's § 1125(a) claim was necessarily fatal to his claim under 73 Pa. Stat. Ann. § 201-2(4)(iii) of the UTPCPL, 73 Pa. Stat. Ann. §§ 201-1 to 201-9.3.

**OUTCOME:** The court granted the author's and the publisher's dismissal motions. It stated that an appropriate dismissal order would be entered in the case.

**COUNSEL:** [*1] For REV. HERMAN DOUGLAS, SR., Plaintiff, Pro se, NORRISTOWN, PA.

For RETAILERS, Defendant: MICHAEL EIDEL, LEAD ATTORNEY, DLA PIPER RUDNICK GRAY CARY US LLC, PHILADELPHIA, PA.

For OREGONBOOKS AND GAMES, LLC, Respondent, Pro se, GRANTS PASS, OR.

**JUDGES:** Tucker, J.

**OPINION BY:** Tucker

**OPINION**

**MEMORANDUM AND ORDER**

**Tucker, J.**

Presently before this Court are Defendants' Joel Osteen and Hachette Book Group USA, Inc.'s Motions to Dismiss (Docs. 7 and 23). [1] For the reasons set forth below, upon consideration of Defendants' Motions,

560 F. Supp. 2d 362; 2008 U.S. Dist. LEXIS 40152, *;
87 U.S.P.Q.2D (BNA) 1146

Plaintiff's Response (Doc. 9), and Defendants' Reply and Accompanying Exhibits (Docs. 18 and 19), this Court will grant Defendants' Motions.

1  Because the Motions to Dismiss of Defendants Joel Osteen and Hachette Book Group USA, Inc. are substantively identical, the Court will consider the motions in tandem, Plaintiff's response to Defendant Osteen's motion as responsive to both motions, and Defendant Osteen's Reply as filed on behalf of both defendants.

## BACKGROUND

From the evidence of record, taken in a light most favorable to the Plaintiff, the pertinent facts are as follows. In 1990, pro se Plaintiff, Reverend Herman Douglas, Sr., authored a book entitled *Prayer Power in the Eyes of Faith* for which  [*2] he obtained copyrights in 1990 and 2006. [1] In 2004, Defendant Reverend Joel Osteen ("Osteen") authored and obtained a copyright for *Your Best Life Now: 7 Steps to Living at Your Full Potential*. Both Plaintiff's and Osteen's books focus on religious motivation, recounting biblical stories and setting forth motivational prayers and anecdotes. On March 31, 2007, Plaintiff purchased a copy of Osteen's *Your Best Life Now* and noticed several similarities between his and Osteen's book, including use of the title of Plaintiff's book, the same biblical stories, similar words and expressions, and the same literary style. Prior to filing suit, Plaintiff consulted with a "legal advisor," who, in April 2007, advised Plaintiff that the legal advisor was prepared to take Plaintiff's case. Plaintiff did not retain but agreed to employ the legal adviser on an "as needed basis." On a subsequent undisclosed date, Osteen's counsel contacted Plaintiff's legal advisor and threatened to file a motion to dismiss.

2  Although Plaintiff alleges that he obtained a copyright for *Prayer Power in the Eyes of Faith* in 1990 and again in 2006, the record reveals that Plaintiff obtained a copyright for his book in 2005  [*3] and a copyright for a second version of the same book in 2007. Indeed, Plaintiff attaches to both his Amended Complaint and Response to Defendants' Motions a copyright registration for *Prayer Power in the Eyes of Faith* dated August 1, 2005. Also, the U.S. Copyright Office's online database reveals copyrights for *Prayer Power in the Eyes of Faith* (registration number: TXu001254354, date of creation: 2000) issued to Plaintiff on August 1, 2005 and *Prayer Power in the Eyes of Faith: A Historical Examination of Prayer over Time and how Prayer Moved Mountains out of God's Children's*

*Way* (registration number: TX0006596637, date of creation: 2005) issued to Plaintiff on June 11, 2007. No other copyrights are registered for works which contain "Prayer Power in the Eyes of Faith" in their title.

On September 24, 2007, Plaintiff filed suit against Osteen; Osteen's publisher, Hachette Book Group USA ("Hachette Book"); and unnamed Distributors and Retailers, alleging copyright infringement under the U.S. Copyright Act, 17 U.S.C. §§ 101-810; trademark infringement under the Lanham Act, 15 U.S.C. §§ 1051-1129; violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"),  [*4] 73 P.S. §§ 201-1 to 201-9.3; and tortious interference with contractual relations under Pennsylvania common law. Defendants Osteen and Hachette Book now move to dismiss all counts for failure to state a claim.

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. See In re Warfarin Sodium, 214 F.3d 395, 397-98 (3d Cir. 2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000). While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions,  [*5] unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. Morse v. Lower Merion School District, 132 F.3d 902, 906 (3d Cir. 1997). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" Kost v. Kozakewicz, 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d § 1357 at 340).

The court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. See Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998); 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d § 1357. "Plaintiffs cannot prevent a court from looking at the texts of the

560 F. Supp. 2d 362; 2008 U.S. Dist. LEXIS 40152, *;
87 U.S.P.Q.2D (BNA) 1146

documents on which its claim is based by failing to attach or explicitly cite them." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997). "[A] 'document *integral to or explicitly relied* upon in the complaint may be considered 'without converting the motion [to dismiss] into one for summary judgment." Id. (emphasis in original) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)). [*6] Any further expansion beyond the pleading, however, may require conversion of the motion into one for summary judgment. FED. R. CIV. P. 12(b).

## DISCUSSION

Defendants move to dismiss Plaintiff's copyright infringement, trademark infringement, UTPCPL violation, and tortious interference claims. The Court will grant Defendants' Motions.

## A. Copyright Infringement

In Count I of the Amended Complaint, Plaintiff alleges that there are "substantial similarities" between Plaintiff's and Osteen's books sufficient to constitute copyright infringement, in violation of the Copyright Act, 17 U.S.C. § 501. Plaintiff specifically alleges that Defendants use of the title of his book, [3] the same biblical stories, similar words and expressions, and the same literary style amounts to copyright infringement. Defendants argue that Plaintiff has failed to state a claim because there is no copyright protection for titles of books, short phrases, or biblical stories which are in the public domain and use of the same literary style does not give rise to a finding of "substantial similarity."

> 3    Plaintiff's Response asserts that Defendant used only a portion of the title of his book, namely the phrase "eyes of faith." [*7] For the reasons set forth infra, the short phrase "eyes of faith" is not subject to copyright protection.

To establish copyright infringement, the plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991) (citing Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 548, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)). Copying may be demonstrated by either direct evidence or circumstantial evidence showing that the defendant had access to the copyrighted work and that the original and allegedly infringing works bare substantial similarities. Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 207-08 (3d Cir. Pa. 2005). "Not all copying, however, is copyright infringement." Id. at 208 (quoting Feist Publ'ns, 499 U.S. at 361). To be actionable, the alleged copying must amount to an

unlawful appropriation of protectable material. Id. Protectable material includes expressions of ideas, not the ideas themselves nor matters in the public domain. See 17 U.S.C. § 102(b) (barring copyright protection for ideas); 37 C.F.R. § 202.1(b) (same); Kay Berry, 421 F.3d at 208 ("It is a fundamental [*8] premise of copyright law that an author can protect only the expression of an idea, but not the idea itself."); Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc., 797 F.2d 1222, 1232 n.23 (3d Cir. 1986) (noting that the plaintiff must show that the similarities between the works was due to copying and not because both parties drew from common sources that were part of the public domain); Ty, Inc. v. GMA Accessories, 132 F.3d 1167, 1170 (7th Cir. 1997) (same). Stated differently, protectable material includes only the original elements of the plaintiff's work. Kay Berry, 421 F.3d at 208.

Here, Plaintiff alleges that there exist substantial similarities in the words, expressions, biblical stories, and literary method used in the two books at issue in this case. Plaintiff may not claim a copyright in the title of his book nor the individual words, expressions, or short phrases used therein. The U.S. Copyright Office's regulations specifically exclude from copyright protection "words and short phrases such as names, titles, and slogans . . . ." 37 C.F.R. § 202.1(a); accord Southco v. Kanebrdige Corp., 390 F.3d 276, 286 (3d Cir. 2004); Kirkland v. National Broadcasting Co., 425 F. Supp. 1111, 1114 (E.D. Pa. 1976). [*9] Similarly, Plaintiff may not claim a copyright in biblical stories, which are in the public domain. See Torah Soft Ltd. v. Drosnin, 136 F. Supp. 2d 276, 286 (S.D.N.Y. 2001) (noting that the Bible is in the public domain, and therefore unprotectable); see also Computer Assocs. Int'l v. Altai, Inc., 982 F.2d 693, 710 (2d Cir. 1992) (stating material from the public domain "is free for the taking and cannot be appropriated by a single author even though it is included in a copyrighted work"); Whelan Assocs., 797 F.2d at 1232. Lastly, there is no copyright protection for a particular literary style. See Whitehead v. CBS/Viacom, Inc., 315 F. Supp. 2d 1, 11 (D.D.C. 2004).

The two books at issue in this case are motivational religious books. It is unsurprising that they contain the same biblical stories, similar expressions and phrases, and similar literary styles because the two books explore the same idea, namely religious motivation. Further, nowhere in the Amended Complaint has Plaintiff alleged that Defendants copied any of the original elements of his work; Plaintiff merely alleges that both he and Osteen wrote motivational religious books, which contain common elements that are not [*10] subject to copyright protection. See Kay Berry, 421 F.3d at 208 (indicating that there is no copyright protection where the allegedly infringing work is substantial similar "merely because it

560 F. Supp. 2d 362; 2008 U.S. Dist. LEXIS 40152, *;
87 U.S.P.Q.2D (BNA) 1146

contains elements that would be expected when two works express the same idea or explore the same theme"). As such, Plaintiff's copyright infringement claim will be dismissed for failure to state a claim.

## B. Trademark Infringement

In Count II, Plaintiff alleges that Osteen's use of the title of Plaintiff's book, *Prayer Power in the Eyes of Faith*, four times on one page of Osteen's differently-titled book, *Your Best Life Now*, constitutes trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a). [4] In his Response to Defendants' Motions, Plaintiff asserts that Osteen used only a portion of the title of his book, namely the phrase "eyes of faith," ten times in Osteen's book. With respect to the title "Prayer Power in the Eyes of Faith," Defendants argue that it is not a protectable mark because has it not acquired secondary meaning. Defendants also argue that Plaintiff's allegation (albeit false) that the phrase "prayer power in the eyes of faith" is used on one page of Osteen's differently-titled [*11] book could not, as a matter of law, support a finding of likelihood of confusion. With respect to the phrase "eyes of faith," Defendants argue that Plaintiff does not and cannot hold any trademark rights in the phrase and Plaintiff does not and cannot allege that Osteen's use of the phrase ten times in the text of his 305-page book creates a likelihood of confusion with Plaintiff's book, *Prayer Power in the Eyes of Faith*.

4    The Court notes that while Plaintiff's Amended Complaint cites to 15 U.S.C. § 1114, which governs infringement of registered trademarks, Plaintiff does not allege registration of the marks "Prayer Power in the Eyes of Faith" or "eyes of faith," nor does a search of the online database of the U.S. Patent and Trademark Office ("PTO") reveal any such registration. Because Plaintiff neither claims nor owns registrations for the marks "Prayer Power in the Eyes of Faith' or "eyes of faith," the Court will not address Defendants' argument regarding Plaintiff's failure to allege ownership of a registered trademark. Further, because Plaintiff proceeds pro se in this action, the Court will assume that Plaintiff intended to assert a claim under 15 U.S.C. § 1125(a), which governs [*12] infringement of unregistered trademarks. See Holley v. Dep't of Veteran Affairs, 165 F.3d 244, 248 (3d Cir. 1999) (indicating that the court is required to read a pro se litigant's pleadings liberally and to "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name") (citations omitted).

Under the Lanham Act, trademark infringement is defined as "use of a mark so similar to that of a prior user as to be likely to cause confusion, or to cause mistake, or to deceive." Freedom Card, Inc. v. JP Morgan, 432 F.3d 463, 469 (3d Cir. 2005). Accordingly, the Lanham Act "protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." Id. To establish a claim for trademark infringement, the plaintiff must show that (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) defendant's use of the mark to identify goods or services is likely to create confusion regarding the origin of the goods or services. A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000); Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 291 (3d Cir. 1991). [*13] Where the plaintiff claims an interest in an unregistered mark, the plaintiff must also show that he was first to adopt the mark in commerce, he has continuously used the mark in commerce since its adoption, and his unregistered mark is either inherently distinctive or has acquired secondary meaning. Ford Motor Co., 930 F.2d at 292; see also Dranoff-Perlstein Assoc. v. Sklar, 967 F.2d 852, 855 (3d Cir. Pa. 1992) (stating that federal trademark law extends protection to an unregistered mark only "if the public recognizes it as identifying the claimant's goods or services and distinguishing them from those of others") (quoting A.J. Canfield Co. v. Honickman, 808 F.2d 291, 296 (3d Cir. 1986)).

At issue here is whether Plaintiff has alleged ownership of a valid and protectable mark and likelihood of consumer confusion sufficient to state a claim for infringement under § 1125(a). Plaintiff claims an unregistered trademark in the title of his book, *Prayer Power in the Eyes of Faith*, which qualifies as a descriptive mark under the Lanham Act. See Herbko Int'l, Inc. v. Kappa Books, Inc., 308 F.3d 1156, 1163 n.2 (Fed. Cir. 2002) ("While titles of single works are not registrable, they may be [*14] protected under section 43(a) of the Lanham Act upon a showing of secondary meaning."). As a descriptive mark, Plaintiff must allege that the book title has acquired secondary meaning and the alleged use of the mark four times on one page of Osteen's book creates a likelihood of consumer confusion. Plaintiff's only claim of secondary meaning is an allegation that his book is available on the internet. Even assuming arguendo that Plaintiff's trademark in the title of his book has acquired secondary via the internet, Plaintiff has failed to allege any likelihood of confusion resulting from Osteen's alleged use of the mark four times on one page of his differently-titled book. See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000) (stating that "a likelihood of confusion exists when 'consumers viewing the mark

560 F. Supp. 2d 362; 2008 U.S. Dist. LEXIS 40152, *;
87 U.S.P.Q.2D (BNA) 1146

would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark'") (quoting Dranoff-Perlstein Assoc., 967 F.2d at 862); Qwest Commc'ns Int'l v. Cyber-Quest, Inc., 124 F. Supp. 2d 297, 304 (M.D. Pa. 2000) (stating that a motion to dismiss a trademark [*15] infringement claim may be granted if "no reasonable factfinder could find a likelihood of confusion on any set of facts that plaintiff could prove"). Further, while the Court, in considering Defendants' 12(b)(6) motion to dismiss, must accept as true all factual allegations in Plaintiff's Amended Complaint, the Court notes that Plaintiff's allegation of Osteen's use of the title of Plaintiff's book is patently false. See Plaintiff's Response at 8, 26 (stating that Osteen used only the phrase "eyes of faith"). Compare Defendant's Reply at Exhibits B and D (2005 and 2007 versions of Plaintiff's book, respectively), with id. at Exhibit E (Osteen's book).

As to Plaintiff's claimed trademark in the phrase "eyes of faith," the Court also concludes that Plaintiff has failed to state a claim for infringement. To be protectable under the Lanham Act, a mark must be capable of distinguishing the plaintiff's product from those of others. Dranoff-Perlstein Assoc. 967 F.2d at 855. Plaintiff claims that the mark "eyes of faith" is descriptive of his book, *Prayer Power in the Eyes of Faith*. See Plaintiff's Response at 23-24 ("*Prayer Power in the Eyes of Faith* was written to show that you must see things [*16] through the eyes of God.") (emphasis omitted). As a descriptive mark, the phrase "eyes of faith" must acquire secondary meaning to be protectable under the Lanham Act. Dranoff-Perlstein Assoc, 967 F.2d at 855. Plaintiff has not only failed to allege secondary meaning, but the phrase "eyes of faith" is incapable of distinguishing Plaintiff's book from the products of others. For example, Amazon.com lists over fifty books which contain the phrase "eyes of faith" in their title and a rudimentary internet search reveals three websites which bear the phrase "eyes of faith" in their URL addresses, namely eyesoffaith.org, eyesoffaith.com, and eyesoffaith.net. Defendant's Reply at Exhibits E and F; see also id. at Exhibit H (showing use of phrase "eyes of faith" in two verses of the *Amplified Bible*: Psalm 13:3 and Hebrews 11:20). Like Plaintiff's book, *Prayer Power in the Eyes of Faith*, these books and websites focus on religious motivation, encouraging the reader to view the applicable subject matter through the "eyes of faith." Because Plaintiff does not allege (and cannot prove) that the phrase "eyes of faith" distinguishes his book from the products of others, Plaintiff has failed to state [*17] a claim for trademark infringement under § 1125(a).

## C. UTPCPL Violation

In Count II, Plaintiff also alleges that Defendants' actions violate the UTPCPL. Plaintiff does not identify which section of the UTPCPL Defendants have allegedly violated, but his claim is asserted within Count II, which he has designated "trademark infringement." See Plaintiff's Amended Complaint at 8. Accordingly, the Court will read Plaintiff's pleadings liberally to allege a violation of UTPCPL, 73 P.S. § 201-2(4)(iii), which makes it an unfair business practice to cause a likelihood of confusion as to the source of goods or services. [5] See Gabriel v. O'Hara, 368 Pa. Super. 383, 389 n.7, 534 A.2d 488 (Pa. Super. Ct. 1987) (stating that the UTPCPL's unfair or deceptive acts or practices provisions enumerated in 73 P.S. § 201-2(4) are based on the Lanham Act, 15 U.S.C. § 1125(a)). Because the elements of claims brought under § 1125(a) and the UTPCPL are so similar, the same legal standards apply. Nor-Am Chemical Co. v. O.M. Scott & Sons Co., No. 86-3810, 1987 U.S. Dist. LEXIS 6336, at *4 (E.D. Pa. July 14, 1987). As stated above, Plaintiff has failed to state a claim under § 1125(a). As such, Plaintiff's UTPCPL claim must also [*18] fail.

> 5   To the extent Plaintiff contends that Defendants' alleged copyright infringement violates the UTPCPL, that claim must fail as the Copyright Act preempts all state law claims. 17 U.S.C. § 301; see also Klitzner Industries, Inc. v. H. K. James & Co., 535 F. Supp. 1249, 1258 (E.D. Pa. 1982) (stating that "state regulation of unfair competition is preempted as to matters falling within the broad confines of the copyright clause of the United States Constitution") (citing Triangle Publications, Inc. v. Sports Eye, Inc., 415 F. Supp. 682, 683 (E.D. Pa.1976)).

## D. Tortious Interference with Contractual Relations

In Count III, Plaintiff asserts a tortious interference with contractual relations claim under Pennsylvania common law. Plaintiff alleges that counsel for Osteen contacted Plaintiff's "legal advisor" and threatened to file a motion to dismiss. Defendants argue that Plaintiff has failed to state a claim because the conversation between defense counsel and Plaintiff's legal advisor was privileged, no "wrongful means" was employed, and Plaintiff has failed to allege that he had a contractual relationship with said legal advisor. To state a claim for tortious interference with contractual [*19] relations, the plaintiff must allege (1) the existence of a contractual relationship; (2) an intent on the part of the defendant to harm the plaintiff by improperly interfering with that contractual relationship; (3) the absence of a privilege or justification for such interference; and (4) damages resulting from the defendant's conduct. Small v. Juanita College, 452 Pa. Super. 410, 682 A.2d 350, 354 (Pa.

560 F. Supp. 2d 362; 2008 U.S. Dist. LEXIS 40152, *;
87 U.S.P.Q.2D (BNA) 1146

Super. 1996) (citing Triffin v. Janssen, 426 Pa. Super. 57, 626 A.2d 571, 574 (Pa. Super. 1993); RESTATEMENT (SECOND) OF TORTS § 767). First, no contractual relationship between Plaintiff and his purported legal advisor. The Amended Complaint specifically states that the legal advisor offered to represent Plaintiff in the instant action but Plaintiff rejected the legal advisor's offer for a contractual relationship, choosing instead to seek the legal advisor's assistance on "as needed basis." See Amended Complaint at 9, 12. Next, pretrial communications between purported counsel are privileged under Pennsylvania law. Pawlowski v. Smorto, 403 Pa. Super. 71, 588 A.2d 36, 41 (Pa. Super. 1991); Smith v. Griffiths, 327 Pa. Super. 418, 476 A.2d 22, 24 (Pa. Super. 1984). Lastly, Plaintiff merely alleges that defense counsel contacted Plaintiff's putative lawyer and [*20] advised that Osteen intended to file a motion to dismiss; such action does not constitute improper interference. See Adler, Barrish, Daniels, Levin and Creskoff v. Epstein, 482 Pa. 416, 393 A.2d 1175, 1182 (Pa. 1978) (stating that improper interference is "purposeful interference without justification"); Small, 682 A.2d at 354 (stating that improper interference is determined by evaluating, inter alia, the nature of the actor's conduct, the relationship between the parties, and the social interests in protecting the freedom of action of the actor) (quoting

RESTATEMENT (SECOND) OF TORTS § 767). As such, Plaintiff has failed to state a claim for tortious interference with contractual relations.

## CONCLUSION

For the foregoing reasons, this Court will grant Defendants Osteen and Hachette Book's Motions to Dismiss. An appropriate order follows.

### ORDER

AND NOW, this 16th day of May 2008, upon consideration of Defendants' Joel Osteen and Hachette Book Group USA, Inc.'s Motion to Dismiss (Docs. 7 and 23), Plaintiff's Response (Doc. 9), and Defendants' Reply and Accompanying Exhibits (Docs. 18 and 19), **IT IS HEREBY ORDERED and DECREED** that Defendants' Motions to Dismiss (Docs. 7 and 23) are **GRANTED. JUDGMENT IS ENTERED** for Defendants and against Plaintiff on all counts of the Complaint.

BY THE COURT:

/s/ Petrese B. Tucker

**Hon. Petrese B. Tucker, U.S.D.J.**



LEXSEE



Analysis
As of: Sep 08, 2008

CLIFTON MALLERY a/k/a ENJAI OMAA EELE and AMNAU KARAM EELE,
Plaintiffs, -v- NBC UNIVERSAL, INC., NBC UNIVERSAL TELEVISION STUDIO,
TAILWIND PRODUCTIONS, TIM KRING, DENNIS HAMMER, ALLAN
ARKUSH, JEPH LOEB and BRYAN FULLER, Defendants.

07 Civ. 2250 (DLC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2007 U.S. Dist. LEXIS 88960

December 3, 2007, Decided
December 3, 2007, Filed

**SUBSEQUENT HISTORY:** Motion denied by,
Judgment entered by Mallery v. NBC Universal, Inc.,
2008 U.S. Dist. LEXIS 12835 (S.D.N.Y., Feb. 21, 2008)

**COUNSEL:** [*1] For Plaintiffs: John A. Coleman, Jr.,
Freidberg Cohen Coleman & Pinkas, LLP, New York,
NY.

For Defendants: Marcia Beth Paul, Davis Wright
Tremaine LLP, New York, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*OPINION AND ORDER*

DENISE COTE, District Judge:

Plaintiffs Clifton Mallery a/k/a Enjai Omaa Eele and
Amnau Karam Eele ("plaintiffs") bring this action
against the defendants NBC Universal, Inc., NBC
Universal Television Studio, Tailwind Productions, Tim
Kring, Dennis Hammer, Allan Arkush, Jeph Loeb, and
Bryan Fuller ("defendants") alleging that the television
series *Heroes,* which is (collectively) written, produced,
and broadcast by the defendants, infringes the copyrights
held by the plaintiffs in their 777-page handwritten novel
*The Twins: Journey of the Soul* ("*The Twins*"), their short

film based on *Twins* entitled *The Letter,* and their
painting series *Envious of America.* On June 15, 2007,
defendants moved to dismiss the complaint pursuant to
Fed. R. Civ. P. 12(b)(6). For the reasons stated below,
the motion to dismiss is converted to a motion for
summary judgment and is granted.

BACKGROUND

The following facts are taken from the complaint.
Plaintiffs are "divination artists"     [*2] known
professionally as "The Twins." On April 22, 2005,
plaintiffs screened their short film *The Letter* at Hunter
College in New York City, exhibited paintings from their
series *Envious of America,* and presented a lecture on
their art. At this event, they also made available excerpts
from their novel *The Twins.* Persons identifying
themselves as writers from defendant Tim Kring's
("Kring") television show *Crossing Jordan* attended the
event and "are believed to have taken copies" of those
materials. Plaintiffs also screened *The Letter* at several
other venues, and sent excerpts of *The Twins* along with
a copy of *The Letter* to several entertainment executives,
including to a corporate affiliate of defendants NBC
Universal and NBC Universal Television Studio.

Defendant Kring conceived the idea for the
television series *Heroes* around October or November of
2005. *Heroes* debuted on NBC in September 2006, and
twenty-three episodes of the series had aired at the time
the motion to dismiss was filed, constituting the first

2007 U.S. Dist. LEXIS 88960, *

season of the series. Plaintiffs allege that *Heroes* is "so strikingly similar" to their works *The Twins, The Letter,* and *Envious of America* that Kring and the other defendants [*3] "must have had access to and copied" their work.

## DISCUSSION

### I. Governing Copyright Standards

"Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying." *Tufenkian Import/Export Ventures, Inc v. Einstein Moomjy, Inc.,* 338 F.3d 127, 131 (2d Cir. 2003) (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998)). In order to prevail on a claim for infringement, a copyright holder must show (1) "that his work was actually copied," and (2) "that the copying amounts to an improper or unlawful appropriation." *Castle Rock Entm't,* 150 F.3d at 137 (citation omitted).

Under the first prong, "[b]ecause direct evidence of [actual] copying is seldom available, a plaintiff may establish copying circumstantially by demonstrating that the person who composed the defendant's work had access to the copyrighted material, and that there are similarities between the two works that are probative of copying." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51 (2d Cir. 2003) (citation omitted). Similarities between the works are "probative" if, "under all the circumstances, [they] make independent creation unlikely." *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 140 (2d Cir. 1992) [*4] (citation omitted).

The second prong requires a plaintiff to demonstrate "unlawful appropriation." This reflects a recognition that even where "actual copying" may have occurred, not all such copying is actionable under the copyright laws. To establish "unlawful appropriation," a plaintiff must demonstrate "substantial similarity" between the original and allegedly infringing works. *Tufenkian Import/Export Ventures,* 338 F.3d at 131 (citation omitted). The works are "substantially similar" if the similarities are "more than de minimis," and if "it was protected expression in the earlier work that was copied." *Id.* (citation omitted). Where the copying is not literal or does not plagiarize the protected work, infringement may nonetheless occur. *Id.* at 132-33. To determine whether a defendant has infringed a plaintiff's copyright in these circumstances, a court must "analyze the . . . works closely to figure out in what respects, if any, they are similar, and then determine whether these similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking." *Id.* at 134-35.

For [*5] the purposes of this motion, defendants do not contest that the plaintiffs hold registered copyrights in *The Twins, The Letter,* or *Envious of America,* [1] or deny that they had access to these works. Rather, defendants argue that there is simply no "substantial similarity" between these works and the television show *Heroes,* and that plaintiffs' copyright infringement claim therefore fails as a matter of law. Plaintiffs counter by pointing out both general and specific similarities between the works in question.

> 1 Although the defendants' do not press this argument, it may be noted that the complaint itself and the record to date do not reflect that *Envious of America,* or any of the paintings that make up that series, have been registered with the copyright office.

In light of the arguments presented, this motion is properly treated as a motion for summary judgment. Whether certain works are substantially similar to one another is a question of fact to be resolved by a jury. *Cf. Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 111 (2d Cir. 2001) (citing *Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 355, 118 S. Ct. 1279, 140 L. Ed. 2d 438 (1998)). "However, a district court may determine noninfringement as a [*6] matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff work, or when no reasonable trier of fact could find the works substantially similar." *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48 (2d Cir. 1986); *see also Williams v. Crichton,* 84 F.3d 581, 587 (2d Cir. 1996). Although the defendants filed their motion pursuant to Fed. R. Civ. P. 12(b)(6), the arguments raised in the defendants' motion papers and in the plaintiffs' opposition have focused almost exclusively on these questions -- *i.e.,* whether the alleged similarities relate to noncopyrightable elements and whether any reasonable observer could consider the works substantially similar -- and thus it is appropriate to convert this motion to one for summary judgment in order to address the merits of the arguments raised by the parties. [2] Before a discussion of the merits can proceed, however, it is first necessary briefly to review the works in question.

> 2 A district court must ordinarily give notice to the parties before converting a motion to dismiss to a motion for summary judgment. *See, e.g., Kopec v. Coughlin,* 922 F.2d 152, 154-55 (2d Cir. 1991). "A [*7] party is deemed to have notice that a motion may be converted," however, "if that party should reasonably have recognized the possibility that such a conversion would occur." *Sira v. Morton,* 380 F.3d 57, 68 (2d Cir. 2004) (citation omitted). Given the arguments raised by

the parties (as well as the cases cited, which almost exclusively resolve such arguments on motions for summary judgment), the parties should have reasonably recognized that the instant motion could be converted to one for summary judgment. In any event, the parties have suffered no prejudice as a result of the conversion, as the works in question are the only documents it is necessary to review in order to resolve the questions presented by the motion; thus, "all material made pertinent to [a motion for summary judgment] by Rule 56" is already before the Court. Fed. R. Civ. P. 12(b).

## II. Summary of Works at Issue

### A. *The Twins*

*The Twins* is a 777-page, handwritten novel co-authored by the plaintiffs. It chronicles the lives of Idai and Hadah, "twins" who are separated before birth into two different wombs by their grandmother, a mystic named Madame Naomi Dachette. "The Twins," as they are referred to, are born in the same [*8] small town in Louisiana, and are aware from a young age that they possess certain special abilities, which are partly genetic and partly spiritual in origin. Early in the novel, for example, Idai predicts the crash of a plane carrying Dylan Renway, an inhabitant of the town. This prediction is embodied in a "sketch" made by Idai. Idai attempts to warn Dylan's mother about the crash, but she ignores Idai's warning, and Idai later sees in the newspaper that his prediction came true. Later in the novel, Idai will also make predictive sketches relating to, among other things, the Columbine shootings and George W. Bush's election in Florida.

The female twin, Hadah, also has the ability to see the future, which she depicts in artwork affixed to the backs of doors. Hadah also has several other powers, including the ability to make her enemies bleed using only her mind, and to transcend space and time. (Idai also appears to share these powers.) In addition, Idai and Hadah are both skilled martial artists.

The Twins are initiated into the Li-Maa Divination Clan by their grandmother, a "Diviner" who is the head of the Clan, as well as Servitor Ti-Qui Saru, a Diviner and "Nem-Fa" who can, among [*9] other things, walk through walls. The initiation rituals are elaborate and mystical. For example, the "opening the ground" ritual involves, *inter alia,* a sheet of fire in which "500,000 faces" appear and enter Hadah's body, and a stone that rises out of the ground and pulls Hadah down into the earth.

Idai and Hadah's families attempt, for a time, to hide The Twins' special abilities, and during this time Idai works as an engineer for oil companies in Texas, Kuwait, and Mexico, and Hadah works as a salesperson at a jewelry store and fashion model. Idai and Hadah eventually marry, and live in Los Angeles, Miami, and Manhattan.

In addition to tracing the origins and experiences of Idai and Hadah, *The Twins* follows numerous additional storylines and characters. For example, the novel tells the story of Olagaia Atune, who is born into poverty in Cuba, becomes an art dealer in America, discovers his own special powers -- such as the ability to erase people's memories -- and searches for The Twins and two sacred twin statues. A character by the name of Professor Heinman also searches for The Twins, along with other people with "special abilities." Maitre Jess, a Hatian voodoo priestess, is [*10] a rival of Madame Dachette's with whom The Twins do battle. Maitre Jess's story is, in turn, intertwined with the story of several families from Cuba, including the Atune, Ferrer, Vega, and Illadro families, some of whom become involved with Maitre Jess, The Twins, the Santeria religion, and drug and organ trafficking.

The bulk of the novel concerns the intersecting story lines of the characters listed above (along with many others) and the physical and spiritual conflict between The Twins and Maitre Jess. In the last twenty-five pages, Idai makes another sketch prophesying the future, this time predicting that two planes will destroy the Twin Towers on September 11. [3] The Twins are initially hesitant to share this new "divination" with anyone, recalling that their predictions -- such as their prediction of the Columbine shootings -- are often ignored. The Twins overcome this initial reluctance and travel to the Port Authority to tell someone about their divination, and there they learn that Larry Silverstein is about to buy the doomed buildings. The Twins meet with several people who work for Silverstein in an attempt to warn him about the impending attack. They agree to pass on The [*11] Twins' warning to Silverstein, but apparently to no avail, as the novel ends with The Twins watching the first plane hit the Twin Towers.

> 3   The copyright page of the novel states that it was written in June of 2001. Presumably, plaintiffs proffer the novel itself as proof of their own powers.

The tone and pacing of *The Twins* is sprawling and mystical. The narrative is an undifferentiated stream of description and dialogue without guiding punctuation, and the novel shifts repeatedly between various settings, including Louisiana, Cuba, Miami, Texas, Africa, Paris, New York, and more ethereal realms.

### B. *The Letter*

*The Letter* is a short film that plaintiffs assert is based on *The Twins*. The film deals with The Twins' purported efforts to warn Robert De Niro and his company, Tribeca Films, of the September 11 attacks. *The Letter* opens with a photograph of outer space, which is then superimposed on two figures (presumably The Twins), who walk down a hallway towards a wall on which there are several hand-drawn images. The most prominent image is a symbol that plaintiffs refer to as a "cosmogram": a circle bisected by two straight lines, dividing it into four equal quadrants, as in a simplified [*12] Celtic cross. Background music begins to play — a somewhat playful and repetitive tune driven by an acoustic guitar and a single male voice -- and the camera zooms into the center of the circle.

As the music continues to play, the captions state that, "[i]n March 2001 four views to September 11, 2001 were hand delivered by The Twins to Jane Rosenthal at Tribeca Films, owned by Robert De [] Niro." These "four views" are then catalogued. They are entitled: (1) "1st View: SIXTH RACE (c) 1995." This "view" is an image of the painting "Sixth Race," created by plaintiffs, which depicts several ghostly figures gathered around a central figure who appears to be wearing military medals. A photograph of George Bush and Alan Greenspan standing in a similar posture is then superimposed over this image, which plaintiffs state represents a "validation" of the "prediction" contained in the painting. (2) "2nd View: Compliant (c) 1999." Various symbols (crosses, letters, "cosmograms," etc.) appear one-by-one on the screen in several dozen rows to the sound of a typewriter. The bottom-right corner of the screen contains a section of a "cosmogram." [4] (3) "3rd View: AMNAU'S DIVINING BOARD (c) 2000." This [*13] "view" depicts a door on which various newspaper articles, photographs, and other assorted materials (*e.g.*, a packet of sugar from the United Nations) are mounted, including one scrap of paper that refers to the World Trade Center. (4) "4th View: The Atta Page (c) 2001." This portion of the video slowly reveals a hand-drawn sketch that depicts, *inter alia*, two planes crashing into the Twin Towers, the name "Atta," and the date and time of the September 11 attacks.

> 4   Plaintiffs assert that the coded symbols "are used to predict the attacks of September 11," although *The Letter* itself does not suggest that interpretation.

After the "four views" are described, the captions and video explain that these works, which plaintiffs assert predicted the September 11 attacks, were sent to Tribeca films and rejected. A pair of disembodied eyes then appears on the screen; the eyes are slowly revealed to be those of Mohamed Atta. Another video sequence shows photographs of Robert De Niro and Jane Rosenthal delivering food via boat to workers at Ground Zero, and of "The Twins" crying following the September 11 attacks.

### C. *Envious of America*

The complaint states that *Envious of America* is a "series of [*14] oil-on-canvas paintings" painted in 1995 that have been exhibited at several galleries across the country. Plaintiffs assert that "The Sixth Race," which is depicted in *The Letter* and discussed in *The Twins,* is a part of that series.

### D. *Heroes*

*Heroes* is an hour-long, weekly television series about ordinary people who discover that they posses extraordinary powers, and the complications, adventures, and dangers that follow. Key characters include Isaac Mendez, a comic-book artist and drug addict from New York who can "paint the future" when high on heroin; Claire Bennet, a cheerleader from Texas who can heal herself; Mr. Bennet, Claire's adoptive father, who works for an unnamed organization that tracks people with special abilities; Mr. Bennet's assistant, "The Haitian," who can erase people's memories and block the use of certain heroes' powers; Hiro Nakamura, an office worker from Japan who can bend time and space; Matt Parkman, a policeman who can read minds; Nathan Petrelli, a politician running for Congress, who can fly; Peter Petrelli, Nathan's brother, who can "absorb" the powers of others; Sylar, a serial killer who robs others of their powers; Mohinder Suresh, a professor from [*15] India who, following in the footsteps of his slain father, seeks out those with special abilities in order to validate his father's genetic theories; and numerous others. As Mohinder and his father explain, the special powers possessed by these characters are the result of genetic changes caused by the human evolutionary process. During the twenty-three episodes of the first season, *Heroes* follows each of these characters as they discover their abilities and how they are meant to be used.

In an early episode, Issac paints a picture while high on heroin showing the destruction of New York City by what appears to be an atomic bomb, and Hiro -- during a brief visit to the future -- also sees the same event. Through various plot twists, several of the heroes mentioned above undertake a quest to prevent this attack, during which time the heroes are also being hunted down by Sylar, who seeks to kill them, and sought out by Mohinder, who seeks to study and help them. Toward the end of the first season, Issac is killed by Sylar, but in the final episode the destruction of the city is averted when

2007 U.S. Dist. LEXIS 88960, *

Peter -- who, it turns out, is the source of the explosion -- is flown by his brother Nathan to [*16] a point high above the city, where Peter can explode without harming anyone.

*Heroes* is suffused with a general air of suspense, due to the gradual revelation of various plot elements, the mysterious nature and origins of the heroes' powers, and the haunting musical soundtrack. The series is also characterized by a visual theme that calls to mind the show's comic-book predecessors in the superhero genre, including captions rendered in a "handwritten" comic-book style.

## III. Analysis and Comparison

Plaintiffs allege that *Heroes* infringes on their copyrights in *The Twins, The Letter,* and *Envious of America.* Having reviewed these works in some detail, it is readily apparent that these claims are wholly without merit, as nearly every instance of alleged similarity between *Heroes* and the plaintiffs' work relates to unprotectable ideas rather than protectable expression and, viewed more broadly, the "total concept and feel" of these works are profoundly different. [5] *Castle Rock,* 150 F.3d at 140.

> 5  The parties contest whether plaintiffs' works can be considered in the aggregate for the purposes of evaluating their copyright infringement claim. As the discussion below indicates, resolution of this [*17] question is not necessary, as plaintiffs' claim fails regardless of the manner in which their works are considered.

Plaintiffs' complaint contains a litany of alleged "substantial similarities" between *Heroes* and either *The Twins, The Letter,* or both. [6] Plaintiffs focus particularly on the similarities between Idai from *The Twins* and Isaac Mendez of *Heroes,* noting that both (1) are "minorities" (Idai is African-American and plaintiffs presume Issac Mendez to be Latino), (2) have the ability to "paint the future"; (3) often paint in oil on large canvasses; (3) create depictions of "two landmark New York City buildings being destroyed" (Idai the Twin Towers, Issac the Empire State and Chrysler Buildings); (4) create paintings of a bus being destroyed in the future, which prediction is then validated in a newspaper article; and (5) attempt to stop the destruction of those buildings.

> 6  Although the infringement claim also makes reference to *Envious of America,* the complaint does not assert any similarities between *Heroes* and that particular series specifically. (Various references are made, however, to the plaintiffs' "work" as a whole.)

Plaintiffs' allegations regarding the similarities between [*18] Idai and Isaac cannot form the basis for a copyright infringement claim for several reasons. On the most general level, a "minority artist" who has the ability to paint the future is an "idea" that is not protected under the copyright laws. As Judge Hand memorably noted in the landmark case of *Nichols v. Universal Pictures Corp.,* 45 F.2d 119 (2d Cir. 1930):

> If *Twelfth Night* were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play. . . .

*Id.* at 121. In addition, (1) painting a future in which tragic and destructive events take place, such as the destruction of landmark buildings in New York City; (2) having a prediction confirmed by a newspaper report; and (3) making an attempt to prevent a tragic event in light of a prediction of the future, are simply "*scenes a faire,* [or] sequences of events that necessarily result from the choice of a setting or situation, [*19] [which] do not enjoy copyright protection." *Williams,* 84 F.3d at 587 (citation omitted).

Of course, it must be recognized that "[a] character is an aggregation of the particular talents and traits his creator selected for him. That each one may be an idea does not diminish the expressive aspect of the combination." *Warner Bros. v. Am. Broadcasting Cos.,* 720 F.2d 231, 243 (2d Cir. 1983). That said, "just as similarity cannot be rejected by isolating as an idea each characteristic the characters have in common, it cannot be found when the total perception of all the ideas as expressed in each character is fundamentally different." *Id.* That is the case here. In sum, Idai is a member of the fictional Li-Maa Divination Clan, as well as an engineer and martial artist, and is one of a set of spiritual twins; Issac is a comic-book artist and drug addict whose ability to paint the future is only unlocked when he is high on heroin. The "total perception" of these characters could hardly be more different, and the plaintiffs' argument that they are "identical but for the change in race" does not withstand scrutiny.

The other alleged instances of similarity between *Heroes* and the plaintiffs' works [*20] similarly fail to contribute to a valid claim of copyright infringement, as they also allege copying of unprotectable ideas such as a

2007 U.S. Dist. LEXIS 88960, *

"stopping the catastrophe story arc," the depiction of a "cosmogram" (which appears in one scene in *Heroes,* as well as in *The Letter* and *The Twins*), the use of symbols "to signal a plot event," characters with "extraordinary abilities," and the use of "block capital letters" in title sequences. [7] While the line between mere "ideas" and protected "expression" is famously difficult to fix precisely, *see, e.g., Nichols,* 45 F.2d at 121, these alleged "similarities" are textbook examples of the former.

> 7 It may also be noted that the letters used in the title sequences of *The Letter* and *Heroes* are not typographically similar, and thus plaintiffs' claim seems to be based solely on the use of white "block capital letters" against a largely black background in both works.

The DVD submitted by plaintiffs in their opposition to the instant motion specifically identifies many of the alleged similarities between *Heroes* and *The Letter,* and only underscores the plaintiffs' failure to identify any actionable copying. For example, plaintiffs allege that "close up eye [*21] images are used" in both works in a way that is "virtually identical." In support of this claim, the DVD shows (1) the moment in *The Letter* in which Mohamed Atta's eyes are floating alone on the screen, after which his full face is revealed, and (2) a clip from *Heroes* in which the camera is tightly zoomed in on one character's eyes, then rapidly zooms out. Plaintiffs also argue that there are "twin characters" in both *The Letter* and *Heroes;* in support, the DVD shows an image from *The Letter* of The Twins walking down a hallway, followed by various scenes from *Heroes* in which there are two characters together on screen. Needless to say, close-ups of eyes and the depiction of two people simultaneously on screen -- or, as plaintiffs put it, the "twinning" of characters -- are not examples of protectable expression under the copyright laws. The absurd results that would follow from holding otherwise need not be enumerated. In sum, having "analyze[d] the . . . works closely to figure out in what respects, if any, they are similar," it must be concluded that whatever similarities may be said to exist between *Heroes* and plaintiffs' works are not "due to protected aesthetic expressions original [*22] to the allegedly infringed work," but rather related to ideas "in the original that [are] free for the taking." *Tufenkian Import/Export Ventures,* 338 F.3d at 134-35.

Plaintiffs also argue that the similarities they have identified are evidence of a "total concept and feel" shared by their works and *Heroes. See, e.g., Castle Rock,* 150 F.3d at 140. It is well established that "substantial similarity" may be found where a later work appropriates the "total concept and feel, theme, characters, plot, sequence, pace, and setting" of an earlier work, even if

no single instance of alleged copying is itself actionable. *Id.; see also Tufenkian Import/Export Ventures,* 338 F.3d at 134. As the summaries above indicate, however, there is simply no "plausible claim that there is a common aesthetic appeal between" *Heroes* and *The Twins, The Letter,* or *Envious of America. Castle Rock,* 150 F.3d at 140. While plaintiffs have pointed out several highly generalized similarities in characterization (*e.g.,* the ability to paint the future or erase people's memories) visual elements (*e.g.,* the use of symbols, block lettering), and plot points (*e.g.,* a threat to Manhattan, a solar eclipse), this "scattershot" [*23] listing "fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another," even without scrutinizing the plaintiffs' works to isolate their protected elements. *Williams,* 84 F.3d at 590. Having reviewed the works in question, no reasonable juror could find that they are substantially similar.

"Once one goes beyond th[e] level of abstraction" on which the plaintiffs' proffered similarities lie, "the similarity [between the works] disappears." *Id.* at 589. *Heroes* is a hour-long suspense/drama that mixes moments of action, humor, and mystery as it follows an eclectic, international group of genetically enhanced heroes and their quest to prevent a catastrophic explosion in New York -- an explosion that may be caused, it turns out, by one of their own number. *The Letter,* by contrast, is a fifteen-minute, documentary-style film with a jaunty soundtrack that presents an account of The Twins' attempt to warn Robert De Niro and Tribeca Films about September 11. While, on the most abstract level, both of these works concern the prevention of a tragic and violent event in New York, the "two stories are not similar in mood, details [*24] or characterization," and, indeed, differ in nearly every relevant way. *Reyher v. Children's Television Workshop,* 533 F.2d 87, 92 (2d Cir. 1976). *The Twins* also presents a stark contrast to *Heroes;* it is a sprawling, fantastical story about, among many other things, two spiritual "twins" who are married to one another and are members of a mysterious "Divination Clan." Although the novel shares various superficial similarities with *Heroes,* as described in the complaint, the context, presentation, plot lines, narrative structure, and style of the two works are substantially different; indeed, the "the ordinary observer, unless he set out to detect" the similarities, "would be disposed to overlook them" -- precisely the opposite of what the copyright law requires to support an infringement claim. *Boisson v. Banian, Ltd.,* 273 F.3d 262, 272 (2d Cir. 2001).

This conclusion is confirmed by a review of the case law, which reveals that creations far more comparable than *Heroes* and the plaintiffs' works have been found

2007 U.S. Dist. LEXIS 88960, *

not to be "substantially similar" as a matter of law. *See, e.g., Williams, 84 F.3d 581* (comparing children's book about visit to a dinosaur zoo to *Jurassic Park*); *Walker v. Time Life Films, Inc., 784 F.2d 44 (2d Cir. 1986)* [*25] (book *Fort Apache* and film "Fort Apache: The Bronx"); *Warner Bros., 720 F.2d 231* (works containing the character "Superman" and television show "The Greatest American Hero"); *Reyher, 533 F.2d 87* (children's book *My Mother Is the Most Beautiful Woman In The World* and short illustrated story for children "The Most Beautiful Woman In The World"); *Nichols, 45 F.2d 119* ("Abie's Irish Rose" and "The Cohens and the Kellys"). A review of these authorities and a comparison of the works at issue here compels the conclusion that "no reasonable trier of fact could find the works substantially similar." *Walker, 784 at 48*. Plaintiffs' infringement claim must therefore be dismissed.

CONCLUSION

The defendants' June 15, 2007, motion to dismiss is converted to a motion for summary judgment and is granted. An Order to be issued in connection with this Opinion will establish a schedule for addressing the defendants' request for costs and fees pursuant to 17 U.S.C. § 505.

SO ORDERED:

Dated: New York, New York

December 3, 2007

/s/ Denise Cote

DENISE COTE

United States District Judge



LEXSEE



Positive
As of: Sep 08, 2008

LEONARD TABACHNIK, PH.D, Plaintiff, - against - PROFESSOR BRUCE
DORSEY, and the PRESIDENT'S OFFICE OF SWARTHMORE COLLEGE;
CORNELL UNIVERSITY PRESS; and PRESIDENT JEFFREY S. LEHMAN,
CORNELL UNIVERSITY, Defendants.

04 Civ. 9865 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2005 U.S. Dist. LEXIS 14267

July 15, 2005, Decided
July 15, 2005, Filed

**SUBSEQUENT HISTORY:** Affirmed by Tabachnik v. Dorsey, 2007 U.S. App. LEXIS 28950 (2d Cir. N.Y., Dec. 13, 2007)

**DISPOSITION:** [*1] Cornell defendants' motion granted and case dismissed in its entirety, with prejudice, as to all defendants.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a copyright holder, sued defendants, a professor, a university, a university press, and a university president, alleging copyright infringement of his doctoral dissertation, monopolization of trade and commerce, and academic conspiracy. The professor, university, press, and president moved to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

**OVERVIEW:** The copyright holder belatedly submitted a certificate of copyright registration of his doctoral dissertation obtained four months after the filing of his action. The court initially held that it lacked federal subject matter jurisdiction over the copyright holder's complaint at the time of its filing because there was no copyright registration certificate of his doctoral dissertation as required by 17 U.S.C.S. §§ 410(a) and 411. The court further held that the historical facts in the copyright holder's doctoral dissertation fell within the public domain and were not copyrightable, and that the professor's presentation of the same historical facts was not substantially similar to the copyright holder's doctoral dissertation because the professor presented those facts in his own distinct style and wording. The court held that the copyright holder's claims of monopolization under 15 U.S.C.S. §§ 1 and 2 failed because there were no allegations in his complaint of an antitrust conspiracy and no allegations of economic monopoly power in any relevant market, rather, the sole question presented was whether the copyright holder's doctoral dissertation was entitled to copyright protection.

**OUTCOME:** The motion to dismiss was granted. The case was dismissed in its entirety with prejudice.

**COUNSEL:** Leonard Tabachnick, Ph.D, Plaintiff, Pro se, New York, New York.

For Cornell Defendants: Nelson E. Roth, Esq., Ithaca, New York.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

2005 U.S. Dist. LEXIS 14267, *

**OPINION & ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Dr. Leonard Tabachnik, proceeding pro se, has sued a number of defendants alleging copyright infringement, monopolization of trade and commerce and academic conspiracy. Cornell University Press and President Jeffrey S. Lehman (the "Cornell defendants") move to dismiss plaintiff's Amended Motion and Complaint [1] ("Cmpl.") for lack of subject matter jurisdiction and for failure to state a legally cognizable cause of action. *See* Fed. R. Civ. P. 12(b)(1) & 12(b)(6). For the following reasons, defendants' motion is granted and this case is dismissed as to all defendants.

> [1] Construing plaintiff's Amended Complaint liberally, his reference to a motion can be interpreted as a request to preliminarily enjoin Cornell University Press from publishing additional copies of the alleged infringing work. This request will be moot if the case is dismissed. *Cf. Ruby v. Pan American World Airways, Inc.*, 360 F.2d 691 (2d Cir. 1966) (dismissing appeal from order denying motion for preliminary injunction on ground that it had become moot where complaint in case had been dismissed).

**[*2] I. FACTS**

In his pleading, Dr. Tabachnik alleges that his doctoral dissertation, entitled *Origins of the Know-Nothing Party: A Study of the Native American Party in Philadelphia, 1844-1852*, is the subject of copyright protection. [2] *See* Cmpl. P1. Dr. Tabachnik further alleges that parts of Professor Bruce Dorsey's book entitled *Reforming Men and Women* violate the copyright laws "by describing important events using virtually identical language as is found in the text of Dr. Tabachnik's dissertation." *Id.* P14. Professor Dorsey's book was published by Cornell University Press. *See id.* Dr. Tabachnik further claims that the academic community "successfully subverted" him so that others could present, and get credit for, his research. *See id.* P18 ("Had Dr. Tabachnik been allowed to publish his research years ago, those who have subsequently published on the subject could have made their citations accordingly. Since that is not the case, the press, the authors, and the universities are all committing illegal acts against Dr. Tabachnik."). Dr. Tabachnik is claiming damages in the amount of $ 2,0000,000,000 (two trillion dollars). *See id.* P3.

> [2] The statute cited by plaintiff provides that "the owner of copyright under this title has the exclusive rights to do and to authorize any of the

following: (1) to reproduce the copyrighted work in copies or phonorecords . . . ." 17 U.S.C. § 106.

**[*3] II. LEGAL STANDARDS**

**A. Lack of Subject Matter Jurisdiction Under Rule 12(b)(1)**

A district court may exercise subject matter jurisdiction if the action "arises under" federal law. *Bracey v. Board of Educ. of City of Bridgeport*, 368 F.3d 108, 113 (2d Cir. 2004) (citing 28 U.S.C. § 1331). An action "arises under" federal law if "in order for the plaintiff to secure the relief sought he will be obliged to establish both the correctness and the applicability to his case of a proposition of federal law.'" *Id.* at 114 (quoting *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9, 77 L. Ed. 2d 420, 103 S. Ct. 2841 (1993)). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the court lacks the statutory or constitutional power to adjudicate the case." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996). *See also Carlson v. Principal Fin. Group*, 320 F.3d 301, 306 (2d Cir. 2003) ("In order to sustain federal jurisdiction, the complaint must allege a claim that arises under the Constitution or laws of the United States [*4] and that is neither made solely for the purpose of obtaining jurisdiction nor wholly insubstantial and frivolous.").

A plaintiff bears the burden of proving the existence of subject matter jurisdiction by a preponderance of the evidence. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). *See also Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998) ("The party invoking federal jurisdiction bears the burden of proving facts to establish that jurisdiction."). "When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Raila v. United States*, 355 F.3d 118, 119 (2d Cir. 2004). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Id.* In resolving a motion to dismiss under Rule 12(b)(1), a court may consider evidence outside the pleadings, including affidavits submitted by the parties, and is not limited to the face of the complaint. *See Robinson v. Government of Malaysia*, 269 F.3d 133, 140-41 (2d Cir. 2001). [*5]

**B. Failure to State a Claim Under Rule 12(b)(6)**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Curto v. Edmundson*, 392 F.3d 502, 503 (2d Cir. 2004) (internal quotation marks and citation

2005 U.S. Dist. LEXIS 14267, *

omitted). The task of the court in ruling on a motion to dismiss is "merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004) (internal quotation marks and citation omitted). When deciding a motion to dismiss, courts must accept all factual allegations as true and draw all reasonable inferences in the non-moving party's favor. *See Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

Furthermore, a complaint need not state the legal theory, facts, or elements underlying the claim in most instances. *See Phillips v. Girdich*, 408 F.3d 124, 2005 WL 1154194, at *2-3 (2d Cir. 2005). [*6] Pursuant to the simplified pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure, a complaint must include only "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002) (quoting Fed. R. Civ. P. 8(a)(2)). And when a plaintiff is proceeding pro se, courts are instructed to construe the complaint liberally. *See Haines v. Kerner*, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972); *see also Boddie v. Schnieder*, 105 F.3d 857, 860 (2d Cir. 1997).

Finally, while courts generally may not consider matters outside the pleadings in determining if a complaint should survive a Rule 12(b)(6) motion, documents attached to the pleadings, documents referenced in the pleadings, and documents integral to the pleadings may be considered. *See Chambers*, 282 F.3d at 152-53; Fed. R. Civ. P. 10(c). Courts may also take judicial notice of facts within the public domain and public records if such facts and records [*7] are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). *See also Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'") (quoting Fed. R. Evid. 201(b)(2)).

## III. DISCUSSION

### A. Plaintiff's Copyright Claim

"The Copyright Act requires that 'no action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title.'" *Morris v. Business Concepts, Inc.*, 259 F.3d 65, 68 (2d

Cir. 2001) (quoting 17 U.S.C. § 411(a)). *See also Whimsicality, Inc. v. Rubie's Costume Co., Inc.* 891 F.2d 452, 453 (2d Cir. 1989) ("Proper registration is a prerequisite to an action for infringement."). [*8] Thus, "federal district courts do not have jurisdiction over a claim for federal copyright infringement until the Copyright Office has either approved or refused the pending application for registration." *Corbis Corp. v. UGO Networks, Inc.*, 322 F. Supp. 2d 520, 521 (S.D.N.Y. 2004). The interplay of the relevant statutory provisions has been explained as follows:

> Section 411(a) provides that jurisdiction is not conveyed "until registration of the copyright claim has been made in accordance with [the Copyright Act]." 17 U.S.C. § 411(a). Additionally, Section 410(a) indicates that a claim must be examined and approved by the Register of Copyrights before it is registered. 17 U.S.C. § 410(a). Only after the Register of Copyrights examines the material deposited and determines that the legal and formal requirements of the statute have been met does it register the claim and issue a certificate of registration. *Id.* Thus, the plain language of the statute confirms that although submission of a claim begins the registration process, a claim is not deemed registered until the Register of Copyrights approves it.

[*9] *Greene v. Columbia Records/Sony Music Entm't Inc.* 2005 U.S. Dist. LEXIS 3062, No. 03 Civ. 4333, 2004 WL 3211771, at *3 (S.D.N.Y. Mar. 1, 2005) (footnote omitted).

In sum, "an action for copyright infringement cannot be asserted unless a certificate of registration has been *issued;* the mere filing of an application is simply insufficient to support such a claim." *National Assoc. of Freelance Photographers v. Associated Press*, 1997 U.S. Dist. LEXIS 19568, No. 97 Civ. 2267, 1997 WL 759456, at *12 (S.D.N.Y. Dec. 10, 1997) (emphasis in original) (citing *Fonar Corp. v. Domenick*, 105 F.3d 99, 103 (2d Cir. 1997), for the proposition that "there are only two elements of an infringement claim: ownership of a valid copyright and the copying of constituent elements of the work that are original"). *See also Noble v. Town Sports Int'l, Inc.*, 1998 U.S. Dist. LEXIS 919, No. 96 Civ. 4257, 1998 WL 43127, at *1 (S.D.N.Y. Feb. 2, 1998) ("The issuance of a registration statement certificate is a prerequisite to the commencement of the infringement action and an application for registration does not suffice.").

2005 U.S. Dist. LEXIS 14267, *

Here, Dr. Tabachnik appended his Application for Registration of a Claim to Copyright, dated December 27, 1973, as [*10] an exhibit to his Amended Complaint. *See* Cmpl., Document 2. In his Reply papers, dated June 21, 2005, Dr. Tabachnik belatedly submitted an Additional Certificate of Registration of a Claim to Copyright, dated April 22, 2005, and signed by the Register of Copyrights. In *M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486 (11th Cir. 1990), the appellate court reviewed a lower court decision dismissing the case because plaintiff failed to register its copyright before initiating the infringement action, but allowing plaintiff to amend its complaint based on subsequently obtaining a certificate of registration. *See id.* at 1489.

The appellate court excused this procedural irregularity but stated that "the filing of a new lawsuit would ordinarily have been the proper way for [plaintiff] to proceed once it received the registration certificate." *Id.* Here, plaintiff has not moved to amend, instead, plaintiff has belatedly submitted a certificate of registration obtained some four months after the filing of the instant Complaint. This Court lacked jurisdiction over plaintiff's Complaint at the time of filing because there was no registration [*11] certificate. Therefore, the proper course is to dismiss the case without prejudice. *See id.* at 1488 ("The registration requirement is a jurisdictional prerequisite to an infringement suit."). Accordingly, this case is dismissed for lack of subject matter jurisdiction.

The next question is whether the dismissal should be with or without prejudice. To subject another court to plaintiff's claims would be a waste of judicial resources if the facts alleged by plaintiff cannot support any claim which would entitle him to relief. "To allege a claim of copyright infringement, [plaintiff] must claim that a substantial similarity exists between the defendant's work and the protectible elements of its work. To be 'protectible,' these elements must be original." *County of Suffolk v. First Am. Real Estate Solutions,* 261 F.3d 179, 187-88 (2d Cir. 2001) (citing *Feist Publ'ng, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345-349, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991)). In *Feist,* the Supreme Court explained that copyright protection extends only to original authorship and that the publication of facts, regardless of how much effort was expended in discovering them, is not original [*12] authorship. *See Feist,* 499 U.S. at 347-48; *see also id.* at 350 ("Facts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted . . . In no event may copyright extend to the facts themselves."). Here, plaintiff has provided the following table comparing his text with the allegedly infringing Dorsey text.

| Tabachnik Text | Dorsey Text |
| --- | --- |
| Chapter 1 - The Birth of the Naive | Paragraph 1 |
| [sic] American Party. | |
| | |
| "In 1844, two related events — a controversy over Bible reading in the public schools and a series of riots between Irish Catholics and those who later call themselves Native Americans -- led to a dramatic change in the political life of Philadelphia.["] | "Between May and July 1844, one of the worst incidents of ethnic and religious violence in the history of the US erupted in the outlying districts of Philadelphia." |
| | |
| | Paragraph 1 |
| | |
| p. 36. "The danger to individual life was so great that the Irish Catholic residents in the district fled into the nearby woods located between Kensington and Richmond. They camped there, women and children, in the most pitiable conditions with scarcely anything to eat, and exposed to the rain." | "Frightened Irish families fled the city and camped in nearby woods to escape the wrath of the nativists." |

2005 U.S. Dist. LEXIS 14267, *

| Tabachnik Text | Dorsey Text |
|---|---|
| pp. 36-37. "During the course of the riot, city officials were helpless. Volunteer fireman either refused to respond to alarms for fear of their lives, or were prevented by the mob from extinguishing fires on Catholic property." | "Local authorities were powerless to stop the rioting, and, when the state militia tired to quell the disturbances, their presence merely escalated the violence." |
| pp. 33-33. "These riots were symptomatic of a deeper malady: the discontent caused by the depression of Kensington's hand-loom economy. Since one-third of the third world's gainfully employed males earned their livelihood from handloom weaving the conditions in that industry greatly affected the general economic state of the district . . . From 1835 to 1845 wages declined by 100%." | p. 200. Handloom weavers- weavers riots. "The weavers' riots exposed the complexity of ethnic conflict and the changing dynamic produced by new immigrants. Kensington's weaving population was overwhelmingly Irishborn. The majority were Catholics. . . .["]. |
| p. 20. "In November of 1842, when Archbishop Kendrick made his demands to the Board of Controllers, a group of sixty-one local Protestant clergymen formed a body known as the American Protestant Association. By the time the new association had drawn up its charter in December of 1842 it had added another twenty-eighty clergymen to its list of charter members, giving the organization thirty-seven percent of the city's clergy." | p. 201. "In Philadelphia nearly one hundred Protestant clergymen joined together in November 1842 to create the American Protestant Association, whose principle objective was to encourage and equip ministers to preach regularly against Catholicism." |

[*13] Amended Motion and Complaint P14.

The above excerpts reveal that Tabachnik is seeking to protect the kind of historical facts that fall within the public domain and, as such, are not copyrightable. *See Sparaco v. Lawler, Matusky, Skelly, Engineers LLP*, 303 F.3d 460, 466 (2d Cir. 2002) ("The view developed that historical, scientific, or factual information belongs in the public domain, and that allowing the first publisher to prevent others from copying such information would defeat the objectives of copyright by impeding rather than advancing the progress of knowledge."); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980) (a pre-*Feist* case holding that historical facts are not protected by copyright).

Not only are the historical facts themselves not subject to copyright protection, but it is apparent from the above that Dorsey did not copy Tabachnik's presentation of those facts, which may be protected by copyright. *See Feist*, 499 U.S. at 349 ("Notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, [*14] so long as the competing work does not feature the same selection and arrangement."). *See also Churchill Livingstone, Inc. v. Williams & Wilkins*, 949 F. Supp. 1045, 1050 (S.D.N.Y. 1996) ("The facts in a medical textbook nevertheless are not copyrightable; the over-all selection and arrangement of these facts, if original, may be copyrightable."). Although Dorsey does state some of the same facts as

2005 U.S. Dist. LEXIS 14267, *

Tabachnik, he does so in his own distinct style and wording. It cannot be said that Dorsey's presentation is substantially similar to that of Dr. Tabachnik. Accordingly, plaintiff has not stated a valid claim of copyright infringement. Having failed to state a claim upon which relief can be granted, plaintiff's infringement claim is dismissed with prejudice. *See Buckman v. Citicorp,* 1996 U.S. Dist. LEXIS 891, No. 95 Civ. 773, 1996 WL 34158. at *3 (S.D.N.Y. Jan. 30, 1996), *aff'd,* 101 F.3d 1393 (2d Cir. 1996) ("A court may dismiss a copyright claim if it concludes that no reasonable jury could find that the two works are substantially similar, or if it concludes that the similarities between the two works pertain only to unprotected elements of the plaintiff's work. [*15] ") (citing *Warner Bros., Inc. v. American Broad. Cos.,* 720 F.2d 231, 240 (2d Cir. 1983)).

**B. Plaintiff's Remaining Claims**

Plaintiff's remaining claims, brought under Sections 1 and 2 of the Sherman Act, can be summarily dismissed as there are no allegations in his Amended Complaint to support such claims. Section 1 of the Sherman Act provides as follows:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the Several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. In order to state a claim under Section 1, a plaintiff must allege: "(1) a contract, combination, or conspiracy; (2) in restraint of trade; (3) affecting interstate commerce." *Maric v. Saint Agnes Hosp. Corp.,* 65 F.3d 310, 313 (2d Cir. 1995). Section 2 of the Sherman Act penalizes "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. "The offense of monopoly

under § 2 of the [*16] Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992) (internal quotation marks and citation omitted). The question, then, is whether plaintiff's Amended Complaint sufficiently alleges the required elements of either Sherman Act claim.

Plaintiff's claim under Section 1 of the Sherman Act, entitled "Academic Conspiracy," and his claim under Section 2, entitled "Monopolization of Trade and Commerce," lack any connection to trade or commerce. There are no allegations of an antitrust conspiracy and no allegations of economic monopoly power in any relevant market. The sole question presented here is whether plaintiff's scholarly dissertation is entitled to copyright protection. The kinds of economic activity covered by the Sherman Act are simply not at issue in this case. Plaintiff's reliance on the Sherman Act is therefore misplaced. Accordingly, plaintiff's remaining claims, brought [*17] under Sections 1 and 2 of the Sherman Act, must also be dismissed.

**V. CONCLUSION**

For the foregoing reasons, the Cornell defendants' motion is granted and this case is dismissed in its entirety, with prejudice, as to all defendants. Counsel for the Cornell defendants is directed to provide a copy of this Opinion and Order to his co-counsel. The Clerk of the Court is directed to close this case.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

July 15, 2005



LEXSEE



Positive
As of: Sep 08, 2008

**TWISTED RECORDS, INC., Plaintiff, -against- PETER RAUHOFER, Defendant.**

03 Civ. 2644 (DF)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**2005 U.S. Dist. LEXIS 3313; Copy. L. Rep. (CCH) P28,979**

March 3, 2005, Decided
March 3, 2005, Filed

**DISPOSITION:** [*1] Defendant's motion to dismiss denied. Plaintiff's motion to amend complaint granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff record company filed suit against defendant music producer, alleging claims for copyright infringement, unfair competition, and breach of contract. After filing a counterclaim for breach of contract, the producer filed a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and (b)(6) and for judgment on his counterclaim under Rule 12(c). The company filed a motion to amend its complaint under Fed. R. Civ. P. 15.

**OVERVIEW:** The company sought actual or statutory damages under the Copyright Act (Act), 17 U.S.C.S. § 504, alleging that the producer infringed its copyright in a remix of a pre-existing musical composition. The company subsequently sought to amend its complaint to add a claim that the producer infringed its rights in the pre-existing composition. The court held: (1) it had subject matter jurisdiction over the company's complaint under 28 U.S.C.S. § 1338 because the company was seeking a remedy expressly granted by the Act; (2) it was appropriate to deny the producer's motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) and for judgment on the producer's counterclaim under Rule 12(c), with leave to file a properly supported motion under Fed. R. Civ. P. 56, because the producer's motion relied heavily on evidence outside the pleadings and the parties failed to present the full set of submissions

required for the court to assess fully their summary judgment arguments; and (3) the company was entitled to amend its complaint because the producer failed to show that he would suffer undue prejudice and delay or that the proposed amendment would be futile.

**OUTCOME:** The court denied the producer's motion to the extent it sought dismissal on jurisdictional grounds. To the extent the producer sought dismissal for failure to state a claim or sought judgment on his counterclaim, the court denied the motion without prejudice to the filing of a properly supported summary judgment motion. The court granted the company's motion to amend the complaint.

**COUNSEL:** For Twisted Records, Inc., Plaintiff: Stuart Elliot Wachs, Fogel & Wachs PC, New York, NY.

For Peter Rauhofer, Defendant: Theodore Weiss, Serling, Rooks and Ferrara, L.L.P., New York, NY.

**JUDGES:** DEBRA FREEMAN, United States Magistrate Judge.

**OPINION BY:** DEBRA FREEMAN

**OPINION**

**MEMORANDUM AND ORDER**

**DEBRA FREEMAN, United States Magistrate Judge:**

2005 U.S. Dist. LEXIS 3313, *; Copy. L. Rep. (CCH) P28,979

In this action, before me on consent pursuant to 28 U.S.C. § 636(c), defendant Peter Rauhofer ("Rauhofer" or "Defendant") has moved to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that this Court lacks subject matter jurisdiction in this action and that the plaintiff Twisted Records, Inc. [*2] ("Twisted" or "Plaintiff") has failed to state a cause of action upon which relief can be granted. Defendant also moves, presumably pursuant to Federal Rule of Civil Procedure 12(c), for judgment on his counterclaim. [1] In addition, Plaintiff has moved pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to amend its Complaint to add a new claim of copyright infringement.

> 1 Defendant's Notice of Motion, as well as his memoranda in support of his motion, refer only to Rule 12(b) and offer no separate basis for judgment on the counterclaim.

For the reasons stated below, to the extent Defendant seeks dismissal of the Complaint on jurisdictional grounds, the motion is denied. To the extent Defendant seeks dismissal under Rule 12(b)(6), or seeks judgment on the counterclaim under Rule 12(c), the motion is denied without prejudice to the filing of a properly supported summary judgment motion addressing the evidentiary arguments [*3] raised. Plaintiff's motion to amend the Complaint under Rule 15(a) is granted.

## BACKGROUND

### A. Allegations of the Complaint and Counterclaim

According to the Complaint, Twisted, a record company, hired Rauhofer, a dance music producer and disc jockey, to create a remix of a pre-existing musical composition called "Dark Beat." [2] (See Complaint, dated April 14, 2003 ("Compl.") (Dkt. 1), PP7-8, 10.) The parties signed a contract on October 27, 2002, which stipulated the terms for creation, delivery and ownership of the Remix. (See Certificate of Employment/Work for Hire Agreement ("Contract"), attached to Compl. as Ex. A; see also Compl. P10.) Rauhofer delivered the Remix to Twisted in November 2002 (id. P13), and Twisted obtained a copyright registration certificate for the Remix on March 3, 2003 (id. P21).

> 2 "Dark Beat" will be referred to herein as the "Pre-Existing Work," and the remix of "Dark Beat" will be referred to as the "Remix."

Twisted filed suit against Rauhofer [*4] on April 15, 2003, alleging infringement of its copyright in the Remix, unfair competition, and breach of contract. (Id.)

Among other things, Twisted claims that Rauhofer, without Twisted's knowledge or consent, unlawfully performed the Remix publicly, distributed a copy of the Remix to at least one individual, and listed the Remix on his website. (Id. P17.) Twisted seeks both injunctive relief and damages, as well as costs and attorneys' fees. (Id. at 6-8, PP1-6.)

Rauhofer, for his part, alleges that his public performance of the Remix was authorized by a Twisted representative, and denies distributing copies of the Remix to any individuals. (Answer, dated July 25, 2003 ("Answer") (Dkt. 29), at 8, 17.) Further, Rauhofer has counterclaimed for breach of contract, alleging that Twisted has failed to pay him the $ 100?? owed to him under the Contract. (See id. 8-10, PP1-8.)

On March 6, 2004, Rauhofer filed a motion to dismiss the Complaint. (See Notice of Motion, dated March 15, 2004 (Dkt. 28); Memorandum of Law in Support of Defendant's Motion to Dismiss, dated March 15, 2004 ("Def. Mem. in Support of Mot. to Dismiss") (Dkt. 29), at 1.) Plaintiff filed its opposition [*5] on March 30, 2004, (Plaintiff's Memorandum of Law in Response to Defendant's Motion for Judgment Under Rule 12, dated March 29, 2004 ("Pl. Mem. in Opp. to Def.'s Mot. to Dismiss") (Dkt. 30), and Rauhofer filed a reply on April 28, 2004, (Defendant's Memorandum of Law in Reply to Plaintiff's Opposition to Defendant's Motion for Judgment Under Rule 12, dated April 26, 2004 ("Def. Reply Mem. in Support of Mot. to Dismiss") (Dkt. 38)).

### B. The Proposed Amendment To the Complaint

Apparently, Twisted did not originally assert a claim for infringement of its copyright in the Pre-Existing Work because, although Twisted had sought to register a copyright in that work in December 2002, the Copyright Office lost the registration application. (See Plaintiff's Memorandum of Law in Support of Motion to Amend Complaint, dated April 9, 2004 ("Pl. Mem. in Support of Mot. to Amend") (Dkt. 34), at 2.) On March 25, 2004, however, nearly a year after this litigation was commenced, the Copyright Office notified Twisted that its application had been located and that the copyright certificate would be issued shortly. (Id.) Accordingly, on March 26, 2004, Twisted requested leave to amend [*6] the Complaint to assert a claim that Rauhofer had infringed its rights in the Pre-Existing Work. (Letter, dated March 26, 2004 (Dkt. 32).) As Defendant would not consent to the proposed amendment, the Court directed Twisted to file a formal motion to amend (id.), which Twisted timely filed on April 13, 2004 (Dkt. 33).

In support of its motion to amend, Twisted contends that the proposed amendment merely sets forth a new theory of recovery, based on the same underlying facts.

(Pl. Mem. in Support of Mot. to Amend, at 4.) Rauhofer opposes the motion on the grounds that the amendment would be unduly prejudicial, would cause undue delay, and would be futile. (See Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Amend Complaint, dated April 26, 2004 ("Def. Mem. in Opp. to Mot. to Amend") (Dkt. 35).) Specifically, Rauhofer contends that he would be unduly prejudiced because he had no notice of any claim regarding the Pre-Existing Work (id. at 2-3), and that the supposed lack of proof of Twisted's ownership of the Pre-Existing Work would cause undue delay in discovery that is otherwise closed (id. at 4-5). Rauhofer further argues that the proposed amendment [*7] would be futile because, given the belated nature of its copyright registration, Twisted would be unable to recover on its new claim under the Copyright Act. (Id. at 5.)

Many of Rauhofer's arguments against permitting the amendment center on the fact that, as of the time Twisted filed its motion to amend, it had still not obtained a copyright registration certificate for the Pre-Existing Work. In May 2004, however, after Rauhofer had already filed his opposition to Twisted's motion, the Copyright Office did issue a copyright certificate for the Pre-Existing Work, with the effective date of registration listed as December 26, 2002. (See Plaintiff's Reply Memorandum of Law in Further Support of Motion to Amend Complaint, dated May 14, 2004 ("Pl. Reply Mem. in Support of Mot. to Amend") (Dkt. 37), at 2.) Twisted has submitted this certificate in conjunction with its reply on its motion to amend, and see??ks to annex it to -- and incorporate it by reference in -- its proposed Amended Complaint. (See Amended Complaint ("Amended Compl."), attached to Motion for Leave to Amend Complaint as Ex. 2 (Dkt. 33), at P21 (stating intent to annex the copyright certificate to the Amended [*8] Complaint once the certificate issued); see also Certificate of Registration, attached to Pl. Reply Mem. in Support of Mot. to Amend as Ex. 3.)

## DISCUSSION

## I. DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

### A. Rule 12(b)(1)

A federal district court has original and exclusive jurisdiction in civil cases arising under any federal Act relating to copyrights. 28 U.S.C. § 1338(a). A motion under Rule 12(b)(1), challenging the Court's subject matter jurisdiction, may be made on the face of the complaint or on an evidentiary record, and the issue of subject matter jurisdiction may be raised at any time by the parties or sua sponte by the Court. Fed. R. Civ. P. 12(h)(3); Moodie v. Fed. Reserve Bank, 58 F.3d 879, 882

(2d Cir. 1995). Where the jurisdictional challenge is based on the complaint, the material allegations of the complaint are presumed to be true. See Tasini v. New York Times Co., Inc., 184 F. Supp. 2d 350, 353 (S.D.N.Y. 2002). Where, on the other hand, the challenge is mounted based on evidence outside the pleadings, the complaint is entitled [*9] to no such presumption, as the Court must consider and weigh the presented evidence. See id. at 353-54. The party asserting jurisdiction has the burden of proof on this issue. Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994).

Here, Rauhofer has argued that Twisted's suit arises under state law, rather than the Copyright Act, and that this Court therefore lacks subject matter jurisdiction to hear this case. [3] (Def. Mem. in Support of Mot. to Dismiss, at 3-4.) Specifically, Rauhofer alleges that Twisted's claim is essentially for breach of contract, and that any alleged copyright infringement claim necessarily arises from the purported breach. (Id.) Because Rauhofer does not rely on evidence outside the pleadings to make this argument, the Court must resolve this aspect of Rauhofer's motion on the face of the Complaint, the allegations of which are presumed to be true. Further, "the claims established by the well-pleaded complaint must necessarily be determined from the plaintiff's statement of his or her own claim, not including statements raised in anticipation or avoidance of possible defenses that may be interposed. [*10] " Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 304 (2d Cir. 2004) (citing Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 808-09, 100 L. Ed. 2d 811, 108 S. Ct. 2166 (1988)).

> 3  In his motion to dismiss, Rauhofer incorrectly states that a cause of action arising under the Copyright Act would give rise to federal jurisdiction under 28 U.S.C. § 1441, which actually governs removal jurisdiction. (See Def. Mem. in Support of Mot. to Dismiss, at 3.) As pleaded in the Complaint, the statute that gives rise to federal jurisdiction over copyright claims is 28 U.S.C. § 1338. (See Compl. P1.)

In Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 355 (2d Cir. 2000), the Second Circuit reaffirmed its prior ruling in T.B. Harms Co. v. Eliscu, 339 F.2d 823, 828 (2d Cir. 1964), cert. denied, 381 U.S. 915 (1965), as to the appropriate test for determining the Court's jurisdiction under the Copyright [*11] Act, where the plaintiff's copyright claim is related to, or may arise from, a contract claim. Under this test (often referred to as the T.B. Harms test), a federal district court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338 where "the complaint is for a remedy expressly

2005 U.S. Dist. LEXIS 3313, *; Copy. L. Rep. (CCH) P28,979

granted by the [Copyright] Act . . . or[] the complaint . . . asserts a claim requiring construction of the Act." *Bassett,* 204 F.3d at 349 (quoting *T.B. Harms Co.,* 339 F.2d at 828). "When a complaint alleges a claim or seeks a remedy provided by the Copyright Act, federal jurisdiction is properly invoked." *Id.* at 355. To the extent Rauhofer seeks to interpret *T.B. Harms* differently, as suggesting that the Court must determine the essential nature of the pleaded claim (*see* Def. Mem. in Support of Mot. to Dismiss, at 3-4, citing *Topolos v. Caldewey,* 698 F.2d 991, 993 (9th Cir. 1983)), any such interpretation was explicitly rejected by *Bassett. See Bassett,* 204 F.3d at 355.

In this case, Twisted has met the *T.B. Harms* test by seeking a remedy expressly granted by the Copyright Act. Specifically, [*12] Twisted has alleged copyright infringement (Compl. P17), and is seeking actual or statutory damages under the Copyright Act pursuant to 17 U.S.C. § 504 (*id.* at 7, PP1-5). Under *T.B. Harms* and *Bassett,* this is sufficient to invoke federal jurisdiction under 28 U.S.C. § 1338. *See Marvullo v. Gruner & Jahr,* 105 F. Supp. 2d 225, 233 (S.D.N.Y. 2000) (holding that subject matter jurisdiction was proper where plaintiff claimed copyright infringement and sought relief under the Copyright Act).

Accordingly, Defendant's motion to dismiss for lack of subject matter jurisdiction is denied.

### B. Rule 12(b)(6)

A motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss a complaint for failure to state a claim upon which relief can be granted, must be decided solely on the basis of the complaint itself. *See Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir. 1991); *CBS, Inc. v. Ahern,* 108 F.R.D. 14, 18-19 (S.D.N.Y. 1985). The Court "must accept all factual allegations in the complaint as true and draw inferences [*13] from those allegations in the light most favorable to the plaintiff." *Jaghory v. New York State Dep't of Ed.,* 131 F.3d 326, 329 (2d Cir. 1997) (citing *Albright v. Oliver,* 510 U.S. 266, 268, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994)); *see also Rotter v. Leahy,* 93 F. Supp. 2d 487, 497-98 (S.D.N.Y. 2000) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993)). A claim may not be dismissed under Rule 12(b)(6) unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir. 1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).

Where, however, the moving party relies on matters outside the pleading in support of its motion, the motion may not be capable of resolution on the basis of the complaint alone. Rather, it may be more appropriate for

the Court to consider the issues raised under Rule 56, which governs motions for summary judgment. Rule 12 provides the Court with the option of converting a Rule 12(b)(6) motion to one for summary judgment, provided that all parties have had [*14] a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b). Otherwise, the motion under Rule 12(b)(6) is appropriately denied without prejudice. *See, e.g., Pruitt v. Lewy,* 2004 U.S. Dist. LEXIS 20558, No. 02 Civ. 8559 (LAK), 2004 WL 2319187, at *1 (S.D.N.Y. Oct. 15, 2004) (denying the motion to dismiss while instructing the defendant to move for summary judgment, "giving appropriate notice to the plaintiff"); *Madison v. Wright,* 2004 U.S. Dist. LEXIS 6482, No. 02 Civ. 10299 (RWS), 2004 WL 816429, at *2 (S.D.N.Y. Apr. 13, 2004) (denying defendant's motion to dismiss without prejudice with instructions to re-file as, in part, a motion for summary judgment); *Reid v. Marrinaccio,* 2003 U.S. Dist. LEXIS 1916, No. 00 Civ. 5164 (RCC)(JCF), 2003 WL 289832, at *1 (S.D.N.Y. Feb. 10, 2003) (denying motion to dismiss without prejudice to refiling it as motion for summary judgment).

Here, as Twisted points out in its opposition papers, Rauhofer's motion relies heavily on evidence outside the pleadings, thereby making it inappropriate for resolution under Rule 12(b)(6). Further, although Twisted has recognized that Rauhofer offered evidence [*15] in support of his motion, and has taken the opportunity to do the same in opposition, neither party has presented the full set of submissions, including affidavits and statements under Local Civil Rule 56.1, that is required for the Court to assess fully the parties' summary judgment arguments. Thus, the better course here is for the Court to deny Rauhofer's Rule 12(b)(6) motion, with leave for Rauhofer to file a properly supported motion under Rule 56.

## II. DEFENDANT'S MOTION FOR JUDGMENT ON THE COUNTERCLAIM

As noted above, Rauhofer purports in his Notice of Motion to seek judgment on his counterclaim, even though he has not invoked the basis for such a motion, and he barely addresses it in his briefs. Further, although the Court assumes that this aspect of Rauhofer's motion has been brought under Rule 12(c) of the Federal Rules of Civil Procedure, which governs motions for judgment on the pleadings, Rauhofer again appears to rely on matters outside the pleadings in support of his request for relief. Thus, as with his motion under Rule 12(b)(6), Rauhofer's motion for judgment on the counterclaim would be more appropriately [*16] brought as a summary judgment motion under Rule 56.

Accordingly, the motion for judgment on the counterclaim is denied, without prejudice to Defendant's

2005 U.S. Dist. LEXIS 3313, *; Copy. L. Rep. (CCH) P28,979

filing a properly supported summary judgment motion directed to the counterclaim.

## III. PLAINTIFF'S MOTION TO AMEND THE COMPLAINT

Twisted's motion to amend the Complaint to add a copyright claim for infringement of the Pre-Existing Work is governed by Rule 15(a) of the Federal Rules of Civil Procedure. Under Rule 15(a), leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). A motion to amend should be denied, however, "if there is an 'apparent or declared reason -- such as undue delay, bad faith or dilatory motive . . ., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment.'" Dluhos v. Floating and Abandoned Vessel Known as "New York," 162 F.3d 63, 69 (2d Cir. 1998) (quoting Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)); see also Richardson Greenshields Sec., Inc. v. Lau, 825 F.2d 647, 653 n.6 (2d Cir. 1987) [*17] (citation omitted) (A "motion to amend should be denied only for such reasons as 'undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party.'"). The decision whether to grant leave to amend is within the sound discretion of the Court. See Foman, 371 U.S. at 182.

Here, Rauhofer asserts that Twisted's late amendment would result in undue prejudice and delay of these proceedings, and would also be futile.

### A. Undue Prejudice and Delay

Mere delay, absent a showing of bad faith or undue prejudice, does not provide a basis for denying a motion to amend. Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993) (quoting State Teachers Retirement Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981));?? see also Saxholm AS v. Dynal, Inc., 938 F. Supp. 120, 123 (E.D.N.Y. 1996) ("Although courts have recognized that prejudice tends to increase with delay, delay alone is seldom reason to deny a motion to amend.") (internal citations omitted). In determining whether a party's interests will be unduly prejudiced by an amendment, courts generally [*18] consider "whether the assertion of the new claim . . . would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction," Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 284 (2d Cir. 2000) (quoting Block, 988 F.2d at 350), with more emphasis on the first two considerations, see, e.g., E.E.O.C. v. Morgan Stanley & Co., Inc., 211

F.R.D. 225, 227 (S.D.N.Y. 2002); Tokio Marine & Fire Ins. Co. Ltd. v. Employers Ins. of Wausau, 786 F.2d 101, 103 (2d Cir. 1986).

Rauhofer's arguments as to why he would suffer prejudice and why delay would result from permitting the amendment mainly stem from the supposed lack of evidence of Twisted's actual ownership of the Pre-Existing Work. In particular, Rauhofer contends that additional discovery would be required in order to prove Twisted's ownership of the Pre-Existing Work and that undue delay would result from either the need to complete this additional discovery or to wait for [*19] the relevant copyright certificate to be issued. (Def. Mem. in Opp. to Mot. to Amend, at 3-4.) Rauhofer, however, raised these points prior to the issuance of the copyright certificate, which, as stated above, occurred last spring. As the record shows that the Pre-Existing Work is now registered as owned by Twisted, Rauhofer's principal prejudice and delay arguments are moot.

Rauhofer also argues that the amendment should not be permitted because discovery has closed and the non-moving party has filed a motion for summary judgment. (Def. Mem. in Opp. to Mot. to Amend, at 4-5.) The mere fact that discovery has concluded, however, does not provide a reason for denying leave to amend, especially where the new claim arises from the same set of operative facts as the original claims. See Cemar Tekstil Ithalat Ihracat San Ve Tic. A.S. v. Joinpac, Inc., 1993 U.S. Dist. LEXIS 5065, No. 91 Civ. 8408, 1993 WL 126890, at *1 (S.D.N.Y. Apr. 16, 1993) (allowing amendment to add a counterclaim where discovery had already closed); Purdy v. Town of Greenburgh, 166 F. Supp. 2d 850, 859 (S.D.N.Y. 2001) (allowing plaintiff to amend complaint despite moving after discovery was closed). In this case, [*20] the proposed new infringement claim relates to the same facts as alleged in Twisted's original claim for infringement of its copyright in the Remix. In addition, Rauhofer has already obtained, through discovery, documents relating to the Pre-Existing Work. (See Pl. Reply Mem. in Support of Mot. to Amend, at 3.) Thus, allowing the proposed amendment should not result in a significant expenditure of additional resources or substantially prolong the litigation.

Further, this is not a case, like those cited by Rauhofer, in which the party seeking to amend has made its motion after a long, unexplained period of delay. (See Def. Mem. in Opp. of Mot. to Amend, at 5, citing Grochowski v. Phoenix Construction, 318 F.3d 80, 86 (2d Cir. 2003) (plaintiffs moved to amend their complaint based on a case that was decided after the start of litigation but disposed of more than one year prior to the motion); Lowry v. Eastman Kodak Co., 14 Fed. Appx. 27, 30 (2d Cir. 2001) ("Lowry offers no good

2005 U.S. Dist. LEXIS 3313, *; Copy. L. Rep. (CCH) P28,979

cause for his delay in filing an amended complaint."); _Smith v. State Univ. of New York at Buffalo_, 14 Fed. Appx. 66, 68 (2d Cir. 2003) ("Smith could [*21] have filed her amended complaint . . . years prior.").) To the contrary, Twisted apparently did not receive notification until March 25, 2004 that its copyright registration certificate would be issued (Pl. Mem. in Support of Mot. to Amend, at 2), and Twisted filed its motion to amend the complaint less than one month after this notification from the Copyright Office. Under these circumstances, and for the other reasons discussed above, Rauhofer has only a minimal basis for claiming undue prejudice and delay.

**B. Futility**

An amendment is considered "futile" when the proposed new claim would not withstand a motion to dismiss under _Rule 12(b)(6) of the Federal Rules of Civil Procedure_. _Oneida Indian Nation v. City of Sherrill_, 337 F.3d 139, 168 (2d Cir. 2003); _see also Lupowitz, Inc. v. Eclipse Holdings, Inc._, 1996 U.S. Dist. LEXIS 7302, No. 94 Civ. 2916 (DC), 1996 WL 285363, at *2 (S.D.N.Y. May 30, 1996), _aff'd_, 108 F.3d 1370 (2d Cir. 1997) (court may deny leave to amend where the claim to be added would fail to state a claim upon which relief may be granted). Thus, if the proposed amended complaint [*22] would be subject to "immediate dismissal" for failure to state a claim, the Court should not permit the amendment. _Jones v. New York State Div. of Military & Naval Affairs_, 166 F.3d 45, 55 (2d Cir. 1999). If, however, the party seeking to amend "'has at least colorable grounds for relief, justice . . . require[s]'" that its motion be granted. _Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc._, 748 F.2d 774, 783 (2d Cir. 1984) (citation omitted).

As set forth above (_see supra_ at 8), the standards for adequacy under _Rule 12(b)(6)_ turn on the allegations of the pleading, which must be presumed true. Here, Rauhofer seems to contend that the proposed amendment would be futile because, based on the belated timing of its copyright registration for the Pre-Existing Work, Twisted would be precluded from seeking relief under the Copyright Act for Rauhofer's alleged infringement. (_See_ Def. Mem. in Opp. to Mot. to Amend, at 5.) Although Rauhofer cites no provision of the Copyright Act in support of this proposition (_see id._), he is

presumably referring to _17 U.S.C. § 412(2)_, which limits liability for infringements [*23] occurring after a work has already been published. Specifically, _Section 412(2)_ disallows an award of statutory damages and attorney's fees where the infringement has occurred after the copyrighted work was first published and before the effective date of registration, "unless such registration is made within three months after the first publication of the work." As noted above, however, Twisted has sought to annex to its proposed Amended Complaint the copyright certificate for the Pre-Existing Work, showing an effective registration date of December 26, 2002. (_See_ Amended Compl. P21; Certificate of Registration.) As Twisted alleges in its proposed amendment that the Pre-Existing Work was first published on November 1, 2002, less than three months prior to this effective registration date, _Section 412(2)_ is inapplicable, and Rauhofer's futility argument is unpersuasive.

Accordingly, as Rauhofer has not demonstrated undue prejudice, delay, or futility, Twisted's motion to amend the Complaint is granted.

**CONCLUSION**

For all of the foregoing reasons, Rauhofer's motion to dismiss the complaint is denied to the extent it seeks dismissal under _Federal Rule of Civil Procedure 12(b)(1)_ [*24] for lack of subject matter jurisdiction. To the extent it seeks dismissal under _Rule 12(b)(6) of the Federal Rules of Civil Procedure_ for failure to state a claim, Rauhofer's motion to dismiss is denied without prejudice to the filing of a properly supported summary judgment motion. Similarly, Rauhofer's motion for judgment on his counterclaim is denied without prejudice to his raising the same grounds on a proper motion for summary judgment. Twisted's motion under _Federal Rule of Civil Procedure 15(a)_ to amend its Complaint is granted

Dated: New York, New York

March 3, 2005

SO ORDERED

DEBRA FREEMAN

United States Magistrate Judge



LEXSEE



Positive
As of: Sep 08, 2008

**U2 HOME ENTERTAINMENT, INC., Plaintiff, -against- KYLIN TV, INC., NEULION, INC., FALCONSTAR, INC. and TRANSVIDEO INTERNATIONAL, LTD., Defendants.**

06-CV-02770 (DLI) (RLM)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2007 U.S. Dist. LEXIS 50131

July 10, 2007, Decided
July 11, 2007, Filed

**SUBSEQUENT HISTORY:** Application granted by, in part <u>U2 Home Entm't, Inc. v. Kylin TV, Inc., 2008 U.S. Dist. LEXIS 30755 (E.D.N.Y., Apr. 14, 2008)</u>

**COUNSEL:** [*1] For U2 Home Entertainment, Inc., Plaintiff: Harvey Shapiro, LEAD ATTORNEY, Sargoy Stein Rosen & Shapiro, New York, NY.

For Kylin TV, Inc., Neulion, Inc., Falconstor, Inc., Transvideo International Ltd., Defendants: Lana C. Marina, LEAD ATTORNEY, Winston & Strawn LLP, New York, NY.

**JUDGES:** DORA L. IRIZARRY, United States District Judge.

**OPINION BY:** DORA L. IRIZARRY

**OPINION**

**OPINION AND ORDER**

**DORA L. IRIZARRY, U.S. District Judge:**

On June 2, 2006, plaintiff U2 Home Entertainment, Inc. ("U2") brought suit against defendants Kylin TV, Inc. ("Kylin"), Neulion, Inc. ("Neulion"), Falconstar, Inc. ("Falconstar"), and Transvideo International, Ltd. ("Transvideo") (collectively, "defendants"), claiming that they had infringed on plaintiff's alleged exclusive right to publicly perform the twenty-five Asian language films

listed in the complaint. In lieu of an answer, defendants jointly filed a motion to dismiss the complaint for failure to state a claim pursuant to <u>Fed. R. Civ. P. 12(b)(6)</u> on July 31, 2006. On November 28, 2006, plaintiff filed a letter motion seeking a premotion conference on its proposed motion for a preliminary injunction. The court granted plaintiff's request, and a pre-motion conference was held on January [*2] 11, 2007. However, by letter dated February 22, 2007, plaintiff withdrew its motion for a preliminary injunction. For the reasons set forth below, defendants' motion to dismiss is denied.

**Background**

Plaintiff is a California corporation doing business as Century Home Entertainment, New Image Audio & Video and Tai Seng Video Marketing. (Compl. P 2.) U2 claims to have the exclusive authority to publicly perform in the United States certain Chinese language (Cantonese and Mandarin), as well as other Asian language, motion pictures and television programs originally produced in Asia via television, cable television, satellite television and the Internet. (*Id.* at PP 2, 10.) As an exhibit to the complaint, plaintiff attached a list of the twenty-five motion pictures at issue herein, along with their registration numbers, if available. (*Id.* at Ex. A.) [1]

  1 The following titles represent the twenty-five works cited by plaintiff in Exhibit A: "2 Young," "Addicted," "Chinese Paladin [Eps. 1-2],"

2007 U.S. Dist. LEXIS 50131, *

"Colour of Truth," "Dream of a Warrior," "Driving Miss Wealthy," "Hansom Siblings, The [Eps 1-2]," "Honesty," "House of Fury," "Humanist," "Inner Senses," "Kung Fu Mahjong," "Legend of Speed [Eps. 1-2]," " [*3] Lion Roars, The," "Love for All Seasons," "Love is a Many Stupid Thing," "Love on a Diet," "Love on the Rocks," "Love Undercover 2: Love Mission," "Master Q: Incredible Pet Detective," "Set to Kill," "Shaolin Popery II: Messy Temple," "Six Strong Guys" and "Three of a Kind."

Defendant Kylin is a Delaware corporation with its principal place of business in Plainview, New York, and defendants Neulion and Falconstar are New York corporations with their principal places of business in Plainview, New York and Melville, New York, respectively. (*Id.* at PP 4-6.) Defendant Transvideo is an "unknown entity that is an affiliate of Kylin TV, Inc." (*Id.* at P 7.) U2 alleges that all defendants "participate[d] in," "authorize[d]," "contribute[d] to," and are "vicariously liable for" the "unauthorized public performance of plaintiff's motion pictures." (*Id.* at PP 8, 13.)

Throughout the complaint, plaintiff refers to all above-named defendants collectively as "Kylin TV." (*Id.* at P 8.) In relevant part, plaintiff describes defendants' allegedly infringing activities as follows: "a member of the public can become a monthly subscriber by registering with Kylin TV on the internet website . . . [and] pay[ing]    [*4] a monthly subscription fee beginning at fifteen dollars . . . [which provides the subscriber with a] set top box . . . [which may then be connected] to a television and to a cable or DSL broadband connection . . . . The subscriber is [then] able to view feature length motion pictures and television programs. Kylin TV duplicates, distributes and uploads these motion pictures onto a computer network accessible to members of the public." (*Id.* at PP 13-16.) In so doing, plaintiff claims that the Kylin TV website provides subscribers with the option to view certain of plaintiff's motion pictures including, but not limited to, the titles attached to the complaint as Exhibit A, even though plaintiff has never authorized defendants to "duplicate, distribute or perform publicly any of plaintiff's motion pictures." (*Id.* at PP 17-19.)

Plaintiff's counsel first notified Kylin of its claims of infringement by forwarding a copy of a draft complaint to Kylin's offices on April 24, 2006. (Kohlberger Decl. Ex. 1.) In the draft complaint, plaintiff identifies the defendants as "John Does I Through X, doing business as 'Kylin TV, Inc.'" (*Id.*) On April 26, 2006, Kylin's counsel sent a letter to plaintiff's [*5] counsel, which stated that it was investigating plaintiff's claims. (Kohlberger Decl. Ex. 2.) On May 8, 2006, Kylin's counsel sent a letter to

plaintiff's counsel asking it to provide documentary evidence demonstrating that U2 is the owner or exclusive licensee of each of the works listed in Exhibit A of the draft complaint. (Kohlberger Decl. Ex. 3.) On May 9, 2006, plaintiff's counsel responded by stating:

> [Plaintiff's] rights have been repeatedly sustained by federal courts, most recently in the reported decisions of U2 Home Entertainment, Inc. v. Lai Ying Music & Video Trading, Inc. and Wei Ping Yuan, 2005 U.S. Dist. LEXIS 9853, 2005 WL 1231645 (S.D.N.Y. May 25, 2005) and U2 Home Entertainment v. Rolling Rock Music Corp. et al., 2004 U. S. Dist. LEXIS 23274, 2004 WL 2609416 (S.D.N.Y. Nov. 17, 2004). Although we have not compared the lists of works in these actions with those set forth in Exhibit A, the claims of title will surely be similar if not identical.

(Kohlberger Decl. Ex. 4.) On May 17, 2006, Kylin's counsel again requested that plaintiff provide evidence that it is the exclusive licensee of the works listed in plaintiff's draft complaint. (Kohlberger Decl. Ex. 5.) The May 17 letter also stated that "Kylin TV was granted a sublicense  [*6] to the relevant works by its affiliate, TransVideo International Ltd." (*Id.*)

On June 2, 2006, U2 commenced the instant action for copyright infringement. In addition to seeking the maximum statutory damages, attorneys fees and costs, plaintiff seeks to have defendants enjoined preliminarily during the pendency of this action and permanently from: (1) duplicating, distributing or uploading onto a computer network accessible by the public any of plaintiff's motion pictures; (2) transmitting, broadcasting or otherwise publicly performing any of plaintiff's motion pictures; and (3) infringing or contributing to or participating in the infringement by others of any of the copyrights in plaintiff's motion pictures, and from acting in concert with, aiding or abetting others to infringe any of said copyrights in any way.

The time to answer was extended to July 31, 2006, on which date defendants moved to dismiss the complaint pursuant to Rule 12(b)(6). In support of their motion to dismiss, defendants' counsel submitted as exhibits the online records of the United States Copyright Office, as well as copies of the results of a search conducted by Thomson of the assignment files of the United States  [*7] Copyright Office for the twenty-five motion pictures at issue herein. (*See* Kohlberger Decl. Exs. 6-9.) Plaintiff filed its opposition brief on

August 14, 2006, along with an affirmation by plaintiff's counsel, which allegedly includes documents relating to defendants Neulion, Falconstar and Transvideo, and an affidavit from U2's General Counsel, Alan T. Huie, Esq., which allegedly includes copies of copyright registrations or pending registrations, as well the corresponding "chain of title" documents. (Shapiro Affirm. Exs. A-F; Huie Aff. Exs. 1-25.) Defendants filed their reply on August 21, 2006.

## Discussion

### I. Documents That May Be Considered on a Motion to Dismiss

As a threshold matter, both parties to the instant action have submitted a number of exhibits with their briefs. When material outside the complaint is presented to, and not excluded by the court, "the motion shall be treated as one for summary judgment and disposed of as provided in [Federal Rule of Civil Procedure] 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion . . . ." Fed. R. Civ. P. 12(b). However, for purposes of this rule, the complaint is deemed to [*8] include documents attached to the complaint, documents referenced in the complaint, and documents integral to the complaint. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); Fed. R. Civ. P. 10(c). A document is "integral" to the complaint where "the complaint relies heavily upon its terms and effects." Chambers, 282 F.3d at 153. "A plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." Id. (emphasis in original).

Under these standards, while the court is permitted to consider the parties' pre-filing correspondence, it may not consider the exhibits attached to plaintiff's counsel's affidavit on this motion. In Chambers, the Second Circuit noted that the harm from considering material outside the complaint is the lack of notice that the material may be considered. Id. However, where there is actual notice by the opposing party of all the information in the movant's papers, such as where the plaintiff has relied on the correspondence in question in framing the complaint, the necessity to convert a [*9] motion to dismiss to one for summary judgment is dissipated. Id. Here, as the pre-filing correspondence included letters to and from the parties' counsel, plaintiff clearly had notice of such documents. Moreover, the complaint states that "Transvideo International, Inc. is an unknown entity that is an affiliate of Kylin TV, Inc.," indicating that plaintiff relied on the May 17, 2006 letter from Kylin's counsel in drafting the complaint. (Compl. P 7.) By contrast, the

documents attached to plaintiff's counsel's affidavit relating to defendants Neulion, Falconstar and Transvideo were neither referenced in, nor were they integral to the complaint given that the complaint merely states where defendants Neulion, Falconstar and Transvideo are incorporated and their principal places of business. (See Compl. PP 5-7.)

Although plaintiff neither attached the relevant "chain of title" documents to its complaint nor incorporated them by reference, it is clear that plaintiff relied on the terms and effects of such documents in framing its complaint. For instance, the complaint states that plaintiff "was and is the exclusive licensee in the United States for the public performance of certain Asian [*10] language motion pictures . . . [t]hese works are licensed by plaintiff for public performance on television and cable television systems, satellite television systems and over the Internet," and that plaintiff "has complied with all statutory formalities required by the Copyright Act, including renewals, where required, to maintain the validity of the registered copyrights in [p]laintiff's [m]otion [p]ictures." (Compl. PP 10-11.)

Despite this reliance, defendants assert that the "chain of title" documents are "unauthenticated," and as such, must be disregarded in their entirety. (Defs.' Reply Br. at 6.) Case law suggests that where a plaintiff relies on documents of disputed authenticity, as is the case here, the court may not consider them on a motion to dismiss. See Philadelphia Parking Auth. v. Federal Ins. Co., 385 F. Supp. 2d 280, 284-85 (S.D.N.Y. 2005) (where a "plaintiff relies upon a document of undisputed authenticity," a court may consider documents attached to the complaint or incorporated in it by reference) (emphasis added). As the authenticity of the documents is disputed, the court will not consider them on the motion to dismiss.

Finally, the court may take judicial notice [*11] of facts within the public domain and public records if such facts and records are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Accordingly, the court is entitled to take judicial notice of the exhibits attached to the Kohlberger affidavit, which include online records of the United States Copyright Office at <www.copyright.gov>, as well as copies of the results of a search conducted by Thomson of the assignment files of the United States Copyright Office for the twenty-five motion pictures at issue herein. Id.; see also Island Software and Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 261 (2d Cir. 2005) ("[t]he district court was entitled to take judicial notice of Microsoft's federal copyright registrations, as published by the Copyright Office's registry."). Similarly, the court takes judicial notice of the copyright

2007 U.S. Dist. LEXIS 50131, *

registrations attached as exhibits to Mr. Huie's affidavit. *Id.*

## II. Defendants' Motion to Dismiss

### A. Legal Standards

When considering a motion to dismiss pursuant to Rule 12(b)(6), the court must accept all factual allegations as true and draw all reasonable inferences [*12] in the non-moving party's favor. *Dangler v. New York City Off Track Betting Corp.*, 193 F. 3d 130, 138 (2d Cir. 1999). A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure. Rule 8(a) sets forth the requirements for pleading a claim in federal court and directs that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

The Supreme Court recently clarified the pleadings standards under Rule 8(a) and the standard under which Rule 12(b)(6) motions are reviewed. In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), the Court rejected the "oft-quoted" standard set forth half a century ago in *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 45-46. The Court "retire[d]" *Conley's* "no set of facts" language in favor of the requirement that plaintiff plead enough facts "to state a claim for relief that is plausible on its face." *Bell Atlantic Corp.*, 127 S. Ct. at 1974.

The [*13] Second Circuit has not interpreted the foregoing language to require a "universal standard of heightened fact pleading;" rather, it requires a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 2007 U.S. App. LEXIS 13911, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007) (emphasis in original). Indeed, shortly after its decision in *Bell Atlantic*, the Court reiterated that the pleading of specific facts in support of a complaint is not necessary. Instead, a complaint need only give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007). Although a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action will not do." *Bell Atlantic Corp.*, 127 S. Ct. at 1964-65. Plaintiff's factual allegations must be sufficient to raise a right to relief above [*14] the speculative level, assuming that all the allegations in the complaint are true, even if doubtful in fact. *Id.* at 1965.

The elements of a copyright infringement claim are: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *See Feist Pub'lns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed 2d 358 (1991). Under the case law of this Circuit, to plead these elements sufficiently for purposes of Rule 8, a complaint must allege: (1) which specific original works are the subject of the copyright claim; (2) that plaintiff owns the copyrights in those works; (3) that the copyrights have been registered in accordance with the statute; and (4) a description of the specific acts, including time frame, allegedly committed by the defendant that infringed on the copyright. *See Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36 (S.D.N.Y. 1992), aff'd, 23 F.3d 398 (2d Cir. 1994), cert. denied, 513 U.S. 950, 115 S. Ct. 365, 130 L. Ed. 2d 318 (1994).

### B. Sufficiency of the Pleadings

In the instant motion, defendants first challenge the sufficiency of the complaint insofar as it alleges acts by defendants Neulion, Falconstar and [*15] Transvideo that infringed plaintiff's copyrights. Specifically, defendants argue that the complaint does not satisfy the notice pleading requirements set forth in Rule 8 because it merely states the places of incorporation and principal places of business for each defendant, alleges that each defendant is liable for "participat[ing] in," "authoriz[ing]" and "contribut[ing] to" the infringing activities, and describes the infringing activities of the defendants collectively. (See Compl. PP 5-18.) Paragraph 8 of the complaint states, "[d]efendants may herein be referred to as 'Kylin TV'." (*Id.* at P 8.) Although the complaint is not a model of clarity, it meets, for the most part, the standards set forth above.

At this stage of the litigation, plaintiff is not required to specify exactly what acts each individual defendant performed in order to put defendants on fair notice of the claims against them. *See Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 251 (S.D.N.Y. 2000) (complaint sufficient under Rule 8, "despite the fact that each individual infringement was not specified," where plaintiff alleged the publication of certain designs in national and international stage products and [*16] videos in 1997 and 1998 and their use in certain commercial products"); see also *Plunket v. Doyle*, No. 99 Civ. 11006, 2001 U.S. Dist. LEXIS 2001, 2001 WL 175252, at *6 (S.D.N.Y. Feb. 22, 2001) ("plaintiff need not specify each infringing act with respect to each original work; the [c]ourt recognizes that discovery is likely to provide many of the details of the allegedly

2007 U.S. Dist. LEXIS 50131, *

infringing acts and much of this information may be exclusively in defendants' control."). Moreover, *Rule 8* does not prohibit plaintiff from choosing to make allegations against defendants collectively. *See Clayton v. City of Middletown*, 237 F.R.D. 538, 540 (D. Conn. 2006) ("plaintiff apparently chose to make its allegations against the defendants collectively, and *Rule 8* does not prohibit such allegations against multiple defendants.").

Referring to defendants Kylin, Neulion, Falconstar and Transvido collectively as "Kylin TV," plaintiff alleges that defendants infringed on its exclusive right to publicly perform the twenty-five Asian language films at issue herein as follows: "a member of the public can become a monthly subscriber by registering with Kylin TV on the internet website . . . [and] pay[ing] a monthly subscription fee beginning at [*17] fifteen dollars . . . [which provides the subscriber with a] set top box . . . [which may then be connected] to a television and to a cable or DSL broadband connection . . . . The subscriber is [then] able to view feature length motion pictures and television programs. Kylin TV duplicates, distributes and uploads these motion pictures onto a computer network accessible to members of the public." (Compl. PP 13-16.) Plaintiff asserts that such acts render defendants Neulion, Falconstar and Transvido directly, contributorily and vicariously responsible for the infringement. (*Id.* at PP 8.) Therefore, defendants cannot really argue that they do not have notice of the claims against them because "the complaint is so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin*, 861 F.2d at 42.

Accordingly, plaintiff's allegations against defendants Neulion, Falconstar and Transvideo more than satisfy the *Rule 8* requirements.

**B. Failure to State a Claim**

Defendants next move to dismiss the complaint for failure to state a claim upon which relief can be granted, pursuant to *Rule 12(b)(6)*.

**1. Ownership by Plaintiff**

Defendants first argue that [*18] plaintiff cannot establish ownership of valid copyrights as a matter of law because it failed to attach to its complaint copies of the certificates of registration for the works at issue, or evidence as to how it obtained ownership interest in the works. Defendants claim that plaintiff "has the burden of proving [its] chain of title" because the Registration and Assignment Records of the Copyright Office indicate that with respect to at least twenty-two out of the twenty-four registered works identified in the complaint, plaintiff is not the owner. *Kenbrooke Fabrics, Inc. v.*

*Soho Fashions, Inc.*, 13 U.S.P.Q. 2d 1472, 1476 (S.D.N.Y. 1989) (*quoting* 3 NIMMER ON COPYRIGHT, § 12.11[C] at 12-81-12-82 (1989)). Moreover, even assuming that plaintiff has obtained a limited license to the works at issue for a specific purpose, defendants claim that plaintiff has not obtained an exclusive license of all the statutory rights granted as a copyright owner under 17 U.S.C. § 106 for each work at issue. *See Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613, 617 (S.D.N.Y. 2001) ("an exclusive licensee may not sue for infringement of rights as to which he is not licensed, even if the subject [*19] matter of the infringement is the work as to which he is a licensee.").

On a motion to dismiss, the court must refrain from engaging in fact-finding, and plaintiffs must be given a fair chance to contest defendants' evidentiary assertions. *See Amaker v. Weiner*, 179 F.3d 48, 50 (2d Cir. 1999). Moreover, "[c]omplaints [for copyright infringement] simply alleging present ownership by plaintiff, registration in compliance with the applicable statute, and infringement by defendant, have been held to be sufficient under the rules." *Mid America Title Co. v. Kirk*, 991 F.2d 417, 421 n. 8 (7th Cir. 1993) (*quoting* 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1237, at 283 (1990)). Here, Exhibit A contains a list of the twenty-five Asian language motion pictures at issue herein, along with the copyright registration numbers for all but one of the works. Plaintiff claims to be the "exclusive licensee in the United States for the public performance" of such motion pictures, and has allegedly "complied with all statutory formalities required by the Copyright Act, including renewals, where required, to maintain the validity of the registered copyrights in [its] motion pictures." [*20] (*Id.* at PP 10, 11, Ex. A.) Moreover, as set forth above, plaintiff alleges in sufficient detail the manner in which defendants infringed on plaintiff's alleged exclusive right to publicly perform the twenty-five Asian language films. As such, the complaint sufficiently alleges ownership by plaintiff of the copyrights at issue and infringement by defendants.

To the extent defendants argue that plaintiff failed to allege an unbroken chain of title to the rights at issue, it is unnecessary for the complaint to include such detailed factual recitation. At a later stage in this litigation, plaintiff will bear the burden of proving either its ownership interest, or that it is an exclusive licensee of all the statutory rights granted in a copyright owner for each work at issue herein. It is a burden plaintiff may yet fail to carry. However, defendants fail to make the necessary showing to justify dismissal of the complaint

at this stage of the litigation because such particularity in pleadings is not required.

2. Registration

Defendants further argue that the court does not have jurisdiction over plaintiff's claim to the works, "Love Undercover 2: Love Mission" and "Set to Kill," because (1) [*21] plaintiff has not yet received a certificate of registration or a denial from the Copyright Office for "Love Undercover 2: Love Mission," and (2) no relevant record can be located in the United States Copyright Office for "Set to Kill" under either the title provided or the registration number provided in Exhibit A. Ordinarily, "no action for infringement of the copyright of any work shall be instituted until registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a); see also _Tuff-n-Rumble Management, Inc. v. Sugarhill Music Publ'g Inc._, 49 F. Supp. 2d 673, 677 (S.D.N.Y. 1999) ("district courts are without subject matter jurisdiction to hear claims for federal copyright infringement unless a party asserts in its pleadings that he has received an actual certificate of registration or its denial from the Copyright Office."). However, proof of registration is not necessary if the work, as here, originated in a country outside the United States that is a signatory to the Berne Convention for the Protection of Literary and Artistic Works ("Berne Convention"). See _La Resolana Architects, PA v. Clay Realtors Angel Fire_, 416 F.3d 1195, 1201 n. 5, 1205-06 (10th Cir. 2005); [*22] see also 17 U.S.C. § 411(a) ("no action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."). [1]

    [1] Section 101 of Title 17 states:

        For purposes of section 411, a work is a "United States work" only if -- (1) in the case of a published work, the work is first published (A) in the United States; (B) simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States; (C) simultaneously in the United States and a foreign nation that is not a treaty party; or (D) in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries,

or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States; (2) in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters [*23] in the United States; or (3) in the case of pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States. 17 U.S.C. § 101.

Here, viewing the facts in a light most favorable to the non-moving party, the court assumes that plaintiff's works are subject to the Berne Convention because they were first published in China, a signatory to the Berne Convention. See United States Copyright Office, Circular 38a, International Copyright Relations of the United States (Mar. 1, 2003), available _at http://www.copyright.gov/circs/circ38a.pdf_; see also _Swierkiewicz v. Sorema N.A._, 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) ("[W]e must accept as true all of the factual allegations contained in the complaint."); _Neitzke v. Williams_, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."). Accordingly, the court retains jurisdiction over plaintiff's claim to the works, "Love Undercover 2: Love Mission" and "Set to Kill."

3. Acts of Infringement

Finally, defendants appear to rehash [*24] their arguments pursuant to Rule 8, namely plaintiff's supposed failure to sufficiently allege the acts by which the defendants had infringed plaintiff's exclusive copyrights. The court addressed this argument earlier, and the same analysis applies here.

**Conclusion**

For the foregoing reasons, defendants' motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) is denied.

SO ORDERED.

DATED: Brooklyn, New York

