UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————

MICHAEL PORTO (ALSO KNOWN AS GUY
MICHAELS),

                    Plaintiff,            08 Civ. 1228 (JGK)

                                          OPINION AND ORDER
         - against -

STEPHEN ADLY GUIRGIS, ET AL.,

                    Defendants.
————————————————————————————————

JOHN G. KOELTL, District Judge:

     The biblical story of the betrayal of Jesus Christ by Judas
Iscariot is well known.  It is also a well known part of that
story that Judas, wracked with despair, committed suicide by
hanging himself from a tree.  Can the insights from those
stories be brought to life through the convention of a fictional
trial of Judas Iscariot in which the issue is:  should Judas be
admitted to heavenly paradise?  That is the background for this
copyright case in which the author of a novel about a trial of
Judas Iscariot before a fictional World Court of Religion
presided over by Solomon and held in the Federal Courthouse in
New York's Foley Square claims that the author of a play about a
trial of Judas before a fictional judge held in Hope (a place in
Purgatory) infringed the copyrights for the novel.

     The trials depicted in the two works are dramatically
different in substance, setting, plot, theme, language, and the
overall thrust and feel of the works.  Stripped of unprotectible

elements—such as the biblical characters and biblical story—the works are not substantially similar.  While some of the ideas in the two works are similar, it is black letter law that ideas are not copyrightable and, for the reasons explained below, no ordinary reader would view the expression of the ideas as substantially similar.  Therefore, the defendants' motion for summary judgment must be granted.

More specifically, author Michael Porto (also known as "Guy Michaels") ("the plaintiff") brings this action alleging copyright infringement, vicarious and contributory copyright infringement, and common law unfair competition against playwright Stephen Adly Guirgis, LAByrinth Theater Company, actor and director Philip Seymour Hoffman, and publishers Dramatists Play Service, Inc. and Faber and Faber, Inc. (collectively, "the defendants").  The plaintiff alleges that the defendants' play The Last Days of Judas Iscariot violates the copyrights for his novel Judas on Appeal.[1]

The defendants have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56 on the basis that the defendants' play is not substantially similar

---

[1] The Last Days of Judas Iscariot was written by defendant Guirgis, performed in New York City by defendant LAByrinth Theater Company, directed by defendant Hoffman, and published by defendants Dramatists Play Service and Faber and Faber.

to the plaintiff's novel and therefore does not infringe any copyright protection for that work.  The defendants also move for an award of costs and attorneys' fees under 17 U.S.C. § 505. Because the defendants have submitted evidentiary materials in support of their motion, and have given appropriate notice to the plaintiff pursuant to Federal Rule of Civil Procedure 12(d), this Court will treat the defendants' motion as a motion for summary judgment.

I.

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."

Gallo, 22 F.3d at 1224.  The moving party bears the initial
burden of informing the district court of the basis for its
motion and identifying the matter that it believes demonstrates
the absence of a genuine issue of material fact.  Celotex, 477
U.S. at 323.  The substantive law governing the case will
identify those facts that are material and "only disputes over
facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary
judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).

 Summary judgment is appropriate if it appears that the non-
moving party cannot prove an element that is essential to the
non-moving party's case and on which it will bear the burden of
proof at trial.  See Cleveland v. Policy Mgmt. Sys. Corp., 526
U.S. 795, 805-06 (1999); Celotex, 477 U.S. at 322; Powell v.
Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004).  In
determining whether summary judgment is appropriate, a court
must resolve all ambiguities and draw all reasonable inferences
against the moving party.  See Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United
States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also
Gallo, 22 F.3d at 1223.  Summary judgment is improper if there
is any evidence in the record from any source from which a
reasonable inference could be drawn in favor of the nonmoving

party.  See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998); Cummins v. Suntrust Capital Mkts., Inc., No. 07 Civ. 4633, 2009 WL 2569127, at *1 (S.D.N.Y. Aug. 20, 2009).


## II.


The following facts are undisputed unless otherwise indicated.


## A.


The plaintiff's novel Judas on Appeal was self-published on or about February 11, 1999.  (Am. Compl. ¶ 9.)  The plaintiff is the owner of Copyright Registration Nos. TXu 887-386 (February 10, 1999) and TX 6-626-162 (February 1, 2008), which protect his

novel.  (Am. Compl. ¶¶ 11-12; Decl. of Adam D. Siegartel Ex. 1B, July 27, 2008 ("Siegartel Decl."))  On or about February 11, 1999, the novel was disseminated to the public by a listing on Amazon.com, where it was listed for sale to the public.  (Am. Compl. ¶ 13; Siegartel Decl. Ex. 1C.)  The plaintiff and his novel were the subject of a New York Daily News article published in or about February 1999.  (Am. Compl. ¶ 14; Siegartel Decl. Ex. 1C.)

On or about March 2, 2005, defendant producer LAByrinth Theater Co. began live performances of The Last Days of Judas Iscariot at The Public Theater in New York City.  (Am. Compl. ¶ 15; Siegartel Decl. Ex. 1D.)  Defendant Philip Seymour Hoffman directed the play, written by defendant Stephen Adly Guirgis.  (Am. Compl. ¶ 15; Siegartel Decl. Ex. 1D.)  Previews of the show began on February 8, 2005, and the show ran in New York City from approximately March 2, 2005 to April 3, 2005.  (Am. Compl. ¶ 16.)  Subsequent performances occurred in other cities, including Boston, Chicago, and Los Angeles, with different producers.  (Am. Compl. ¶ 16.)  Defendant Dramatists Play Service, Inc. published the play in 2006, and it was listed for sale on Amazon.com and BN.com.  (Am. Compl. ¶ 17; Siegartel Decl. Exs. 1E-F.)  The screenplay was also published by defendant Faber and Faber, Inc. in 2006, and the Faber edition

6

was publicized on Amazon.com and BN.com.  (Am. Compl. ¶ 18;
Siegartel Decl. Exs. 1E-F.)

Both the plaintiff's novel and the defendants' play are
included in the record and the Court has reviewed both works.
Their content is plainly undisputed


**B.**


The plaintiff's novel recounts the appeal from eternal
damnation of Judas Iscariot before the World Court of Religion
in room 1705 of the federal courthouse in Foley Square, New
York, apparently the Court of Appeals hearing room at the
venerable "40 Foley Square."  The judges are well-known
historical figures:  Chief Judge Solomon, Buddha, Mohammed,
Machiavelli, Karl Marx, and Joseph Smith.  There is also an
analyst panel composed of Aristotle, Martin Luther, and Thomas
Moore.  The purpose of the trial—which is styled as an appeal by
Judas—is to determine whether Judas should be released from hell
and admitted into heaven.  Judas, represented by John Calvin,
argues that he was pre-destined to betray Jesus and commit
suicide.  Because his betrayal was inevitable, and indeed
necessary for redemption, he ought to be admitted into heaven.
The cause of Christianity is led by advocate Dante, arguing that
Judas ought to remain in hell.

The action proceeds chronologically following narrator Michael Sarto, the anchorman for a fictitious television network who covers each day of the proceedings, often asking for commentary from the analyst panel.  The examinations during the court sessions are patterned on traditional courtroom examination techniques and the analyst panel frequently comments on the effectiveness of the examinations and whether they support a defense of predestination.  Sarto returns home in the evening to his wife, and is the subject of an assassination attempt that mistakenly fells the policeman who is guarding him. Various historical figures testify, including Judas himself, Pontius Pilate, Jesus Christ, the High Priest Caiaphas, and, naturally, Satan.  Judas testifies that he acted as he did because a "spirit" guided him.  (Siegartel Decl. Ex. 1A at 249, 255.)  Jesus testifies.  He thanks the panel for having invited him, and assures the panel that his appearance does not constitute the Second Coming and Judgment Day.  (Siegartel Decl. Ex. 1A at 285.)  Jesus is then questioned by four of the judges and explains that Judas acted of his own free will although, if he had not done so, the scriptures would not have been fulfilled.  (Siegartel Decl. Ex. 1A at 290.)  The author describes how the action frequently leaves the spectators in utter disbelief at what they are seeing.

In the end, the World Court is divided and in view of the split decision, the Court determines that Judas should be remitted to Limbo.  Jesus then asks to speak and explains that because there is a question with respect to pre-destination, his Father has decided to forgive Judas and has instructed Peter, the gatekeeper of heaven, to allow Judas in.  Pandemonium breaks loose in the courtroom.  Judas leaps for joy, kisses Jesus's robe and thanks him for forgiveness.  Sarto tells us that "Solomon was banging away with his gavel, entreating for order. No one was paying attention to Solomon at this point." (Siegartel Decl. Ex. 1A at 305.)  Then, Sarto wakes up from his dream.  (Siegartel Decl. Ex. 1A.)

## C.

The defendants' award winning play depicts a trial before a single fictional Judge Littlefield, brought pursuant to a writ from God, to determine whether Judas, currently residing in hell, should be admitted into heaven.  The trial takes place in Hope, which is centered in Purgatory.  The play begins with a lengthy soliloquy by Henrietta Isacariot, the mother of Judas, who describes her love for her son and the abject loneliness that attended his burial.  She recalls, "I buried my son.  In a potter's field.  In a field of Blood.  In empty, acrid silence.

9

There was no funeral.  There were no mourners.  His friends all absent.  His father dead. . . . I discovered his body alone, I dug his grave alone . . . ."  (Siegartel Decl. Ex. 1E at 9.)  The play then turns to the fictional court.  The fictional attorneys—Yusef El-Fayoumy for the prosecution and Fabiana Aziza Cunningham for the defense—debate the fate of Judas Iscariot.  The banter between the attorneys is quite unlike the behavior expected at a trial—at one point, El-Fayoumy invites Cunningham for "dinner and a sensual massage"—underscoring the differences between the play and an actual trial.  (Siegartel Decl. Ex. 1E at 15.)  In the same vein, the examinations of the witness do not proceed in the straight-forward manner expected of a trial.  For example, El-Fayoumy interrogates Sigmund Freud regarding his cocaine use.  When Freud yawns disdainfully, El-Fayoumy asks "A little tired, are we, Doctor?  Perhaps a kilo or two of fine-grade Bolivian flake would restore your pep?!"  (Siegartel Decl. Ex. 1E at 64 (emphasis in original).)  When El-Fayoumy asks Freud if that is his real nose, Freud asks, "Your mother denied you her breast, didn't she?"  (Siegartel Decl. Ex. 1E at 64.)

Some of the witnesses in the two works are the same—including Satan, Saint Peter, Pontius Pilate, and Caiaphas—but many do not overlap, such as Mother Teresa, Sigmund Freud, Saint Monica, Henrietta Iscariot, and Butch Honeywell (the jury

foreman), all characters in the defendants' play but not in the plaintiff's novel.

The play proceeds without a narrator in a series of examinations and interchanges in court as well as scenes that do not occur in court.  Judas, a witness in the plaintiff's novel but not in the defendants' play, mostly appears here in a catatonic state except when he is in a confrontation with Jesus. Jesus is never called as a witness, but appears to talk with Judas outside the confines of the trial.  While the setting is a trial, the examinations are conducted in a loose way that bears little resemblance to examination and cross examination.  The witnesses speak in a brash and often vulgar manner, and their interplay with the lawyers and the Judge is often humorous and vernacular.

In contrast with the predestination theme of the plaintiff's novel, the play centers on despair.  In the words of Mother Teresa, called as a witness:

> Judas, he succumb to despair.  The music of God's love
> and Grace kept playing, but he, he made himself hard
> of hearing—like me, no?  I need this earphone device
> to hear you, jess?  Without them, I can no hear
> nothing.  Judas, he threw his earphones away—and dat
> is very sad, but dat is what he chose and dat is what
> happened.

(Siegartel Decl. Ex. 1E at 39.)  In the middle of Mother Teresa's testimony, Sister Glenna, an Irish nun appears.  Mother Teresa says that Sister Glenn has quoted Thomas Merton on the

subject of despair, and the apparition of Sister Glenna repeats the quotation: "Despair . . . is the ultimate development of a pride so great and so stiff-necked that it selects the absolute misery of damnation rather than accept happiness from the hands of God and thereby acknowledge that He is above us and that we are not capable of fulfilling our destiny by ourselves." (Siegartel Decl. Ex. 1E at 38.)

The ending bears no relationship to the conclusion of the plaintiff's novel. Jesus appears to Judas and explains his love for Judas and how he has always been there for Judas, and continues to want to love him. During this confrontation, Judas emerges briefly from his catatonic state and rebukes Jesus for not being there for Judas, while Jesus had saved and forgiven others. Judas spits at Jesus and when Jesus asks Judas to love him, Judas responds that he cannot. The play then turns to a soliloquy by Butch Honeywell explaining to Judas in hell that the jury had determined that Judas was in fact guilty. The soliloquy is laced with reflections from Honeywell's own life as to how he had been unfaithful to his wife and how that had changed the course of his previously love filled marriage and led to a life of more unfaithfulness, drinking, and unhappiness. Unlike the pandemonium in the courtroom and Judas jumping for joy as he rushes to thank Jesus and touch his robe portrayed in the plaintiff's novel, in the play, after Honeywell's soliloquy

there is an image of Jesus who sighs, takes off his shirt and plunges it into a bucket of water and washes the feet of the once again catatonic Judas as the lights fade.  There is also no waking up from a dream.

D.

The plaintiff has provided a list of the alleged similarities between the two works.  (Plaintiff's Response to Defendant's Supplemental Statement of Material Facts Pursuant to Local Rule 56.1 ¶ 25 ("Pl.'s 56.1 Stmt."))  Both works are an account of a modern day trial on the issue of whether Judas Iscariot should be allowed into heaven.  (Pl.'s 56.1 Stmt. ¶ 25.1; Defendants' Supplemental Statement of Material Facts Pursuant to Local Rule 56.1 ¶¶ 7-8 ("Defs.' 56.1 Stmt."))  Historical and biblical figures are witnesses in both trials, and some, although not all, of the witnesses are the same (including Satan, Caiaphas, Pontius Pilate, and Peter).  (Pl.'s 56.1 Stmt. ¶ 25.2; Defs.' 56.1 Stmt. ¶¶ 19-20.)  Both trials are commenced at the direction of God.  (Pl.'s 56.1 Stmt. ¶ 25.11.)  Both works include some discussion of the possibility that Judas was predestined to betray Jesus.  (Pl.'s 56.1 Stmt. ¶ 25.14; Defs.' 56.1 Stmt. ¶ 18.)  The plaintiff claims that each work ends with Jesus forgiving Judas, although the defendants dispute

the plaintiff's characterization of their play.  (Pl.'s 56.1
Stmt. ¶ 25.15-16.)

Satan is dressed in formal or semi-formal clothing at each
trial, a black tuxedo in the plaintiff's novel and a Gucci suit
in the defendants' play, testifies in both works that it was
easy to obtain Judas's soul and that Judas was in "despair", and
ridicules the questioning lawyer.  (Pl.'s 56.1 Stmt. ¶ 25.3-6;
Defs.' 56.1 Stmt. ¶¶ 11-12, 17.)

Caiaphas testifies at both trials that he feared Roman
reprisals, that he did not approach Judas about betraying Jesus,
and that Jesus had blasphemed.  (Pl.'s 56.1 Stmt. ¶ 25.7-8,
25.12; Defs.' 56.1 Stmt. ¶ 13.)

Peter tells the story of the Last Supper at both trials and
testifies that Jesus told Judas to do quickly what he is going
to do.  (Pl.'s 56.1 Stmt. ¶ 25.9; Defs.' 56.1 Stmt. ¶ 15.)   In
the plaintiff's novel, Peter testifies that Jesus said it would
have been better for Judas had he not been born, and Satan
testifies that this is his opinion in the defendants' play.
(Pl.'s 56.1 Stmt. ¶ 25.13; Defs.' 56.1 Stmt. ¶ 16.)

Pontius Pilate testifies at each trial and indicates that
he viewed Jesus as just "one more Jew" or "one less Jew."
(Pl.'s 56.1 Stmt. ¶ 25.10; Defs.' 56.1 Stmt. ¶ 14.)

The defendants allege that the two works differ in
narrative and story, structure, plot, language, setting, theme,

characters, tone, mood, and overall thrust and feel.  (Defs.'
56.1 Stmt. ¶ 5; Pl.'s 56.1 Stmt. ¶ 5.)   Furthermore, the
defendants allege that the similarities between the two works
are rooted in historical and Christian theological concepts, and
plot elements and characters that result directly from the idea
of Judas standing trial for his alleged betrayal of Jesus.
(Defs.' 56.1 Stmt. ¶ 6; Pl.'s 56.1 Stmt. ¶ 6.)   While the
plaintiff disputes these assertions they are readily
determinable from the texts of the works themselves.   The
defendants further allege, and the plaintiff disputes, that
various similarities are also incorporated in the works of third
parties, including the idea of Judas standing trial, Satan in
formal or semi-formal garb, the idea that it was easy for Satan
to obtain Judas's soul, and Pontius Pilate's disparagement of
the Jews.  (Defs.' 56.1 Stmt. ¶¶ 9-12, 14; Pl.'s 56.1 Stmt. ¶¶
9-12, 14.)[2]  The defendants also point to biblical sources for
some of the alleged similarities between their play and the
plaintiff's novel, including the content of Caiaphas's
testimony, the idea that Judas should quickly do what he needed
to do, that Judas despaired, that Judas was predestined to

---

[2] The plaintiff objects to the defendants' inclusion of materials outside the
complaint.  However, the Court is treating the motion as a motion for summary
judgment and can plainly consider the entire summary judgment record to
determine if there are genuinely disputed issues of material fact.  See,
e.g., Wright v. Brae Burn Country Club, Inc., No. 08 Civ. 3172, 2009 WL
725012, at *2 (S.D.N.Y. Mar. 20, 2009).  Therefore, this Court may consider
the materials submitted by the defendants outside of the complaint.

betray Jesus, and that he would have been better off if never born (Defs.' 56.1 Stmt. ¶¶ 13, 15-18; Pl.'s 56.1 Stmt. ¶¶ 13, 15-18.)  Furthermore, the defendants allege that the story of Judas is a stock biblical story depicted in numerous other creative works, although the plaintiff disputes that all of the analogous characters in the two works are dictated by the biblical story.  (Defs.' 56.1 Stmt. ¶ 20; Pl.'s 56.1 Stmt. ¶ 20.)

## E.

The defendants warned the plaintiff that pursuing the claims in this case was unjustified.  In a letter dated September 25, 2007, the plaintiff's former counsel notified the defendants that the plaintiff believed their play to be in violation of his copyright.  (Siegartel Decl. Ex. 13.)  In a series of letters and telephone conversations with the plaintiff's former counsel, counsel for the defendants expressed their view that the plaintiff had not stated a copyright claim and urged the plaintiff's former counsel to consult a copyright specialist.  (Siegartel Decl. Ex. 13; Pl.'s 56.1 Stmt. ¶ 21; Defs.' 56.1 Stmt. ¶ 21.)

On February 6, 2008, having obtained new counsel, the plaintiff filed this action against the defendants.  The

complaint alleges copyright infringement in violation of the
Copyright Act, 17 U.S.C. § 101 et seq. against defendant Stephen
Adly Guirgis, vicarious and contributory copyright infringement
under the Copyright Act against defendants Dramatists Play
Service, LAByrinth Theater Company, Faber and Faber, Inc., and
Philip Seymour Hoffman, and common law unfair competition
against all the defendants.  The plaintiff seeks both injunctive
relief and damages.

III.

     "To establish copyright infringement, 'two elements must be
proven:  (1) ownership of a valid copyright, and (2) copying of
constituent elements of the work that are original.'"  Williams
v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996) (citing Feist
Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361
(1991)); see also ABKCO Music, Inc. v. Stellar Records, Inc., 96
F.3d 60, 64 (2d Cir. 1996); Yurman Design, Inc. v. Golden
Treasure Imps., Inc., 275 F. Supp. 2d 506, 513 (S.D.N.Y. 2003).
The parties here do not dispute that the plaintiff has a valid
copyright for his novel.  Thus, the issue for summary judgment
is whether there remains a genuine issue of material fact
regarding the second element.

To prove the second element of a copyright claim, infringing copying, the plaintiff must demonstrate both that the defendants have actually copied his work, and that such copying was illegal because a "substantial similarity" exists between the allegedly infringing work (the defendants' play) and the protectible elements of the copyrighted work (the plaintiff's novel).  See Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1002 (2d Cir. 1995); see also Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 123 (2d Cir. 1994); Yurman Design, Inc., 275 F. Supp. 2d at 514, 516-17; Odegard, Inc. v. Costikyan Classic Carpets, Inc., 963 F. Supp. 1328, 1336 (S.D.N.Y. 1997).

In the absence of proof of direct copying, the "plaintiff may establish copying circumstantially by demonstrating [(i)] that the person who composed the defendant[s'] work had access to the copyrighted material and [(ii)] that there are similarities between the two works that are probative of copying."  Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003). [3]

---

[3] The probative and substantial similarity inquiries are distinct.  Thus, this opinion uses the term "probative similarity" for the sake of clarity to refer to the test for copying that requires access and similarity probative of copying.  See Blakeman v. The Walt Disney Co., 613 F. Supp. 2d 288, 304 (E.D.N.Y. 2009) ("In the context of deciding whether the defendant[s] copied at all (as distinguished from whether it illegally copied), similarity relates to the entire work, not just the protectible elements, and is often referred to as 'probative similarity.' (quoting Adams v. Warner Bros. Pictures Network, No. 05 Civ. 5211, 2007 WL 1959022, at *3 (E.D.N.Y. June 29, 2007))); Bus. Mgmt. Int'l, Inc. v. Labyrinth Bus. Solutions, LLC, No. 05 Civ.

On the issue of probative similarity, the Court asks
"whether an average lay observer would recognize the alleged
copy as having been appropriated from the copyrighted work."
Blakeman v. The Walt Disney Co., 613 F. Supp. 2d 288, 304
(E.D.N.Y. 2009) (quoting Warner Bros. v. Amer. Broad. Cos., 654
F.2d 204, 208 (2d Cir. 1981)).[4]  Similarities between the two
works are probative only if the similarities "would not be
expected to arise if the works had been created independently."
O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500,
517 (S.D.N.Y. 2008) (quoting Velez v. Sony Discos, No. 05 Civ.
0615, 2007 WL 120686, at *6 (S.D.N.Y. Jan. 16, 2007)).

In this case, the defendants deny that they copied the
plaintiff's work but their motion for summary judgment is not
based on the lack of copying.  Therefore, the issues of copying,
access, and probative similarity are not at issue on this
motion.  Rather, the defendants argue only that there is no

---

6738, 2009 WL 790048, at *7 n. 6 (S.D.N.Y. March 24, 2009) (Court of Appeals
for the Second Circuit uses term "probative similarity" when "referring
to the initial burden of proving copying by establishing access and/or
similarities" to avoid confusion resulting from two uses of the term
"substantial similarity" (quoting Repp v. Webber, 132 F.3d 882, 889 n. 1 (2d
Cir. 1997))).

[4] Under the probative similarity analysis used in this Circuit, the Court must
look at each work in its entirety, including protectible and unprotectible
elements.  See Bus. Mgmt. Int'l, 2009 WL 790048, at *7 ("In the context of
deciding whether the defendant[s] copied at all (as distinguished from
whether [they] illegally copied), 'similarity' relates to the entire work,
not just the protectible elements.") (quoting Fisher-Price, 25 F.3d at 123).
See also Blakeman, 613 F. Supp. 2d at 304 (test for probative similarity is
"less demanding" than substantial similarity test, requiring "only that the
works are similar enough to support an inference that the defendant[s] copied
the plaintiff's work") (quoting Eve of Milady v. Moonlight Design, Inc., 48
U.S.P.Q.2D 1809, 1812 (S.D.N.Y. 1998)).

substantial similarity between the defendants' play and the
protectible elements of the plaintiff's novel.

### A.

The test for "substantial similarity" is the "ordinary
observer test."  See Knitwaves, 71 F.3d at 1002; Fisher-Price,
25 F.3d at 123.  The ordinary observer test asks "whether the
ordinary observer, unless he set out to detect the disparities
[between the two works], would be disposed to overlook them, and
regard their aesthetic appeal as the same."  Folio Impressions,
Inc. v. Byer Cal., 937 F.2d 759, 765 (2d Cir. 1991) (internal
quotations and citations omitted); see also Knitwaves, 71 F.3d
at 1002; Yurman Design, Inc., 275 F. Supp. 2d at 516.  Under the
ordinary observer test, the Court "considers the themes,
characters, plots, settings, and total concept and feel of the
two works."  Crane v. Poetic Prods. Ltd., 549 F. Supp. 2d 566,
569 (S.D.N.Y. 2008) (citing Flaherty v. Filardi, 388 F. Supp. 2d
274, 287 (S.D.N.Y. 2005)).  "[D]issimilarity between some
aspects of the works will not automatically relieve the
infringer of liability, for 'no copier may defend the act of
plagiarism by pointing out how much of the copy he has not
pirated.'"  Williams, 84 F.3d at 588 (emphasis in original)
(quoting Rogers v. Koons, 960 F.2d 301, 308 (2d Cir. 1992)).

Nevertheless, differences between the two works are relevant to the question of substantial similarity because "numerous differences tend to undercut substantial similarity." Warner Bros., 720 F.2d at 241 (citation omitted); see also Mallery v. NBC Universal, Inc., No. 07 Civ. 2250, 2007 WL 4258196, at *8 (S.D.N.Y. Dec. 3, 2007) ("scattershot" listing of "several highly generalized similarities" between television series Heroes and plaintiffs' novel does not address the issue of "whether a lay observer would consider the works as a whole substantially similar). "It is only when the similarities between the protected elements of [the plaintiff's work] and the allegedly infringing work are of 'small import quantitatively or qualitatively' that the defendant[s] will be found innocent of infringement." Williams, 84 F.3d at 588, 590 (holding that novel Jurassic Park and children's book about dinosaur zoo are not substantially similar) (quoting Rogers, 960 F.2d at 308).

When a work contains both protectible and unprotectible elements, the inspection must be more discerning. See Knitwaves, 71 F.3d at 1002. The court "must attempt to extract the unprotectable elements from [its] consideration and ask whether the protectible elements, standing alone, are substantially similar." Id. (emphasis in original); see also Fisher-Price, 25 F.3d at 123. This more discerning test does not change the degree of similarity required, only what elements

of the works are being compared.  See Knitwaves, 71 F.3d at 1002-03; see also Fisher-Price, 25 F.3d at 123 ("Where as here, we compare products that have both protectible and unprotectible elements, we must exclude comparison of the unprotectible elements from our application of the ordinary observer test"); Folio, 937 F.2d at 766 ("[S]ince only some of the design enjoys copyright protection, the observer's inspection must be more discerning."); Yurman Design, Inc., 275 F. Supp. 2d at 516-17; Odegard, 963 F. Supp. at 1338.

Summary judgment is appropriate in copyright infringement cases when the protectible expression in parties' works is not substantially similar.  If the similarity between the two works "concerns only noncopyrightable elements" or "no reasonable trier of fact could find the works substantially similar", a Court may grant a motion for summary judgment.  Crane, 549 F. Supp. 2d at 569 (quoting Williams, 84 F.3d at 587); see also Warner Bros., 720 F.2d at 239-40 (while it is true that lack of substantial similarity must be "so clear as to fall outside the range of reasonably disputed fact questions requiring resolution by a jury," summary judgment is nevertheless appropriate when similarity concerns only non-copyrightable elements or when no reasonable jury could find substantial similarity); LaPine v. Seinfeld, No. 08 Civ. 128, 2009 WL 2902584, at *5 (S.D.N.Y. Sept. 10, 2009) (same).

To decide the issue of substantial similarity, this Court will first address each of the similarities the plaintiff alleges exists between the two works.[5]  Second, the Court will note the substantial differences alleged by the defendants.

**i.**

The plaintiff alleges the following similarities between his novel and the defendants' play:

1.  <u>Judas Standing Trial</u>

Both works are a fictional account of a modern trial of Judas Iscariot, ordered by God, to determine the fate of his soul.  (Pl.'s 56.1 Stmt. ¶ 25.1, 25.11; Defs.' 56.1 Stmt. ¶ 7-8.)  An idea, as opposed to the expression of an idea, is not protectible.  <u>See</u> 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea . . . .");  <u>see also</u> <u>New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.</u>, 497 F.3d 109, 116 (2d Cir. 2007) ("It has been long accepted that copyright protection does not extend to ideas; it protects only the means of expression employed by the author." (quoting <u>CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.</u>, 44 F.3d 61, 68 (2d Cir.

---

[5] The plaintiff has listed sixteen alleged similarities.  Many of the similarities are related, and the Court has grouped them together in the discussion below.  (<u>See</u> Pl.'s 56.1 Stmt. ¶ 25.)  Each of the alleged similarities is covered.

1994))).  The reason behind the idea/expression dichotomy is to

allow open public debate, essential to a free democratic

society.  New York Mercantile Exch., 497 F.3d at 116.

The distinction between an idea and the expression of an

idea is not a bright line, but rather is guided by the Judge

Learned Hand's principle:

> Upon any work, and especially upon a play, a great
> number of patterns of increasing generality will fit
> equally well, as more and more of the incident is left
> out.  The last may perhaps be no more than the most
> general statement of what the play is about, and at
> times might consist only of its title; but there is a
> point in this series of abstractions where they are no
> longer protected, since otherwise the playwright could
> prevent the use of his 'ideas,' to which, apart from
> their expression, his property is never extended.

Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir.

1930).  The "protection covers the 'pattern' of the work . . .

the sequence of events, and the development of the interplay of

characters."  Brown v. Perdue, No. 04 Civ. 7417, 2005 WL

1863673, at *6 (S.D.N.Y. Aug. 4, 2005), aff'd, 177 Fed. Appx.

121 (2d Cir. 2006) (alteration in original) (quoting Hogan v. DC

Comics, 48 F. Supp. 2d 298 (S.D.N.Y. 1999)).

In this case, "Judas standing trial" is an unprotectible

idea.  "Judas standing trial" is a highly general description

of both works, but does not cover the protectible expression in

each work.  In fact, the pattern of each work is quite distinct.

The events do not occur in the same sequence and the interplay

of the characters is quite different.  "Judas standing trial" is much like the "idea of a mystery thriller set against a religious backdrop" found to be unprotectible in a case involving Dan Brown's The Da Vinci Code.  Brown, 2005 WL 1863673, at *6 (emphasis in original).  Both are broad, highly generalized descriptions of the two works whose details and patterns turn out to be quite different from one another.[6]

Furthermore, the idea of "Judas standing trial" is not an original one.  The defendants identified two other depictions of a Judas trial.  (Siegartel Decl. Exs. 3-4.)  Looking beyond Judas Iscariot, there is a broader tradition of fictional trials of historical or famous figures, including Dr. Josef Mengele, Prime Minister Tony Blair, President George W. Bush, Nazi Dr. Ernst Janning, and even God Himself.  (Siegartel Decl. Ex. 5.)

A modern fictional account of a trial to determine the fate of Judas Iscariot's soul is an unprotectible idea, and therefore must be excluded under the substantial similarity analysis.

    2.  Satan

Both works include testimony from Satan that it was easy for him to obtain Judas's soul and that Judas was in "despair." (Pl.'s 56.1 Stmt. ¶ 25.4, 25.6; Defs.' 56.1 Stmt. ¶¶ 12, 17.) In the plaintiff's novel, Satan, says that Judas's soul was

---

[6] Nor does the inclusion of God ordering both trials render the works substantially similar.  Indeed, God is likely the only character who could order such an appeal.

"handed to [Satan] on a silver platter." (Siegartel Decl. Ex. 1A at 151.) In the defendants' play, Satan testifies that Judas "didn't require nudging. Judas was a gimme . . . ." (Siegartel Decl. Ex. 1E at 50.) In both, Satan is dressed in formal or semi-formal wear—a black tuxedo in the plaintiff's novel and a Gucci suit in the defendants' play. (Pl.'s 56.1 Stmt. ¶ 25.3; Defs.' 56.1 Stmt. ¶ 11.) Satan also ridicules the questioning lawyer in both works. (Pl.'s 56.1 Stmt. ¶ 25.5.)

Copyright protection does not extend to "scenes a faire, sequences of events that 'necessarily result from the choices of a setting or situation." Williams, 84 F.3d at 587 (citing Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir. 1986)). Similarly, historical events, facts, stock themes, and typically-portrayed characters receive no copyright protection. See Arden v. Columbia Pictures Indus., Inc., 908 F. Supp. 1248, 1259 (S.D.N.Y. 1995) (granting summary judgment in case alleging that the film Groundhog Day, depicting a man living the same day repeatedly, infringed copyright of a novel featuring same situation, because repetition is necessary element of the idea of a repeating day and therefore an unprotectible scene a faire). For example, in Walker unprotectible scenes a faire in a work of fiction about police in the Bronx included "drunks, prostitutes, vermin . . . derelict cars," "[f]oot chases . . . not to mention the familiar figure of the Irish cop." Williams,

26

84 F.3d at 588 (alteration in original) (quoting Walker, 784 F.2d at 50).  The Court must exclude such unprotectible elements from the substantial similarity analysis.  See Flaherty, 388 F. Supp. 2d at 287.

In this case, the alleged Satan similarities are unprotectible aspects of the plaintiff's novel.  The testimony of Satan, an obvious figure in any story about eternal damnation, necessarily results from an author's choice to depict a trial of Judas Iscariot.  As such, the inclusion of Satan's testimony in the plaintiff's novel is an unprotectible scene a faire.

The depiction of Satan in formal or semi-formal attire is a stock artistic device that is not original to the plaintiff's novel.  (See Siegartel Decl. Ex. 6 (at least fifteen examples of artistic works depicting Satan in formal or semi-formal wear).)  Furthermore, unlike the defendants' play, Satan does not exclusively appear in modern formal wear in the plaintiff's novel.  Satan also appears in a red toga and sandals with jewelry in the plaintiff's novel.  (Siegartel Decl. Ex. 1A at 146.)  The appearance of Satan in modern formal garb at one point in the plaintiff's novel is an unprotectible stock element.

That Satan mocks the questioning lawyer in each work is similarly unprotectible.  The idea that Satan, the Lord of Hell,

would mock someone must necessarily come from the choice of Satan as a character. It could hardly be expected that Satan would testify perfectly, and with a sanctimonious demeanor. Similarly, the idea that Satan found Judas's soul easy to obtain is an unprotectible and unoriginal stock theme.  Judas, widely reviled for his alleged betrayal of Jesus Christ for thirty pieces of silver, is surely an obvious candidate for the temptations of Lucifer.  Furthermore, the idea that Judas "despaired" is a well-established Biblical idea.  (See Reply Decl. of Adam D. Siegartel Exs. 2-3, Sept. 8, 2008 ("Siegartel Reply Decl."))  As such, these elements of Satan's testimony are unprotectible scenes a faire and must be excluded from this Court's substantial similarity analysis.

    3.   Caiaphas

    Caiaphas testifies at both trials that he feared Roman reprisals, that he did not approach Judas about betraying Jesus, and that Jesus had blasphemed. (Pl.'s 56.1 Stmt. ¶ 25.7-8, 25.12; Defs.' 56.1 Stmt. ¶ 13.)  Caiaphas is a biblical figure, and each of these claims are found in the Bible.  (See Siegartel Decl. Ex. 8.)  The Caiaphas similarities are unprotectible elements of the plaintiff's novel and thus must be excluded from the substantial similarity analysis.

    4.   Pontius Pilate

Pontius Pilate testifies at each trial and indicates that
he viewed Jesus as just "one more Jew" or "one less Jew."
(Pl.'s 56.1 Stmt. ¶ 25.10; Defs.' 56.1 Stmt. ¶ 14.)   Like
Caiaphas, Pontius Pilate is a stock biblical character who
necessarily arises in any retelling of the story of Judas.   The
antagonistic relationship between Pontius Pilate and the Jews is
also biblically grounded.   As such, the Pontius Pilate
similarities are unprotectible elements of the plaintiff's novel
and must be excluded from the substantial similarity analysis.

   5.   Peter

Peter recounts the Last Supper in both works and testifies
that Jesus told Judas to do quickly what he is going to do.
(Pl.'s 56.1 Stmt. ¶ 25.9; Defs.' 56.1 Stmt. ¶ 15.)   In the
plaintiff's novel, Peter says Jesus told Judas, "What thou hast
to do, do it quickly." (Siegartel Decl. Ex. 1A at 44.)   In the
defendants' play, Peter (also known as "Simon") states that
Jesus told Judas, "Do what you gotta do." (Siegartel Decl. Ex.
1E at 47.)   The character of Peter and the story of the Last
Supper are both stock biblical elements of the story of Judas.
Like some of the above alleged similarities, the "do it quickly"
idea is found in the Bible.  (See Siegartel Decl. Ex. 11.)

As the plaintiff points out in his opposition papers, both
works also depict a character who states that it would have been
better for Judas had he not been born.  (Pl.'s 56.1 Stmt. ¶

25.13; Defs.' 56.1 Stmt. ¶ 16.)  In the plaintiff's novel, Peter testifies, "The Master said to Judas, 'The Son of Man indeed goes His way, as it is written of Him, but woe to that man by whom the Son of Man is betrayed.  It is better for that man if he had not been born.'"  (Siegartel Decl. Ex. 1A at 43-4.)  In the defendants' play, Satan says, "I'd say that if this clown we're talking about betrayed the Messiah, that, probably, 'it would've been better for that man if he had never been born.'" (Siegartel Decl. Ex. 1E at 55 (emphasis in original).)  As the defendants correctly point out in their reply papers, this quotation is taken almost directly from the Gospel According to Mark and is not protectible expression by the plaintiff.  (See Siegartel Reply Decl. Ex. 1.)

The alleged Peter similarities are unprotectible elements of the plaintiff's novel and must be excluded from the substantial similarity analysis.

6.  Predestination and Forgiveness

Both works include some discussion of the possibility that Judas was predestined to betray Jesus, but this is plainly an unprotectible idea that warrants philosophical and theological discussion and not copyright protection.  (Pl.'s 56.1 Stmt. ¶ 25.14; Defs.' 56.1 Stmt. ¶ 18.)  The plaintiff claims that each work ends with Jesus forgiving Judas, although the defendants correctly dispute the plaintiff's simplistic characterization of

30

their play.  (Pl.'s 56.1 Stmt. ¶ 25.15-16.)  Toward the end of
the plaintiff's novel the judges' panel announces that they have
reached an evenly divided decision, and therefore Judas will be
placed in limbo.  Then Jesus enters and delivers a message of
forgiveness for Judas, who will be permitted to enter heaven.
The courtroom erupts in chaos just as the narrator, Michael
Sarto, wakes from his dream.  On the other hand, the ending of
the defendant's play reveals that the jury has found Judas
guilty.  The verdict is not central to the ending, however, and
does not even occur on stage.  Instead, the news is delivered to
Judas in his lair by the jury foreman just after Judas rejects
Jesus in a powerful confrontation.  The jury foreman delivers a
soliloquy telling the story of how he ended up unable to go to
heaven after committing adultery.  After the soliloquy, Jesus
washes Judas's feet as the lights fade.  It is readily apparent,
contrary to the plaintiff's argument, that the endings of the
two works are quite distinct.

Moreover, the themes of predestination and Jesus as
forgiver are stock themes in Christian theology.  (See Siegartel
Reply Decl. Ex. 3 (examples of the idea that Judas was
predestined).)  It would be remarkable, and certainly
unjustified, to find that the plaintiff could copyright the
concept of Jesus as forgiver.

The standard themes of the predestination of Judas and Jesus as forgiver are unprotectible elements of the plaintiff's novel and cannot be considered by this Court under the substantial similarity analysis.

**ii.**

While the differences between the works are not dispositive, "numerous differences tend to undercut substantial similarity." Warner Bros, 720 F.2d at 241. The defendants point to the following differences between their play and the plaintiff's novel, and these differences are indisputably found in the two works:

1.   Narrative and Story Structure

The two works have wholly different narrative structures. The plaintiff's novel features a first-person narrator and the story is told in a straight-forward chronological fashion.  The novel is repetitive, frequently reciting the mundane details of the characters' daily lives.

The defendants' play, on the other hand, has no narrator and does not follow a linear structure.  Instead, the play includes flashbacks, apparitions, and other episodes that break up the trial scenes.  The play omits the everyday details of the characters' lives.

2.   <u>Setting</u>

The plaintiff's novel occurs in modern-day New York City, with the trial being held at the federal courthouse in Foley Square, apparently in the courtroom used by the Court of Appeals at 40 Foley Square before its closing for renovation.  Other scenes occur in the narrator's home, on the way into or out of the courthouse, and in front of St. Patrick's Cathedral.

The defendants' play, on the other hand, does not take place on Earth.  Rather, the trial primarily occurs in Hope, within Purgatory, with other scenes in additional fictional or unspecified locations.

3.   <u>Plot</u>

The plaintiff's novel includes a narrator, an anchorman who is the target of some of the violence surrounding the Judas trial, and includes scenes of the narrator with his wife.  The trial in the novel has a six-judge panel and an analyst panel composed of Aristotle, Martin Luther, and Thomas Moore who occasionally comment for the reporter's newscast.  The judges, lawyers, and analysts are well-known historical and religious figures.

The defendants' play, however, does not have a narrator, does not feature violence surrounding the trial, and does not contain any of the characters who make up the judges, lawyers, and analyst panel in the plaintiff's novel.  Instead, the play

33

has fictional lawyers and a single fictional judge, but no analyst panel.

While the parties dispute the meaning of the ending of the defendants' play, several differences are clear.  The plaintiff's novel contains a twist—revealing that the entire story was merely the narrator's dream—that is not found in the defendants' play and the jubilation of Judas upon his learning that he will go to heaven.  The ending of the plaintiff's novel focuses on the verdict.  The ending of the defendants' play, however, does not depict the actual verdict and instead focuses on Judas with Jesus and the reflection of the jury foreman.  Judas is in a catatonic state in hell at the conclusion of the defendants' play and not jubilantly on his way to heaven, as in the plaintiff's novel.

### 4. <u>Language</u>

The two works use entirely distinct syntax and word choice.  The plaintiff's novel is told in polite and pedestrian language.  For example, the novel frequently tells the reader that the "spectators gasped."  (Siegartel Decl. Ex. 1A at 44, 78.)  During a funeral, the narrator remarks on "grown men and women actually shedding tears."  (Siegartel Decl. Ex. 1A at 176.)

The defendants' play, on the other hand, is told in often crass or profane language, in distinct dialects, or in humorous exchanges.  For example, in a flashback Pontius Pilate tells

Judas that "[w]e ain't tryin' to lay down no heavy charge on
that Nazareth boy—we just gonna beat down his ass a little . . .
ain't like we lookin' to crucify the mutha . . . !"  (Siegartel
Decl. Ex. 1E at 81-82.)  Mother Teresa, who wears a hearing
device, on the question of whether Judas is in hell, comments
that "we can't never know for sure, but it doan look good."
(Siegartel Decl. Ex. 1E at 37.)

     5.   <u>Theme</u>

     The theme of the plaintiff's novel is predestination.  The
trial focuses on the question of whether Judas was predestined
to betray Jesus and, if he was, whether he should be allowed
into heaven for fulfilling his role in redemption.

     The defendants' play, however, focuses on the idea that
Judas is in despair.  Mother Teresa and Satan both testify that
Judas's real problem is despair.  (Siegartel Decl. Ex. 1E at 38-
39, 99.)  The jury foreman's closing monologue is an analogy for
Judas's inability to accept Jesus's love. (Siegartel Decl. Ex.
1E at 107-11.)

     6.   <u>Characters</u>

     The plaintiff is correct that there are a number of
characters shared by both works, including Judas, Satan, Peter,
Caiaphas, and Pontius Pilate.  However, as discussed above, all
of these characters are dictated by the choice to tell a story
about Judas and his alleged betrayal of Jesus.

There are also a number of characters in each work that are not found in the other. In the plaintiff's novel, these include the narrator Michael Sarto and his wife, policemen who are assigned to protect Sarto, and the historical figures comprising the judges, lawyers, and analyst panel.[7] The characters in the novel are rarely well-developed.  In the defendants' play, characters include several historical witnesses—including Sigmund Freud and Mother Teresa—the fictional judge, lawyers, and jury foreman, Judas Iscariot's mother, and several religious figures such as Saint Monica.  The characters are presented very differently in the defendants' play.

7.   Overall Thrust, Mood, and Feel

The substantial similarity test is "guided by comparing the total concept and feel of the contested works." LaPine, 2009 WL 2902584, at *6, *11 (internal quotation omitted) (finding two cookbooks designed to help parents trick their children into eating healthy food not substantially similar in total concept and feel).  The overall feel of both works is so distinct that an ordinary observer would not regard the defendants' play as substantially similar to the plaintiff's novel.  One particularly striking point that underscores the substantially

---

[7] The plaintiff argues that the use of historical figures in itself is another similarity between his novel and the defendants' play.  However, apart from figures necessarily dictated by the nature of the Judas story, these characters are not the same.  The idea of including a historical figure is not itself protectible.

different feel between the two works is the differences between
the endings of the works.  The plaintiff's novel ends in a
predictable, straight-forward manner.  The reader is told the
outcome of the trial, Jesus miraculously intervenes on Judas's
behalf, and the narrator then wakes up from his dream.  The
novel's ending is entirely within the character of the rest of
the work.  The defendants' play, on the other hand, ends in an
entirely different and very powerful manner.  The jury's verdict
is not at all central; in fact, it is not even shown on stage.
Instead, after Jesus tells Judas that Judas has always been with
Jesus, the jury foreman informs Judas that he was convicted,
almost as an aside.  The foreman then delivers a powerful
monologue describing how he is not in heaven because of his
adulterous affairs and then Jesus washes Judas's feet.  Both
endings certainly impact the overall feel an observer would take
away from each work.

### iii.

It is apparent that none of the alleged similarities the
plaintiff addresses can be considered by this Court under the
substantial similarity analysis.  Furthermore, the differences
between the plaintiff's novel and the defendants' play are clear
and pervasive.  When the unprotectible elements are removed, no

reasonable observer could regard these works as substantially similar. It is notable that over the course of a 111-page play and a 305-page book, the plaintiff is unable to point to any similarity of expression that is protectible. As a matter of law, no ordinary observer would regard these works as substantially similar. Therefore, the defendants' motion for summary judgment dismissing the copyright infringement claim is granted.

## IV.

The complaint also alleges claims for vicarious and contributory copyright infringement under 17 U.S.C. § 101 et seq. and common law unfair competition.

The defendants correctly argue that there can be no vicarious or contributory copyright infringement because there is no copyright infringement. See Faulkner v. Nat'l Geographic Enters. Inc., 409 F.3d 26, 40 (2d Cir. 2005) ("[T]here can be no contributory [copyright] infringement absent actual infringement."); Ariel(UK) Ltd. v. Reuters Group PLC, No. Civ. 9646, 2006 WL 3161467, at *10 (S.D.N.Y. Oct. 31, 2006) ("If the direct [copyright] infringement claim is dismissed, the vicarious claim . . . must also be dismissed."); Pavlica v. Behr, 397 F. Supp. 2d 519, 528 (S.D.N.Y. 2005) ("To be found

liable for contributory infringement, there must be a primary
infringer."). The plaintiff does not respond to this argument.
Because this Court has granted summary judgment in favor of the
defendants on the underlying direct copyright infringement
claim, summary judgment is likewise granted on the claim for
vicarious and contributory infringement.

The plaintiff's final claim is for common law unfair
competition. The defendants argue that this claim is preempted
by § 301 of the Copyright Act, 17 U.S.C. § 301, because the
claim of unfair competition is based on the same alleged copying
underlying the copyright claim. A state law claim is preempted
by § 301(a) of the Copyright Act if the following two elements
are satisfied: "(1) the particular work to which the claim is
being applied falls within the type of works protected by the
Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim
seeks to vindicate legal or equitable rights that are equivalent
to one of the bundle of exclusive rights already protected by
copyright law under 17 U.S.C. § 106." Myrieckes v. Woods, No.
08 Civ. 4297, 2009 WL 884561, at *4 (S.D.N.Y. Mar. 31, 2009)
(finding New York unfair competition claim preempted by federal
copyright law) (quoting Briarpatch Ltd., L.P. v. Phoenix
Pictures, Inc., 373 F.3d 296, 305-06 (2d Cir. 2004)). Here, the
plaintiff's novel is within the scope of the Copyright Act and
the unfair competition claim aims to vindicate the same rights

as the plaintiff's copyright infringement claim.  The plaintiff does not dispute this argument.  Therefore, the common law unfair competition claim is dismissed as preempted.


                                V.


     The defendants also move for an award of costs and attorneys' fees under 17 U.S.C. § 505.  A court may award costs to any party (other than the United States), and attorneys' fees to a prevailing party in a copyright action.  See 17 U.S.C. § 505.  Attorneys' fees are "not to be awarded automatically to a prevailing party . . . but 'only as a matter of the court's discretion.'"  Knitwaves, 71 F.3d at 1011 (quoting Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 (1994)).  In determining whether such an award is appropriate, the court should consider "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence," so long as these factors further the purposes of the Copyright Act.  Fogerty, 510 U.S. at 534 n. 19 (internal citations and quotations omitted); see also Knitwaves, 71 F.3d at 1011-12.

                                40

Having weighed the Fogerty factors, the Court finds that an award of reasonable costs and attorneys' fees is appropriate in this case.  While a finding of bad faith is not required for an award of costs and attorneys fees under § 505, see Screenlife Establishment v. Tower Video, Inc., 868 F. Supp. 47, 52 (S.D.N.Y. 1994), there are indicia of bad faith here.  The plaintiff's first counsel was warned, before any action had been filed, that there was no colorable copyright infringement claim. (Siegartel Decl. Ex. 13; Pl.'s 56.1 Stmt. ¶ 21; Defs.' 56.1 Stmt. ¶ 21.)  The plaintiff nevertheless persisted in obtaining new counsel and filing his complaint.  Furthermore, this case has the hallmarks of an abusive lawsuit.  The complaint is directed against an award-winning play and author, and a well-known director (who is also an Academy Award-winning actor). The suit was brought several years after the production of the play.  The plaintiff failed to defend the claims of unfair competition, and vicarious and contributory infringement. Furthermore, many of the similarities the plaintiff alleges come directly from the Bible, and therefore clearly cannot be protectible elements of the plaintiff's novel.

Even if there is no bad faith here, an award of costs and attorneys' fees is appropriate under § 505 when the plaintiff's claim is objectively unreasonable.  See Diplomatic Man, Inc. v. Nike, Inc., No. 08 Civ. 139, 2009 WL 935674, at *3 (S.D.N.Y.

Apr. 7, 2009) ("[O]bjective unreasonableness of a party's claims or defenses is sufficient to subject a party to an award of attorney's fees under § 505 without regard to any other equitable factor." (internal quotations omitted) (quoting Crown Awards, Inc. v. Discount Trophy & Co., 564 F. Supp. 2d 290, 294 (S.D.N.Y. 2008)).  A copyright infringement claim is "objectively unreasonable when the claim is clearly without merit or otherwise patently devoid of a legal or factual basis." Diplomatic Man, 2009 WL 935674, at *3 (quoting Contractual Obligation Prods., LLC v. AMC Networks, Inc., 546 F. Supp. 2d 120, 125 (S.D.N.Y. 2008)).

The plaintiff's copyright infringement claim in this case is objectively unreasonable.  All of the similarities alleged by the plaintiff are unprotectible elements of his novel that must necessarily be excluded from a substantial similarity analysis. Many of them involve historical or Biblical figures that are clearly dictated by the choice to tell the Judas story.  Various similar statements made by witnesses at the trials in both works are taken from the Biblical account of the betrayal of Jesus. For example, "[W]oe to that one by whom the Son of Man is betrayed!  It would have been better for that one not to have been born" is from Mark 14:17-21.  (See Siegartel Reply Decl. Ex. 1.)  Such elements are clearly unprotectible under copyright law.

In a recent case in this District, attorneys' fees were
awarded when the plaintiff's copyright infringement claims were
"wholly without merit, as nearly every instance of alleged
similarity between [the defendants' work] and the plaintiff['s]
work relates to unprotectible ideas rather than protectible
expression" and the "total concept and feel" of the works were
"profoundly different."  Mallery v. NBC Universal, Inc., No. 07
Civ. 2250, 2008 WL 719218, at * 1 (S.D.N.Y. Mar. 18, 2008)
(finding the television series Heroes, depicting ordinary people
who discover that they possess special powers, did not infringe
the plaintiffs' copyright in their novel The Twins:  Journey of
the Soul and related short film and paintings, a fictional
account of two twins with various powers including the ability
to predict the future).  When the plaintiff cannot point to a
single similarity that relates to a protectible element of his
novel, his claim of copyright infringement is objectively
unreasonable.

Furthermore, the goals of compensation and deterrence are
met by an award of reasonable costs and attorneys' fees in this
case. In Mallery, an award of attorneys' fees advanced both
compensation and deterrence as "failing to award attorney's fees
to defendants . . . would invite others to bring similarly
unreasonable actions without fear of any consequences." Id. at
*2 (alterations in original) (quoting Earth Flag Ltd. v. Alamo

43

Flag Co., 154 F. Supp. 2d 663, 668 (S.D.N.Y. 2001)).  When a
plaintiff cannot demonstrate a single similarity among the
protectible elements of his work and the defendants' work, it is
appropriate to award attorneys' fees so as to compensate the
defendants for their costs in litigating this matter, and to
deter future potential plaintiffs from filing objectively
unreasonable claims.

        An award of costs and attorneys' fees is consistent here
with the goals of the Copyright Act.  The primary purpose of the
Copyright Act is to "encourage the origination of creative works
by attaching enforceable property rights to them."  Matthew
Bender & Co. v. West Publ'g. Co., 240 F.3d 116, 122 (2d Cir.
2001) (quoting Diamond v. Am-Law Publ'g Corp., 745 F.2d 142, 147
(2d Cir. 1984)).  Because attorneys' fees awards are limited to
objectively unreasonable cases, they do not aim to deter
plaintiffs with reasonable claims from asserting their rights in
court.  Furthermore, an award here will help deter future
objectively unreasonable lawsuits.

        For the above reasons, the defendants' motion for
reasonable costs and attorneys' fees pursuant to 17 U.S.C. § 505
is granted.  At oral argument defense counsel indicated that the
amount of attorneys' fees they are seeking is approximately
$10,000, although what amount would be reasonable has not been
fully briefed.  Under Federal Rule of Civil Procedure

54(d)(2)(C), this Court can determine a party's liability for
attorney's fees before the parties make their submissions on the
issue of what amount would be "reasonable" under 17 U.S.C. §
505.

## CONCLUSION

For the reasons stated above, the defendants' motion for
summary judgment is **granted** in full.  The defendants' motion for
reasonable costs and attorneys' fees under § 505 is also
**granted**.  The clerk is directed to enter judgment dismissing the
complaint.  The amount of attorneys' fees will determined after
judgment is entered.  The defendants should submit an
appropriate post-judgment motion pursuant to Rule 54(d)(2)(B).
The Clerk is directed to close Docket No. 17.

SO ORDERED.

Dated:     New York, New York
           September 26, 2009

John G. Koeltl
United States District Judge

45